1          UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF WISCONSIN

3  ----------------------------------------------------------------

4  UNITED STATES OF AMERICA,           )
                                       )
5                  Plaintiff,          )     Case No. CR 11-135
                                       )     Milwaukee, Wisconsin
6      vs.                             )
                                       )     August 9, 2012
7  ARVIND AHUJA,                       )     9:00 a.m.
                                       )
8                  Defendant.          )

9  ----------------------------------------------------------------

10         **TRANSCRIPT OF MOTION HEARING (VOLUME 1)**
         BEFORE THE HONORABLE CHARLES N. CLEVERT, JR.
11            UNITED STATES CHIEF DISTRICT JUDGE

12  APPEARANCES:

13  For the Plaintiff
    UNITED STATES OF AMERICA:     Office of the US Attorney
14                                By: TRACY M. JOHNSON
                                  517 E Wisconsin Ave - Rm. 530
15                                Milwaukee, WI 53202
                                  Ph: 414-297-1580
16                                Fax: 414-297-4394
                                  tracy.johnson@usdoj.gov
17  )
                                  United States Department of
18                                Justice DC
                                  By: JOHN E. SULLIVAN
19                                    MELISSA S. SISKIND
                                  Tax Division - Ben Franklin
20                                Station - PO Box 972
                                  Washington, DC 20044
21                                Ph: 202-514-5196
                                  Fax: 202-616-1786
22                                john.e.sullivan@usdoj.gov
                                  melissa.s.siskind@usdoj.gov
23

    U.S. Official Reporter:       JOHN T. SCHINDHELM, RMR, CRR,
24                                johns54@sbcglobal.net

25  Proceedings recorded by computerized stenography,
    transcript produced by computer aided transcription.

1

```
 1   APPEARANCES CONT'D:

 2   For the Defendant          Friebert, Finerty & St. John SC
     ARVIND AHUJA:              By: SHANNON A. ALLEN
 3   (Present)                  Two Plaza East - Ste 1250 - 330 E
                                Kilbourn Ave
 4                              Milwaukee , WI 53202
                                Ph: 414-271-0130
 5                              Fax: 414-272-8191
                                rhf@ffsj.com
 6                              saa@ffsj.com

 7                              Winston & Strawn LLP
                                By: DAN K. WEBB
 8                                  THOMAS L. KIRSCH II
                                35 W Wacker Dr
 9                              Chicago , IL 60601-9703
                                Ph: 312-558-5600
10                              Fax: 312-558-5700
                                dwebb@winston.com
11                              tkirsch@winston.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          P R O C E E D I N G S (9:49 a.m.)

2        THE CLERK:  Case No. 2011-CR-135, United States of

3   America vs. Arvind Ahuja.  This matter is before the court for a

4   motions hearing.  May we have the appearances, please?

09:49   5        MS. JOHNSON:  Good morning, Your Honor.  Tracy

6   Johnson.  And with me at counsel table I have Attorney Melissa

7   Siskind and John Sullivan from the United States Department of

8   Justice, Tax Division, as well as Special Agent Geoffrey Cook of

9   IRS out of D.C.

09:50  10       THE COURT:  Good morning to each of you.

11        MR. WEBB:  Your Honor, Dan Webb on behalf of the

12   defendant Arvind Ahuja.  Present in court with me at counsel

13   table is Dr. Ahuja sitting next to me, Tom Kirsch, and also

14   Shannon Allen.  We're all at counsel table.

09:50  15       THE COURT:  Greetings to you as well.  Are the parties

16   prepared to proceed?

17        MS. SISKIND:  Yes, Your Honor.

18        THE COURT:  All right, we will start with the

19   government.

09:50  20       MS. SISKIND:  Thank you, Your Honor.  On the phone we

21   have Vandana Katju who will be testifying as a witness regarding

22   the admissibility of documents.

23        THE COURT:  All right.  Is the witness on the phone?

24        THE WITNESS:  Yes, I am.

09:50  25       THE COURT:  Would you swear her in, please.

1    THE CLERK:  Do you solemnly swear or affirm under

2  penalty of perjury that the testimony you are about to give will

3  be the truth, the whole truth and nothing but the truth?

4    THE WITNESS:  I do.

5    THE CLERK:  Please state your full name for the record

6  and spell your names.

7    THE WITNESS:  Vandana Katju.  V-A-N-D-A-N-A.  My last

8  name Katju, K-A-T-J-U.

9    MS. SISKIND:  You may proceed.

10    VANDANA KATJU, GOVERNMENT WITNESS, DULY SWORN

11    DIRECT EXAMINATION

12  BY MS. SISKIND:

13  Q.  Thank you, Ms. Katju.  This is Melissa Siskind, we spoke on

14  the phone yesterday.

15  A.  Hi, also.

16  Q.  Thank you for agreeing to testify on the telephone today.  I

17  just wanted to let you know that everything you say today is

18  being taken down by a court reporter, so it's very important for

19  you to speak very slowly and clearly so that he can take

20  everything down.  Do you understand?

21  A.  Yes.

22  Q.  Can you start off just by telling the court where are you

23  from originally?

24  A.  India.

25  Q.  And how long have you been in the United States?

1   A.  About six years.

2   Q.  Where do you work right now?

3   A.  HSBC.

4   Q.  In what -- did you say you work at HSBC?

09:52   5   A.  I work with HSBC, California, USA.

6   Q.  And you just said in California?

7   A.  I did.

8   Q.  What job do you do for the bank right now?

9   A.  I'm a branch manager.

09:52   10  Q.  In what branch?

11  A.  The Montgomery Street branch, in San Francisco.

12  Q.  Can you repeat the name of the branch?

13  A.  Montgomery Street.  San Francisco.

14  Q.  Montgomery Street?

09:52   15  A.  That's right.

16  Q.  How long have you worked at the Montgomery Street branch for

17  HSBC?

18  A.  About seven months now.

19  Q.  Was that seven months, Ms. Katju?

09:52   20  A.  Yes.  About seven months.

21  Q.  Was there a time when you worked in an HSBC-India

22  representative office in Fremont, California?

23  A.  I did.

24  Q.  Approximately during what time period were you working in

09:53   25  the representative office in Fremont, California?

1  A.  I started working in 2007, and I was there until they

2  closed.

3  Q.  And approximately what year did it close?

4  A.  I think it closed in 2009.  It could have closed in 2010

09:53  5  also.  I'm sorry, I don't --

6  Q.  Prior to working in the HSBC-India representative office in

7  Fremont, California, did you also work in the representative

8  office in New York City?

9  A.  I did.

09:53  10  Q.  During approximately what time period did you work in that

11  office?

12  A.  From March 2006 to (Indiscernible) 2007.

13  Q.  And prior to coming to the New York representative office in

14  March 2006, where did you work?

09:53  15  A.  I worked in HSBC-India (Indiscernible).

16  Q.  Can you repeat your answer, please?

17  A.  I worked at HSBC-India.

18  Q.  And was that in New Delhi, India?

19  A.  (Indiscernible).

09:54  20  Q.  Can you repeat your response, please?

21  A.  I said I was both in New Dehli (Indiscernible) for a short

22  period I worked in Mumbai.

23  Q.  You primarily worked in New Dehli but you also worked in

24  Mumbai.

09:54  25  A.  Yes.

1    MR. KIRSCH:  I'm understanding part of it, but I'm not

2  the one that's taking it down and transcribing it.  So I'm

3  concerned, Your Honor, there are going to be gaps in the

4  transcript.  I'm not the court reporter so I can't speak

5  definitively on that.

6    THE REPORTER:  I'm speaking up when I can't understand

7  something.

8    THE COURT:  He's not shy.  If he doesn't understand

9  he'll let us know.  Go ahead.

09:54  10  BY MS. SISKIND:

11  Q.  Now, Ms. Katju, when you were working in the representative

12  office in New York, what was your job title?

13  A.  I was an AVP relationship manager.

14  Q.  A what kind of a relationship manager?

09:55  15  A.  Assistant vice-president and relationship manager.  An NRI

16  Services Relationship Manager.

17  Q.  And what are the duties of an NRI Services Relationship

18  Manager?

19  A.  To manage the NRI clients of HSBC-India and to answer any

09:55  20  questions of any prospective clients of HSBC-India.

21  Q.  And when you say NRI, does that stand for "non-resident

22  Indian"?

23  A.  It does.

24  Q.  And does that refer to clients of the bank who are of Indian

09:55  25  descent living in this case in the United States?

7

1    A.   That's right.   They could live anywhere in the world but

2    they're here in the United States.

3              THE REPORTER:   Repeat that, please.

4              THE WITNESS:   They could live anywhere in the world

5    but they're here in the United States.

6    BY MS. SISKIND:

7    Q.   Now, when you were providing services for existing NRI

8    clients, what types of services did you provide for them?

9    A.   Any banking  (Indiscernible) -- so if they wanted to get

10   some information about their accounts, if they wanted to do some

11   regular maintenance on their accounts.   Any information that you

12   would get if you walk into a branch in the U.S. we could provide

13   that (Indiscernible).   Such as the checkbook, the balances.

14   Q.   Can you repeat that, please?

15   A.   Any service that you would require, that you could get if

16   you walk into a branch.   For instance, if you wanted to audit a

17   checkbook for your NRI account, you wanted to get a debit card,

18   you wanted to get Internet banking, if you wanted to find out

19   something about your account such as your account balances, or

20   your interest rate.   Any of those services, we could provide it.

21   Q.   When you were providing services for clients did you

22   correspond with those clients by e-mail?

23   A.   Yes.   (Indiscernible) -- would correspond via e-mail.

24   Q.   And was the use of e-mail to correspond with clients a

25   regular part of your duties as a relationship manager?

8

1    A.  Yes.

2    Q.  Would you also as relationship manager contact HSBC bankers

3    in other parts of the world on your clients' behalf?

4    A.  Yes.

09:57  5  Q.  Would that include bankers in India?

6    A.  Yes.

7    Q.  When you contacted bankers in India on your client's behalf,

8    would that be done sometimes by e-mail?

9    A.  That's right.

09:57  10  Q.  Would it be fair to say that e-mail was the preferred method

11   of contacting India?

12   A.  Yes.

13   Q.  And why is that?

14   A.  Because of the time difference.

09:58  15  Q.  And how about when you were contacting relationship managers

16   in other countries, would you also use e-mail to correspond with

17   those individuals?

18   A.  Yes.

19   Q.  And was that for the same reason, that there were time

09:58  20  differences between New York and branches in other parts of the

21   world?

22   A.  Yes.

23   Q.  When you would e-mail with your clients or with other HSBC

24   bankers, were those e-mails business related?

09:58  25  A.  For the most part, yes.

1   Q.  And would you ever e-mail with other employees within the

2   representative office?

3   A.  Yes.

4   Q.  What kinds of e-mails would those be?

09:58   5   A.  (Indiscernible).

6   Q.  I'm sorry, can you repeat your answer?

7   A.  If we want to share information with each other or some work

8   that you wanted to get done and you weren't able to do it.

9   Q.  Now, are you familiar with the HSBC-India computer system

09:59   10   called HUB, H-U-B?

11   A.  Yes.

12   Q.  Is that the system -- well, what is your familiarity with

13   that system?  What is it used for?

14   A.  If you walked into a branch and had a question the

09:59   15   services -- (Indiscernible) the -- to provide the information

16   it's how to get the information about -- (Indiscernible).

17   Q.  Okay.  I'm just going to need you to slow down when you give

18   your answer.  You were talking a little too fast for the court

19   reporter to understand you.

09:59   20   A.  I'll repeat that.  So if you walk into an HSBC branch this

21   is the computer system that the employee customer services

22   person would look at to provide your information to you.  So

23   these -- (Indiscernible) we can look at the HUB system and

24   provide the information to the customer.

10:00   25   Q.  Did you say these are customer inquiry screens?

10

1    A.   Yeah.  You could call them customer inquiry screens also.

2    Q.   Is this the system that HSBC-India would use to generate

3    bank statements?

4    A.   I think so.

5    Q.   Was this a system that you used when you were working for

6    the bank in India?

7    A.   Yes.

8    Q.   Was it a system that you relied upon in the course of your

9    regular duties at the bank in India?

10   A.   Yes.

11   Q.   Are you familiar generally with the different types of

12   information you can gather from this system?

13   A.   Sometimes -- (Indiscernible) I'm sort of familiar.

14        THE REPORTER:  Repeat that answer, please.

15   BY MS. SISKIND:

16   Q.   We couldn't hear your answer.  Could you repeat what you

17   said whether you were generally familiar with the types --

18   A.   I'm generally familiar but it's been some time now.  I'm

19   generally familiar with them.  (Indiscernible).

20   Q.   Now, when you were working in the representative office in

21   New York did you have access, direct access to this computer

22   system?

23   A.   No.

24   Q.   Did any HSBC employees in the United States have direct

25   access to this computer system?

1    A.   No.

2    Q.   If you as a relationship manager in New York needed

3    information from this system, what did you do?

4    A.   We would -- if it were a simple inquiry such as can I check

5    my account balance, we would call the call center, the 24-hour

6    call center the agency has established, and get that simple

7    answer.  But if it was a more complicated inquiry then I would

8    contact -- [Indiscernible].

9    Q.   You really need to slow down.  We're trying to have you

10   testify on the phone so you don't have to come down here, but

11   it's very hard to understand when you're speaking quickly.

12          So if you could explain again what were the

13   circumstances under which you would have them send you a print

14   screen as opposed to giving you information over the phone.

15   A.   Okay.  So if it was a simple inquiry, say of just the

16   customer's balance in his account, then we could call the

17   24-hour help line number and get that information over the

18   phone.  But if it was a more complicated inquiry which had more

19   details associated with it, then we would get a screen shot or a

20   print of the customer's screen, the HUB screen, from which we

21   could then get that information.  Could you hear me this time?

22   Q.   Yes.  How would you request the print screen?  Would you do

23   that by phone or by e-mail or both?

24   A.   Generally by e-mail, sometimes by phone.

25   Q.   And then once you requested that, how did you receive the

12

1    print screen from India?

2    A.  Almost always -- [Indiscernible] via e-mail.

3    Q.  Can you repeat that, please?

4    A.  As far as I remember, via e-mail.  Almost always by e-mail.

5    Q.  And once you received the print screen by e-mail what did

6    you do with it?

7    A.  We took whatever information we required from those images

8    and I provide that information to the client.

9    Q.  And how would you provide that information to the client?

10   A.  We could put it into a spreadsheet to the client or any

11   format the client would like.

12   Q.  Was there a particular reason why you would first receive

13   the screen shot and then provide information to the client as

14   opposed to India giving information directly to the client?

15   A.  Sometimes -- we have quite a few accounts, so

16   [Indiscernible] quite a lot of information about each of these

17   CDs.  [Indiscernible] And we wanted to actually see the CD

18   inquiry screen ourselves [Indiscernible] to make sure that we

19   are providing the information -- we are providing absolutely

20   accurate information.  We didn't want to rely on the junior

21   staff [Indiscernible] to make a mistake.  (Indiscernible).

22   Q.  It was a little difficult to understand some parts of that.

23   Can you explain again why you would get the information and give

24   it to the client instead of HSBC-India giving it directly to the

25   client?  And just try to speak as slowly and clearly as

13

1    possible.

2    A.    Okay.   Sometimes a client have quite a few CDs with us.   For

3    example, a client has 20 CDs with us.   And if we -- we would

4    prefer that HSBC-India send those screens -- the image of the

5    screens to us.   We could extract the information directly from

6    those screens as the client wanted.   We wanted to make sure that

7    there was no error in the information that would apply to the

8    client, so we wanted to see those screens ourselves because we

9    did not want to make an error [Indiscernible].

10   Q.   And the screen shots, we've seen some --

11        THE COURT:   One second.   She wanted to make sure that

12   there was no error; what did you say after you said "no error"?

13        THE WITNESS:   Yes.

14        THE COURT:   You wanted to make sure of what?

15        THE WITNESS:   I wanted to make sure there was no error

16   in the information that was supplied by HSBC-India because

17   usually the folks that would be supplying this information would

18   be junior people and we wanted to make sure, you know, that

19   there was no error in the information that was supplied to us.

20        THE COURT:   Go ahead.

21   BY MS. SISKIND:

22   Q.   Did you indicate that this was particularly important for

23   your high net worth clients?

24   A.   Yes.

25   Q.   Now, the court has seen and the parties have seen some

14

1  different types of screen shots in this case, some are called

2  J92 or J93, can you explain generally why there are different

3  codes for these screen shots?

4  A.  [Indiscernible] as an example if you want to be -- of all

5  the CDs (Indiscernible).

6  Q.  Ms. Katju, I need to stop you.  The court reporter couldn't

7  understand what you just said.  Can you start again, explaining

8  the difference between the different types of screen shots.

9  A.  Yes.  (Indiscernible) represents the kind of inquiry that

10  you're making.  So the inquiry (Indiscernible).

11  Q.  Would it be fair to say that there are different codes for

12  different types of inquiries that you might make from the HUB

13  system?

14  A.  That's right.

15  Q.  So, for example, if you wanted to know deposits, that might

16  be one code.

17  A.  That's right.

18  Q.  But balances might be a different code.

19  A.  Yes, that's right.

20  Q.  And J92 and J93 are examples of different types of screen

21  shots.

22  A.  That's right.

23         MS. SISKIND:  We have no further questions,

24  Your Honor.

25         THE COURT:  One second.

1        MR. KIRSCH:  Cross-examination, Your Honor?  I

2   couldn't hear you.

3        THE COURT:  Stop, please.  Let's go off the record.

4        (Discussion off the record.)

10:10  5        THE COURT:  We're going to take a short break.  We ask

6   that the witness remain available next to the phone.  We're

7   going to try a different setup and see whether or not we can

8   clarify matters a bit.  All right?  We'll take a short break.

9        THE BAILIFF:  All rise.

10:10  10        (Recess taken at 10:10 a.m., until 10:22 a.m.)

11        THE COURT:  Would the reporter please read back the

12   last question.

13        (Record read.)

14        THE COURT:  Okay.  One second.

10:23  15        (Brief pause.)

16        THE COURT:  You may proceed.

17        MS. SISKIND:  Your Honor, we have no further

18   questions.

19        MR. KIRSCH:  Thank you, Your Honor.

10:23  20                    CROSS-EXAMINATION

21   BY MR. KIRSCH:

22   Q.  Ms. Katju, can you hear me okay on the telephone?  Hello?

23   A.  Hello.

24   Q.  Can you hear me okay on the telephone?

10:24  25   A.  Yes, I can.

1    Q.   Okay.  My name is Tom Kirsch, and I represent Dr. Arvind

2    Ahuja.  I'm going to be asking --

3             Should I speak into that phone?

4             MR. RIEDIJK:  You can, or if you can just speak

5    louder.

6             MR. KIRSCH:  Well, I can just move.  Do you want me to

7    --

8             MR. RIEDIJK:  Yeah, that's fine.

9    BY MR. KIRSCH:

10   Q.   Okay, Ms. Katju, can you hear me better now?

11   A.   Yes, much better.

12   Q.   Okay.  I have some -- my name is Tom Kirsch, I started to

13   tell you I represent Dr. Arvind Ahuja in this case, and I have

14   some questions for you regarding the testimony that you just

15   gave and an interview statement that you gave yesterday to the

16   prosecutors that were on the phone today and also to Special

17   Agent Geoffrey Cook of the IRS, okay?

18   A.   Okay.

19   Q.   Now, Ms. Katju, you have never met Dr. Ahuja; is that

20   correct?

21   A.   That's correct.

22   Q.   You've never had a telephone conversation with him; that's

23   correct?

24   A.   Correct.

25   Q.   He's never authorized you in any way to speak or make any

17

1  statements on his behalf; that's correct, isn't it?

2  A.  Correct, absolutely.

3  Q.  Now, Ms. Katju, in this case the government has marked

4  numerous documents that it wants to admit as exhibits.  You've

5  not seen any of those documents, have you?

6  A.  No, I don't think so.

7  Q.  So the e-mails that are at issue in this case that we're

8  going to be talking about here, you've never seen those

9  e-mails -- I'm sorry -- you've never seen those e-mails, have

10  you?

11  A.  I seen some e-mails, a sample, I think, that HSBC-USA's

12  lawyers showed me.

13  Q.  The HSBC, would that have been yesterday?

14  A.  I saw some a few days back.

15  Q.  Okay.  And were these -- who were these e-mails to and who

16  were they from?

17  A.  They were e-mail exchanges between HSBC-India and HSBC

18  representative office.  I think most of the e-mails were just

19  e-mail exchanges between the two of them and e-mails sent to

20  Dr. Ahuja from the representative office.

21  Q.  Do you remember whether those e-mails were marked with a

22  particular exhibit sticker?

23  A.  (No response.)

24  Q.  We're at somewhat of a disadvantage because I can't show you

25  anything over the phone.  So I'm trying to get what you recall

18

1    about those particulars.  I can't show you any of the

2    government's exhibits over the phone.

3    A.  I understand.

4    Q.  So do you remember specifically to whom those e-mails were

10:27    5    sent and who they were from?  Other than just HSBC?

6    A.  They were e-mail exchanges between Priti Dhanani,

7    (Indiscernible), HSBC-India, and Dr. Ahuja.  What I remember.

8    Q.  Do you know Dr. Ahuja's e-mail address?

9    A.  I do not.

10:27    10    Q.  So were you told they were e-mail exchanges between these

11    HSBC bankers and Dr. Ahuja?

12    A.  No, I just -- no one told me anything.  I just read the

13    e-mail, you know, that this was addressed to Dr. Ahuja,

14    addressing Dr. Ahuja.

10:27    15    Q.  Okay, but you don't know if they were -- so she would write

16    Dr. Ahuja in the e-mail.

17    A.  Yes.  Yes.

18    Q.  Do you know when the e-mails were sent?

19    A.  I don't remember now.

10:28    20    Q.  And what was the subject of the e-mails that were sent that

21    you reviewed?

22    A.  I saw a very small sample, and they mostly had to do with

23    fixed deposits in India, that's what I remember.  I could be

24    wrong.  And I didn't actually review it in great detail so --

10:28    25    Q.  Do you remember -- do you remember the timeframe or the

19

1   dates generally when these e-mails were sent?

2   A.  From 2007 to -- no.  The answer is no.

3   Q.  So it sounds like you're just trying to -- it sounds like

4   you're just kind of guessing from the best that you can recall

5   at what you looked at --

6   A.  That's right.  I just browsed through it.  I didn't go into

7   any great detail.

8   Q.  All right.  So you just browsed through them, you haven't

9   looked at them in any detail.  So if I were to ask you

10  specific -- I mean, I don't know what you saw so I really can't

11  ask you specific questions about them, but it sounds like even

12  if I could you wouldn't be able to remember the specifics

13  anyway; is that right?

14  A.  That's right.  But yesterday I saw the screen and -- I think

15  some screen shots I saw yesterday.

16  Q.  You're talking about screen shots and I'm going to come to

17  that in a minute.

18  A.  Okay.

19  Q.  Okay?  But you're talking about something different than

20  these e-mail communications, right?

21  A.  Sure, sure.  Absolutely.

22  Q.  Now, I think you testified on direct examination -- and, by

23  the way, you do recall giving a statement yesterday over the

24  phone to the prosecutors and to the IRS agent, right?

25  A.  Yes.

20

1   Q.   Okay.  Now, you testified I think on direct examination that

2   HSBC-India maintained a 24-hour call center; is that correct?

3   A.   That's right.

4   Q.   And you had the option of calling the 24-hour call center in

5   India if you needed assistance with one of your customer's

6   inquiries, correct?

7   A.   Correct.

8   Q.   You testified I think on direct examination that if it was

9   more complicated, if there was a more complicated inquiry and it

10  wasn't a simple inquiry, you would generally request that

11  information by e-mail, correct?

12  A.   Yes.

13  Q.   But you were the one that independently decided whether it

14  was a simple inquiry or a complicated inquiry, correct?

15  A.   If there is -- if the client required something documented,

16  then it had to go to HSBC-India because we couldn't provide that

17  document to the client and the call center obviously couldn't do

18  it either.  So it had to go to HSBC-India, not by our choice but

19  by the nature of the inquiry.

20       If it was more of a verbal question, you know, if it

21  was a more complicated verbal inquiry for which, you know, we

22  wanted to make sure that the information supplied to the client

23  was absolutely accurate, then, yes, the decision, we would make

24  the decision.

25  Q.   So you individually would make the decision as to whether or

 1  not you were gonna pick up the phone and call the call center or

 2  whether you were going to just shoot an e-mail over to

 3  HSBC-India; is that correct?

 4  A.  Yes.

 5  Q.  There was no --

 6  A.  Under the circumstances I described to you.

 7  Q.  Right.  Right.  Under the circumstances that you sort of

 8  applied on a case-by-case basis, correct?

 9  A.  Right.  If the client wanted something documented we had to

10  reach out to HSBC-India.  If the client wasn't necessarily

11  interested in it being documented but the inquiry was

12  complicated, then we refer to HSBC-India.

13  Q.  Right.  But you would agree with me that HSBC did not have

14  any particular policy that required you to send inquiries to

15  HSBC-India by e-mail, right?

16  A.  That's right.  Yes.

17  Q.  You would independently make the decision and you would

18  decide whether to call the call center or to send an e-mail.

19  A.  That's true.  It was not a policy, it was a practice.

20  Q.  It was your practice, correct?

21  A.  The practice of the representative office.

22  Q.  But the practice of the representatives in the office was

23  determined -- your practice might be a little bit different than

24  the practice of the person sitting next to you, right?  I mean,

25  in other words, that person sitting next to you may prefer to

22

1   use the call center where you prefer to use e-mail on a more

2   frequent basis as a matter of convenience, correct?

3   A.  (No response.)

4   Q.  Does that make sense?

5   A.  It makes sense.  It's possible.

6   Q.  Do you remember -- you remember yesterday when you gave a

7   statement to Special Agent Cook of the IRS, do you remember

8   telling him that it was preferable to use e-mail to contact

9   individuals in India due to the time differences —  I take it

10  between the United States and India — and for convenience

11  reasons; do you remember saying that yesterday?

12  A.  Yeah.

13  Q.  And that's accurate, right?

14  A.  Sorry?

15  Q.  That is accurate, correct?  What you told Agent Cook

16  yesterday is accurate?

17  A.  Yeah.  Yeah.  Yes.

18  Q.  And also you would agree with me that when you spoke with

19  your clients or your customers at HSBC, sometimes you would use

20  the telephone and sometimes you would send an e-mail, correct?

21  A.  That's right, yes.

22  Q.  And do you remember telling Agent Cook that you -- you

23  basically considered the information and then you made a

24  decision whichever method was more convenient would use; do you

25  remember that?

1    A.  Yes.

2    Q.  And also, you would make a decision based on whether or not

3    the client preferred one method or another, right?

4    A.  Yes.

5    Q.  So, again, there was no policy at HSBC that would require

6    you to reach out to a client via e-mail or by telephone.  You

7    made decisions yourself on a case-by-case basis, correct?

8    A.  Correct.

9    Q.  Now, I want to go back just for a minute to the e-mails that

10   the government marked in this case as exhibits.  Now, I take it

11   since you haven't -- you don't know what those e-mails are.  I

12   take it you would agree with me that you could not testify that

13   there are policies at HSBC --

14          THE COURT:  One second.

15          MR. KIRSCH:  I'm sorry, Your Honor.

16          THE COURT:  I want to get this addressed at the outset

17   and before the trial begins.  I will bar the parties from asking

18   witnesses whether or not the witnesses agree with counsel.

19   That's inappropriate because, in essence, counsel is indirectly

20   testifying.  Therefore, frame your question differently and in

21   the future as this case proceeds do not ask any question of a

22   witness which includes the statement as to whether or not they

23   agree with counsel.  Proceed.

24          MR. KIRSCH:  Yes, Your Honor.

25   BY MR. KIRSCH:

24

1    Q.  So I'm going to restate the question, Ms. Katju.  There is

2    -- I asked you some questions about the e-mails that the

3    government has marked as exhibits in this case, but --

4    A.  That's right.

5    Q.  -- but I take it you've not reviewed the particular

6    information that's contained within those exhibits because you

7    don't know exactly what they are, correct?

8    A.  Right.  Correct.

9    Q.  So you can't testify to whether or not there's a policy of

10   HSBC that requires its employees to send that particular type of

11   information by e-mail, correct?

12   A.  Correct.

13   Q.  If you just bear with me for one minute, I want to go

14   through my notes.  I have some questions for you about the

15   screen shots but I want to make sure that I've asked you all my

16   questions about the e-mail.

17            (Counsel peruses documents.)

18   BY MR. KIRSCH:

19   Q.  Okay.  Let me ask you some questions now, Ms. Katju, about

20   the screen shots that you testified to.

21   A.  Okay.

22   Q.  And this information contained in the screen shots comes

23   from a HUB, H-U-B computer system; is that correct?

24   A.  That's right.

25   Q.  Now, I think you testified on direct examination that you

25

1   did not have direct access to this computer system, correct?

2   A.  Yes.

3   Q.  And you told -- do you remember telling Agent Cook yesterday

4   that you don't know how data was input into this system?

5   A.  That's right.

6   Q.  When you requested information from India, I think you

7   testified that you had to rely on somebody in India to pull up

8   the information; is that correct?

9   A.  Yes.

10  Q.  And I think you explained on direct examination, but you can

11  correct me if I'm wrong, I think you explained on direct

12  examination that before -- that HSBC-India bankers did not

13  respond directly to customers of HSBC because you, who were more

14  experienced at HSBC-NRI Services in the United States, wanted to

15  make sure that the information was accurate before it was

16  provided to the customer, correct?

17  A.  I did not say it like that.  So -- I did not say that

18  HSBC-India doesn't -- cannot correspond or would not correspond

19  with the client.  What we spoke about was why we would get this

20  screen from HSBC-India, and I said we'd get these screens

21  because we -- some of these clients had multiple CDs and

22  complicated accounts with us, and they wanted to make sure that

23  we were looking at the screen and giving them accurate

24  information.

25  Q.  Right.

A.  So, but if they wanted to they could directly correspond

with HSBC and there was nothing stopping them from doing that.

Q.  Okay, thank you for that clarification.  I understand now.

They could reach out to HSBC-India directly if they wanted to,

right?

A.  That's right.

Q.  But when they reached out to you and asked you a question,

you wanted to see the information that HSBC-India was providing

to make sure that the customer's question was being addressed,

correct?

A.  That -- we wanted to see the screens themselves directly to

make sure that we were capturing the information that they

wanted correctly.

Q.  Right, that it captures the information that the customer

requested, correct?

A.  Correct.

Q.  But you could not independently verify the accuracy of the

information contained on the screen shot because you didn't have

access to the computer, right?

A.  We did not have access to the HUB system.

Q.  You also I think told Agent Cook yesterday that the screen

shots could be confusing to interpret and to understand, so

sometimes you would have to look at them and then interpret them

for the client; is that fair to say?

A.  We were speaking about already we would give the screen

1    shots directly to the client, and I said the normal practice was

2    that we would not give it directly to the client because it was

3    confusing to interpret for the client, so on and so forth.  And

4    we would provide the information from the screen shots to the

5    client.

6    Q.  I think I'm about done, but I have one other question for

7    you.  You testified on direct examination that the e-mails that

8    you exchanged with HSBC bankers were for the most part work

9    related; do you recall that?

10   A.  Yes.

11   Q.  And I -- well, I think -- well, did you say that they were

12   for the most part work related because you would occasionally

13   exchange and send personal e-mails back and forth between some

14   of your friends that you worked with at HSBC-India -- or even

15   HSBC-United States?

16   A.  Yeah, sure.

17              MR. KIRSCH:  Your Honor, could I just have one minute?

18              THE COURT:  Certainly.

19              (Defense counsel confer.)

20              MR. KIRSCH:  Thanks.

21   BY MR. KIRSCH:

22   Q.  Ms. Katju, I just have one more question for you.  When you

23   were provided a screen shot or information from HSBC-India that

24   you reviewed before it was sent to the client, you had no way to

25   independently verify the accuracy gained in that information you

28

1    received from HSBC-India; is that correct?

2    A.  They were screen shots from the HUB system which was the

3    system -- the main inquiry system for all HSBC transactions of

4    HSBC clients.  So I don't understand your question.

10:43    5    Q.  Okay.  You testified that you did not have access to the

6    system, correct?

7    A.  No.  I did not have.  Are you saying I couldn't -- sorry,

8    what are you asking me?

9    Q.  Well, here, I'll just break it down a little bit.  You

10:43    10    didn't have access to the HUB system, correct?

11    A.  Correct.

12    Q.  And you didn't input information into the HUB system,

13    correct?

14    A.  Correct.

10:43    15    Q.  And when you received information from representatives in

16    HSBC-India, you had to rely upon the information that they

17    provided you.  You had no independent or other computer system

18    that you could use to verify the accuracy of the information

19    that was sent to you, correct?

10:44    20    A.  Correct.  But --

21            MR. KIRSCH:  Your Honor, I have no further questions.

22            THE WITNESS:  -- there is no other system in India.

23    That's the only system.

24            MR. KIRSCH:  The HUB system.

10:44    25            THE WITNESS:  That could verify the accuracy of the

1    full system.  As far as I know --

2            MR. KIRSCH:  Your Honor, I have no further questions

3    of Ms. Katju.  Your Honor, I have no further questions.

4            THE COURT:  Ms. Siskind?

5            MS. SISKIND:  Thank you, Your Honor.

6                    REDIRECT EXAMINATION

7    BY MS. SISKIND:

8    Q.  Ms. Katju, Mr. Kirsch was asking you if you had reviewed

9    some e-mails earlier this week; do you remember that?

10   A.  Can I -- I can't really hear you.  Could you come closer to

11   the phone?

12   Q.  Yes.  Ms. Katju, Mr. Kirsch was asking you if you had

13   reviewed some e-mails; were those e-mails shown to you by

14   lawyers for the bank?

15   A.  Yes.

16   Q.  And when we spoke on the phone yesterday and you spoke with

17   me and my colleagues from the government, we did not ask you to

18   look at any e-mails.

19   A.  That's right.

20   Q.  And we were asking you generally about the practices of the

21   representative office and not about any particular transactions;

22   is that correct?

23   A.  Correct, absolutely.

24   Q.  Now, the HUB system, was that something you personally used

25   when you worked for the bank in India?

30

1    A.  I did.

2    Q.  When you were working in India did you rely on the entries

3    in that system in conducting your work at HSBC?

4    A.  Yes.

5    Q.  Did you ever have any reason to doubt the reliability of

6    that system?

7    A.  No.

8    Q.  And when you were working in the United States and you were

9    using screen shots that came from that system, did you ever have

10   any reason to doubt the reliability of those screen shots?

11   A.  No.

12   Q.  And would it be fair to say that -- did you rely on those

13   screen shots when working as a relationship manager in New York?

14   A.  Yes.

15            MS. SISKIND:  No further questions.

16            THE COURT:  Rebuttal?

17            MR. KIRSCH:  No, Your Honor.  I have no further

18   questions.

19            THE COURT:  There are no further questions of the

20   witness, therefore, the witness is excused.  Thank you very much

21   for your testimony.

22            THE WITNESS:  Thank you.

23            THE COURT:  Have a good day.  Even though your day got

24   started a little earlier than usual.

25            You may disconnect the call.

31

1      There's an additional party?

2           MR. SULLIVAN:  There is an attorney on.

3           THE COURT:  Oh, there's an additional party still on

4      the line?  I assume there was no testimony you wished to get

5      from that attorney.

6           MR. SULLIVAN:  No.

7           THE COURT:  I understand there's an additional

8      witness?

9           MS. SISKIND:  Yes, Your Honor.

10          THE COURT:  Let's have that witness testify and then

11     we'll go back and argue.

12          MS. SISKIND:  Yes, Your Honor.

13          THE COURT:  Let me also put the parties on notice.

14     You are not to ask any witness whether or not it is fair to say

15     anything.  What is fair is relative.  And you are in effect

16     asking a witness for an opinion, which is not necessarily

17     appropriate.

18          Proceed.

19          THE CLERK:  Please raise your right hand.

20       SCOTT MACIEJEWSKI, GOVERNMENT WITNESS, DULY SWORN

21          THE CLERK:  Please state your full name for the record

22     and spell your name.

23          THE WITNESS:  Scott Maciejewski.  My first name is

24     spelled S-C-O-T-T.  My last name is spelled

25     M-A-C-I-E-J-E-W-S-K-I.

1        THE CLERK:  Thank you.

2                 DIRECT EXAMINATION

3    BY MS. SISKIND:

4    Q.  Can you tell the court what you do for a living?

5    A.  I manage the subpoena compliance area for HSBC Bank in the

6    Legal Paper Processing Department.

7    Q.  And where is that based out of?

8    A.  Buffalo, New York.

9    Q.  What are your duties in that role?

10   A.  We receive legal requests for records such as subpoenas or

11   authorizations, and the team that I manage goes out and requests

12   documents using various methods and provides the records to the

13   requesting party.

14   Q.  Did you prepare a 902(11) records certification in this

15   case?

16   A.  Yes, I did.

17   Q.  What did you do prior to preparing that certification?

18   A.  I was provided with records that were retrieved through

19   various means within HSBC Bank-USA, and I reviewed the records

20   and once I determined that the records were HSBC Bank-USA

21   documents I signed the certification.

22   Q.  And is the attachment A that follows your certification, is

23   that a list of the records you reviewed in preparing that

24   certification?

25   A.  Yes, they are.

1    Q.  Can you tell the court where the various places that those

2    records were maintained?

3    A.  We have computer servers that hold e-mails.  We also have a

4    shared directory which is basically a server where people can

5    save records to a shared directory for access within their

6    department, or from their own computers, as well as side files

7    or hardcopies that are kept on location or at archives.

8    Q.  So were the e-mail records, the records from the shared

9    drive and the hardcopy documents all maintained in the United

10   States by HSBC?

11   A.  Yes, they were.

12   Q.  And are all the records that are the subject of your

13   certification, were they produced to the government by HSBC

14   pursuant to one or more subpoenas?

15   A.  Yes, they were.

16   Q.  Does the bank have any policies relating to the retention of

17   e-mails?

18   A.  Yes, we do.

19   Q.  What is your understanding of that policy?

20   A.  My understanding is that no later than January 1st, 2006,

21   100 percent of the e-mails that come through the server,

22   in-going and outgoing, are retained.

23   Q.  Are they retained indefinitely, to your knowledge?

24   A.  To my knowledge they are.

25   Q.  Are you familiar with documents that have been commonly

1    referred to as screen shots?

2    A.  Yes.

3    Q.  Do you know whether those screen shots were maintained in

4    some form in HSBC offices here in the United States?

10:50  5    A.  That is my understanding, yes.

6    Q.  What is your understanding of what types of forms those

7    records were maintained in?

8    A.  My understanding is that they were retained either as

9    attachments in e-mails and possibly saved to the shared drive

10:50  10   after that, as well as printed out hardcopies.

11   Q.  Are you familiar with whether HSBC-India maintained one or

12   more representative offices in the United States?

13   A.  Yes.

14   Q.  Do you know whether employees who worked in HSBC-India

10:51  15   representative office were subject to the same policies and

16   procedures as other HSBC employees working in this country?

17   A.  My understanding is that they were.

18   Q.  And in preparation for your testimony today did you review a

19   Lotus Notes mail policy that the bank has?

10:51  20   A.  Yes, I did.

21   Q.  And is that, in fact, a policy you have signed working for

22   the bank here in this country?

23   A.  Yes, it is.

24   Q.  Is it your -- what is your understanding about whether that

10:51  25   Lotus Notes mail policy applied to HSBC-India employees working

35

1    in the representative office in New York?

2    A.   It's my understanding that since they have HSBC Bank-USA

3    e-mail addresses that they are bound to those policies.

4    Q.   So that policy, would that apply to anybody with an HSBC-USA

5    e-mail address?

6    A.   Yes.

7    Q.   Have you also reviewed in preparation for your testimony

8    today a policy entitled, "HSBC-North America e-mail policy"?

9    A.   Yes.

10   Q.   What is your understanding about whether that policy applied

11   to employees in HSBC-India's representative office?

12   A.   It is my understanding that it is applicable to them as

13   well.

14           MS. SISKIND:  No further questions, Your Honor.

15           THE COURT:  Cross?

16           MR. KIRSCH:  Yes, Your Honor.  Your Honor, I'd like to

17   show the witness some documents.  Can I approach the podium?

18   Should I do cross from the podium or would you rather have me do

19   it from here?

20           THE COURT:  The podium is fine.  During the trial I do

21   prefer use of the podium.

22           MR. KIRSCH:  Yes, Your Honor.

23           And also, Your Honor, I don't know if the Elmo is

24   turned on.  I would like the court to see some of these

25   documents but --

36

1        THE COURT:  I can turn it on.

2        MR. KIRSCH:  Okay.

3                    CROSS-EXAMINATION

4    BY MR. KIRSCH:

5    Q.  Good afternoon, sir.

6    A.  Hello.

7    Q.  Or good morning, I should say.  Sir, you're employed, is it

8    correct -- I think you testified on direct examination that

9    you're employed by HSBC Bank-USA?

10   A.  Yes.

11   Q.  And I think you testified that you're familiar with the

12   e-mail policies; is that correct?

13   A.  That's correct.

14   Q.  Sir, before you came in to testify today, did you review the

15   e-mails that the government has marked as exhibits in this case?

16   A.  Yes, I did.

17   Q.  And you testified that those e-mails were maintained on

18   HSBC's server, correct?

19   A.  Correct.

20   Q.  There's no dispute about that, but did you review the

21   content of those e-mails?

22   A.  No, I did not.

23   Q.  So you didn't look at what the banker was -- or what one

24   banker was sending to another banker; is that fair to say?

25   A.  Yes.

1       MR. KIRSCH:  Your Honor, I -- if I make a mistake on a

2   question, please just --

3       THE COURT:  Just proceed.

4   BY MR. KIRSCH:

5   Q.  Sir, you did not review these e-mails to determine whether

6   or not the content of the e-mail was required by an HSBC policy;

7   is that correct?

8   A.  Was I required?

9   Q.  Correct.

10  A.  I'm not sure what you mean.

11  Q.  Well, in other words, if you didn't look at the e-mail to

12  determine whether the information contained in one particular

13  e-mail was required to be documented or sent by e-mail by an

14  HSBC policy, correct?

15  A.  Well, I can't speak to the requirements of what someone

16  e-mails.  I mean, in my position I'm not required to e-mail one

17  thing over another.  What I did review on the documents was the

18  e-mail address, and I saw the H-plus e-mail address which means

19  that it was held on the HSBC Bank-USA server.

20      MR. KIRSCH:  Your Honor, can I put a an e-mail on

21  the --

22      THE COURT:  You may.

23      MR. KIRSCH:  Thank you.

24  BY MR. KIRSCH:

25  Q.  Sir, I think this is going to come up on the screen in front

38

1    of you.  Do you see that?

2    A.  Yes.

3    Q.  Just so you can see.  Can you see that?  This has been

4    marked as Government Exhibit 50, and you can see the HSBC-NRI

5    stamp on the bottom?

6    A.  Yes.

7    Q.  Okay.  Sir, when you reviewed this e-mail you testified you

8    looked at the header of the e-mail to see who the e-mail was

9    from; is that correct?

10   A.  Yes.

11   Q.  And to see who it was to, correct?

12   A.  Correct.

13   Q.  And you testified on your direct examination that this

14   e-mail was maintained on the HSBC server, correct?

15   A.  Correct.

16   Q.  But you can't testify today that the content of this e-mail

17   was required by HSBC policy, correct?

18   A.  No, I cannot.

19   Q.  It could have been -- it could have been the case that the

20   sender of this e-mail may have just picked up the phone and

21   asked for this information by telephone, correct?

22   A.  I couldn't speak to that.  I don't know.

23   Q.  Well, you're not aware of any -- if that was the case,

24   you're not aware of any policy or HSBC policy that would have

25   been -- that would have prohibited that or would have been

1    violated had this person Ankush Tandon just picked up the phone

2    and called Priti Dhanani and asked for this information over the

3    phone; is that right?

4    A.   I really can't speak to what a policy is for another

5    department.  Can you maybe clarify the question?

6    Q.   Well, sure.  You just don't know what the policy is, right?

7    A.   I don't know what the requirements would be for providing

8    these records.

9    Q.   So you can't testify that Ankush Tandon was required to

10   request this information by e-mail.

11   A.   I cannot.

12   Q.   I take it, sir -- I don't want to go through all these

13   e-mails.  I take it, sir, that would be the same -- your

14   testimony would be the same with respect to the other e-mails

15   that you certified in this case with respect to their content;

16   is that accurate?

17   A.   That's correct.

18            MR. KIRSCH:  Your Honor, can I just have one moment?

19            (Defense counsel confer.)

20   BY MR. KIRSCH:

21   Q.   If you look at that e-mail right there.  You notice it

22   doesn't have -- on the header it doesn't say the e-mail

23   addresses, it just says the name.

24   A.   I see that.

25   Q.   Can you just tell us how it was that you were able to verify

40

1  that that e-mail was on the HSBC server?

2  A.  Yeah, from my understanding when e-mails are searched, when

3  we get a subpoena the request is made through our IT department

4  and they only search the H-plus server and respond with

5  documents that are found on the H-plus server for e-mails.

6  Q.  But can you testify today under oath that that particular

7  e-mail is found and maintained on the HSBC server, or do you not

8  know that?

9  A.  If it was provided with the records it was maintained on the

10  HSBC Bank-USA server.

11  Q.  But you don't have any personal knowledge of that.  In other

12  words, you didn't go back and actually look at the e-mail and

13  make sure that it was maintained on the HSBC server, correct?

14  A.  I don't have access to the server to do that.  The records

15  were provided by the IT person after a search of the HSBC

16  server.  This was one of the e-mails that was provided with it.

17  So my understanding is that it was on the HSBC server based on

18  the fact that they don't have the authorization or the ability

19  to search foreign servers, they only can search the HSBC

20  Bank-USA server.

21  Q.  So somebody else told you that this e-mail was provided by

22  HSBC to the government.

23  A.  Our IT department.

24  Q.  But your IT department told you that this particular e-mail

25  was provided by HSBC to the government?

1    A.   No, not directly.  Our IT department conducted the search

2    and provided the records.

3    Q.   I'm just trying to get to what your personal knowledge is,

4    not to what the knowledge of your IT department is.  As you sit

5    here today, can you testify under oath that this particular

6    document that you're looking at is maintained and kept on HSBC's

7    server?

8    A.   I can testify that the search was conducted on the HSBC

9    server and this was one of the records that was returned.

10   Q.   But you didn't conduct the search, right?

11   A.   I did not, no.

12   Q.   And you only know that this was one of the documents that

13   was returned because somebody told you that, right?

14   A.   Correct.

15   Q.   You didn't do it yourself.

16   A.   No.

17   Q.   Okay.

18        I think that's all the questions I have, Your Honor.

19   May I approach and get the document?

20        THE COURT:  You may.

21        MR. KIRSCH:  And I have no further questions,

22   Your Honor

23        MS. SISKIND:  Your Honor, may I briefly inquire?

24        THE COURT:  Absolutely.

25                    REDIRECT EXAMINATION

42

1   BY MS. SISKIND:

2   Q.  Sir, the process you just described whereby the IT

3   department does the search and then your office provides a

4   certification, is that how things generally work when you're

5   responding to a subpoena or providing certification?

6   A.  Yes.

7   Q.  So it's never the case where you're the one doing the

8   search; is that correct?

9   A.  Not for e-mails, no.

10  Q.  Are you at all familiar with the Bates numbers that appear

11  in the lower right-hand corner of documents that you are asked

12  to certify?

13  A.  Yes.

14  Q.  What is your understanding if a Bates number begins HSBC-NRI

15  and then a number, what is your understanding of where that

16  document would have been maintained?

17  A.  HSBC Bank-USA.

18          MS. SISKIND:  Nothing further, Your Honor.

19          THE COURT:  You may step down.  Thank you very much.

20          (Witness excused at 11:01 a.m.)

21          THE COURT:  Is there any further need for the witness

22  today?

23          MS. SISKIND:  No, the witness may be excused,

24  Your Honor.

25          THE COURT:  All right.  Thank you.

1    All right.  Let's go back to the beginning.

2  Government may be heard.

3    MS. SISKIND:  Would you prefer I approach the podium,

4  Your Honor?

5    THE COURT:  Either way.

6    MS. SISKIND:  I'll stand here, Your Honor.

7    I first ask Your Honor how you prefer to proceed.

8  There are several categories of documents that are now at issue.

9  It might make sense to go on a category-by-category basis to

10  address them or however --

11    THE COURT:  I would prefer a category-by-category

12  basis, and then if there is any subset argument that needs to be

13  addressed we will go into that.  But let's deal with the

14  categories first.

15    MS. SISKIND:  Thank you, Your Honor.

16    The first large category of documents are e-mails

17  authored by HSBC employees, particularly employees in the

18  representative office in New York, namely, Priti Dhanani and

19  Ankush Tandon.  The government is offering their statements in

20  these e-mails pursuant to Rule 801(d)(2)(C) under the theory

21  that they are authorized statements.

22    The government's theory of admissibility is that when

23  the defendant opened bank accounts at HSBC, he established a

24  relationship with the bank whereby bankers were authorized to

25  make statements on his behalf to carry out financial

1    transactions that he wanted to take place.

2         So, for example, if the banker is calling over to

3    India and requesting a debit card, that is a statement they're

4    authorized to make because the defendant has opened an account

5    with this bank and, in doing so, has authorized bankers to carry

6    out his banking related wishes.

7         The fact that these statements are authorized is also

8    bolstered by the fact that several of the e-mails are forwards,

9    I mean, they're letters or e-mails written by the defendant.

10   So, for example, there are e-mails that the defendant wrote to

11   Ankush Tandon I believe on two occasions requesting that the

12   credit limit associated with an HSBC-Jersey account be

13   increased.  You can see in the e-mail chain that Ankush Tandon

14   then forwarded the defendant's request --

15        THE COURT:  What's the exhibit number?

16        MS. SISKIND:  If you look at -- Exhibits 21 and 22 are

17   those two particular examples.

18        THE COURT:  Let me see if I can get the exhibits in

19   here.

20        (Brief pause.)

21        THE COURT:  All right.  I'm looking at 21.  Go ahead.

22        MS. SISKIND:  If you look at 21 and you turn to the

23   third page, Your Honor will see that there's an e-mail from the

24   defendant and you can tell it's from the defendant both because

25   of the e-mail address, aahuja3803@aol.com, and the fact that it

45

1    is signed "thanks, AA."

2         THE COURT:  Let me interrupt to inquire of the defense

3    as to whether or not there is any disagreement with the

4    government's statement that the e-mail address shown on page 3

5    at the top, with the numbers 3803 -- with the number 3803, is

6    the defendant's e-mail address.

7         MR. KIRSCH:  Yes, Your Honor, that was a shared e-mail

8    address.

9         THE COURT:  All right.  Go ahead.

10        MS. SISKIND:  So, Your Honor, here we have the

11   defendant sending an e-mail to his banker, or one of his bankers

12   Ankush Tandon who was in the representative office in New York,

13   and requesting that Mr. Tandon increase the credit limit and pay

14   his credit card bill.  The rest of the e-mail chain is Ankush

15   Tandon taking that e-mail, forwarding it along to the

16   appropriate employee.  In this case it was someone associated

17   with HSBC in the Bailiwick of Jersey because this particular

18   credit card was associated with that account.

19        Mr. Tandon forwards along that request.  And if you

20   look at the next e-mail in the chain, which is at the bottom of

21   page 2, he says, "As per the enclosed e-mail from the customer,

22   they have utilized their limit on the credit card.  They would

23   like the outstanding amount on the credit card to be paid off

24   from their current account."

25        So an e-mail of this type, for example, it's clear

1  from the e-mail chain itself that the communication from the

2  banker has been authorized by the defendant.  He went to his

3  banker, made a service related inquiry, and the banker then took

4  actions to further that inquiry and to satisfy the customer's

5  wishes.

6         The e-mail Exhibit 22 is a very similar circumstance.

7  A few months later the defendant's coming back to Ankush Tandon

8  again for a second time asking his credit limit be raised, and

9  the same pattern repeats itself where Mr. Tandon forwards that

10  request on to the appropriate banker.  So these two examples,

11  it's clear from the document itself that the specific

12  communication at issue was authorized by the defendant.

13         And there's other examples as well in Exhibits 46, 61,

14  and 63, where bankers are taking not an e-mail in that case but

15  a letter with a handwritten signature from the defendant and

16  forwarding a copy of that letter to other employees to make

17  inquiries on the defendant's behalf.

18         So, for example, in Exhibit 46, Priti Dhanani is

19  forwarding a letter from the defendant in which the defendant is

20  requesting that money from his HSBC-India account be transferred

21  to another bank — HDSC, also in India.  And Priti takes that

22  letter from the defendant, attaches it as a zip file to an

23  e-mail, and forwards it along to the appropriate employee in the

24  bank who could satisfy that request and do as the customer

25  asked.

1          So this would be another example of a communication

2     that is, just from the exhibit itself, is clearly authorized by

3     the defendant because he is making a request, and that is being

4     forwarded along by the banker.

5          THE COURT:  All right.  Let's hear from the defense.

6          MR. KIRSCH:  Your Honor, I'll address -- if you'd

7     like, Your Honor, maybe what I can do is just address the

8     801(d)(2)(C) argument and then address these particular e-mails.

9          THE COURT:  All right.

10         MR. KIRSCH:  First of all, Your Honor, we addressed

11    this in our paper with respect to the 801(d)(2)(C) argument, but

12    I would just like to -- I'd like to summarize what we say.

13         Your Honor, the government -- in order to admit

14    something under 801(d)(2)(C), this is a very narrow rule.  The

15    government must show that the declarant of the statement has

16    specific authority from in this case Dr. Ahuja to speak on the

17    specific subject matter of the statement.  And Your Honor --

18         THE COURT:  Let's cut to the chase with respect to the

19    exhibits that have just been discussed.

20         MR. KIRSCH:  Okay.

21         THE COURT:  It appears to me that Dr. Ahuja did

22    provide specific authority to the bank to communicate with

23    others with respect to the subjects that he addressed in his

24    communications.  Now, tell me where I am in error.

25         MR. KIRSCH:  Okay.  Your Honor, I think there's two

48

1    problems with that.

2           Number one, Dr. Ahuja's e-mail is a declarant of the

3    defendant.  He asked a question.  He didn't authorize anybody to

4    say anything on his behalf at any time.

5           THE COURT:  The nature of the inquiry or request by

6    your client requires some action and some statements to be

7    communicated.  And it would appear to me from what was said in

8    these communications from your client that he was directing that

9    some action be taken on his behalf.  And it would appear that

10   what is included in the subsequent e-mails, including a copy of

11   the materials submitted by your client, in particular, the

12   written statement and the e-mail, warranted action and action

13   was taken consistent with the directive of your client.  Hence,

14   the actions of the banker involved in any such transaction would

15   appear to be action taken in a representative capacity.

16          Now, where is there a flaw in that line of reasoning?

17          MR. KIRSCH:  Well, Your Honor, I think that line of

18   reasoning is what the rule itself prohibits.  And Rule

19   801(d)(2)(C) specifically states the statement must be

20   considered, but does not by itself establish the defendant's --

21   or, I'm sorry, the declarant's authority under (C).

22          THE COURT:  That's correct.  However, what we have

23   here is not just the statement of a banker.  We have, with the

24   statement of the banker, the instructions which motivated the

25   statement and the relationship that is apparent by virtue of the

49

1    statement given by your client; i.e., there was a

2    banker/customer relationship that existed at the moment your

3    client communicated with HSBC; there were instructions provided

4    to the banker; and there was action taken consistent with the

5    instruction by your client; and communications that set forth

6    the particulars of the request and the action that should be

7    taken in response.

8           MR. KIRSCH:  Well, Your Honor, I mean, I guess I just

9    respectfully disagree with the court's --

10          THE COURT:  I understand.  And you're entitled to

11   disagree.

12          MR. KIRSCH:  I think that the response just as well --

13   Dr. Ahuja writes:  "The charge card reached its limits, can you

14   pay all of it and raise the limit?  E-mail me if possible.

15   Thanks.  AA."  Then he says:  All "will be paid in pounds.

16   Thanks, AA."  The response could have been "yes."

17          I think 801 -- by the way, there's little case law on

18   801(2) -- 801(d)(2)(C), because it is a very, very narrow rule.

19   Because you can see how -- I mean, the government's first

20   argument was that Dr. Ahuja opened an account at the bank so he

21   authorized bankers to speak on his behalf.  Your Honor, I would

22   be quite shocked if there were bankers at my bank that were

23   speaking on my behalf because opened --

24          THE COURT:  I'm not asking whether or not you were

25   shocked.  I would like to know what the reasoning is with

50

1    respect to your position.

2            MR. KIRSCH:  I think the reasoning is the rule is very

3    narrow.  The government has to show that he has authority to

4    speak -- that the declarant has the authority to speak on

5    Dr. Ahuja's behalf with respect to a specific issue.  And then

6    there has to be independent evidence of it.  They can't just

7    look at Dr. Ahuja's statement.

8            And that's -- Your Honor, there's going to be no HSBC

9    witnesses.  They're using -- the only thing they've got is

10   Dr. Ahuja's statement.  And they're saying, Your Honor, you

11   should take Dr. Ahuja's statement and make the inferences that

12   you made to determine that it's admissible under 801(2)(d)(C)

13   (sic).  And the rule says that's exactly what you can't do.  You

14   have to take the statement and you should consider the

15   statement, but there's got to be something more.  There's got to

16   be independent evidence in addition to that particular

17   statement.  Because otherwise --

18           THE COURT:  There should be independent evidence with

19   respect to what aspect of your -- of the statement made by the

20   banker?

21           MR. KIRSCH:  Pardon, Your Honor?

22           THE COURT:  There should be independent evidence of

23   what?

24           MR. KIRSCH:  There should be independent evidence that

25   Dr. Ahuja -- there should be independent evidence that Dr. Ahuja

51

1    gave the banker specific authority to speak on his behalf.  And

2    that e-mail does not do that, it just asks a question.  He's not

3    giving anyone specific authority to act on his behalf.

4         If we can take -- take 46, for instance.  All the

5    government has in Exhibit 46 is a letter.  Now, Your Honor, we

6    agree, this letter -- the letter on the second page, it's a

7    weight and not an admissibility issue.  But this letter, this

8    letter, the government is using this letter to include the

9    statement from the bankers that is broader than the letter

10   itself.

11        I mean, here the statement says, "Enclosed is an

12   instruction for our very high net individual customer."  These

13   statements are not statements -- these are not admissible under

14   801(d)(2)(C) as statements as an authorized agent.

15        THE COURT:  There may be a limitation on what may be

16   disclosed to the jury with respect to the e-mail that was sent

17   in response to your client's request.  So I would like to hear

18   more about that.

19        MS. SISKIND:  Your Honor, the government's position is

20   that there may be a mix of types of statements and e-mails.  So,

21   for example, we're looking at 46.

22        THE COURT:  Precisely.

23        MS. SISKIND:  When she says, "Requests you to please

24   do the needful and courier the draft ASAP," the government

25   submits that is the quintessential authorized statement here

1    because she is quoting on request.  Anything else in that e-mail

2    the government is not offering for the truth of the matter

3    asserted.  It provides context to the authorized statements.

4         For example, when she says "enclosed is an instruction

5    from a very high net worth individual customer," that is her

6    trying to explain to the bank why it's important that this

7    request be taken care of.  Whether or not it's important we're

8    not offering for the truth of the matter asserted, it just gives

9    context to the rest of her statements.

10        THE COURT:  I understand that.  So you would agree

11   with the defense that any editorialization by the banker with

12   respect to the request made by the defendant would not be

13   admissible for the truth of the matter asserted and would --

14   should be limited or perhaps redacted.

15        MS. SISKIND:  Your Honor, we would object to a

16   redaction.  We would not object to some kind of limitation where

17   it is only being offered for limited purpose and not for the

18   truth of the matter asserted.  But in this case Priti Dhanani is

19   one of the alleged co-conspirators in the indictment.  Certain

20   things that she may have said while not being offered for the

21   truth of the matter asserted, do go to her state of mind with

22   respect to the conspiracy.  So there may be alternative bases

23   other than authorized statements for which those sentences

24   should be allowed to be shown to the jury.

25        THE COURT:  All right.  So you would certainly be

53

1    suggesting that it is the government's intention to demonstrate

2    prior to offering this exhibit or series of exhibits evidence

3    that Priti Dhanani was a co-conspirator.

4            MS. SISKIND:  Yes, Your Honor.  And that's part of the

5    Santiago proffer that we filed is all of the totality of the

6    circumstances that establish her membership in the conspiracy.

7            THE COURT:  All right.  The defense has the floor.

8            MR. KIRSCH:  Your Honor, as an initial matter, we

9    addressed the Santiago proffer.  Your Honor, there is absolutely

10   no evidence in this case, none whatsoever, that Priti Dhanani or

11   Ankush Tandon knew of any object of a conspiracy.  The

12   government's argument is that they knew that Dr. Ahuja wanted to

13   conceal his accounts.  There's not one document in the case and

14   there's not one witness that will testify to that.  Not one.

15   And so, there's a major problem in this case with a Santiago

16   proffer, I believe, because if the government is allowed to

17   submit statements that are not admissible under any other rule

18   and admit them under 801(d)(2)(E), they cannot establish -- they

19   have not set forth in their Santiago proffer any evidence that

20   they will admit at trial to establish that Priti Dhanani or

21   Ankush Tandon agreed with Dr. Ahuja to commit or to defraud the

22   IRS.  None.  So that's a problem.

23           THE COURT:  All right.  We will definitely get into

24   the Santiago issue a little more after we finish discussing the

25   basic admissibility issue.

54

1    MR. KIRSCH:  Okay.  But, Your Honor, I think that if

2    you just take -- take Exhibit 46 that we're looking at, and the

3    government has a letter, and the letter is addressed to the

4    manager at HSBC Services NRI.  Now, the government wants to put

5    in an e-mail.  The e-mail has a header on it.  It's -- the

6    letter, by the way, isn't dated.  If you notice, the letter

7    itself, there's no date on the letter.  But the government then

8    wants to use this header on the e-mail, "from Priti," who

9    there's absolutely no evidence whatsoever that Dr. Ahuja

10    authorized Priti Dhanani to say a single word on his behalf.

11    None.

12    The government wants to use this header to argue that

13    Priti Dhanani, who they allege was a member of a co-conspiracy,

14    was authorized to speak on Dr. Ahuja's behalf, and that she was

15    authorized to send an e-mail to NRI Termination, MDR, and these

16    other people that I have no idea who they are, Mayur Patni, I

17    have no idea where they are, I have no idea what they do.  I

18    mean, this is so far removed from an 801(2)(d)(C) (sic) --

19    Like, the government cited the case Michaels vs.

20    Michaels.  In that case it was a broker.  You're selling your

21    house and you engage a broker to speak on your behalf to

22    potential buyers of the house.  That's 801(2)(d)(C) (sic).  You

23    know who you're authorizing to speak on your behalf.  You know

24    exactly what they're going to say.  They're going to try to sell

25    your house.  They're going to talk about the number of bedrooms

55

1    and the new floors and the new roof.  They're authorized to

2    speak on your behalf.  Here, the government is taking a letter,

3    which is their only evidence, so they have no independent

4    evidence whatsoever, they're taking a letter --

11:21    5    THE COURT:  Are you saying there is no evidence that

6    the government will be offering with respect to the relationship

7    that -- any relationship your client may have had with HSBC and

8    employees thereof?

9    MR. KIRSCH:  No, no.  I'm not saying that.  They will

11:21    10    establish that my client had a banking relationship with HSBC.

11    But that is way too broad under the rule.  The rule requires

12    that the individual, the declarant, is authorized to speak on

13    the specific subject matter.  So the rule prohibits the

14    government from saying, well, he had a banking relationship with

11:22    15    HSBC, so HSBC was authorized to speak on his behalf as his agent

16    on all banking matters.  It's gotta be examined on a

17    case-by-case basis.

18    THE COURT:  And here we have a specific request with

19    regard to Exhibit Number 46.  That is the letter addressed to

11:22    20    the manager, HSBC-NRI Services, with the subject "withdrawal of

21    NRE deposits" in a particular account.

22    By the way, is it the intention of the parties to have

23    the account numbers redacted for the purpose of this trial?

24    MR. KIRSCH:  Well, Your Honor, the government can

11:23    25    speak to this.

56

1        MS. SISKIND:  Your Honor, we intend to, in the

2   Sanction program which will display the exhibits electronically,

3   to have account numbers, addresses and all other necessary

4   things redacted before trial.  The last four digits as required

5   by the redaction policy.

6        THE COURT:  Is that the understanding of the defense

7   as well?

8        MR. KIRSCH:  Pardon?

9        THE COURT:  Is that the understanding of the defense

10  as well?

11       MR. KIRSCH:  Well, Your Honor, it is, although there

12  are certain things that I think that we're not going to be able

13  to redact.  Like address and things like that are going to be

14  important in this case on certain documents.  But it all has to

15  do with the defendant.  So, you know, we're not gonna be showing

16  other people's addresses, other than businesses.

17       THE COURT:  Well, if the defendant wants to disclose

18  the particulars of his addresses and so forth, that's certainly

19  within his province.

20       MR. KIRSCH:  Thank you, Your Honor.

21       THE COURT:  But I do want the parties to be sensitive

22  to the need to redact information and there are some

23  instructions on your tables under the glass.

24       MR. KIRSCH:  Thank you, Your Honor.

25       So, Your Honor, with respect to this statement,

1    statement number 46, if you look at the language, the plain

2    language of 801(d)(2)(C), states that:  "The statement is

3    offered against an opposing party," here Dr. Ahuja, "and was

4    made by a person whom the party authorized to make a statement

5    on the subject."

6         This letter -- this is the whole reason they have to

7    have independent evidence.  This letter -- nowhere in this

8    letter does it authorize Priti Dhanani.  It's not addressed to

9    Priti Dhanani.  We don't know if it was sent to Priti Dhanani.

10   We don't know who it was sent to.  We don't know when it was

11   sent.  We don't know any of those things.  This letter could

12   have been sent in 2002.  And the government wants to use the

13   header of this e-mail to make an argument that Dr. Ahuja

14   authorized Priti Dhanani to speak to Mayur Patni and these other

15   people on the e-mail on Thursday, February 7th, 2008 with

16   respect to this particular e-mail.  That's exactly what the rule

17   prohibits them from doing.  They can use the letter.  We agree

18   with that.  That's a weight issue, not an admissibility issue.

19   The e-mail, though, is not admissible under 801(d)(2)(C).

20        THE COURT:  What additional information, if any, does

21   the government have with respect to Priti Dhanani as it relates

22   to this case?

23        MS. SISKIND:  Your Honor, the government will

24   establish that she was employed in the HSBC-India representative

25   office in New York.

58

1    And Your Honor heard testimony today from Vandana

2    Katju who also worked in that office.  And she told the court

3    about the duties of employees in that office, including

4    responding to customer inquiries.  She gave some examples of if

5    a customer called asking for a checkbook or a debit card or

6    account information, those were all of the types of things that

7    relationship managers in that office would do.

8    Ms. Katju also testified today that when a customer

9    made those kind of inquiries, the relationship manager would in

10   turn go to other HSBC employees, whether they be in India or in

11   other countries, in order to fulfill those requests.  And the

12   example we talked the most about today were the screen shots,

13   where if a customer had a question about their balance that

14   would cause the relationship manager in New York to contact

15   India in order to obtain information.

16   And so the government submits that the testimony the

17   court has heard today, combined with the evidence that

18   Ms. Dhanani was employed in the HSBC representative office in

19   New York, establishes that when relationship managers in New

20   York were making inquiries they were doing so at their

21   customer's direction and on their behalf.

22   THE COURT:  And so is it your intention to offer

23   testimony that Priti R. Dhanani was a relationship manager?

24   MS. SISKIND:  Your Honor, we can put into evidence her

25   personnel file or parts thereof that establish her job title.

59

1    Just her signature block on the e-mail has her title as

2    assistant vice-president, which I believe Vandana Katju

3    testified today she held that same title, she said AVP,

4    assistant vice-president.  Which would suggest that

5    Ms. Dhanani's job duties were the same or similar to Ms. Katju's

6    duties.

7             THE COURT:  All right.

8             MS. SISKIND:  And, Your Honor, I just want to point

9    out also, the Michaels case which we cite in our papers and

10   Mr. Kirsch alluded to, is a helpful case in the circumstance.

11   Because in that case, one of the parties contracted with a

12   broker to help sell company assets.  The broker then went out

13   and sent various communications to different prospective buyers.

14   And the question was, were those communications authorized.  And

15   the Seventh Circuit found that they were authorized by nature of

16   the relationship.  The person had hired a broker and, in doing

17   so, necessarily authorized that broker to go out and make

18   communications regarding the sales of business assets.

19             The court didn't require a finding that each

20   individual communication was separately authorized.  The court

21   instead found that an overall relationship was created when a

22   person hired the sales broker, and it was that relationship that

23   led to the authorization of these communications.  I think that

24   is helpful here, particularly in light of Ms. Katju's testimony

25   today of all the different types of things that relationship

60

1    managers would do for their clients.

2         THE COURT:  All right.  I'm satisfied generally that

3    there was a banker/customer relationship, as I previously said;

4    that by virtue of that relationship the HSBC Bank and its

5    employees were required to engage in transactions in accordance

6    with the instructions of the defendant customer.

7         As it relates to the exhibits we have discussed, and

8    in particular 46, 61, 63, the court is satisfied that these

9    exhibits -- these e-mails are admissible.  The requirements for

10   admissibility on the basis of what I have heard have been met.

11        Now, there may be instances where statements are

12   included in these e-mails generated by the bank which may

13   warrant redaction.  So I'm not making a blanket ruling with

14   respect to whether or not some portion of an e-mail may require

15   redaction, other than to mask account information.

16        However, it is certainly appropriate that the

17   parties -- that the defense be heard with respect to any

18   particular e-mail where there is extraneous information that may

19   be in the document.  So I'm placing the onus on you to bring to

20   my attention any particular e-mail where there is something that

21   is stated by the communicating employee, and in particular --

22   especially Priti R. Dhanani, that may warrant an objection.

23   But, generally speaking, it appears to me that Priti Dhanani's

24   e-mails in response to instructions of the defendant are

25   admissible.

61

1    MR. KIRSCH:  Your Honor, could I -- I don't want to

2  argue, can I just make one observation for the record?

3    THE COURT:  You can certainly make your observation to

4  preserve your rights.

5    MR. KIRSCH:  Thank you, Your Honor.

6    Your Honor, Exhibit Number 63 the court ruled on.

7  Exhibit 63 is not one that we discussed.  In Exhibit 63 there is

8  not a single statement from Dr. Ahuja contained on that e-mail.

9  Not one.  And the government's offering that under 801(d)(2)(C),

10  and I think that's improper, and the court just referenced that.

11    THE COURT:  Let me look at 63.

12    (Brief pause.)

13    THE COURT:  I only see one page.  It refers to a

14  letter from Dr. Ahuja, but I do not see that letter.

15    MS. SISKIND:  Your Honor, if you flip to the previous

16  exhibit, Exhibit 62, the letter is in Exhibit 62.

17    THE COURT:  Does the defendant wish to comment?

18    MR. KIRSCH:  Your Honor, I didn't realize that they

19  had done it this way with some exhibits and not with others.  I

20  just -- the only thing I want to comment on, Your Honor, is we

21  would request, on Exhibit 62, as you can see there's a date,

22  September 21, 2009?

23    THE COURT:  Yes.

24    MR. KIRSCH:  The e-mails are sent relatively close to

25  the date.

62

1          THE COURT:  And I do note the -- at the bottom of the

2     exhibit --

3          MR. KIRSCH:  Right.

4          THE COURT:  -- it says HSBC-NRI 0008289, on 62, and

5     HSBC-NRI 0008288.  So these certainly are sequential exhibits as

6     far as the Bates numbering system is concerned.  And I assume

7     for the purpose of our discussion that these materials are among

8     those that are submitted by HSBC in response to the subpoena and

9     are part of the materials that have been certified as having

10    been prepared and maintained in the ordinary course of HSBC's

11    business.

12         MR. KIRSCH:  Your Honor, I -- well, I agree with the

13    bank's numbering and all that sort of stuff.  But I just want to

14    point out to the court -- and these are the types of things that

15    I think we'll ask to be redacted, including like the date of the

16    last e-mail that we discussed where the authorized statement was

17    not dated.  The government has no independent evidence as to

18    when that letter was sent.

19         And like with respect to this letter, Your Honor --

20    and this is the problem with these exhibits.  If you look at the

21    letter -- the letter is -- it's to HSBC-Jersey.  "Dear sir."

22    And then it says "account closure requested" and it lists an

23    account number and a customer I.D.   And then it says "will you

24    please" -- "with reference, please close the account,"

25    et cetera, et cetera.

1    And then the next page is a statement from Priti

2    Dhanani in the top e-mail saying "He has requested to close his

3    Jersey account."

4    But there's no evidence -- the government will have no

5    evidence whatsoever that that account number is a Jersey

6    account.  And so the government is bootstrapping its entire case

7    through inadmissible hearsay by trying to get in documents, to

8    get in documents that should be admissible from very, very

9    narrow purposes, and then argue very broad propositions from

10   those documents, such as the dates that letters were sent.

11   They're not on the letter, but the government's going to use

12   another piece of hearsay evidence to try to argue when it was

13   sent.

14   The government's gonna use hearsay evidence to try to

15   argue what certain possible or alleged statements by Dr. Ahuja

16   meant.  And that's exactly what they can't do.

17   And they say it's context and all that sort of stuff.

18   But, Your Honor, if it's context they can strike it.  It's not

19   context.  The only reason it's relevant whatsoever is for the

20   truth of the statement, and that's how they're going to argue it

21   and that's how they're going to present it to the jury.

22   THE COURT:  Does the government wish to reply?

23   MS. SISKIND:  Your Honor, just on the matter of

24   proving it's a Jersey account number.  The letter in Exhibit 62,

25   he's writing a letter to HSBC-Jersey regarding a particular

1    account number.  The reasonable inference to be drawn from that

2    is that is an HSBC-Jersey account number.  If it wasn't, why

3    would he be directing this letter to HSBC-Jersey?

4         THE COURT:  Well, let's -- I do see in the header it

5    says, the account manager, HSBC-Jersey.

6         MR. KIRSCH:  I agree, Your Honor.  I see that.  We

7    don't know who drafted this letter.  Okay?  And it's --

8         THE COURT:  When you say who drafted "this" letter,

9    are you referring to Exhibit 62 or are you referring to 63?

10        MR. KIRSCH:  62, Your Honor.  But it's -- see, and

11   this is the issue.  If you go back to the last exhibit we were

12   talking about, it's addressed to HSBC-NRI Services manager or

13   something like that.

14        So the government wants to disregard the heading on

15   that letter and they want to use the heading on the e-mail to

16   argue, well, it was sent to these people in India so Dr. Ahuja

17   must have known his accounts were in India.  And here they say,

18   oh, now we've got the header.  So, I mean, it's just such a

19   totally inconsistent position as to how they want to use these

20   documents and these e-mails without --  Your Honor, they're not

21   gonna -- by the way, these witnesses that testified today over

22   the telephone, they're not testifying at trial.  The government

23   is not going to call one single witness from HSBC.  Not one.

24   And that is a -- I mean, well, with respect to the Santiago

25   proffer and with respect to these exhibits, they're not going to

1  call one HSBC witness.  Their whole case is gonna be based on

2  their interpretation of these e-mails that they want to get in

3  through hearsay exceptions.  So they are trying to convict

4  Dr. Ahuja based on their interpretation and argument of these

5  e-mails.  That's it.  They have no witnesses, not one that's

6  gonna testify to these e-mails, and that they mean what the

7  government says they mean.

8       And so, I think in this case we have to be

9  particularly careful considering the evidence that the

10  government's gonna put on at trial how the government is able to

11  use and argue these exhibits, and they shouldn't be able to use

12  them in an inconsistent manner.

13       THE COURT:  What does the government say about the

14  foundation for admission of the exhibits in general and the

15  comment of the defense that the government will not be calling

16  anyone from HSBC to testify respecting the matters that were

17  heard today?

18       MS. SISKIND:  Your Honor, the government has first not

19  made a final decision yet.  The defense just amended their

20  witness list yesterday.  The government has yet to make a final

21  decision on what the final exhibit list and final witness list

22  is gonna look like.

23       But I think part of what Mr. Kirsch is saying is

24  there's a difference between whether the document comes in and

25  then what it means.  And certainly in any trial the sides are

1    going to have different interpretations of the import of a

2    particular document.  And that's not an issue that relates to

3    admissibility, it's an issue that's dealt with by the parties in

4    their arguments to the jury.  So that's -- while certainly a

5    particular document, the parties will interpret its meaning in

6    different ways, that doesn't necessarily mean a document is

7    inadmissible.

8            THE COURT:  As I stated earlier, I'm satisfied that

9    Exhibit 63 is admissible inasmuch as there is a foundation for

10   admissibility as discussed here today, particularly in view of

11   what is set forth in Exhibit Number 62 which is addressed to the

12   manager of HSBC-Jersey and dated September 21st, 2009, above the

13   signature of what is purported to be the defendant Arvind Ahuja.

14           Let's move to the next category.

15           One second.

16           (Brief pause.)

17           THE COURT:  We will take a short break in this case.

18   I want to return -- I have another matter that's scheduled at

19   11:30.  I want to see what's going on there.  We'll resume as

20   soon as we can.

21           (Recess taken at 11:41 a.m., until 12:09 p.m.)

22           THE COURT:  Before we address additional issues I'd

23   like to get some guidance from the parties.  Can you project at

24   this stage how much additional time you think you will need to

25   conclude your arguments?  We'll start with the government.

67

1    MS. SISKIND:  Thank you, Your Honor.  So far we've

2 addressed five documents in the hearing.  By my count, I might

3 be off by one or two, I think there are still 39 more documents

4 that have not been addressed.  Many of those documents the

5 government is moving to admit, the statements of bankers, under

6 801(d)(2)(C).  And the arguments we've already made regarding

7 the relationship between Dr. Ahuja and the bank apply to those

8 e-mails as well.

9    I think the defense wants to go on an e-mail by e-mail

10 basis.  We would suggest that the court's finding already that

11 there was a relationship between the defendant and the bank, and

12 that bankers made statements as part of that relationship, would

13 cover many of the contested e-mails that we still haven't talked

14 about.

15    Other than those banker e-mails the only things we're

16 still talking about are two e-mails authored by Ramit Bhasin who

17 is a relative of the defendant's who is not a relationship

18 manager in the representative office.  We're talking about three

19 documents that were maintained in the records of Kolb+Co which

20 is the defendant's accountant.  And then -- and that just

21 addresses some of the hearsay issues.  And then we can also talk

22 about the screen shots which you've heard a lot about today,

23 Your Honor, and the reliability and the method of those

24 creations.

25    So, a lot of it I think is going to depend on whether

1    we keep going on a category basis or have to start talking

2    e-mail by e-mail.

3              THE COURT:  All right.  Let me hear from the defense.

4              MR. KIRSCH:  Your Honor, I just -- I think it's going

5    to be longer than the government thinks because I guess I

6    respectfully disagree with the government's characterization of

7    the court's ruling.  And I think what the government did with

8    these 802(d)(2)(C) e-mails is they cherry-picked basically the

9    easiest ones and they said in these e-mails there's a specific

10   directive from Dr. Ahuja, and then carried out the directive.

11             I think the court ruled for that basis those documents

12   were admissible.  The court did not rule that any statement that

13   any banker ever made that was purportedly on behalf of

14   Dr. Ahuja, even if Dr. Ahuja is nowhere on the e-mail or on the

15   document or making any request whatsoever, is admissible under

16   801(2)(d)(C) (sic).

17             THE COURT:  You are correct.

18             MR. KIRSCH:  I think that's what the government wants

19   to argue, and I respectfully submit they can't do that.  They

20   can't bootstrap the court's ruling into these other e-mails and

21   that's why I think we'll have to address these other e-mails.

22             THE COURT:  Would it be helpful if you had an

23   opportunity to go back and look at the various additional

24   exhibits to see if there is any one or more which would be

25   covered by the court's initial ruling?

69

1    MR. KIRSCH:  It would be, Your Honor.  But I think --

2    I think that there are only about three of those.  And, I mean,

3    I can tell you, like, for instance, I guess 29 would be covered.

4    Subject to our objection, 29 I think would be covered by the

5    court's previous ruling.  That's an e-mail from a shared e-mail

6    address that Dr. Ahuja used, and then there is a response from

7    the banker.  So I think that would be covered under the court's

8    prior ruling.  But I think -- that's 29, I think there are only

9    a -- like one or two.  There might only be one more of that.  I

10   think that may be the only one, Your Honor.  I guess the

11   government would know better, but I think that's the only other

12   one that's in the same category as those five e-mails that the

13   government pointed out to you where Dr. Ahuja makes a specific

14   request and then the bank responds, you know, where you have

15   Dr. Ahuja making the request.

16        THE COURT:  With all of that said, how much time do

17   you think you will need to address the pending issues?

18        MR. KIRSCH:  Your Honor, I just --

19        THE COURT:  You can't venture a guess.

20        MR. KIRSCH:  But I think it's going to take hours.  I

21   think that the 801(d)(2)(C) issue is probably the most

22   straightforward issue.

23        We have the Santiago issue which is a big issue.  We

24   have the 803(6) issue which is a big issue.  And then,

25   Your Honor, we have the -- we had the motion in limine, the

70

1   Ramit Bhasin motion in limine.  And we have the jury --

2          Now, by the way, the court may be happy to hear this,

3   we've worked hard with the government over the past few days on

4   these jury questionnaires, and we have reached a lot of

5   agreement to present to the court on that issue.  But there are

6   still some issues with respect to jury selection that we need to

7   cover.

8          THE COURT:  That's why I thought we should deal with

9   the jury issue later rather than at the beginning of the

10  hearing.  But it is apparent from what the parties are saying

11  that we cannot easily get the issues that remain in the limited

12  time we have available today.  Hence, it appears to me that we

13  will either have to continue tomorrow, or on another date which

14  would necessarily require that the trial be adjourned.

15         MR. WEBB:  Your Honor, one other possibility I might

16  suggest.  I know we're picking the jury next Monday.  If you

17  wanted -- if the government -- we could pick the jury and then

18  come back and argue a lot of these evidentiary issues and do

19  opening statements starting Tuesday.  So you could pick up a

20  half a day maybe Monday afternoon.  I'm just trying to come up

21  with time.

22         THE COURT:  I understand that but I'm also concerned

23  about jeopardy.

24         MR. WEBB:  Fine.  We understand.

25         THE COURT:  Because it would appear to me that there

1    are some issues related to whether or not the government would

2    be in a position to call witnesses or would call witnesses whose

3    testimony will have a bearing on the exhibits that are at issue.

4            Can the government address that?

5    MS. SISKIND:  Well, Your Honor, I think we could

6    continue this tomorrow if we don't finish today, or we could, in

7    a slight reversal of what Mr. Webb has indicated, maybe come in

8    Monday morning and have it and then do jury selection Monday

9    afternoon if it proceeds to that point.

10           I just would raise for the court, one of our witnesses

11   is flying in from India.  He might very well be on a plane right

12   now.  I think he's supposed to arrive in the United States

13   today.  So if at all possible we would like to be able to

14   proceed at some point next week to trial because he has taken it

15   upon himself to fly here and arrive -- I believe he's arriving

16   today.

17           THE COURT:  Believe me, I don't take the matter of a

18   continuance lightly and would like to proceed if at all

19   possible.

20           Let me ask the clerk what time we have available to

21   conclude these proceedings, in part today and, say, tomorrow.

22           THE CLERK:  Today until 3 :15, and then tomorrow we

23   would have to address some scheduling issues.

24           THE COURT:  What time slots do we have tomorrow

25   assuming we continue some of the matters that can be continued?

72

1      THE CLERK:  From 11:00 to perhaps 2:30.  May be again

2  from 3:30 to the end of the day.

3      THE COURT:  Would those time slots be available?

4      MS. SISKIND:  For the government, yes, Your Honor.

5      MR. WEBB:  Your Honor, the answer will be yes, we'll

6  do whatever Your Honor wants.

7      This afternoon -- if we go this afternoon, we'll all

8  be here.  Dr. Ahuja, he didn't -- he's going to be here whenever

9  we tell him to be here.  He didn't realize that we'd be going

10  into this afternoon.  I guess I underestimated how long this

11  would take.  He's got two major surgeries this afternoon in very

12  difficult cases.  Would it be okay if we waived -- if we waived

13  his appearance under the rule we could excuse him this

14  afternoon.  Obviously, he'll be here at all times during the

15  trial.  But we're willing to waive his appearance.  But if you

16  tell us he's gotta be here he'll be here.  I guess I'm

17  requesting --

18      THE COURT:  Well, I will inquire of your client at

19  this stage.  Or you may address him.

20      MR. WEBB:  I will.

21      Doctor, based on the request you made to me in the

22  hallway, it's important that if you're not going to be here this

23  afternoon you have to waive on the record right now your right

24  to be here because you have an absolute right to be here.  Do

25  you waive your right to be here this afternoon?

73

1          THE DEFENDANT:  For my patients I waive my rights.

2          MR. WEBB:  He waives his right to be here this

3     afternoon.

4          THE COURT:  Very well.  The court accepts the waiver

12:19   5     and we will proceed.

6          We will do this.  We will go for, let's say, another

7     15 or 20 minutes, and we will take a 45-minute break and we will

8     resume after that until 3:15.

9          MR. WEBB:  Yes, Your Honor.

12:19   10         THE COURT:  All right.  Counsel, you may continue.

11         MS. SISKIND:  Your Honor, the court reporter had asked

12    for a copy of the exhibit binder; can I have the special agent

13    just bring him a copy --

14         THE COURT:  Absolutely.

12:20   15         MS. SISKIND:  -- of the binder?

16         The issue came up a moment ago about what other

17    examples there might be of communications from bankers that were

18    specifically authorized.  I want to go through a couple of

19    those -- go through those examples for the ones that the

12:20   20    government has located specific authorizations since those are

21    the easier cases.

22         THE COURT:  One second.  Hold on.

23         (Brief pause.)

24         THE COURT:  Proceed.

12:20   25         MS. SISKIND:  Thank you, Your Honor.

74

1          So far we have already addressed Exhibits 21, 22, 46,

2     61, and 63.  Another example of two banker communications that

3     were specifically authorized by the defendant are found in

4     Exhibits --

12:21   5          THE COURT:  I believe we discussed 62 as well.

6          MS. SISKIND:  I'm sorry, 62 as well, yes.  As

7     corroborating, yes.

8          If we go to Exhibits 6 and 7, these are e-mails

9     particularly from Priti Dhanani, and also one from Ramit Bhasin

12:21  10     which I'll talk about separately in a moment because he was not

11     an employee of the representative office.  But in 6 and 7 there

12     are e-mails from Priti Dhanani regarding Dr. Ahuja's desire to

13     have a checkbook issued to him from his HSBC-India account.

14     Those communications by the bankers on the subject of the

12:21  15     checkbook are specifically authorized by the signed letter from

16     Dr. Ahuja in Government Exhibit 5.

17          This is an undated letter to HSBC-New Delhi, signed by

18     the defendant, requesting that the bank urgently issue him a

19     checkbook for his account.  And he says, "Do not stamp NRO on

12:22  20     the checkbook, just mention my account number.  I hereby

21     authorize Mr. Ramit Bhasin to collect the checkbook on my behalf

22     upon valid identification."

23          This e-mail which the defendant is requesting the bank

24     issue him a checkbook, and then authorizing Mr. Bhasin to

12:22  25     collect the checkbook for him, is the specific authorization for

75

1    the communications from Priti Dhanani and from Ramit Bhasin in

2    Government's Exhibits 6 and 7.

3              THE COURT:  Does the defense wish to be heard?

4              MR. KIRSCH:  To be brief on Exhibits 6 and 7.  But,

12:23  5    Your Honor, the way I read this e-mail is a little bit different

6    than the way the government reads it.  I read the first e-mail

7    on page 6 on the bottom of the page to be an e-mail from Ramit

8    Bhasin to Arvind Ahuja.  There's no evidence whatsoever that

9    Mr. Bhasin was ever authorized to speak on behalf of an e-mail

12:23  10   to Arvind Ahuja in an e-mail which he sent to Arvind Ahuja.  So

11   I'm just a little confused by the government's argument.

12             Then there's -- that e-mail is forwarded to Mr. Priti

13   Dhanani.  Which was -- so this e-mail first is a request from

14   Ramit Bhasin to Arvind Ahuja.  Arvind then filed -- I'm sorry.

12:24  15   Dr. Ahuja then sends that e-mail to Ms. Dhanani at HSBC.

16   Ms. Dhanani then sends back to Dr. Ahuja a letter.  And the

17   government is suggesting that the letter that Ms. Dhanani sent

18   back to Dr. Ahuja is Government Exhibit 5.  But I note that

19   Government's Exhibit 5 is a signed letter from Dr. Ahuja.

12:24  20             So unless the government's going to argue that

21   Ms. Dhanani signed the letter on Dr. Ahuja's behalf and then

22   sent it back to Dr. Ahuja, I have no idea -- and this is the

23   problem, Your Honor, when there's no HSBC witnesses -- I have no

24   idea what this is.  And I can see the Bates numbers are close,

12:24  25   they're not exact.  Oh, they are exact, actually, because the

76

1   last one is 28199.  But that just means that the bank stamped

2   them.  I don't know who put these -- I mean, these stamps

3   weren't done -- they were done by a human being.  So somebody

4   made the decision that this was the letter that Priti Dhanani

5   sent to Arvind Ahuja on August 21, 2008.  But, Your Honor, this

6   is -- the letter we did not object to, Government's Exhibit 5,

7   because we recognize that's a weight, not an admissibility

8   determination.

9           But the government separates these out and puts 5 and

10  6, and now they're using 5 to bootstrap 6.  And I don't think

11  they can do that.  And I don't know where in 6 there's a

12  statement from Arvind Ahuja asking Ramit Bhasin to do anything

13  at all.  And clearly he's the declarant.  The whole purpose that

14  the government wants to put this -- if you cut off the top half

15  of this e-mail, that's really all the government cares about is

16  the bottom half, the e-mail from Ramit Bhasin to Arvind Ahuja.

17  Your Honor, I can't think of any problem way that's admissible

18  under 801(2)(d)(C) (sic).

19          THE COURT:  Let me see if I am interpreting number 6

20  correctly.  Number 6, sent out allegedly by Priti Dhanani on the

21  21st of August of 2008, it is addressed to Dr. Ahuja.  And after

22  that it is unclear.  Can the government tell me exactly what

23  they believe this shows?

24          MS. SISKIND:  Yes, Your Honor.  If Your Honor starts

25  at the bottom of the page, there's an e-mail from Ramit Bhasin

77

that starts "Hi, Arvind."  Ramit Bhasin is explaining to him
some things that Mr. Basin needs from the defendant in order to
open up a bank account at another -- to open up a financial
account with Mann Financial.  The defendant then adopts that
statement by forwarding Ramit Bhasin's e-mail along to Priti
Dhanani, and that's what shows in the middle of the page, Arvind
Ahuja to Priti Dhanani.

THE COURT:  One second.  The top of the page shows an
address to Arvind Ahuja, to -- it says "to Priti Dhanani."  Then
it has a subject, and then it says "forward, HI."  And below
that it says "THX1, original message from Ramit Bhasin."  And it
says "Hi, Arvind."

And it has a second page which has a cautionary
statement followed by a reference to the deletion of the
material by Priti Dhanani.  And below that it says something
about checkbook.doc.

What is the purpose of this e-mail?

MS. SISKIND:  The government is going to introduce
evidence through the testimony of Ramit Bhasin at trial
regarding a checkbook that the defendant obtained for his bank
account.

THE COURT:  So you anticipate calling this particular
witness who authored the document.

MS. SISKIND:  Yes, Your Honor.

THE COURT:  And you anticipate authenticating the

1  document.

2  MS. SISKIND:  Yes, Your Honor.  He will explain the

3  circumstances under which he assisted the defendant in obtaining

4  this checkbook.

5  THE COURT:  All right.  And statements that he makes

6  in the documents, what do you intend them to show?

7  MS. SISKIND:  They're intended to show that the

8  defendant -- the circumstances under which the defendant

9  obtained this checkbook.  Mr. Bhasin will testify that he was

10  helping the defendant open other financial accounts in India,

11  including the one at Mann Financial, and that in doing so Mann

12  Financial required him to obtain a checkbook.  So Mr. Bhasin was

13  assisting the defendant because, as Mr. Bhasin will testify, he

14  was living in India for part of this time period and was on the

15  ground in India and it was helpful for him to facilitate certain

16  transactions.

17  THE COURT:  So it's your intention to show that

18  Mr. Ramit Bhasin was an agent of the defendant and that he took

19  certain actions consistent with instructions that were given to

20  him by the defendant?

21  MS. SISKIND:  Yes, Your Honor.

22  THE COURT:  And is it also your intention to show what

23  may have motivated conduct by Mr. Bhasin?

24  MS. SISKIND:  I'm sorry, Your Honor?

25  THE COURT:  Is it your intention to show what

1     motivated certain conduct by Mr. Bhasin?

2              MS. SISKIND:  Yes, Your Honor.

3              THE COURT:  All right.  I'm not certain I understand

4     why the defendant believes this particular set of exhibits would

12:31    5     not be admissible, assuming there is the testimony of Mr. Bhasin

6     as outlined by the government.

7              MR. KIRSCH:  Your Honor, with all due respect,

8     Mr. Bhasin is not going to be able to authenticate this letter.

9     He's not -- he may be able to say he wrote the e-mail.  And I'll

12:31    10     tell you why.  I just picked up on this because the court

11     mentioned it.  If you look at the letter, the letter that is

12     attached says checkbook.doc.  That's a Word document.  Now I'm

13     not all that computer literate, but Word documents do not appear

14     like the document in Government's Exhibit 5.

12:32    15              There's a signature on this document.  There is -- I

16     mean, this is not a Word document.  This may be a PDF, it may be

17     a scanned document, but it's not a Word document.  So, again,

18     they're taking an e-mail that may have well contained an

19     unsigned letter and they're saying, nope, this was the letter.

12:32    20              Now, there's no way that Mr. Bhasin is --

21              THE COURT:  When you say an unsigned letter, are you

22     talking about what Mr. Bhasin said as opposed to Exhibit

23     Number 5?

24              MR. KIRSCH:  I don't know -- I don't I don't know --

12:32    25     well, I guess -- all I can say is if you take Mr. Bhasin's

1    e-mail that he sent to Dr. Ahuja, there was nothing attached

2    when he sent the letter.  The only way to read the e-mails --

3    Mr. Bhasin sends an e-mail to Dr. Ahuja.  There's nothing

4    attached to that e-mail.  Then, Dr. Ahuja forwards that e-mail

5    to Priti Dhanani.  Priti Dhanani then sends a letter to Arvind

6    Ahuja, but Ramit Bhasin is not on that e-mail.  He never

7    receives this letter.  Never.  The letter is attached to Priti

8    Dhanani's e-mail to Ramit Bhasin.  Ramit Bhasin cannot lay the

9    foundation for this e-mail and for this letter.  He may be able

10   to say that he sent this original e-mail to Dr. Ahuja on August

11   21, but that's not an 801(d)(2)(C) statement, first of all.  An

12   e-mail to one -- if I sent you an e-mail it would not be

13   admissible under 801(d)(2)(C), my e-mail to you.

14          And so, again, the government, they can't call Ramit

15   Bhasin to testify and to lay a foundation and to lay the

16   foundation for Exhibit Number 5 and Exhibit Number 6 when he

17   wasn't on that e-mail.  He's not on the e-mail from Priti

18   Dhanani to Arvind Ahuja which attaches this letter.  This

19   document does not show that Mr. Bhasin ever received the letter,

20   and certainly not the e-mail.

21          THE COURT:  Does the government wish to be heard?

22          MS. SISKIND:  Yes, Your Honor.  This may be a

23   circumstance where it's worthwhile to wait and see what

24   Mr. Bhasin says when he testifies.  It's my recollection of his

25   previous statements that he was aware that a letter signed by

1    the defendant and provided to the bank.  I believe, and I will

2    have to look back at his grand jury testimony, I believe he may

3    have been involved in giving that letter signed by the defendant

4    to the bank.  But it might be helpful -- when he's on the stand

12:34    5    I will take him through the circumstances leading up to this

6    letter and we can see what he says.

7         THE COURT:  Well, this exhibit is not clearly

8    inadmissible and, therefore, at this stage the court is going to

9    withhold ruling as to its admissibility.

12:34    10        MS. SISKIND:  And moving on to 7 which is the related

11    e-mail from Priti Dhanani on August 24th, 2008.  If you look at

12    her e-mail that starts "Hi, Vivek," under number 1 she says

13    "Enclosed is the request letter for the same and authorizing

14    Mr. Ramit Bhasin to collect the same."  I would suggest that

12:35    15    that -- when shes talking about issuing the checkbook and

16    enclosed is a letter, that refers to the letter signed by the

17    defendant in Exhibit 5 authorizing the checkbook to be issued

18    and for Ramit Bhasin to pick it up at the bank.

19        THE COURT:  Does the defense wish to be heard?

12:35    20        MR. KIRSCH:  Yes, Your Honor, just very briefly on

21    Exhibit 7.  On Exhibit 7 there's nothing enclosed or attached.

22    This is an e-mail from Priti Dhanani, she's not going to be here

23    to explain it, to Vivek Gupta, he's not going to be here to

24    explain it, cc: Ramit Bhasin and natasha2@bloomberg.net.

12:36    25        And I agree what it says.  I can read it, "enclosed is

1  the request letter," but there is no letter.  And, again, I

2  don't know how this is -- maybe the -- the government raised

3  with 6, they want to try to establish a foundation for

4  admissibility and the court reserved ruling, but I don't know

5  how the government can ask for a pretrial ruling on this e-mail

6  under 801(2)(d)(C) (sic).

7      THE COURT:  How do you plan to tie this up,

8  Ms. Siskind?

9      MS. SISKIND:  Your Honor, if you look at what

10  Ms. Dhanani is saying in Exhibit 7 as she explains what the

11  attached letter is.  She says, "Could you please arrange for the

12  following:  Issuance of a loose checkbook.  Enclosed is the

13  request letter for the same.  And authorizing Mr. Ramit Bhasin

14  to collect the same."

15      It is very clear from the letter in Exhibit 5 that

16  this is the letter she's referring to.  Because in Exhibit 5

17  Dr. Ahuja says, "You are requested to please urgently issue a

18  loose NRO savings account checkbook.  I hereby authorize Ramit

19  Bhasin to collect the checkbook."

20      Taken together, it seems clear that the letter that

21  Priti Dhanani is referring to in Exhibit 7 is the letter in

22  Exhibit 5.  The content is identical.

23      THE COURT:  Mr. Kirsch, that would seem to be so.

24      MR. KIRSCH:  Your Honor, there's not going to be a

25  single witness that testifies from the witness stand and tells

1    the jury that that's the case.  Not one single witness is going

2    to tell the jury that.  And again, the government is going to

3    argue their theories from hearsay evidence to the jury.

4           The government, they can't lay the foundation for the

5    admission of -- they can't do it through argument of counsel,

6    and they have no witness that's going to testify to what

7    Ms. Siskind just told the court.  None.  If they called a

8    witness and the witness testified to that perhaps they would lay

9    the foundation.  They can't lay the foundation by just arguing

10   to the court this is what they think.

11          And, Your Honor, the other thing is, I would just

12   point out to the court, there's a whole bunch of other stuff in

13   this e-mail, paragraph after paragraph after paragraph, and

14   we're only talking about one sentence.  So I don't know what

15   the other -- I mean --

16          THE COURT:  Are you referring, for example, to

17   paragraph 2 that says something about "wants a bank certificate

18   on the letterhead"?

19          MR. KIRSCH:  Exactly, Your Honor.  I mean, I just

20   don't know -- I'm saying that.  I'm saying "one of your branch's

21   largest Premier customers and a couple of urgent requests."

22   There's nothing in anywhere that indicates that Dr. Ahuja made a

23   request, that it was urgent, that he was one of the largest

24   Premier customers.  This is all hearsay that the government

25   wants to put in front of the jury and they make these arguments.

84

1    THE COURT:  That I do believe is problematic.  That's

2  why I made the comment earlier about certain editorial comments

3  that may be in some of the materials.

4    So I would like to hear what the government has to say

5  respecting whether or not the document should be received in its

6  present form without redaction, except for, of course, the

7  account numbers that have to be masked.

8    MS. SISKIND:  Your Honor, there's some statements that

9  it might be possible to redact without altering what the

10  government is trying to use this document for.  But as I

11  indicated earlier, Your Honor, there are some statements that

12  are going to be in these e-mails from Priti Dhanani and from

13  Ankush Tandon that bear on their state of mind as

14  co-conspirators in this case.

15    So even if the statement would not be admissible for

16  the truth of the matter asserted to show what they might have

17  done on the defendant's behalf, when Priti Dhanani talks about

18  things like him being the -- one of the highest net worth

19  customers at the bank, the government submits those are

20  statements that bear on her state of mind with respect to the

21  conspiracy, and the jury should be permitted to view those

22  statements so that the parties can argue about what the

23  co-conspirators or alleged co-conspirators' state of mind was.

24    THE COURT:  Will you be offering her testimony as

25  well?

85

1    MS. SISKIND:  No, Your Honor.  Unfortunately, she is

2  in India and not subject to the subpoena power of this court.

3    THE COURT:  I'm going to allow the statement, that

4  portion of the statement.  But, of course, there has to be a

12:41  5  foundation for that inasmuch as it appears the government is

6  proceeding on several theories one of which is the statements of

7  Dhanani were part of the conspiracy and these statements were in

8  the course of the conspiracy.  So I do believe you need to

9  establish a foundation for some of this.

12:42  10    MS. SISKIND:  Yes, Your Honor.

11    THE COURT:  Proceed.

12    MS. SISKIND:  The next one I think we should look at

13  is Government Exhibit 35.  And this is an e-mail in which Ankush

14  Tandon is writing to the defendant regarding credit card PIN

12:42  15  numbers being delivered to a United Kingdom address.  This

16  statement -- or the fact that this is a statement that has been

17  authorized by the defendant is corroborated by Government

18  Exhibit 32, which is a letter signed by the defendant dated one

19  day earlier than Ankush Tandon's e-mail in which the defendant

12:43  20  requests for PIN numbers to be issued for his credit card and be

21  sent to an address in London.

22    THE COURT:  I note that 32 is addressed to the Premier

23  Department, HSBC-Jersey, with a date of November 16th, 2006.

24  Purports to be signed by the defendant.  And the subject is as

12:43  25  you've stated.

86

1      35 appears to have been transmitted by someone and the

2  subject is consistent with 32.  However, the identity of Tandon

3  is not apparent.

4      On the other hand, it appear that this is one of the

12:44  5  items provided to the government by HSBC-NRI.  And it also

6  appears the subject is consistent with what the government

7  represented that is an address in London where a PIN should be

8  sent respecting a credit card.

9      Does the defense wish to be heard?

12:45  10      MR. KIRSCH:  Just very briefly, Your Honor.  We've not

11  objected to 32.  So just so the court knows is the letter.

12      THE COURT:  All right.

13      MR. KIRSCH:  I recognize that that comes in.

14      But 35 I just have two very brief comments.  Number

12:45  15  one, there's no evidence that Dr. Ahuja ever authorized Ankush

16  Tandon to ever speak or say anything on his behalf, number one,

17  under 802 -- 801(d)(2)(C).

18      Number two.  Your Honor, 35 is irrelevant.  I don't

19  know -- we're not talking about relevance here, but 35 is

12:45  20  irrelevant.

21      THE COURT:  All right, what is the relevance?

22      MS. SISKIND:  Your Honor, the government alleges in

23  the indictment that as part of the conspiracy HSBC bankers

24  including Priti Dhanani and Ankush Tandon assisted the defendant

12:46  25  with the management of his account.  And as part of that, they

1    assisted him in accessing funds in his undeclared offshore

2    accounts by means of credit cards and debit cards.

3            And there are two more examples of e-mails that we've

4    also exhibited in which Mr. Tandon is helping the defendant

5    obtain credit and debit cards linked to his HSBC-Jersey account.

6            THE COURT:  Well, let me stop you.  I do see in

7    looking at 34 a reference to Ankush Tandon.  Is that part of the

8    string of e-mails that you will seek to have admitted?  And one

9    that should be taken into account in determining whether or not

10   35 is admissible?

11           MS. SISKIND:  Yes, Your Honor.  34 and then also 31 is

12   another e-mail from Ankush Tandon regarding this same issue of

13   debit cards or credit cards linked to the HSBC-Jersey account.

14   There's really three e-mails from Mr. Tandon, all on the same

15   subject matter, that Mr. Ahuja -- or Dr. Ahuja's letter pertains

16   to.

17           THE COURT:  I see that Dr. Ahuja's letter is dated

18   November 7th.  That's number 33.

19           32 is dated November 16th.

20           34 is dated November 7th.  That's one that was sent by

21   Tandon.  He does have additional communications which include a

22   statement:  "Hi, Ankush, regrettably, due to security reasons we

23   are unable to act upon your request.  Please request our

24   customer contact us direct via telephone or fax."

25           At the bottom it talks about "Arvind and Namrata Ahuja

88

1    are high net worth clients HSBC-India and they also have Premier

2    accounts with HBOS.  They have the following cards with their

3    HBOS account and have requested us that these cards be

4    activated.  Also, they would like fresh PIN numbers to be

12:48    5    generated for both these cards and couriered to their U.S.

6    mailing on priority.  Please have the actioned urgency and

7    advise us the counter tracking airway bill number."

8            And there are card numbers that follow, with Ankush at

9    the bottom -- listed at the bottom of the page as the signatory.

12:49    10            MR. KIRSCH:  Your Honor, I think I have -- I may have

11    misspoke when I addressed the court earlier.  Exhibit 33 is a

12    letter signed by Nami Ahuja?  Did you withdraw that exhibit?

13            MS. SISKIND:  33 we're not addressing here.  We

14    understand that that is not admissible.

12:49    15            MR. KIRSCH:  Okay.  I'm sorry Your Honor.  So 33 is

16    gone.

17            32 is dated November 16th, 2006.  But these e-mails

18    from November 6, 10 days before that, they make no reference to

19    Arvind Ahuja having told anybody anything.  It says "they--"

12:50    20    "they have the following cards and have requested--"

21            We don't know who -- maybe it was Mrs. Ahuja who made

22    the request, but Ankush Tandon is not going to be testifying.

23    So, I mean, the letter from Dr. Ahuja comes in, but these

24    other --

12:50    25            THE COURT:  But the November 7th letter which appears

89

1    to -- which follows the -- which follows number 33 appears to be

2    one that was generated in response to something that was said by

3    a person other than this defendant.  That's what you're arguing,

4    correct?

12:50   5    MR. KIRSCH:  Right.  33 is not -- the government

6    recognizes it's hearsay, it not admissible for any purpose.

7    They're not even offering it.  It's signed by Nami Ahuja.  But

8    they're using these e-mails 31 and -- at least 31 and I guess

9    34, these e-mails -- and even, Your Honor, if you look at 34,

12:51   10   the PDF at the very top of the page that is attached, it says

11   "Enclosed is a signed instruction from the client that has been

12   sent to us at HSBC-New York.  Please execute this on priority."

13   The name of the PDF is Namrata.  That's Nami.  It's signed -- or

14   it's sent on November 7th, 2006.  Dr. Ahuja doesn't even sign

12:51   15   Government's Exhibit 32 until November 16th, 2006 --

16   THE COURT:  Correct.

17   MR. KIRSCH:  -- so this has gotta be the letter 33.

18   THE COURT:  You're right.  You're right.

19   MR. KIRSCH:  I'll sit down.

12:51   20   THE COURT:  You're ahead.

21   MS. SISKIND:  Your Honor, I think I can give some

22   clarity to this.  33 we're not admitting.  The letter from

23   Namrata Ahuja, we agree that it's not admissible.

24   THE COURT:  So why would 34 be admissible?  Which is

12:52   25   dated November 7th.

1    MS. SISKIND:  Right.  34, Your Honor, was one that we

2    were attempting to admit under the -- our overarching theory

3    that that was part of the relationship between the bankers and

4    the bank to help clients get debit cards.  It's actually 35 that

5    we are trying to admit based on 32.

6    THE COURT:  So you're not trying to admit 34 either.

7    MS. SISKIND:  We're trying to admit 34 but not

8    corroborated by the letter in 32.  It's under a different theory

9    of admissibility.

10    THE COURT:  And the theory is merely --

11    MS. SISKIND:  That there was a relationship between

12    the defendant and his bankers whereby the bankers were

13    authorized to make certain communications including helping him

14    obtain debit cards.  And that's consistent with Ms. Katju's

15    testimony earlier today that one of the things that she did as a

16    relationship manager was help clients get debit cards.

17    THE COURT:  Exhibit 32 refers solely to a credit card;

18    is that correct?

19    MS. SISKIND:  And then the same thing is referred to

20    in 35.  We also got confirmation that the credit card PINs would

21    be delivered to the UK address.

22    THE COURT:  It looks like we need to take a break.  We

23    will resume in 45 minutes.

24    MS. SISKIND:  Thank you, Your Honor.

25    THE BAILIFF:  All rise.

1    (Recess taken at 12:54 p.m., until 1:48 p.m.)

2    THE COURT:  When we broke we were talking about

3  Exhibit 35.

4    MS. SISKIND:  Yes, Your Honor.

01:48    5    THE COURT:  Let me ask you before you continue with

6  the line of thought that you had, what exhibits do you have with

7  respect to the creation of the accounts -- I should say the

8  establishment of the various accounts at HSBC by the defendant?

9    MS. SISKIND:  We have at least one account application

01:49    10  that was filled out by the defendant.  And we have some -- there

11  was some notations on that application that at the time that

12  application was filled out the defendant was already an existing

13  customer of the bank.  And I believe it indicates that he had

14  had an account with the bank as early as 2004.

01:49    15    So although we don't have the application that goes

16  back to 2004, there are statements within a business record that

17  indicate he had accounts going back to 2004.

18    THE COURT:  Now, with respect to that account or any

19  other accounts, do you have the -- any documents setting forth

01:49    20  the terms of the relationship between the defendant and HSBC?

21    MS. SISKIND:  There are some discussion of that in the

22  account opening forms that we do have among our exhibits.  We do

23  not have the original account opening documents.  Unfortunately,

24  those are likely in India and were unable to be obtained through

01:50    25  a subpoena.

92

1    THE COURT:  But as of the relevant dates do you have

2  any existing -- any documents respecting the nature of the

3  relationship between the defendant and HSBC?

4    MS. SISKIND:  The only documents we have concerning

01:50  5  the nature of the relationship are statements made by each party

6  to each other during the course of that relationship.  And we

7  would suggest the fact that the parties are discussing account

8  management suggests that account management was part of the

9  relationship between the parties.

01:50  10    THE COURT:  Do you have any particular statute or

11  regulation with respect to the nature of the relationship

12  between the defendant and HSBC at all times relevant in this

13  case?

14    MS. SISKIND:  I don't believe so, Your Honor.

01:50  15    THE COURT:  All right.  Do you rely upon anything

16  within the UCC or any regulations governing HSBC spelling out

17  the terms of the relationship and any obligations that HSBC may

18  have to Dr. Ahuja as a customer?

19    MS. SISKIND:  No, Your Honor.

01:51  20    THE COURT:  All right.  That's what I needed to know.

21    MR. KIRSCH:  Your Honor, can I comment?

22    THE COURT:  Oh, absolutely.

23    MR. KIRSCH:  Okay.  Your Honor, I actually -- you hit

24  on what I was going to talk about.  I think this is a very, very

01:51  25  important point.  The government alleges in its indictment that

93

1   Dr. Ahuja opened an account at HSBC in New York in the early

2   2000s.  But there is nothing, there is not one document, there

3   will be absolutely no evidence, there will be no testimony,

4   there will be nothing at all establishing that relationship

5   between Dr. Ahuja and HSBC.  There's no account opening

6   application, there are no e-mails, there's no nothing that set

7   forth the relationship between Dr. Ahuja and HSBC at the time it

8   was created.  What he was told, what they told him, there's

9   nothing.

10          And I think that's very important.  The government's

11  trying to establish this agency relationship, there is not one

12  single bi of evidence to establish -- no witness testimony, no

13  documents, no nothing to establish that relationship at the time

14  that it was existent — what Dr. Ahuja may have been told, what

15  he knew, what he wasn't told, et cetera.  So I think the court's

16  questions touch on a very, very important issue that affects all

17  of the evidentiary rulings in this case.

18          THE COURT:  There is no doubt.  And I am very

19  concerned about the bases for the government's claims respecting

20  the relationship of Dr. Ahuja to HSBC.  And what I would like

21  the government and the defense to do is to provide me with

22  authorities related to the relationship between the defendant

23  and HSBC, to the extent that they pertain to this case and the

24  indictment.  Because the centerpiece of the government's

25  arguments respecting the admissibility of the various pieces of

94

1 materials that the government will be offering as exhibits is

2 that there was a banking relationship which governs or did

3 govern the conduct of the bank vis-a-vis the defendant; that

4 there was an understanding that the bank would be required to

5 follow instructions given to it by Dr. Ahuja; and, of course,

6 that the bank carried out the instructions of Dr. Ahuja for the

7 purpose of allowing him to avoid reporting certain transactions,

8 certain funds and any obligation he may have had to pay taxes.

9   To the extent that these things are very important I

10 believe it is imperative that you be required to respond

11 immediately to these concerns.

12   Now, I've canceled part of my calendar tomorrow to

13 accommodate additional discussion of the evidentiary issues that

14 have been raised, and I'm wondering given what I've just heard

15 and the questions I just raised whether or not it would be

16 productive -- or more productive for us to shift gears and look

17 at some of the other matters and then come back to this

18 discussion of exhibits, particularly those that relate to

19 e-mails and other materials such as screen shots that were

20 apparently prepared in response to requests made by Dr. Ahuja of

21 various HSBC employees at various times.  What does the

22 government have to say?

23   MS. SISKIND:  Your Honor, we would submit that one

24 thing the court does have before it is the testimony of Vandana

25 Katju about what the role of representative office employees

1    were.  What we can do this evening is locate for you documents

2    specifically relating to Priti Dhanani, for example, that show

3    that her job duties were just as Vandana Katju described.

4         In terms of those, something in writing in document

5    form establishing that they were to provide those for Dr. Ahuja

6    specifically, I don't know that we're going to find that.  But

7    what we are going to be able to show is he was a customer, they

8    were relationship managers, and as relationship managers they

9    had certain responsibilities with respect to their customer.

10   And we can provide some additional documentation.  There's one

11   document that I can think of off the top of my head that

12   explains Priti Dhanani's role in the bank exactly as Vandana

13   Katju described it.  The document would describe what her role

14   was at the bank.  And what I think Your Honor would see looking

15   at that, is that it describes her role just as Vandana Katju

16   described the role of a relationship manager today.

17        THE COURT:  So what I gather from your comments is,

18   the government will not be relying upon any banking regulations

19   or any case law to support its contentions with respect to the

20   way -- with respect to the relationship of Dr. Ahuja to HSBC and

21   its employees; is that correct?

22        MS. SISKIND:  You're correct, Your Honor.  It's going

23   to be based on the facts and circumstances as opposed to a

24   particular regulation or statute.

25        THE COURT:  All right.  And beyond that, what you

1    envision is looking into -- looking at the various materials to

2    bootstrap what you've said thus far respecting the obligations

3    that HSBC employees and the bank in particular had vis-a-vis

4    Dr. Ahuja.

01:59    5    MS. SISKIND:  Yes, Your Honor.  Although there are

6    some more examples of what we've looked at earlier where there

7    is a particular e-mail tying to a particular letter from the

8    defendant.  There are some more examples of that with particular

9    e-mails that seem from the context to be clearly authorized by

01:59    10    the defendant.

11    As far as the other types of e-mails where there is

12    not a specific letter from the defendant that ties to that

13    e-mail, yes, we are basing our theory of admissibility on the

14    general relationship between relationship managers and customers

01:59    15    at HSBC.

16    THE COURT:  All right.  Does the defense believe that

17    it should be given an opportunity to supplement its arguments

18    with research?

19    MR. KIRSCH:  Well, Your Honor, we can do that.  I

01:59    20    agree that we should move on.  I mean, I have no problem with

21    that.  We can do that.  We can look to supplement the research

22    and the arguments that I've made today.

23    But, Your Honor, I just want to make one thing clear

24    that the screen shots issue, which is another issue that's come

02:00    25    up, you mentioned screen shots that were requested by Dr. Ahuja.

97

1    The woman -- the lady who we spoke with this morning, she talked

2    about screen shots generally.  But if you look at the

3    government's exhibits that have to do with screen shots, which

4    include Government's Exhibit 69, Government's Exhibit 71, these

02:00    5    are various screen shots.  There is no evidence that Dr. Ahuja

6    ever asked for a single screen shot.  None.

7         And it's -- a big issue are these screen shots.

8    Because the government called a witness this morning who

9    testified that she has no idea how these were created.  She

02:00    10    couldn't access the computer, she couldn't input information,

11    she doesn't know who inputted the information.  Based on what,

12    she had no information on that.  And there's not a single

13    request from Dr. Ahuja asking for a screen shot.

14         So, I just wanted to clear that up.  But yes, we can

02:01    15    move -- if the court wants to move on to other issues I'm

16    perfectly fine with that, Your Honor.

17         THE COURT:  Well, with respect to screen shots, I also

18    understand from the testimony that the witness was familiar with

19    the HUB computer system of HSBC because while she was employed

02:01    20    by HSBC in India she had access to and regularly utilized the

21    computer system and the HUB for the purpose of viewing the

22    account information of HSBC customers.

23         What she observed while in India and what she has

24    since observed in connection with this case she said was

02:02    25    consistent, and that there was nothing about the various screen

1    shots that she saw that led her to conclude that there was

2    anything inaccurate with respect to those screen shots. She,

3    from her testimony it would appear that screen shots are

4    produced by accessing various pages of a customer's account, and

02:02  5    that it is the regular and customary practice of HSBC to input

6    information which would be reflected in screen shots that could

7    then be ordered by someone in the United States who is in one of

8    the representative positions in response to an inquiry by an

9    HSBC customer, particularly a customer who is seeking

02:03  10   information that is subject to some kind of confusion and there

11   is a need to report that to that customer accurately the

12   materials in the customer's account.

13          And so even though there may not be specific testimony

14   that Dr. Ahuja ordered a particular bank employee to produce the

02:03  15   screen shots, the question that has to be answered is whether or

16   not the screen shots would be admissible on other grounds,

17   particularly in view of the stipulation that was reached by the

18   parties. Would you agree or disagree?

19          MR. KIRSCH: Your Honor, I generally agree with that,

02:03  20   whether it would be admissible on other grounds. I think this

21   witness this morning testified, though, that she never saw these

22   screen shots and she never viewed these screen shots.

23          I think -- I agree with the court's -- I agree with

24   the court's summary of her testimony about what she did while

02:04  25   she was in India. But she never inputted data into the computer

1  system.

2          THE COURT:  That was clear.  But it would appear --

3  from her testimony and from the stipulation, it would appear

4  that screen shots are produced as part of the regular business

02:04  5  activities of HSBC, and that here that agents of HSBC made

6  inquiry of the company in India as to what is in a customer's

7  account and the screen shots are then provided in response to

8  their inquiries.  And it is normal and regular for this to take

9  place.  And it's my understanding that the parties have

02:05  10  stipulated that these materials, including the screen shots,

11  were produced in the ordinary course of the business of HSBC by

12  someone who engages in this activity as part of their duties.

13  Unless I've misunderstood the stipulation that's what I believe

14  is before the court.

02:05  15          MR. KIRSCH:  Your Honor, what we stipulated to is that

16  they were produced to us -- that they were HSBC records, that

17  they're authentic records.  What we have not stipulated to is

18  that they were created in the regular course of the business by

19  a person with knowledge.  There's been no testimony at all about

02:06  20  how these documents were created.  What information was inputted

21  into the system, based on what, to get and to show that final

22  screen shot.

23          So we don't know that the information contained in the

24  screen shot is reliable because there's been no testimony about

02:06  25  how these screen shots were created and based on what documents

100

1    they were created.

2           And that was specifically my line of questioning when

3    I asked her did you have input, and I asked her -- Your Honor,

4    there was a question I -- almost a verbatim question, I asked

5    her if she knew how information was put into the system, and she

6    testified no.  She didn't have any idea how the screen shots

7    were created.

8           And I think that's -- our 803 objection is basically

9    based on that; that the government can't produce evidence as to

10   how the records were created which is a fundamental requirement

11   of 803(6).

12          We don't have any -- look, there's no doubt that HSBC

13   produced these records to the government and the government gave

14   them to us.  We're not disputing that.  But to satisfy 803(6)

15   and to qualify as a hearsay exception, the government has to

16   show how it was that they were created, they were created by a

17   person at or near the time with knowledge of the information,

18   and that this witness was not able to do.  And, of course, the

19   other witness who testified live — I forgot his last name.  I

20   remember his first name was Scott but I can't remember his last

21   name.  He had absolutely no idea.  He didn't even review them.

22   He just testified that they were on HSBC's server.

23          THE COURT:  Does the government wish to reply?

24          MS. SISKIND:  Yes, Your Honor.  First, as Your Honor

25   stayed, Ms. Katju was able to testify as to the reliability of

101

both the bank records in India and the screen shots that came

out of those bank records.  She was in the unique position to

have worked in both places.  And I think she was very clear that

the computer records in India, the screen shots produced from

those records, were both things that were accurate and were

relied upon by her and other employees of the bank in the

conducting of their duties.

        In an effort to bolster the reliability of the screen

shots the government took a look at one example of a screen shot

and was able to find some examples of other documents that

corroborate the reliability of that document, if Your Honor

would like to see that particular example.

        THE COURT:  Go ahead.

        MS. SISKIND:  If Your Honor looks at Exhibit 71, and

go to the third page of that exhibit.

        THE COURT:  All right.  I have it.

        MS. SISKIND:  It's the page Bates number ending in

27737.  It should be the third page of Exhibit 71, I believe.

        THE COURT:  27737?

        MS. SISKIND:  27737, yes, Your Honor.

        THE COURT:  All right.  I have it.

        MS. SISKIND:  There are three particular transactions

reflected in this screen shot that can be corroborated by other

government exhibits.  It is the November 8, 2006 deposit of

$1 million; the June 19th, 2006 deposit of a little over $1.8

102

1    million; the August 3rd, 2006 deposit of $1 million.  And I can

2    now point Your Honor to other documents in that binder that

3    corroborate that those three deposits were actually deposits the

4    defendant made into his account.

5           THE COURT:  Okay.  Go ahead.

6           MS. SISKIND:  First, if you go to Exhibit 20.  I'm

7    hoping Your Honor's copy of Exhibit 20 has three pages.

8           THE COURT:  It does.

9           MS. SISKIND:  Okay.  In here there are some

10   instructions signed by the defendant.

11          I'm sorry.  Oh, you don't have --

12          MR. KIRSCH:  My 20 is just one page.

13          MS. SISKIND:  Do you have an extra copy?

14          THE COURT:  I have Bates 27693, 27700, and 27701.

15          MS. SISKIND:  That's correct.  And we're focusing on

16   27700 and 27701.  If you look at 27700, this is a letter signed

17   by the defendant on August -- in August of 2005 --

18          THE COURT:  August 9th?

19          MS. SISKIND:  August 9th, yes.  August 9th of 2005,

20   regarding a deposit of $1 million on October 2nd, 2005.  That

21   corresponds to the entry in the screen shot from August 3rd that

22   reflected a $1 million deposit.  I'm sorry, it reflects a

23   maturity date of August 3rd of 2006.

24          If you look at the next page of this exhibit, this is

25   another letter signed by the defendant, this one corresponding

1    to the approximately $1.8 million deposit shown on the screen

2    shot.  And that dollar amount is reflected in the first

3    paragraph.  Reflecting a maturity date of June 19th, 2006, which

4    is the date Your Honor saw in the screen shot.

02:11   5          THE COURT:  All right.  It's noted.

6          MS. SISKIND:  Okay.  And then if you go to Exhibit 72,

7    which are actually records from the defendant's HSBC-USA

8    account, and the defense as we understand it is not objecting to

9    the admissibility of these domestic bank records.

02:12   10         And if you go to the -- if you go to the page, Bates

11   number page ending 28052, this reflects a $1 million wire

12   transfer that was made from HSBC-United States to HSBC-India.

13   And this is the third transaction that's reflected in the screen

14   shot.  So now we have three otherwise admissible documents —

02:12   15   domestic bank records and two letters signed by the defendant —

16   that corroborate the reliability of one particular screen print.

17         Your Honor, we would submit that that, combined with

18   the testimony of Ms. Katju regarding the reliability of these

19   records, supports the admissibility of all of the screen shots

02:13   20   under 803(6).

21         THE COURT:  What about sub (d)?  803(6)(d)?  "All

22   these conditions are shown by the testimony of the custodian or

23   another qualified witness or by a certification that complies

24   with 902(11) or 902(12), or with a statute permitting

02:14   25   certification."

104

1          MS. SISKIND:  Your Honor, that subpart of the rule has

2     been satisfied in two ways:  First, by the testimony of a person

3     with knowledge — in this case Vandana Katju who is familiar with

4     the creation of screen prints; and second, by the testimony of

5     the HSBC records custodian combined with his certification which

6     establishes on its face that these documents were created and

7     maintained in the ordinary course of HSBC business.

8          THE COURT:  I would like a response.

9          MR. KIRSCH:  Yes, Your Honor.  First of all,

10    Your Honor, we can get the transcript, but we fundamentally

11    disagree that Ms. Katju testified that she was familiar with how

12    these screen shots were created.  Her testimony was inapposite.

13    She is not familiar with how the screen shots are created.

14    She's not familiar with that.

15          Now, if you look at the screen shot and you see --

16    Your Honor, this is part of the problem with the screen shot.

17    If you look at the top of the screen shot, and it says -- it

18    looks like "IN-HSBC," and then it says "TB" something, and then

19    it says "inquiry by customer."

20          There is absolutely nothing to show an inquiry by any

21    customer.  There's nothing to show that Dr. Ahuja ever requested

22    or ever even received a copy of this screen shot.  This is

23    hearsay that's highly prejudicial.  The government's gonna argue

24    that this document establishes that Dr. Ahuja requested the

25    screen shot.  But Ms. Katju, she testified:  She doesn't know

105

1    Dr. Ahuja; she's never spoke with Dr. Ahuja; she never reviewed

2    these screen shots; she doesn't know how this information was

3    put onto these screen shots.  It's not a policy of the bank to

4    create these screen shots, they were created merely as a matter

5    of convenience.

6            Your Honor, these are not --

7            THE COURT:  I did not understand that to be the

8    testimony of Ms. Katju.  Now, you certainly asked her whether or

9    not some of these things were produced because it was convenient

10   to do so.  But, overall what her testimony was indicated that

11   screen shots -- that the HUB system allows employees of the bank

12   to pull up information reflected in the account of HSBC

13   customers, and that Ms. Katju, while employed in India,

14   regularly accessed the HUB system and observed screen shots of

15   various HSBC customers.

16           Further, while here in the United States she has been

17   able to make inquiries of the bank in India regarding the

18   accounts of various customers, and has done so particularly in

19   those instances where she in her discretion has determined that

20   it would be more accurate to have the screen shot as opposed to

21   someone's summary of the information in the screen shot to avoid

22   errors in providing information to customers.  And that on no

23   occasion has she had any reason to doubt the accuracy of the

24   information in the screen shots which she has relied upon while

25   employed at HSBC, and it is the practice of other HSBC employees

106

1    to utilize and to rely upon the information in the accounts as

2    reflected in the screen shots.

3         MR. KIRSCH:  Your Honor, I agree with that.  But what

4    she testified to I think is that she could access the screen

5    shots, and that she relied on them.  But she cannot testify --

6    and this is where I pushed her a little bit on this -- she

7    cannot testify as to how they were created.  So it would be no

8    different than if the government brought in -- if you consider

9    the domestic bank records -- and we're not objecting to those,

10   they can come in, we don't object to those.  But if the

11   government brought in a bank teller from HSBC who said I can go

12   onto a computer system at the local branch of HSBC and I can

13   access these bank documents, but I can't tell you how these bank

14   documents are created, I can't tell you that they were created

15   at the time, by someone with knowledge, I can't tell you the

16   basis on which they were created, then the documents do not come

17   in under 803(6).

18        Just because Ms. Katju could access the documents, and

19   just because Ms. Katju relied upon screen shots — not these

20   screen shots but screen shots that I have no idea what they look

21   like or what they contain.  She never reviewed these to even say

22   these were similar to the screen shots that she relied on 10

23   years ago at HSBC-India.  Not one time.  And she cannot testify

24   that the documents were created.

25        So that's the fundamental problem with Ms. Katju's

107

1    testimony.  She provides nothing to advance the argument that

2    the documents were created by someone with knowledge or even how

3    they were created.

4            Like, for instance, this inquiry by customer.  Who

5    wrote that?  Is that mandatory where you access the screen shot

6    even if someone didn't ask for it?  Arvind Ahuja may never have

7    asked for the screen shot.  Priti Dhanani may have because she

8    wanted to see something.  And so somebody from India writes

9    "inquiry by customer" when Dr. Ahuja, he doesn't even know that

10   these screen shots exist.  And yet, here's this document that

11   says "inquiry by customer," Ms. Katju -- Ms. Katju, she can't

12   testify how that was created.  And that is the fundamental

13   problem with the government's 803(6) argument with regard to the

14   screen shots.

15           THE COURT:  I was trying to look at the particulars of

16   that witness' testimony.  And I do recall that she testified

17   that she did not know the particulars of how these documents are

18   created.  And I'm also mindful of the point you just made.

19   There is nothing in the record to show that Dr. Ahuja was aware

20   of what was contained in a particular screen shot, or that the

21   screen shots that are being offered in evidence differ in any

22   way from screen shots that the witness saw while employed in

23   India or has seen since she has been here in the United States.

24   Nonetheless, it would appear that these screen shots are made

25   and utilized in the ordinary course of HSBC's business.

108

1          I'm looking at the other particulars of the rule.

2          (Brief pause.)

3          MR. KIRSCH:  Your Honor, it's 803(6)(a) that I'm

4     focused on.

5          THE COURT:  Yeah.  I'm looking at sub (a):  Whether

6     the record was made at or near the time or from information

7     transmitted by someone with knowledge.

8          Because it does appear that the records were kept in

9     the course of a regularly conducted business activity based upon

10    what the record custodian said and what -- Miss, is it Katju?

11    The person from San Francisco?

12         MS. SISKIND:  Katju, Your Honor.

13         THE COURT:  Katju.  -- Ms. Katju said.

14         Can the government comment on sub (a)?  803(6)(a)?

15         MS. SISKIND:  Yes, Your Honor.  Ms. Katju testified

16    that when she was looking to get a screen print she would

17    contact India, India would respond to her with a screen print.

18    That suggests first that the record, the screen print, was

19    created at or near the time that we're talking about.

20         THE COURT:  Why so?  Let's say, for example, if you

21    have -- you've had an account at a bank for years.

22         MS. SISKIND:  Well, I think there's two -- I guess two

23    levels to what this record is.  There's the computer records in

24    India and then there's these screen prints which are printed out

25    from the computer records in India.

109

1           The screen prints were created as needed on the times

2      they were requested by the relationship managers in New York.

3      They were not created until such time as the relationship

4      manager requested it, because there would have been no need for

5      it otherwise.

6           THE COURT:  So basically, a screen shot is a snapshot

7      in time.

8           MS. SISKIND:  Yes, Your Honor.

9           THE COURT:  And they reflect whatever is pictured or

10     produced by the HUB computer system when a demand or request is

11     made.

12          MS. SISKIND:  Yes, Your Honor.  And Ms. Katju

13     testified that she relied on that computer system and had no

14     reason to doubt its accuracy.

15          THE COURT:  Now, with regard to the latter portion of

16     sub (a), you're not suggesting that -- you're showing that it

17     was -- what can you say about the knowledge of the person who

18     may have input the data?

19          MS. SISKIND:  Well, Your Honor, as far as the screen

20     prints, we're also talking about the knowledge of the person who

21     made the screen print which would be an HSBC employee sitting in

22     India, fielding a request from a relationship manager, capturing

23     the image on a screen shot, and transmitting it to New York.

24          So the person in India has knowledge of what's on the

25     computer at that moment, because he or she is in India where he

110

1    or she has access to that computer system.  So at the moment in

2    time when that screen shot is captured, it's being done by a

3    person with knowledge of what the computer system looks like at

4    that moment in time.

5              THE COURT:  All right.

6              MR. KIRSCH:  Your Honor, may I briefly respond?

7              THE COURT:  Please.

8              MR. KIRSCH:  Your Honor, first of all, nobody

9    testified to that.  And second, if the government is using this

10   to argue that somebody printed this from their computer and

11   they're not concerned about what's in the screen shot, it's

12   totally irrelevant.

13             The only reason these screen shots are relevant is to

14   show the information that was in the HUB computer system.  If

15   they want to say that somebody printed a shot of their computer,

16   it could have been anything.  I mean, it could have been a Word

17   document, a photo of their family.  It's totally irrelevant, the

18   fact that they printed it.  What's relevant is how the

19   information got put into the HUB computer system in the first

20   place and what was it based on.  And there's absolutely no

21   testimony, and there will be no testimony, because the witnesses

22   the government called cannot testify to it.  They don't know

23   what the information was based on.

24             We could call Ms. Katju right now and we could ask her

25   about inquiry to customer, and I'm certain she would testify:  I

1   have absolutely no idea.  I have absolutely no idea whether

2   Dr. Ahuja inquired of these screen shots.  I don't know if

3   they're Dr. Ahuja's screen shots.  I don't know who input that

4   information.  And I don't know on what they based it.

5           And the same is true for every single line in this

6   screen shot.  She cannot testify that this screen shot was

7   created at or -- or, I'm sorry, the information contained in the

8   screen shot was created at or -- the exact language of the

9   rule -- at or near the time or from information with someone --

10  by someone with knowledge.

11          THE COURT:  It appears that what she testified to was

12  she would order a screen shot and would receive a reply

13  consistent with her order or request.  And she relied upon the

14  information in the request as it relates to the account of the

15  customer.

16          Now, you do make a valid point with respect to other

17  things shown in the screen shot, and in particular to any

18  reference to an inquiry by a customer.  On the other hand, the

19  witness did testify that relationship managers in the U.S. would

20  make inquiries on behalf of customers, and that she was familiar

21  with that practice as a result of her duties while in India and

22  her duties since she's been here in the United States.

23          And so I share your concern about the suggestions that

24  a customer has made a request, and how that got into the screen

25  shot, et cetera, is certainly problematic and I do have some

112

1   concerns as to whether or not the screen shots with that

2   information unredacted should be shown to the jury.

3           MR. KIRSCH:  Your Honor, can I point out one other

4   thing with respect to these screen shots which I think is really

5   telling?

6           THE COURT:  Yes.

7           MR. KIRSCH:  If you look at the top of this screen

8   shot, I was reading this along -- we're looking at page 27737.

9   It says, "Inquiry by customer."  And then it says, "January 3rd,

10  2006."

11          So as I was sitting here, I was thinking, well, was

12  the inquiry made on January 3rd, 2006, or is this the screen,

13  the state of the account on January 3rd, 2006?

14          And then I looked down at what the government says

15  these are deposit dates.  And I see October 3rd, '06, October

16  19, '06, November 24, '06.  And I am just -- it's just -- it's

17  very confusing to me.  And that's -- so, I don't know -- again,

18  I don't know who -- who put in October 19th -- like you look at

19  the first one, who put in November 8th, 2006, U.S. dollars,

20  $1 million?  Or who put in November 24, 2006, $51,251.62, and

21  what was it based on?  And we will never know the answer to

22  those questions.

23          We're gonna ask the jury a week from now to guess as

24  to what that means and whether or not Dr. Ahuja should be

25  convicted of a federal criminal tax offense.  That's what the

113

1  government wants to do.  But, I mean, how -- anyway.  That's why

2  803(6)(a) exists, and the government cannot meet its -- they

3  cannot meet the elements of 803(6)(a) with respect to these

4  screen shots.

02:30   5       THE COURT:  Ms. Siskind?

6           MS. SISKIND:  Your Honor, I misspoke.  I should not

7  have said deposit dates; it's actually due dates.  If you saw

8  from some of the records, the defendant would put in -- purchase

9  a CD that would mature often a year and a day from the time that

02:31  10  it was deposited.  So when we're looking at a screen shot for

11  January 3rd, 2006, these are actually the dates the CDs are

12  maturing.  That was my mistake.  They're not the dates that

13  money was deposited.  That's why they are dates in the future

14  because the CDs have not matured yet.

02:31  15       THE COURT:  I did note you mentioned earlier when

16  looking at the HSBC documents, one showing a million dollar

17  deposit, that it was a maturity date.

18           MS. SISKIND:  Correct, Your Honor.  And the other

19  issue, I just want it to be clear with the court on what  we're

02:31  20  --

21           THE COURT:  Was that 28052 that you were looking at

22  earlier?

23           MS. SISKIND:  28052 is one of the examples, yes.  And

24  I think in the language of that wire transfer it talks about

02:31  25  placing a CD for a year and a day, to mature a year and a day

114

1    later.

2        MR. WEBB:  And, by the way, Your Honor, we have no

3    objection -- 28052, we have no objection to that document.  That

4    document -- we have no objection to that bank statement coming

5    in evidence.

6        But still, if the government wants to redact

7    everything else from this screen shot except that one input,

8    because they can argue that it appears that that -- that that

9    particular line entry was inputted from this particular bank

10   statement, then that's one matter.  But I don't think that's

11   what they're arguing.  They have got page after page after page

12   of screen shot.  They've got one entry.  And we don't --

13       Well, anyway, we just don't know how these screen

14   shots and how this HUB information was computed.

15       The HSBC Bank statements can come in under 803(6).  No

16   objection to that.  They can use these.  But they should not be

17   permitted to use these screen shots because they have one

18   example and then argument as to what it means with not -- with

19   testimony from not one single witness.  There's gonna be nobody

20   for us to cross-examine on this issue.

21       THE COURT:  I want to give some additional thought to

22   the utilization of the screen shots, so I'll withhold any ruling

23   respecting the same.

24       MR. KIRSCH:  Your Honor, do you want to move on to the

25   jury issue?  I'll do whatever you want to do but you had

115

1  suggested moving on and then we --

2  THE COURT:  I think it probably would be a prudent --

3  we talked about the screen shots.  There was one other --

4  MS. SISKIND:  Your Honor, there was one other

5  category, and that was the accountant records.

6  THE COURT:  The accountant.

7  MS. SISKIND:  We could address those.

8  THE COURT:  Yes, please.

9  MS. SISKIND:  That would be Exhibits -- apologize,

10  Your Honor.

11  MR. KIRSCH:  Your Honor, can I make a suggestion with

12  respect to those?  I think they're going to call the accountant.

13  Maybe the government will agree or disagree, I'm not sure that

14  the accountant exhibits -- I think they're going to call the

15  accountant as a witness.  So there may not be the foundational

16  exhibits -- issues that exist with respect to the accountant.

17  We may be able to table that for the time being.

18  There is the Santiago proffer issue which is a big

19  issue, but the accountant stuff I'm not sure is -- unless the

20  government disagrees with me.

21  MS. SISKIND:  We are going to call the accountant.

22  He's going to lay the foundation for whatever layers of hearsay

23  may exist within these documents.

24  THE COURT:  Well, let's move on.  Let's quickly talk a

25  little bit about the jury.

116

1          MR. KIRSCH:  Your Honor, what we've done is the

2     government and the defense have exchanged a series of e-mails

3     over the past -- we had several telephone conferences.  And,

4     Your Honor, what we've done -- I hope this is helpful to the

5     court.  We thought it would be helpful to the court so this is

6     what we did.

7          Last night we went through the juror questionnaires

8     basically together, and we created a list of jurors that at

9     least the defendant and the government agree should be -- should

10    not have to come in on Monday, either for cause or for hardship

11    reasons.  And I have that list, and if you'd like I can go

12    through that list quickly and tell you the names --

13          THE COURT:  Why don't you hand up the list.

14          MR. KIRSCH:  Your Honor, can I hand you a -- I have a

15    -- it's got my handwriting on it.  If you look at the names --

16    well, it's got some of my notes but --

17          THE COURT:  One second.  Just so that you know, you

18    are also being recorded so I ask that if you wish to be heard

19    clearly, stay near a microphone at all times.

20          MR. KIRSCH:  Your Honor, I have a list, it's got some

21    of my notes on it, I can give it to you if you like, but the

22    names that are crossed off on the list are the ones that we've

23    agreed to.

24          THE COURT:  Do we have numbers beside any one of them?

25          THE CLERK:  No, we don't.

117

1    THE COURT:  All right.  Has the government seen that

2  list that you have?

3    MR. KIRSCH:  Oh, yes.  We talked about it last night

4  and we talked about it again this morning.

5    THE COURT:  Just hand me the list without mentioning

6  the names.

7    MR. KIRSCH:  Yes, Your Honor.  And, Your Honor, you

8  can ignore the names that are circled.  Those are people that we

9  think should be struck but the government doesn't agree with.

10  It's just the ones that are crossed out.

11    THE COURT:  All right.  I won't share that.

12    (Court peruses document.)

13    THE COURT:  The ones that are circled, only the ones

14  with the lines are the ones you agree on; is that correct?

15    MR. KIRSCH:  Correct, Your Honor.  The ones with the

16  lines are the agreed-on ones.  The circled ones are the ones

17  that we want to strike.

18    THE COURT:  Okay.  All right.

19    (Court peruses document.)

20    THE COURT:  So I count 13.

21    MR. WEBB:  Your Honor, I think there should be 10 with

22  lines through.

23    THE COURT:  10.  Let me go back.

24    (Brief pause.)

25    THE COURT:  I did.

Case 2:11-cr-00135-CNC   Filed 08/14/12   Page 118 of 122   Document 139

1          (Brief pause.)

2          THE COURT:  All right.  Let me give this to the clerk.

3    And you can -- why don't you make a copy of that so that you can

4    take the names and numbers off of the list.

5          Now, the reasons the parties have concluded these

6    jurors should be stricken include what?

7          MR. KIRSCH:  Your Honor, some of them -- well, I don't

8    think you want me to go through them one by one, or I will if

9    you'd like me to.  But the --

10         THE COURT:  Categories.

11         MR. KIRSCH:  The primary, what we looked at was

12   hardship that we believed that satisfied both parties without

13   the person being brought in that they should be off.

14         THE COURT:  All right.

15         MR. KIRSCH:  And the second thing, Your Honor, was

16   what we believed -- I think the parties jointly believed, based

17   on the answers to the questionnaire, the person would not be

18   able to be rehabilitated and -- you know, to satisfy the fair

19   and impartial requirement.  Their answers were so sort of out

20   there, I guess, that we thought that they should be clearly

21   struck without having to bring them in.  So those are the

22   categories.  That was the basis for our agreements.

23         THE COURT:  Who is going to speak on behalf of the

24   government?

25         MS. SISKIND:  I will, Your Honor.

119

1        THE COURT:  All right.  Counsel?

2        MS. SISKIND:  We concur with Mr. Kirsch's assessment.

3   The reasons were hardship for some and bias for others.

4        THE COURT:  Well, consistent with the practice I've

02:41   5   used in other cases of this sort where we've used juror

6   questionnaires, the court will accept the determinations of the

7   parties with regard to the eligibility of these jurors or the

8   hardship that may be suffered by these jurors if they are called

9   for service in this case and, therefore, they will be excused.

02:41   10       Now, are there other jurors as to whom there is some

11  disagreement?

12       MR. KIRSCH:  Yes, Your Honor.  And it's a small number

13  but there are some.

14       THE COURT:  All right.  Let's talk off the record.

02:42   15  I'd like to see the parties in the jury room.

16       (Proceedings continued off the record in the jury room

17  at 2:42 p.m., until 3:23 p.m., at which time the proceedings

18  were adjourned for the day.)

19                        *      *      *

20

21

22

23

24

25

1 UNITED STATES DISTRICT COURT

2 EASTERN DISTRICT OF WISCONSIN

3

4      I, JOHN T. SCHINDHELM, RMR, CRR, Official Court

5 Reporter for the United States District Court, Eastern District

6 of Wisconsin, do hereby certify that I reported the foregoing

7 proceedings, and that the same is true and correct in accordance

8 with my original machine shorthand notes taken at said time and

9 place.

10 Dated this 10th day of August, 2012

11 Milwaukee, Wisconsin.

12

13 _____
     Official Court Reporter

14      United States District Court

15

16

17

18

19

20

21

22

23

24

25

```
                      I N D E X

WITNESS    EXAMINATION                                    PAGE

VANDANA KATJU, GOVERNMENT WITNESS

       DIRECT EXAMINATION BY MS. SISKIND................    4

       CROSS-EXAMINATION BY MR. KIRSCH..................   16

       REDIRECT EXAMINATION BY MS. SISKIND..............   30

SCOTT MACIEJEWSKI, GOVERNMENT WITNESS

       DIRECT EXAMINATION BY MS. SISKIND................   33

       CROSS-EXAMINATION BY MR. KIRSCH..................   37

       REDIRECT EXAMINATION BY MS. SISKIND..............   42


                        * * * * *

                    E X H I B I T S

NUMBER              DESCRIPTION          OFFERED ADMITTED

       NONE .......................................
```