2    FOR THE EASTERN DISTRICT OF WISCONSIN

3    ----------------------------------------------------------------

4    UNITED STATES OF AMERICA,          )
                                        )
5                      Plaintiff,       )      Case No. CR 11-135
                                        )      Milwaukee, Wisconsin
6         vs.                           )
                                        )      August 10, 2012
7    ARVIND AHUJA,                      )      1:00 p.m.
                                        )
8                      Defendant.       )

9    ----------------------------------------------------------------

10             **TRANSCRIPT OF MOTION HEARING (VOLUME 2)**
            BEFORE THE HONORABLE CHARLES N. CLEVERT, JR.
11              UNITED STATES CHIEF DISTRICT JUDGE

12   APPEARANCES:

13   For the Plaintiff
     UNITED STATES OF AMERICA:      Office of the US Attorney
14                                  By: TRACY M. JOHNSON
                                    517 E Wisconsin Ave - Rm. 530
15                                  Milwaukee, WI 53202
                                    Ph: 414-297-1580
16                                  Fax: 414-297-4394
                                    tracy.johnson@usdoj.gov
17   )
                                    United States Department of
18                                  Justice DC
                                    By: JOHN E. SULLIVAN
19                                      MELISSA S. SISKIND
                                    Tax Division - Ben Franklin
20                                  Station - PO Box 972
                                    Washington, DC 20044
21                                  Ph: 202-514-5196
                                    Fax: 202-616-1786
22                                  john.e.sullivan@usdoj.gov
                                    melissa.s.siskind@usdoj.gov
23

24   U.S. Official Reporter:        JOHN T. SCHINDHELM, RMR, CRR,
                                    johns54@sbcglobal.net

25   Proceedings recorded by computerized stenography,
     transcript produced by computer aided transcription.

```
 1    APPEARANCES CONT'D:

 2    For the Defendant              Friebert, Finerty & St. John SC
      ARVIND AHUJA:                  By: SHANNON A. ALLEN
 3    (Present)                      Two Plaza East - Ste 1250 - 330 E
                                     Kilbourn Ave
 4                                   Milwaukee , WI 53202
                                     Ph: 414-271-0130
 5                                   Fax: 414-272-8191
                                     rhf@ffsj.com
 6                                   saa@ffsj.com

 7                                   Winston & Strawn LLP
                                     By: THOMAS L. KIRSCH II
 8                                   35 W Wacker Dr
                                     Chicago , IL 60601-9703
 9                                   Ph: 312-558-5600
                                     Fax: 312-558-5700
10                                   dwebb@winston.com
                                     tkirsch@winston.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          P R O C E E D I N G S (1:15 p.m.)

2          THE CLERK:  Case No. 2011-CR-135, United States of

3   America vs. Arvind Ahuja, this matter is before the court for a

4   continued pretrial conference.  May we have the appearances,

01:16   5   please?

6          MS. JOHNSON:  Tracy Johnson on behalf of the United

7   States and Melissa Siskind and John Sullivan from the DOJ Tax

8   Division, as well as Special Agent Geoffrey Cook.

9          THE COURT:  Greetings to all.

01:16   10          MR. KIRSCH:  Good afternoon, Tom Kirsch for the

11   defendant Arvind Ahuja who is present in court.  I'm here with

12   Shannon Allen.

13          THE COURT:  Greetings to you as well on this very

14   windy Friday.

01:16   15          As we begin I would like to invite the parties to

16   comment on any matters that affect the way we will proceed in

17   this case.  I'll first turn to the government.

18          MR. SULLIVAN:  Thank you, Your Honor.  I wanted to

19   give the court an update on two of our witnesses.  The first is

01:16   20   Mr. Bhasin, B-H-A-S-I-N, who has now arrived in the United

21   States and he is a cooperating witness, he resides outside the

22   subpoena power of the court, and he needs to get back for a

23   business meeting on Thursday, at least he wants to, in India.

24   And my concern is that if we have a continuance due to not being

01:17   25   able to resolve some of these issues, or if the court determines

125

1    that our bank records are not admissible under 803(6), that

2    would gut our entire case.  And if that were to happen the

3    government would seriously consider filing an interlocutory

4    appeal which would, it's my understanding, stay the proceedings.

01:17    5    If that happens I would like to propose taking his deposition,

6    or trial testimony, right here on videotape under Rule 15.  And

7    I've already discussed that with Mr. Kirsch.  So I just want to

8    throw that out there just to let you know it's out there, and

9    that's all --

01:18    10           And secondly, the other update --

11           THE COURT:  Well, we certainly have the technical

12    ability to take that down.

13           MR. SULLIVAN:  And Ms. Johnson has informed me that

14    we've already got the wheels in progress, or we can do that, we

01:18    15    can get the wheels in progress to do that either on Monday --

16    hopefully it would be Monday.

17           Your Honor, there are a lot of issues on the Santiago

18    because it's based on the totality of the circumstances.  So

19    that means everything.  And there's a lot of everything.

01:18    20           The second update is that we reached out and issued a

21    trial subpoena to Ms. Vandana Katju.

22           THE COURT:  The branch manager at the Montgomery

23    branch in San Francisco?

24           MR. SULLIVAN:  Yes.  And so she will be a trial

01:19    25    witness because we have now been asked by the defense to bring

126

1    in a live witness to go over some of these records.

2              THE COURT:  I hope you don't plan to bring in a dead

3    one.  But go ahead.

4              MR. SULLIVAN:  In that process I've turned over an

01:19    5    e-mail exchange -- speaking of e-mails -- that I had with

6    Mr. Hill, and I'd like to proffer this to the court if I may.

7              THE COURT:  Certainly.

8              MR. SULLIVAN:  Which is, it verifies -- we saw

9    clarification of her testimony about not knowing about how the

01:19    10   records were created.  And I'll give the court a moment if the

11   court wants to look at the big paragraph there.  But --

12             (Court peruses document.)

13             THE COURT:  I read it.

14             MR. SULLIVAN:  So if, in fact, she could testify to

01:20    15   that effect, she doesn't know about how the records were input

16   into the computer system in India but knows that they were

17   regularly -- it was a regular practice to enter in the records

18   at the time that the CDs were opened.

19             It kind of puts the government in a quandary because

01:20    20   it's really great evidence that goes to a concern that the court

21   had yesterday, but it's not really in the record, it's a proffer

22   the government is making.  She's coming, she could be here on

23   Monday.  I don't know if that's necessary.  Or Tuesday she could

24   be here.

01:21    25             But if the trial starts without the ruling under a

1    Seventh Circuit case that I found, if the court hasn't

2    determined that those business records come in for the screen

3    shots, the bank records, then jeopardy would have attached and

4    the government would be out of luck.

5            THE COURT:  I'm certainly cognizant of jeopardy as I

6    mentioned yesterday, and hopefully we will have that aspect of

7    the case determined before the close of business today.

8            MR. SULLIVAN:  Thank you, Your Honor.

9            THE COURT:  But would you please clarify something for

10   me.  Is it your representation that Ms. Katju envisions

11   testifying respecting her knowledge of how information reflected

12   in screen shots is placed in the computer system of HSBC?

13           MR. SULLIVAN:  Yes.  It's our understanding from her

14   attorney that she could testify that when a customer made a

15   transaction at the bank in India such as opening a certificate

16   of deposit, the bank would routinely in the ordinary course of

17   business soon thereafter make a record of it in its computer

18   system that would be reflected on a HUB screen shot.

19           THE COURT:  All right.  And what is the defense

20   position with respect to this discrete issue?

21           MR. KIRSCH:  Well, Your Honor, we would -- first of

22   all, her live testimony before the jury is not necessary.  And

23   we would file a motion in limine on that, I think, and I'll tell

24   the court why.

25           Your Honor, the government, they clearly recognize now

128

1    the problem that we discussed yesterday for hours.  And they now

2    want a second bite at the apple.  And they called Ms. Katju

3    yesterday who testified under oath and she testified -- and this

4    is on page 27 of the transcript -- I asked her:

5         "Question:  Now, I think you testified on direct

6    examination that you did not have direct access to this computer

7    system, correct?

8         "Answer:  Yes.

9         "Question:  And you told -- do you remember telling

10   Agent Cook yesterday that you don't know how data was input into

11   that system?

12        "Answer:  That's right."

13        Now, I go to Agent Cook's memorandum of interview,

14   he's here, he can testify, I suspect he would say that

15   everything he wrote in his memorandum is absolutely correct.

16   I've never had an agent ever --

17        THE COURT:  Slow down.  Slow down.

18        MR. KIRSCH:  Yes.  I'm sorry.  Your Honor, in this

19   memorandum of interview which was attached to the government's

20   supplemental motion to admit documents pursuant to Federal Rules

21   of Evidence 801(d) and 803(6) --

22        THE REPORTER:  Counsel, can you please get closer to

23   the microphone.

24        MR. KIRSCH:  I'm sorry.  Is that better?

25        THE COURT:  Let me add, if the wind dies down we may

129

 1   have to deal with jet planes as well.  There's an air show in

 2   town this weekend and they fly just a couple of blocks to our

 3   east.

 4              MR. KIRSCH:  I wondered what that was.

 5              Okay.  So, Your Honor, what I was saying is on -- in

 6   paragraph 9 of that memorandum of interview which the government

 7   relied upon just yesterday, there's a sentence in there that

 8   reads, and I quote.  I quote:

 9              "The system that is used to generate the print screens

10   is the same system used to generate account statements.  It was

11   called HUB.  Katju does not know how the data is input into the

12   system."

13              That is unequivocally her testimony on that issue.

14   This e-mail doesn't change that not one bit.  First of all, the

15   e-mail is a statement by the government -- the government

16   prosecutor leads her, it's a leading statement from the

17   government prosecutor to her lawyer saying would she testify to

18   that --

19              THE COURT:  I understand that.

20              MR. KIRSCH:  And the question is wrong.  The question

21   says:  Could Ms. Ahuja testify to when a customer made a

22   transaction with the bank in India?  Dr. Ahuja's transactions

23   were with the bank in New York City.  I mean, this is totally

24   inapposite.  This is the 803(6)(a) problem all over.  This

25   e-mail does not change one bit her testimony from yesterday.

1    And it doesn't change it.  And it doesn't weigh in on her

2    testimony yesterday that she cannot testify as to how data was

3    input into that system.

4         Therefore, in other words, she can't testify about

5    that inquiry by customer.  She can't testify that that's what

6    happened.  She can't do it.

7         I just -- I think the government now recognizes the

8    803(6)(a) problem that we raised in our papers that we discussed

9    yesterday, and they're trying to walk that back and they want to

10   do it through Ms. Katju.  And now they want essentially the jury

11   to make the foundational finding as to whether or not these are

12   business records under 803(6), and, Your Honor, they can't do.

13   The court has everything in front of it that it needs to rule on

14   an 803(6)(a) issue.  And I think the government --

15        THE COURT:  If there is nothing more the government

16   can offer, and at this stage of the proceeding I see no reason

17   to bar the government from seeking additional testimony from

18   Ms. Katju.

19        Now, let me add, given the time constraint it would be

20   imperative that Ms. Katju provide any supplemental testimony

21   today as part of this ongoing hearing.  We're not going to wait

22   until next week.  And as the defense has pointed out, there are

23   logistical concerns that it has, and the government is also

24   concerned about the fact that if we take the statement

25   subsequent to impanelment of the jury jeopardy will have

131

1    attached and there will be no opportunity for a second-guess by

2    the Court of Appeals.

3            So, with that on the table is it the government's

4    desire to supplement Ms. Katju's testimony as part of this

5    ongoing proceeding?  And if so, I'll give you a couple of

6    moments to try to work out the logistics of getting her on the

7    line so additional questions can be asked and additional

8    responses can be given.

9            MR. SULLIVAN:  Well, as you can see from the e-mail

10   chain, Mr. Hill was in a deposition in the morning.  I presume

11   he's probably finished with that.  I can call him.

12           But Ms. Siskind, who is primarily responsible for the

13   argument, the legal argument, has a couple of cases that support

14   the proposition that the witness who testifies about the

15   procedures of the bank doesn't need to know how the data was

16   input.  She just needs to know that -- well, can I turn it over

17   to Ms. Siskind for that short thing, Your Honor?

18           THE COURT:  Absolutely.  I understand.  I think I

19   understand where you're going with this, but go ahead.

20           MS. SISKIND:  Thank you, Your Honor.  After

21   yesterday's hearing when the issue came up with subpart (a) of

22   803(6), we went back and did some additional research on what

23   kind of information the court needs to have before it to make

24   the finding that a record was created at or near the time by a

25   person with knowledge.

132

1    And I have two cases, and I have copies if the court

2  and defense counsel would like to see them.  It's both Seventh

3  Circuit case law.  One is United States vs. Moore, one is United

4  States vs. Keplinger.  And both are interpreting the phrase

01:29  5  qualified witness as that phrase is used in 803(6).  Both cases

6  talk about how the court is to broadly construe what it means to

7  be a qualified witness within the meaning of that rule.

8    In United States vs. Moore the Seventh Circuit said:

9  "Rule 803(6) requires that a custodian or qualified witness

01:30  10  testify that the various requirements of the business records

11  exception are met.  There is no requirement, however, that a

12  qualified witness must have personally participated in or

13  observed the creation of the document.  The phrase 'qualified

14  witness' is to be broadly interpreted as requiring only someone

01:30  15  who understands the system."

16    And then United States vs. Keplinger says that to

17  impose such a requirement that a person know all aspects of how

18  the record was created "would eviscerate the business records

19  exception, since no document could be admitted unless the

01:30  20  preparer, and possibly others involved in the

21  information-gathering process, personally testified as to its

22  creation.  Rather, the phrase 'other qualified witness' in Rule

23  803(6) is to be given the broadest possible interpretation — the

24  witness need only be someone who understands the system."

01:30  25    We would --

1    THE COURT:  Go ahead.

2    MS. SISKIND:  Your Honor, for example, in a normal

3    prosecution involving bank records, forgetting about foreign

4    bank records for a moment.  Let's say you want to put in a

5    signature card that was maintained at Bank of America.  The

6    standard practice for putting that in would be to put on a Bank

7    of America records custodian who would the testify that this

8    document meets the requirements of 803(6).  The government

9    wouldn't need to put on the person who handed the blank

10   signature card to a customer, the person who collected the

11   signed signature card from the customer, the person who scanned

12   in the signature card into the system.  It would just need to be

13   a person generally familiar with how that record was created and

14   maintained in the ordinary course of the bank's business.

15   Similarly, in this case Ms. Katju has already

16   testified, without even adding any additional testimony from

17   her, that the -- that what the HUB system was, about how it was

18   used, about the type of information it contained, and about how

19   she relied on it in performing her duties at the bank both in

20   India and the United States.  And so we would submit that based

21   on the testimony the court already has before it, including the

22   testimony of the record custodian from Buffalo, New York, that

23   there has been essentially two qualified witnesses who have

24   taken the stand — one who can testify to the way that system is

25   used in India, and another who has testified to how screen shots

1    made from that system were kept and maintained in the United

2    States, and that together those should be sufficient without any

3    further testimony for the court to make a finding that the

4    screen shots meet the requirements of 803(6).

01:32   5            THE COURT:  With that said can you give me the

6    citations?  The point cites or the copies?

7            MS. SISKIND:  Yes, Your Honor.  I'll hand up the

8    copies.  I have it flagged with the page with quotes on it as

9    well.

01:32  10            THE COURT:  Number two, is it still your desire to

11    have Ms. Katju testify and supplement what she said yesterday?

12            MS. SISKIND:  Your Honor, we would -- Court's

13    indulgence?

14            (Government counsel confer.)

01:33  15            MS. SISKIND:  Your Honor, we would defer to the court.

16            THE COURT:  It's your case.

17            MS. SISKIND:  Your Honor, then we will have testimony

18    from her.

19            THE COURT:  Do you want a couple moments to see -- or

01:33  20    have one person who is on your team see whether or not she's

21    available?

22            MS. SISKIND:  Yes, Mr. Sullivan will take care of

23    that.

24            THE COURT:  All right.  Number two.  There is a matter

01:33  25    related to jurors.  My clerk has handed you a questionnaire

135

1    which just came in.  And my clerk was also to instruct you

2    regarding what we have learned since receiving this

3    questionnaire.  In particular, this member of the pool indicated

4    to the jury clerks that there is an important meeting this

5    person must attend Monday.

6            Do you have any comments respecting this juror's

7    attendance on Monday?

8            MR. KIRSCH:  Your Honor, is the juror that has the

9    meeting on Monday the person whose questionnaire that we

10   received this morning?

11           THE COURT:  Well, yes, it's the -- the male juror?

12           MR. KIRSCH:  Yes, okay.  We talked about two.  I

13   don't -- I mean, I think we probably have enough people so -- I

14   don't know.  I mean, he didn't put it on his questionnaire.  I

15   think we have enough people.  I just leave it to the discretion

16   of the court, Your Honor.

17           THE COURT:  What's the position of the government?

18           MS. SISKIND:  The government concurs with defense

19   counsel.

20           THE COURT:  All right.  Well, I'm not aware of any

21   particulars concerning this person's attendance other than what

22   the jury clerk related.  And so what I am going to ask the

23   courtroom deputy to do is to contact the jury clerk who is to

24   quiz this juror further concerning the engagement on Monday and

25   to report back to me, and hopefully we will have some additional

1    information before we conclude.  And I'll make a decision.

2         The second matter relates to yet another juror who has

3    a medical problem which came to light yesterday.  I assume

4    you've been advised of the medical problem.  And it was on the

01:36    5    basis of what I learned concerning this medical problem that I

6    have instructed the jury clerks to let this person know there is

7    no need to attend on Monday.  Do you have any comments?

8         MS. SISKIND:  Not from the government, Your Honor.

9         MR. KIRSCH:  No objection.

01:36    10         THE COURT:  Very well.

11         Third.  I would like to address the motion in limine

12    filed by the defense.  I note there has not been any response by

13    the government, and that the subject of the motion is the

14    witness who just flew in.  What's the position of the government

01:37    15    concerning the motion in limine?

16         MS. SISKIND:  Thank you, Your Honor.  The government

17    did not file a written response because it was only filed a few

18    days before yesterday's hearing.

19         THE COURT:  I understand.

01:37    20         MS. SISKIND:  First I would note that some of the

21    bases for the motion in limine are questions that were asked of

22    this witness both by government counsel and by members of the

23    grand jury during his grand jury testimony.  And certainly

24    matters come up all the time in a grand jury appearance that

01:37    25    might not be admissible at trial.  So just because we asked him

137

1    about it in a grand jury doesn't mean we're going to ask him

2    those same exact questions at trial.

3            THE COURT:  That's understood.  But will you be asking

4    the witness questions that will solicit the answers that were

5    given during the witness's grand jury testimony?

6            MS. SISKIND:  We intend -- we believe that Mr. Bhasin

7    can testify, and we intend to ask him, about the fact that he

8    personally opened and maintained an undeclared bank account at

9    HSBC-India.

10           THE COURT:  Let's try to focus.

11           MS. SISKIND:  Okay.

12           THE COURT:  Will you be seeking the information from

13   Mr. Bhasin that is reflected in his grand jury testimony?

14           MS. SISKIND:  Some of it yes and some of it no.

15           THE COURT:  All right.  Will be seeking from him any

16   of the hearsay that is in his grand jury testimony?

17           MS. SISKIND:  Some of it yes and some of it no.

18           THE COURT:  All right.  What hearsay will you be

19   seeking from Mr. Bhasin?

20           MS. SISKIND:  We will be asking him about statements

21   made to him by bankers at HSBC at the time he opened a bank

22   account in India, and statements specifically on the subject of

23   the issuance of 1099s.  The government is not offering those

24   statements of those unidentified bankers for the truth of the

25   matter asserted, so it is non-hearsay testimony.  We're offering

138

1   it to go to Mr. Bhasin's state of mind at the time he opened an

2   account with the bank.

3           THE COURT:  All right.  And is there any other reason

4   why you would be seeking that information from Mr. Bhasin?

5           MS. SISKIND:  That particular statement we would also

6   be introducing to -- to the extent Mr. Bhasin also testifies

7   that he referred the defendant to the bank for the opening of

8   the bank account, we would be -- leave open the opportunity to

9   ask him whether he said anything to the defendant regarding

10  whether 1099s would be issued.  We do not know the answer to

11  that question, it wasn't asked in the grand jury, but we plan on

12  asking him that when we meet with him tomorrow.

13          THE COURT:  Is it your intention to solicit his -- the

14  statements that were given to him or made to him by these

15  unknown HSBC employees prior to determining whether or not he

16  made any statement to the defendant regarding 1099s?

17          MS. SISKIND:  Yes, Your Honor, in order to show his

18  state of mind.

19          THE COURT:  All right.  Does the defense maintain its

20  request that the government be barred from soliciting that

21  testimony from Mr. Bhasin?

22          MR. KIRSCH:  Your Honor, the --

23          THE COURT:  Yes or no?

24          MR. KIRSCH:  Yes, some of it.

25          THE COURT:  Which portion do you still object to?

139

1    MR. KIRSCH:  Well, I was a little unclear on the third

2  portion.  I think the third portion was that they're going to

3  ask Mr. Bhasin whether he ever told Dr. Ahuja that -- whether

4  Dr. Ahuja and Mr. Bhasin ever discussed 1099s.  And we have no

5  objection to that because Mr. Bhasin says no, we never discussed

6  it.  So it's not hearsay, it's not anything.

7            But, Your Honor --

8            THE COURT:  The government suggests they haven't asked

9  that question of Mr. Bhasin.  But anyway, go ahead.

10            MR. KIRSCH:  Your Honor -- this was in the grand jury,

11  he was asked four, five times, he said no.

12            So, Your Honor, the -- obviously this is a huge -- I

13  need 30 seconds to tell the court about it.  They're gonna ask

14  Mr. Bhasin whether or not an HSBC banker ever told him that he

15  wasn't going to receive 1099s.  They recognized the hearsay

16  problem and they argue it's not for the truth of the matter

17  asserted, it's admissible to show Bhasin's state of mind.

18  Bhasin's state of mind is not -- is absolutely relevant.

19            THE COURT:  It's not relevant.  That's why I'm trying

20  to get quickly to the point.  I agree with you.

21            MR. KIRSCH:  It's not relevant, and -- well, maybe I

22  should just sit down.  If the court has any questions for me I'm

23  happy to answer them.

24            THE COURT:  At this stage, no.

25            The court is not going to allow the government to

140

1    offer Mr. Bhasin's testimony respecting his state of mind unless

2    you can demonstrate that his state of mind has some relevance in

3    this case.

4              MS. SISKIND:  Thank you, Your Honor.

01:42   5         THE COURT:  And to that extent the defendant's motion

6    in limine is granted.

7              Now, let's talk about co-conspirator statements.  The

8    government is seeking to offer a multitude of statements in this

9    case that it attributes to employees of HSBC and, in particular,

01:42   10   two employees of HSBC.

11             You provided a chart as part of your motion which is

12   docketed at docket entry 125.  That chart begins on page 4 and

13   continues -- which is page 4 of 19 of docket entry 125, to page

14   5 of 19 of docket 125.

01:43   15        Is it still the intention of the government to seek

16   the admission of all of the materials that are referred to on

17   those pages?

18             MS. SISKIND:  Your Honor, some of those statements

19   were addressed in the context of authorized statements

01:43   20   yesterday.

21             THE COURT:  Is it still the government's intention to

22   seek the admission of all of these statements?

23             MS. SISKIND:  Yes, Your Honor.

24             THE COURT:  Yes or no?

01:43   25        MS. SISKIND:  Yes, Your Honor.

141

1    THE COURT:  Okay.  And in light of that, I note

2   further that these statements relate primarily to HSBC employees

3   Priti, P-R-I-T-T-I, R., last name Dhanani, D-H-A-N-A-N-I, and

4   Ankush, A-N-K-U-S-H, K., last name T-A-N-D-O-N.  Is that

5   correct?  Is that correct?

6    MS. SISKIND:  That's correct, Your Honor.

7    THE COURT:  All right.  And is it the theory of the

8   government that each of these exhibits taken as a whole and only

9   with respect to each of these individuals establish grounds upon

10  which they should be admitted as -- as exception to the hearsay

11  rule because they were made by co-conspirators during the course

12  of and in furtherance of a conspiracy with the defendant?

13    MS. SISKIND:  Yes, Your Honor.

14    THE COURT:  Is there independent evidence that does

15  not include any portion of the exhibits that are discussed on

16  pages 4 and 5 of Exhibit 119 that you look to to support your

17  theories respecting admissibility?

18    MS. SISKIND:  Yes, Your Honor.

19    THE COURT:  What independent evidence are you relying

20  upon?

21    MS. SISKIND:  First we have statements of the

22  defendant contained both in e-mails and in letters signed by the

23  defendant that along with the co-conspirator statements

24  establish the existence of the conspiracy.

25    THE COURT:  Okay.  In responding to the question,

142

 1    address only those matters that are independent of statements

 2    made by Dhanani or Tandon.

 3         MS. SISKIND:  The independent evidence are statements

 4    of the defendant Arvind Ahuja, testimony of Ramit Bhasin, and

 5    the screen shot evidence.

 6         We also have a check related to a bank transaction

 7    involving the defendant's account in Jersey.

 8         We have HSBC-United States bank records reflecting

 9    wire transfers to HSBC-India.  Those are the non-statement

10    evidence combined that goes along with the co-conspirator

11    admissions and the defendant's non-hearsay statements.

12         THE COURT:  Okay.  Let's first talk about exhibits.

13    Would you please identify by exhibit number the materials that

14    you rely upon to demonstrate that these two persons/employees of

15    HSBC were part of a conspiracy.

16         MS. SISKIND:  Yes, Your Honor.  The first would be a

17    statement from the defendant at Exhibit 54 which relates to

18    changing his correspondence address to an address that he does

19    not reside at in India.

20         Shall I continue, Your Honor?

21         THE COURT:  Hold up for a moment, please.

22         MS. SISKIND:  Sure.

23         THE COURT:  All right.  I have this in front of me.

24    And for the record, it appears to be a communication to "The

25    Manager HSBC-NRI Services."  And it says:  "Dear sir.  Subject:

143

1    Change of correspondence address."  Then it has an account

2    number and says:  "With reference to the above subject, you are

3    requested to please change the correspondence address on all my

4    accounts under the customer I.D." -- and then it has the

5    customer I.D. --  "to my India P2 address mentioned below."

6            The address follows.  And it goes on to say:

7    "Thanking you.  Yours faithfully, Dr. Arvind Ahuja."

8            Is that right?

9            MS. SISKIND:  The next piece of independent evidence

10   corroborating the co-conspirators' intent would be the portion

11   of the e-mail in Exhibit 29 that is the statements of the

12   defendant as opposed to the statements of the alleged

13   co-conspirators.

14           THE COURT:  I have that exhibit in front of me.  And

15   are you referring to the bottom portion of Exhibit 29 when you

16   talk about the statements of Dr. Ahuja?

17           MS. SISKIND:  Yes, Your Honor, the e-mail that begins

18   "hi Ankush" and is written in all capital letters.

19           THE COURT:  All right.  Go ahead.

20           MS. SISKIND:  So that would be the next one.  The next

21   piece of independent evidence with respect to the co-conspirator

22   statements.

23           THE COURT:  Now, this letter has certain -- it reads

24   "HSBC charge card increased."  Then it has "Namrata."  Then it

25   has what appears to be a charge card number.  And then it says

144

 1    "Arvind" and what appears to be a charge card number, a 16-digit

 2    number.  It continues, question mark, "Is their CD due June

 3    14th?  Thanks.  Let me know.  Thanks.  AA."

 4          Is that the communication you attribute to the

 5    defendant as evidence supporting the involvement of Mr. Ankush

 6    Tandon in the conspiracy?

 7          MS. SISKIND:  Yes, Your Honor.

 8          THE COURT:  All right.  And I see the top a response

 9    and you're not relying upon that because that is being -- that

10    would be contrary to what you said earlier about not relying on

11    non-hearsay evidence, correct?

12          MS. SISKIND:  Your Honor, we -- that is not part of

13    the independent evidence.  That is, though, part of the

14    evidence, of course --

15          THE COURT:  Yeah, but that's not part of the

16    independent evidence.

17          MS. SISKIND:  Correct, Your Honor.

18          THE COURT:  All right.  Go ahead.

19          MS. SISKIND:  We are also relying on the testimony of

20    Vandana Katju regarding the circumstances under which employees

21    in the HSBC representative office would produce screen shots.

22    And it was her testimony that those screen shots were obtained

23    because bank account information was not available in the United

24    States.  So we'd be relying on that as independent evidence to

25    support the co-conspirators membership in the conspiracy and

145

1  their understanding that the defendant was not receiving bank

2  statements in the United States.

3          THE COURT:  All right.

4          MS. SISKIND:  And on that point, Your Honor, the very

5  existence of the screen shots and the fact that the HSBC records

6  custodian testified yesterday that screen shots relating to the

7  defendant were maintained in the United States suggests that

8  this was a manner in which employees at the representative

9  office, including Priti Dhanani and Ankush Tandon, had obtained

10  information for the defendant because he wasn't receiving bank

11  statements.

12          THE COURT:  One second.  You just indicated that there

13  will be testimony that the defendant was not receiving bank

14  statements.

15          MS. SISKIND:  Correct, Your Honor.  If you recall --

16          THE COURT:  And that testimony is going to come in in

17  what manner?

18          MS. SISKIND:  Ms. Katju will testify generally that

19  screen shots were only a necessity because that was the only way

20  that people in the United States could access bank account

21  information.  The reasonable inference to be drawn from the fact

22  that there are Arvind Ahuja screen shots maintained in this

23  country is that representative office employees had to get those

24  in order to give him account information.

25          THE COURT:  Are you saying the fact that HSBC

1    maintains in its records screen shots of the defendant's

2    accounts in the bank in India demonstrates that such information

3    was requested or available to U.S. employees and, in particular,

4    Tandon and, what's the other person's name?

5               MS. SISKIND:  Dhanani.

6               THE COURT:  Dhanani.

7               MS. SISKIND:  No, Your Honor.  The screen shots

8    Mr. Maciejewski testified yesterday were actually maintained in

9    the United States, not in India.

10              THE COURT:  Yes.

11              MS. SISKIND:  So it's our -- the inference from the

12   fact they were maintained in the United States, combined with

13   Ms. Katju's testimony, is that somebody in the representative

14   office had to request them for the defendant.

15              The further inference to be drawn from that is there

16   would be no need to get these screen shots to give him account

17   information if he was receiving bank statements as he was for

18   other domestic bank accounts.

19              THE COURT:  All right.  Go ahead.  What else do you

20   rely upon?

21              MS. SISKIND:  The one additional piece of independent

22   evidence on the bank statement, also on the issue of whether he

23   was receiving 1099s, will be the testimony of CPA Mark Miller

24   who will testify that in the course of preparing tax returns for

25   the defendant for the years 2006 through 2009, he relied on bank

147

 1  statements and 1099s provided by the defendant or the

 2  defendant's financial advisor regarding bank accounts that the

 3  defendant had in this country.  And Mr. Miller will testify that

 4  the defendant, or his financial advisor, produced many bank

 01:56  5  statements and bank account records for that task.  However,

 6  Mr. Miller will testify he never received any bank statements

 7  from an account maintained either at HSBC-India or HSBC-Jersey.

 8          THE COURT:  Okay.  What else do you look to?

 9          MS. SISKIND:  The next piece of independent evidence

 01:56  10  would be Exhibit 62.

 11          THE COURT:  We talked about that yesterday.

 12          MS. SISKIND:  Yes, Your Honor.  This would be the

 13  letter relating to the closure of the Jersey account.

 14          THE COURT:  All right.

 01:57  15          MS. SISKIND:  The next piece of independent evidence

 16  would be Government Exhibit 64, which is a copy of the check

 17  issued to the defendant after his Jersey account was closed.

 18          THE COURT:  All right.  What else do you have?

 19          MS. SISKIND:  The next one is also something we

 01:57  20  discussed yesterday, Exhibit 5, which is a signed letter from

 21  the defendant requesting a checkbook that does not have "NRO"

 22  printed on it.

 23          THE COURT:  What does NRO stand for?

 24          MS. SISKIND:  It stands for non-resident ordinary.

 01:58  25          THE COURT:  Okay.  Okay.

148

1    MS. SISKIND:  And on the subject of that checkbook,

2  Mr. Ramit Bhasin will also provide independent evidence by way

3  of testimony about the circumstances under which that checkbook

4  was issued from the bank to the defendant.

5    THE COURT:  And that testimony essentially will be

6  what?

7    MS. SISKIND:  He will explain why the checkbook was

8  necessary.  And he will explain it was necessary because the

9  account -- excuse me, the financial institution at which the

10  defendant wanted to open a bank account would not have done so

11  for him if they knew he was a resident of the United States.

12  And essentially, having "NRO" on the checkbook would be a clue

13  to the financial institution in India that the defendant was a

14  resident of somewhere other than India.

15    THE COURT:  All right.  What else?

16    MS. SISKIND:  The next piece of independent evidence

17  is Exhibit 82, which is a set of two letters signed by the

18  defendant on October 8th, 2009.

19    THE COURT:  And that letter is addressed to The

20  Manager US -- I'm sorry, manager HSBC-NRI Services USA, and

21  reads:  "Dear Sir, subject:  NRO CD encashment requests,"

22  followed by an account number.

23    It continues:  "With reference to the captioned

24  subject, request you to encash the following CDs on maturity and

25  credit them to the NRO Savings A/C number," then it has an

149

1    account number.

2         Afterward there are five sets of numbers followed by a

3    maturity date -- I should say followed by maturity dates of

4    October 7th of 2009, October 7, 2009, September -- correction,

02:01  5    October 9th, 2009, October 9th, 2009, October 24th, 2009.  And

6    it has signatures purported to be those of Arvind Ahuja and

7    Namrata Ahuja.

8         There is also a notation on the right side of the

9    document that says "okay to encashment," and there is what

02:01  10   appears to be some signature.

11        At the bottom there is also some doodling which I

12   can't read.  And I note that at the top of the document in

13   someone's handwriting is the date 08 October 2009.

14        There's a second page to this exhibit as well, which

02:02  15   is addressed to The Manager, HSBC-NRI Services, USA.  Has the

16   date 08 October 2009, and reads:  "Dear sir, Sub:  Premature NRO

17   CD encashment with the account number."  It's the same account

18   number that appears on the first portion of Exhibit 82 which is

19   HSBC-NRI, and I'm giving you the Bates number, HSBC-NRI 0008345,

02:03  20   the second is 0008346.

21        The body of the letter reads:  "With reference to the

22   captioned subject, request you to prematurely encash the CD

23   numbers," and then it has the account number -- actually, two

24   account numbers -- "and credit them to the NRO savings A/C

02:03  25   number," followed by an account number, "in the name of Namrata

1    Ahuja.  Thanks and regards."

2         At the bottom, above the signatures that purport to be

3    those of Arvind Ahuja and Namrata Ahuja.  There is similar

4    writing at the bottom.  There's writing at the bottom similar to

02:03  5    that on the previous page.  And it appears to be someone's

6    signature.  It may be Priti.  Does this purport to be the

7    signature of Priti Dhanani?

8         MS. SISKIND:  We have no independent evidence that's

9    her signature.  To me that's what it looks like.  Certainly the

02:04  10   jury can determine for itself what that says.

11        THE COURT:  All right.  But that's all that you have

12   in that regard.  What other exhibit or exhibits do you have to

13   support independently this conspiracy?

14        MS. SISKIND:  Relating to these two we just looked at,

02:04  15   there's also Exhibit 84, but not the statement, just the e-mail

16   header information on Exhibit 84, which shows that the two

17   letters we just looked at closing out certain accounts,

18   transferring the money to another, that that new account

19   confirming that it's an account for Namrata Ahuja.

02:04  20        THE COURT:  This e-mail header reads From.  Then it

21   says, in caps, K-H-E-T-A-N, X, S-O-M-N -- S-O-M-I-N-A.  Sent:

22   Monday, June 7, 2010, 3:30 a.m.  To:  Adheer.  In caps,

23   U-P-A-D-H-Y-A-Y.  CC:  Priti R. Dhanani.  Subject:  Preferential

24   NRO rate request.  It has an account number followed by a slash

02:05  25   and the name Namrata Ahuja.  All right.

 1     MS. SISKIND:  And, Your Honor, to circle back just for

 2  a moment to the Jersey account check and the letter from the

 3  defendant in Exhibit 62 directing that the account be closed.

 4     THE COURT:  All right.

02:05  5     MS. SISKIND:  I do have, if the court wants to see it,

 6  a chart that explains the relationship between that independent

 7  evidence, the check and the letter from the defendant, how those

 8  relate to later co-conspirator statements.

 9     THE COURT:  All right.

02:06  10     MS. SISKIND:  Your Honor, may I approach?

 11     THE COURT:  You may.

 12     (Document tendered to the court.)

 13     THE COURT:  Thank you.  Proceed.

 14     MS. SISKIND:  Thank you, Your Honor.  Would Your Honor

02:06  15  like an explanation on this chart?  Just by way of offering how

 16  things relate to each other.

 17     THE COURT:  Does the defense have the chart?

 18     MR. KIRSCH:  Yes, Your Honor.  Thank you.

 19     THE COURT:  All right.  Go ahead

02:06  20     MS. SISKIND:  Would Your Honor like anything

 21  additional on this chart?  I think it speaks --

 22     THE COURT:  Well, why don't you describe it for the

 23  record.

 24     MS. SISKIND:  Sure, Your Honor.  It's a chart that

02:06  25  establishes the flow of funds of the check that was -- that is

Case 2:11-cr-00135-CNC   Filed 08/14/12   Page 30 of 95   Document 140

1    in Exhibit 64.

2    THE COURT:  And that's check number 14221397, correct?

3    MS. SISKIND:  Correct, Your Honor.

4    THE COURT:  All right, go ahead.

5    MS. SISKIND:  The chart starts by indicating that

6    Grand Jury Exhibit -- I'm sorry, Trial Exhibit 62 is a letter

7    from the defendant dated 9/21 --

8    THE COURT:  One second.  Let's mark this as hearing

9    Exhibit 1.

10    (Hearing Exhibit 1 marked.)

11    THE COURT:  Go ahead.

12    MS. SISKIND:  Thank you, Your Honor.

13    So this chart shows -- it begins with a check, check

14    number 14221397, being issued to the defendant after he asks

15    that his Jersey account be closed.

16    Exhibit 64 shows that the check was sent to the

17    defendant in Wisconsin.

18    Then Exhibit 65 is a statement we're offering as a

19    co-conspirator statement in which the bank is forwarding that

20    check along through the lockbox in England for eventual

21    crediting to the defendant's account.

22    Exhibit 87 shows that, in fact, that exact dollar

23    amount on the check was credited to the defendant's HSBC-India

24    account on December 4th of 2009.

25    And then Exhibit 88 shows that those funds were made

1    available to the defendant at a branch in London for him to

2    withdraw on a trip to London on January 25th of 2010.

3             THE COURT:  Go ahead.

4             MS. SISKIND:  Thank you, Your Honor.  We would suggest

02:09    5    that the route that this check took around the world and the

6    flow of funds helps establish the intent and the knowledge of

7    the co-conspirators.

8             THE COURT:  All right.

9             MS. SISKIND:  The next piece of independent evidence

02:09   10    is also two documents we looked at yesterday.  Those are letters

11    from the defendant in Exhibits 21 and 22, which are the e-mails

12    from the defendant in 21 and 22 asking Ankush Tandon to raise

13    the credit limit on the cards linked to his HSBC-Jersey account.

14             THE COURT:  All right.

02:10   15             MS. SISKIND:  The next item is Government's

16    Exhibit 32, which is a letter signed by the defendant to the

17    Premier Department of HSBC-Jersey on November 16th, 2006.  And

18    in this letter the defendant is requesting that PINs be issued

19    for a credit card and because he was going to need them shortly

02:10   20    for his trip to the United Kingdom, asking that the PINs be sent

21    to care of Ramit Bhasin to an address in London.

22             THE COURT:  All right.

23             MS. SISKIND:  And I think we looked yesterday at some

24    e-mails that showed that the bankers, in fact, helped with this

02:11   25    request.  And also, the other independent corroboration is

154

1    Mr. Bhasin will testify, as he did in the grand jury, that he

2    was with the defendant in London in November of 2006 and saw the

3    defendant use a debit card.

4              THE COURT:  Go ahead.

5              MS. SISKIND:  Your Honor, that is the total of the

6    independent evidence and we'd ask the court to consider that

7    along with the statements themselves in finding the existence of

8    a conspiracy.

9              THE COURT:  What conspiracy?

10             MS. SISKIND:  Your Honor, the defendant opened and

11   maintained undeclared bank accounts both in India and in Jersey

12   with HSBC.

13             THE COURT:  All right.

14             MS. SISKIND:  The government's theory of the

15   conspiracy is that in order to conceal those accounts from his

16   accountant and from the IRS, the defendant required the

17   assistance of employees at the bank.  He required their help in

18   preventing statements from going to his house in Wisconsin.  He

19   needed their help in accessing funds in his account while

20   traveling abroad, whether it be through cash withdrawals,

21   transfers of funds to third parties, or the issuance of debit

22   and credit cards.  He needed their help in moving money between

23   accounts at the bank and from the account in India to other

24   financial accounts including at HDFC which is another bank in

25   India.

155

1      The help of the employees in the representative office

2   was particularly important in light of the fact the defendant

3   wasn't receiving bank statements at his house in Wisconsin.

4      The government will establish at trial that he is a

02:13   5   financially savvy individual.  He likes to keep track of his

6   investments, keeps on top of interest rates.  The e-mails in

7   this case shows that he's requesting information about when CDs

8   are matured.  And he needs all this information but can't get it

9   without the help of the representative office employees because

02:13  10   he doesn't have bank statements.  And that's where their help

11   comes in.  They're able, as Vandana Katju testified, to get

12   information for him from the bank in India.  They could request

13   screen prints or other information and then relay that

14   information to him to keep him abreast of what was going on in

02:14  15   his account.

16      The evidence shows that particularly Priti Dhanani

17   played an instrumental role in placing a hold mail on his

18   account which was to prevent any account statements from going

19   to him in Wisconsin.

02:14  20      We saw -- there's an e-mail from her in which even

21   after the hold mail is on a statement is accidentally sent to

22   his house in Wisconsin and she writes an e-mail to another

23   banker very angrily complaining about this and demanding to know

24   why a statement had been sent to him and not to her in New York.

02:14  25   And that demonstrates she knows the defendant does not want to

1    receive bank statements.

2         The evidence also shows that after she finds out he

3    accidentally received a statement, she drafts a letter for him

4    to sign changing the correspondence address on his account to an

5    address in India.  And we will offer testimony -- offer evidence

6    at trial that she knew he lives in Wisconsin and not in India.

7    And, in fact, there are letters in this case that identify a

8    person who does live at the address that she changes his

9    correspondence address to.

10        The chart that we just provided to the court also

11   helps establish how the -- how Priti Dhanani in particular knew

12   that it was important for the defendant not to make records of

13   his offshore bank accounts in the United States.  Here we have

14   him closing his account, with her help, receiving a check from

15   HSBC-Jersey — and that's that check number 14221397.  And what

16   the evidence shows is that the defendant did not take that check

17   and walk into the local US Bank branch and deposit that.

18   Instead, he held onto that check after he received it in October

19   of 2009.  The government will offer evidence that he met with

20   Priti Dhanani in October of 2009, and we will argue the

21   inference from that is he handed the check to her at that

22   meeting because the following month an employee of the

23   representative office in New York took that check, which they

24   had obtained from the defendant, mailed it to England so it

25   could be cleared through their lockbox because the check was

157

1   denominated in pounds, it couldn't go right to India, it cleared

2   the lockbox in England, was credited to his account in India,

3   and he was able to access it several months later when he

4   traveled to London.  So this check took this route across the

5   world just to come back to where it started to the defendant's

6   possession.

7        Priti Dhanani's involvement in this transaction is

8   strong evidence that she knew of his intent to hide the

9   existence of his foreign bank accounts from the government.

10  There is no reasonable explanation for the transaction here in

11  Exhibit 1, other than concealment.  There is no reasonable

12  explanation for putting a hold mail on bank statements.  When

13  you're a financially savvy individual who likes to keep on top

14  of your investments, there's no reasonable explanation for that

15  other than --

16       THE COURT:  There may not be any reasonable

17  explanation for what Dr. Ahuja did or knew.  The question that

18  has to be addressed at this stage, however, is different.  It

19  is, what did Priti Dhanani or Tandon know?

20       MS. SISKIND:  Yes, Your Honor.

21       THE COURT:  And what you provided me thus far are a

22  list of exhibits and anticipated testimony that does not discuss

23  what these individuals knew at any given point in time.

24       MS. SISKIND:  Your Honor, the government's position is

25  that the transactions that Ms. Dhanani and Mr. Tandon undertook

158

1   on the defendant's behalf, that there is no reasonable

2   explanation for the types of transactions other than

3   concealment.  And the fact that they were voluntary participants

4   in these transactions, saw what the defendant wanted to have

5   accomplished through these transactions, that is evidence of

6   their intent and their knowledge of the concealment.

7           THE COURT:  Why so?  Let me give you an example.

8   Exhibit 54.  Is there anything in Exhibit 54, the correspondence

9   seeking to change the defendant's address to an address in

10  India, indicating that these two individuals whose e-mails and

11  other correspondence you want this court to admit knew at that

12  point in time what the defendant may have been up to?

13          MS. SISKIND:  First, Your Honor, we know that Priti

14  Dhanani -- there's evidence that Priti Dhanani drafted this

15  letter.  She drafted this letter for the defendant after a

16  statement was accidentally mailed to his house in Wisconsin.  We

17  know that in two ways.  First, --

18          THE COURT:  Let's stop for a moment, please.

19          MR. SULLIVAN:  Your Honor, I hate to interrupt, this

20  is a real critical part of this, but the two -- the witness is

21  ready to initiate the call.

22          THE COURT:  Well, let's take the call.

23          MR. SULLIVAN:  Sorry to interrupt.

24          THE COURT:  No.  I'm happy to interrupt if it's going

25  to get some critical information on the record.

1      Kris, I'm going to leave the bench.  Make sure

2  everything is okay.

3           (Recess taken at 2:20 p.m., until 2:27 p.m.)

4           THE COURT:  Are the parties prepared to proceed?

02:28  5           MS. SISKIND:  Yes, Your Honor.

6           MR. KIRSCH:  Yes, Your Honor.

7           THE COURT:  Is the witness on the phone?  Ms. Katju?

8           THE WITNESS:  Yes, hi.

9           THE COURT:  Good afternoon.  You have been previously

02:28  10  sworn for this case and remain under oath subject to the

11  penalties of perjury.

12           The government may proceed.

13           MS. SISKIND:  Thank you, Your Honor.

14       VANDANA KATJU, GOVERNMENT WITNESS, PREVIOUSLY SWORN

02:28  15                        DIRECT EXAMINATION

16  BY MS. SISKIND:

17  Q.  Ms. Katju, this is Melissa Siskind from the Tax Division,

18  how are you?

19  A.  Very good, how are you?

02:28  20  Q.  Good.  I just want to remind you again just like yesterday,

21  please speak as slowly and as clearly as you can so that the

22  court reporter can hear you and we don't have to have you repeat

23  your answers too many times, okay?

24  A.  Okay.

02:28  25  Q.  I want to just ask you a few questions to clarify with you

160

1    one answer in particular you gave yesterday.  Do you recall

2    indicating yesterday that you did not know how data was input

3    into the HUB system in India?

4    A.  Yes.

5    Q.  Can you explain what you meant by that?

6    A.  What I meant was I was never a supervisor of the back

7    officers and I was never aware of how the actual input of the

8    information into the computer systems took place.

9    Q.  Are you familiar, though, with the types of transactions

10   that would get input into the computer system?

11   A.  On a general level, yes.

12   Q.  Let me give you some examples and you can indicate whether

13   you're familiar or not with that.  If there was an NRI customer

14   in the United States --

15            MR. KIRSCH:  Judge, I'm going to object to leading.

16            THE COURT:  Objection sustained.

17   BY MS. SISKIND:

18   Q.  Do you have any knowledge about how records of new

19   certificates of deposit would be reflected in the HUB system?

20   A.  Your voice is echoing.

21            THE COURT:  Repeat that, please.

22   BY MS. SISKIND:

23   Q.  Do you have any knowledge about how records of how

24   certificates of deposit would be made in the HUB system?

25            THE COURT:  Well, are records of certificates of

161

1    deposits put into the HUB system?

2            THE WITNESS:  I personally don't know --

3            THE COURT:  Please listen to the question.  Do you

4    know whether records related to certificates of deposit are put

5    into the HUB system?

6            THE WITNESS:  Yes.

7            THE COURT:  Proceed.

8            THE WITNESS:  Yes.  Specifically, to certificates of

9    deposit the transaction was inputted into the HUB system.  From

10   there the customer service people could look it up and advise

11   the clients that their transaction was complete.

12           THE COURT:  Go ahead.

13   BY MS. SISKIND:

14   Q.  Would there be records in the HUB system if a person

15   prematurely encashed a certificate of deposit?

16   A.  Sorry, could you say that again?

17   Q.  Would there be any record in the HUB system if a person

18   prematurely encashed a certificate of deposit?

19   A.  I believe so.  To the best of my knowledge, yes.

20   Q.  What other types of transactions, to your knowledge, are

21   reflected in the HUB system?

22   A.  All the transactions that are banking, account opening,

23   issuing a checkbook, debit card.  Everything has to be inputted

24   into the HUB system.

25   Q.  Were those inputs made at or near the time of the

02:30
02:31
02:31
02:31
02:32

162

1    transaction?

2            MR. KIRSCH:  Objection, Your Honor.  She testified she

3    doesn't know how they were input.

4            THE COURT:  That's a different question.

02:32  5        Can you answer the question as asked?

6            THE WITNESS:  Would you repeat the question for me?

7    BY MS. SISKIND:

8    Q.  Sure.  Were the inputs into the HUB system made at or near

9    the time of the transaction?

02:32 10   A.  They would be made at or near the time of the request of the

11   client.

12           MS. SISKIND:  We have nothing further, Your Honor.

13           THE COURT:  Does the defense have questions?

14           MR. KIRSCH:  Yes, I do, Your Honor.

02:32 15                      CROSS-EXAMINATION

16   BY MR. KIRSCH:

17   Q.  Good afternoon, Ms. Katju.  I have some questions for you.

18   This is Tom Kirsch again.  I represent the defendant, Dr. Ahuja.

19   A.  Okay.

02:33 20   Q.  Okay.  Ms. Katju, have you ever seen the screen shots that

21   the government has marked as exhibits in this case?

22   A.  I don't believe so.

23   Q.  You don't know if they're in English or if they're in

24   Spanish or if they're in German, do you?

02:33 25   A.  No, sir.

1    Q.  Yesterday, Ms. Katju, do you recall that I asked you the

2    following questions.  I asked you:

3             "Question:  Now I think you testified on direct

4    examination --"

5             THE COURT:  Slow down.

6             MR. KIRSCH:  I'm sorry, Your Honor.  I'm sorry.  I try

7    not to do that.

8    BY MR. KIRSCH:

9    Q.  I asked you a question:  Now, I think you testified on

10   direct examination that you did not have direct access to this

11   computer system.  Do you remember giving the answer "yes"?

12   A.  Yes.  (Indiscernible) I was in the representative office.

13            THE COURT:  Repeat that, please.

14            THE WITNESS:  Sorry?

15            THE COURT:  Repeat what you said, please.

16            THE WITNESS:  I said -- sure.  I said I did not have

17   access to the HUB system while I worked for the representative

18   office.

19   BY MR. KIRSCH:

20   Q.  Did you have direct access to the HUB system when you worked

21   in India?

22   A.  Yes, sir.

23   Q.  Did you input data into the HUB system when you worked in

24   India?

25   A.  Very early in my career, yes.

Case 2:11-cr-00135-CNC   Filed 08/14/12   Page 42 of 95   Document 140

1  Q.  Do you remember yesterday testifying --  do you remember --

2  and I asked you this question:  "Do you remember telling Agent

3  Cook yesterday that you don't know how data was input into this

4  system?"

5          I asked you that question and your answer was:

6  "That's right."

7  A.  I don't now know how data is inputted into the system at

8  all.

9  Q.  And you don't know, do you?

10 A.  No, sir.  So I don't know now how they put it into the

11 system.

12 Q.  But did you know when you worked in India how it was put

13 into the system?

14 A.  I don't recall anymore.  It was 9 or 10 years ago.

15 Q.  So you don't recall whether you knew at that time or not,

16 right?

17 A.  I don't recall -- sorry, say that again?

18 Q.  I mean, it was just too long ago, you don't recall whether

19 you knew at that time or not, right?

20 A.  I don't recall how the data was inputted and I don't know

21 how it is inputted into the system.

22 Q.  You testified -- Ms. Siskind asked you a question about

23 prematurely breaking CDs, and asked if you knew whether that

24 information was put into the HUB system.  And you testified that

25 you believed so, to the best of your knowledge.  Do you remember

1    that?

2    A.  Yes.

3    Q.  You really don't know; you're just guessing, right?

4    A.  No, I do know because although I wouldn't input the

5    information into the HUB system, I could -- as a customer

6    services representative I could look it up.  So I would use -- I

7    would be an end-user of the HUB system.

8    Q.  So you recall looking up information about individuals who

9    prematurely broke CDs in the HUB system?

10   A.  Yes, sir.

11   Q.  Can you give us an example?

12   A.  Of what?

13   Q.  Of one that you would have looked up.

14   A.  I can't remember.  It was too long ago.

15   Q.  You can't remember -- well, you still work at HSBC, correct?

16   A.  Yes, but now I don't work on the HUB system at all.

17   Q.  Right.  But you can't even remember one single example of

18   looking up in the HUB system a CD that was prematurely broken.

19   A.  That is right, sir, because it was over six years ago.

20   Q.  But to the best of your knowledge that input -- that

21   information was put into the HUB system, correct?

22   A.  To the best of my knowledge.

23          MR. KIRSCH:  Your Honor, I don't think I have any

24   further questions.

25          THE COURT:  I have a couple of questions.

166

1                        EXAMINATION

2    BY THE COURT:

3    Q.  Ms. Katju, you testified a few moments ago that you input

4    information into the HUB system while you were employed by HSBC

02:38    5    in India; is that correct?

6    A.  Very early in my career I would input some -- some

7    information into the HUB system.  You know, we were not allowed

8    to input any major information into the HUB system because there

9    was a separate department altogether which did it.

02:38    10          So some cursory information I have experience in doing

11    it but that was many years ago, and especially I have no

12    experience in complicated transactions such as, you know,

13    inputting information about CDs, encashment of CDs and so on.

14    Q.  All right.  So you are familiar with the process by which

02:38    15    some information was put into the HUB system during the period

16    of time that you were in India working for HSBC; is that

17    correct?

18    A.  Yes.  But I have no recollection of, you know, how I did it

19    and what I did.  No recollection because it was 9 or 10 years

02:39    20    ago.

21          THE COURT:  All right.  Do the parties have additional

22    questions?

23          MS. SISKIND:  Briefly, Your Honor.

24                    REDIRECT EXAMINATION

02:39    25    BY MS. SISKIND:

167

1    Q.  Ms. Katju, when you worked in the representative office in

2    New York, did you ever help a customer transfer money to India

3    to open a CD?

4    A.  Customers would transfer money to India by the lockbox and

02:39  5    the CD would be opened in India.  So if customer wanted any

6    information for the process, yes, we would provide that

7    information to them.

8    Q.  And to the best of your knowledge would that transaction

9    then be recorded in the HUB system?

02:40  10   A.  Yes.

11   Q.  Do you know about how long it would take for a transaction

12   to be recorded in the HUB system?

13   A.  As far as I remember to the best of my knowledge we would be

14   given -- (Indiscernible) within two or three days, to the best

02:40  15   of my knowledge.

16   Q.  Can you just repeat that one more time?

17   A.  Yeah.  Within 24 to 48 hours to the best of my knowledge.

18            MS. SISKIND:  No further questions.

19            MR. KIRSCH:  I just have one.

02:40  20                    RECROSS-EXAMINATION

21   BY MR. KIRSCH:

22   Q.  Ms. Katju, can I ask, you answered to the best of your

23   knowledge, what's your knowledge based on?

24   A.  In my working in the representative office.

02:41  25   Q.  But can you give one example of a transaction that was put

Case 2:11-cr-00135-CNC  Filed 08/14/12  Page 46 of 95  Document 140

1    into the HUB system within 24 to 48 hours of you being made

2    aware of the transaction?

3    A.  I'm sorry, I can't give you examples right now.  Nothing

4    comes to mind.

5                    MR. KIRSCH:  Your Honor, I have no further questions.

6                    THE COURT:  Thank you very much.  We have nothing more

7    at this time.  We will end the call.

8                    (Telephone conference ended.)

9                    THE COURT:  We will come back to this discussion

10   later.  All right.

11                   Ms. Siskind, do you wish to be heard further?

12                   MS. SISKIND:  Yes, Your Honor.  I want to point to

13   another set of circumstances that indicates the co-conspirator's

14   knowledge that the defendant intended to hide income from the

15   IRS.

16                   THE COURT:  All right.

17                   MS. SISKIND:  Ms. Katju testified yesterday that one

18   of the roles of employees in the representative office was to

19   provide customers with account opening forms.  And Your Honor

20   can see an example of an account opening form at Exhibit 42.

21                   This particular account opening form was signed by the

22   defendant, and it contains a customer declaration in it.  And if

23   you look at Exhibit 43, we've provided a cleaner copy of the

24   customer declaration because it's hard to read the copy in

25   Exhibit 42.

169

1          THE COURT:  All right.

2          MS. SISKIND:  The customer declaration that is part of

3     the account opening form that all new customers were required to

4     fill out told clients -- excuse me, told customers of the bank

02:42   5     that they were required, under U.S. tax laws, to report their

6     worldwide income to the IRS.  And this is significant because

7     the Seventh Circuit has held --

8          THE COURT:  One second.  Where in the form is it?

9     It's a very -- it has very tiny print.

02:43  10          MS. SISKIND:  Locating it right now, Your Honor.

11          THE COURT:  I see it.  I found it.  It's one of the

12     bullet points near the top of the page.  In fact, it's the

13     fourth bullet point, correct?

14          MS. SISKIND:  Yes, Your Honor.  And it says, "Under

02:43  15     current U.S. tax laws, U.S. citizens and residents are subject

16     to tax on their worldwide income."  And then in parentheses it

17     indicates, "Please consult your tax advisor regarding the tax

18     treatment of these deposits in USA or any other country where

19     you are subject to tax, including your country or

02:43  20     residence/nationality."

21          THE COURT:  All right.

22          MS. SISKIND:  This would have been a form that Priti

23     Dhanani and Ankush Tandon were familiar with, we know from

24     Vandana Katju's testimony, because this was a form regularly

02:44  25     used by employees in the representative office.  Ms. Dhanani

170

1    also knew that the defendant was a resident of the --

2           THE COURT:  What evidence will there be that these

3    particular individuals utilized these forms?

4           MS. SISKIND:  The form in 42, Your Honor, is signed by

02:44    5    the defendant.

6           THE COURT:  I'm talking about Dhanani and Tandon.

7    What evidence is there that they utilized these forms and were

8    familiar with these forms?

9           MS. SISKIND:  If you look at the first page,

02:44    10   Your Honor, of Exhibit 42?  We see again that signature which

11   certainly the jury can decide for itself what it says.  It

12   appears to say "Priti" on top of the stamp "NRI status confirmed

13   as per passport.  Copies enclosed."

14          THE COURT:  And you are representing that that is the

02:44    15   signature of Priti Dhanani?

16          MS. SISKIND:  Your Honor, we will ask the jury to

17   determine.  We don't have any exemplars to compare her

18   signature.

19          THE COURT:  Are you suggesting that this is the

02:45    20   signature of Priti Dhanani?  Is that what you're going to argue?

21          MS. SISKIND:  Yes, Your Honor.

22          THE COURT:  And what do you have regarding Tandon?

23          MS. SISKIND:  As far as Mr. Tandon, we can establish

24   that Priti Dhanani was working under Ankush Tandon during this

02:45    25   time period.  There's an e-mail in the binder in which Priti

171

1    Dhanani's contacting the defendant saying I work with Ankush

2    Tandon and talking about a transaction.  The fact that she was

3    working underneath him and that she was utilizing this form

4    suggests this was a form used in the office at that time that

02:45    5    Mr. Tandon would have been familiar with.

6                THE COURT:  All right.

7                MS. SISKIND:  This form, coupled with the

8    co-conspirators' knowledge that the defendant was a resident of

9    the United States, suggests they knew he had a tax liability.

02:45    10                THE COURT:  Now, the knowledge that these individuals

11    had concerning the defendant's residence is gleaned from --

12                MS. SISKIND:  There is a copy of the defendant's

13    passport.

14                THE COURT:  And that -- are you referring to a

02:46    15    separate exhibit as well as to the stamp which appears on 42 as

16    evidence that the passport of the defendant was made available

17    to at least one of the two individuals?

18                MS. SISKIND:  Yes, Your Honor.  That stamp establishes

19    that his passport was provided to Priti Dhanani.

02:46    20                THE COURT:  All right.  Passport appears where?

21                MS. SISKIND:  Court's indulgence.

22                (Government counsel confer.)

23                MS. SISKIND:  Your Honor, there is a copy of the

24    defendant's U.S. passport in the exhibit binder in the Citibank

02:46    25    records.

1    And we have evidence that the co-conspirators knew --

2    particularly Priti Dhanani knew that the defendant lived in

3    Wisconsin because she sent things to him in Wisconsin.

4        THE COURT:  All right.

5        MS. SISKIND:  The Seventh Circuit in the Furkin case

6    addressed the issue of proving co-conspirators' knowledge of the

7    aims of the conspiracy in the context of a tax case.  And in

8    that case, what the Seventh Circuit looked at was whether the

9    alleged co-conspirators were aware of the defendant's liability

10   for a tax.

11       So here we have the customer declaration on an account

12   opening form, a form that was utilized in the office where

13   Ms. Dhanani and Mr. Tandon worked, and a form that informs

14   customers, and bankers as well, that customers with accounts in

15   India are subject to the income tax on their worldwide income

16       THE COURT:  Is Furkin 119 F.3d 1276?

17       MS. SISKIND:  That's correct, Your Honor.  And the pin

18   cite is 1279 where this issue is addressed.

19       THE COURT:  Go ahead.

20       MS. SISKIND:  Thank you, Your Honor.  The fact that

21   the -- that Ms. Dhanani and Mr. Tandon knew that the defendant

22   was going to have to pay income taxes on his worldwide income,

23   including interest income earned from his HSBC-India account,

24   coupled with the acts undertaken by the co-conspirators to

25   assist the defendant in concealing his account, establish the

173

1    conspiracy in this case.

2         And as far as acts that they undertook to assist in

3    concealment, we would point to Ms. Dhanani assisting the

4    defendant with a mail hold; Ms. Dhanani preparing a letter for

5    the defendant to stop any mail relating to his account from

6    coming into the United States.

7         We would point to the fact that both Mr. Tandon and

8    Ms. Dhanani helped the defendant access funds in his account

9    outside of the country so it wouldn't create any records of

10   withdrawals of funds in the United States.

11        And we would point to the route that this HSBC-Jersey

12   check took around the world to come from a defendant's -- the

13   defendant's account in Jersey back to the defendant's possession

14   in England.  These transactions, the mail hold, the change of

15   the correspondence address, the HSBC-Jersey check, all of which

16   the co-conspirators were intimately involved in, have no

17   reasonable explanation other than they were designed to help the

18   defendant conceal his account.

19        So, taken together, the co-conspirators' involvement

20   with these acts show that they knew the defendant did not want

21   his account records in this country because it could lead to

22   them being disclosed to the IRS.  And that's the conspiracy in

23   this case.

24        THE COURT:  Where is the agreement between the

25   defendant and any one of the two individuals we're discussing?

1    Tandon is the first one I'd like you to discuss.

2         MS. SISKIND:  Your Honor, in the Seventh Circuit no

3    formal agreement is required.  And the court -- the Seventh

4    Circuit has recognized that because conspiracies are secretive

5    by nature the existence and purpose of the conspiracy often

6    needs to be proven by circumstantial evidence.

7         THE COURT:  And independent of these statements that

8    are the subject of our discussion, is the agreement to be

9    gleaned from a combination of these various materials that

10   you've mentioned or some particular subset of that group of

11   exhibits and evidence?

12        MS. SISKIND:  Your Honor, the agreement is to be

13   gleaned from the totality of the circumstances:  The defendant's

14   statements, the co-conspirators' statements, and acts undertaken

15   by all of the parties.

16        THE COURT:  All right.  And is that true of both the

17   bank employees?

18        MS. SISKIND:  Yes, Your Honor.  They both had

19   different roles in helping the defendant conceal.  Priti Dhanani

20   about was more involved with the mail hold, Mr. Tandon was more

21   involved with the debit cards.  They were working in the same

22   office, they were working together, and they both helped the

23   defendant conceal his account.

24        THE COURT:  By the way, where in the evidence is there

25   proof that Dhanani and Tandon worked in the same office?

175

1    MS. SISKIND:  Your Honor, if you would like me to take

2  a moment to find that e-mail.  There is an e-mail where

3  Ms. Dhanani identifies herself as working for Mr. Tandon or with

4  Mr. Tandon.

5    THE COURT:  Does that indicate that they're working in

6  the same office?

7    MS. SISKIND:  Your Honor, we don't have it in an

8  exhibit.  We can introduce aspects of their employment records

9  that shows that they're both employed in the NRI office in New

10  York.

11    THE COURT:  I'm just asking where is the record?

12    MS. SISKIND:  It wasn't something that we intended to

13  use as a trial exhibit.  We can -- and I believe, Your Honor,

14  with the court's indulgence --

15    THE COURT:  If you're relying upon it then it needs to

16  be in the record; if you're not gonna put it in the record you

17  can't rely upon it.

18    MS. SISKIND:  First, Your Honor, I can hand up

19  regarding Ms. Dhanani.  And I'll also say for the record at some

20  point during the time period she got married, she's identified

21  on this document at Priti Jhangiani, J-H-A-N-G-I-A-N-I.

22    THE COURT:  Is it a document that's not among the

23  marked exhibits?

24    MS. SISKIND:  That is correct, Your Honor.

25    THE COURT:  So it would have to be Exhibit Number 88,

1    correct?

2              MS. SISKIND:  Yes, Your Honor.  89, Your Honor.

3              THE COURT:  All right.

4              (Exhibit 89 marked.)

02:55    5              THE COURT:  For the record this Exhibit Number 89 has

6    Bates stamp numbers 003622.

7              MS. SISKIND:  Your Honor, this was a letter that was

8    prepared in support of Ms. Dhanani's visa application to stay in

9    this country and continue working for the bank.

02:55   10              I'm directing Your Honor to page 2 under the heading,

11    "The U.S. Position to Be Held By the Transferee."  It states:

12    "We currently require Ms. Jhangiani's managerial services in the

13    United States in the managerial position of Manager — NRI

14    Services in our New York, New York office."

02:55   15              So this establishes that Ms. Dhanani worked for the

16    bank in its New York office.

17              THE COURT:  All right.

18              MS. SISKIND:  The exhibit I previously referred to

19    that establishes that they worked together is Exhibit 38.

02:56   20              THE COURT:  All right.

21              MS. SISKIND:  And I would note that one of the

22    pleadings that had been filed by the defense attached a similar

23    visa type letter for Mr. Tandon, a visa related letter.  It was

24    document number 130-2.

02:57   25              THE COURT:  Is that Bates number 130-2 or --

177

1    MS. SISKIND:  No, Your Honor, it's a document from

2  PACER, 130-2.

3    THE COURT:  Oh.  All right.  This is Exhibit B in

4  130-2.  PACER page 130-2, page 3 of 4.  All right.

02:58    5    MS. SISKIND:  Your Honor, this document indicates on

6  the second page of the letter that Mr. Tandon had been employed

7  with HSBC in the United States since July of 2004.  This letter

8  is dated 2005.  In terms of whether we can establish they

9  worked --

02:59    10    THE COURT:  That's May 24th, 2005.  Go ahead.

11    MS. SISKIND:  In terms of whether they worked in the

12  same office, we would point to Exhibit 38 in which Ms. Dhanani

13  says, "My name is Priti Dhanani and I work with Ankush Tandon in

14  the NRI team here in New York."

02:59    15    THE COURT:  All right.

16    MS. SISKIND:  And finally, just to offer one

17  additional piece of evidence regarding the relationship between

18  Ms. Dhanani and the defendant, I have -- it's been -- it's one

19  of the defendant's trial exhibits, 2054.

02:59    20    (Document tendered to the court.)

21    THE COURT:  Bates number -- actually -- yes, Bates

22  number 0013898-13899.  I'm sorry, 13900.  And 13 -- this also

23  says 13900.  There are two with that number.

24    MS. SISKIND:  Your Honor, it's an Excel spreadsheet

03:00    25  and the way it was produced it has the same Bates number but

178

1       it's a multipage Excel spreadsheet.

2               THE COURT:  All right, go ahead.

3               MS. SISKIND:  If Your Honor looks at the last page of

4       Defendant's Exhibit 2054, this comes from a spreadsheet of

03:01   5       information relating to NRI customers.  And the reason most of

6       this page is black is we've redacted the other customers,

7       besides the defendant, who are listed here before we produced it

8       to the defendant.

9               What we can see is the line referring to the defendant

03:01   10      Arvind Ahuja.  And it specifies that the employee at the bank

11      handling Arvind Ahuja is Priti Dhanani.  This would tend to

12      establish that she was the relationship manager in the NRI

13      office in New York who handled the defendant's accounts.

14              THE COURT:  Where is there information concerning New

03:02   15      York?

16              MS. SISKIND:  Your Honor, if Your Honor looks at the

17      file names on the page before the spreadsheet.  These are all

18      references to computer files for the NRI representative office.

19      For example, there's a file called "New York Rep Office."

03:03   20      There's a file "Operating Guidelines."

21              THE COURT:  Let me see.

22              (Brief pause.)

23              THE COURT:  All right.  You've highlighted on Bates

24      page 10013900, Defense Exhibit 2054-000003, four lines starting

03:05   25      with line 5 under the caption "Key Folders" certain information

                                                                    179

1    that appears.

2        The first set of information reads:  J, colon,

3    NRI/monthly activity/2009/REP office report to HBUS CMP/.

4    There's a space and another column and the line "monthly rep

03:05    5    office reports to be sent to HBAP and HBUS.  CMPINCL

6    representative."  What does that mean?

7        MS. SISKIND:  Regarding monthly office reports, HBAP,

8    H-B-A-P, refers to HSBC-India.  And HBUS is HSBC-United States.

9    This file would be regarding reports generated in the office in

03:06    10    New York and sent to different components of HSBC.  And this

11    establishes that these files relate to the operation of an

12    office of the bank in the United States.

13        THE COURT:  In New York?

14        MS. SISKIND:  Yes, Your Honor.

03:06    15        THE COURT:  And you conclude it's New York because of

16    information that appears below that; is that correct?

17        MS. SISKIND:  Yes, Your Honor.  Based on a file a

18    little farther down the page that ends in "NY Rep Office."

19        THE COURT:  All right.  And that would be --

03:07    20        MS. SISKIND:  Five lines up from the bottom on the

21    left side.

22        THE COURT:  Yes.  All right.

23        MS. SISKIND:  And we did have testimony from Vandana

24    Katju yesterday that HSBC-India operated an office in New York

03:07    25    and, in fact, she worked there for a period of time.

180

1    THE COURT:  All right, I recall the testimony.  Okay.

2    MS. SISKIND:  So these documents relate to the office.

3    And I just want to add, because it does bear on the discussion

4    of the Santiago proffer, that the last page of this exhibit, the

03:07  5    part of the Excel spreadsheet regarding the defendant, does

6    indicate that the defendant likes to have things faxed, not

7    e-mails.  And if this was admitted at trial we would use that to

8    argue to the jury that he was attempting to prevent records from

9    being maintained on e-mail servers or sent to him by mail and

03:08  10   that Ms. Dhanani was aware of this because she was entering his

11   preferences into this spreadsheet.  But that is an aside,

12   Your Honor, from the issue of where they worked.

13   THE COURT:  You said she's entering this on the

14   spreadsheet; what supports your conclusion that she was entering

03:08  15   this on the spreadsheet?

16   MS. SISKIND:  If you look at the box under "PRM

17   Handling" it says "self, Priti."

18   THE COURT:  Will there be an explanation of why or

19   what this means given by a witness?

03:09  20   MS. SISKIND:  Your Honor, court's indulgence.

21   THE COURT:  Yes.

22   (Government counsel confer.)

23   MS. SISKIND:  Your Honor, the e-mail on the first page

24   shows that this is a -- it's called a hand-over file.

03:09  25   THE COURT:  This is a what?

1        MS. SISKIND:  Hand-over file.  As in handing over

2    files to a new person coming into the office.

3        THE COURT:  It says "FW hand-over file/final."

4        MS. SISKIND:  Yes, Your Honor.  And I believe at trial

5    Agent Cook could testify that there were -- people would rotate

6    through the office in New York on a regular basis.  They would

7    come over from India, and that during this time period there

8    were several individuals who would rotate through this office.

9        This is a means by which they could share information

10   with their successor, in this case regarding customer

11   preferences.  Certainly for their high net worth customers it

12   was important for bankers to know what those customers'

13   preferences were.  And because there was sometimes a lack of

14   continuity among employees in the office, this enabled them to

15   pass along that information.

16       So here is the type of information they would pass

17   along — in this case a spreadsheet that we can tell was created

18   by Priti Dhanani because it says "self, Priti," and then it

19   contains customer preferences.

20       THE COURT:  All right.

21       MS. SISKIND:  And that is the totality of our evidence

22   on the Santiago issue, Your Honor.

23       THE COURT:  Very well.  Do you need a break?  If not,

24   we'll proceed.

25       MR. KIRSCH:  Thank you, Your Honor.

182

1    Your Honor, I don't know exactly where to start.  But,

2    of course, if the court has any questions I'll answer.  I'll

3    start by saying that.

4    Your Honor, I want -- I want -- first of all, I

5    just -- I want -- this whole -- the whole argument may be summed

6    up by the last thing that Ms. Siskind said:  That Agent Cook

7    will testify to what happened at HSBC.  Agent Cook never worked

8    at HSBC.  It's all hearsay.  Their whole case is hearsay.

9    Your Honor, I actually thought they were going to

10    dismiss the conspiracy count in this case.

11    THE COURT:  Well, at this point in time you're ahead

12    on points.

13    MR. KIRSCH:  Okay.  Can I -- I'm sitting down.

14    THE COURT:  And I say that to advise that at this

15    point in time there is no indication that this case agent can

16    testify with respect to this particular exhibit and what the

17    various things mean.  And if his testimony is critical to the

18    government tying up its case and demonstrating that Priti

19    Dhanani was part of a conspiracy, the government will not be

20    allowed to provide that critical evidence.

21    So, we will take a very short recess to give the

22    parties a couple of moments to think about what I just said.

23    MR. KIRSCH:  Yes, Your Honor.

24    THE BAILIFF:  All rise.

25    (Recess taken at 3:13 p.m., until 3:24 p.m.)

183

1    THE COURT:  We're back on the record.

2    I'd like to hear -- I would like to hear from the

3  government respecting where we stand in this matter,

4  particularly as relates to the foundation for the government's

5  assertion that Priti Dhanani and Mr. Tandon were members of a

6  conspiracy involving this defendant and the ability of the

7  government to prove that conspiracy utilizing the testimony of

8  the case agent, particularly with respect to the last exhibit we

9  had discussed prior to the break.

10    MS. SISKIND:  Your Honor, I first want to clarify that

11  we do not intend to establish our conspiracy through the

12  testimony of our case agent.  That last exhibit which I pointed

13  to was something to help Your Honor understand the relationship

14  between the co-conspirators in the New York representative

15  office and Agent Cook could have provided some context to that.

16    But our conspiracy is going to be proven through:

17  Statements of the defendant, statements of the co-conspirators,

18  and actions taken by the defendant and his co-conspirators.

19  We're not going to rely on Agent Cook to provide some kind of

20  independent testimony as to the conspiracy.  We think the

21  various statements and documents we've already gone through at

22  this hearing today provide sufficient evidence, looking at the

23  totality of the circumstances, that a conspiracy existed.

24    THE COURT:  All right.  One second.

25    (Brief pause.)

Case 2:11-cr-00135-CNC  Filed 08/14/12  Page 62 of 95  Document 140

1    THE COURT:  All right.  I'll turn to the defense and I

2    need to hear what you have to say in 10 minutes or less.

3    MR. KIRSCH:  Okay, Your Honor.  Your Honor, I'm going

4    to start with -- I'm going to start with the Furkin case that

5    the government cited.  And I'd like to quote from that case at

6    page 1280.  119 F.3d 1276, page 1280.

7    And the Furkin court, they got it right.  And the

8    government wants Furkin to stand for the proposition that

9    co-conspirators' knowledge of tax obligations is sufficient to

10   establish a conspiracy.  But they've turned Furkin on its head.

11   Furkin, at the cite that I'm talking about on page 1280, the

12   Furkin court writes:  Lanzotti, who was the co-conspirator in

13   that case, was also aware --

14   THE COURT:  One second.  Go ahead.

15   MR. KIRSCH:  It says:  Lanzotti was also aware that

16   Furkin was not reporting the illegal gambling income to the IRS.

17   Both Lanzotti and Furkin knew that income had to be reported to

18   the IRS.

19   So, Your Honor, this case stands for everything that

20   I've said in my filings, that there has to be evidence that the

21   co-conspirators knew that the defendant was not reporting the

22   income earned on the HSBC accounts.  And, Your Honor, there is

23   absolutely no evidence of that.  None whatsoever.

24   THE COURT:  I have not been directed to any such

25   evidence, so I would agree to that extent.

185

1          MS. KIRSCH:  Your Honor, if I can just look through my

2    --

3          THE COURT:  The customer forms do speak of an

4    obligation on the part of customers to pay U.S. taxes, however.

03:28    5          MR. KIRSCH:  Your Honor, I couldn't -- I'm sorry.

6          THE COURT:  The customer form that we've talked about

7    earlier does -- I believe bullet point 4 or 5 -- mention the

8    obligation of HSBC customers to pay U.S. taxes that they may be

9    due and owing -- that may be owing and directs them to consult

03:29    10    with their tax advisors.  That is in the record.

11          MR. KIRSCH:  I agree with that, Your Honor, but I

12    don't think that establishes anything at all with respect to a

13    conspiracy here because there's no evidence whatsoever that

14    Priti Dhanani or Ankush Tandon knew that Dr. Ahuja did not

03:29    15    report the income on his tax returns.

16          THE COURT:  Or whether or not he was planning to

17    report such income.

18          MR. KIRSCH:  Correct.  And I just -- and as far as the

19    government, even looking -- Your Honor, I think you just

03:29    20    short-circuited my whole argument but I just want to go through

21    my notes to make sure.  I don't --

22          THE COURT:  I want you to complete your circuit, so go

23    ahead.

24          MR. KIRSCH:  Okay.

25          (Brief pause.)

186

1    MR. KIRSCH:  Your Honor, I think the court during the

2    course of its questioning of counsel I think asked all the right

3    questions.  And I just -- I -- I just -- I'm so -- I'm so -- I

4    think the evidence of a conspiracy is -- there's just -- there's

5    none.  I mean, I almost don't even know what to say because the

6    evidence that the government points to --

7                 THE COURT:  Whatever is necessary.

8                 MR. KIRSCH:  Pardon, Your Honor?

9                 THE COURT:  Whatever is necessary.

10                MR. KIRSCH:  Well, Your Honor, the government talks

11   about these exhibits, and I can go through -- I don't want to

12   waste the court's time by going through each one unless the

13   court has some particular questions about any of these exhibits.

14                But just to take the first exhibit that the government

15   cited to, Government's Exhibit 54, is a letter that Dr. Ahuja

16   signed asking him to change his address on the correspondence

17   that he received from HSBC.  There is absolutely -- that says

18   absolutely nothing about what Priti Dhanani and Ankush Tandon

19   knew about why Dr. Ahuja was changing the address or why he was

20   requesting that the address be changed on the statements.

21                The government's arguments are internally

22   inconsistent.  The government argues on the one hand that these

23   are routine breaking (sic) practices under 803(6), they are

24   carried out by bankers every day across America, and then on the

25   other hand these regular practices of the bank were not, in

1    fact, regular practices of the bank but were acts in furtherance

2    of an effort to conceal the defendant's account.

3          And, Your Honor, this actually, if these -- if these

4    e-mails back and forth to the United States, and the letters,

5    the bank actually required Dr. Ahuja to put things in writing in

6    a letter, if this is evidence of concealment the government's

7    argument, make no mistake, is that Dr. Ahuja and HSBC bankers

8    were the dumbest criminals in the history of the world because

9    they were trying to conceal something.  Priti Dhanani and Ankush

10   Tandon wanted to conceal something.  And in order to conceal it

11   they required this man to sign a letter and send it back to

12   them.  But that's what they were doing when they tried to

13   conceal.

14         The government's exhibit, the flowchart that the

15   government provided, the government says, well, this was an

16   effort to conceal and Priti Dhanani knew it.  Your Honor, the

17   government cited to an exhibit -- I think it was Exhibit 65 or

18   64.  It was the long e-mail chain.  And we went over that at

19   some great length.  It wasn't 64, it was --

20         THE COURT:  Are you talking about the e-mail chain

21   involving 61, 62, 63 and 64?

22         MR. KIRSCH:  Yes, Your Honor.  If you look at that

23   e-mail chain, and I'm looking for the long -- there's a series

24   of e-mails that the government --

25         THE COURT:  65 was the series of e-mails.

188

1    MR. KIRSCH:  Okay.  Your Honor, that e-mail -- I

2  looked at that while the government was talking about it, the

3  only time that Priti Dhanani's name ever appears on that e-mail,

4  she's cc'd on the last e-mail in the chain.

5    And the check, they're trying to conceal this check,

6  but Dr. Ahuja actually -- there's evidence in the e-mail to the

7  government that Dr. Ahuja says "send the check to my address in

8  Wisconsin."  "Send it to me at home in Wisconsin."  And then it

9  goes from Wisconsin, and then it goes back and is deposited in

10  an account and Dr. Ahuja's withdraws some money in England.

11    That's the government's evidence and they say from

12  that evidence Priti Dhanani and Ankush Tandon knew that

13  Dr. Ahuja was not going to report income on his tax returns.

14  They have not one witness that will testify that Priti Dhanani

15  or Ankush Tandon ever had any conversation with anybody, nobody,

16  about taxes.  In fact, the evidence will be -- Your Honor,

17  just -- the evidence will be that Dr. Ahuja, and the government

18  will agree with this, Dr. Ahuja was not receiving a 1099 form

19  reporting the interest income on his HSBC bank statement -- or

20  CDs.  He was not receiving a 1099.

21    There is no evidence, none, not one witness and not

22  one document, and there's nobody that will testify that

23  Dr. Ahuja was ever told by anybody that he was not going to

24  receive a 1099 on that interest.  And, in fact, Ramit Bhasin,

25  the government's star witness, will testify that he and

189

1    Dr. Ahuja never talked about the 1099 issue.  They never talked

2    about it.

3         The government talks about Ms. Katju, and I just want

4    to comment on her real quick.  The government talks about her

5    and I guess the government wants to put her on the witness stand

6    to speculate that Dr. Ahuja was not receiving bank statements.

7    That's what they said.  She was going to testify that there's an

8    inference.  She's going to testify that the screen shots were

9    used because statements weren't sent and from that the

10   government will infer.  Now, she can't testify that Dr. Ahuja

11   didn't receive statements.  And, in fact, Your Honor, the

12   evidence is the opposite.

13        Then the government goes on to cite e-mails and says,

14   well, hey, here he asked for the statements to be held.  So who

15   asked for statements to be held and not to be mailed if you're

16   not receiving statements?

17        Then there's an e-mail that the government cites where

18   they say, well, here Priti is upset because a statement was

19   mailed to Dr. Ahuja in the United States after he had put the

20   hold mail on.  So that has to mean that statements were being

21   mailed to Dr. Ahuja in the United States before the mail hold

22   was placed on.  And then she's complaining about it.

23        I mean, there's just -- she -- the government says

24   that Mark Miller is -- Mark Miller, by the way, I think he'll

25   testify he's probably never heard the name Priti Dhanani in his

190

1    entire life.  That's my guess.  But she said that he's going to

2    testify that he relied on bank statements and 1099s provided by

3    the defendant and his financial advisor and he never received

4    bank statements from HSBC.

5    Your Honor, he was asked in the grand jury -- he's an

6    accountant, he's a tax preparer.  He was asked in the grand

7    jury, page 58 of his grand jury transcript:

8    "Question:  But I mean for bank statements for 2000.

9    Let's say 6 through 2009, have you seen any of those bank

10   statements from HSBC-India?

11   "Answer:  We don't get copies of bank statements.  We

12   get copies at the end of the year of a 1099, something to report

13   information from.  We don't receive copies of monthly or

14   quarterly annual bank statements."

15   Your Honor, accountants don't prepare tax returns from

16   bank statements, they prepare them from 1099s.  So the

17   government's gonna argue that -- about bank statements that Mark

18   Miller says he never got.

19   THE COURT:  Is there anything else that you find

20   essential?

21   MR. KIRSCH:  No, Your Honor.  I don't.  I mean, a lot

22   of this is very repetitive.  If the court has questions about

23   particular exhibits the government cited I would like the

24   opportunity to address them if the court's gonna rely on them.

25   THE COURT:  Very well.  At this juncture the court is

191

1    ruling that the co-conspirator statements the government seeks

2    to admit will not be allowed during the trial of this case.  The

3    ruling is based upon the court's conclusion that the evidence

4    cited during the course of this proceeding as supporting the

03:38    5    admission of the co-conspirator statements, coupled with the

6    arguments set forth in the government's brief, docket number

7    126, as well as the testimony that has been offered in this case

8    including the testimony the court received today, fails to show

9    that the alleged co-conspirators were indeed members of a

03:39   10    conspiracy.

11        There are incredible gaps in the evidence the

12    government cites as support for its conclusion that Priti

13    Dhanani and Ankush Tandon communicated with this defendant and

14    were aware of any intention on the part of the defendant not to

03:40   15    report his U.S. taxes, or any portion of sums that were -- that

16    would be or were payable as taxes in the United States.

17        In addition, the government has failed to establish

18    that the screen shots which it cites as critical evidence in

19    this case are admissible.

03:40   20        The court's conclusion in that regard is based on a

21    multiplicity of things that have come out during the course of

22    these proceedings, but in particular the court notes that

23    Ms. Katju's testimony yesterday and today fails to show that she

24    has personal knowledge of how information is input into the HUB

03:41   25    system utilized by HSBC in India, or the time or times at which

1    information is input into that system.

2         It is notable that today Ms. Katju mentioned that some

3    information is input at the time instructions are given by a

4    bank customer.  That testimony alone does not demonstrate that

03:42   5    she has the requisite knowledge that would allow the admission

6    of the screen shots as business records.  And when you couple

7    what she said with the testimony given by the custodian of

8    records who testified yesterday, there still is a deficiency

9    with respect to the testimony supporting the admission of the

03:42   10   screen shots.

11        Ms. Katju did not indicate anything with respect to

12   transactions that may have been conducted with respect to a

13   customer's account.  She did not say that the HUB system and the

14   screen shots reflect various transactions that have occurred and

03:43   15   that the screen shots reflect what has been regularly input at

16   or near the time of given transactions.  There's nothing

17   respecting that.

18        The government has to show that materials are

19   routinely and regularly input into that HUB system, and it has

03:43   20   to demonstrate that those persons who do that do so with

21   knowledge with respect to the transactions.  The records

22   custodian merely talked about how the U.S. arm of HSBC

23   retains -- obtains and retains the information that is in the

24   HUB system.

03:44   25        With that, the court believes that at this juncture it

1   has to give the government an opportunity to be heard with

2   respect to what has been determined by the court.  But given the

3   time, which is 3:45 -- let me check one more thing.

4       (Brief pause.)

03:44   5       THE COURT:  I must apprise the jury clerks how to

6   proceed.  And in view of that I am going to cancel the jurors

7   who were set to come in on Monday, and I'm notifying my staff

8   that they should let the jury clerks know that the jury should

9   be told not to come in Monday inasmuch as it would appear from

03:45   10   what the government has said it believes a ruling by this court

11   with respect to the screen shots and the co-conspirator

12   statements may be the subject of an appeal to the Seventh

13   Circuit Court of Appeals as an interlocutory appeal.  Hence, it

14   would not be prudent under the circumstance for jeopardy to

03:45   15   attach or for the case to proceed on Monday.

16       Does the government wish to be heard?

17       MR. SULLIVAN:  Yes, Your Honor, briefly.  There is one

18   more rule of evidence that Ms. Siskind discussed with me this

19   morning that I think she actually discovered this morning.  I

03:46   20   don't know if the court wants to hear -- it deals with Rule, I

21   believe, 807 and the residual rule and cases involving foreign

22   evidence where custodial witnesses are not even available.

23       And I know it's late in the day, but it might

24   preclude -- I can understand continuing the case and not

03:46   25   bringing in the jury.  That makes sense.

1    THE COURT:  Well, at the very least I'm not going to

2  have -- we need to notify more than 50-plus people in just a

3  couple of moments and we have to do so electronically before our

4  staff leaves.  So, under the circumstance I certainly will give

03:46  5  you an opportunity to be heard respecting residual hearsay and

6  any other rule or rules that you believe may have a bearing on

7  the admissibility of some or all of the evidence that is at

8  issue.  But given the timing, it is imperative that a decision

9  be made.  You wanted a decision, you have a decision with

03:47  10  respect to key things, and I must proceed in giving the

11  appropriate notice to the jury.

12    Hold on for one moment, please.

13    (Brief pause.)

14    MR. KIRSCH:  Can I be heard on that issue, Your Honor?

03:47  15    THE COURT:  Yes.

16    MR. KIRSCH:  Your Honor, I wonder, I understand the

17  lateness of the day, but we do not want -- I mean, Dr. Ahuja has

18  now gone through this for years, we do not want -- is there any

19  way the court would with consider calling the jurors off for

03:48  20  Monday but just extending it to Tuesday?  I know the Department

21  of Justice probably is not going to be able to make a -- it's --

22  it's 4:45 in Washington, and I just wonder if there's any way

23  they could -- you could just cancel them for Monday.  I just

24  don't want to have to start the process all over again,

03:48  25  Your Honor, with trial schedules and things like that.  Can we

195

1    just continue them till Tuesday?  To give us over the weekend.

2    I hope I'm making sense.

3            THE COURT:  You make sense.  I've sent notice asking

4    them to ask the jurors to call in Tuesday afternoon.

03:49  5            MR. KIRSCH:  Thank you, Your Honor.  Thank you.

6            THE COURT:  Let's go back on the record.

7            Does the government wish to be heard with respect to

8    any other matter?

9            MS. SISKIND:  Yes, Your Honor.

03:49  10           The primary basis the government had been proceeding

11   under for introducing the screen shots was Rule 803(6).  And as

12   such, we had not addressed the admissibility under any other

13   rule; we were proceeding under the business records exception.

14           This morning in light of concerns Your Honor raised

03:49  15   yesterday about meeting the requirements of 803(6), particularly

16   proving that the record was made at or near the time by a person

17   with knowledge, we started to look into alternative theories of

18   the admissibility of these records.  There is precedent for

19   situations in which a court has found, or in which the parties

03:49  20   agree, that a particular foreign record is not admissible under

21   803(6), but a court has still found that record to be admissible

22   under the residual hearsay exception which is now Rule 807.  And

23   it used to be I believe, Your Honor, 803(24).  It's referred to

24   that way in the case law as well.

03:50  25           The government recognizes that Rule 807 has certain

196

 1    notice requirements, but the fact that we are proceeding under

 2    Rule 803(6) we did not intend to provide notice of proceeding

 3    under Rule 807 until this morning.

 4             There are three cases that the government can provide

 5    to the court in which a court has admitted bank records from a

 6    foreign country without the certification of a foreign records

 7    custodian because the documents bear sufficient indicia of

 8    reliability that the court could admit them under the residual

 9    hearsay exception.

10             Two of the cases in particular are tax cases.  In

11    those cases, the government had obtained bank records from -- I

12    believe all from Caribbean countries under the provisions of a

13    tax treaty.  In those cases there was no accompanying

14    certification from a records custodian to certify the

15    requirements of 803(6).  And in those cases the courts permitted

16    the introduction of those bank records at trial under the

17    residual hearsay exception.  And the government can provide the

18    court with those citations.

19             THE COURT:  What are the cites?

20             MS. SISKIND:  The first case is United States vs.

21    Wilson, 249 F.3d 366.  It's a 2001 decision of the Fifth Circuit

22    Court of Appeals.  It was overruled on other grounds by a later

23    opinion, but it was cited with approval by the Fifth Circuit as

24    recently as 2011 for the proposition that the government is

25    citing it for.  The pin cite to the relevant part of that case

1    is page 374 to 375.

2          The defendant is arguing that the court improperly

3    admitted bank records from the Bahamas, under the residual

4    hearsay exception.  And the court recognized that a court can

03:52    5    admit documents as long as they provide circumstantial

6    guarantees of trustworthiness.

7          The Fifth Circuit concluded that the district court

8    did not abuse its discretion in concluding that the Bahamian

9    bank records possessed those necessary guaranties of

03:52   10    trustworthiness.  In reaching that decision the Fifth Circuit

11    cited to an opinion of the Ninth Circuit Court of Appeals in the

12    case of Karme, K-A-R-M-E, vs. Commissioner of the Internal

13    Revenue.  It is 673 F 2.d 1062.  It's a 1982 Ninth Circuit

14    opinion.

03:53   15          In that case a district court had admitted records

16    from a bank in the Netherland Antilles.  The records were placed

17    into evidence through the testimony of an IRS special agent who

18    was neither a custodian nor other qualified witness for purposes

19    of 803(6).  But the court found that the bank records from the

03:53   20    Netherland Antilles nevertheless were admissible at trial

21    because they met the requirements of the residual hearsay

22    exception, namely, that they were material, they were probative,

23    and they had circumstantial guaranties of trustworthiness.  In

24    particular, the court pointed to the fact that there was a lack

03:53   25    of any evidence in the record to suggest that the bank records

1    were anything other than what they purport to be.

2          And finally, there's a third opinion that's a decision

3    of the United States Tax Court, and it's available at 1986

4    Westlaw 21439.  It's a 1986 Tax Court opinion that has the same

5    rationale for admitting foreign bank records as the other two

6    cases that I've mentioned.

7          The court has before it already evidence that the

8    screen shots and that the underlying HUB computer system

9    possessed sufficient circumstantial guaranties of

10   trustworthiness such that they can be admissible under the

11   residual hearsay exception.  You have the -- Your Honor has the

12   testimony before the court of Vandana Katju, that she never in

13   her career had the occasion to doubt the reliability of either

14   the HUB records or the screen shots.

15         We also had some argument yesterday that I presented

16   to the court on one particular screen shot and how the entries

17   in that screen shot could be corroborated by other evidence.

18   And if -- we have other examples that the special agent has

19   prepared this morning of other screen shots in the government's

20   evidence and some of the underlying records that corroborate

21   them.

22         So even though Ms. Katju may not be a qualified

23   witness for purposes of admitting documents under 803(6),

24   because she was not involved in the input because there were

25   some questions about if she knew how certain things got into the

199

1    system, her testimony, coupled by the corroboration that the

2    special agents can provide with matching up documents to screen

3    shots, provides the court with sufficient guarantees of

4    trustworthiness for these records such that they should be

03:55    5    admitted under Rule 807.

6        And the question under that rule is whether the

7    statement has:  Circumstantial guaranties of trustworthiness;

8    whether it's offered as evidence of a material fact; whether it

9    is more probative on the point for which it is offered than any

03:56    10    other evidence that the proponent can offer through reasonable

11    efforts; and whether admitting it will serve the purposes of

12    these rules and the interests of justice.

13        I've just gone through why there are circumstantial

14    guaranties of trustworthiness:  Ms. Katju's testimony and the

03:56    15    corroboration.  It's offered as evidence of a material fact.

16    The government is going to use these screen shots for two

17    purposes:  One, it's the government's burden to prove under the

18    charges under 26 United States Code 72061, that the defendant's

19    tax returns were materially false.  The government has alleged

03:56    20    in the indictment they're materially false because, among other

21    things, the defendant did not report interest income from his

22    foreign bank accounts.  These screen shots, particularly those

23    that relate to the certificates of deposit, show that, in fact,

24    he had earned interest income on his foreign bank accounts

03:56    25    during the years at issue.

200

1      The screen shots are also probative with respect to

2  the Title 31 charge of failing to file a report of foreign bank

3  and financial account.  For that charge the government needs to

4  prove, among other things, that for each calendar year at issue

03:57  5  the defendant had more than $10,000 in his foreign bank

6  accounts.  The screen shots are what the government will use to

7  establish the high balances in those accounts.  And more

8  generally, the existence of the screen shots -- the screen shots

9  themselves prove or provide evidence that the defendant had a

03:57  10  foreign bank account.  And one of the other ways in which the

11  government alleges his returns were false is that on Schedule B

12  he checked the box for "no" next to the question asking him if

13  he has any foreign bank accounts.  So I think it's clear that

14  the screen shots are being offered by the government as evidence

03:57  15  of a material fact.

16      In terms of whether they are more probative on the

17  point than anything else the government can obtain through

18  reasonable efforts, this is an unusual case where the -- perhaps

19  some of the best evidence is outside of the subpoena power of

03:58  20  this court.  And the defendant used bank records -- was able to

21  obtain bank records in the form of screen shots.  Those are what

22  came into this country.

23      THE COURT:  The government was able to obtain records.

24      MS. SISKIND:  Yes, Your Honor.  And the records, as

03:58  25  the custodian of records testified yesterday, what was turned

201

1    over in response to a subpoena was only those electronic files

2    or pieces of paper that were in the United States.  Those are

3    the screen shots.  The HUB system was not in this country.  We

4    can't obtain information from it in this country.  What we have

5    and what is the most probative item on this point we can obtain

6    through reasonable efforts, are those documents that were

7    maintained at HSBC in the United States and for bank records,

8    that's the screen shots.

9            And the question of whether admitting these documents

10   will serve the interests of justice, this is a serious case

11   involving a large amount of unreported income.  And the

12   government should be permitted to use these screen shots to

13   demonstrate the defendant's guilt on these charges.  And it is

14   the best evidence of the existence of the defendant's account,

15   the interest income earned, and the high balances in that

16   account.

17           THE COURT:  All right.  Is the defense in a position

18   to respond to this at this time?

19           MR. KIRSCH:  Well, Your Honor, I would like to make

20   some statements and if the court wants to adjourn -- I just want

21   to make a couple statements about Rule 807.  I've just read the

22   rule.  I've never actually had an exhibit in any trial admitted

23   under Rule 807, so it's not a rule that I have intimate

24   familiarity with.

25           THE COURT:  So is your comment basically a prelude to

202

1    a request that after you argue you be given time to do some

2    research and to supplement what you have to say?

3         MR. KIRSCH:  Yes.  If I have to.  Because I just want

4    to say a couple of things.

5         THE COURT:  You're certainly entitled to the time that

6    you requested and given the timetable we have I would look

7    forward to receiving something as soon as possible, and

8    certainly no later than Monday morning.

9         MR. KIRSCH:  Yes, Your Honor.  I can do that.  Can I

10   just -- I'm just gonna make this very brief.

11        Number one, as to 807(a)(1), the statement has to have

12   equivalent circumstantial guaranties of trustworthiness.  Not

13   sufficient equivalent.  You've already ruled under 803(6) that

14   it doesn't have the circumstantial guaranties of trustworthiness

15   to be admissible under that hearsay exception, so there's no way

16   it can be now admissible under 807(a)(1).

17        Second, it's offered to prove a material fact.

18   Ms. Siskind just stated to the court, she finished by saying,

19   Judge, what's at issue is a large amount of unreported income.

20   But, Your Honor, the court should know what's at issue is less

21   than 2 percent of the total reported income of the defendant.

22   Less than 2 percent.  For the year.  When the defendant had HSBC

23   accounts, the government has brought this tax case alleging that

24   he underreported his federal income tax by less than 2 percent

25   of his total tax liability.  And now they're telling the court

1     that, well, this is a big case with a large amount of unreported

2     income. And I think that's a little bit unfair and misleading

3     to the defendant.

4          The second thing is -- the court, of course -- I mean,

5     the government did not address Rule 807(b), which is a notice

6     provision, which includes that the statement is admissible only

7     if before trial or hearing the proponent, being the government,

8     gives an adverse party, being us, reasonable notice of the

9     intent to offer the statement and its particulars including the

10    declarant's name and address so the party has a fair opportunity

11    to meet it.

12          That's exactly what's lacking in this case. The

13    government is basically saying on Friday at 4:00 o'clock in the

14    afternoon before trial, well, here's your notice; and, by the

15    way, we're the Department of Justice and HSBC had two lawyers in

16    the courtroom yesterday, they had a lawyer on the phone today,

17    but they won't produce these records to us but, defendant, go

18    ahead, go have at it. Go have at it by Tuesday and get these.

19          THE COURT: Well, let me interrupt because you're not

20    talking about records that were not disclosed to the defense.

21    You clearly have had access to these particular screen shots and

22    you have argued about those screen shots here today. So this

23    isn't a situation where someone comes out of the woodwork or out

24    of the basement at the last minute and says a-hah, here I am.

25          So you knew that these screen shots were something the

204

1    government wanted to use in this trial.  So it's not fair to

2    suggest that the government is doing something that you did not

3    intend to address.

4         On the other hand, the theory underlying the

04:03    5    government's request has changed.  And by virtue of that, you

6    have not had a chance to do the requisite research to determine

7    whether, in fact, the residual hearsay rule is applicable here

8    and would provide a basis for the screen shots to be utilized.

9         MR. KIRSCH:  Your Honor, that's absolutely correct.  I

04:03    10    apologize to the court.  I didn't mean to suggest that we didn't

11    have the screen shots.  What I meant to suggest is it's not our

12    burden of proof to get them admitted.  We're not the ones that

13    need to admit them under the federal rules of hearsay rules.

14         Your Honor, I don't have -- unless the court was going

04:04    15    to rule right now that they're not admissible under 807 I don't

16    have much more to say.  I have the rule.  The rule clearly

17    states "equivalent circumstantial guaranties."  The government

18    can offer no equivalent circumstantial guaranties.  They're just

19    trying to rely on the guarantees that the court has already

04:04    20    rejected under Rule 803(6).  There's nothing else.

21         And that's what I think Rule 807 prohibits.  You can't

22    say it's -- the exact argument is not good enough for 803(6) but

23    it is good enough for 807.  That would make no sense and the

24    exception of 807 would entirely swallow the entire rule 806, not

04:04    25    just -- I'm sorry, 803.  Not just 803(6).  It would swallow 803.

1          THE COURT:  We'll have to see.

2          Is there anything else the defense wishes to say

3    respecting this alternative theory the government is utilizing

4    at this stage?

04:05   5          MR. KIRSCH:  No, Your Honor.  Can I -- we'll file a

6    brief on Monday morning, and I think that we probably -- I don't

7    know what the -- we need -- I think the parties need to talk

8    regarding some of the charges in this case and what's gonna

9    happen from here going forward.  Because obviously we've not

04:05   10   moved to dismiss count one, we would do that if the government

11   was gonna -- it would be a sure mistrial.  Anyway, there's

12   things we need to discuss, Your Honor.

13         THE COURT:  Well, one of the things we need to discuss

14   before we break is the witness who has to go back to India on

04:05   15   Thursday.  The government has indicated it would like to

16   preserve that witness's testimony in the event this case does

17   not proceed as scheduled.  Obviously, the ruling I just made has

18   stalled the trial at the very least.

19         In light of that, what is the desire of the government

04:06   20   and the response of the defense concerning the witness?

21         MR. SULLIVAN:  We would like to take the videotape

22   testimony.  Is it allowable in this courtroom if we set it up?

23         THE COURT:  I previously said that we have the ability

24   to do that.  The question is whether or not we can do it right

04:06   25   now or whether it would have to wait until Monday.

206

1          And in that regard, a key consideration is how much

2     time you will need because power is going to be shut off in this

3     building this weekend and -- Kris, is that at 5:00, at 6:00

4     o'clock tonight?

04:06  5          THE CLERK:  I need to check.

6          THE COURT:  All right, let me find out.

7          MS. JOHNSON:  Your Honor?  I just need to inquire

8     exactly what it is that the government needs to provide to the

9     court for purposes of the videotape testimony on Monday; whether

04:07  10    we just need a videographer, or is your court reporter going to

11    continue with his regular duties?

12         THE COURT:  One second.

13         (Brief pause.)

14         THE COURT:  I just sent a request for our IT guy.

04:07  15    Because we have video.

16         MS. JOHNSON:  So we don't need to provide a

17    videographer?

18         THE COURT:  I'm not certain.  That's why I've sent for

19    the IT guy.  And he'll tell us what we're capable of doing under

04:07  20    the circumstance.

21         MR. KIRSCH:  Your Honor, may I be heard briefly on

22    this?

23         THE COURT:  Yes.

24         MR. KIRSCH:  Your Honor, this is something that I have

04:08  25    to think about.  This was raised right before the hearing

207

1    started and I obviously need to talk to my client about this.

2    But I just want to know, just for the court when you asked about

3    how long this will take, this is the government's first witness

4    and it's their star witness.  Mr. Bhasin is testifying under a

5    non-prosecution agreement.  Mr. Bhasin admitted that he

6    willfully filed false tax returns.  And he's going to testify

7    under a non-prosecution agreement that requires his cooperation

8    in exchange for his non-prosecution.

9         This is a major, major -- this is not a 15-minute

10   telephone witness.  And Rule 15 --

11        THE COURT:  I figured it would probably take about

12   16 minutes.

13        MR. KIRSCH:  Rule 15(a).  And, Your Honor, I need to

14   give this some thought.

15        THE COURT:  I understand.

16        MR. KIRSCH:  But Rule 15(a) says that the court may

17   grant the motion because of exceptional circumstances and in the

18   interest of justice.  And I just have to think about how this

19   would affect my client, to cross-examine the main witness before

20   opening statements, before we've heard anything what the

21   government's theory is about.  I mean, this is just -- this is a

22   huge issue.

23        THE COURT:  I understand that as well.

24        MR. KIRSCH:  Thank you.

25        THE COURT:  But we still need to find out what we are

208

1    capable of doing technologically and who will have to do the

2    heavy lifting in preparation for any testimony that may be taken

3    by video deposition.

4         MR. KIRSCH:  I agree.  I wasn't meaning to suggest

5    that we shouldn't do that.

6         THE COURT:  Mr. Sullivan?

7         MR. SULLIVAN:  Your Honor, there's one outstanding

8    issue with that witness Mr. Bhasin, and that is that the defense

9    has asked for copies of his amended tax returns that he agreed

10   to file pursuant to this non-prosecution agreement/cooperation

11   agreement.  We'll turn those over.  We agree to turn those over.

12   But we would like the court to order the defendant, because of

13   privacy laws in Title 26, that they can only be used for

14   purposes of cross-examination and they are not to be

15   disseminated to anyone other than the attorneys -- and the

16   defendant can look at them too, but just that they will only be

17   used for that sole purpose and then --

18        THE COURT:  For the purpose of this trial only.

19        MR. SULLIVAN:  That's what I meant to say.

20        THE COURT:  What, if any, response can the defense

21   give at this time?

22        MR. KIRSCH:  I have no objection.  I think that we can

23   work out the particulars of that.  Cross-examination is too

24   narrow.  We'd be able to use them in opening statement and

25   things like that.  But for the purpose of the case is fine, so

209

1    long as the defendant can see them and people working at our

2    direction, which might not all be attorneys, of course.

3            But, Your Honor, we won't disseminate them.  I guess

4    that's what the court wants to know and I will just say that

5    right now.  We will not disseminate them.

6            THE COURT:  All right.  Very well, let's switch gears

7    momentarily.

8            Mr. Riedijk, will you please come forward?

9            The government has indicated that it wishes to

10   preserve the testimony of a witness for use during the course of

11   the trial in this case so that the jury will see it -- will be

12   able to see it and hear it.

13           MR. RIEDIJK:  Okay.

14           THE COURT:  Is your office able to video, do a video

15   deposition?

16           MR. RIEDIJK:  Yeah.

17           THE COURT:  I know we can do a live feed, but are you

18   able --

19           MR. RIEDIJK:  We can record the feed, yeah.  An hour?

20           THE COURT:  It could be extensive but it would not

21   take place today.  Otherwise it would have to be set up and

22   interrupted and it's my understanding that the power in the

23   building will be off this weekend starting when, this evening?

24           MR. RIEDIJK:  Starting this evening.  Starting in the

25   morning for sure.  We're gonna start shutting down equipment

210

1    this evening.

2         THE COURT:  All right.  What I would ask is that the

3    parties confer with our IT staff member off the record to see

4    whether or not this is something that you would prefer doing

04:13    5    independently, or whether or not this is something that you can

6    work out with the court staff.

7         I'm looking for the most efficient way of getting the

8    testimony recorded if it is to be recorded by video, by video

9    means.  And, of course, the defense is entitled to be heard with

04:13    10   respect to any objection it has to the proceeding.  And I

11   believe it's appropriate that the defense have time to consider

12   what its options are and what its position is concerning this

13   testimony.

14        But if the testimony is to be taken by video for use

04:14    15   during the course of the trial on the grounds that Mr. Bhasin is

16   not going to be available at the time of the trial when his

17   testimony would otherwise be taken, then we have to make sure

18   that everything is spread on the record concerning that matter

19   or that position.

04:14    20        All right.  Is there anything else to address at this

21   moment?

22        MR. SULLIVAN:  Just one more follow-up on the tax

23   returns.  We view them as extrinsic evidence under Rule 806(b),

24   prior instances of untruthfulness, and so we want to make sure

04:14    25   that the defense doesn't want to try to introduce those and

211

1  clutter up the record with the witness's amended tax returns

2  that can be used but not offered and admitted into evidence.

3  That's my understanding of the rule.

4  THE COURT:  Does the defense have anything it can say

04:15  5  respecting how it may use the amended tax returns of the

6  witness?

7  MR. KIRSCH:  Yes, Your Honor.  I haven't seen them yet

8  so I don't know exactly what they show.  Number one.  That's the

9  first thing I can say.

04:15  10  Number two, the fact that he needed to file amended

11  tax returns was part of his agreement with the government.  It

12  was part of the agreement.  So it's certainly not extrinsic -- I

13  don't see how it's -- I don't know how we're going to use them.

14  It's not -- I mean, Your Honor, I've been -- well -- I've been

04:15  15  busy the last couple days.

16  THE COURT:  Well, at least you're on notice of what

17  likely will be an objection if you use or attempt to use the tax

18  returns in a manner that is contrary to the understanding in the

19  view of the government.

04:15  20  MR. KIRSCH:  Thank you, Your Honor.

21  THE COURT:  Okay.  All right.  We're in recess for the

22  moment, unless there's something further you need to address.

23  MR. KIRSCH:  Scheduling.  We will file -- Your Honor,

24  I will just tell the court, we'll file our position with respect

04:16  25  to the Rule 15 motion by Monday morning.  We'll file our

212

1    Rule 807 response in writing by Monday morning.  And I think

2    that the parties need to talk about what's gonna happen with

3    some of these counts over the weekend or we may have additional

4    motions that we need to bring.  But since you're asking the jury

5    to come back -- or to call in, do you want to see us sometime on

6    Monday?

7              THE COURT:  Guess what?  I have a very short response:

8    Yes.

9              MR. KIRSCH:  Okay.

10             THE COURT:  It's just a matter of what time.

11             MR. KIRSCH:  We're available.

12             MS. SISKIND:  Your Honor, I appreciate Mr. Kirsch

13   wanting to confer with his client and file something on the

14   Rule 15 issue.  It's just an issue of if we are going to go

15   forward on Monday with a videotape testimony of Mr. Bhasin, we

16   would need to put things in motion in the next couple hours to

17   make that happen.  So it would not be able to happen on -- if

18   Mr. Kirsch is going to file something Monday morning and the

19   court's first going to take it up at a hearing on Monday

20   morning, we probably would not get things in motion in time for

21   a deposition.

22             THE COURT:  I would suggest that you put things in

23   motion and even though they may be in motion the brakes can be

24   put on.

25             MS. SISKIND:  Thank you, Your Honor.

213

 1          THE COURT:  That's the only way we can proceed.

 2          MS. SISKIND:  And, Your Honor, we are going to file

 3     something in writing as well on the 807 to lay out our position.

 4          THE COURT:  Let's envision -- I envision that we would

 5     start, let's say, at 10:30.

 6          MS. SISKIND:  Yes, Your Honor.

 7          THE COURT:  That will give you some morning time to

 8     take care of some logistics in light of what other position that

 9     may be revealed in the defense's response.  If the defense can

10     respond sooner, at least directed to the government orally prior

11     to its written submission, that would certainly give the

12     government a heads up.  And if there's something key in what the

13     government expects to file that the defense should be aware of

14     even before it is finalized, the government should reciprocate.

15          MS. SISKIND:  Your Honor, to clarify, do you mean

16     10:30 Monday morning or 10:30 tonight?

17          THE COURT:   No, no.  10:30 -- well, if you want to

18     come back at 10:30 tonight --

19          A VOICE:  The power will be off, Your Honor.  The

20     power will be off.

21          THE COURT:  Bring your flashlight.

22          MS. SISKIND:  Just to clarify, we'll file something on

23     Monday morning regarding our position.

24          THE COURT:  Very well.

25          MR. KIRSCH:  Your Honor, we will let the government

1    know our Rule 15 position as soon as we make a decision.

2    They'll know before Monday morning before we file something what

3    our position is going to be.

4              THE COURT:  All right.  Let's go off the record.

5              (Discussion off the record.)

6              THE COURT:  All right.  Have a good evening.

7              (Proceedings concluded for the day at 4:19 p.m.)

8                              *    *    *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

215

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF WISCONSIN

3

4              I, JOHN T. SCHINDHELM, RMR, CRR, Official Court

5    Reporter for the United States District Court, Eastern District

6    of Wisconsin, do hereby certify that I reported the foregoing

7    proceedings, and that the same is true and correct in accordance

8    with my original machine shorthand notes taken at said time and

9    place.

10   Dated this 10th day of August, 2012

11   Milwaukee, Wisconsin.

12

13   _____
     Official Court Reporter

14   United States District Court

15

16

17

18

19

20

21

22

23

24

25

```
                              I N D E X
```

WITNESS   EXAMINATION                                    PAGE

VANDANA KATJU, GOVERNMENT WITNESS

      DIRECT EXAMINATION BY MS. SISKIND................  160

      CROSS-EXAMINATION BY MR. KIRSCH.................  163

      EXAMINATION BY THE COURT........................  167

      REDIRECT EXAMINATION BY MS. SISKIND.............  167

      RECROSS-EXAMINATION BY MR. KIRSCH...............  168

```
                              * * * * *
```

```
                          E X H I B I T S
```

NUMBER                  DESCRIPTION                    MARKED

Hearing Ex 1    Chart within Trial Ex 64............. 153

Trial Ex 89     Letter in support of Dhanani visa.   177

217