3 ----------------------------------------------------------------

4  UNITED STATES OF AMERICA,            )
                                        )
5                     Plaintiff,        )      Case No. CR 11-135
                                        )      Milwaukee, Wisconsin
6        vs.                            )
                                        )      August 15, 2012
7  ARVIND AHUJA,                        )      9:00 a.m.
                                        )
8                     Defendant.        )      PAGES 1-174

9 ----------------------------------------------------------------

10                    **TRANSCRIPT OF JURY TRIAL**
             BEFORE THE HONORABLE CHARLES N. CLEVERT, JR.
11          UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY

12 APPEARANCES:

13  For the Plaintiff
    UNITED STATES OF AMERICA:     Office of the US Attorney
14                                By: TRACY M. JOHNSON
                                  517 E Wisconsin Ave - Rm. 530
15                                Milwaukee, WI 53202
                                  Ph: 414-297-1580
16                                Fax: 414-297-4394
                                  tracy.johnson@usdoj.gov
17  )
                                  United States Department of
18                                Justice DC
                                  By: JOHN E. SULLIVAN
19                                    MELISSA S. SISKIND
                                  Tax Division - Ben Franklin
20                                Station - PO Box 972
                                  Washington, DC 20044
21                                Ph: 202-514-5196
                                  Fax: 202-616-1786
22                                john.e.sullivan@usdoj.gov
                                  melissa.s.siskind@usdoj.gov
23

    U.S. Official Reporter:       JOHN T. SCHINDHELM, RMR, CRR,
24                                johns54@sbcglobal.net

25  Proceedings recorded by computerized stenography,
    transcript produced by computer aided transcription.

```
 1    APPEARANCES CONT'D:

 2    For the Defendant          Friebert, Finerty & St. John SC
      ARVIND AHUJA:              By: ROBERT H. FRIEBERT
 3    (Present)                      SHANNON A. ALLEN
                                 Two Plaza East - Ste 1250 - 330 E
 4                               Kilbourn Ave
                                 Milwaukee , WI 53202
 5                               Ph: 414-271-0130
                                 Fax: 414-272-8191
 6                               rhf@ffsj.com
                                 saa@ffsj.com
 7
                                 Winston & Strawn LLP
 8                               By: DAN K. WEBB
                                     THOMAS L. KIRSCH II
 9                               35 W Wacker Dr
                                 Chicago , IL 60601-9703
10                               Ph: 312-558-5600
                                 Fax: 312-558-5700
11                               dwebb@winston.com
                                 tkirsch@winston.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

2

1                P R O C E E D I N G S (9:04 a.m.)

2          THE CLERK:  Case No. 2011-CR-135, United States of

3    America vs. Arvind Ahuja.  This matter is before the Court for a

4    jury trial.  May we have the appearances, please?

5          MS. JOHNSON:  Good morning.  On behalf of the

6    government, Tracy Johnson, Attorney Melissa Siskind, Attorney

7    John Sullivan, and IRS Special Agent Geoffrey Cook.

8          Good morning, Your Honor.

9          THE COURT:  Good morning to each of you.

10         MR. WEBB:  Good morning, Your Honor.  Dan Webb on

11   behalf of the defendant, Arvind Ahuja, who is in the courtroom

12   standing.  Tom Kirsch and Shannon Allen are also present,

13   Your Honor.

14         THE COURT:  Good morning, all.

15         IN UNISON:  Good morning.

16         THE COURT:  I'm in receipt of a motion in limine filed

17   by the defendant and docketed at Number 144.  Is the government

18   in receipt of the same?

19         MS. SISKIND:  Yes, Your Honor.

20         THE COURT:  Is the government prepared to respond to

21   the motion?

22         MS. SISKIND:  Yes, Your Honor.

23         THE COURT:  All right, proceed.

24         MS. SISKIND:  First I would note, Your Honor, the

25   first item of evidence that the defense is objecting to will

1  come from the testimony of Mark Miller regarding the overall

2  financial picture of the defendant, the types of investments he

3  made, and his overall financial success as an investor.  The

4  defense has put this fact in issue.  The jury questionnaire that

5  they proposed and the Court accepted asked the question about --

6  a question about the defendant earning $65 million during the

7  years at issue.  They have put his financial success at issue

8  with that very question.  And in reviewing the slides they plan

9  on using for their opening today, they're talking about, among

10  other things, how between 2006 and 2009 Dr. Ahuja received

11  between approximately 18 to 32 separate 1099 and similar

12  tax-related forms.

13       If they're going to argue that there's some relevance

14  to him receiving a lot of 1099s, well, then the jury should know

15  what those 1099s were, where did that income come from, how much

16  the defendant was earning in interest over these years.

17       The other thing they're objecting to is a statement

18  from a application to open a investment in oil and gas drilling.

19  I would first note that they're first objecting to the relevance

20  of this 10 minutes before we walked into the courtroom this

21  morning, even though they've had this document for probably

22  close to a year.

23       But nonetheless, both Mr. Miller's testimony as to the

24  defendant's investing and his sophistication as an investor and

25  statements the defendant made on the Texas energy document,

4

1    which is a document which he represents to this investment

2    company that he handles his own investments, both of those go

3    directly to willfulness in this case.

4            And multiple circuits have held that the background

5    and experience of a defendant, particularly when it comes to

6    financial matters, is highly probative of willfulness.  And

7    there are cases I cite to the Court from the Tenth, Fifth,

8    Second, Eighth, and Fourth Circuits, all addressing

9    circumstances in which courts have held that things like a

10   defendant's experience as an entrepreneur, his experience with

11   taxes, his experience with investing, are all probative of

12   willfulness.  Because the government needs to prove that when

13   the defendant filed false tax returns, it was willful; that he

14   knew that he was required to report that income; and that he

15   failed to do so.

16           And in order to do that, one piece of evidence the

17   government intends to offer is that he was a savvy investor,

18   familiar with the markets, kept up on financial affairs, and

19   therefore knew that he was required to report the interest

20   income from the CDs that he had in India.

21           THE COURT:  Would you please next address one of the

22   several items mentioned on page 1 of the defendant's motion, and

23   in particular Mr. Miller's impressions of Mr. Ahuja's -- or

24   Dr. Ahuja's level of sophistication in terms of his investment

25   activities.  Is it your intention to offer such impression

5

1  testimony?

2          MS. SISKIND:  Your Honor, we would submit it's proper

3  lay opinion testimony in this case.  Mr. Miller, unlike the

4  members of the jury, had an opportunity to sit across the table

5  from the defendant on multiple occasions and talk about his

6  finances.  Mr. Miller is an experienced certified public

7  accountant and should be permitted to -- using that experience

8  and using his interactions with the defendant -- testify as to

9  the defendant's overall level of financial savvy and

10  sophistication in the market.

11          THE COURT:  All right.  The defense may be heard.

12          MR. WEBB:  Thank you very much, Your Honor.  And as

13  Your Honor knows, this case actually involves a relatively

14  limited set of facts involving CDs at HSBC and interest income

15  that did not get reported on Dr. Ahuja's tax returns.

16          We don't object.  We do not object to the fact,

17  general evidence that Dr. Ahuja did acquire a significant amount

18  of wealth from the practice of medicine.  We're not objecting to

19  that; that's built into the case.  We don't object to the fact

20  that Dr. Ahuja had investments beyond HSBC.  We don't object to

21  that.

22          What we object to is the effort by the government to

23  offer specific evidence about the amount of trading that he

24  engaged in in the stock market; about how much money he invested

25  in the stock market; what his trading activities were in the

6

1    stock market; and those kind of details.

2            If the only evidence the government is going to offer

3    is general evidence from Mr. Miller about the fact that

4    Dr. Ahuja had a significant number of investments and a variety

5    of different types of instruments, we don't object to that.

6            In fact, counsel mentions 1099 forms.  There's no

7    question that part of our defense is that Dr. Ahuja's and the

8    people that gathered his tax information, he got so many 1099s

9    and K-1's that there's no way that he would have known if one

10   was missing.  And so I do intend to cross-examine Mr. Miller

11   about that.

12           So the fact that Dr. Ahuja had other investments,

13   we're not objecting to that.  What we're objecting to is what we

14   set forth on page 1 is the amount of trading he engaged in the

15   stock market and the fact that he earned a lot of money from

16   trading in the stock market.  We do object to that evidence

17   coming in.

18           As far as Mr. Miller's testimony as a lay witness

19   about the sophistication of Dr. Ahuja, based on the grand jury

20   testimony of Mr. Miller it does not appear that the government

21   has the foundation to lay for that.  That requires a foundation

22   that has to be laid before you can ask that question.  And based

23   on the grand jury testimony that we cite on page 2 of our brief,

24   Mr. Miller indicates he doesn't feel that he has that type of

25   knowledge about Dr. Ahuja's trading activities to reach a

7

1    conclusion about sophistication, and that's why we object to

2    that.

3              THE COURT:  Well, as it stands right now, unless the

4    government does establish a foundation for asking for a lay

5    opinion, the testimony will be barred.  And at this point I

6    can't make any other ruling with regard to a question that may

7    be asked of Mr. Miller respecting his opinion.  I will not find

8    at this stage that the government cannot under any circumstance

9    inquire of Mr. Miller concerning his evaluation of the

10   defendant's level of sophistication respecting the stock market

11   or business transactions because there just isn't enough

12   information before the Court to make a ruling that would be

13   sweeping in its nature.

14             Now, with regard to the second aspect of your motion

15   in limine, that is whether or not the government can offer

16   Exhibit Number 58, do you wish to be heard a little bit further?

17             MR. WEBB:  On which issue, Your Honor?  I'm sorry.

18             THE COURT:  Exhibit 58, the Texas Energy Holdings

19   exhibit, particularly in light of what the government has noted

20   as your defense and what you acknowledge in your comments.

21             MR. WEBB:  Well, there's no question that a major part

22   of our defense is lack of willfulness, and we don't deny that.

23   But this agreement has no connection at all to the events and

24   transactions in this case.  And that's why I don't think it

25   should be admissible because it doesn't relate to the events in

1    this case.

2            THE COURT:  Well, first of all, within the relevant

3    period of time.  It's dated February 9th, 2009, correct?

4            MR. WEBB:  I think it's dated February 16th, 2009.

5    Yes.

6            THE COURT:  16th, 2009.  I stand corrected.

7            MR. WEBB:  Yes, Your Honor.

8            THE COURT:  And it does have representations by your

9    client respecting his background; is that also true?

10           MR. WEBB:  That is correct, Your Honor.

11           THE COURT:  And I see in particular on page 3 of 12,

12   Bates Number DOJ-TXE-000010 under Item 4, a statement that I

13   further represent and warrant that I have the capacity to

14   evaluate the merits and risks of the prospective investment in

15   interest and that such investment is not disproportionate to my

16   income or available in liquid funds; that I further have the

17   capacity to protect my interests in connection with the purchase

18   and bear the economic risks of such investment for an indefinite

19   period.  The following is a description of any experience in

20   financial and business matters required.

21           It goes on to say in handwriting:

22   "Neurosurgeon/occupation, personally run most of my own

23   investments.  Have numerous oil, gas programs in place."

24           That appears to me to be very relevant to issues in

25   this case, and therefore the motion is denied with respect to

1    Exhibit Number 58.

2              Unless there's something else respecting preliminary

3    matters, we will take a short break for several reasons.  One

4    is, I need to go to the jury assembly room where I will hand out

5    to the jurors the questionnaires that they sent in so that they

6    can review them quickly before they come to the courtroom.  One

7    of the questions that will be asked this morning is whether or

8    not any of the responses that the jurors gave when submitting

9    their questionnaires needs to be altered.

10             You should also know that we have additional jurors

11   who have shown up today.  They were part of the original pool

12   but did not submit questionnaires.  We will accept those

13   questionnaires this morning but we will not include those jurors

14   in the pool that will come down initially.  If we need these

15   additional jurors then we will call them to the courtroom a

16   little later.

17             However, regardless, I will address the entire panel

18   to let them know that we are preparing for their arrival in the

19   courtroom.  They are not to share with their fellow jurors any

20   matters touching on this case, including what they have said in

21   their questionnaires.

22             Additionally, there is a juror who called in to say

23   she had childcare issues.  I believe she is here today with her

24   children.  So I would ask the clerk to give you the number, if

25   she can; if not, then we will get that number to you and you can

10

1    tell us at the outset what your view is with respect to that

2    particular juror.  All right?

3              MR. WEBB:  Yes, Your Honor.

4              THE COURT:  Mr. Sullivan?

5              MR. SULLIVAN:  We do have the 404(b) notice and that

6    will affect what we say in our opening statement.  But I think

7    we can probably address that a little later on before we start.

8              THE COURT:  I will address it after returning.  I do

9    want to get this upstairs to the jury pool so they'll have

10   sufficient time to look over the materials and prepare to come

11   to the courtroom.  So we will take a very short break.

12             THE BAILIFF:  All rise.

13             (Recess taken at 9:18 a.m., until 9:51 a.m.)

14             THE COURT:  Be seated, please.

15             In accordance with our prior discussions, I understand

16   there is a motion the government wishes to make at this time.

17             MR. SULLIVAN:  The government requests leave to move

18   to dismiss the indictment -- I mean to dismiss count one of the

19   indictment, Your Honor.

20             THE COURT:  The superseding indictment?

21             MR. SULLIVAN:  The superseding indictment, yes, Your

22   Honor.

23             THE COURT:  I gather there would not be any objection

24   to the same?

25             MR. WEBB:  There is no objection.

1    THE COURT:  Very well.  The Court will grant the

2 government's -- is granting the government's motion for leave to

3 dismiss count one of the superseding indictment in this case.

4 You may proceed accordingly.

5    With that, is there anything else we need to address

6 before the jury comes down?

7    MR. WEBB:  Your Honor, if there -- before they walk

8 in, can we get the list?  When do we get the list?

9    THE COURT:  The list is being prepared as we speak.

10    MR. WEBB:  Thank you.

11    THE COURT:  So they will be coming down.  You will

12 note also that you have the additional questionnaires.  We will

13 not get -- likely get to those potential jurors if those above

14 them with numbers of 50 or lower remain qualified to proceed.

15    But inasmuch as the jurors have not yet arrived, is

16 there any person on the list -- any person whose questionnaire

17 you have now seen for the first time a person you believe should

18 be stricken for cause?

19    MR. WEBB:  I don't believe so.  Mr. Kirsch, if you --

20    MR. KIRSCH:  Correct.

21    MR. WEBB:  The answer is no.

22    MS. SISKIND:  Not from the government, Your Honor.

23    THE COURT:  All right.  And during the individual

24 questioning, as I said, we will not get to those 50 -- above 50

25 unless there is a clear need to do so.

1          Is there any other procedural issue that we need to
2    address?

3          MR. WEBB:  Just one brief logistical.  Because we have
4    multiple people on our side, when we get the list would the --
5    would we be able to get three or four copies of the list?

6          THE CLERK:  Yes.

7          MR. WEBB:  Thank you.  Thank you.

8          THE COURT:  Does the government want more than one
9    copy?

10         MS. SISKIND:  Yes, Your Honor.

11         THE COURT:  All right.  Then we will have to take a
12   sufficient break so you -- so we can get the list copied.

13         All right, we will remain informal until the panel
14   arrives and you have had a chance to receive and review the
15   list.

16         THE CLERK:  All rise.

17         (Recess taken at 9:54 a.m., until 10:12 a.m.)

18         THE CLERK:  Juror No. 1's children will go right into
19   the jury room.  You will have a seat there and your children
20   will go to the left.

21         (Jury panel in at 10:12 a.m.)

22         THE CLERK:  You can be seated.

23         (Brief pause.)

24         THE BAILIFF:  All rise.  Please be seated.

25         THE COURT:  Case No. 11-CR-135, United States of

1  America vs. Arvind Ahuja.

2          Please state your appearances for the record.

3          MR. SULLIVAN:  John Sullivan, Melissa Siskind, Tracy

4  Johnson, and Geoffrey Cook for the United States of America.

5          MR. WEBB:  Your Honor and members of the jury, Dan

6  Webb, and this is the defendant, Arvind Ahuja, Dr. Arvind Ahuja.

7  And we have Tom Kirsch and Shannon Allen at our table as counsel

8  for Dr. Ahuja.

9          THE COURT:  Good morning to all.

10                      **JURY VOIR DIRE**

11          THE COURT: Members of the jury panel, we are at this

12  stage prepared to select a jury to hear the case that is now

13  before the Court and soon will be before you who remain as

14  jurors.

15          As I mentioned briefly upstairs in the jury assembly

16  room, we must go through the jury selection process, and in

17  doing so it is imperative that we have candid answers from each

18  of you.  You are about to be placed under oath, and your sworn

19  statements will form a basis for a decision as to who will

20  remain as jurors in this case.

21          At this point it is our belief that this case can be

22  completed within the next week and that we will from time to

23  time have interruptions in the trial for various things that

24  remain on the court's calendar and other logistical matters

25  which should not be of concern to you.

14

1          So as we proceed, I do ask that you give this matter

2     your undivided attention.  And also, if you have an electronic

3     device please check it now and make sure it is off.  If a device

4     goes off during these proceedings, our very friendly bailiff

5     will ask you to hand in your device and it will be retained

6     because we cannot have disturbances which oftentimes will show

7     up through our microphone system.  And we don't want the system

8     to buzz or problems to arise.

9          So would the jury pool please stand and take the oath.

10          THE CLERK:  Please raise your right hand.

11          (Jury panel sworn.)

12          THE CLERK:  Please be seated.

13          THE COURT:  We will begin with Juror No. 1, and that

14     juror is asked to retire to the jury room along with the

15     parties.

16          (Trial adjourned to jury room.)

17          THE COURT:  Before any questioning of Juror No. 1, I

18     do note that during the course of voir dire the parties are to

19     use the jury numbers of the individual jurors.

20          Also if at some point an individual's name is utilized

21     inadvertently, the Court is ruling that that name will be

22     redacted from the transcript of the proceedings in this case.

23          Is there anyone who feels that that is inappropriate?

24          MS. SISKIND:  No, Your Honor.

25          MR. WEBB:  No.

1          THE COURT:  Very well.  We'll proceed accordingly.

2          Do the parties have the questionnaire for Juror No. 1?

3          MR. WEBB:  Yes, Your Honor.

4          THE COURT:  Now, I know, Juror No. 1, that today you

5     have with you a few traveling companions.

6          PROSPECTIVE JUROR NO. 1:  I do.

7          THE COURT:  Can you tell us the situation with respect

8     to your children?

9          PROSPECTIVE JUROR NO. 1:  I had a baby-sitter lined up

10    for Monday.  Sort of looking down the week not knowing whether I

11    would be a juror or not, could not find anybody for today.  I

12    have a lot of college sitters that have all gone back to school.

13    I have high school sitters who have started sports.  My husband

14    is an attorney, solo practitioner, so it's not feasible for him

15    to stay home.

16         THE COURT:  Are you able to secure anyone for the

17    balance of the week if you are selected as a juror in this case?

18         PROSPECTIVE JUROR NO. 1:  I know Friday and Monday I

19    have been unable to find anybody.

20         THE COURT:  All right.  What arrangements do you make

21    ordinarily when you have childcare issues?

22         PROSPECTIVE JUROR NO. 1:  To be honest, I don't

23    usually have sitters an entire day.  I may have one for a couple

24    hours in the afternoon.  So it's just hard to find somebody to

25    do it all day.

1      THE COURT:  So ordinarily you are with the children

2   during some portions of the day; is that correct?

3      PROSPECTIVE JUROR NO. 1:  Every day.

4      THE COURT:  What types of hours do you ordinarily work

5   when you're employed outside the home?

6      PROSPECTIVE JUROR NO. 1:  I haven't been employed

7   outside the home since shortly after my four-year-old was born,

8   but I have taken a part-time job starting the 27th.

9      THE COURT:  And what hours will you work starting the

10  27th of August of this year?

11     PROSPECTIVE JUROR NO. 1:  8:00 to 11:00.  My youngest

12  is in school and I'm at home as I need to.

13     THE COURT:  And the youngest would be in four-year

14  kindergarten?

15     PROSPECTIVE JUROR NO. 1:  Correct, half days.

16     THE COURT:  Now, you responded to a questionnaire in

17  this case; is that correct?

18     PROSPECTIVE JUROR NO. 1:  Yes.

19     THE COURT:  Have you reviewed that questionnaire

20  today?

21     PROSPECTIVE JUROR NO. 1:  I have.

22     THE COURT:  Would any of your responses to the matters

23  in the questionnaire be different today than they were at the

24  time you filled out the questionnaire initially?

25     PROSPECTIVE JUROR NO. 1:  The only one would be

1    regarding childcare.  I think the question is do you want to

2    serve on this jury, which I honestly would like to do, but -- I

3    don't know what to do with my kids otherwise.

4            THE COURT:  All right.  The parties are free to ask

5    questions of the juror at this time.  We'll start with the

6    government.

7            MR. SULLIVAN:  I note, Juror No. 1, that you indicated

8    that you believe that the tax code should be rewritten.  Given

9    that this case involves a criminal -- criminal tax laws and the

10   obligation of citizens to report income, is there anything about

11   your view on the tax code that would not -- that would prevent

12   you from being fair and impartial to the government

13   specifically?

14           PROSPECTIVE JUROR NO. 1:  Not necessarily.  I have my

15   own feelings about how much tax I pay and people I know pay and

16   don't agree with that.  But to the extent that that would make

17   me right off the bat say one way or the other, I don't think so.

18           MR. SULLIVAN:  Could you put that to the side?  If you

19   truly believe that the tax breaks were too high, could you put

20   that aside and judge this case just based on the evidence

21   presented in the courtroom and the law as instructed by Judge

22   Clevert, even though you hold the view that the tax rates might

23   be too high?  Would that cloud your judgment in this case?

24           PROSPECTIVE JUROR NO. 1:  I would certainly try not to

25   let --

18

1    MR. SULLIVAN:  Could you promise to put that aside and

2    not consider that?  If selected as a juror and if you begin

3    deliberating on this case, could you put your views on the tax

4    code and the tax rates to the side?

5         PROSPECTIVE JUROR NO. 1:  I would do the best I could.

6         MR. SULLIVAN:  Could you promise to do that, though?

7         PROSPECTIVE JUROR NO. 1:  Promise to do the best I

8    could?

9         MR. SULLIVAN:  No.  Promise to put it to the side and

10   decide the case just on the evidence.

11        PROSPECTIVE JUROR NO. 1:  Yes.

12        MR. SULLIVAN:  And the law.

13        PROSPECTIVE JUROR NO. 1:  Yes.

14        MR. SULLIVAN:  That's all I have, Your Honor.

15        MR. WEBB:  My only questions are your children.  You

16   made a statement in your questionnaire about being duty bound

17   and interested in being on this jury.  Obviously you've got

18   children which is the most paramount thing in your life.

19        If today as we're here going through jury selection,

20   do you have any ability to try to call and see -- the trial's

21   only going to last a week, and if -- is there any way that you

22   have an ability today as we go through selection to call anybody

23   and see if there's a chance you could get childcare for the next

24   several days?

25        PROSPECTIVE JUROR NO. 1:  To be perfectly honest, I've

1  kind of gone through that.  When I called yesterday she said you

2  kind of waited till the last minute to call and say this, but I

3  waited till the last minute trying to find somebody.  And I

4  think I'd have somebody for tomorrow, but I have not been able

5  to find anybody for Friday and Monday and I haven't looked any

6  further.  I just don't know who else I could call.

7          MR. WEBB:  I'm trying to see if there is any way, and

8  you're saying, if I understand --

9          PROSPECTIVE JUROR NO. 1:  I don't think so.

10         THE COURT:  I do note at the bottom of your

11  questionnaire, you indicate that you're going to be out of the

12  country.

13         PROSPECTIVE JUROR NO. 1:  Yes.

14         THE COURT:  Are your children traveling with you?

15         PROSPECTIVE JUROR NO. 1:  No.

16         THE COURT:  What childcare arrangements do you have

17  for that trip?

18         PROSPECTIVE JUROR NO. 1:  My husband is flying his

19  parents in from Colorado.

20         THE COURT:  Is there anything else?

21         MR. WEBB:  No.

22         THE COURT:  Thank you.  Go back to the courtroom.

23         (Juror No. 1 out.)

24         THE COURT:  Do the parties wish to be heard?

25         MR. SULLIVAN:  We have no objection from releasing her

1    from her duty.  I think she was very sincere about her efforts

2    to find childcare.  I saw the three children.

3              THE COURT:  They're getting a tour right now.  My

4    assistant is teaching them something about the power files of

5    our office and what goes on in chambers.  Go ahead.

6              MR. WEBB:  We're going to follow Your Honor's

7    decision.  I don't want to lose this juror, but at the same

8    time -- I will follow whatever decision Your Honor makes.

9              THE COURT:  Well, it is absolutely clear that this

10   particular juror has issues with childcare that are going to

11   interfere with the attention she can give to this case.  It is

12   also clear that the kids are young enough that they cannot all

13   stay home alone.  And therefore, it's my conclusion that this

14   juror should be excused for cause.

15             With that said, I will ask the clerk to advise the

16   juror that she may leave at this time and she and the children

17   can return home.  All right.  We'll take a couple minutes so the

18   kids can be gathered up and the courtroom can get back to

19   normal.

20             Is there anything else that you need to bring up at

21   this point?  Off the record.

22             (Discussion off the record.)

23             (Trial resumed in open court.)

24             THE COURT:  Members of the jury, you have been

25   introduced to the parties in this case, and so at the outset I

1  would like to inquire whether or not there is anyone who is part

2  of the panel who recognizes one or more of the parties you've

3  been introduced to.

4        Number 24?

5        PROSPECTIVE JUROR NO. 24:  The doctor, actually the

6  main doctor, is on my best friend's case who is in St. Luke's

7  right now under his care.

8        THE COURT:  All right.  And have you had any personal

9  contact with the defendant?

10        PROSPECTIVE JUROR NO. 24:  When he would come into my

11  friend \\\\\\\\ room, hospital room.

12        THE COURT:  Again, the individual name should be

13  redacted from the record.

14        PROSPECTIVE JUROR NO. 24:  I'm sorry.

15        THE COURT:  That's all right.

16        But beyond that context, do you know Dr. Ahuja?

17        PROSPECTIVE JUROR NO. 24:  Other than him being her

18  medical doctor, no.

19        THE COURT:  Do you have any feelings about

20  Dr. Ahuja --

21        PROSPECTIVE JUROR NO. 24:  Yes, I do.

22        THE COURT:  And are any of those feelings negative?

23        PROSPECTIVE JUROR NO. 24:  As in what way?

24        THE COURT:  Do you have any negative feelings toward

25  Dr. Ahuja?

22

1          PROSPECTIVE JUROR NO. 24:  Not at all.

2          THE COURT:  Okay.  Thank you.

3          Is there anyone else?

4          PROSPECTIVE JUROR NO. 34:  34.

5          THE COURT:  All right.

6          PROSPECTIVE JUROR NO. 34:  I recognize someone as an

7   acquaintance who is in the courtroom and may possibly be related

8   to the defendant.

9          THE COURT:  All right.  Where is that person in the

10  courtroom?

11         PROSPECTIVE JUROR NO. 34:  At the end of the first

12  row.

13         THE COURT:  All right.  And in what context do you

14  know this person?

15         PROSPECTIVE JUROR NO. 34:  We're acquaintances in

16  political campaigns.  Sometimes we've been on the same side and

17  sometimes we've been on opposite sides.  We're not personal

18  friends.

19         THE COURT:  All right.  In light of that, do you have

20  any strong feelings one way or the other about this individual

21  that may affect you if you are selected as a juror in this case?

22         PROSPECTIVE JUROR NO. 34:  Not at all.

23         THE COURT:  All right.  Would it depend on anything

24  outside of this case as to whether or not your feeling might

25  change at some point in time?

Case 2:11-cr-00135-CNC   Filed 08/24/12   Page 23 of 174   Document 158

1          PROSPECTIVE JUROR NO. 34:  I don't understand the

2    question.

3          THE COURT:  Well, for example, if you wind up on

4    the -- on a different side of a political issue, would that

5    affect your personal feelings toward this individual or that

6    person's relative or someone you believe might be a relative?

7          PROSPECTIVE JUROR NO. 34:  Absolutely not.  If that

8    were the case I wouldn't have any friends anyway.

9          (General laughter.)

10          THE COURT:  As Arsenio Hall would say, it's one of

11    those things that make you go "hmm."  All right, thank you.

12          PROSPECTIVE JUROR NO. 34:  Thank you.

13          THE COURT:  The jury in this case will consist of 14

14    members.  And I mentioned that we expect this case to take

15    perhaps a week.  Would that be problematic for any one or more

16    of you?  All right.  Number 31?

17          PROSPECTIVE JUROR NO. 31:  Number 31.  I had cleared

18    my schedule for this week but unfortunately made plans to travel

19    starting on Saturday.

20          THE COURT:  This coming Saturday?

21          PROSPECTIVE JUROR NO. 31:  Excuse me?

22          THE COURT:  This coming Saturday?

23          PROSPECTIVE JUROR NO. 31:  Yes.  Yes, sir.

24          THE COURT:  All right.  And is this travel something

25    that would be local or long distance?

1    PROSPECTIVE JUROR NO. 31:  Long distance.  Two
2    relatives are coming in from out of town to accompany us.
3    THE COURT:  Have you purchased tickets or made
4    financial arrangements for the trip?
5    PROSPECTIVE JUROR NO. 31:  Yes, sir.  Yes, Judge.
6    THE COURT:  And would it be difficult to change your
7    itinerary and perhaps delay your trip?
8    PROSPECTIVE JUROR NO. 31:  On my account, no; but on
9    the part of the people who are going to accompany me, yes.
10    THE COURT:  So it would be an expensive change or a
11    very inconvenient change; is that correct?
12    PROSPECTIVE JUROR NO. 31:  Very inconvenient.
13    THE COURT:  All right.  Thank you.
14    Do we have another?
15    PROSPECTIVE JUROR NO. 26:  Number 26.  Currently
16    tomorrow I have a case pending in this particular building for a
17    bankruptcy.
18    THE COURT:  What time?
19    PROSPECTIVE JUROR NO. 26:  10:30.  Other than that, I
20    don't have any issue.
21    THE COURT:  All right.  Knowing that proceeding, I can
22    help take care of the time.  That shouldn't be a problem.  I can
23    certainly see to it that you're in and out of that proceeding
24    very quickly if necessary.
25    PROSPECTIVE JUROR NO. 26:  Okay, thank you.

1          THE COURT:  Is there anyone else?  41?  43.  I'm

2     sorry.

3          PROSPECTIVE JUROR NO. 43:  I'm self-employed and so

4     any significant amount of time away affects my livelihood.

5          THE COURT:  What is the nature of your business?

6          PROSPECTIVE JUROR NO. 43:  I'm an independent

7     insurance agent.

8          THE COURT:  All right.  Have you set up appointments

9     for this week and next week?

10          PROSPECTIVE JUROR NO. 43:  Not because of the

11     uncertainty.  I didn't know what we were doing.

12          THE COURT:  Do you have others who work with you?

13          PROSPECTIVE JUROR NO. 43:  They can cover phones, but

14     any new business that comes in I need to be there.

15          THE COURT:  Now, do your staff members review with

16     potential clients the parameters of the products you have

17     available?

18          PROSPECTIVE JUROR NO. 43:  No, that's all done by

19     myself.

20          THE COURT:  Are you able to schedule call-backs and

21     visits with clients after 5:00 o'clock at night?

22          PROSPECTIVE JUROR NO. 43:  To a degree, yes.

23          THE COURT:  Is that something that you do regularly?

24          PROSPECTIVE JUROR NO. 43:  If it fits.  I mean, if it

25     fits.  Whatever fits the customer's schedule best.

1     THE COURT:  Do you also schedule appointments on

2  weekends?

3           PROSPECTIVE JUROR NO. 43:  No.

4           THE COURT:  Is that by choice or by necessity?

5           PROSPECTIVE JUROR NO. 43:  Normally by choice.  This

6  weekend I have another obligation, so there's something

7  scheduled for this weekend.

8           THE COURT:  All right, thank you.

9           Is there anyone else?

10          PROSPECTIVE JUROR NO. 45:  Number 45.

11          THE COURT:  Number 45?

12          PROSPECTIVE JUROR NO. 45:  Yes.

13          THE COURT:  Go ahead.

14          PROSPECTIVE JUROR NO. 45:  Right now I'm a crisis

15  stabilizer, so I get paid by clients and I have three clients.

16  So that's going to put me -- I'm the only person that's working.

17  I need to be at my job.

18          THE COURT:  Can you explain what types of contacts you

19  have with these clients during the course of a normal workweek;

20  that is, from 8:00 to say 5:00 or 6:00 in the evening?

21          PROSPECTIVE JUROR NO. 45:  Crisis.  Behavior problems.

22          THE COURT:  Behavior problems?

23          PROSPECTIVE JUROR NO. 45:  Right.

24          THE COURT:  Can you explain what type of contact you

25  have would have during the business hours I just mentioned?

27

1          PROSPECTIVE JUROR NO. 45:  Taking them to the

2    anger-management classes.

3          THE COURT:  So if something should come up, let's say,

4    during the hours of 8:00 to 6:00 or 9:00 to 6:00, you would be

5    available -- have to be available to deal with those potential

6    problems?

7          PROSPECTIVE JUROR NO. 45:  Correct.

8          THE COURT:  Normally, however, will you be able to

9    tell in advance whether or not you would need to have contact

10   with these individuals during hours I mentioned?

11         PROSPECTIVE JUROR NO. 45:  No.  Only when there's a

12   crisis.  When they call me and I need to go -- I need to

13   stabilize them.

14         THE COURT:  You'll have to put the mic right in front

15   of your face.

16         PROSPECTIVE JUROR NO. 45:  I need to stabilize the

17   conditions.  They call me at random.  I go to the home and

18   counsel them and stabilize the situation.

19         THE COURT:  Have you had these persons as clients in

20   the past?

21         PROSPECTIVE JUROR NO. 45:  Yes.

22         THE COURT:  How much contact have you had with these

23   individuals or any one of these individuals during an average

24   week?

25         PROSPECTIVE JUROR NO. 45:  Twice a week.

1            THE COURT:  Twice a week?

2            PROSPECTIVE JUROR NO. 45:  Yes.

3            THE COURT:  Have you had contact with those

4    individuals this week thus far?

5            PROSPECTIVE JUROR NO. 45:  No, not this week.

6            THE COURT:  All right.  Is there any way to predict

7    how much time you will need to devote to any one of these

8    individuals during the course of the upcoming --

9            PROSPECTIVE JUROR NO. 45:  No, I can't predict that.

10           THE COURT:  And is there anyone else to whom these

11   persons can direct their calls or concerns during the course of

12   this week if you are selected as a juror?

13           PROSPECTIVE JUROR NO. 45:  To my supervisor.

14           THE COURT:  And that supervisor could be put on notice

15   of your unavailability during, let's say, the hours are from

16   8:00 until 5:00 or 6:00 o'clock; is that correct?

17           PROSPECTIVE JUROR NO. 45:  Yes.

18           THE COURT:  All right, thank you.

19           PROSPECTIVE JUROR NO. 40:  Number 40.

20           THE COURT:  All right.  Number 40.

21           PROSPECTIVE JUROR NO. 40:  I also have a camping

22   reservation for next week, the 20th through the 23rd.  I am

23   willing to forego that, but I would like to know so I can cancel

24   the reservation and inform my employer not to use up my vacation

25   time.

1          THE COURT:  I understand that.  Thank you.

2          PROSPECTIVE JUROR NO. 42:  I'm Number 42, Your Honor.

3    I got a subpoena for a civil case in Kenosha County for next

4    Tuesday.

5          THE COURT:  What kind have of case would that be?

6          PROSPECTIVE JUROR NO. 42:  It's a family court case.

7    I'm a private investigator who was a witness in a case.

8          THE COURT:  I assume you know the case number and the

9    court involved in that particular matter; is that correct?

10          PROSPECTIVE JUROR NO. 42:  Yes, I have it but I don't

11    have it today.  It's not an issue right now, but I just want to

12    let you know I was subpoenaed.

13          THE COURT:  All right.  Thank you.  Is there anyone

14    else?

15          PROSPECTIVE JUROR NO. 50:  Number 50.

16          THE COURT:  All right.  Number 50.

17          PROSPECTIVE JUROR NO. 50:  If the case goes till next

18    week, Friday I'm still trying to work out childcare for my

19    one-year-old.  That's the only thing.

20          THE COURT:  Thank you.

21          PROSPECTIVE JUROR NO. 2:  I'm Number 2.

22          THE COURT:  All right.  Number 2.

23          PROSPECTIVE JUROR NO. 2:  I work for the University of

24    Wisconsin-Parkside in the professional development department.

25    We do professional development for educators, and the summer is

1    our big time.  We're in the middle of a conference now, and I

2    have another one scheduled for the 21st and 22nd of next week.

3                THE COURT:  All right.  And what is your

4    responsibility in connection with such conferences?

5                PROSPECTIVE JUROR NO. 2:  I do the registration, I

6    handle the logistics as far as room reservations, get the

7    presenters, contracts, all of their needs, order food, make sure

8    everything is going with food service on campus, parking.

9    Basically everything except for present.

10               THE COURT:  When you are unavailable, is there someone

11   else who handles those responsibilities?

12               PROSPECTIVE JUROR NO. 2:  I do have a supervisor who

13   knows most of what I do.  I was able to keep her updated for

14   this week, but I have not prepared for the 21st or 22nd.

15               THE COURT:  Would the responsibilities associated with

16   the conference next week be something that you could relay to

17   your supervisor during a recess in this case?

18               PROSPECTIVE JUROR NO. 2:  I could try, definitely.  I

19   mean, it would help if I was there.  But as she's running the

20   conference that were there right now -- we probably could talk

21   in the evening, I'm sure, yes.

22               THE COURT:  All right, thank you.

23               PROSPECTIVE JUROR NO. 2:  You're welcome.

24               THE COURT:  Number 3?

25               PROSPECTIVE JUROR NO. 3:  Yes, I'm Number 3.

1          Your Honor, I asked to be excused because I'm under

2    medical care right now, and I'm seeing three different doctors.

3    I have PTSD, I suffer from anxiety and insomnia disorders, and

4    I'm on a lot of different medications.  And I would have to take

5    them during the day, and I don't think that would be too good to

6    sit through the courtroom proceeding under those medications.

7                THE COURT:  Are you comfortable at this point in time?

8                PROSPECTIVE JUROR NO. 3:  I'm in a lot of pain right

9    now.

10               THE COURT:  Is there anything we can do to assist?

11               PROSPECTIVE JUROR NO. 3:  Well, I'll try to bear with

12   it, you know, right now and then just take my medication when I

13   get home.

14               THE COURT:  When you are medicated, does that affect

15   your attention?

16               PROSPECTIVE JUROR NO. 3:  Yes.  I have to take things

17   like hydrocodone, I take things kind of like make me groggy,

18   dizzy, sleepy.

19               THE COURT:  Have you had any difficulty handling your

20   personal affairs while taking your medication as prescribed?

21               PROSPECTIVE JUROR NO. 3:  Yeah.  See, I won't drive or

22   try to do housework.  It's kind of difficult for me under those

23   medications.

24               THE COURT:  Thus far, has there been anything that you

25   have been unable to follow as we have gone through voir dire?

1           PROSPECTIVE JUROR NO. 3:  Excuse me again?

2           THE COURT:  Is there anything that we've talked about

3    so far that you have had any difficulty understanding so far?

4           PROSPECTIVE JUROR NO. 3:  No, sir.

5           THE COURT:  All right.  Thank you.

6           PROSPECTIVE JUROR NO. 3:  You're welcome, sir.

7           PROSPECTIVE JUROR NO. 16:  Hi, Your Honor.  I'm a

8    diabetic, and right now I'm not feeling all that good.

9           THE COURT:  What's your number?

10          PROSPECTIVE JUROR NO. 16:  16.

11          THE COURT:  All right.  Number 16.

12          Have you taken your medication as prescribed?

13          PROSPECTIVE JUROR NO. 16:  Not today because I haven't

14   ate anything and I'm kind of shaky.  So I'm not feeling all that

15   good.

16          THE COURT:  Do you need a short break at this point in

17   time to handle any issues that you may be having at the moment?

18          PROSPECTIVE JUROR NO. 16:  Yeah.  I need to eat

19   something.

20          THE COURT:  You didn't eat?

21          PROSPECTIVE JUROR NO. 16:  I was trying to get here.

22          THE COURT:  All right.  Please be seated.  Help is on

23   the way.

24          PROSPECTIVE JUROR NO. 23:  Number 23.  I understand

25   that this trial is scheduled to extend into next week for some

1    time.  If it were to go to the week of the 26th for some reason,

2    I have a nonrefundable plane ticket to be at a professional

3    conference that week.

4               THE COURT:  Where is the conference?

5               PROSPECTIVE JUROR NO. 23:  Hawaii.  I didn't choose

6    that, I swear.

7               (General laughter.)

8               THE COURT:  I didn't ask for that reaction.

9               (General laughter.)

10              THE COURT:  I think they're jealous.  You said it's a

11   nonrefundable ticket?

12              PROSPECTIVE JUROR NO. 23:  Yes, sir.

13              THE COURT:  On which island are you going to have this

14   conference?

15              PROSPECTIVE JUROR NO. 23:  I don't know, I have to fly

16   into the Kona Airport.  Is that the big island?

17              THE COURT:  No, that's Oahu.  The big island is

18   Hawaii, but Oahu is the main airport for Hawaii.  All right.

19   Thank you.

20              Is there anyone else?

21              (No response.)

22              THE COURT:  Do the parties have any questions of the

23   jurors who were just questioned by the Court?

24              MR. SULLIVAN:  No, Your Honor.

25              THE COURT:  Does the defense have any questions of the

1    jurors who were just questioned by the court?

2         MR. WEBB:  Just briefly.

3         Juror No. 2, as far as the conference next week and

4    the arrangements that you've told us about as far as the -- if I

5    understand it, you're going to attempt to contact your

6    supervisor to see if the she could possibly handle that next

7    week.  Is that --

8         PROSPECTIVE JUROR NO. 2:  I am.

9         MR. WEBB:  I can hear.  That's fine.  I don't know

10   exactly the arrangements, but would the fact that you would feel

11   that you needed or wanted to be at the conference and because

12   it's important to you and your job, would that maybe affect your

13   ability to pay attention?  Would you be distracted because of

14   the concerns that you're not at the conference and taking care

15   of issues that you think you should take care of?

16        PROSPECTIVE JUROR NO. 2:  I've already been distracted

17   this morning, yes.

18        MR. WEBB:  You have.  And as far as we understand your

19   job and the responsibilities -- so if you were to serve on this

20   jury like into next week, do you think that distraction might

21   interfere a little bit with your ability to pay attention to the

22   case?

23        PROSPECTIVE JUROR NO. 2:  I would hope not.  I want to

24   say no, but my e-mail goes to the phone and I -- I've been on

25   e-mail all morning.

1        MR. WEBB:  We understand you want to, and this is a

2    very important case and there's a lot of stake in the case.  And

3    we understand responsibilities.  And so when you said you would

4    like to, I kind of sensed a little hesitation there because

5    you're trying to dig deep and be honest with us, and that's what

6    we want you to do.  So I take it you have a little doubt; in

7    other words, you think maybe it might interfere.  Is that fair

8    to say?

9        PROSPECTIVE JUROR NO. 2:  Yes.

10        MR. WEBB:  I have no more questions.

11        THE COURT:  All right.  Is there anyone on the panel

12    who has any difficulty hearing?  Has anyone had any problems

13    hearing what has taken place in the courtroom up to this point?

14        (No response.)

15        THE COURT:  I mentioned upstairs that we do have

16    assistive devices here in the courtroom; therefore if anyone

17    should at some point in time have difficulty hearing, you can

18    let us know and we will get you a listening tool.

19        Now, each of you has received and responded to a

20    questionnaire.  After reviewing those questionnaires this

21    morning, is there anyone who would respond differently to what

22    you were asked in the questionnaire at the outset?  All right.

23    We will start with those in the jury box.  Number 22.

24        PROSPECTIVE JUROR NO. 22:  Number 22.  It's regarding

25    the question 14.  I kind of misinterpreted the question.  I do

36

1    have a son-in-law -- I don't know if it's pertinent in this

2    case, but he's a police officer here in Milwaukee.

3            THE COURT:  All right.  What type of assignment does

4    that individual have?

5            PROSPECTIVE JUROR NO. 22:  He's a patrol officer.

6            THE COURT:  All right.  Is there anything about your

7    son-in-law's work that you can now think about or that you think

8    about at this time which would affect your ability to be fair to

9    both sides in this case?

10           PROSPECTIVE JUROR NO. 22:  No.

11           THE COURT:  All right.  Thank you.

12           In the back near the window.  We'll start with the

13   front row.  Number 25.

14           PROSPECTIVE JUROR NO. 25:  Number 25.  On Question

15   Number 11, I answered originally to taxes and tax preparation, I

16   said yes because I prepared my own taxes.  I have not done it on

17   a professional level or I don't have any education or training

18   or work experience.  So I misunderstood the question at first.

19           THE COURT:  All right.  Is there anyone else?

20           PROSPECTIVE JUROR NO. 25:  That's it.

21           THE COURT:  Thank you.

22           PROSPECTIVE JUROR NO. 31:  Number 31.  The only thing

23   I would change is what I previously mentioned regarding travel

24   for next week.

25           THE COURT:  All right.

1        PROSPECTIVE JUROR NO. 52:  Number 52.  I answered

2   Question Number 16, I checked it wrong.  I misunderstood the

3   question.  My response -- the reason I think --

4        THE COURT:  You'll have to speak up.

5        PROSPECTIVE JUROR NO. 52:  I'm employed as a parole

6   and probation agent, so the reason that I think this could

7   affect me because I don't know if I could form a fair opinion in

8   this case.

9        THE COURT:  Why so?

10       PROSPECTIVE JUROR NO. 52:  Based on my experiences

11  dealing with caseloads and those involved with the criminal

12  justice system, it's kind of -- I mean you form a certain

13  opinion after a while.

14       THE COURT:  You'll have to explain that a little more.

15  You form certain opinions concerning what?

16       PROSPECTIVE JUROR NO. 52:  Based upon those

17  individuals' criminal pasts and their adjustment to supervision.

18       THE COURT:  So --

19       PROSPECTIVE JUROR NO. 52:  I just don't know if --

20       THE COURT:  It's your job as a probation and probation

21  officer for the State of Wisconsin to deal with persons who have

22  been convicted of crimes; is that correct?

23       PROSPECTIVE JUROR NO. 52:  That is correct.

24       THE COURT:  And are you suggesting that when you have

25  people who are being supervised by you, you have certain

1    opinions that you formed concerning those individuals?  Is that

2    correct?

3           PROSPECTIVE JUROR NO. 52:  Sometimes, yes.

4           THE COURT:  All right.  Now, this is a case where you

5    are being asked to serve as a juror and to assess the facts as

6    they are presented.  Do you believe that your work as a

7    probation officer would make it impossible for you to assess the

8    facts that would be presented in this case fairly?

9           PROSPECTIVE JUROR NO. 52:  In a way.

10          THE COURT:  Why so?

11          PROSPECTIVE JUROR NO. 52:  Well, I guess looking at --

12   I guess I would want to know -- if I'm presented with the

13   person's past, if there's anything I guess that would cause me

14   to be able to make a fair decision.

15          THE COURT:  As a probation and parole officer, are you

16   asked to provide reports concerning people you work with?

17          PROSPECTIVE JUROR NO. 52:  Yes.

18          THE COURT:  When you prepare those reports, do you

19   include in those reports facts as they are presented to you?

20          PROSPECTIVE JUROR NO. 52:  Yes.

21          THE COURT:  When you evaluate the people you work

22   with, do you evaluate them on the basis of the facts that are

23   presented?

24          PROSPECTIVE JUROR NO. 52:  Yes.

25          THE COURT:  Can you tell me why you would deal with

39

1   people differently as a juror than you would in your

2   professional capacity as a probation and parole officer for the

3   State?

4           PROSPECTIVE JUROR NO. 52:  (No response.)

5           THE COURT:  In other words, I'm asking you whether or

6   not you as a juror could be fair in a way that would be

7   consistent with your responsibility as a probation and parole

8   officer.

9           PROSPECTIVE JUROR NO. 52:  (No response.)

10          THE COURT:  Are you telling me that you're incapable

11  as a probation and parole officer with dealing with people

12  solely on the basis of the facts?

13          PROSPECTIVE JUROR NO. 52:  No.

14          THE COURT:  If that is so, can you explain why you

15  would not be able to assess the facts in this case solely on the

16  basis of what is presented in the courtroom?

17          PROSPECTIVE JUROR NO. 52:  I could assess that.

18          THE COURT:  Do you understand what I'm getting at?

19          PROSPECTIVE JUROR NO. 52:  Yes.

20          THE COURT:  Is there any reason why you believe you

21  would not -- you should not sit on this case beyond what you've

22  said so far?

23          PROSPECTIVE JUROR NO. 52:  I guess it just kind of

24  makes it, I guess, a bit uncomfortable.

25          THE COURT:  Are you looking for a reason not to serve

1  on the jury in this case?

2          PROSPECTIVE JUROR NO. 52:  No.  Just the comfort

3  level, that's all.

4          THE COURT:  Why would you be uncomfortable serving as

5  a juror?

6          PROSPECTIVE JUROR NO. 52:  I guess with it being a

7  criminal matter.

8          THE COURT:  Are you uncomfortable being around people

9  who are involved in criminal cases?

10          PROSPECTIVE JUROR NO. 52:  No.  I wouldn't say that.

11  But I guess --

12          THE COURT:  Well, what would you say about being

13  around people who are involved in criminal cases?

14          PROSPECTIVE JUROR NO. 52:  I guess -- I don't know.  I

15  can't really --

16          THE COURT:  We'll come back to you.

17          Is there anyone else?

18          PROSPECTIVE JUROR NO. 51:  Number 51.  I noticed I

19  forgot to answer the second half of Question 8, and that is did

20  I deal with government regulations a lot in my current job.  And

21  then in Question 11 I misread.  And I do have work experience in

22  accounting and bookkeeping, and I do not have work experiences

23  in taxes and tax preparation.

24          THE COURT:  All right.  Thank you.

25          Do we have anyone else?

1          PROSPECTIVE JUROR NO. 42:  Yes, Your Honor --

2          THE COURT:  Number 42?

3          PROSPECTIVE JUROR NO. 42:  Number 42, sorry.

4          I had mentioned it was a jury trial and it was

5    postponed at least once, so I just wanted to bring that to the

6    Court's attention.

7          THE COURT:  Very well.  Were you subpoenaed by the

8    State or by the defense?

9          PROSPECTIVE JUROR NO. 42:  By the defense.

10          THE COURT:  All right.  So you wouldn't start off as a

11   witness in the case.  You would be toward the end of the case.

12          PROSPECTIVE JUROR NO. 42:  Thanks.

13          THE COURT:  Go ahead.

14          PROSPECTIVE JUROR NO. 50:  Number 50.  I first -- oh,

15   49, I'm sorry.  I first answered no to Number 9.  I first

16   answered no to Number 9 as far as owning a business, but I

17   wasn't thinking.  My husband and I have a karate school, but I

18   don't really have anything to do with it.

19          THE COURT:  You have a karate school?  Do you have a

20   karate belt?

21          PROSPECTIVE JUROR NO. 49:  I do.

22          THE COURT:  Which one?

23          PROSPECTIVE JUROR NO. 49:  A brown.

24          THE COURT:  How long have you held it?

25          PROSPECTIVE JUROR NO. 49:  About 15 years.

Case 2:11-cr-00135-CNC   Filed 08/24/12   Page 42 of 174   Document 158

```
 1                THE COURT:  All right.  Thank you.  I won't ask you to
 2    do any katas in the courtroom.
 3                Number 33.
 4                PROSPECTIVE JUROR NO. 33:  I changed Number 30 from
 5    "comfortable" to "not very comfortable," the reason being I'm
 6    just very nervous about -- my IQ isn't very high, and I just
 7    don't want to -- that I could do this.
 8                THE COURT:  What type of work do you do?
 9                PROSPECTIVE JUROR NO. 33:  I am retired.
10                THE COURT:  What type of work did you do prior to
11    retirement?
12                PROSPECTIVE JUROR NO. 33:  Factory work.
13                THE COURT:  What type of factory work?
14                PROSPECTIVE JUROR NO. 33:  I worked at --
15                THE COURT:  You worked in a bindery at what place?
16                PROSPECTIVE JUROR NO. 33:  World Color.
17                THE COURT:  World Color.  Go ahead.
18                PROSPECTIVE JUROR NO. 33:  And I worked at Milwaukee
19    Faucet.  Piecework, really.  Screws.
20                THE COURT:  Were you ever a supervisor?
21                PROSPECTIVE JUROR NO. 33:  No.
22                THE COURT:  How long have you been retired?
23                PROSPECTIVE JUROR NO. 33:  Ten years.
24                THE COURT:  What types of things do you do to occupy
25    your time most days?
```

```
 1              PROSPECTIVE JUROR NO. 33:  Run errands for everybody.
 2    I sew.  Fish.
 3              THE COURT:  All right.
 4              PROSPECTIVE JUROR NO. 33:  Clean house.
 5              THE COURT:  Thank you.
 6              Do we have anyone else?  Number 7?
 7              PROSPECTIVE JUROR NO. 7:  Yeah.
 8              THE COURT:  One second.
 9              PROSPECTIVE JUROR NO. 7:  Okay.  Number 7.  Question 6
10    I should have left blank, and I misread it.  That's it.
11              THE COURT:  You said you left blank?
12              PROSPECTIVE JUROR NO. 7:  I should have left blank.
13    Just misread it.
14              THE COURT:  That question asked about hobbies.
15              PROSPECTIVE JUROR NO. 7:  Oh, Question 6.
16              THE COURT:  6, I'm sorry.  All right.  Very well.
17    Number 5.
18              PROSPECTIVE JUROR NO. 5:  Number 5.  For Question 2, I
19    just recently moved on the first of this month, so instead of --
20    I changed my address two weeks ago.
21              THE COURT:  All right.  And is it still within Eastern
22    Wisconsin?
23              PROSPECTIVE JUROR NO. 5:  Yes, sir.
24              THE COURT:  You didn't fly in from Hawaii, did you?
25              PROSPECTIVE JUROR NO. 5:  No, sir.
```

1          (General laughter.)

2          THE COURT:  Just wanted to make sure.

3          Is there anyone else?

4          (No response.)

5          THE COURT:  Do the parties have questions of any one

6    of these jurors based upon what was just asked and said by them?

7          MR. SULLIVAN:  No, Your Honor.

8          MR. WEBB:  No, Your Honor.

9          THE COURT:  Is there anyone who has read anything

10   concerning this case?

11          (No response.)

12          THE COURT:  I'm not restricting your reading to things

13   you may have read in a newspaper.  I'm taking into account any

14   social media or online materials.

15          By the way, is there anyone who does any tweeting?

16   All right.  We have two -- number -- what's your number?

17          PROSPECTIVE JUROR NO. 20:  20.

18          THE COURT:  20.  And in the back, is there someone

19   else?

20          PROSPECTIVE JUROR NO. 44:  44.

21          THE COURT:  44.  Is there anyone who blogs?

22          (No response.)

23          THE COURT:  All right.  I've already put you on notice

24   concerning social media, but I will reiterate.  You may not at

25   any point in time engage in any communications directly,

1    face-to-face, or by way of any social media.  You are not to say

2    to any person anything concerning the particulars of this case

3    or do any research impacting on this case or the issues that may

4    arise during the course of this case because it may adversely

5    affect this trial.  The parties deserve from you the promise

6    that you will restrict what you learn or what you see to those

7    things that are presented in this courtroom.

8              We will take a very short recess at this time.  Please

9    do not wander far.  If anyone needs to use the restroom, you

10   will be given an opportunity to utilize the facilities at this

11   point in time.

12             I'd like to see the parties at side bar.

13             (Off-the-record discussion at side bar with all

14   counsel and the court.)

15             (Recess taken at 11:12 a.m., until 11:24 a.m.)

16             THE COURT:  I'd like to see counsel at side bar.

17             You may be seated.

18             (At side bar on the record.)

19             THE COURT:  Please note we're at side bar.  The

20   defendant is not at side bar.  I did mention during our final

21   pretrial conference earlier that the defendant is entitled to

22   participate in every phase of the case, including side bar

23   conferences.  Do you want to check with your client to ensure

24   that he recognizes his right to be here?

25             MR. WEBB:  I have.  You'll put on the record I

1   consulted with Dr. Ahuja about his right to be at side bar

2   conferences, and he's agreed that by and large he will not be at

3   side bar conferences.  But if he chooses to be, he will

4   accompany me if the issue warrants it.

5          THE COURT:  All right.  Juror No. 16, the person who

6   indicated she is diabetic, is in the jury room at this point in

7   time.  My clerk reports that during the recess she was able to

8   eat some food; however, she also reported that her blood glucose

9   is now at 300, and that is exceedingly high.

10         Do you wish to ask additional questions of Juror

11  No. 16 in the jury room?

12         MR. WEBB:  Yes.

13         MR. SULLIVAN:  We move to strike for cause.

14         THE COURT:  Would you repeat that, Mr. Webb?

15         MR. WEBB:  I would like to briefly ask questions.

16         THE COURT:  All right.  We'll go to the jury room.

17         (End of discussion at side bar.)

18         (Trial adjourned to the jury room.)

19         THE COURT:  Let the record show that we're in the jury

20  room with Juror No. 16 and another individual whom I believe is

21  her spouse.  Is that correct?

22         SPOUSE:  Correct.

23         THE COURT:  Juror No. 16, while you were in the

24  courtroom you indicated that you were having some health issues.

25  Can you explain a little further what's going on?

1        PROSPECTIVE JUROR NO. 16:  Okay.  I'm a diabetic, and

2   I'm not really a good diabetic.  And I used the bathroom,

3   frankly, and I was in a hurry to get here this morning because I

4   came from Kenosha, so I didn't eat anything.  So -- and then I

5   didn't take no medicine.  So it didn't help.

6        THE COURT:  Do you have your medication?

7        PROSPECTIVE JUROR NO. 16:  Yeah, I have pills, but

8   then I supposed to take a shot right after I eat and I don't

9   have that.

10       THE COURT:  All right.  Have you checked your blood

11  glucose?

12       PROSPECTIVE JUROR NO. 16:  Yeah, I just checked it.

13  It's 329.

14       THE COURT:  What does it run ordinarily?

15       PROSPECTIVE JUROR NO. 16:  Usually it should be like

16  98 to 115.

17       THE COURT:  When did you last check your blood

18  glucose?

19       PROSPECTIVE JUROR NO. 16:  Last night it was 145 after

20  I ate.

21       THE COURT:  When you say you're not a good diabetic,

22  does that mean that you do not follow your doctor's instructions

23  as closely as I know you should?

24       PROSPECTIVE JUROR NO. 16:  Right.

25       THE COURT:  Is there anything else in terms of your

1    feelings at this time that you can report?

2           PROSPECTIVE JUROR NO. 16:  Just not feeling good.

3    That's about it.

4           THE COURT:  When you say you're not feeling well, what

5    in particular is going on?

6           PROSPECTIVE JUROR NO. 16:  I'm talking like a little

7    shaky, a little nervous, you know, just really not feeling good.

8           THE COURT:  Is the nervousness something that you

9    experience with some degree of regularity when you're having

10   problems with your diabetes?

11          PROSPECTIVE JUROR NO. 16:  Yeah, I get like jittery.

12          THE COURT:  All right.  You live in Kenosha.  How long

13   does it take you to get back and forth ordinarily?

14          PROSPECTIVE JUROR NO. 16:  I don't know nothing about

15   Milwaukee, so --

16          THE COURT:  Well, when you got here this morning, how

17   long did it take you to arrive at the courthouse from the time

18   you left home?

19          PROSPECTIVE JUROR NO. 16:

20          SPOUSE:  About an hour, with traffic.

21          THE COURT:  All right.  Ordinarily it would take you

22   about what, 45 minutes?

23          SPOUSE:  If I speeding, yeah.

24          THE COURT:  Are you closer to the lake in Kenosha?

25          SPOUSE:  Yes.

1    THE COURT:  And so do you drive westward on which, is

2  that 39?

3    SPOUSE:  Take today, I took west on Washington Road to

4  94 and then east.

5    THE COURT:  And then westward on 94.

6    SPOUSE:  Yeah.

7    THE COURT:  Do the parties have questions?

8    MR. SULLIVAN:  None from the government.

9    MR. WEBB:  Your health has to be of paramount

10  importance.  Let me just ask you directly:  If you had the right

11  medications and ate at the right times, would you be okay with

12  serving on this jury, or are you kind of telling us that because

13  of your health you just feel you should not be on this jury?

14    PROSPECTIVE JUROR NO. 16:  Because I'm going to have

15  to keep getting up, going to the bathroom -- like I said, I use

16  it frequently.  I just can't -- I don't think -- if I'm sick,

17  I'm not going to really pay attention to what's going on.  It's

18  going to be about me.  So --

19    THE COURT:  We do take breaks about every hour, hour

20  and a half, if necessary.  Would that accommodate you if you

21  were a juror?

22    PROSPECTIVE JUROR NO. 16:  I can't say because I can't

23  say when it's up and when it's down.  And when it's down, I go

24  to shaking and stuff.  So I can't make that call, you know.

25    SPOUSE:  May I say something?  She failed to say that

1    she's in waiting for her insulin, her new supply.  She ran low

2    and her insurance only allowed them to send bulk orders and --

3              PROSPECTIVE JUROR NO. 16:  They sent me some but they

4    didn't send all.

5              THE COURT:  So are you saying you don't have all your

6    medication at home?

7              PROSPECTIVE JUROR NO. 16:  Right.  Because this new

8    mail stuff with the insurance, you have to mail, you know.  You

9    know how that goes.

10             THE COURT:  All right.  Very well.  How do you feel at

11   this moment?

12             PROSPECTIVE JUROR NO. 16:  Not feeling too good.  Now

13   my feet is itching and that's one of the problems.

14             THE COURT:  I understand.

15             PROSPECTIVE JUROR NO. 16:  I'm just not feeling good.

16   I just want to go lay down.

17             THE COURT:  All right.  I'd like to see the parties at

18   side bar.  Better yet, stay here.

19             Can you step out for a moment, please?

20             PROSPECTIVE JUROR NO. 16:  Yes.

21             THE COURT:  That might be easier.  You can take a

22   chair outside, Kris.

23             (Juror No. 16 and spouse out.)

24             THE COURT:  Be seated, please.  I'd like your

25   comments.  First offer with the government?

1      MR. SULLIVAN:  Government moves to strike for cause.

2  Based on what I just observed, the woman is presently ill, she

3  said she wanted to go lie down.  In the courtroom her head was

4  down.  I think she is suffering from an insulin reaction right

5  now, and in the interests of justice I'd like to let her go to

6  seek medical attention if necessary.

7      MR. WEBB:  I'm going to do the same thing as I did

8  last time.  I don't want her excused.  I just think she doesn't

9  want to be on this jury, but quite frankly, I'm just going to

10  let Your Honor decide.

11      THE COURT:  I agree in part with what the defense

12  said; that is, I believe this juror does not wish to be here.

13  On the other hand, there are several things she said that

14  indicate to me she should not be on the jury.  The first is her

15  description of her symptoms.  What she testified to or asserted

16  are classic symptoms of some adverse effects of diabetes.  More

17  important, this juror said she does not have and currently is

18  not using insulin as directed by her doctor because of insurance

19  issues and failure of the insurance company to provide her with

20  necessary insulin in a timely manner.

21      That being so and given the fact that this juror is

22  likely to seek the opportunity to excuse herself from the

23  courtroom more frequently than would be appropriate, I will

24  excuse her for cause.

25      MR. SULLIVAN:  May I add one thing for the record,

1    Your Honor?

2              THE COURT:  Yes.

3              MR. SULLIVAN:  On her juror questionnaire she said,

4    she indicated that she likes jury duty, and we wanted to -- for

5    the record, we had her in a good category.  So we're somewhat

6    remiss to lose her.

7              THE COURT:  Yeah, I do see that there are some

8    inconsistencies there, but at this point in time it's pretty

9    apparent that she does not want to be here.  But the fact that

10   she did come this morning notwithstanding the medical issues

11   that she raised shows a sense of faithfulness to obligation that

12   can't be discounted.  But I do believe under the circumstance

13   there is cause for dismissal.

14             Now, with regard to any one or more of the other

15   jurors who indicated they're having a problem, do you wish to be

16   heard or have any view as to whether or not who should be

17   excused?

18             MR. WEBB:  Your Honor -- I'm sorry, you go first.  I

19   should let the government go first.

20             MR. SULLIVAN:  I think the first one is Juror 31

21   indicated that she would be traveling on Saturday.

22             THE COURT:  The clerk's out of the room and she keeps

23   track of all of this for me.  Off the record.

24             (Discussion off the record.)

25             THE COURT:  31.

1        THE CLERK:  You want to see 31?

2        THE COURT:  Yeah.  Thank you.  Go ahead.

3        (Brief pause.)

4        MR. SULLIVAN:  And again, Your Honor, we have her

5    in -- our preliminary assessment of her is she would be a good

6    juror.  She indicated she would be fair and impartial.  But she

7    did note earlier that that would be a financial hardship on her,

8    I believe she said.

9        THE COURT:  I believe she also mentioned that there

10   are relatives coming in town and it would also be expensive and

11   very difficult for them as well.

12       MR. SULLIVAN:  Yes.  So we move to strike for cause

13   because we -- really, the government wants jurors who not only

14   want and are willing and are capable of serving but do not have

15   a type of financial hardship or other hardship that would

16   interfere with their lives.  Maybe she can come back and serve

17   on a different panel.

18       MR. WEBB:  I agree.

19       THE COURT:  All right.  We'll excuse her for cause.

20       Next?

21       MR. SULLIVAN:  24.  I was going to do some follow-up

22   questioning on her.  She indicated she has feelings regarding

23   Dr. Ahuja.  We didn't really explore that.  I can wait.  We can

24   wait later and explore that in the courtroom.  But at this point

25   in time, we would move to have her excused for cause because she

1   said that she personally knows the defendant, and the government

2   would be more comfortable with jurors that don't know any of the

3   parties, and especially a juror that has said she has feelings

4   about the defendant.

5         MR. WEBB:  Well, never mind.  I didn't mean to

6   interrupt.

7         THE COURT:  No, go ahead.

8         MR. WEBB:  I object to excusing her.

9         THE COURT:  I agree.  At least on the basis of what we

10   know thus far.  However, inasmuch as the government wishes to

11   explore further the feelings that this juror had notwithstanding

12   her earlier statement that she does not have any negative

13   feelings toward Dr. Ahuja, we'll bring her in.

14         Would you bring her in?

15         (Juror No. 24 in.)

16         THE COURT:  Juror No. 24, I'd like to ask you some

17   additional questions regarding your knowledge of Dr. Ahuja and

18   the feelings you have toward Dr. Ahuja.  Would you give us some

19   additional details respecting your knowledge of Dr. Ahuja?

20         PROSPECTIVE JUROR NO. 24:  On the 25th, I believe it

21   was --

22         Do I need to say names?

23         THE COURT:  No.

24         PROSPECTIVE JUROR NO. 24:  -- my friend went into the

25   hospital with what they said was 100 percent curable back tumor

1    on her spine.  We are -- now I'm up there every day at

2    St. Luke's, and she's now in the neurological ICU.  She cannot

3    speak, she cannot move, she can't do anything.  She's got

4    something going on with her brain.

5           And my feelings personally are is he's a great doctor

6    and he should be there taking care of my friend, making her talk

7    to me again.  She's not talking to me.  I don't want to sit here

8    and watch him go through whatever his personal issues are when I

9    want my best friend back.  It's as simple as that.  So -- I

10   mean, can I be partial against him?  I don't know because the

11   only side I see from him is him trying to cure her.  So I don't

12   know --

13          THE COURT:  Is he her treating physician?

14          PROSPECTIVE JUROR NO. 24:  She's got so many doctors I

15   can't even name them all.  Her husband is somewhere out in the

16   gallery waiting for me, actually, because we go to the hospital

17   together every day.

18          THE COURT:  Is he wearing a cap?

19          PROSPECTIVE JUROR NO. 24:  He's gray.  I don't know if

20   he has a hat on today.  He's got a checkered shirt on.

21          THE COURT:  Red shirt?

22          PROSPECTIVE JUROR NO. 24:  Yes.

23          THE COURT:  All right.

24          PROSPECTIVE JUROR NO. 24:  And like I said, my mind is

25   all on her.  She went from talking to us to not talking to us at

1    all.  And it's all neurological.  So this all had to do with --

2    I understand you guys have a case.  I understand you guys have a

3    case, but my only feelings are I want him taking care of her.

4    His personal life is -- I don't care about actually.  So --

5            THE COURT:  So you don't have any negative feelings

6    about the government merely because Dr. Ahuja is a defendant in

7    this case; is that correct?

8            PROSPECTIVE JUROR NO. 24:  The government itself

9    towards him?

10           THE COURT:  Yeah.  The government as it relates to

11   him.  The government is prosecuting him.

12           PROSPECTIVE JUROR NO. 24:  Not as it relates to him,

13   no.

14           THE COURT:  Do you have any feelings about whether or

15   not Dr. Ahuja should be required to respond to a charge?

16           PROSPECTIVE JUROR NO. 24:  Oh, I definitely think he

17   should be required to respond to charges against him.

18           THE COURT:  Okay.  And when I say required to respond,

19   that means he has to be in a courtroom.  He doesn't have to

20   prove whether or not he is guilty or innocent.  Do you

21   understand that?

22           PROSPECTIVE JUROR NO. 24:  I understand that.  It's

23   just --

24           THE COURT:  So you know the burden is on the

25   government to prove somebody guilty.

1      PROSPECTIVE JUROR NO. 24:  Yes, I do understand that.

2          THE COURT:  With that said, would you tend to rush to

3  get to a judgment if you were a juror because you want Dr. Ahuja

4  out of here?

5          PROSPECTIVE JUROR NO. 24:  Honestly, yes.  To be

6  totally honest with you, I'd rather him be in the hospital

7  because he's a very good doctor.  He's promised us that he would

8  do everything that he could to make her better, and I want him

9  to stick to his promise.  I want my friend back.  If you want

10  total honesty, yeah, I would.  I want this over with.  So I --

11          THE COURT:  Does the government have any questions?

12          MR. SULLIVAN:  None, Your Honor.

13          THE COURT:  The defense?

14          MR. WEBB:  A couple.  I'm one of Dr. Ahuja's lawyers.

15  This trial is going to last one week, maybe less, but one week

16  we'll say.  And he has to be here.  I can't change that and you

17  can't either.

18          PROSPECTIVE JUROR NO. 24:  Yeah, I know.

19          MR. WEBB:  What we're looking for, though, people need

20  to serve on a jury that can set aside personal feelings and just

21  be fair and impartial to both sides.  So if I heard you a moment

22  ago as far as your ability to be fair and impartial, you're okay

23  on that.  Is that --

24          PROSPECTIVE JUROR NO. 24:  Yes and no.  I don't know

25  how to answer that.  I mean, fair and impartial as in -- my

58

1    whole feeling -- my mind wouldn't be there.  My whole mind is

2    wanting to get back to St. Luke's.  I spend all day at

3    St. Luke's.  So I don't know how to answer that question.  I

4    mean, would I listen to the evidence?  Would I understand it?

5    I'm smart enough to understand it.  I just --

6              MR. WEBB:  Let me see if I can help you, then.  Let me

7    ask you, His Honor is going to give you an instruction that as a

8    juror if you're on this jury you have to follow the law as he

9    gives it to you.

10             PROSPECTIVE JUROR NO. 24:  Yes, I can follow the law.

11             MR. WEBB:  You can do that.

12             PROSPECTIVE JUROR NO. 24:  Yes.

13             MR. WEBB:  And one of the instructions that he's going

14   to give you is that you must decide the case just based on the

15   evidence you hear in the courtroom.

16             PROSPECTIVE JUROR NO. 24:  Yes.

17             MR. WEBB:  And I take it you could follow that

18   instruction.

19             PROSPECTIVE JUROR NO. 24:  Oh, yeah.

20             MR. WEBB:  You don't doubt that for a moment, do you?

21             PROSPECTIVE JUROR NO. 24:  No.

22             MR. WEBB:  And you right now, even though your

23   feelings about your friend -- and I understand everything you

24   said.  But you will be able to follow the instruction that the

25   Court gives you and you will base any verdict you reach just on

59

1    the evidence you heard in this courtroom if you're selected.

2              PROSPECTIVE JUROR NO. 24:  Yes.

3              MR. WEBB:  I have no more questions.

4              MR. SULLIVAN:  If you could press a button right now

5    and that button would find the defendant not guilty so he could

6    go help your friend, would you do it?

7              PROSPECTIVE JUROR NO. 24:  Honestly?

8              MR. SULLIVAN:  Yes.

9              PROSPECTIVE JUROR NO. 24:  Yes.  In a heartbeat.

10   That's my life right now.

11             THE COURT:  Regardless of the evidence?

12             PROSPECTIVE JUROR NO. 24:  I'm not going to lie.  I

13   probably would.  If you could tell me right now that he could go

14   and cure her, I would do anything.

15             THE COURT:  You understand that nobody can

16   guarantee --

17             PROSPECTIVE JUROR NO. 24:  It's contradictory, but I'm

18   not going to lie.  I mean, I want her better.  You know, I want

19   him there to make her better.  So --

20             THE COURT:  Do you understand that a doctor cannot

21   guarantee results.

22             PROSPECTIVE JUROR NO. 24:  Yes, I do.

23             THE COURT:  And do you know that a juror should not

24   decide a case solely on the basis of her feelings?

25             PROSPECTIVE JUROR NO. 24:  Yes, I do.

 1          THE COURT:  You know you can't fulfill your obligation

 2    as a juror based on sympathy.

 3          PROSPECTIVE JUROR NO. 24:  Yes, I do.

 4          THE COURT:  You know you can't fulfill your obligation

 5    based on prejudice.

 6          PROSPECTIVE JUROR NO. 24:  I understand that.

 7          THE COURT:  And with that in mind, are you saying that

 8    your sympathy for your friend would form the basis for your

 9    decision as a juror in this case if you were selected?

10          PROSPECTIVE JUROR NO. 24:  Not so much for my

11    sympathy, it's more of I can honestly say my mind wouldn't be

12    there.  Like he said, if you give me right now that you could

13    let him go right now and he could go take care of my friend,

14    yes, I would choose that.  Am I going to lie -- I'm not going to

15    lie to you, you know, could I be partial if I had to listen to

16    the evidence and everything like that?  Yes, I'd listen to the

17    evidence.  Yes, I would.  You know, I would do everything I

18    could to form an opinion one way or the other.

19          THE COURT:  Based solely on the evidence?

20          PROSPECTIVE JUROR NO. 24:  Based solely on the

21    evidence.  But I honestly don't know if right now my mind would

22    really be -- you know, my mind is so many other places right

23    now.

24          THE COURT:  So are you saying that your attention may

25    not be devoted solely to the evidence in this case?

1    PROSPECTIVE JUROR NO. 24:  Not 100 percent.  I mean, I

2    have a hard enough time having my attention on my family at home

3    and not on her because she is going downhill so fast and they

4    don't know why.

5         THE COURT:  All right.

6         PROSPECTIVE JUROR NO. 24:  I mean, that's 100 percent

7    honesty.  I'm not going to lie to you to make you or you happy.

8    You know, so --

9         THE COURT:  My happiness isn't something you should be

10   concerned about.

11        PROSPECTIVE JUROR NO. 24:  I'm just saying I'm not

12   going to lie to you.

13        THE COURT:  Mr. Sullivan?

14        MR. SULLIVAN:  Just to be clear, if you had -- if you

15   were on the jury and you were deliberating and you knew that if

16   you voted for a guilty verdict, if in your mind you thought a

17   guilty verdict would prevent Dr. Ahuja from being able to care

18   for your friend, wouldn't that cloud your judgment?

19        PROSPECTIVE JUROR NO. 24:  No.  Because if I have to

20   sit on a jury, I have to go by the evidence.  It's -- I mean,

21   you know, I don't foresee it clouding my judgment.  If you can

22   prove that he's guilty, then he's guilty.  If you can prove he's

23   innocent, then he's innocent.  I mean, you have to have proof

24   either one way or the other.  You know, it has nothing to do

25   with me saying, you know, well, yeah, you're guilty, go away

 1    because if you prove him guilty, he's not taking care of her.

 2    If they prove him innocent, he is.  But I just wasted a week to

 3    be with her to sit here and prove him one way or the other.

 4         MR. SULLIVAN:  Then I don't understand what the

 5    problem is.  Because we're looking for someone who is fair and

 6    impartial and just decide the case on the evidence.

 7         PROSPECTIVE JUROR NO. 24:  Right now my head wouldn't

 8    be on the case.  The issue is, is that I really could not

 9    concentrate on -- you know, from what I read on the form that

10    you guys gave me, it's, you know, I wouldn't really be

11    concentrating on that.  My whole thing is that he should be -- I

12    understand if he did what he did he needs to be held liable, or

13    if he didn't then he needs to be set free.  But the only thing

14    my head is thinking is he is a doctor, he's my friend's doctor,

15    he needs to be there helping her.  I mean, that's the only

16    answer I can really give you.  So I don't know.

17         THE COURT:  That's fine.  Thank you.  You may return

18    to the courtroom.

19         On second thought, Kris, have her sit outside.

20         (Juror No. 24 out.)

21         THE COURT:  Mr. Sullivan?

22         MR. SULLIVAN:  The government moves to strike the

23    juror or have the juror excused for cause because at certain

24    points she indicated that she right now would vote not guilty by

25    pressing the magic button.  Other times she said she could be

1  fair and impartial.  Other times she said she couldn't pay

2  attention.  Frankly, the government is very confused and would

3  prefer to have jurors that are willing, able, and do not have

4  issues with friends who are apparently in comas being treated by

5  the defendant.

6          MR. WEBB:  My response is, first of all, in response

7  to Mr. Sullivan's last question in response to my question and

8  in response to Your Honor's question, she said if she is

9  selected on the jury she will listen to the evidence and return

10  a verdict accordingly.  That's number one.

11          Number two, the fact that the government is

12  confused -- and by the way, under the case law I believe the

13  fact that a juror indicates that they have personal problems in

14  their life that it makes it challenging for them to be on the

15  jury, which is what she essentially said, is not grounds to

16  excuse her for cause.  That's why we have peremptory challenges.

17          So based on the record that has just been established

18  before Your Honor, I object to her being excused for cause

19  because I don't think as a matter of law there's a basis to

20  excuse her for cause.  And the parties can evaluate this after

21  they do more questioning of her as to whether they want her to

22  serve or not, but I don't believe there's a basis to excuse her

23  for cause right now.

24          THE COURT:  What the juror has said is equivocal, at

25  worst.  I do not find from her responses a basis for excusing

1   her for cause.  What she said about possibly pushing a magic

2   button and getting out of here quickly was also explained during

3   the course of her examination in a way that provides the Court

4   with some question as to whether or not she can be fair, but it

5   does not demonstrate that she would be unfair.

6           Therefore, the Court declines to strike this juror for

7   cause.  We will revisit this issue after examination of the

8   entire panel and any additional responses of this juror that may

9   be warranted.

10          Is there any other juror we need to discuss at this

11  point in time?  Well, maybe I should get her back to the

12  courtroom.

13          (Brief pause.)

14          MR. SULLIVAN:  Not at this time from the government.

15          THE COURT:  Does the defense have any issues or

16  questions concerning the jurors who have responded thus far?

17          MR. WEBB:  One second, Your Honor.

18          MR. SULLIVAN:  Can I take that back and add one?

19          THE COURT:  Sure.

20          MR. SULLIVAN:  Juror No. 3 indicated that he is not

21  taking his medication.

22          THE COURT:  The guy with PTSD.

23          MR. SULLIVAN:  Yes.  But that if he does take it he

24  would feel groggy, dizzy, and sleepy, and that right now he's in

25  pain but he seems to be able to bear the pain right now.  So

1    that would be --

2              THE COURT:  Mr. Webb?

3              MR. WEBB:  Sorry.  Are you making a motion on Juror

4    No. 3?  I didn't understand what you just said.

5              THE COURT:  I think what he said was equivocal, at

6    best.

7              MR. WEBB:  I do too.

8              MR. SULLIVAN:  I'm not saying the government is

9    confused, but -- we should move on.

10             MR. WEBB:  I have two jurors I would like to call to

11   Your Honor's attention.

12             THE COURT:  All right.

13             MR. WEBB:  One second.  Off the record.

14             (Discussion off the record.)

15             (Juror No. 39 in.)

16             THE CLERK:  This is Juror No. 39.

17             THE COURT:  Juror No. 39.

18             PROSPECTIVE JUROR NO. 39:  Yes.

19             THE COURT:  Do you have at this time an ongoing

20   medical issue?

21             PROSPECTIVE JUROR NO. 39:  Yes.

22             THE COURT:  How is it affecting you?

23             PROSPECTIVE JUROR NO. 39:  It's just a little painful.

24   And basically, I had a hysterectomy a little less than a month

25   ago, and so just this stomach pain and cutting the stomach

1    muscles.  I use my back to overcompensate a lot so it hurts just

2    to sit for long periods of time.

3             THE COURT:  Are you able to stand periodically?  Is

4    that helpful?

5             PROSPECTIVE JUROR NO. 39:  Yes, for a little bit.

6    Because with that I've just -- I also feel really tired.

7             THE COURT:  Are you on pain medication?

8             PROSPECTIVE JUROR NO. 39:  I did not take any today,

9    no.

10            THE COURT:  Do you need pain medication at this time?

11            PROSPECTIVE JUROR NO. 39:  Every once in a while.

12            THE COURT:  Are you taking over-the-counter

13   medication?

14            PROSPECTIVE JUROR NO. 39:  Right this second, no.  I

15   haven't taken anything today.

16            THE COURT:  But before coming here and on days

17   preceding this, have you taken any medication?

18            PROSPECTIVE JUROR NO. 39:  Yes.  Either that or

19   prescription medication.

20            THE COURT:  Are you able to -- do you believe that if

21   you were to take your pain medication or over-the-counter

22   medication it would relieve the discomfort you're having at this

23   time?  Because we have to take a break at some point.

24            PROSPECTIVE JUROR NO. 39:  Yes and no.  It all just

25   depends.  Sometimes in order to relieve discomfort I need to use

1    a heating pad, along with pain medication, and lay down.

2              THE COURT:  Are you having severe discomfort at this

3    point or just --

4              PROSPECTIVE JUROR NO. 39:  My back is between mild and

5    severe right now.

6              THE COURT:  Is there anything that would relieve your

7    symptoms sufficiently for you to devote full attention to this

8    case if you were to be selected today and go home tonight and

9    take your medication?

10             PROSPECTIVE JUROR NO. 39:  It would not be better

11   tomorrow.  I mean, it would be the same.

12             THE COURT:  But if you were to take your medication,

13   would that ordinarily provide you with a level of comfort that

14   would enable you to pay full attention to this case?

15             PROSPECTIVE JUROR NO. 39:  It's hard to say because

16   it's a number of things.  You know, it's the medication, it's

17   the heating pad, it's laying down that can relieve it.

18             THE COURT:  And so you would not be able to do all of

19   those things if you were selected.

20             PROSPECTIVE JUROR NO. 39:  Correct.

21             THE COURT:  All right.  And when you do all of those

22   things, are you then sufficiently comfortable to carry on

23   normally?

24             PROSPECTIVE JUROR NO. 39:  I spend a lot of time

25   laying in bed, if that's -- I mean, I can do things -- spurts of

1    things but not -- I couldn't make it through a whole day out of

2    bed.

3                THE COURT:  Are you especially tired postsurgery?

4                PROSPECTIVE JUROR NO. 39:  Oh, without a doubt.

5                THE COURT:  Have you become more alert as time as

6    passed since your surgery?

7                PROSPECTIVE JUROR NO. 39:  Oh, yeah.

8                THE COURT:  How much are you sleeping during the

9    course of an average day right now?

10               PROSPECTIVE JUROR NO. 39:  Um, usually I take a nap

11   every day, two to three hours, and then 10 to 12 hours of sleep

12   at night.

13               THE COURT:  Are you employed at this time?

14               PROSPECTIVE JUROR NO. 39:  No.

15               THE COURT:  Were you employed prior to surgery?

16               PROSPECTIVE JUROR NO. 39:  I was just baby-sitting

17   children.  No, not full-time.

18               THE COURT:  Do the parties have questions of the

19   juror?

20               MR. WEBB:  No.

21               MR. SULLIVAN:  No, Your Honor.

22               THE COURT:  All right.  Would you sit in the other

23   room for a moment, please.

24               (Juror No. 39 out.)

25               THE COURT:  Mr. Sullivan?

69

1        MR. SULLIVAN:  Government moves to excuse the juror

2  for cause.  She is in obvious pain.  While she can sit for a

3  while, she would then need to stand.  And then she said when she

4  could stand that it would then make her tired.  And she just

5  said that she sleeps for hours and hours a day.  And she just

6  had surgery about a month ago, a hysterectomy.  And we have a

7  very large jury pool here and I think that --

8        THE COURT:  Well, that's not the test.

9        MR. SULLIVAN:  Well, okay, then I believe that she

10  could not pay attention and give both sides a fair shake,

11  including the government.

12        MR. WEBB:  I object to excusing her.  I think she

13  doesn't want to be on this jury.  I'm sympathetic to her pain,

14  but she can take pain medication like the rest of us do in the

15  world when we have something like this, and I don't think -- I

16  object to excusing her.

17        THE COURT:  I agree.  I do note that she did not

18  appear to be a person who was anxious to take medication for the

19  problem that she's experiencing.  And based upon my knowledge of

20  the kind of surgery she described, it is most unusual for a

21  person to have the kind of symptoms that she's describing this

22  long after surgery without some kind of medical intervention.

23  In fact, I want to ask another question to see whether or not it

24  confirms my feelings in that regard.  I want to ask her about

25  her visits to the doctor.  All right.

1          (Juror No. 39 in.)

2          THE COURT:  Juror No. 39, are you still under doctor's

3    care?

4          PROSPECTIVE JUROR NO. 39:  Yes.

5          THE COURT:  When did you last see your doctor?

6          PROSPECTIVE JUROR NO. 39:  Friday.  Not last Friday

7    but the Friday before.  And my next appointment is August 28th.

8          THE COURT:  All right.  And were you at that time

9    prescribed any medication?

10         PROSPECTIVE JUROR NO. 39:  On that day, no.

11         THE COURT:  On that date did you describe the symptoms

12   that you are having at this time?

13         PROSPECTIVE JUROR NO. 39:  Yes.

14         THE COURT:  And on the basis of that -- well, let me

15   go a little further.  Did your physician offer to provide you

16   with any medication at that time?

17         PROSPECTIVE JUROR NO. 39:  No.

18         THE COURT:  Did you indicate to your physician that

19   you were having pain at that time?

20         PROSPECTIVE JUROR NO. 39:  Yes.

21         THE COURT:  Ordinarily in a situation like that have

22   you been asked to rate your level of discomfort of pain?

23         PROSPECTIVE JUROR NO. 39:  Yes.

24         THE COURT:  How did you rate your level of discomfort

25   or pain?

1          PROSPECTIVE JUROR NO. 39:  That day?

2          THE COURT:  Yeah.

3          PROSPECTIVE JUROR NO. 39:  A 4.

4          THE COURT:  And prior to that date, what level of pain

5     were you having, on a scale of 1 to 10?

6          PROSPECTIVE JUROR NO. 39:  It's hard to say because on

7     the day of surgery it was very painful.  I would call it a 9.

8     But in looking back, that pain was probably the worst, and I got

9     better and I would say I'm still at a 4.

10         THE COURT:  And yesterday did you take any medication?

11         PROSPECTIVE JUROR NO. 39:  I did.

12         THE COURT:  Did it relieve your discomfort?

13         PROSPECTIVE JUROR NO. 39:  Yes.

14         THE COURT:  Today have you taken any medication?

15         PROSPECTIVE JUROR NO. 39:  No.

16         THE COURT:  All right.  Thank you.  Would you return

17    to the courtroom, please?

18         (Juror No. 39 out.)

19         THE COURT:  The decision stands.  She's on for now.

20         MR. WEBB:  Your Honor, there's two jurors that raised

21    their hands concerning whether they can serve for a week.  Juror

22    No. 45, this is the lady who has the -- she does this crisis

23    stabilization process.  She does not -- she doesn't know in

24    advance when she's needed.  She cannot predict how much she

25    will -- when she will be called, and she didn't think her

1    supervisor would be able to deal with the issues.  I would like

2    to explore this in a little more detail because I thought -- it

3    appeared to me that maybe there's a basis to excuse her for

4    hardship because of her employment.  And I would ask if we could

5    to talk to her a little bit more, but I didn't want to do so in

6    open court, if we can do it in chambers.

7              MR. SULLIVAN:  We don't object to having her excused

8    for hardship cause.  She indicated a financial hardship because

9    of the three clients that she wanted to assist.

10              THE COURT:  We'll explore it a little bit more.  Your

11   position is noted.  Would you call her in, please.

12              (Juror No. 45 in.)

13              THE COURT:  Juror No. 45, you mentioned that you are

14   working with several clients as a crisis counselor?

15              PROSPECTIVE JUROR NO. 45:  Right.

16              THE COURT:  Can you tell us a little bit more about

17   your need to attend to their problems during the course of the

18   day?

19              PROSPECTIVE JUROR NO. 45:  When I get a call, my duty

20   is to come to the home, talk to the mother, talk to the child.

21              THE COURT:  So they are juveniles.

22              PROSPECTIVE JUROR NO. 45:  Yes.

23              THE COURT:  You mentioned that you have someone who

24   works with you as a supervisor; is that correct?

25              PROSPECTIVE JUROR NO. 45:  Correct.

1        THE COURT:  Now, if you were selected as a juror,

2   would you be able to contact your supervisor to let that person

3   know that you would not be able to handle those clients for the

4   next week?

5        PROSPECTIVE JUROR NO. 45:  Yes.

6        THE COURT:  Is there any reason why your supervisor

7   would not be able to fulfill your responsibilities if you were

8   devoting yourself to this case?

9        PROSPECTIVE JUROR NO. 45:  Only if he has a caseload.

10        THE COURT:  All right.  Are you able to contact your

11   supervisor -- will you be able to contact your supervisor during

12   a break to verify your supervisor's availability?

13        PROSPECTIVE JUROR NO. 45:  Yes, I can.

14        THE COURT:  Okay.  Do the parties have questions at

15   this time?

16        MR. SULLIVAN:  None from the government.

17        MR. WEBB:  No.

18        THE COURT:  Would you step out there, please.  We have

19   a chair for you.

20        (Juror No. 45 out.)

21        THE COURT:  Mr. Webb?

22        MR. WEBB:  I guess we should wait for her to contact

23   her supervisor and get back.  I had been concerned as to whether

24   she would be able to pay attention to the evidence because of --

25   but if her supervisor, if it's no more than making a phone call,

1    if she gets called so she won't be taken off the jury, I have no

2    motion.

3              THE COURT:  All right.

4              (Juror No. 45 in.)

5              PROSPECTIVE JUROR NO. 45:  I didn't mention to you

6    that it's a new job so I'm like on a probationary period.  I'm

7    just working like maybe 10 or 12 hours a week.

8              THE COURT:  And you were unemployed previously?

9              PROSPECTIVE JUROR NO. 45:  Right.  I've been getting

10   unemployment and it stopped so I'm not getting unemployment.  So

11   I'm just at a crisis where I need to --

12             THE COURT:  Would you lose substantial income if you

13   were to serve as a juror?

14             PROSPECTIVE JUROR NO. 45:  Yes, I would.

15             THE COURT:  And would that income be greater than any

16   fee that you would receive as a juror?

17             PROSPECTIVE JUROR NO. 45:  Right.  I wouldn't be

18   making no money.

19             THE COURT:  Okay.  Are you -- would you be paid

20   hourly?

21             PROSPECTIVE JUROR NO. 45:  Yes.

22             THE COURT:  Are you paid when you're on standby?

23             PROSPECTIVE JUROR NO. 45:  No.

24             THE COURT:  So your hourly rate would only apply to

25   the times that you would respond to the calls from --

1      PROSPECTIVE JUROR NO. 45:  Right.  It's with

2  documentation and traveling too.

3      THE COURT:  So at this point in time, it's unclear

4  exactly what your income would be say during the next week for

5  attending to one or more of these individuals; is that correct?

6      PROSPECTIVE JUROR NO. 45:  Right.  Uh-huh.

7      THE COURT:  Would that income nonetheless be greater

8  than your fee as a juror in this case?

9      PROSPECTIVE JUROR NO. 45:  It would be less.

10     THE COURT:  So at this point in time, you just don't

11  know whether you would receive less income than your juror fee

12  or more income than your juror fee for the next week because of

13  the uncertainty of whether you will be called.

14     PROSPECTIVE JUROR NO. 45:  Right.

15     THE COURT:  And if you receive a call during

16  off-hours, are you required to respond?

17     PROSPECTIVE JUROR NO. 45:  Yes.

18     THE COURT:  That is, after 6:00 in the evening or

19  before 8:00 in the morning?

20     PROSPECTIVE JUROR NO. 45:  I'm required to respond

21  whenever they call.  And I am responsible for making sure that

22  they have adequate -- go to, like, the facility for anger

23  management once a week.  So I have three clients, so that's

24  15 hours regardless.

25     THE COURT:  So you would be compensated regardless of

1    whether or not there's a crisis phone call.

2            PROSPECTIVE JUROR NO. 45:  Right.

3            THE COURT:  Because you would have to take these

4    clients to these appointments.

5            PROSPECTIVE JUROR NO. 45:  Right.

6            THE COURT:  And return them home.

7            PROSPECTIVE JUROR NO. 45:  Right.

8            THE COURT:  Okay.  All right.  Would you make that

9    phone call, please?

10           PROSPECTIVE JUROR NO. 45:  Sure.

11           (Juror No. 45 out.)

12           THE COURT:  Mr. Webb, does your view -- has your view

13   changed?  Off the record.

14           MR. WEBB:  Off the record.

15           (Discussion off the record.)

16           (Trial resumed in open court.)

17           THE COURT:  Does the government have any questions of

18   the jury pool at this time?

19           MR. SULLIVAN:  Yes, Your Honor.

20           Good afternoon, everyone.  My name is John Sullivan.

21   I'm an attorney with the United States Department of Justice.  I

22   just have a few follow-up questions.

23           Obviously the government is looking for jurors who

24   cannot only agree but promise to decide the case based solely on

25   the evidence presented in the courtroom.  And in that regard, I

1    want to just focus in on potential biases and prejudices and

2    potential sympathy issues that might come up.

3             And I just want to reintroduce Special Agent Geoffrey

4    Cook of the IRS.

5             This is a criminal tax case.  Every defendant is

6    entitled to a clean slate, a fair trial, but the government is

7    also entitled to jurors who will agree to not only base their

8    verdict on the evidence but on the law.

9             And I note that Juror No. 17, is that -- sir, do you

10   still own a small business?

11            PROSPECTIVE JUROR NO. 17:  Correct.

12            MR. SULLIVAN:  And because you own that small

13   business, I take it you have to pay a lot of taxes to a lot of

14   different government authorities.

15            PROSPECTIVE JUROR NO. 17:  Correct.

16            MR. SULLIVAN:  And you probably don't enjoy that; is

17   that --

18            PROSPECTIVE JUROR NO. 17:  Correct.

19            (General laughter.)

20            THE COURT:  He's smiling.

21            MR. SULLIVAN:  If anyone enjoys paying taxes, would

22   you please raise your hand?

23            (General laughter.)

24            MR. SULLIVAN:  Sir, is it -- because this involves a

25   tax case, is it -- could you put to the side -- if you believed

1    that the tax rates were too high or that there was too much

2    government red tape, could you put that aside and just base your

3    verdict, if you're selected, on the evidence and the law as

4    instructed by the court?

5             PROSPECTIVE JUROR NO. 17:  I believe I could.

6             MR. SULLIVAN:  And so you could then promise to do

7    that.

8             PROSPECTIVE JUROR NO. 17:  Yes.

9             MR. SULLIVAN:  Instead of asking everyone else who had

10   a small business, is there anyone that feels that they paid so

11   much in taxes that they couldn't promise to be fair and

12   impartial and give the government a fair shake in this case?

13   And the IRS.  By the way, as I mentioned --

14            THE COURT:  Both sides, not just the government.

15            MR. SULLIVAN:  Well, both sides.  But I mean on the

16   taxation issue.  Is there anyone that has very strong feelings

17   about our system of taxation which would prevent them from being

18   fair and impartial to not only the government but both sides?

19            (No response.)

20            MR. SULLIVAN:  Okay.

21            THE COURT:  One second.  Be seated.

22            (Juror No. 45 enters the courtroom.)

23            THE COURT:  Mr. Sullivan, would you ask that last

24   question of Juror No. 45?

25            MR. SULLIVAN:  Ma'am, this is a criminal tax case and

1    it implicates the tax laws of the United States, and one of the

2    government representatives is an IRS agent.

3           Do you have strong feelings about paying taxes?

4           PROSPECTIVE JUROR NO. 45:  Well, I've been paying

5    taxes all my life.  No, I don't.  I disagree with some of the

6    things that our taxes are being used for, but --

7           MR. SULLIVAN:  But do you understand that this case

8    here doesn't have anything to do with that?  This has to do with

9    whether or not the government can prove its case beyond a

10   reasonable doubt.  Could you put that aside, any notions you

11   have --

12          PROSPECTIVE JUROR NO. 45:  Oh, yes, I could put that

13   aside.

14          MR. SULLIVAN:  That's basically the bias, that we

15   would not -- we wouldn't want a juror who was biased against the

16   government.

17          So moving on to prejudice, Juror No. 30?  Based on

18   your questionnaire, it seems that you might have a problem with

19   a defendant who was wealthy.

20          PROSPECTIVE JUROR NO. 30:  I was reviewing that

21   question.  There's certain frustrations at times with me feeling

22   like I have to work hard and there are other -- I don't really

23   have -- sorry.  I'm frustrated by sometimes working hard and not

24   feeling like I can get ahead.  At the same time, I really feel

25   that people who work hard and are rewarded for their working

 1    hard should be able to get what they want, a reward for working

 2    hard.

 3            MR. SULLIVAN:  Do you understand that this case isn't

 4    about how hard somebody worked, it's more about whether somebody

 5    complied with the tax laws?

 6            PROSPECTIVE JUROR NO. 30:  Yes.

 7            MR. SULLIVAN:  Can you set aside your feelings

 8    about -- maybe about how hard people have to work in this

 9    country to get ahead and just focus and decide this case based

10    on the evidence and the law as instructed?

11            PROSPECTIVE JUROR NO. 30:  Yes.

12            MR. SULLIVAN:  Is there anyone else that might have --

13    and that goes to prejudice.  If you don't like this tie here,

14    folks, can you put that aside and decide this case based on the

15    evidence?

16            (No response.)

17            MR. SULLIVAN:  Thank you, Juror No. 30.

18            Juror No. 26.  You indicated that you had a case.  Is

19    that next week?

20            PROSPECTIVE JUROR NO. 26:  The bankruptcy case?

21            MR. SULLIVAN:  Yes.

22            PROSPECTIVE JUROR NO. 26:  That's tomorrow.

23            MR. SULLIVAN:  Tomorrow?  Okay.  I really don't have a

24    question for you.

25            And seeing it's about 12:30, that's all the questions

1    I have, Your Honor.

2           THE COURT:  All right.  Before we -- we are going to

3    take a luncheon break very shortly, but I neglected to ask

4    several things and I want to find out before we break whether

5    any of you know any of the people whose names I will read off.

6           CPA Mark W. Miller of Brookfield.

7           Andrea Heise, H-E-I-S-E, a CPA.

8           Does anyone know anyone with Kolb+Co Financial

9    Advisors?

10          All right, Number 47.

11          PROSPECTIVE JUROR NO. 47:  Yes, sir.  Juror No. 47.

12   As far as Kolb, I know a CPA that -- he was employed by Kolb+Co.

13          THE COURT:  You know a CPA who previously was with

14   that company?

15          PROSPECTIVE JUROR NO. 47:  Yes, sir.

16          THE COURT:  And in what way have you had association

17   with that CPA?

18          PROSPECTIVE JUROR NO. 47:  He is my mother's

19   accountant.

20          THE COURT:  All right.  Beyond that, you don't know

21   too much about this individual.  Is that what you're telling us?

22          PROSPECTIVE JUROR NO. 47:  I don't know anything --

23   any of his duties with Kolb other than he was employed by them.

24          THE COURT:  Are you satisfied or dissatisfied with

25   what was done for your mother by this person who was with Kolb?

1          PROSPECTIVE JUROR NO. 47:  He's still with my mother,

2    so --

3          THE COURT:  All right, thank you.

4          Thomas E. Branch, director of finance of Neurosurgery

5    and Endovascular Associates of Milwaukee.

6          Ramit Bhasin.  Is that the correct pronunciation?

7          Patrick J. Ruby, R-U-B-Y, of Chicago.

8          Ronald Braver, B-R-A-V-E-R, of Chicago.

9          Mark Ambrosius, A-M-B-R-O-S-I-U-S, of Florida.

10         Bradden C. Backer of Albrecht Backer Labor &

11   Employment Law SC of Milwaukee.  Does anyone know him?

12   Otherwise known as Brad Backer.

13         PROSPECTIVE JUROR NO. 34:  Yes, I know Brad Backer.

14         THE COURT:  In what way?

15         PROSPECTIVE JUROR NO. 34:  His mother was a colleague

16   of mine at MATC, and I have seen him on occasion and I consider

17   him an acquaintance and we're very friendly when we see each

18   other.

19         THE COURT:  How often have you seen Mr. Backer in the

20   past?

21         PROSPECTIVE JUROR NO. 34:  I probably seen him about

22   once every two to three years.

23         THE COURT:  And do you have any strong feelings about

24   Mr. Backer one way or the other?

25         PROSPECTIVE JUROR NO. 34:  I think he's a good guy.  I

1    like him.  I liked his mother.  I like his dad.

2              THE COURT:  All right.  Thank you.

3              PROSPECTIVE JUROR NO. 34:  You're welcome.

4              THE COURT:  Dr. David L. Coran, C-O-R-A-N, of

5    Milwaukee.

6              Jefferson V. DeAngelis, D-E capital A-N-G-E-L-I-S, of

7    Milwaukee.

8              Dr. Neil Guenther, G-U-E-N-T-H-E-R.

9              Jane Parthum, P-A-R-T-H-U-M, a nurse of Milwaukee.

10             Dr. Mandeep K. -- how do you pronounce his name? --

11   Rai, R-A-I, of Arizona.

12             Dr. Kenneth Reichert, R-E-I-C-H-E-R-T, of Waukesha.

13             Becky Slivinski, S-L-I-V-I-N-S-K-I, of Milwaukee.

14   Actually, River Hills.

15             Thomas -- correction, Christopher Thomas Jr., of

16   New York.

17             Pamela D. Forrest of Indiana.

18             Laurie Johnson of Minneapolis.

19             Jose Martinez of New York.

20             Jenny Miller of Alaska.

21             Amy -- I'm not going to try to pronounce this --

22   C-H-I-O-N-C-H-I-O, of Milwaukee.

23             Kumar Iyer, I-Y-E-R, of Milwaukee.

24             Is there any individual whose name I did not mention?

25             MR. SULLIVAN:  Ms. Vandana Katju, K-A-T-J-U, who is

1    the HSBC banker from San Francisco, California.

2            THE COURT:  Is there any additional name that should

3    be added to the list at this time?  The last name is Katju.

4    She's from California.

5            (No response.)

6            THE COURT:  Mr. Webb, in light of the questions that

7    were asked by the government and what we discussed in the jury

8    room, do you believe that your voir dire will take more than a

9    few minutes?

10           MR. WEBB:  I believe it would take about the same

11   estimate I gave Your Honor in chambers.

12           THE COURT:  All right.  Well, considering the time and

13   the fact that people have not eaten, I do ask that you return no

14   later than 1:25.  You are not to discuss this case or anything

15   that we have said in this courtroom with anyone.  You're not to

16   do any research concerning this case.  You're not to surf the

17   Internet or do any surfing down at the lakefront.  I will see

18   you in about 45 minutes.

19           THE BAILIFF:  All rise.

20           (Jury panel out at 12:38 p.m.)

21           THE COURT:  Kris, Juror No. 45 I want to wait for a

22   second.

23           (Brief pause.)

24           THE COURT:  Be seated, please.  You may be seated.

25           Did Mr. Webb leave, do you know?

1        MS. ALLEN:  Yeah, I'll go get him.

2        (Brief pause.)

3        (Discussion off the record.)

4        THE COURT:  We'll take a break.  I don't want to

5   deprive you of your lunch.  We'll take it up after lunch.

6        (Lunch recess taken at 12:41 p.m., until 1:35 p.m.

7   Trial resumed in open court, in the presence of the jury panel.)

8        THE COURT:  Mr. Webb?

9        MR. WEBB:  Yes, Your Honor.

10       THE COURT:  You may proceed.

11       MR. WEBB:  Good afternoon, ladies and gentlemen.

12  Welcome back from lunch.

13       And as you can tell, the court is now giving me an

14  opportunity on behalf of my client to ask you some questions

15  during jury selection.  My name is Dan Webb.  I'm one of the

16  lawyers that will be representing Dr. Ahuja during the course of

17  this trial.

18       And I think most of you have probably already figured

19  out that what we're doing here is that the lawyers are trying to

20  find people that can serve on this jury that right now believe

21  that you can be completely fair and impartial to both sides in

22  this case.  People that honestly can say right now that they are

23  totally open-minded.

24       Because when we start a trial, you ultimately, as

25  jurors, must make a verdict on only one thing, which is the

1    evidence that you actually hear during the course of the trial.

2            So if there are people that are in a process like this

3    who, because of just preconceived feelings or notions or beliefs

4    or ideas that would cause you right now based on what you know

5    to think to yourself, "I might favor one side over the other,"

6    then we'd like to know about that.

7            And that's why I'm going to ask you some general

8    questions, and then because I have your questionnaires, I'm

9    going to go into some specific questions of some of you just to

10   do some follow-up from the questionnaires.

11           But as I ask you questions, all I respectfully say to

12   you is that, number one, there are no right or wrong answers.

13   There are none.  These are questions about how you think, how

14   you feel, what your notions and ideas are; whether you have any

15   feelings or ideas that maybe we should know about because maybe

16   it could affect whether or not you're the right people for this

17   jury.  There could be other cases that you might be more right

18   for than this one, and you can tell us about that.

19           So what I want to do is just ask you to kind of dig

20   down deep as I ask you questions and think about whether or not

21   there's things that you think would be helpful for Dr. Ahuja and

22   his lawyers to know as we go through this process.

23           Now, let me start with this question:  You now know

24   that the government has formally charged Dr. Ahuja with filing

25   false income tax returns.

1    And we know from our everyday experiences in life that

2    sometimes there are people that believe that if the federal

3    government has gone to the trouble of formally charging somebody

4    with a federal crime, that maybe that person did do something

5    wrong.  Maybe.  Maybe.

6    And then if that were the case, the government would

7    be starting out a half step ahead of us.  If you look at this

8    case like a race, we both need to be right together at the

9    starting blocks, exactly even.  No one should be a half a step

10   ahead of the other.  Because that would not be the way we should

11   start any fair race.  Both should be exactly equal on the

12   starting lines.

13   Is there anyone, anyone at all, who because the

14   federal government has charged Dr. Ahuja formally with a federal

15   crime of filing false tax returns -- is there anything about

16   that in and of itself that just causes you to say to yourself,

17   "You know, maybe the federal government is starting out just a

18   little bit ahead of Dr. Ahuja"?  If anyone at all feels that

19   way, just raise your hands, and we'll talk about it.

20   (No response.)

21   MR. WEBB:  Okay.  Now, let me ask you another general

22   question of the whole group.

23   The government has the burden of proof in this case

24   because they brought this case.  The defendant has no burden of

25   proof.  The government has to prove all of the elements of the

1    crime of filing a false tax return beyond a reasonable doubt.

2    Beyond a reasonable doubt.  And the defendant is presumed to be

3    innocent at all times.

4           Until you actually go back to the jury room to

5    deliberate and become convinced that the government has proven

6    its case beyond a reasonable doubt, you are to accept the

7    presumption of innocence, and it doesn't leave throughout the

8    trial as you hear witnesses.  Dr. Ahuja is presumed to be

9    innocent and under our law has no obligation, zero obligation,

10   to present any evidence whatsoever.

11          There are people that just believe that having someone

12   presumed to be innocent under those circumstances all the way

13   through the process, that that's just a bit too much, and they

14   really don't like that.  And they don't feel comfortable in a

15   case like that.

16          And so all I'm going to ask you:  Is there anything

17   about what I just said to you about the presumption of innocence

18   and the government having the burden of proof that causes any of

19   you just to say to yourself, "Do you know what, I don't feel

20   real comfortable about that.  Maybe Dr. Ahuja is starting a

21   little bit behind"?  Anyone feel that way at all?  Just raise

22   your hand.

23          (No response.)

24          MR. WEBB:  Let me go to another general question.

25          Dr. Ahuja was born in India.  And his family moved to

1    the United States when he was 13 years old.  They settled at

2    Ohio.  He got his early education in Ohio.  Became a citizen of

3    the United States at age 18, went on and got to school, medical

4    degree, and has been practicing neurosurgery here in Milwaukee

5    for quite a while.

6            There are people who believe that our government is

7    too lax in letting people outside the United States come into

8    the United States and live in the United States.  They just

9    believe that.  It's okay.  Everyone has a right to have beliefs

10   like that.

11           And so the question is:  Is there anything about

12   Dr. Ahuja's background of coming here as a young man from India

13   and what I just told you -- is there anything about that that

14   just causes any of you to say to yourself, "Ah, you know, it

15   bothers me a little bit"?  Anyone at all?  Just raise your hand.

16           (No response.)

17           MR. WEBB:  One last general question, then I'll get

18   more specific and go through some issues on your questionnaire.

19           Some of you may generally be aware that people who

20   were born in India usually follow a religious belief of either

21   Muslim or Hindu.  And Dr. Ahuja and his family are Hindus.

22           And I just want to ask whether -- is there anything

23   about Dr. Ahuja's religious background as a practicing Hindu

24   that just causes any of you to say that you have a little bit of

25   a bias about that, and if you do, I'd like to know about it.

90

1    Anyone at all?  If you do, just raise your hand.

2              (No response.)

3              MR. WEBB:  Well, that's all my general questions.  I

4    just wanted to kind of make sure that we're all on a level

5    playing field as we start our trial.  And what I'd like to do

6    now is, because I have your questionnaires, I'd like to go

7    through the questionnaires.  And some of you I have a few

8    questions of, not many, but there's a number of jurors I have a

9    few questions of, and some I don't have any questions of.  But

10   let me just start and go through it.

11             Juror No. 2, I talked to you a little bit this

12   morning, and I just wanted to -- I've read your questionnaire

13   over, and I just had a couple of questions I wanted to ask you.

14             On your questionnaire, you had -- there was a

15   question 29, which I'm going to read -- I think you -- do you

16   have your questionnaire there?

17             PROSPECTIVE JUROR NO. 2:  I do.

18             MR. WEBB:  Question 29 dealt with:  Evidence may be

19   presented that Defendant Dr. Arvind Ahuja, who's charged with

20   tax fraud, reported over $65 million in income during the years

21   in question.  Do you feel you might have any difficulty being

22   completely fair and impartial in a case where a wealthy person

23   is charged with tax fraud.

24             And you candidly answered "Yes."

25             Do you see that?

1    PROSPECTIVE JUROR NO. 2:  Yeah.  I checked "No" first.

2    And I was trying to be as honest as I could.

3    MR. WEBB:  I thought you dug a little deeper and

4    thought maybe the answer was "Yes."  Is that fair?

5    PROSPECTIVE JUROR NO. 2:  That's fair.

6    MR. WEBB:  And your answer was, "I would like to say I

7    wouldn't, but it was hard to read that statement and not raise

8    my eyebrows over the amount of money he made."

9    And so I appreciate that candor.

10   And then I notice also, by the way, question 36.  Do

11   you see question 36?

12   PROSPECTIVE JUROR NO. 2:  Uh-huh.

13   MR. WEBB:  Would you like to serve on this jury, and

14   you said, "No."

15   PROSPECTIVE JUROR NO. 2:  Uh-huh.

16   THE COURT:  Is that a "yes"?

17   PROSPECTIVE JUROR NO. 2:  That was a "no."

18   MR. WEBB:  Pardon me?

19   THE COURT:  I just wanted her to clarify her answer

20   because she said "uh-huh."  And "uh-huh" doesn't translate into

21   a "yes" or "no."

22   MR. WEBB:  I'm sorry.

23   You checked the box "No"?

24   PROSPECTIVE JUROR NO. 2:  I did.

25   MR. WEBB:  And you stated that "I've worked for the

1  State of Wisconsin for 10 years, and as a government employee,

2  we are first -- we are hit first when times are rough.  The

3  person may have taken advantage of the system, although he was

4  making millions of dollars.  That is a bit upsetting."

5          And so I took it from those two answers that I read

6  off that, as we start this case right now, because of those

7  facts you may not be able to be completely fair and impartial.

8          PROSPECTIVE JUROR NO. 2:  Is that a question?

9          MR. WEBB:  Well, do you feel like you can be fair and

10 impartial?

11         PROSPECTIVE JUROR NO. 2:  I feel like I may not be

12 able to be fair and impartial.

13         MR. WEBB:  Pardon me?  I'm sorry.

14         PROSPECTIVE JUROR NO. 2:  May not be able to be fair

15 and impartial.

16         MR. WEBB:  That's what I thought.  I know that you're

17 not certain of that because maybe you could be, but you do have

18 some doubt in your mind that you may not be able to be fair and

19 impartial.

20         PROSPECTIVE JUROR NO. 2:  I do.

21         MR. WEBB:  Thank you for telling me that.

22         PROSPECTIVE JUROR NO. 2:  You're very welcome.

23         MR. WEBB:  One other thing I asked you this morning,

24 which I don't think I need to go in, but that conference that

25 you have next week, that --

1          PROSPECTIVE JUROR NO. 2:  I have one this week and

2    next week.

3          MR. WEBB:  Someone's handling it this week, and next

4    week is the real problem for you.  And you told us that that

5    might interfere with your ability to really concentrate on the

6    evidence in this case to some extent.

7          PROSPECTIVE JUROR NO. 2:  Correct.

8          MR. WEBB:  And that's because you take your job very

9    seriously, and that's your responsibility to be there; is that

10   right?

11         PROSPECTIVE JUROR NO. 2:  It is.

12         MR. WEBB:  Thank you very much.

13         PROSPECTIVE JUROR NO. 2:  You're welcome.

14         MR. WEBB:  Now, Juror No. 6.  How are you?

15         Now, remember, I'm not allowed to use your names,

16   okay.  So I'm not trying to be in any way rude, but I'm supposed

17   to call you by your juror number, and so I will do that.

18         As far as -- I was looking over your questionnaire,

19   and I just had a couple of follow-up questions.

20         Do you have your questionnaire handy?

21         PROSPECTIVE JUROR NO. 6:  I do, yes.

22         MR. WEBB:  Question number 11 was that you have had

23   work experience or training that deals with compliance with

24   rules and regulations.

25         PROSPECTIVE JUROR NO. 6:  Correct, yes.

94

1          MR. WEBB:  Can you talk to me a little bit more about
2     that?  What does that relate to?
3          PROSPECTIVE JUROR NO. 6:  I am a registered
4     professional engineer for the State of Wisconsin.  I am a civil
5     engineer.  And I would say on a daily basis I am dealing with
6     permits on federal level, state level, local level, in
7     particular federal emergency management agency, FEMA; Wisconsin
8     Department of Natural Resources; Wisconsin Department of
9     Transportation; the local governments.  Mainly we regulate,
10    control and flood plain, and that kind of thing.
11         MR. WEBB:  Now I do understand.
12         So now because you deal with rules and regulations, do
13    you find sometimes that you feel like -- and because of your
14    engineering background, are you pretty particular about making
15    sure that everything should be done just according to the rules
16    and whatever the rules say you should do; is that kind of --
17    talk to me.  How do you feel about that?  Do you find rules
18    sometimes vague and indefinite and not as easy to follow as you
19    might want?
20         PROSPECTIVE JUROR NO. 6:  How I really feel is it all
21    depends on the regulator, but you're more likely to get a permit
22    approved if you follow the letter of the law.  There are certain
23    exceptions to the rule that we present our case as to why we
24    made an exception to the rule, and I'm more than willing to do
25    that for the client, too.

1          MR. WEBB:  Okay.  And one last question.  There was a

2     question on the questionnaire, question number 30, and the

3     question was:  If you were the Defendant Dr. Arvind Ahuja, how

4     comfortable would you be having you as a juror in this case, and

5     you checked "very comfortable."

6          Tell me why you checked it that way.

7          PROSPECTIVE JUROR NO. 6:  I checked it that way

8     because I really feel I am impartial to this potential case.  I

9     don't really have much extensive knowledge of the tax laws.  So

10    whatever would be presented to me would be somewhat new

11    evidence.  And I would be able to weigh that in a fair, balanced

12    manner.

13         MR. WEBB:  And you're convinced that you can be a

14    juror in this case and ultimately decide the case just based on

15    the evidence that gets presented.  Is that how you feel?

16         PROSPECTIVE JUROR NO. 6:  That is how I feel.  Yes.

17         MR. WEBB:  Thank you.  That's all I have.

18         Juror No. 8.  How are you today?

19         PROSPECTIVE JUROR NO. 8:  Good.

20         MR. WEBB:  I had a couple of follow-up questions, if I

21    could.  If you look at your questionnaire and look at

22    question 29.

23         PROSPECTIVE JUROR NO. 8:  Yes.

24         MR. WEBB:  And this was the same question I had asked

25    about earlier that:  Dr. Ahuja has reported over $65 million in

1  income during the years in question, and do you feel you might

2  have any difficulty in being completely fair and impartial in a

3  case where a wealthy person is charged with tax fraud.

4          And you didn't check "yes" or "no."

5          PROSPECTIVE JUROR NO. 8:  No.

6          MR. WEBB:  Go ahead.  You were a little uncertain

7  about that?

8          PROSPECTIVE JUROR NO. 8:  Well, when I read that

9  amount, to me that's an extremely high amount of money.

10  Something that I can't relate to.

11          MR. WEBB:  I understand.

12          PROSPECTIVE JUROR NO. 8:  But, again, if I was

13  selected, I would do my very best to be objective.

14          MR. WEBB:  And the answer you gave was, you said,

15  "Unknown."  You didn't know whether you could answer "yes" or

16  "no," but "I would try to be impartial"; is that correct?

17          PROSPECTIVE JUROR NO. 8:  Yes.

18          MR. WEBB:  But as I ask you to kind of dig down deep

19  and we're trying to find people who could be completely fair and

20  impartial, is there a little nagging doubt in your mind because

21  you can't wrap your mind around that much money, that maybe,

22  just maybe you can't be completely fair and impartial?  Is there

23  a little doubt there?

24          PROSPECTIVE JUROR NO. 8:  I have no experience in

25  doing this.  So, again, if I were in the other person's shoes, I

97

1  would certainly hope that I would be judged by others who were

2  being as objective as they could be.

3          Do I have a nagging?  A little bit, a little bit, just

4  because we're seated here and you mentioned that the government

5  initiated this process, correct?

6          MR. WEBB:  Yes.  Yes.

7          PROSPECTIVE JUROR NO. 8:  Why was that?  Why?  Why was

8  that started?

9          MR. WEBB:  Right.  And so that kind of sticks in your

10  mind a little bit?  That's all I'm asking.

11          PROSPECTIVE JUROR NO. 8:  It's a red flag.  Something

12  happened, right?

13          MR. WEBB:  And so because something happened, you have

14  a little nagging doubt.

15          PROSPECTIVE JUROR NO. 8:  But I also haven't been

16  presented information to me to make an informed decision.

17          MR. WEBB:  I understand.  That's fine.  But because of

18  the charges and his wealth, you have a little bit of a nagging

19  doubt as to whether you could be completely fair and impartial,

20  and that's how you feel.

21          PROSPECTIVE JUROR NO. 8:  Perhaps a bit.

22          MR. WEBB:  Now, one other question.  Question 33, I

23  think, touches upon the last part of your answer where -- I

24  think; is that right?  That you're -- the last part of your

25  answer is that -- you answered question 33 that:  "If he were

1  totally not guilty, why is he being brought to trial"; that was

2  your question, right?

3           PROSPECTIVE JUROR NO. 8:  When I wrote that, I don't

4  know if I had worded that correctly.  But, again, it's simply a

5  matter of we're here for a reason and something occurred.

6           MR. WEBB:  I understand.  You're trying to be as

7  candid as you possibly can answering questions and in a somewhat

8  unfamiliar experience being here, right?  Fair enough.

9           I also noticed question 36.  When asked if you would

10  like to serve on the jury, you said "No."  That's your answer.

11           PROSPECTIVE JUROR NO. 8:  Right.

12           MR. WEBB:  And it would be difficult to travel from

13  West Bend daily.  So was that something -- talk to me a little

14  bit about that.

15           PROSPECTIVE JUROR NO. 8:  Well, at the time that I was

16  filling this out, I wasn't feeling too optimistic about having

17  to break out of my routine and, you know, do something out of

18  the ordinary that, obviously, we all have sacrifices that we've

19  made to do this.  But, again, you need people that need to do

20  this, so I understand that.

21           MR. WEBB:  Thank you.  That's all I had.  Thank you.

22           Juror No. 9.  There you are down there.  How are you?

23           PROSPECTIVE JUROR NO. 9:  Good.

24           MR. WEBB:  I was -- just a couple -- question

25  number 35.  The question was:  Is there anything else about your

1   ability to serve as a juror that you think the judge and the

2   parties should know?  And you said, "None.  I would be a good

3   juror, timing is tough."

4           Just talk, what was the timing issue that you're

5   concerned about?

6           PROSPECTIVE JUROR NO. 9:  Just work-related right now.

7           MR. WEBB:  Work-related?  And that's something -- I

8   also noticed that you answered question 36 by talking about

9   "This is a critical time period at work and would create

10  hardship for coworkers."  Is that right?

11          PROSPECTIVE JUROR NO. 9:  It would create some

12  hardships, yes.

13          MR. WEBB:  Explain what's the hardship.  I want you to

14  explain that for us.

15          PROSPECTIVE JUROR NO. 9:  I'm in retail.  And this

16  period of time right now it's back to school season.  It's

17  bigger than our Christmas season.  So every day making decisions

18  on --

19          THE COURT:  Please move your mic closer.

20          PROSPECTIVE JUROR NO. 9:  I'm sorry.

21          Every day making budget decisions and supervising

22  people.  So it certainly will be a sacrifice.  But one I would

23  be willing to make.  It's just a busy time at work.

24          MR. WEBB:  I noticed you checked "No" as far as

25  whether you want to serve on the jury, and so let me ask you

1    this question:  With the pressures at work and your concern

2    about coworkers, do you think that that might interfere a little

3    bit about your ability to concentrate and pay attention to the

4    evidence because of your concerns about work?

5             PROSPECTIVE JUROR NO. 9:  Not at all.

6             MR. WEBB:  Okay.  Good.  Okay.  Thank you.  That's all

7    I had.

8             Juror No. 17.  How are you, sir?

9             PROSPECTIVE JUROR NO. 17:  Fine.  Thanks.

10            MR. WEBB:  I just also had a couple of follow-up

11   questions.  On question number 9, I don't know if you have your

12   questionnaire handy there, sir.

13            Have you ever owned your own business?  You said,

14   "Yes."  Can you talk to me a little bit, tell me about that

15   business and just give me a little information about that.

16            PROSPECTIVE JUROR NO. 17:  Sure.  I work full-time in

17   addition to that business.  That's a family business.  I'm in

18   partnership with my father and my brother.  So that is also a

19   second job.

20            MR. WEBB:  You still have that business today; is that

21   correct?

22            PROSPECTIVE JUROR NO. 17:  That's correct.

23            MR. WEBB:  Can you describe that business to us in

24   just a little more detail?

25            PROSPECTIVE JUROR NO. 17:  Sure.  It's a nursery, tree

1  nursery, that is in the northern part of state and occupies most

2  of my weekends and free time.

3         MR. WEBB:  Okay.  Question number 30, sir, on the

4  questionnaire, the question about:  If you were the defendant --

5  let's me give you a chance to find it there.

6         If you were the Defendant Dr. Arvind Ahuja, how

7  comfortable would you be having you as a juror in this case, and

8  your choices were "very comfortable," "comfortable," and you

9  checked off "somewhat comfortable."

10         PROSPECTIVE JUROR NO. 17:  Correct.

11         MR. WEBB:  And I saw that.  And since I represent

12  Dr. Ahuja, is there something about the nature of this case --

13  why did you check that answer?

14         PROSPECTIVE JUROR NO. 17:  Putting myself in his

15  shoes, I don't know if I could be comfortable with anybody being

16  on the jury.

17         MR. WEBB:  Was there anything in particular about you?

18         PROSPECTIVE JUROR NO. 17:  No, not specifically.

19         MR. WEBB:  So you weren't thinking about yourself and

20  whether or not he would be uncomfortable about you.

21         PROSPECTIVE JUROR NO. 17:  Correct.

22         MR. WEBB:  Let me just ask you.  Is there anything at

23  all about the nature of this case or anything you know so far --

24  because you haven't heard any evidence -- that causes you any

25  concern about whether you can be fair and impartial?

102

1    PROSPECTIVE JUROR NO. 17:  Nothing that I've heard so

2  far.

3    MR. WEBB:  Okay.  Thank you very much.

4    Juror No. 18.  How are you today?

5    PROSPECTIVE JUROR NO. 18:  Fine.  Thank you.

6    MR. WEBB:  And, again, just a couple of questions.  In

7  looking at your questionnaire, you indicated that -- question

8  number 13, that your spouse worked or has worked for the

9  Department of Justice, FBI; is that correct?

10    PROSPECTIVE JUROR NO. 18:  Yes, sir.

11    MR. WEBB:  Just tell me a little bit about his job and

12  what his position was.

13    PROSPECTIVE JUROR NO. 18:  He worked in the radio room

14  as a dispatcher down here in Milwaukee at the FBI.

15    MR. WEBB:  And is he still working there?

16    PROSPECTIVE JUROR NO. 18:  No, sir, he's not.  He

17  retired the 1st of December.

18    MR. WEBB:  How many years did he work for the FBI?

19    PROSPECTIVE JUROR NO. 18:  About three years.

20    MR. WEBB:  Okay.  And in this case the federal

21  government, obviously, is bringing this case against my client,

22  and IRS Special Agent Cook will be testifying in this case.  And

23  you'll be eventually instructed in this case that all

24  witnesses -- all the witnesses should be judged the same as all

25  others as far as you make the judgment about credibility, but

1    some people believe that people in law enforcement, because

2    they're in law enforcement, have a leg up, that people tend to

3    say, "Well, I might believe a law enforcement officer more

4    easily than a different type of witness.

5            Do you have any thoughts about that because of your

6    husband's FBI background?

7            PROSPECTIVE JUROR NO. 18:  No, sir.  I don't think he

8    has influenced me in any way with his position that he had with

9    the FBI.

10           MR. WEBB:  Okay.  I also noticed question number 11,

11   that you have some experience with compliance with rules and

12   regulations.  Can you explain that to me?

13           PROSPECTIVE JUROR NO. 18:  Yes.  I was in the military

14   and almost everything we do is based on regulations.

15           MR. WEBB:  You were in the Air National Guard?

16           PROSPECTIVE JUROR NO. 18:  Yes, sir.

17           MR. WEBB:  Training manager.

18           PROSPECTIVE JUROR NO. 18:  Yes, sir.

19           MR. WEBB:  They have rules and regulations --

20           PROSPECTIVE JUROR NO. 18:  For everything.

21           MR. WEBB:  For everything.  Did you ever find it

22   difficult because you thought some rule or regulation might not

23   be as clear as you thought it should be but -- and maybe --

24   wasn't as easy to follow as folks might have thought?

25           PROSPECTIVE JUROR NO. 18:  Oh, definitely, but being

104

1    in the military, when it comes down to a rule or regulation, you

2    can question it, but there's usually somebody higher up that

3    will give you directive on exactly what to do.

4            MR. WEBB:  Fair enough.  That's all the questions I

5    have.

6            PROSPECTIVE JUROR NO. 18:  Thank you.

7            MR. WEBB:  Let me ask that question -- no, not you.

8    I'm sorry.  I didn't mean -- I thought maybe I should just ask

9    everyone here.

10           That issue about this is the federal government and

11   Agent Cook will testify.  Is there anyone here who just because

12   of your -- the way you feel about things, the fact that he's a

13   law enforcement agent would cause you to want to give more

14   credibility to Agent Cook than you might to any other witness?

15   Anyone feel that way that you want to talk to me about that?

16           (No response.)

17           MR. WEBB:  I'm not going to go through each one of you

18   individually.  That's -- thank you.

19           Now, let me go on.  Juror No. 19.  I was looking at

20   question number 11 on your questionnaire.

21           PROSPECTIVE JUROR NO. 19:  Yes, sir.

22           MR. WEBB:  And it's the question, the same question,

23   you checked off that you have some experience and training with

24   rules and regulations.  Just talk to me a little bit about that.

25           PROSPECTIVE JUROR NO. 19:  Correct.  I'm a treasurer

105

1    for a local union.  I've been doing that for the last 15 years.

2    I do all the accounting, reporting to the Department of Labor,

3    Treasury, IRS, state reporting, all that stuff I've been doing

4    since '97.

5             MR. WEBB:  Okay.  Now, on question number 30 on your

6    questionnaire, the same question I asked about just a couple

7    minutes ago.  Question number 30, which is:  If you were the

8    Defendant Dr. Arvind Ahuja, how comfortable would you be having

9    you as a juror in this case, and you did not check off very

10   comfortable, you did not check off comfortable, but you checked

11   off "somewhat comfortable."

12            Can you tell me why you checked that box?

13            PROSPECTIVE JUROR NO. 19:  I would go back to what

14   juror 17 said.  I had the same feelings.  I wouldn't be

15   comfortable being in his spot no matter who was on the jury.

16            MR. WEBB:  Fair enough.  And there's nothing that you

17   know of about you and your feelings and beliefs that should

18   cause Dr. Ahuja to be concerned about your ability to be

19   completely fair and impartial to him.

20            PROSPECTIVE JUROR NO. 19:  No.

21            MR. WEBB:  None at all.

22            PROSPECTIVE JUROR NO. 19:  None.

23            MR. WEBB:  Thank you.

24            Juror No. 23.  How are you, sir?

25            PROSPECTIVE JUROR NO. 23:  Good.  Thank you.

106

1          MR. WEBB:  I was looking at question number 9 on your

2    questionnaire about had you ever owned your own business, and

3    you said that you had.  Can you tell me a little bit about that?

4          PROSPECTIVE JUROR NO. 23:  I started the business

5    19 years ago.  That's why I still work today.

6          MR. WEBB:  And give me -- give me some details about

7    that business.

8          PROSPECTIVE JUROR NO. 23:  We do consulting work for

9    federal contractors.  What we do is assist them in complying

10   with some regulations issued by the U.S. Department of Labor

11   through its office of Federal Contract Compliance Programs.

12         We put together affirmative action plans by doing a

13   series of statistic reports and then help our clients to go

14   through regulatory review when they are contacted by this

15   special agency.

16         MR. WEBB:  Look at question 15, if you have it handy

17   there, sir.  Question 15 was:  Have you or has someone close to

18   you ever had a bad experience with, and there are some folks

19   listed there, and one of them was a bad experience with a

20   surgeon.

21         And you indicated -- and I don't mean to get into any

22   detail about this, but your wife had some surgery that failed,

23   and talk to me a little about what that was, but I'm not trying

24   to pry into anything real personal.  But is there anything --

25   kind a tell me what happened.

1  PROSPECTIVE JUROR NO. 23:  Without going into

2  extensive details, my wife had gone to the doctor to have some

3  surgery, was told that the surgery that she would have would fix

4  her specific problems and there would be no ongoing issues after

5  that.  It turns out that the doctor did not give her complete

6  information.  That while he might have fixed her immediate

7  problem, the surgery caused other issues.  Those had not been

8  disclosed to her or to us ahead of time.

9  MR. WEBB:  I'm not going to ask you about the details.

10  Is there anything about that experience because of -- Dr. Ahuja

11  is a doctor, a neurosurgeon.  Anything about that experience

12  with the medical profession that you think in some way might

13  affect your ability to be fair and impartial to Dr. Ahuja?

14  PROSPECTIVE JUROR NO. 23:  No.  As with any

15  profession, there are very good capable people at very

16  profession.  There are people within every profession that make

17  mistakes and are not as capable.

18  MR. WEBB:  Speaking of that, you had had an issue with

19  an accountant at one time.  Tell me a little bit about that.

20  PROSPECTIVE JUROR NO. 23:  That was a much simpler

21  situation.  The accountant simply failed to file some paperwork

22  and caused some fairly minor issues in terms of having to refile

23  some tax forms.  And, ultimately, I found another accountant who

24  was able to get the proper paperwork filed.  We had some very

25  minor penalties associated with the failure to file the initial

108

1    tax form.

2              MR. WEBB:  And I think there will be some testimony

3    from the CPAs in this case.  There's nothing about that

4    experience that would affect you to be fair and impartial in

5    this case?

6              PROSPECTIVE JUROR NO. 23:  No, sir.

7              MR. WEBB:  Thank you very much.

8              Juror No. 30.  How are you, sir?

9              PROSPECTIVE JUROR NO. 30:  Good.

10             MR. WEBB:  I had a couple questions from your

11   questionnaire that I wanted to follow up on.  If I could, you

12   also answered a question on your questionnaire about your

13   mother-in-law had some surgery that went bad?

14             PROSPECTIVE JUROR NO. 30:  Yes.

15             MR. WEBB:  And I don't want to pry into your

16   mother-in-law's personal health issues.  Can you tell me a

17   little bit about it?  But you don't have to go into much detail.

18             PROSPECTIVE JUROR NO. 30:  She had pain, and one

19   doctor, when they thought he could take care of something, that

20   he did not do a good job at, she had to have it fixed later.  So

21   it was a stressful time for her and as a result the family.

22             MR. WEBB:  Now, was there anything about that

23   experience -- Dr. Ahuja is, obviously, a surgeon and part of the

24   medical profession.  Is there anything about that experience

25   that would affect your ability to be fair and impartial to

1  Dr. Ahuja?

2           PROSPECTIVE JUROR NO. 30:  No.

3           MR. WEBB:  Now, on question -- do you have your

4  questionnaire there?

5           Don't worry about it.  That's no problem.

6           Question number 29 was a question that basically asked

7  you:  After telling you about Dr. Ahuja and his financial

8  success, do you feel you might have any difficulty being

9  completely fair and impartial in a case where a wealthy person

10  is charged with tax fraud?

11           And you did check "yes" to that; is that correct?

12           PROSPECTIVE JUROR NO. 30:  I did check "yes."

13           MR. WEBB:  And you wrote down that you're frustrated

14  with the rich getting richer.

15           PROSPECTIVE JUROR NO. 30:  Yes, that's what I wrote.

16           MR. WEBB:  I take it that was an honest answer that

17  you gave; is that correct?

18           PROSPECTIVE JUROR NO. 30:  Yes.

19           MR. WEBB:  And do you think that because of the fact

20  of Dr. Ahuja's wealth that's part of this case and the fact that

21  he's being charged with tax crimes that when you checked yes to

22  that question -- was that because you actually thought you would

23  have some difficulty?

24           PROSPECTIVE JUROR NO. 30:  I think it was frustration

25  coming out just because I've worked so hard, and I don't feel

1    like I can get ahead.  And so the rich getting richer comment

2    was the frustration coming out in there.

3              MR. WEBB:  And so when you answered the question that

4    you might have some difficulty being fair and impartial, that

5    was an honest answer.

6              PROSPECTIVE JUROR NO. 30:  Yes.

7              MR. WEBB:  And that's fine.  Thank you very much, sir.

8              Number 34.  Hi, sir.

9              PROSPECTIVE JUROR NO. 34:  Hi.

10             MR. WEBB:  Do you have your questionnaire handy?

11             PROSPECTIVE JUROR NO. 34:  I do.

12             MR. WEBB:  Question number 15 talked about that you

13   had had some bad experiences with a lawyer.  Do you see that?

14             PROSPECTIVE JUROR NO. 34:  Yes.

15             MR. WEBB:  And, again, I don't think I need a lot of

16   detail, but can you give me just a little insight into that?

17             PROSPECTIVE JUROR NO. 34:  This was an employment

18   issue, and I was supervising a small office.  One of the

19   employees had not been, in our opinion, performing her duties.

20   And so we fired her, and we went to arbitration over that.

21             The attorney we hired to represent us in the

22   arbitration I felt was -- didn't listen to us, was extremely

23   arrogant.  We subsequently lost the case.  We had to take her

24   back.  Two years later we fired her again with another lawyer

25   who listened to us, and we succeeded in getting her out of the

111

1    office.

2          MR. WEBB:  Anything about that experience that you

3    think would have any impact on how you view this case, the

4    lawyers in this case, or the case at all?

5          PROSPECTIVE JUROR NO. 34:  Absolutely not.  My father

6    was a lawyer.  Several of my brothers are lawyers.  I deal with

7    lawyers, both good and bad, all the time.

8          MR. WEBB:  So you're not going to hold it against us

9    that some of us are lawyers.

10         PROSPECTIVE JUROR NO. 34:  Absolutely not.

11         MR. WEBB:  You had had an issue with a bank one time.

12   Again, you don't have to give me a lot of detail, but was

13   that --

14         PROSPECTIVE JUROR NO. 34:  My wife just had some

15   problems with her one-person office, and she's had some problems

16   with her bank that I heard a lot about.  And so that's why I

17   checked that.

18         MR. WEBB:  Okay.  And a bill collector?

19         PROSPECTIVE JUROR NO. 34:  Oh, yeah.  The bill

20   collectors who call.  When they turn the file over to the people

21   who call you constantly on the phone and you think you've taken

22   care of the problem and they harass you on the phone.

23         MR. WEBB:  You're not real happy about that all the

24   time, are you, when that happens?

25         PROSPECTIVE JUROR NO. 34:  No.  I don't know anyone

1  who is.

2           MR. WEBB:  None of us are.  And the healthcare

3  provider, an issue?

4           PROSPECTIVE JUROR NO. 34:  Yes.  Just a good friend

5  had a back problem and his HMO fought -- it, essentially,

6  disabled him for a period of about three years.  His HMO

7  defeated him in that case, and I thought he was treated

8  unfairly.  I only heard his side of the story, but he's someone

9  I trust.

10          MR. WEBB:  And you did check the box that you thought

11  you would be very comfortable if you were Dr. Ahuja having you

12  on this case.  Tell me why you say that.

13          PROSPECTIVE JUROR NO. 34:  I'm an impartial person.

14  I'm open minded and think about things and judge them on what

15  the evidence is.

16          MR. WEBB:  Thank you very much.

17          PROSPECTIVE JUROR NO. 34:  You're quite welcome.

18          MR. WEBB:  Juror No. 37.  How are you?

19          PROSPECTIVE JUROR NO. 37:  Good.  Thanks.

20          MR. WEBB:  Just a couple of questions.  On your

21  questionnaire, question number 5, in connection with your work

22  as in the accounting field, have you had any connection or

23  involvement much with tax preparation or tax issues?

24          PROSPECTIVE JUROR NO. 37:  Not really, no.

25          MR. WEBB:  Okay.  Well, you said that you deal with

113

1    government regulations while working at a law firm?

2              PROSPECTIVE JUROR NO. 37:  Yes.

3              MR. WEBB:  Tell me about that.

4              PROSPECTIVE JUROR NO. 37:  We did criminal tax, and

5    pretty much I helped my paralegals requesting information from

6    the IRS and the government.  FOIAs and things like that.

7              MR. WEBB:  So when you did work for the law firm, you

8    did some work on criminal tax cases?

9              PROSPECTIVE JUROR NO. 37:  Pretty much assisting.

10   Mostly administrative.

11             MR. WEBB:  This is a criminal tax case.  You're

12   obviously aware of that.

13             PROSPECTIVE JUROR NO. 37:  Yes.

14             MR. WEBB:  Is there anything about your experience in

15   the law firm with criminal tax cases that you think could affect

16   your ability to be completely fair and impartial in this case?

17             PROSPECTIVE JUROR NO. 37:  I don't think so.

18             MR. WEBB:  You said you don't think so.  Is there

19   anything.

20             PROSPECTIVE JUROR NO. 37:  I'm sure.

21             MR. WEBB:  I didn't know if there was anything in the

22   back of your mind.  Nothing stands out in your mind that you

23   think would be a problem.

24             PROSPECTIVE JUROR NO. 37:  No.

25             MR. WEBB:  Okay.  Now, I know your father worked as a

114

1    police officer or used to work; is that correct?

2              PROSPECTIVE JUROR NO. 37:  Correct.

3              MR. WEBB:  And fathers are very special.  So he was a

4    policeman, and we have law enforcement involved in this case.

5              Is there anything about that experience that you think

6    might cause you to favor law enforcement in this case over

7    Dr. Ahuja?

8              PROSPECTIVE JUROR NO. 37:  No, I don't.

9              MR. WEBB:  Okay.  You answered several questions --

10   Strike the question.

11             You also checked off that you would be very

12   comfortable being a juror.  Why did you check "very

13   comfortable"?

14             PROSPECTIVE JUROR NO. 37:  Just the experience in the

15   law firm.  I had never been on jury duty, but I thought it would

16   be interesting.  And I know I would be able to be objective.

17             MR. WEBB:  Thank you.

18             Juror No. 41.  How are you?

19             PROSPECTIVE JUROR NO. 41:  I'm good.

20             MR. WEBB:  Just a couple of follow-up questions.  In

21   connection with your job or previous jobs, do you have any

22   experience with tax preparation?

23             PROSPECTIVE JUROR NO. 41:  No.

24             MR. WEBB:  None at all.

25             PROSPECTIVE JUROR NO. 41:  I pay my taxes, but

115

1   somebody else does them.

2           MR. WEBB:  Somebody else prepares your tax returns for

3   you.

4           PROSPECTIVE JUROR NO. 41:  Correct.

5           MR. WEBB:  And I think the court reporter is going to

6   want you to keep your voice up as best you can.

7           PROSPECTIVE JUROR NO. 41:  Is that better?

8           THE COURT:  No.  A little louder, please.

9           PROSPECTIVE JUROR NO. 41:  Like this.

10          MR. WEBB:  In looking at question number 9 where it

11  says:  Have you ever owned your own business, you checked "Yes."

12          Tell me about that business.

13          PROSPECTIVE JUROR NO. 41:  Well, it's a consulting

14  business.  Financial and business consulting.

15          MR. WEBB:  And how long have you owned that business?

16          PROSPECTIVE JUROR NO. 41:  Almost 30 years.

17          MR. WEBB:  And -- but in connection with that

18  business, you don't get involved in -- as far as financial

19  consulting, you don't get involved in tax issues.

20          PROSPECTIVE JUROR NO. 41:  No, I don't.

21          MR. WEBB:  Okay.  And you also checked off you could

22  be comfortable being on this case or Dr. Ahuja should feel

23  like --

24          PROSPECTIVE JUROR NO. 41:  That's correct.

25          MR. WEBB:  Tell me why you said that.

116

1    PROSPECTIVE JUROR NO. 41:  Well, I believe in

2  fairness.  And, like you said, in a situation like this

3  everybody should start at the starting line.

4    MR. WEBB:  You have no trouble with that whatsoever.

5    PROSPECTIVE JUROR NO. 41:  None.

6    MR. WEBB:  Thank you.

7    42.  Sir, I just -- in connection with question

8  number 11, you answered the question that you had gained some

9  knowledge about law and compliance and rules and regulations?

10    PROSPECTIVE JUROR NO. 42:  Yes, I did.

11    MR. WEBB:  Can you explain that a little bit to me,

12  please?

13    PROSPECTIVE JUROR NO. 42:  I worked as a private

14  investigator for probably the last 15 years.  And I've

15  exclusively done work with attorneys.

16    MR. WEBB:  So are there some specific areas of rules

17  and regulations that you've become familiar with as a private

18  detective?

19    PROSPECTIVE JUROR NO. 42:  No.  The rules and

20  regulations part, compliance part at the bottom.  That's when I

21  was a risk manager at the casinos in Las Vegas.  And I managed a

22  safety program at Worker's Compensation, and I worked with OSHA

23  on regulations and stuff like that.

24    MR. WEBB:  So you were familiar with the OSHA

25  regulations that affected what you were doing in your position;

117

1    is that right?

2          PROSPECTIVE JUROR NO. 42:  Yes.

3          MR. WEBB:  Now, as a private detective -- and you do

4    interact with law enforcement on occasion; is that correct?

5          PROSPECTIVE JUROR NO. 42:  Yes, I do.

6          MR. WEBB:  Now, is there anything about your ties to

7    law enforcement that you think in any way might cause you to be

8    a little more in favor of the prosecutors here than the defense?

9          PROSPECTIVE JUROR NO. 42:  No.  I've worked and helped

10    on both sides of different cases.

11          MR. WEBB:  Which sides do you think you worked on the

12    most?

13          PROSPECTIVE JUROR NO. 42:  Probably the defense side.

14          MR. WEBB:  Good.

15          (General laughter.)

16          MR. SULLIVAN:  Objection, Your Honor.

17          MR. WEBB:  Sir, I take it you believe you can be fair

18    and impartial to Dr. Ahuja; is that fair to say?

19          PROSPECTIVE JUROR NO. 42:  Absolutely.

20          MR. WEBB:  Thank you.  \\\\\\\\\\ -- I apologize.

21          THE COURT:  It will be redacted.

22          MR. WEBB:  Number 44.  Sir, I want to follow-up just

23    on a couple questions on your questionnaire.  Do you have that

24    handy, the questionnaire?

25          PROSPECTIVE JUROR NO. 44:  I don't right now.

118

1          MR. WEBB:  No problem.  Question 29, sir, on the

2    questionnaire, it was this question about Dr. Ahuja's wealth?

3          PROSPECTIVE JUROR NO. 44:  Yes.

4          MR. WEBB:  And the question was:  Do you feel you

5    might have any difficulty being completely fair and impartial in

6    a case where a wealthy person is charged with tax fraud, and you

7    answered "Yes."

8          PROSPECTIVE JUROR NO. 44:  That's correct.

9          MR. WEBB:  And you explained that, I think, most

10   people who consider themselves middle class and pay their taxes

11   every year are upset when they hear a wealthy person might not

12   have paid his taxes or his fair share.

13         PROSPECTIVE JUROR NO. 44:  That's correct.

14         MR. WEBB:  And that was your honestly held view; is

15   that correct?

16         PROSPECTIVE JUROR NO. 44:  Yes.

17         MR. WEBB:  And so the fact is you will have some

18   difficulty in being fair in this case; is that correct?

19         PROSPECTIVE JUROR NO. 44:  I would like to think every

20   case is unique and whatever evidence you present I'll evaluate

21   it based on that evidence.

22         MR. WEBB:  Well -- but when the question was asked:

23   Would you have any difficulty being completely fair and

24   impartial, you checked "Yes" because you thought you might have

25   some difficulty; is that correct?

Case 2:11-cr-00135-CNC   Filed 08/24/12   Page 119 of 174   Document 158

1          PROSPECTIVE JUROR NO. 44:  Yes, it is.

2          MR. WEBB:  Now -- that's all I have.  Thank you, sir.

3    Thank you very much.

4          PROSPECTIVE JUROR NO. 44:  Okay.

5          MR. WEBB:  47.  I just -- I saw because of your

6    occupation, do you have some experience with taxes and tax

7    preparation?

8          PROSPECTIVE JUROR NO. 47:  Yes, sir.

9          MR. WEBB:  Explain that to us if you could, please.

10         PROSPECTIVE JUROR NO. 47:  I've been a CPA since 1986.

11         MR. WEBB:  And so how much experience have you had in

12   preparing taxes?

13         PROSPECTIVE JUROR NO. 47:  Well, I've been

14   self-employed since that period.  I also did mortgage business.

15   So I did the double whammy as far as regulations.

16         MR. WEBB:  So you've actually had quite a bit of

17   experience with tax issues; is that correct?

18         PROSPECTIVE JUROR NO. 47:  Yes, sir.  Mostly on an

19   individual basis.

20         MR. WEBB:  And you've had quite a bit of experience

21   with preparing tax returns; is that also correct?

22         PROSPECTIVE JUROR NO. 47:  Yes, sir.

23         MR. WEBB:  Is there anything about that experience

24   that you think would cause you to in any way have any concerns

25   of not being fair and impartial to Dr. Ahuja?

120

1          PROSPECTIVE JUROR NO. 47:  No, sir.

2          MR. WEBB:  Thank you.  Thank you.

3          PROSPECTIVE JUROR NO. 47:  Thank you.

4          MR. WEBB:  49.  How are you?

5          PROSPECTIVE JUROR NO. 49:  Good.

6          MR. WEBB:  I just have a couple questions.  Again,

7    it's actually the same question, on question number 5, because

8    of your bank auditor position with Wells Fargo, does that cause

9    you -- do you get involved in tax issues?

10         PROSPECTIVE JUROR NO. 49:  No.

11         MR. WEBB:  Not at all?

12         PROSPECTIVE JUROR NO. 49:  No.  Other than making

13   sure -- the customers we go to, we just check to see if they

14   paid their payroll taxes, basically.

15         MR. WEBB:  And you said that you had -- you have had

16   an account in Japan; is that correct?

17         PROSPECTIVE JUROR NO. 49:  Yeah.  Checking account.

18         MR. WEBB:  Pardon me?

19         PROSPECTIVE JUROR NO. 49:  A checking account.

20         MR. WEBB:  How did you end up having an account in

21   Japan?  What were the circumstances?

22         PROSPECTIVE JUROR NO. 49:  My husband lived over

23   there.  He was doing research over there.

24         MR. WEBB:  And you opened up an account when you were

25   living there.

121

1          PROSPECTIVE JUROR NO. 49:  Yes.

2          MR. WEBB:  And do you still have the account?

3          PROSPECTIVE JUROR NO. 49:  No.  We closed it when we

4     came back.

5          MR. WEBB:  You said Dr. Ahuja should feel very

6     comfortable with you on his jury.  Why you'd say that?

7          PROSPECTIVE JUROR NO. 49:  I keep an open mind, and I

8     listen to the facts.

9          MR. WEBB:  Is there anything at all about this case

10    that you say to yourself, bothers you or that you couldn't be

11    fair to Dr. Ahuja?

12         PROSPECTIVE JUROR NO. 49:  No.

13         MR. WEBB:  Thank you very much.

14         Juror 50.  Sir, I just got a couple questions.  In

15    question number 11 on the questionnaire, you talked about having

16    some training in the field of accounting or bookkeeping?

17         If you can just explain that to me.

18         PROSPECTIVE JUROR NO. 50:  Sure.  I was the general

19    manager for a small book store.  So I pay all the bills.

20         MR. WEBB:  And have you had had some experience in tax

21    preparation?

22         PROSPECTIVE JUROR NO. 50:  No.

23         MR. WEBB:  Other than your own.

24         PROSPECTIVE JUROR NO. 50:  Correct.  I don't prepare

25    my own.  I have an accountant do it.

122

1          MR. WEBB:  You also said that Dr. Ahuja should feel

2    very comfortable if you were on this jury.  Why did you conclude

3    that?

4          PROSPECTIVE JUROR NO. 50:  I think I understand that

5    it needs to be a fair trial, and you can only judge by the

6    evidence that is presented.  I just have a appreciation for

7    that.  So I think that would be it.

8          MR. WEBB:  I have no more questions.  Thank you.

9          That's all my questions.  Thanks all of you for all of

10   your candor.  We appreciate it very much.  Thank you.

11         THE COURT:  I'd like to see the parties in the jury

12   room.  You can stretch while we're out.  If anyone needs to

13   refresh, this will be a good opportunity to do so.

14         THE BAILIFF:  All rise.

15         (Trial adjourned to the jury room.)

16         (Discussion off the record.)

17         THE COURT:  Please note that we are in the jury room

18   and that the defendant has opted not to be here.

19         Let's begin by discussing where you stand with respect

20   to any potential challenges for cause.  I did not discern any

21   problems or issues that would raise a challenge for cause, but

22   perhaps my eyes were wide shut.

23         MR. SULLIVAN:  None from the government.

24         MR. WEBB:  We have four.

25         THE COURT:  Okay.

123

1    MR. WEBB:  Juror No. 2 had answered question 29
2  that -- she answered question 29 on the questionnaire that she
3  would have -- that she would -- she would have difficulty being
4  completely fair and impartial in this type of case because of
5  the wealth of the defendant, and then she actually wrote out in
6  response to question 36 that this person may have taken
7  advantage of the system, although he was making millions of
8  dollars.  This is a bit upsetting.
9    And she also, then, had written out in response to
10  question 29 that, "I'd like to say I wouldn't," which means be
11  bias, "against him, but it was hard to read that statement and
12  not raise my eyebrows about the amount of money he made."
13    I asked her very directly as a result of that was she
14  telling me that she could not be completely fair and impartial
15  to Dr. Ahuja, and she said yes.  So she's made a direct
16  statement that she could not be fair and impartial.
17    THE COURT:  Mr. Sullivan?
18    MR. SULLIVAN:  I think reading the tea leaves she
19  doesn't want to be here.  She wants to get back to her planning
20  for her business, but the government views her as someone who
21  could be fair and impartial.
22    THE COURT:  Was she planning for UW-Parkside?
23    MR. SULLIVAN:  Yes.  She has a conference ongoing this
24  week.
25    THE COURT:  So it's not her business.  It's her

124

1    employment.

2            MR. SULLIVAN:  Correct.  You're correct, Your Honor.

3    But we view her as somebody who could be fair and impartial, and

4    I asked questions to the panel and no one raised their hand when

5    I asked:  Is there anyone who cannot promise to decide this case

6    based solely on the evidence and the law as instructed by the

7    court.  And they do have 10 peremptories.

8            THE COURT:  That's not the test.  We'll bring in the

9    juror.

10           THE CLERK:  I'm sorry, which number?

11           THE COURT:  Number 2.

12           (Juror No. 2 in.)

13           THE COURT:  Juror No. 2, I would like to explore a

14   couple things with you.

15           The first is what you said regarding your ability to

16   be fair in this case when asked by Mr. Webb to explain your

17   responses to inquiries on the questionnaire.  Can you tell us a

18   little bit more about your feelings concerning your ability to

19   be fair?

20           PROSPECTIVE JUROR NO. 2:  As I stated in my

21   questionnaire, seeing that 65 million was a rather large sum of

22   money, and I would not like -- I'd like to say I'm not biased

23   towards anyone making that much money, but I did, like I said,

24   raise my eyebrows.  And knowing the charges that were brought

25   were something with taxes, not reporting correctly on taxes or

125

1   whatnot, just already made me feel like, wow, you know.

2           THE COURT:  Even though the numbers may be big, your

3   role as a juror is not to assess whether or not a lot of zeros

4   are involved in this case, but rather whether or not the

5   government can prove its case against the defendant beyond a

6   reasonable doubt, based solely on what is presented here in the

7   courtroom, not based upon anything that may have occurred

8   outside of this court.

9           With that said, do you believe that you would be able

10  to sit in the jury box and make a decision based on what is

11  presented in that courtroom and that alone?

12          PROSPECTIVE JUROR NO. 2:  Again, I would like to say I

13  would, but -- I would hope I could, but I don't think I can.

14          THE COURT:  Why so?

15          PROSPECTIVE JUROR NO. 2:  As I stated in there, it

16  just has to do with the -- I know you say not to look at the

17  amount of money, but it is there, and to not have known it

18  beforehand would probably have helped, but knowing it, it's not

19  like I can't -- I can forget it.

20          THE COURT:  Now, if you were a party in this case --

21  let's say you were sitting in that courtroom at one of the

22  tables, would you expect a juror, or every juror, to make a

23  decision solely on the law and the facts?

24          PROSPECTIVE JUROR NO. 2:  Yes.

25          THE COURT:  Is there any reason why you can't do what

126

1   you would expect a juror to do if you were involved in this

2   case?

3          PROSPECTIVE JUROR NO. 2:  Again, I would hope that I

4   would be able to do that, but I'm not perfect.  And knowing

5   that --

6          THE COURT:  I'm not asking you for perfection.  I'm

7   asking you for --

8          PROSPECTIVE JUROR NO. 2:  For honesty.

9          THE COURT:  For honesty and to do what you inside

10  believe you're capable of doing.

11         PROSPECTIVE JUROR NO. 2:  And I have to say I'm

12  also -- knowing myself, I know that I'm quick to judge not given

13  all the facts.  I do that with my children and my husband all

14  the time.  And knowing the facts that we've already heard, I do

15  not think I can be as fair as I would want a juror to be.

16         THE COURT:  Do you tend to make snap decisions?

17         PROSPECTIVE JUROR NO. 2:  I tend to make very snap

18  decisions.  It's good in my job, though, in what I do.  So I

19  know my strengths and I know my weaknesses.

20         THE COURT:  So you're quick on your feet.

21         PROSPECTIVE JUROR NO. 2:  I'm very quick on my feet.

22         THE COURT:  And at work are you supervised?

23         PROSPECTIVE JUROR NO. 2:  I am supervised.

24         THE COURT:  And do you expect your supervisors to

25  evaluate you on what you do and how well you do it?

127

1    PROSPECTIVE JUROR NO. 2:  I do.

2    THE COURT:  Given that, do you believe that you can

3  provide to the parties in this case a kind of sensibility and

4  fairness that you expect of your supervisors?

5    PROSPECTIVE JUROR NO. 2:  I feel like we're asking the

6  same question, just rewording it.

7    THE COURT:  Yes, I am.  And the reason -- let me

8  explain.  The reason is to try to awaken in you at least all

9  senses and have a full understanding of what you are saying to

10  make sure that you believe as you've stated; that is, whether or

11  not you can be fair.

12    PROSPECTIVE JUROR NO. 2:  Okay.  Again, I would try to

13  the best of my ability to be fair, if I am chosen, and put all

14  biases and snap decision-making aside, and that's that.

15    THE COURT:  Let's assume for the moment that this case

16  was expected to take, oh, just another three hours from start to

17  finish, and it merely involved a car accident and whether or not

18  somebody was injured.  Would your feeling about your ability to

19  be fair and impartial be different?

20    PROSPECTIVE JUROR NO. 2:  No.  And I say that only

21  because knowing myself, I tend to read more into what is

22  presented.  If evidence is presented, I would read how people

23  present it, how people sit, how people look when things are

24  presented.

25    And so -- and I trust my judgments, but are they fair?

128

1   Not all the time, because they're not always based on just the

2   facts.  They're based on emotion and past experience.

3               THE COURT:  So ultimately the fact that this case may

4   involve a lot of zeros is not crucial to your statement as to

5   whether or not you can be fair.

6               PROSPECTIVE JUROR NO. 2:  It is, too.  That as well.

7               THE COURT:  But that's just a part of it.

8               PROSPECTIVE JUROR NO. 2:  Yeah.

9               THE COURT:  All right.  Do the parties have questions

10  of the juror?

11              MR. SULLIVAN:  Couple follow-up questions.

12              You don't know anything about this case, do you?

13              PROSPECTIVE JUROR NO. 2:  Just what was in the

14  questionnaire.

15              MR. SULLIVAN:  Would you want to know before you make

16  a decision whether or not the defendant paid tax on that

17  $65 million?  Is that something that you would want to know

18  before you decide this case?

19              PROSPECTIVE JUROR NO. 2:  Before I decided to be on

20  the case or --

21              MR. SULLIVAN:  No.  If you sat on the jury, wouldn't

22  you want to hear the evidence before you make a decision?

23              PROSPECTIVE JUROR NO. 2:  I would.  I would.  But that

24  wouldn't be the only thing -- I would like to say that would be

25  the only thing I'd base my decision on.

129

1           But, as I said before, a lot of opinion and past

2    experience and even reading, you know, looking around and just

3    looking at people's motions and faces and how they sit and

4    whatnot, I tend to be a person that makes decisions not just on

5    facts.  Does that make sense?

6           MR. SULLIVAN:  Not to me.  But I have no further

7    questions.

8           MR. WEBB:  No questions.

9           THE COURT:  Thank you.

10          PROSPECTIVE JUROR NO. 2:  You're welcome.

11          (Juror No. 2 out.)

12          THE COURT:  I find that there is cause for dismissing

13   Juror No. 2.  Her responses to the questions that were asked of

14   her demonstrate clearly that she is not a person who will keep

15   an open mind; that she will make snap judgments on factors that

16   go beyond the evidence in the case.  And as a consequence, she

17   may poison the well and prevent the jury from deliberating fully

18   solely on the facts, evidence, and any instructions given by the

19   court.

20          Do you wish to be heard further?

21          MR. WEBB:  Do you want to move to the next juror?

22          THE COURT:  Yes.

23          MR. WEBB:  Juror No. 8.

24          THE COURT:  Unless you're at an end.

25          MR. WEBB:  No.  I had four.  And I have three left.

1      Juror No. 8.  I move to excuse Juror No. 8 for cause

2  because I asked her about question number 29, same question

3  about whether she would have --

4      THE COURT:  This is the juror who said something about

5  having nagging feelings because of the defendant's income.  And

6  she's a music therapist.

7      MR. WEBB:  Yes.  When someone says that they are not

8  sure they can be fair and impartial under the case law, they're

9  to be excused from being on this jury.

10      She actually wrote -- I don't know how it could be

11  more biased.  She wrote on her questionnaire -- she combines

12  together the fact that he's wealthy and that it's a tax fraud

13  with the following:  "If he were totally not guilty, why is he

14  being brought to trial?"  That was her answer.

15      And she said to me out there that it's a combination

16  of the fact that he's very wealthy, charged with tax fraud, and

17  she believes that if he's -- the government wouldn't have

18  brought him to trial if he didn't have some guilt.  That's the

19  very thing we're trying to avoid in jurors.  So I move for

20  cause.

21      THE COURT:  Does the government have a different view?

22      MR. SULLIVAN:  Yes, Your Honor.  She said that she

23  thinks something happened.  Well, something did happen.

24  Somebody was indicted.

25      But she said there was little nagging doubt.  I don't

131

1  know how close we can get to someone saying they can't be fair

2  and impartial.  I believe she also did say that she could be

3  fair and impartial.  So it's another one of those situations

4  where she's right on the line, I guess.

5        THE COURT:  Well, I do believe that at this stage the

6  water has run hot and cold.  So we will bring her in.

7        (Juror No. 8 in.)

8        THE CLERK:  Juror No. 8.

9        THE COURT:  Good afternoon.

10        PROSPECTIVE JUROR NO. 8:  Hi.

11        THE COURT:  I'd like to explore with you some of the

12  responses that you've given.  And one of the things I'd like to

13  find out is your view of your ability to sit as a juror in this

14  case and make a decision based on what you hear in the courtroom

15  and what I will give you as instructions.

16        Can you give us some insight into your state of mind

17  and ability to handle your responsibilities if you were selected

18  as a juror?

19        PROSPECTIVE JUROR NO. 8:  Again, when I answered the

20  question about number 33 about being fair and impartial, it

21  simply -- I guess I just thought, well, if I'm coming to court

22  to be a juror, then, obviously, something has occurred that

23  something -- somebody has done something wrong.  I don't know if

24  I'm wording that correctly.

25        THE COURT:  Have you heard about the presumption of

1   innocence?  Have you heard of that?

2          PROSPECTIVE JUROR NO. 8:  Not much.

3          THE COURT:  Well, let me tell you a little bit about

4   it.

5          A person who is charged with a crime and brought into

6   court is, under our law, presumed innocent throughout the case,

7   from start to finish, unless or until the government, not the

8   defense, the government, can demonstrate beyond a reasonable

9   doubt that that person is guilty.

10         And there are elements of a crime that need to be

11  established one by one beyond a reasonable doubt.

12         Do you disagree with that as a concept?

13         PROSPECTIVE JUROR NO. 8:  No.

14         THE COURT:  If you were charged with a crime, would

15  you want to throw that concept out of the window?

16         PROSPECTIVE JUROR NO. 8:  Absolutely not.

17         THE COURT:  Do you like the concept, assuming you were

18  the person involved in the case?

19         PROSPECTIVE JUROR NO. 8:  Yes.

20         THE COURT:  So if you were seated at one of the tables

21  in this courtroom -- let's say, for example, you were a victim

22  and you were seeking redress from the other side, would you want

23  people to prejudge the case?

24         PROSPECTIVE JUROR NO. 8:  No, it would not be fair.

25         THE COURT:  Now, given that, would you want someone

1    with your mindset deciding a case if you were a party on either

2    side?  Would you be comfortable with somebody with your way of

3    thinking on the jury?

4          PROSPECTIVE JUROR NO. 8:  Actually, I think I would.

5          THE COURT:  Why would you be comfortable?

6          PROSPECTIVE JUROR NO. 8:  Because I wanted to be

7    100 percent honest with my gut reaction, but that is exactly

8    probably what it was, is just an initial.

9          But, yes, what you're saying is absolutely -- it's

10   imperative that, you know -- and, of course, like when I

11   mentioned out there, if I were in the accused person's shoes, of

12   course, I wished to be presumed innocent.  So --

13         THE COURT:  Now, when I go out in the courtroom a

14   little later, I will touch on this again, and, that is, the

15   presumption of innocence and the fact that an indictment is not

16   evidence.  The mere fact that somebody's been charged doesn't

17   mean that there is evidence to support the indictment, or that

18   the person is guilty or must have done something wrong.

19         An indictment is just a tool used by a grand jury, a

20   big jury -- they can have up to 26 people -- to cause people to

21   answer certain charges that the grand jury believes are

22   supported.

23         But the petit jury, the little jury, the one that

24   ultimately has to have only 12 members makes the final decision.

25         Now, given the fact that an indictment is not

134

1  evidence, do you understand that Dr. Ahuja has no proof against

2  him at this point in time and is presumed to be innocent if this

3  case proceeds to trial?

4             PROSPECTIVE JUROR NO. 8:  Yes.

5             THE COURT:  Now, if you were a juror seated in that

6  box as a petit juror, do you have any question in your mind as

7  to your ability to keep that concept in mind as the case

8  proceeds?

9             PROSPECTIVE JUROR NO. 8:  No.  That's my job to be

10 impartial.

11            THE COURT:  Do the parties have questions of the

12 juror?

13            MR. SULLIVAN:  None from the government, Your Honor.

14            MR. WEBB:  Just a couple.  There are some cases that

15 jurors might be better on than other cases, just the nature of

16 who we are.

17            PROSPECTIVE JUROR NO. 8:  Sure.

18            MR. WEBB:  The question on the questionnaire about

19 whether or not what the court just covered, it said:  The judge

20 will instruct you that you may draw no inference from the

21 defendant -- from the fact that he had been indicted.  Would you

22 have any difficulty applying the judge's instructions on this

23 point?

24            And you checked "Yes" and gave what I thought was a

25 very honest answer.  That if he were totally not guilty, why is

                                                        135

1    he being brought to trial.

2            And so the only reason I'm asking is because we're

3    trying to make sure, is it possible this is a case, because of

4    the facts, because he's wealthy, because of the tax fraud

5    charges, that you have some belief that because he's been

6    brought this far to trial by the government that when you said,

7    why would he -- why is he being brought to trial, that you would

8    have some difficulty in following that concept?

9            PROSPECTIVE JUROR NO. 8:  Well, I don't want it to

10   seem as if I'm using -- if he's wealthy or -- it's simply the

11   fact that he's in the seat that he's at this point.

12           MR. WEBB:  Right.  I understand completely.

13           PROSPECTIVE JUROR NO. 8:  Okay.

14           MR. WEBB:  That causes you to think, as you just said

15   a moment ago, that maybe he's done something wrong.  If I

16   understood your answer, right?

17           PROSPECTIVE JUROR NO. 8:  Uh-huh.

18           MR. WEBB:  And that's how you feel.

19           PROSPECTIVE JUROR NO. 8:  I don't know.  Maybe I'm

20   just not understanding or communicating this correctly.  I

21   understand that he needs to be presumed innocent.

22           MR. WEBB:  Sure.

23           PROSPECTIVE JUROR NO. 8:  I would wish for that to be

24   for me as well.  Okay?  So, we're here for a reason.  Something

25   has occurred.

136

1          I guess I just -- I understand, though, if I'm

2    selected, I need to do what the judge has told me, and I would

3    do that.

4          MR. WEBB:  But you did believe that because of these

5    circumstances --

6          PROSPECTIVE JUROR NO. 8:  When I filled this

7    questionnaire out, I was trying to be 100 percent frank.  Yes.

8          MR. WEBB:  Thank you very much.

9          THE COURT:  That's all.  Thank you.

10          Off the record.

11          (Juror No. 8 out.)

12          (Discussion off the record.)

13          THE COURT:  Back on the record.  Mr. Webb?

14          MR. WEBB:  Your Honor, I do move to excuse this juror

15    for cause.  I recognize Your Honor has attempted to rehabilitate

16    the juror with your questions.

17          THE COURT:  No.  I'm just trying to bring out as much

18    information as I can so that we can make an appropriate

19    decision.  I don't want to rehab anybody who may have been

20    damaged.

21          MR. WEBB:  I'll strike the comment.

22          Your Honor asked questions to get more information,

23    and I believe that this juror, when she said and wrote on this

24    questionnaire that "why would he be brought here to trial if he

25    was totally not guilty?"  And then when you started your

137

1   questioning, the first thing she told you is she believes he

2   must have done something wrong or he wouldn't be here.

3           We've got a lot of jurors sitting out there.  This

4   juror clearly has problems in being fair and impartial.

5           THE COURT:  As I said, in response to what

6   Mr. Sullivan said, that's not the test.  The number of jurors in

7   the courtroom is not the test.

8           MR. WEBB:  I agree it's not the test.  I agree with

9   you.  But my only point is that when we have a sense about

10  someone being not fair and impartial, we can -- you can exercise

11  your discretion to excuse that juror, and I believe this is one

12  of them.

13          MR. SULLIVAN:  I think the juror explained her

14  original answer.  She said this view of hers had nothing to do

15  with the type of case, but then she went on to say that she

16  could be fair and impartial because she hasn't heard any of the

17  evidence yet.  So even though something may have happened, she

18  doesn't know what that is, and she said she could be fair and

19  impartial.  So we object.

20          THE COURT:  Well, I do note in looking at question

21  number -- the response to question number 29 the juror did

22  indicate that she would try to be impartial.  She was consistent

23  throughout in that regard.

24          Moreover, in responding to my questions and those that

25  were asked of her in here by the parties, it was apparent to me

138

1    that she did not fully appreciate the presumption of innocence.

2    And after I went through that presumption with her, it became

3    clear to her that a defendant does not have to prove his

4    innocence; that the government has the burden of proving the

5    defendant guilty; and that she, as a juror, is to keep an open

6    mind throughout the proceedings and reach a verdict only after

7    the evidence has been presented.

8            On the basis of what I've heard, I'm satisfied that

9    this juror has not been shown to be biased and incapable of

10   rendering a verdict based upon the facts and the evidence, and

11   that this juror will not place upon the defendant any obligation

12   to demonstrate that he is not guilty.

13           I understand what the defense has said respecting the

14   juror's initial responses, but I also understand from the

15   totality of her responses that she realizes, as a practical

16   matter, that there is something that has occurred to bring this

17   matter about.  There has to be some type of trigger that would

18   cause matters -- a matter to be in court.

19           She doesn't know what that trigger is, but she is,

20   like all of us, aware that things don't happen for no reason

21   whatsoever.  Some trigger, it may be an innocent thing, or it

22   may be something sinister, but there is something that has

23   occurred.  And even if it's nothing more than a decision by a

24   grand jury to go on a witch hunt.

25           So, with that the defense motion is denied.

1    MR. WEBB:  Your Honor, the next juror that I would

2  move to excuse for cause is Juror No. 30.  And, again, this is

3  because this juror, unlike the last juror, at least she didn't

4  check the box "yes" or "no," she just left it blank.

5         This juror when asked, after the issue about

6  Dr. Ahuja's wealth was presented, Juror No. 30, the question

7  was:  Do you feel you might have any difficulty being

8  completely --

9         THE COURT:  One second.  Off the record.

10         (Discussion off the record.)

11         THE COURT:  Let's go back on the record.

12         All right.  Mr. Webb.

13         MR. WEBB:  As far as \\\\\\\\\\\ Juror No. 30,

14  excused for cause for the reasons I was stating because the --

15  in response to question 29, \\\\\\\\\ stated that he would have

16  difficulty being completely fair and impartial in a case where a

17  wealthy person is charged with tax fraud, and then he put down

18  "frustrated with rich getting richer."

19         And in the courtroom I asked him if that was his

20  answer and if that is how he believed, and he said "Yes."

21         So I don't know how much more I can do to make a

22  record that he believes that he cannot be completely fair and

23  impartial, and that's the standard, and that's because he's

24  frustrated with rich people getting richer.

25         And I move to excuse him for cause.

140

1          MR. SULLIVAN:  Your Honor, this was one of the two

2    jurors I asked questions of, and I believe I recall he said that

3    he could put that aside.  He was the one that believed he works

4    very hard and he's frustrated that he's not gotten further ahead

5    in life.

6          And I asked him, well, what if this case has nothing

7    to do with working hard, can you wait and decide the case based

8    on the evidence presented?  And he said he believed he could.

9    And I believe he said he could be fair and impartial.

10          THE COURT:  Both things are true.  We'll bring in

11    Number 30.

12          Off the record.

13          (Discussion off the record.)

14          (Juror No. 30 in.)

15          THE COURT:  Juror No. 30.

16          PROSPECTIVE JUROR NO. 30:  Hi.

17          THE COURT:  You've expressed during voir dire a number

18    of frustrations and concerns about people who are wealthy.  The

19    parties anticipate testimony that the defendant earned a lot of

20    money over the years.  If that is true, if that occurs, would

21    that cause you to feel that this defendant is guilty?

22          PROSPECTIVE JUROR NO. 30:  I don't think so.

23          THE COURT:  Would you hold it against the defendant

24    that he has been financially successful, or if it is shown that

25    he has been financially successful?

141

1          PROSPECTIVE JUROR NO. 30:  No.  I don't think so.

2          THE COURT:  Now, one of the things jurors will be told

3  repeatedly is that there is a presumption of innocence.  Do you

4  disagree with that concept?

5          PROSPECTIVE JUROR NO. 30:  No.

6          THE COURT:  Do you understand that a defendant does

7  not have to prove himself innocent when he or she is charged?

8          PROSPECTIVE JUROR NO. 30:  Yes.

9          THE COURT:  Do you understand that a trial begins with

10  a blank slate, no proof for either side?  Do you understand

11  that?

12          PROSPECTIVE JUROR NO. 30:  Yes.

13          THE COURT:  Now, you mentioned something about concern

14  about hard work and success.  Can you explain your feelings in

15  that regard?

16          PROSPECTIVE JUROR NO. 30:  I've had a hard go of it,

17  and there's been times where I've -- I felt like I've worked

18  hard and it just no matter what I did it was difficult for me to

19  make it, and I finally got a decent job now, and we're still

20  bearing out.  So that is where personal frustration comes

21  through.

22          THE COURT:  Recently have you endured some financial

23  hardship?

24          PROSPECTIVE JUROR NO. 30:  Still in it.

25          THE COURT:  Does that play into the responses you've

142

1    given so far?

2            PROSPECTIVE JUROR NO. 30:  I'm sure it does.

3            THE COURT:  You mentioned you recently obtained

4    employment.  Is your employment going to be adversely affected?

5            PROSPECTIVE JUROR NO. 30:  No.  No.

6            THE COURT:  If you were selected as a juror in this

7    case, do you feel that you could devote your full attention to

8    what's happening in this courtroom?

9            PROSPECTIVE JUROR NO. 30:  Yes.  I get paid a regular

10   day's salary from them.

11           THE COURT:  Now, is there anything about this case

12   that makes you uncomfortable?

13           PROSPECTIVE JUROR NO. 30:  No.

14           THE COURT:  Anything you've heard so far that makes

15   you uncomfortable?

16           PROSPECTIVE JUROR NO. 30:  No.

17           THE COURT:  If you were a party in this case, would

18   you want somebody who thinks like you deciding the case?  Let's

19   say, for example, if you were injured in a car accident and you

20   were seeking compensation for injuries you suffered, would you

21   want somebody who thinks like you deciding whether or not you

22   win or lose?

23           PROSPECTIVE JUROR NO. 30:  I think so.  I've had other

24   jobs, and one of the things that I've tried to do is be honest,

25   and I value honesty and truth as just core values.  Life does

143

1  happen.  So there are certain things that color and bring about

2  frustrations at different times in your life.  But --

3          THE COURT:  Have you had any significant disagreements

4  with fellow employees in any job that you've had?

5          PROSPECTIVE JUROR NO. 30:  No.  No.

6          THE COURT:  Have you encountered people in your

7  employment you've disagreed with from time to time?

8          PROSPECTIVE JUROR NO. 30:  As far as from my opinion

9  to their opinion?

10          THE COURT:  Yes.

11          PROSPECTIVE JUROR NO. 30:  There's always different

12  opinions, but I can work with people that don't agree with me.

13  In fact, most of the people that I work with have different

14  values than I do.

15          THE COURT:  And have you found it difficult at any

16  time to work with these people and to continue a civil dialog?

17          PROSPECTIVE JUROR NO. 30:  No.  We have a job to do.

18  We can get it done.

19          THE COURT:  Do the parties have any questions of the

20  juror?

21          MR. SULLIVAN:  None from the government.

22          THE COURT:  Mr. Webb?

23          MR. WEBB:  Just one.  When you were told about

24  Dr. Ahuja's wealth and you said you feel you might have

25  difficulty being completely fair and impartial and you said that

1  you would, you checked "Yes," what was it that was in your mind

2  at that time?

3         PROSPECTIVE JUROR NO. 30:  I think it was just

4  there's -- that was two months ago.  It's still difficult as

5  we're trying to get out of debt and try to get into a more --

6  above that situation.  There are certain money things that are a

7  little bit of a hot spot for me.  It's just difficult.

8         MR. WEBB:  I understand that completely.  And I'm not

9  going to pry into that in your life at all.  But because of that

10  feeling, do you think that maybe you might not be able to be

11  completely fair and impartial to Dr. Ahuja?  That's all I'm

12  trying to --

13         PROSPECTIVE JUROR NO. 30:  I understand.  I'll do the

14  best I can.  Are there colors?  I think everyone grew up with

15  different things.  There's always biases.  So I'll do the best I

16  can.

17         MR. WEBB:  If I hear you correctly, are you telling

18  me -- I know you're digging deep and trying to be honest, and

19  that's all anyone can ask, and I can tell you're a very honest

20  person.

21         Are you telling me that you're going to try to be

22  unbiased, but you're not completely sure you can do so?

23         PROSPECTIVE JUROR NO. 30:  To me it seems like there's

24  always an element of doubt in some of these things.  When you

25  always say "always," when you always say "never," that's doesn't

145

1  hold true.

2            MR. WEBB:  I have no more questions.  Thank you.

3            THE COURT:  You said something a moment ago about the

4  time when you filled out your questionnaire.  Do you recall

5  that?

6            PROSPECTIVE JUROR NO. 30:  Yeah.

7            THE COURT:  Was there anything troubling you at the

8  time you filled out that questionnaire?

9            PROSPECTIVE JUROR NO. 30:  We were just coming off --

10  not anything different than normal.  July is a difficult month

11  for us.  We come off the time of shut down where I don't get any

12  overtime.  So we're looking at bills and struggling through

13  them.

14            THE COURT:  So was there anything in your personal

15  life that was troubling you at the time you filled out the

16  questionnaire, other than the general downturn that you

17  experience when your plant is closed?

18            PROSPECTIVE JUROR NO. 30:  Nothing other than just

19  life, ups and downs.

20            THE COURT:  Are the things that were bothering you

21  then under control now?

22            PROSPECTIVE JUROR NO. 30:  We're slowly picking away

23  at our debt.  We're trying to get through, but, I mean, they're

24  still there.  I'm working 60, 65 hours a week if I can to try to

25  get out of it.

146

1          THE COURT:  Thank you.  I appreciate it.

2          MR. WEBB:  Thank you.

3          MR. SULLIVAN:  Thanks.

4          PROSPECTIVE JUROR NO. 30:  Thank you.

5          (Juror No. 30 out.)

6          THE COURT:  Mr. Webb?

7          MR. WEBB:  Yes, Your Honor.  I, again, will renew my

8     motion to excuse Juror No. 30 for the reasons I stated.  When he

9     answered this question that he would have difficulty being

10    completely fair and impartial to a wealthy person charged with

11    tax fraud and I just asked him now whether it still is not

12    100 percent sure that he can be fair and impartial because he

13    has this feeling that he has never been able to get ahead in

14    life and the fact that Dr. Ahuja has made so much money, that's

15    why he said he was frustrated with the rich getting richer, I

16    believe that he can't be completely fair and impartial, and I

17    had made a record to excuse him for cause.

18         MR. SULLIVAN:  Government respectfully disagrees.

19    He's only human.  We're all only human.  He said he could be

20    fair and impartial, but he also said that everyone is different,

21    but he could work together with everyone to reach -- to get the

22    job done or to do the work.

23         And that's what the law requires is that people say

24    that they will be fair and impartial and that they can be fair

25    and impartial.  I think he was very honest.

1          THE COURT:  I'm going to deny the defendant's motion.

2    And I note several things.  You cited them during your

3    arguments.

4          One is, this juror gave answers that provided insight

5    into his thinking process and the frustrations that he has

6    experienced.  It appears to me from what he said that they were

7    having household difficulties and family turmoil that was based

8    in large part on the fact that he was not earning overtime when

9    his company was shut down in July.

10         He was bringing out in his responses to the questions

11   on the questionnaire the frustration that he was experiencing at

12   home.  He is digging out of a financial hole at this time and

13   acknowledges that and knows that to speak in terms of absolutes

14   is a very dangerous thing.

15         And for this court to make a decision as to whether or

16   not this juror can be 100 percent certain of anything would be

17   inappropriate, and the defense is, essentially, asking this

18   court to find on the basis that this juror said he cannot give a

19   100 percent guarantee that he would be biased.  And the court

20   does not accept that.

21         The court denies the defense motion, and this juror

22   will not be stricken for cause.

23         MR. WEBB:  Your Honor, my last motion to excuse for

24   cause is Juror No. 44.  And as far as Juror No. 44 is concerned,

25   Juror No. 44 also, the same question, question 29, after being

1   advised of the wealth of Dr. Ahuja and asked the question:  Do

2   you feel you might have difficulty being completely fair and

3   impartial in a case involving that type of wealth and tax fraud,

4   checked "Yes," he would have trouble being fair and impartial.

5           And his answer -- his explanation was, "I think most

6   people who consider themselves middle class and pay their taxes

7   every year are upset when they hear a wealthy person might not

8   have paid his or her fair share."

9           And I believe that was a candid answer.  I then called

10  it to his attention.

11          THE COURT:  More need not be said at this point.

12  We'll bring him in.

13          MR. SULLIVAN:  Your Honor, we'll never get to him.

14  Based on my calculations, it's impossible to get to Juror No. 44

15  based on the number of eligible jurors.

16          THE COURT:  I think that is true.

17          MR. WEBB:  I haven't done the count.  So I'm not

18  disagreeing with you.

19          THE COURT:  Yeah.

20          MR. SULLIVAN:  We need 32.  So if we -- that's

21  according to my understanding, we need 32 qualified jurors to

22  select from.

23          THE CLERK:  That takes us through 37.

24          THE COURT:  I think we'll not get to 44.

25          MR. WEBB:  That's fine.

149

1          THE COURT:  Okay.  All right.  Let's talk about how we

2     proceed from this point.

3          Would you just indicate for the record the juror

4     numbers who will be subject to peremptory challenges.  First we

5     will go through the process with regard to -- let's see.

6          The first 28.  First 28.  We will select 12 jurors at

7     the outset.  And the government will have 6 strikes and the

8     defense will have 10.

9          After we select those, the next four jurors will be

10    subject to striking, with each side getting an additional one.

11         THE CLERK:  That would take us to 33, if that's what

12    you're referring to.

13         THE COURT:  No.  That would be 34.  I mean, 32.

14         THE CLERK:  I know number 33 --

15         THE COURT:  Oh, Juror No. 33.  Yes.  Because we struck

16    Juror No. 2.

17         Do the parties agree?

18         MR. SULLIVAN:  The government agrees that the first 28

19    would take us to Juror No. 33.

20         MR. KIRSCH:  That's correct.

21         MR. WEBB:  To get 28 jurors, we will go to Juror 33.

22    I believe that is correct.

23         MR. SULLIVAN:  Assuming we all exercise our strikes.

24         MR. WEBB:  Yes.  That's what the court is assuming.

25         MR. SULLIVAN:  Right.

150

1          THE COURT:  All right.  May I suggest that the

2     government exercise -- well, two strikes in each round as a way

3     of moving things along?  Or would you rather or strongly prefer

4     that you strike only one at a time, and then the defense having

5     the last set of strikes?

6          MR. SULLIVAN:  We're only striking one person.

7          THE COURT:  One at a time.

8          MR. SULLIVAN:  We're only striking one person.

9          THE COURT:  Okay.  Total.

10          MR. SULLIVAN:  Yes.

11          THE COURT:  Oh.  Okay.

12          MR. KIRSCH:  Are you going to tell us who it is?

13          MR. SULLIVAN:  If we have to go first.

14          THE COURT:  You have to go first.

15          MR. SULLIVAN:  We are striking Juror No. 24.

16          THE COURT:  All right.  Do you need to go into the

17     courtroom to determine which strikes you want to take?  Or would

18     you rather caucus before you go back out there?

19          MR. WEBB:  Well, Dr. Ahuja wants to be involved in

20     this process.

21          THE COURT:  You'll get a chance to caucus with your

22     client.  Do you want to do that -- caucus with him in here

23     first?

24          MR. KIRSCH:  Could we use the room in the back, the

25     same room that we used?

1          THE COURT:  Yeah, sure.

2          MR. KIRSCH:  Can we talk for one minute before we go

3  back?

4          THE COURT:  Off the record.

5          (Discussion off the record.)

6          (Recess taken at 3:48 p.m., until 4:40 p.m.)

7          THE COURT:  All right.

8          MR. KIRSCH:  Your Honor, we have our 10 strikes.  And

9  I have this, do you want me to write them?  I didn't write them

10  on this list because I didn't --

11          THE CLERK:  Yes.  Go ahead.

12          MR. WEBB:  Should we just write them out and hand them

13  to him?

14          MR. KIRSCH:  I think she's saying just put them on the

15  list.  Defendant number 1.

16          MR. WEBB:  Just write them on the list.

17          MR. KIRSCH:  Oh, I'm sorry.

18          (Brief pause.)

19          THE COURT:  Are you done?

20          MR. KIRSCH:  Yes.  I wrote our challenges for cause on

21  there, but I don't know if you want me to number the jurors 1

22  through 12 or not on there.

23          THE COURT:  Off the record.

24          (Discussion off the record.)

25          THE COURT:  The jurors who are left, the first 12,

1    read them off, please.

2              THE CLERK:  Okay.  3 through 7.

3              MR. KIRSCH:  3, 4, 5, 6, 7.  Okay, we got those.

4              THE CLERK:  10.  15.  17.  20.

5              MR. KIRSCH:  Yes.

6              THE CLERK:  25.  26 and 27.

7              MR. KIRSCH:  Yes.

8              MR. KIRSCH:  That's right.  That's what I have.  27 is

9    Juror No. 12.

10             THE CLERK:  Yes.

11             MR. KIRSCH:  And then 28, 29, 30, 32, and 33 are

12   excused.

13             MR. WEBB:  By the court.

14             MR. KIRSCH:  Because they're not needed.  And then

15   we're at 34 for alternates.

16             MR. WEBB:  Right.

17             THE CLERK:  Right.

18             THE COURT:  Are the parties in agreement?

19             MS. SISKIND:  Yes.

20             MR. WEBB:  Yes.

21             THE COURT:  All right.

22             MR. SULLIVAN:  Your Honor, who goes first on this

23   round?

24             MR. WEBB:  The government goes first on alternates.

25             MR. SULLIVAN:  I'm going to defer to Ms. Siskind on

                                                              153

1    this one.

2              MS. SISKIND:  34.

3              MR. WEBB:  Could we have a couple moments to consult

4    with Dr. Ahuja in the hallway?

5              THE COURT:  Sure.  We'll go off the record.

6              (Discussion off the record.)

7              MR. KIRSCH:  Okay.  We'll strike number 35.

8              THE COURT:  All right.  It's now 25 minutes to 5:00.

9    What we will do is go into the courtroom.  The clerk will

10   announce the jurors without identifying the alternate jurors.

11   After we confirm who has been selected, we will have all the

12   jurors come to the jury room for just a couple of minutes.

13             I'm going to have openings now.  In my view we need to

14   move as far as we can, unless the jurors report that someone has

15   a problem remaining until 6:00 o'clock.

16             MR. WEBB:  Are there preliminary instructions that you

17   give the jurors?

18             THE COURT:  I did not give them because of the way we

19   did our selection, but what I would do is I will -- I hadn't

20   accounted for that amount of time.

21             MR. WEBB:  I'm thinking we'll be here until 6:30.

22   Just respectfully, this witness tomorrow is going to get on and

23   off the stand.

24             THE COURT:  How much cross-examination do you

25   envision, assuming things go as swimmingly as --

154

1    MR. WEBB:  Two hours at the most, okay?  And he's

2  45 minutes on direct.  That's what you told me, okay?

3    MS. SISKIND:  45 minutes to an hour, yeah.

4    THE COURT:  All right, if that's the case --

5    MR. WEBB:  But if it goes 2 1/2 hours --

6    THE COURT:  If that's the case -- you're ahead of the

7  game.  You're ahead of the game.

8    MR. WEBB:  Thank you, Your Honor.

9    THE COURT:  Trust me.  We'll have openings in the

10  morning.

11    MR. WEBB:  Thank you.

12    THE COURT:  All right.

13    MS. SISKIND:  Your Honor, the preliminary statement

14  indicates -- is that for you to read during your preliminary

15  instructions?

16    THE COURT:  Because we did the jury striking in the

17  back and not in the courtroom, they were not given.  So we will

18  give those tomorrow.

19    MS. SISKIND:  Tomorrow.  Okay.

20    THE COURT:  But I will not swear in the jury because I

21  don't want jeopardy to attach, to be very blunt.

22    MS. SISKIND:  Your Honor, on the issue of the

23  preliminary statement, Mr. Kirsch and I were talking, because

24  Count 1 is going to be gone, our proposition would be that it's

25  appropriate to renumber the indictment so that the jury never

155

1    knows there never was a Count 1.

2          THE COURT:  Guess what?  We're working on it.  In

3    fact, what I would suggest is that, if you have a preference

4    with respect to how the statement is made in describing what

5    remains before the jury, you can submit that to me tomorrow

6    morning.  In fact, that would be preferable.

7          MR. KIRSCH:  I think we could even e-mail your clerk

8    tonight.  We've agreed on a statement.

9          THE COURT:  That will be fine.  In fact, I would also

10   ask that you go back through the proposed instructions and

11   modify them.  I've already gone through, and I've stricken some

12   of the proposed instructions because they are no longer

13   appropriate.

14          Let me also suggest that the government take steps to

15   file your dismissal.  Take care of that before jeopardy attaches

16   and before the jury is sworn in.

17          MS. SISKIND:  Yes, Your Honor.

18          MS. JOHNSON:  Your Honor, do you want for the motion

19   to dismiss to be sent to the clerk?

20          THE COURT:  You were already granted leave to dismiss

21   orally, and so that will be reflected in today's minutes.  So

22   all you have to do is then file the dismissal.  All right.

23   Okay?

24          MR. SULLIVAN:  After the jury leaves, maybe we can

25   talk about that 404(b) motion?

156

1          THE COURT:  Sure.  Whatever needs to be done.

2          MR. KIRSCH:  I don't think there's anything to discuss

3     with that tonight, Your Honor.

4          THE COURT:  Okay.  And if you have a revised estimate

5     for how much time the case will take, that will also be helpful

6     in scheduling our calendar for next week.

7          (Recess taken at 4:40 p.m., until 4:41 p.m.)

8          THE COURT:  Members of the jury, jury selection has

9     been completed, and the clerk will announce the numbers of those

10    jurors who have been selected to serve in this case.

11         I do ask that the -- that you remain in place after

12    you hear your number called.  And once all numbers have been

13    called, the jurors who will be serving as jurors in this case

14    should move to the jury box.  And those of you who are in the

15    jury box and are not to serve in this case are asked to move to

16    the back of the room.  All right?

17         THE CLERK:  Juror No. 3, 4, 5, 6, 7, 10, 15, 17, 20,

18    25, 26, 27, 35, and 37.

19         THE COURT:  If you are in the jury box --

20         MR. KIRSCH:  Your Honor, I think there was a mistake.

21         THE COURT:  Read them off again, please.

22         MR. KIRSCH:  I think just the -- well --

23         THE CLERK:  3, 4, 5, 6, 7, 10, 15, 17, 20, 25, 26, 27,

24    35, and 37.

25         MR. KIRSCH:  There is a mistake.

157

1    MR. SULLIVAN:  It should be 36 and 37.

2    MR. KIRSCH:  That's correct, Your Honor.

3    THE COURT:  36 and 37.  Yes.  36 and 37.

4    If your number was called, please move to the jury

5    box; if you're in the box and your number wasn't called, please

6    move to the back.

7    Those of you who are in the front row who were called

8    can remain in place.

9    THE CLERK:  Please stand as I call your number.  3, 4,

10   5, 6, 7, 10, 15, 17, 20, 25, 26, 27, 36, and 37.

11   THE COURT:  Please be seated for a moment.

12   Are the parties satisfied that these are the jurors

13   you selected?

14   MR. KIRSCH:  Yes, Your Honor.

15   THE COURT:  I do ask that the jurors remain in place

16   for a couple moments.  If you're in the back and you're

17   standing, you may take a seat in one of the chairs here.

18   I'd like to see the parties in the jury room for a

19   couple moments.

20   (Trial adjourned to jury room.)

21   THE COURT:  Juror No. 3 is the individual who reported

22   problems with PTSD and pain.  I just want to confirm that the

23   parties are mindful of that as we proceed and to ascertain

24   whether or not you noticed this juror stand during voir dire at

25   various points and also wince just a couple minutes ago when he

158

1    got out of his chair and moved to the jury box and stared at me

2    with a somewhat painful look on his face.

3           MR. WEBB:  I did observe what you just described.  I'm

4    going to suggest that we caucus on this issue.  I think it's an

5    important issue.  I noticed exactly what you noticed.  I think

6    we should talk.

7           THE COURT:  All right.  Off the record.  We'll let the

8    parties confer.

9           (Discussion off the record.)

10          THE COURT:  All right.  Have you made a decision?

11          MR. WEBB:  Your Honor, we consulted our client.  We

12   wanted \\\\\\ on the jury, and we don't want to excuse him.

13   We're hoping that things will calm down.  I did see what you

14   saw.  So I acknowledge that.

15          It's going to be a short trial.  If we lose a juror,

16   we have an alternate.  But I'd like -- we don't want to excuse

17   \\\\\\ now.

18          THE COURT:  An alternative -- I'd like to have that

19   juror come back here.

20          (Juror No. 3 in.)

21          THE COURT:  Juror No. 3, I noted that during jury

22   selection and after your number was called this afternoon you

23   displayed some discomfort.

24          PROSPECTIVE JUROR NO. 3:  I'm in a lot of pain,

25   Your Honor.

159

1    THE COURT:  You did not take your medication?

2    PROSPECTIVE JUROR NO. 3:  Not today.

3    THE COURT:  When you take your medication, does that

4    take care of your difficulties ordinarily?

5    PROSPECTIVE JUROR NO. 3:  Yes, it does.

6    THE COURT:  All right.  So do you think you'll be okay

7    tomorrow?

8    PROSPECTIVE JUROR NO. 3:  See, the problem is, Your

9    Honor -- is that I can't sit for long periods of time because I

10   have to have -- I happen to have osteoarthritis in my knees and

11   I have sciatica.  And by sitting too long, that kind of like

12   causes discomfort and a lot of pain.  So I'm going to have to

13   take something like Vicodin and Xanax.  I have to take stuff all

14   day.

15   THE COURT:  Does that cause you any great difficulty

16   when it becomes necessary to take both of those medications?

17   PROSPECTIVE JUROR NO. 3:  Yeah.  I get kind of fuzzy,

18   and I don't think clearly.

19   It's all in my paperwork here.  The doctor says it was

20   causing me to not focus.  It should be on the third or fourth

21   page.  I was seeing a psychiatrist for a PTSD, and they were

22   saying that I have to take this stuff to kind of tone it down

23   some because it's like I'm nervous, and then I have these

24   anxiety attacks.

25   THE COURT:  Under what circumstances do you experience

160

1    attacks of anxiety?

2            PROSPECTIVE JUROR NO. 3:  Stress.  I'm under a lot of

3    stress.  And then sometimes it just pops up.

4            THE COURT:  How does the anxiety usually manifest

5    itself?

6            PROSPECTIVE JUROR NO. 3:  Nervousness.  Irritability.

7    I get real fidgety.  And how would you say, I get kind of short

8    tempered.  It doesn't take much to make me kind of angry.  I

9    lose my patience.

10           THE COURT:  Are you a veteran?

11           PROSPECTIVE JUROR NO. 3:  Yes.

12           THE COURT:  Did you experience this difficulty prior

13   to your military service?

14           PROSPECTIVE JUROR NO. 3:  No.

15           THE COURT:  Had this difficulty been diagnosed as

16   service -- been determined to be service-related?

17           PROSPECTIVE JUROR NO. 3:  The VA didn't, but I had

18   another psychiatrist say it was.

19           THE COURT:  Did you serve outside of the Continental

20   U.S. when you were in the military?

21           PROSPECTIVE JUROR NO. 3:  One time.  No.  Not any

22   length of time.  I was only out for a couple weeks, and then

23   they brought me back.

24           THE COURT:  Were you in Vietnam?

25           PROSPECTIVE JUROR NO. 3:  No.

161

1          THE COURT:  Do the parties have any questions?

2          MR. SULLIVAN:  No, Your Honor.

3          MR. WEBB:  No, Your Honor.

4          THE COURT:  All right.  Thank you.  You can step out.

5          PROSPECTIVE JUROR NO. 3:  All right.  You're welcome,

6     Your Honor.  Sorry I couldn't help you out.

7          THE COURT:  No.  That's okay.

8          (Juror No. 3 out.)

9          THE COURT:  One second.  I do note the following:

10    This is an outpatient statement, which was handed to me by Juror

11    No. 3.  It discloses that Juror No. 3 has difficulties with

12    depression, in addition to anxiety and anxiety disorder, left

13    shoulder and bilateral knee pain, osteo, has been seen on

14    several dates including March of 2011.

15          I further note that this appears to be -- this

16    paperwork appears to be related to unemployment, an unemployment

17    claim by Juror No. 3.

18          I further note from what Juror No. 3 just reported

19    that stress exacerbates his problem.  He manifests -- and that

20    he manifests his anxiety by getting angry.  And that he also

21    experiences fogginess and difficulties in focusing when he's

22    taking the medication that he needs to control his anxiety and

23    his pain.

24          It appears to me from what he's saying that it's going

25    to be difficult for him to give this case his full attention.

162

1    Do you feel differently based upon what you've heard?

2    MR. WEBB:  Your Honor, the problem -- we exercised our

3  challenges with a certain --

4    THE COURT:  I understand that.

5    MR. WEBB:  I know you understand it.  I'm not going to

6  belabor it.  The government left five challenges on the table,

7  which they could have used if they wanted.

8    Anyway, I don't -- if after a day or two he just

9  doesn't show up, we'll obviously have to take the first

10 alternate.  I recognize that.  It's not going to cause a

11 mistrial.  There's not going to be a mistrial.  This is a short

12 a case as you can get.  We'll be done by next Monday, Tuesday,

13 or Wednesday, somewhere in there.  I'm not trying to get a

14 mistrial.  I'm just trying to preserve --

15    THE COURT:  I don't think you are.

16    MR. WEBB:  I'm not.  I guess I suggest that we keep

17 him on the jury, see what happens over the next couple days.

18 And if we have to bring the alternate in because he doesn't show

19 up, we'll probably not lose any time.  And the alternate gets

20 seated.

21    But right now -- and that's what the law requires.

22 Right now I don't want to agree with that because he may show up

23 tomorrow, hunker down, take a pain pill and be okay.

24    THE COURT:  I'm also concerned about his ability to

25 focus.  I just want the parties to -- no pun intended -- focus

163

1    on that issue as well.

2              Mr. Sullivan?

3              MR. SULLIVAN:  Your Honor, we move to strike for

4    cause.  The jury has not been impaneled.  If he's excused for

5    cause, then the other side would get another strike, and they

6    could select between the next two jurors that were in the

7    original pool, between 28 and 29.

8              MR. WEBB:  No.

9              THE COURT:  No.  I would not limit them to just the

10   next two.  I would give them an opportunity to strike from

11   anyone within that first segment.

12             MR. SULLIVAN:  We will agree to allow them to pick a

13   juror from the next three, 28, 29, I guess 30.  You can just

14   pick.

15             MR. WEBB:  We don't want those jurors.

16             THE COURT:  I'm talking about within the first 28.

17             MR. SULLIVAN:  But they could never get to those

18   jurors regardless because by the government not exercising five

19   of its strikes the pool was limited.  They could never get those

20   jurors.

21             MR. WEBB:  If you're going to get rid of \\\\\ over my

22   objection, then the proper thing to do would be to put the first

23   alternate.  That's what the law requires.  I'm not asking for

24   that because I don't want to get rid of \\\\\.  But the

25   solution -- if you get rid of \\\\\ then you go to the first

1    alternate.

2              MR. SULLIVAN:  Then that's what we should do.  Move

3    the first alternate in, and then we select another alternate.

4              MR. WEBB:  I'm not agreeing to that.

5              THE COURT:  He's not agreeing to that.

6              MR. WEBB:  I'm not agreeing to that.

7              THE COURT:  I note at the outset that jeopardy has not

8    attached.  And that gives us a lot of latitude.

9              We'll proceed with Juror No. 3.  And the court will

10   certainly entertain any concerns that may arise during the

11   balance of the trial respecting any juror who may have some

12   issues that need to be addressed.

13             All right?

14             MR. WEBB:  Yes.

15             THE COURT:  All right.

16             (Trial resumed back in open court.)

17             THE COURT:  Members of the jury, if you have been

18   seated in the jury box, you are to remain in place for a couple

19   of moments.

20             The other jurors are excused.  Thank you so much for

21   your candor and for your attention to this case.

22             Jury duty is as much of a civic responsibility as

23   voting.  I note yesterday we had only a minimal turnout for the

24   primary elections that were held, notwithstanding the fact that

25   there are people around the world who are dying for the

165

1   opportunity to vote.

2           You turned out today in full recognition of your civic

3   responsibility, and I hope that each of you voted yesterday

4   regardless of who you may have voted for.  I urge you as you

5   leave this place and go back to your lives to share with your

6   family members, colleagues, and friends the responsibility that

7   each of us is called upon to shoulder and that you, in fact,

8   shouldered today in participating in jury selection which helps

9   to ensure equal justice under the law and a fair trial for the

10  government and for the defense.

11          Have a good evening.

12          (Balance of jury panel discharged.)

13          THE COURT:  Members of the jury panel, I do ask you --

14  well, be seated for a couple moments.  There are a couple things

15  I want to share.

16          Tomorrow morning you are urged to be here on time.  We

17  will start at 8:30.  The bailiff will be talking with you after

18  you leave the courtroom today and giving you some information

19  respecting how we proceed.  But I do want to bring several

20  things to your attention:

21          You must not communicate with anyone by any means

22  respecting this case.  You, of course, can let your family and

23  friends know that you are serving as a juror, and that you have

24  to be in court.  And, of course, if you're employed, you may

25  wish to contact your employer as well to confirm that you remain

166

1    obligated to serve as a juror in a case in federal court.

2    Beyond that you should not go.

3           Also, keep in mind what I said on several occasions

4    today:  You may not use any electronic device or media such as a

5    telephone, a cell phone, iPhone or Blackberry, the computer,

6    Internet, any Internet service, any text or instant messaging

7    service, any Internet chat room, blog, MySpace, LinkedIn, You

8    Tube, or Twitter to communicate to anyone any information about

9    this case or to conduct any research about this case until I

10   accept your verdict.

11          In other words, you cannot talk to anyone on the

12   phone, correspond with anyone, or electronically communicate

13   with anyone about this case.  You can only discuss the case in

14   the jury room with your fellow jurors during jury deliberations;

15   in other words, after all of the testimony has been completed,

16   after you have been instructed by the court and after you have

17   heard the arguments of counsel.  I expect you will inform me as

18   soon as you have become aware of any violation of this

19   instruction.

20          I will give you further instructions later.

21          Let me add:  You have seen various people in this

22   courtroom today, and you may come in contact with them during

23   the course of this trial outside of this courtroom.  Therefore,

24   even though there may be a natural tendency to communicate with

25   people you have seen previously -- that is, to exchange

167

1    pleasantries -- resist any such urge and don't feel embarrassed

2    or discourteous if you fail to acknowledge someone who is

3    involved in this case.

4         I don't want it to be suggested by anything that you

5    may have said or done outside of this courtroom with respect to

6    any person involved in this case that you are fraternizing or

7    they are fraternizing with you.  Be especially careful in

8    elevators and in stairwells and about the building.

9         In fact, I urge that if you are coming to court or

10   leaving court that you make a direct line, use a direct line in

11   coming to this court.  Don't tarry in the hallways or

12   communicate with family and friends outside of the courtroom in

13   the corridors because that will just expose you to additional

14   opportunities to interact with people in this case.

15        You should also know that it is important to be as

16   timely as possible.  Now, there will likely be some delays in

17   this case from time to time, and I will try to explain to you

18   any delays that occur, but I do want you to know that we cannot

19   begin the trial without all of you being here, and we cannot

20   conclude or conduct any deliberations unless everyone is in the

21   jury room participating in those deliberations.

22        Therefore, once this trial begins and once

23   deliberations begin, it is imperative that you be present and

24   involved in all that needs to take place.

25        The bailiff will talk with you briefly about some of

168

1    the practices we have respecting refreshments and what's

2    available to you for your comfort in the jury room.

3            And as you can note by the relative quiet of the

4    courtroom right now, the air has been turned off.  We will

5    certainly accommodate you in future days if we have to be here

6    after 5:00 o'clock.

7            Generally speaking, I try to go until about

8    6:00 o'clock at night so that we can maximize our jury day, and

9    we will take one break in the morning and one break in the

10   afternoon, unless there are some other issues that arise.

11           I will give you some further instructions,

12   particularly as they relate to what I am about to do --

13           (White noise.)

14           THE COURT:  -- that is, the utilization of that white

15   noise.  We do use that when parties are communicating with me at

16   side bar so that you will not be able to discern the particulars

17   of what we are saying.

18           Those matters are not matters of concern to you, and

19   those matters are generally attended to at side bar so that it

20   won't be necessary for you to get up and down and move in and

21   out of the courtroom while we're trying to resolve issues that

22   may arise from time to time.

23           With that, I ask you to go to the jury room for a

24   couple moments for some discussions with the bailiff.  I'll see

25   you tomorrow morning at 8:30.

169

1      THE BAILIFF:  All rise.

2      (Jury out at 5:20 p.m.)

3      THE COURT:  Please be seated.  I just want to share

4   with you that I've made arrangements for the one juror to be

5   excused from his hearing tomorrow morning, which was scheduled

6   at 10:30.  That's Juror No. 26.  That hearing has been canceled,

7   and it will be rescheduled.

8      Now, are there any matters you'd like to attend to at

9   this time?  I do know that there were several things that we

10  discussed in the jury room.

11     MS. SISKIND:  Your Honor, there is one matter that

12  will affect the content of opening statements tomorrow morning.

13  This may be an appropriate time to address that.

14     THE COURT:  Go ahead.

15     MS. SISKIND:  As Mr. Sullivan raised when the

16  additional witness's name was said during voir dire, we have

17  subpoenaed and do plan on calling Vandana Katju to testify at

18  trial.

19     And Mr. Kirsch has advised me that the defense

20  objects.  Certainly before Ms. Johnson says her name during

21  opening, we should probably figure out what the decision is

22  going to be on this, and I can state for the court, if the court

23  would like to hear, the government's position on the relevance

24  of her testimony.

25     THE COURT:  Go forth.

170

1     MS. SISKIND:  As Your Honor has already heard from her

2     twice so far, she has intimate familiarity with HSBC-NRI

3     Services, which is the division of the bank through which the

4     defendant had most of the bank accounts that are the subject of

5     this case.

6          (Brief pause.)

7          THE COURT:  Go ahead.

8          MS. SISKIND:  Ms. Katju is familiar with that part of

9     the bank through which the defendant had many of his undeclared

10    bank accounts.

11         Now, to sustain our burden of proof on both the false

12    return charges and on the failure to file, the FBAR charges, the

13    government needs to prove that the defendant, in fact, had bank

14    accounts --

15         THE COURT:  Well, let me interrupt and invite the

16    defense to state its objection to -- if any, to this witness

17    being called by the government.

18         MR. KIRSCH:  Oh, yes, Your Honor.  We have -- we do

19    have an objection.

20         Your Honor, this witness, Ms. Katju, was just added to

21    the government's witness list.  The government never intended to

22    call her because she has no knowledge of anything the defendant

23    ever did, ever.

24         She cannot testify to any personal knowledge with

25    respect to the defendant.  She's never met him.  She's never

171

1    talked to him.  She's never seen a single document that he --

2              THE COURT:  The real underlying issue is whether or

3    not she can offer relevant testimony.

4              MR. KIRSCH:  Right.

5              THE COURT:  Is it your assertion that she cannot offer

6    any relevant testimony in this case, and that would be the basis

7    upon which you're objecting to her testifying?

8              MR. KIRSCH:  Absolutely.  The government, I think, is

9    going --

10             THE COURT:  The objection is overruled.

11             MR. KIRSCH:  Can I make a record, Your Honor?

12             THE COURT:  You made your record.  You said it's not

13   relevant.  You don't need to go into any further explanation

14   because the court has heard from this witness during the motion

15   phase of this trial.  And on that basis, it is clear that this

16   witness can offer relevant testimony.

17             Now, if there's something specific that you believe

18   she will be called to testify to that is not relevant, then you

19   will be heard.

20             MR. KIRSCH:  I was trying to respond -- what the

21   government just said has dramatically broadened what this

22   witness has testified to before this court.

23             THE COURT:  Well, regardless.  The only thing that

24   would bar her from testifying during the course of the trial is

25   her inability to testify to matters that are relevant.  If there

1    are, indeed, relevant things that can be -- relevant testimony

2    that she can provide, then she will be allowed to testify.  If

3    she's asked a question that solicits an answer that is not

4    relevant, you may object.

5            MR. KIRSCH:  Yes, Your Honor.

6            THE COURT:  All right?

7            Is there anything else?

8            MS. SISKIND:  Not from the government, Your Honor.

9            MR. WEBB:  No.  Nothing else.

10           THE COURT:  I will see you tomorrow morning with the

11   understanding that the parties will be recrafting the

12   preliminary description of the matters at issue.

13           The parties will be recrafting the instructions with

14   due regard for the fact that Count 1 is to be dismissed by the

15   government inasmuch as the court has granted the government's

16   motion for leave to dismiss the first count.

17           Is there anything else?

18           MS. SISKIND:  8:30 tomorrow morning, Your Honor?

19           THE COURT:  8:30.

20           MS. SISKIND:  Thank you, Your Honor.

21           THE COURT:  I'll see you tomorrow.

22           (The trial concluded for the day at 5:26 p.m.)

23                         *   *   *

24

25

173

```
1   UNITED STATES DISTRICT COURT

2   EASTERN DISTRICT OF WISCONSIN

3

4            I, JOHN T. SCHINDHELM, RMR, CRR, Official Court

5   Reporter for the United States District Court, Eastern District

6   of Wisconsin, do hereby certify that I reported the foregoing

7   proceedings, and that the same is true and correct in accordance

8   with my original machine shorthand notes taken at said time and

9   place.

10  Dated this 15th day of August, 2012

11  Milwaukee, Wisconsin.

12

13  _____
                Official Court Reporter

14              United States District Court

15

16

17

18

19

20

21

22

23

24

25
```