1             UNITED STATES DISTRICT COURT

2         FOR THE EASTERN DISTRICT OF WISCONSIN

3  ----------------------------------------------------------------

4  UNITED STATES OF AMERICA,          )
                                      )        Case No. CR 11-135
5                    Plaintiff,       )        Milwaukee, Wisconsin
                                      )
6       vs.                           )        August 16, 2012
                                      )        8:30 a.m.
7  ARVIND AHUJA,                      )
                                      )        **VOLUME 2**
8                    Defendant.       )        PAGES 175-437

9  ----------------------------------------------------------------

10                  **TRANSCRIPT OF JURY TRIAL**
           BEFORE THE HONORABLE CHARLES N. CLEVERT, JR.
11         UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY

12 APPEARANCES:

13  For the Plaintiff
    UNITED STATES OF AMERICA:      Office of the US Attorney
14                                 By: TRACY M. JOHNSON
                                   517 E Wisconsin Ave - Rm. 530
15                                 Milwaukee, WI 53202
                                   Ph: 414-297-1580
16                                 Fax: 414-297-4394
                                   tracy.johnson@usdoj.gov
17
                                   United States Department of
18                                 Justice DC
                                   By: JOHN E. SULLIVAN
19                                     MELISSA S. SISKIND
                                   Tax Division - Ben Franklin
20                                 Station - PO Box 972
                                   Washington, DC 20044
21                                 Ph: 202-514-5196
                                   Fax: 202-616-1786
22                                 john.e.sullivan@usdoj.gov
                                   melissa.s.siskind@usdoj.gov
23
    U.S. Official Reporter:        JOHN T. SCHINDHELM, RMR, CRR,
24                                 johns54@sbcglobal.net

25  Proceedings recorded by computerized stenography,
    transcript produced by computer aided transcription.

```
 1  APPEARANCES CONT'D:

 2    For the Defendant          Friebert, Finerty & St. John SC
      ARVIND AHUJA:              By: SHANNON A. ALLEN
 3    (Present)                  Two Plaza East - Ste 1250 - 330 E
                                 Kilbourn Ave
 4                               Milwaukee , WI 53202
                                 Ph: 414-271-0130
 5                               Fax: 414-272-8191
                                 saa@ffsj.com
 6
                                 Winston & Strawn LLP
 7                               By: DAN K. WEBB
                                     THOMAS L. KIRSCH II
 8                               35 W Wacker Dr
                                 Chicago , IL 60601-9703
 9                               Ph: 312-558-5600
                                 Fax: 312-558-5700
10                               dwebb@winston.com
                                 tkirsch@winston.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1          P R O C E E D I N G S (8:44 a.m.)

2              THE COURT:  Good morning.  Be seated, please, before

3      we go on the record.

4              (Discussion off the record.)

08:45    5      THE BAILIFF:  All rise.

6              (Jury in at 8:45 a.m.)

7              PRELIMINARY JURY INSTRUCTIONS

8              THE COURT:  Good morning, everyone.  Before proceeding

9      any further, I want to give you some opening comments that I

08:46   10     hope will be helpful.  When I've completed these comments, the

11     parties will then have an opportunity to make opening

12     statements.

13             Now, neither party is required to make an opening

14     statement, and an opening statement is not evidence; indeed, the

08:47   15     statements of the attorneys in this case, whether at this point

16     in the trial or at other points in the trial, are not evidence.

17     And so you should be mindful of that when you hear a question

18     asked or a statement made by an attorney.  The responses of the

19     witnesses that you hear and the materials that are offered and

08:47   20     received in evidence are the things that will have to be weighed

21     by you as the triers of fact.

22             You will hear in this case about an indictment.  I

23     mentioned previously and I do want to emphasize now that an

24     indictment is not any evidence at all; it is a tool that is

08:48   25     utilized by the government to bring charges against an

177

1    individual.  An indictment is, again, not evidence that a

2    defendant is guilty of a crime.  In fact, every defendant at the

3    outset of a case and at every point during a case is presumed to

4    be innocent unless after all of the proof has been submitted and

08:48    5    a jury has deliberated the jury concludes, based upon the

6    applicable law, that the government has established what it is

7    required to establish under our system of law that the defendant

8    is guilty beyond a reasonable doubt.

9         Now, I want to tell you a little bit more about what

08:49    10    is before you in terms of charges.  The defendant is charged

11    with willfully subscribing false tax returns for the calendar

12    years 2006 through 2009, by filing tax returns under penalty of

13    perjury that did not disclose financial accounts and income

14    located in India and the Bailiwick of Jersey, a British crown

08:49    15    dependency located in the Channel Islands, in violation of

16    Title 26, United States Code, Section 7206(1).

17         The defendant denies that he willfully subscribed to

18    false tax returns for those calendar years, but does not have to

19    prove his innocence.

08:50    20         The defendant is charged also with violating Title 31,

21    United States Code, Sections 5314 and 5322, for willfully

22    failing to file reports of foreign bank and financial

23    accounts -- FBAR; that's the acronym -- with the Internal

24    Revenue Service for the years 2006 through 2009 to report

08:50    25    alleged foreign bank accounts.

178

1    Again, the defendant denies that he willfully failed

2    to file reports of foreign bank and financial accounts with the

3    Internal Revenue Service for those years.

4    You will also note, as I said earlier, that there will

08:50  5    have to be proof.  There is more than one way to present

6    evidence in a case; there can be testimony or direct evidence,

7    as well as circumstantial evidence.  You will hear more about

8    the different forms of evidence, and the court will instruct you

9    later regarding the different kinds of evidence.  But

08:51  10   circumstantial evidence, like direct evidence, is admissible and

11   is to be considered by you in this case.

12   Let me also emphasize a couple of additional things.

13   I pointed out previously that it is important that you pay

14   attention to what is going on in this courtroom and that you

08:51  15   also be mindful not to have contact with the parties.  You are

16   also advised that you may, as you have surmised from the

17   notebooks that you have in your hands, take notes throughout

18   this case.  I also give to you as jurors an opportunity to ask

19   questions of the witnesses after they have completed their

08:52  20   testimony on direct and on cross.

21   Therefore, after the lawyers have completed their

22   questioning of each witness you will be given a chance to submit

23   written questions to our bailiff by passing a note down to the

24   bailiff.  I will review any such questions that you write out

08:52  25   and make a determination as to whether or not a question may be

179

1    asked of the witness by you.  I make the ultimate decision as to

2    whether or not a question should be asked.  Now, if your

3    question is not asked don't be offended because there are

4    certain rules that I apply and certain things that I have to

08:53  5    keep in mind during the course of the trial and proceeding and

6    to ensure that each side has a fair trial.

7              I will give you further instructions later.  With

8    that, would the parties please approach side bar.

9              (At side bar on the record.)

08:53  10             THE COURT:  Just want to see whether or not there are

11   any issues with respect to exhibits that you're going to be

12   showing during your openings.  I don't want anything to be

13   amiss.  Yes.  Mr. Sullivan?

14             MR. SULLIVAN:  Your Honor, I forgot to ask, what is

08:54  15   the Court's practice for swearing in the jury?

16             THE COURT:  They will be sworn in.  I wanted to make

17   sure we got all of this out of the way.  They will be sworn in

18   before we begin so that jeopardy will attach.

19             MS. JOHNSON:  The government does not have any

08:54  20   exhibits during opening.

21             MR. WEBB:  And I traded my exhibits with them a day

22   ago so they can look at them and there's no objections.

23             THE COURT:  All right.

24             (End of discussion at side bar.)

08:54  25             THE COURT:  Would the clerk please swear in the jury.

180

1    Ms. Wilson?

2            THE CLERK:  Please stand and raise your right hand.

3            (Jury sworn.)

4            THE CLERK:  Please be seated.

08:55    5            THE COURT:  Let me also note that if anyone becomes

6    uncomfortable, if you believe we need a little more air or you

7    need a break or you need to stretch, don't hesitate to do so.

8    And if there is something that you need that doesn't immediately

9    come to our attention, flag us down.

08:55   10            You may proceed.

11                    GOVERNMENT OPENING STATEMENT

12            MS. JOHNSON:  The case that we will present to you

13    today is about greed, opportunity, and taking advantage of a

14    situation when others are blind to your activities.  This is a

08:56   15    case about $2 million of unreported interest income from 2006

16    until 2009.

17            Dr. Arvind Ahuja, a Greendale neurosurgeon, was

18    provided with the seemingly perfect opportunity to get away with

19    filing false tax returns and never be discovered by the United

08:56   20    States Government.  Dr. Ahuja utilized foreign accounts to

21    conceal part of his income.  He was a client of HSBC Bank, one

22    of the largest banks in the world, and he had accounts with the

23    bank in the United States, the island of Jersey off of England,

24    and India.

08:57   25            May it please the court, opposing counsel.  Good

1    morning ladies and gentlemen of the jury.  My name is Tracy

2    Johnson.  I am an assistant United States Attorney, and with me

3    at counsel table I have my colleagues Mr. John Sullivan and

4    Ms. Melissa Siskind, along with IRS Special Agent Geoffrey Cook.

08:57   5         Dr. Ahuja has been charged in an eight-count

6    indictment.  The first four counts of the indictment charge the

7    defendant with filing false and fraudulent tax returns.  The

8    remaining four counts of the indictment charge the defendant

9    with failing to file an FBAR, which is a report that discloses

08:57  10    financial interest in foreign accounts.  This is not a

11    complicated tax case; this is a case about false statements.

12         Over the course of the next few days, the government

13    will present evidence that will prove that the defendant knew he

14    had foreign accounts but failed to disclose the information

08:58  15    about these accounts on his tax returns and then failed to file

16    a report identifying the accounts.  The government will prove

17    this case by presenting the following evidence using testimony,

18    letters from the defendant, business records, and bank records.

19         Special Agent Cook will testify that he analyzed

08:58  20    records produced by the bank.  He will testify that he

21    calculated the high balances in the defendant's undeclared bank

22    accounts, and his -- and at his peak the defendant had more than

23    $8 million in these accounts.

24         Ms. Vandana Katju is a current bank employee who will

08:59  25    provide testimony laying the foundation of the relationship

1    between the bankers in the United States, India, and Jersey, and

2    that the bank in the United States and India are separate

3    divisions of HSBC.  Ms. Katju will testify that the type of

4    accounts that the defendant had are available to India clients

08:59  5    living in the United States who want bank accounts in India.

6              Ramit Bhasin is an extended family member of the

7    defendant.  Mr. Bhasin is cooperating with the government after

8    signing a non-prosecution agreement.  Mr. Bhasin filed false tax

9    returns which failed to reveal his HSBC-India accounts.

09:00  10   Mr. Bhasin is a former bank employee.  Mr. Bhasin was called

11   upon by the defendant to assist his financial matters in India,

12   including at the defendant's direction transferring funds into

13   other brokerage accounts located in India.  Mr. Bhasin on at

14   least one prior occasion was present when the defendant withdrew

09:00  15   funds from his HSBC-India account.

16             The evidence will show that the defendant is

17   intimately involved with his financial affairs, from following

18   financial news stories to attesting to the fact that he

19   personally runs most of his investments.

09:00  20            Beginning by at least 2005, the defendant had set up

21   bank accounts in India with the bank.  The defendant invested in

22   two certificate of deposits totaling $2.8 million in India.

23   Records will show that in November 2005 the defendant also

24   wire-transferred $1 million from his HSBC-United States account

09:01  25   to HSBC-India.  You will hear that these are separate accounts.

183

1    Dr. Ahuja continued to wire-transfer funds to the bank

2    in India up until at least June 2008, totaling over $4 million.

3    From 2005 through 2008, the defendant invested in multiple

4    certificates of deposit all located with HSBC in India.  The

5    defendant invested in certificates of deposit in India that

6    earned interest income paying out as much as 10.8 percent.

7    The defendant earned interest on his India accounts

8    that he did not report.  In 2006, he earned over $190,000 in

9    interest.  In 2007, he earned over $350,000 in interest.  In

10   2008, he earned over $385,000 in interest.  And in 2009, he

11   earned over $290,000 in interest from his HSBC-India accounts.

12   For each of those tax years the defendant signed and filed his

13   tax returns and failed to report any interest income from his

14   offshore bank accounts.

15   The defendant retained Mr. Mark Miller, a certified

16   public accountant with Kolb+Co, for the purpose of preparing his

17   tax returns.  Mr. Miller will testify that he has prepared the

18   defendant's personal and business taxes for years.  Mr. Miller

19   will testify that as a tax professional he prepares the tax

20   returns for the approval of his clients and that the tax returns

21   are only as accurate as the information provided by his clients.

22   At no time did the defendant inform Mr. Miller that he

23   had foreign accounts.  Mr. Miller will testify that on

24   August 25th, 2009, he met with Dr. Ahuja to discuss his tax

25   returns, and one of the topics discussed was foreign bank

184

1    accounts and the FBAR reporting requirement.  The defendant

2    indicated to Mr. Miller that he would follow up on a few

3    brokerage and bank accounts to confirm that he had no foreign

4    bank accounts which would require FBAR reporting.  The defendant

5    never returned with information on foreign accounts.

6           Less than a month after Dr. Ahuja's meeting with

7    Mr. Miller, on September 21st, 2009, the defendant signed a

8    letter directing bankers at HSBC-Jersey to close his account.

9    By October 8, 2009, the defendant signed a letter directing

10   bankers to transfer over $3 million from his HSBC-India account

11   to a bank account in his wife's name.

12          Mr. Miller and the defendant met again in

13   December 2009 for a year-end tax planning meeting, and once

14   again, the FBAR reporting requirement was part of the agenda.

15   Mr. Miller will testify that the defendant did not tell him

16   about any foreign bank accounts at this December meeting.  On

17   April 15th, 2010, the defendant signed and filed his 2009 tax

18   returns and failed to report any interest income from his

19   offshore bank accounts.

20          In July 2010, the Department of Justice sent a letter

21   to the defendant indicating he was the subject of an

22   investigation relating to undeclared foreign bank accounts.  In

23   May 2011, the defendant filed amended tax returns for 2006

24   through 2009 reflecting that he had failed to report over

25   $2 million of interest income from his undeclared accounts at

185

1    HSBC in Jersey and India.

2            That, ladies and gentlemen of the jury, is the

3    evidence that will be presented to you during trial.  At the

4    conclusion of this case, based on the evidence presented, we

5    will return and ask that you find the defendant guilty on all

6    charges.  Thank you.

7            THE COURT:  You may proceed.

8            MR. KIRSCH:  Your Honor, I think the system has to be

9    switched to our computer.  Thank you.

10                   DEFENDANT OPENING STATEMENT

11           MR. WEBB:  May it please this Honorable Court, good

12   morning, ladies and gentlemen of the jury.

13           I was introduced to you yesterday.  My name is Dan

14   Webb, and I'll be one of the lawyers that will be representing

15   Dr. Ahuja during the course of our trial.  Other lawyers that

16   will be working with me, and you'll see them occasionally, is

17   Tom Kirsch and Shannon Allen, seated at counsel table.  And of

18   course, Dr. Ahuja will be seated next to me throughout the

19   entire trial.  He's the defendant in the case.

20           You've now heard the government's opening statement.

21   So what does that mean?  That means you heard half the story.

22   There are two sides to every story, and what you just heard is

23   the government's version of what they believe the evidence is

24   going to be.

25           I am going to talk to you about the other half of the

09:06
09:07
09:07
09:07
09:08

1    story, because I think all of you know from your everyday

2    experiences in life you're not going to make important

3    decisions -- and this is a very important case with serious

4    charges filed against Dr. Ahuja, and there's no question that I

09:08    5    respectfully ask you as you go through this trial, make sure

6    that you always hear both sides of the story before you try to

7    make any judgments or decisions. For example, witnesses will

8    testify, and you may hear a witness on direct examination tell

9    you certain events; but after you hear the cross-examination,

09:08    10   you may have a completely different view of those events and the

11   importance of what you heard.

12        I believe that's the case with the opening statement.

13   There were things that counsel for the government chose not to

14   tell you about in the opening statement that I respectfully

09:09    15   suggest are critically important to understanding the issues in

16   this case. I'm probably going to talk a bit longer than counsel

17   did because, for him, it is important that I lay out for you

18   more fully the facts that actually occurred during these years

19   and what happened with the tax return so you know what they are.

09:09    20   And then you make the judgments; I don't. But you're entitled

21   to know the full facts that relate to this case.

22        Now, I have put -- I'm not sure if my clicker is

23   working. I sometimes start better when I have charts on the

24   screen and I think better so I try to put them on a piece of

09:09    25   paper so as you start the trial what is the central issue in the

187

1    case.  So let me start with that.  I think I'm fairly setting

2    forth what the issue is.

3         The issue is the government's position is that they

4    contend that they're going to be able to prove beyond a

09:10  5    reasonable doubt that Dr. Ahuja willfully and knowingly -- and I

6    put it in red, "willfully and knowingly" -- filed false income

7    tax returns from 2006 through 2009 by concealing interest by a

8    bank called HSBC.

9         I put in red "willingly and knowingly" because there's

09:10  10   no question there was HSBC interest income that did not get

11   reported on Dr. Ahuja's tax returns.  But you're going to have

12   to ask the question what happened, and you're going to hear a

13   lot of testimony from witnesses.

14        But I tried to simplify it on this chart.  It's not

09:10  15   very complicated.  This bank, HSBC, did not send Dr. Ahuja 1099

16   forms.  You're going to hear a lot of evidence about those, I'm

17   going to explain it to you now in the opening statement.  These

18   are forms that our government requires that banks and other

19   institutions that pay you interest each year, you need to know

09:10  20   how much interest you had and they have to send you a form every

21   year, called a 1099 form.  That's how you know what to put on

22   your tax return.

23        HSBC did not send him 1099 forms.  And the evidence

24   will be overwhelming that he -- because of the number of

09:11  25   investments he had, he didn't realize that one of his payors

188

1    hadn't sent him a 1099 form.  The bottom line is the fact that
2    this money did not get on his tax returns was not something that
3    he did willingly and knowingly; it.  Was a mistake.  It wasn't
4    even his mistake; it was a mistake of HSBC.

09:11
5         And so I'm going to wait until they call the HSBC
6    banker who is going to explain to you why they didn't send him
7    the 1099 forms.  And I'm going to wait to see what happens with
8    that because I can't answer that question for you right now, and
9    I don't know why HSBC did not send him the 1099 forms.  But

09:11
10   that's the issue in the case that we're going to spend the next
11   few days with witnesses.

12        Now, the -- I'm going to start by just talking about
13   five, I think, points.  I'm going to explain them in more
14   detail, but I want to get on one screen significant facts that I

09:12
15   believe means the government will never be able to prove its
16   case beyond a reasonable doubt.  And I don't think these facts
17   are going to be disputed during the trial.

18        Number 1.  HSBC did not provide Dr. Ahuja with 1099
19   forms that could be used by his tax preparers.  They didn't, and

09:12
20   there's no dispute about it.  They did not send him the 1099
21   forms.

22        Number 2.  He did not know they hadn't sent him a 1099
23   form because he has people preparing his taxes for him and they
24   have a system in place.  And when a 1099 form is received in the

09:12
25   mail, it gets taken to the tax preparer, Mark Miller.  And every

189

1    time Dr. Ahuja got a 1099 form, every single time during these

2    years, with no exception, that money is on his tax returns.

3    Every year, every time.  You aren't looking at some tax cheat

4    who tried to hide income.  Any time anyone paid him interest, he

09:13    5    put it on his tax return.

6            He didn't get a 1099 from HSBC.  He gets about between

7    18 and 32 a year.  He doesn't actually get them.  They go to his

8    tax preparer, and his job is to go through them and put them on

9    his tax return.

09:13    10           And his tax preparer is going to testify -- we're

11    going to talk about that.  Mark Miller will tell you that

12    Dr. Ahuja was very cooperative.  Any time he got a 1099 form, it

13    came to him without exception.  There was not one for HSBC

14    because HSBC did not send him 1099 forms in connection with

09:13    15    certain CDs that Dr. Ahuja had invested in, which we're going to

16    talk about.

17           I'm going to explain -- witnesses are going to be

18    called.  I want you to understand this man's, Dr. Ahuja's,

19    tax-preparation process.  It was not sloppy.  He didn't ignore

09:14    20    his taxes.  He earned substantial amounts of money from his

21    medical practice, and after he got successful financially he

22    started making investments.  And he had a lot of investments.

23    And so he had a lot of interest coming in from different payors,

24    but he had a system in place.  Not only did he hire a

09:14    25    professional tax preparer -- probably one of the best in

190

1    Milwaukee who you'll hear from, from probably the best firm in

2    Milwaukee, Kolb+Co, and paid him a lot of money to prepare his

3    returns -- he then hired an individual financial manager named

4    Tom Branch whose job was to make sure that things like 1099

09:14  5    forms got sent to the tax preparer.

6         Dr. Ahuja did not personally go through 1099 forms.

7    You're going to hear from the evidence he's a very busy

8    neurosurgeon, sometimes working 16 to 20 hours a day.  But he

9    hired people, which is perfectly proper.  It's the responsible

09:15  10   thing to do is to hire people that you pay money to who will

11   make sure you file accurate and proper tax returns.  And he

12   didn't.  He did not ignore his tax returns.

13        The last point on the screen is that -- you wouldn't

14   have known it from the government, but during the years that

09:15  15   this HSBC income they say didn't go on his tax returns, he paid.

16   He paid the federal government almost $45 million, $44.4 million

17   he paid the government on his taxes because every dime he earned

18   in his medical practice, every dime he got from a 1099 or

19   outside investment, every one of those went on his tax returns.

09:15  20        And the HSBC didn't go on it.  And by the way, it

21   makes up -- if you look, it makes up 1.8 percent of his total

22   tax liability.  That's what we're talking about in this case.

23   1.8 percent did not go on his tax returns because he didn't get

24   1099 forms.

09:16  25        And those facts, those five facts I call to your

191

1  attention right off the bat because counsel for the government

2  forgot to mention any of those facts when they're talking about

3  what the evidence in this case is and whether they can prove

4  their case beyond a reasonable doubt.

5  And by the way, just so you understand, this interest

6  income, Dr. Ahuja already paid taxes on this money.  When he

7  earned the money in his medical practice, he paid taxes on it.

8  So he paid taxes to the government on all the money that he then

9  invested in these CDs and got interest income.

10  But you're going to hear from Mark Miller and from Tom

11  Branch this man is not a tax cheat.  They got one thing, which

12  is a failure not to report certain interest income when the bank

13  made the mistake and not him.

14  The judge has talked to you about -- I put it up on

15  the screen, but because it's so important I was going to mention

16  it and move on.  But as this case goes from now till the end, I

17  just respectfully ask you to keep in mind, these are not empty

18  words.  The government has the burden of proof beyond a

19  reasonable doubt.  I'm just going to ask you to think about

20  those words.

21  Jurors for 200 years in this country have sat on cases

22  and applied that standard, and it's a very heavy burden of proof

23  because our constitution and our system of justice has made a

24  choice that when you call someone into court and accuse them of

25  serial crimes that have devastating effects on their lives, you

192

1    had better be able to come into court with the type of evidence

2    that is beyond a reasonable doubt.  And those are not empty

3    words, and I'm going to talk about them throughout the case.

4           The defendant is presumed to be innocent, as the court

5    just told you a couple minutes ago.  That's not empty words.

6    He's presumed to be innocent.  As you sit here now, you should

7    be thinking he is innocent until after they prove with all their

8    evidence, all the evidence they want to present, all the

9    evidence I want to present, you go back and deliberate in the

10   jury room, and you decide, well, they met that burden of proof

11   on every element, every element of the crimes, and only then

12   does the presumption leave him.

13          And those words and those concepts are the heart and

14   soul of our criminal justice system.  And across this country

15   one of the reasons why our court system works so well is that 12

16   people like you sit on a jury and you take those words

17   seriously.  Sometimes you get cases where jurors say, you know,

18   I think the guy did it; I think he did it.  But thinking he did

19   it doesn't mean you can convict him beyond a reasonable doubt.

20   You've got to have that type of evidence.  And I'm going to come

21   back and talk about it after the case is all over with and show

22   you that they don't have it.

23          All right.  The government just told you that there's

24   two things that they say Dr. Ahuja did that was false on his tax

25   returns:  He didn't report the HSBC CD interest income; and he

193

1    didn't check off a box that's on the tax return on Schedule B

2    that says he had foreign bank accounts, or at least his tax

3    preparer didn't check off that box.  So we're going to talk

4    about those two issues because those are the false tax returns

09:19    5    that we have in this case.

6        But the bottom line is -- and I put it at the bottom

7    of the screen; it's not very complicated -- if HSBC had sent the

8    1099 forms to Dr. Ahuja, there is no doubt the interest income

9    would have been on his returns and his tax preparer would have

09:19    10    realized that he had foreign bank accounts and he would have

11    checked the box yes.  It's because the 1099 forms didn't get

12    sent by the bank to Dr. Ahuja that caused both these problems

13    that he's now being blamed for.

14        The government's theory that I just heard in opening

09:20    15    statement goes something like this:  They have a theory that

16    Dr. Ahuja knew that the bank was not giving him 1099 forms; that

17    he knew that, they must have told him, hey, Doc, we're going to

18    give you some money and we'll make sure we don't send you 1099

19    forms and you can hide your income.  Well, I'm going to stand

09:20    20    and wait until that happens in this courtroom because it's not

21    going to happen.

22        I will promise you -- I know what the government's

23    evidence is on this point, and if I'm wrong you as jurors can

24    tell me at the end of the case whether it was wrong.  They're

09:20    25    not going to call any witness from HSBC, whoever dealt with

194

1    Dr. Ahuja, who will testify that I told Dr. Ahuja we're not

2    going to give you 1099 forms.  There will not be a single HSBC

3    witness that will be called.  In fact, as far as I know, they're

4    not going to call as witnesses the actual HSBC bankers he dealt

5    with.

6        Dr. Ahuja -- you're gonna hear from the evidence,

7    Dr. Ahuja dealt with --

8        MR. SULLIVAN:  Objection, Your Honor.  May we

9    approach?

10       (At side bar on the record.)

11       MR. SULLIVAN:  I apologize, Mr. Webb, for interrupting

12   your opening.  But this sounds like closing argument to me, and

13   your commenting on evidence that we haven't even presented is, I

14   think, inappropriate.

15       MR. WEBB:  I had commented on what I expect the

16   evidence to be, that they're not going to call a witness who is

17   going to testify that they told him this.  And I know that from

18   the fact that I can talk about the evidence in the case or the

19   absence of evidence in an opening statement.  That's perfectly

20   proper.  I'm not making an argument.  I'm talking about whether

21   there is going to be any testimony that proves he knew that he

22   wasn't getting 1099 --

23       THE COURT:  Okay.  You have to change your tone.

24       MR. WEBB:  Okay.

25       THE COURT:  That's basically it.

195

1    MR. WEBB:  I'll change my tone.

2    THE COURT:  It's not argument.  This is not argument.

3    MR. WEBB:  I respect that.

4    THE COURT:  All right.  But nothing else has been out

5    of bounds.

6    MR. SULLIVAN:  But, Your Honor, based on what he is

7    saying, we are going to renew our request to offer evidence that

8    another individual who opened accounts at the same time was told

9    by HSBC he was not going to get a 1099.  Because it is relevant,

10   probative, and we can deal with it after this is over with.

11   THE COURT:  We'll address it later.  But at this

12   stage, the court does not anticipate ruling in your favor.

13   (End of discussion at side bar.)

14   THE COURT:  Proceed.

15   MR. WEBB:  Let me come back to the point I was making.

16   I don't believe the government will call to the witness stand

17   the HSBC bankers that this man dealt with for several years.

18   There are bankers at that bank, he dealt with them, they're in

19   New York.  HSBC-New York, in the United States.  He dealt with

20   bankers in the United States who oversaw these accounts, and if

21   one of those bankers ever said to Dr. Ahuja we're not going to

22   give you 1099 forms so you don't have to report this money,

23   that's never going to be heard in this courtroom because it did

24   not happen.

25   There's also no documents -- we have large numbers of

196

1    HSBC documents that you will see during the course of the trial.

2    There is also no documentary evidence showing that anybody at

3    HSBC ever hinted or suggested to Dr. Ahuja that he would not be

4    getting 1099 forms.  Nobody, zero evidence.  And this, the

5    theory of their case is that he must have known he wasn't going

6    to get 1099s.

7         Ms. Johnson just told you that because therefore he's

8    a cheat and knew he was cheating everybody.  And there's not

9    going to be a single witness or a single piece of documentary

10   evidence.  In fact, I believe from what I've been told they're

11   going to call someone from HSBC to explain to you the types of

12   accounts there.

13        This witness has never met Dr. Ahuja.  This witness I

14   don't believe has ever talked to Dr. Ahuja.  Dr. Ahuja opened

15   this account up in August of 2001 in New York.  There are

16   witnesses at HSBC that dealt with Dr. Ahuja over the years, and

17   you're going to hear about them during the trial and they're not

18   calling a single one of them, as far as I know, to prove their

19   case beyond a reasonable doubt.

20        What are 1099 forms?  You're going to hear so much

21   about them so I just put it on the screen.  Let me just

22   summarize it quickly.  It's a form that when someone pays you

23   interest -- like a bank, an insurance company, a brokerage

24   firm -- U.S. law requires them to send out to you as the bank's

25   customer at the end of the year this form that tells you how

197

1    much was on -- how much you earned that year on your account.

2    Because you wouldn't have any way to know how much you earned,

3    and they tell you that so that you can report it on your tax

4    return.

5              And the form tells the customer the exact amount that

6    the bank paid you on your deposits.  Whatever you deposited into

7    the bank they had there that year, they tell you how much money

8    it is, and then it's your job -- it's your job as the bank's

9    customer, that's your responsibility then to make sure you take

10   that 1099 form and put it on your tax return.  And every time

11   Dr. Ahuja got a 1099 form, it's on his tax returns.

12             A copy of it is also sent to the IRS so the IRS can

13   monitor what your 1099s are.  And the evidence in this case will

14   be Dr. Ahuja, he got 1099 forms from all kinds of payors of

15   interest, even HSBC.  HSBC sent him a 1099 form that went to his

16   tax preparer that reported interest on an account in New York

17   and didn't report interest on some CDs.  And I don't know who is

18   going to come in and explain to you how and why that happened.

19   And they've got the burden of proof.

20             There's a 1099 -- I just put that up just as an

21   example from a bank.  I just picked one off from his tax return

22   that the bank tells Dr. Ahuja this is how much interest you had.

23   It tells you the name of the payor bank, who the recipient of

24   the money is, how much it is, what year it's for, and it gets

25   reported on your tax return.  It's not very complicated.  That's

198

1    a 1099 form.

2            The major players in this case that you're going to

3    hear about the next few days, I just want you to put them again

4    on the chart just so you start learning who are the players.

5            Dr. Ahuja, you're going to hear a fair amount about

6    him.

7            Ramit Bhasin I think is the first witness in the case,

8    and he's a longtime banking career experienced investor.  He was

9    a relative of Namie Ahuja and became a friend of Dr. Ahuja.

10    You'll hear his testimony, and I think you'll find that I have

11    some significant cross-examination of that man, Mr. Bhasin,

12    which I won't go into now and you'll hear about it this

13    afternoon.

14            Mark Miller will be the next witness I believe, who is

15    a very reputable certified public accountant in Milwaukee.  He's

16    prepared Dr. Ahuja's tax return since 2001, and he's going to

17    have some very important testimony for you and that testimony I

18    think will be today and tomorrow too.

19            I think you'll also hear during the trial from Tom

20    Branch.  Tom Branch was a financial manager that actually worked

21    for Dr. Ahuja, personally worked for him in his medical company.

22    And his job, among other things, was to make sure that

23    Dr. Ahuja's tax records all got organized, gathered together,

24    and delivered to Mark Miller so the tax returns could be

25    prepared accurately.

199

1    Dr. Ahuja.  50 years old.  Married to Namie Ahuja.

2    They got two children.  He was born in India; came to the United

3    States at age 13 with his family.  He spent his early years in

4    Ohio.  Became a U.S. citizen at age 18.  Had the privilege by

5    living in this country to go to medical school and then

6    eventually moved to Milwaukee after completing his medical

7    residency in Buffalo, New York, and he started practicing and

8    he's been here in Milwaukee for many years at St. Luke's

9    Hospital.

10    And you're going to find that he is a prominent brain

11    surgeon.  He does a form of brain surgery that's got this big

12    name called endovascular neurosurgery.  I won't bore you with

13    the details, but it is a cutting-edge type of neurosurgery which

14    very few doctors in the United States can do or do well.  And

15    you're going to hear that.  He does it.  You basically snake a

16    catheter up your groin up into your brain and you solve a lot of

17    problems without cracking your skull open.  And it has enormous

18    benefits for patients.  And so that's what he does.  He's a

19    neurosurgeon.

20    And he has -- there's nothing wrong if people in this

21    country work hard and are successful and they get rewarded for

22    what they do.  There's nothing wrong with that.  And so we're

23    not bashful and we're not shy, and I'm going to talk to you

24    about his finances.  He made a lot of money practicing medicine,

25    and then because he had more money than he needed to live on, he

200

1    then went out and invested it.  Sometimes he lost money and

2    sometimes he made money.  But he invested it in investments, and

3    one of them was he put it into CDs at HSBC, which turned out to

4    be a very small amount of his total assets, but he did.  And

09:30    5    that's what this case is about.

6            You're going to hear from Mr. Bhasin, you're going to

7    hear from Mr. Miller, and you're going to hear from Mr. Branch.

8            Let me talk about Mr. Branch.  Dr. Ahuja, because he

9    knew he's so busy in his tax practice -- I mean -- I'm sorry --

09:31    10    in his medical practice.  And you're gonna hear testimony --

11    anyway, he works hours, 16, 18 hours a day, sees a large number

12    of patients, and he's performing very, very difficult surgery.

13            And he works hard, and somebody had to watch over his

14    financial affairs to make sure that mistakes weren't made.  And

09:31    15    he actually hired someone and paid him a fair amount of money.

16    Mr. Branch himself is a CPA with a master in business

17    administration.  He is the director of finance for Dr. Ahuja's

18    medical practice, and he also oversaw his personal financial

19    affairs.  And he's going to explain he's the one that collected

09:31    20    tax documents like 1099s and made sure that they got to Mark

21    Miller so they end up on the tax return.  And he's going to --

22    and by the way, it was a good system.  Not one single 1099 ever

23    fell through the cracks in all these years.  Every one got

24    reported on his tax returns.  But HSBC didn't send one.

09:32    25            The first -- the idea of not reporting HSBC income, I

201

1    want to talk -- I have to give you a little detail about what

2    happened at HSBC Bank, which the government didn't talk much

3    about.  Here's the story.  HSBC without question did not send --

4    I put these six critical facts that I'm going to walk through

09:32  5    with you now because I would like you to keep these in mind

6    because I respectfully suggest that they affect whether the

7    government can prove its case beyond a reasonable doubt.

8         Let's start with fact 1.  HSBC without his knowledge

9    did not send 1099 forms to him on the interest.  There'll not be

09:32  10   any evidence at all that they did.  It's undisputed.  They did

11   not do that.

12        So let's find out what's the relationship.  And I'm

13   going to take a little time so you understand, because HSBC is a

14   complicated bank.  That's not Dr. Ahuja's fault, but I'm going

09:33  15   to explain it to you.

16        Here's what happened.  In August of 2001, Dr. Ahuja

17   did contact bankers at HSBC-USA.  That is an American bank, just

18   as American as any bank on the street corner in Milwaukee or

19   anywhere else.  HSBC-USA in New York, and he contacted them and

09:33  20   he wanted a conservative investment.  CDs are pretty

21   conservative; they don't have much risk to them.  He put in a

22   million dollars into a bank account in New York -- in New York

23   at HSBC; it's called a premier account.  That account was opened

24   in his own name with his own home address.  No effort to conceal

09:33  25   that he had a bank account at HSBC.  Zero.  Million dollars was

202

1    put in there for them to invest in CDs.  That's in August

2    of '01.

3              So what is HSBC?  We now know today, because we're

4    here in this courtroom, it's a large --

09:34   5              MR. SULLIVAN:  Your Honor, same objection.

6              THE COURT:  Overruled.

7              Proceed.

8              MR. WEBB:  It's a large international bank.  It's

9    actually headquartered in London, England, and it actually has

09:34   10   7,200 affiliated branches, banks in I think it's 80 different

11   countries.  They had one affiliated bank in the United States

12   it's called HSBC-USA, they also had another bank in India called

13   HSBC-India, and they had one that's called the Channel Islands

14   called HSBC-Jersey, but they had 75 others.  I mean, they're a

09:34   15   big organization.

16             Dr. Ahuja, though, dealt with HSBC-New York.  That's

17   where he put his money.  He put his money into HSBC-New York.

18   And that bank, that bank, some of you may be familiar with it.

19   It's a large bank, just the one in the U.S. called HSBC-USA.

09:35   20   It's -- I think it's headquartered in Buffalo, New York.  That's

21   its corporate headquarters.  It's got 470 branches in the United

22   States.  One of those is in New York where Dr. Ahuja invested

23   his money.  It's overseen by the office of the comptroller of

24   the treasury here.  It's a U.S. bank governed by U.S. laws.

09:35   25   That's where Dr. Ahuja invested his money.

203

1      I put a chart here to show you what happened over the

2  years.  Over the time Dr. Ahuja from 2001 to 2008 invested

3  several million dollars into HSBC-New York.  Dr. Ahuja has a

4  bank here in Milwaukee called US Bank.  That's his bank in

09:35  5  Milwaukee.  So when he earns money in his medical practice, it

6  goes into that bank.  Periodically when he had enough excess

7  income he would wire-transfer money to HSBC in New York, in New

8  York, to HSBC-USA.  That's where he deposited his money.  That's

9  where all the bankers were that he dealt with.

09:36  10      Now, we don't know -- Ms. Johnson told you that by

11  2005 a lot of this money is in India at HSBC-India, and some of

12  it is in HSBC-Jersey.  I can't tell you what happened --

13      THE COURT:  One second.  Please proceed with a

14  statement as opposed to your speculation or your argument.

09:36  15      MR. WEBB:  Yes, Your Honor.

16      I don't believe there's any evidence as to what the

17  bank did with this money between 2001 --

18      THE COURT:  Again, please proceed with a statement as

19  opposed to what you believe or argument.

09:37  20      MR. WEBB:  I believe the evidence will show that -- as

21  Ms. Johnson told you, that by 2005 some of his money that he had

22  put into HSBC-USA has been transferred to India and some has

23  been transferred to Jersey, all of which are owned by that

24  company in London.

09:37  25      The evidence will show that he was never told that he

1    would not get 1099 forms, and they never sent him any 1099

2    forms.  This is just one example to show you that he transferred

3    his money to HSBC-U.S.  This is a wire transfer on August 17,

4    '01; that's when the account gets opened, in 2001.  That's sent

09:37    5    from Milwaukee to HSBC-USA in New York.

6           We know by the time you get up into later years that

7    HSBC-New York would transfer money that he deposited to HSBC in

8    India.  We know that.  Dr. Ahuja knew -- came to learn that.

9    There's no question Dr. Ahuja knew that money had gone to India.

09:38    10    But as long as HSBC paid him the amount of interest that they

11    promised on his CDs, he didn't care where the money was.  They

12    have a CD -- well, Dr. Ahuja clearly --

13           THE COURT:  One second.  Please approach.

14           (At side bar on the record.)

09:38    15           THE COURT:  I want to crystalize what I perceive to be

16    part of the problem.  You just said Dr. Ahuja doesn't know so

17    and so.  Now, unless Dr. Ahuja testifies, that sort of thing is

18    tantamount to your testifying on behalf of Dr. Ahuja, and it

19    certainly is in the nature of argument.  So you can talk about

09:39    20    what the evidence will or will not show, and you cannot

21    speculate at this point in terms of what's going to happen or

22    provide argument on the basis of what you believe.  On multiple

23    occasions you said "I'm not of this opinion" or "I have that

24    opinion."  You can't do that.

09:39    25           MR. WEBB:  Okay.  On this point I will just say that I

205

1    believe the evidence will show that Dr. Ahuja had CDs at a fixed

2    term and that he didn't care where the money was.

3            THE COURT:  Again, whether he cared is in the nature

4    of argument or speculating as to what you believe is in his mind

09:40  5    or you're testifying as to what's in his mind.

6            MR. WEBB:  Okay.

7            THE COURT:  You get the point?

8            MR. WEBB:  Yes, and I'm trying not to argue the case.

9            THE COURT:  I understand that.  But I gave you

09:40 10   considerable latitude and did not sustain the objections the

11   government made at the outset because I know that both sides

12   need a fair opportunity to present what they believe the

13   evidence will show.  On the other hand, it is unfair for you to

14   argue at this stage.

09:40 15           MR. WEBB:  I agree with that.

16           THE COURT:  Okay.  Proceed.

17           (End of discussion at side bar.)

18           MR. WEBB:  Let me pick up where I left off.

19           I believe the evidence will establish that HSBC did,

09:41 20   in fact, live up to their obligations and pay Dr. Ahuja the

21   amount of interest on CDs that they promised to pay him, and

22   that they paid him that amount of money, and that what happened

23   here, as I put up on the screen, is that HSBC then each year

24   would send him a 1099 form.  But for whatever reason that 1099

09:41 25   form would show the amount of interest on the New York premier

1    account and did not show the amounts of the CDs.

2              And then those forms were handled properly.  HSBC

3    forms were given to his tax preparer.  That money is on his tax

4    returns, every year.  There's one right here I put up on the

5    screen.

6              So HSBC sent 1099 forms to Dr. Ahuja.  This is

7    HSBC-USA where he deposited his money.  They sent him 1099 forms

8    but then did not include the CD on it.  And the money was then

9    sent to his tax preparer, prepared it based on the 1099 form.

10   And that's going to be the testimony from Mr. Miller.

11             So I should talk to you a little bit about what are

12   certificates of deposit because that's what the types of

13   investments that were made here.

14             It's a common form of investment, it's virtually risk

15   free.  You basically -- you go to a bank and you give them a

16   deposit and put it into a CD, but you lock your money up for a

17   period of time -- six months, one year, three years.  And by

18   locking your money up, the bank has the use of your money

19   because you can't, not like a savings account or checking where

20   you can just draw it out.  They have your money, and they can

21   pay you a higher interest rate on that money, traditionally

22   anyway.

23             And therefore, he had CDs that were guaranteed at

24   certain interest rates, and at the end of the term either your

25   money is paid to you, the principal and interest, or the

207

1    money --

2           MR. SULLIVAN:  Same objection, Your Honor.

3           THE COURT:  The objection is sustained.

4           Please modify your statement.

5           MR. WEBB:  The CDs have terms, and when they end

6    that's called the maturity date, and then the depositor either

7    gets his money or it's rolled over into another CD.  That's what

8    CDs are, and those are the instruments where HSBC placed his

9    money.

10          And there's no question the evidence will show that

11   over time Dr. Ahuja clearly knew that HSBC had put some of his

12   CD money in India.  Some of it had gone to the Channel Islands.

13   At least by 2005 that is what happened; exactly when that

14   occurred, I'll have to wait and see the evidence.  To this day

15   there is no evidence, none at all that I'm aware of, as to when

16   and why HSBC started to do that, to put his CD money into

17   related banks in India and Jersey.  HSBC made that decision at

18   some point in time, somewhere between 2001 and 2005, and I'll

19   have to wait to hear the evidence because I can't tell you.  I

20   don't know what it is.

21          HSBC was required to send 1099 forms to their

22   customers to report interest income on their customer's bank

23   deposit.  That is absolutely not in dispute.  I put up on the

24   screen here a regulation by the United States government which

25   basically imposes the obligation on HSBC-USA should have sent a

208

1    1099 form to Dr. Ahuja on the CDs, and they did not.

2              Now, I put up on the screen an actual bank statement

3    from HSBC-USA which basically says that for deposit accounts

4    opened on HSBC Bank branches to include New York, the accounts

5    are held by HSBC Bank-USA.  That means that when Dr. Ahuja

6    deposited his money into HSBC-New York, that was an account that

7    was held by HSBC-USA and they should have sent him 1099 forms.

8              There's evidence in the case that the parties are

9    going to talk about a lot relating to Citibank, and let me just

10   mention it to you briefly.

11             Dr. Ahuja did the same thing at Citibank that he did

12   at HSBC.  On October 16th, 2008, he deposited $1 million at

13   Citibank USA in New York for investments in a CD similar to what

14   he had done earlier at HSBC in New York in 2001.

15             Like HSBC, Citibank then eventually placed some or all

16   of his money in a CD investment that was in a branch bank of

17   Citibank in India, which is the same thing HSBC did at some

18   point in time.

19             The difference is, Dr. Ahuja did get Citibank 1099

20   forms each year for the interest on his CD investment that

21   Citibank USA had placed in India.  And so what I put up on the

22   screen, this is one of those 1099 forms that Citibank did

23   exactly what they should do.  Even though they chose to put the

24   money in India, they still had to send Dr. Ahuja a 1099 form

25   because he invested the money in Citibank USA.  And they did.

209

1      This is one of those forms, this is in 2009, and this

2  money is on Dr. Ahuja's tax return because Dr. Ahuja's tax

3  preparer got the Citibank 1099 form which has -- this is CD

4  money in India but which Dr. Ahuja then put on his tax return

5  because it went to his tax preparer.  So we know that Citibank

6  USA did exactly what they were supposed to do.

7      HSBC did not issue 1099 forms on the HSBC money they

8  placed in India and Jersey, and Citibank did exactly the

9  opposite.  And when Dr. Ahuja got a 1099 form from Citibank,

10 even though the money is in India, it's got to go on his tax

11 return and it did.  And it did.  And I call that to your

12 attention because that is evidence that obviously Dr. Ahuja was

13 not knowingly and willingly trying to avoid taxes.

14     My next point is that Dr. Ahuja had a very normal and

15 a very comprehensive tax-preparation process.  When he got a

16 1099 form -- and he got a lot of them; it worked; his system

17 worked; he had people watching for these 1099s -- they were

18 given to the tax preparer, and the money is on his tax return.

19 And I believe without exception they didn't make any mistakes.

20 When a 1099 form came in, it got on his tax return.

21     Because of the number and complexity of his return, he

22 has had to hire two professionals to prepare his tax returns,

23 and he did.  And he followed the same process every year, and

24 you're going to hear from those tax professionals.

25     The process that was followed is basically that

210

1    Dr. Ahuja gets a heavy volume of mail.  Some comes to his home,

2    some comes to his law office.  Somebody has to go through --

3    you'll learn from the evidence that these 1099 forms and related

4    kind of tax documents get mailed to you somewhere in the

09:49   5    January-February time period of each year because you have to

6    have them for your April tax return.  Your tax return is due on

7    April 15th.  And so you have to watch your mail and make sure

8    that you're gathering your 1099 forms.

9         Dr. Ahuja put a system in place so that his mail was

09:49   10   being reviewed by Tom Branch.  1099 forms and related tax

11   information would be gathered together, taken over to the tax

12   preparer, and then Mark Miller would make sure that it all got

13   on his tax returns.  And it did.  Every single time.  Every

14   single time.  I don't think there's a single exception.

09:50   15        Now, he received somewhere -- you're going to hear in

16   the years in question, 2006 to 2009, he would get anywhere -- I

17   think Mr. Miller is going to say between 18 to 32 separate 1099

18   forms, and every time one of them came in they went to the tax

19   preparer on his tax return.  HSBC -- when HSBC sent money to him

09:50   20   or sent a 1099, it goes on his tax return.  When Citibank sends

21   him a 1099 form, it goes on his tax return.

22        This is his tax return right here.  And there's a

23   Schedule B of his tax return, and there's an attachment that --

24   because he has so much interest income, there's an attachment

09:50   25   called Statement 14.  And I've highlighted any year that he got

211

1    a 1099 form which sometimes HSBC sent him 1099 forms but for

2    that one account in New York always got on his return.  When

3    Citibank sent him a 1099 form which included money in India,

4    always got on his return.  Every year it got on his tax return.

09:51   5            And I believe the evidence will establish and we'll

6    bring out through Mark Miller and Tom Branch that Dr. Ahuja was

7    not aware that he was not receiving 1099 forms from HSBC on that

8    interest.  Because Dr. Ahuja had Mr. Branch and Mr. Miller was

9    responsible for preparing his tax returns, Dr. Ahuja did not go

09:51   10   through his own mail and pick out the 1099 forms.  Tom Branch

11   did, perfectly good thing to do.  He was paid to do that, and it

12   worked.

13            MR. SULLIVAN:  Your Honor, I object.

14            THE COURT:  Approach.

09:51   15            (At side bar on the record.)

16            MR. SULLIVAN:  Your Honor, he just -- Mr. Webb just

17   did what you told him not to do.  He just testified.

18            THE COURT:  We'll take a short break, and I invite you

19   to look at what you've just said the last five minutes.  We will

09:52   20   then have a discussion regarding how we may be proceeding from

21   here on out.  I'm going to send the jury to the jury room.

22            (End of discussion at side bar.)

23            THE COURT:  We'll take a short recess.  Please do not

24   discuss this case in the jury room.  At no time can you discuss

09:52   25   this case in the jury room or with anyone.  You should be

212

1    mindful that the only discussion that you can have concerning

2    this case has to take place after all of the evidence has been

3    received, after you've heard the instructions of the court, and

4    after the attorneys have presented their final arguments.

09:53    5              Please take a break.

6              THE BAILIFF:  All rise.

7              THE COURT:  You may leave your notebooks in your

8    chairs.

9              (Jury out at 9:53 a.m.)

09:53   10              THE COURT:  You may be seated.  The court reporter

11   will give counsel an opportunity to glance at his realtime feed.

12   After you've had a chance to look at that and digest it for a

13   few moments, we'll proceed.

14              (Recess taken at 9:54 a.m., until 10:05 a.m.)

10:05   15              THE BAILIFF:  All rise.

16              THE COURT:  Be seated, please.

17              The court has on several occasions sustained defense

18   objections to argument by defense counsel.  I have invited the

19   parties to look at the realtime feed so that you are clear as to

10:06   20   what has been said within the last few minutes by Mr. Webb.  If

21   there is continued argument, defense counsel will be admonished

22   in front of the jury.  If the court must do that and defense

23   counsel continues to argue, the defense will be barred from

24   offering any additional statements as part of opening.

10:06   25              Is there any misunderstanding or clarification that

213

1    needs to be made by the court?

2            MR. WEBB:  Yes, Your Honor.

3            THE COURT:  All right.

4            MR. WEBB:  I've reviewed the realtime because I've

5    tried to be as careful as I possibly could to not argue the

6    case.  In the last five minutes of the argument before we took

7    our recess, Mr. Sullivan objected when I was describing witness

8    testimony and what they would describe how CDs operate.

9            I was describing actual witness testimony that is

10   going to be presented through the testimony of Tom Branch and

11   Mark Miller and, I believe, by Mr. Bhasin that will describe to

12   the jury how CDs are structured.  CDs are the critical

13   investment instrument in this case, and the jury will come to

14   learn through the evidence -- I put up a chart that simply in a

15   nonargumentative way described what the witness testimony will

16   be as to what CDs are.  I don't know how else I could have done

17   it.

18           And when Mr. Sullivan objected, I was describing how

19   CDs guarantee certain interest rates and at the end of the term

20   you collect your money.  That's going to be witness testimony.

21   That was not argument, and I don't know how else I could have

22   described to the jury what the witness testimony is going to be

23   factually about CDs.

24           The next time there was an objection was when we just

25   took our recess, was where I was describing what the testimony

214

1    was going to be of Mark Miller and Tom Branch regarding

2    Dr. Ahuja's tax-preparation process.

3         THE COURT:  But included in that description was what

4    you believed Dr. Ahuja knew.  You said, among other things, that

10:08  5    Dr. Ahuja was not aware that he was receiving 1099 forms.

6         Again, the point is, I talked with you at side bar

7    about what you believe the evidence will show or what Dr. Ahuja

8    may have believed or not believed.  You can talk about what the

9    evidence will show, but in terms of the awareness of Dr. Ahuja

10:09  10    as to what was taking place, et cetera, you are going beyond

11    what would constitute a statement of the evidence.  The

12    conclusion that one can draw from evidence goes beyond what I

13    believe to be appropriate -- an appropriate statement of what

14    the evidence is.

10:09  15         That is the precise point that I'm making with regard

16    to that form of discussion in front of the jury.  And on

17    multiple occasions the government has objected and the

18    objections, as I have interpreted them, are to your

19    characterization of Dr. Ahuja's state of mind.  That is critical

10:10  20    in this case, as you have pointed out early on.  But it is not

21    appropriate for you to characterize the evidence as you have.

22         MR. WEBB:  I will always follow any admonition I get

23    from Your Honor.  I will just say this, that as far as being

24    able to -- I was describing the evidence which comes from Tom

10:10  25    Branch and Mark Miller that Dr. Ahuja could not have been aware

215

1  because he didn't review or go through the 1099s; other people

2  did.

3         THE COURT:  Again, whether or not he is aware of

4  certain things depends on a multiplicity of considerations,

10:10  5  direct evidence as well as circumstantial evidence.  And you are

6  characterizing the evidence in your statements to the jury.  You

7  can talk about what the evidence will be:  Mr. Miller will show

8  X, Mr. Miller will show Y.

9         MR. WEBB:  I thought that's what I was doing

10:11  10  because --

11         THE COURT:  But you then took the extra step.  That's

12  the point.  You can't take the extra step as part of your

13  opening.

14         MR. WEBB:  Yes, Your Honor.

10:11  15         THE COURT:  All right?

16         MR. WEBB:  Yes, sir.

17         THE COURT:  We'll proceed.

18         THE BAILIFF:  All rise.

19         (Jury in at 10:11 a.m.)

10:12  20         THE BAILIFF:  Please be seated.

21         THE COURT:  You may proceed.

22         MR. WEBB:  Thank you very much, Your Honor.

23         Let me continue where we left off at our break.  I was

24  explaining to you Dr. Ahuja's tax-preparation process, which

10:12  25  involved the witnesses Tom Branch and Mark Miller, to explain to

216

1    you in some detail that tax-preparation process and will explain

2    to you in particular how the 1099 forms will be mailed to

3    Dr. Ahuja, gathered by Tom Branch, and brought to Mark Miller so

4    that 1099 income could be placed on Dr. Ahuja's tax return.

10:13    5          The next point I want to make, my fifth critical fact

6    which is important, I believe, to show the government cannot

7    prove its case beyond a reasonable doubt, is that in 2011

8    Dr. Ahuja realized he had made a mistake on his returns because

9    this HSBC CD interest was not being reported.  And once he

10:13    10    realized the mistake, he went out and filed amended tax returns,

11    and we'll offer those into evidence.

12          MR. SULLIVAN:  Same objection.

13          THE COURT:  Mr. Webb, you may not argue in front of

14    the jury.  This is your opportunity to set out what you believe

10:13    15    the evidence will show and not draw conclusions from the

16    evidence.  The jury is the trier of fact and it is to draw

17    conclusions.

18          MR. WEBB:  I was just describing --

19          THE COURT:  Just state what facts you believe the

10:14    20    evidence will bring out, either through direct evidence,

21    circumstantial evidence, et cetera.  But you have to -- you

22    cannot characterize the evidence.

23          MR. WEBB:  I understand that, Your Honor.

24          THE COURT:  You talked about what Dr. Ahuja believed,

10:14    25    et cetera; you may not, during the balance of your opening,

217

1    characterize the evidence in that way.  You may proceed.

2              MR. WEBB:  I was explaining to you the facts are that

3    Dr. Ahuja was notified by the Department of Justice on

4    July 10 -- July 9, 2010, with a letter, and he found out that

10:14   5    there was HSBC CD investments that were located in India and

6    Jersey.  Those are facts.

7              A mistake was made, and he filed amended tax returns

8    and he paid all the money that was due to the federal

9    government.  Those are the facts.  All of that happened before

10:15   10   the indictment was rendered in this case.

11             Fact 6.  You're entitled to know the amount of taxes

12   that was not reported on his tax returns was a small fraction of

13   the amount of taxes he had already paid.  We're going to

14   introduce this chart into evidence during the trial.  The bottom

10:15   15   line will show you that there was HSBC income not reported on

16   his tax return by the state because of the 1099 forms not being

17   received.  It was corrected, and the total underpayment is

18   1.8 percent.  Because Dr. Ahuja during that time period had paid

19   the government $44.3 million in taxes during those years.

10:16   20             Let me talk for just a few minutes about the second

21   type of false statement that Ms. Johnson talked to you about in

22   her opening statement.  This deals with Dr. Ahuja not indicating

23   on his tax returns that he did not have foreign bank accounts.

24   And again, through Mark Miller's testimony the evidence will

10:16   25   show that if 1099 forms had been received by HSBC that reflected

218

1  foreign bank accounts, Mark Miller would have reported it on the

2  tax returns.  But it wasn't there.  And so the same problem

3  caused this issue, not getting 1099 forms.  Mark Miller will

4  explain that to you during the course of his testimony.

5  10:17      This is actually the question -- there's a schedule on

6  your tax return called Schedule B where you have to report

7  interest and dividend income.

8      THE COURT:  One second, please.  Approach.

9      (At side bar on the record.)

10 10:17     THE COURT:  I've just observed a Social Security

11 number.

12     MR. WEBB:  We are waiving that.  That is part of our

13 defense that there was no effort to conceal.

14     THE COURT:  Okay.  You want the Social Security

15 10:17 number --

16     MR. WEBB:  Yes.

17     THE COURT:  Okay.  Is that going to be redacted in the

18 final exhibits?

19     MR. WEBB:  I don't think so.

20 10:17     MR. KIRSCH:  We can then substitute it if that's what

21 the court would like us to do at the end of the case with

22 redactions for the public file.

23     THE COURT:  All right.

24     (End of discussion at side bar.)

25 10:18     THE COURT:  Proceed.

219

1          MR. WEBB:  Thank you, Your Honor.

2          So there's a Schedule B that gets attached to your tax

3    return interest for dividend income.  Down at the bottom of

4    Schedule B there's a question, and I'll call it out so you can

5    read it better.  I'll call it out for you now, but it's a

6    question that's down there that basically it's called

7    Question 7a.  It says, "At any time did you have any interest in

8    a foreign account in a foreign country?"

9          Mark Miller will testify that he's the one that

10   checked "no" each year, and he'll explain that to you.  And he's

11   going to explain to you in some detail the issue of his

12   understanding of Dr. Ahuja's investments.  And he's going to

13   explain to you during his testimony that there's a difference

14   between having a foreign bank account and having a domestic

15   account in the U.S., like HSBC-USA, that has made investments in

16   foreign investments.  He will explain that to you.  But he,

17   Mr. Miller, made the decision to check the box "no" based on the

18   facts he had available to him at the time.  And that's -- you'll

19   get his testimony this afternoon.

20         Those are the two issues that we're going to litigate

21   in this case.  I've probably talked too long this morning.  I

22   wanted to try to give you an overview of what I thought the

23   facts were so that you kind of had a sense of it as the

24   witnesses testify.  Our defense is that those two problems --

25   the CD interest not being reported on the income statements or

220

1    on the federal tax return, and the checking of the box -- all

2    resulted from the failure of HSBC to send 1099 forms.

3           Thank you very much for listening to me, and I'll talk

4    to you again at the end of the case.  Thank you.

5           THE COURT:  Members of the jury, before the first

6    witness is called I'd like to just emphasize several things.

7           During the course of this trial objections may be made

8    to the introduction of evidence or other things that have

9    occurred in the courtroom.  I do not ordinarily permit arguments

10   on objections that are made by counsel.  At least I don't permit

11   those arguments in front of the jury.  Those arguments are taken

12   up at side bar where you have seen us have discussions thus far

13   in the case.

14          You must not infer from any ruling that I make or from

15   anything that I should say during the course of the trial that I

16   hold any view whatsoever for or against a party in this lawsuit.

17   During the trial I must and probably will sustain objections to

18   questions asked without permitting a witness to answer or where

19   an answer has been made I may very well instruct that the answer

20   be stricken from the record and that you are to disregard it and

21   to dismiss the answer from your minds.

22          You should not draw any inference from any unanswered

23   question nor may you consider testimony which has been stricken

24   in reaching your decision in this case.  This is because the law

25   requires that your decision be made solely upon the competent

221

1    evidence before you during this case.  If anybody were to ask me

2    what a juror's most important function is, I would

3    unhesitatingly say it is the credibility or believability of the

4    witnesses.  You cannot intelligently discuss a verdict without

10:21  5    first collectively discussing the testimony that you've heard

6    which bears upon that question.

7          It is most important for you to consider as you listen

8    to the testimony of the various witnesses in this trial whether

9    those witnesses are believable.  I urge you not to prejudge the

10:22  10   credibility of any witness until you've heard all of the

11   testimony in the case.

12         In considering the credibility of a witness, you

13   should remember that the testimony of the witness may fail to

14   conform to the facts as they occurred because a witness is

10:22  15   lying, because the witness did not accurately see or hear that

16   about which the witness testifies, because the witness's

17   recollection of the event may be faulty, or because the witness

18   did not clearly testify.

19         There's no magical formula by which you may evaluate

10:22  20   the testimony.  However, you should bring with you to this

21   courtroom and to your work as jurors in this case all of your

22   experiences and background in your lives.  In your lives you

23   determine for yourselves the reliability or the unreliability of

24   statements made to you by others.  The same test that you use in

10:22  25   your everyday dealings are the tests which you should apply to

222

1    your deliberations in this case.

2            The interest or lack of interest of a witness in the

3    outcome of the case, the bias or prejudice of a witness, if

4    there is any, the appearance, the manner in which the witness

10:23    5    testifies on the stand, the opportunity the witness had to

6    observe the facts, the probability or improbability of the

7    witness's testimony when viewed in light of all the other

8    evidence in the case are important factors for you to consider

9    in determining the overall weight and credit that you may give

10:23    10   to a witness's testimony.

11           If it appears that there is a discrepancy in the

12   evidence, you will have to consider whether the apparent

13   discrepancy can be reconciled.  If, however, that is not

14   possible, you must then determine which of the conflicting

10:23    15   versions you will accept as appealing more to your good judgment

16   and common sense.

17           You may proceed.

18           MS. SISKIND:  Thank you, Your Honor.

19           The United States calls Ramit Bhasin.

10:24    20           Your Honor, should we move the podium so it's --

21           THE COURT:  Yes.  It should be moved.  Mr. Hill will

22   assist you.

23           THE REPORTER:  Raise your right hand, please.

24            RAMIT BHASIN, GOVERNMENT WITNESS, SWORN

25           THE REPORTER:  Please state your name and spell your

1    name for the record.

2            THE WITNESS:  Ramit Bhasin, R-A-M-I-T, B-H-A-S-I-N.

3                        DIRECT EXAMINATION

4    BY MS. SISKIND:

5    Q.  Good morning, Mr. Bhasin.

6    A.  Good morning.

7    Q.  Could you please tell the members of the jury where you were

8    born?

9    A.  I was born in New Delhi, India.

10   Q.  When did you come to the United States?

11   A.  In 1982.

12           THE COURT:  You'll have to speak up.  Would you pull

13   the mic a little closer.

14           THE WITNESS:  In 1982.

15   BY MS. SISKIND:

16   Q.  During what years did you live in the country?

17   A.  From 1982 to 2006.

18   Q.  And during the years nineteen eighty --

19           MR. WEBB:  I can't hear, Your Honor.

20           THE COURT:  Just pull the mic just a bit closer.

21           THE WITNESS:  From 1982 to 2006.

22   BY MS. SISKIND:

23   Q.  And during the years 1982 to 2006, did you become a U.S.

24   citizen?

25   A.  Yes, I did.

224

1  Q.  Approximately when did you become a U.S. citizen?

2  A.  It was in '93 or '94.

3  Q.  Mr. Bhasin, are you nervous about testifying today?

4  A.  Yes, I am.

10:26  5  Q.  Have you ever testified in court before?

6  A.  No, I have not.

7  Q.  Why don't we start with you just telling the jury a little

8  bit about yourself.  Can you start with your educational

9  background?

10:26  10  A.  Sure.  I came to States in 1982.  I studied for four years

11  at City University of New York, worked for a couple of years,

12  and then went back to -- then went to University of Chicago for

13  my MBA from '89 to '91.  And from '91 to 2006 I worked for

14  Citibank in HSBC.

10:26  15  Q.  Particularly what did you do for Citibank?

16  A.  Sure.  Out of my MBA program I joined them as an associate.

17  I was on the trading floor.  There were a number of jobs that I

18  had done for them in my career.  I had been on the trading desk

19  for the mortgage department.  I had been on the trading desk for

10:27  20  the government, trading securities, and then on the derivatives

21  desk -- derivative trading desk.

22  Q.  During what years did you work at Citibank?

23  A.  I worked from '87 through '89, then I took a sabbatical, and

24  then when I came back from my MBA from '91 to 2006.

10:27  25  Q.  During that time period, were you at Citibank the whole time

225

1    or were you with any other financial institutions?

2    A.  No.  I was with Citibank only.

3    Q.  Did there come a time when you came to work for HSBC?

4    A.  Yes.  I joined HSBC in 2002.

10:27  5    Q.  What did you do --

6                MR. SULLIVAN:  Your Honor, I'm even having trouble

7    hearing this.  Is anyone having trouble?

8    BY MS. SISKIND:

9    Q.  You're going to have to keep your voice up so everyone can

10:28  10   hear.

11               THE COURT:  I've just tried to turn up the volume a

12   little more.  So go ahead.  Try to speak up as best you can.

13               THE WITNESS:  Sure, sir.

14   BY MS. SISKIND:

10:28  15   Q.  What year did you start at HSBC?

16   A.  In 2002.

17   Q.  And what did you do for HSBC?

18   A.  I was doing the interest rate trading.  I was working on the

19   interest rate trading derivatives desk.

10:28  20   Q.  Is that the same thing you were doing at Citibank?

21   A.  Yes.

22   Q.  In what geographic location were you working for HSBC?

23   A.  I worked with them from 2002 to 2006 in New York and from

24   2006 to April -- March or April 2007 in London.

10:28  25   Q.  And what did you do after the time that you were with HSBC

226

1  in London?

2  A.  I moved back to India.

3  Q.  What did you do when you moved back to India?

4  A.  I was trying to set up a couple of businesses.  I had tried

5  to set up a steel plant business.  I was looking at setting up a

6  warehousing business.  And after that, I joined a firm there

7  that was an asset management firm.  It didn't work out with them

8  so I left them, and then I started another business which was in

9  biomedical waste.  And in December 2009, I took a job at Royal

10  Bank of Scotland.

11  Q.  Do you currently work for the Royal Bank of Scotland?

12  A.  Yes, I do.

13  Q.  Do you still live in India?

14  A.  Yes, I do.

15  Q.  Even though you live in India, do you own any property in

16  the United States?

17  A.  Yes, I do.

18  Q.  And where is that located?

19  A.  I have one apartment in New York City, and I have a house in

20  Scarsdale, New York.

21  Q.  Do you still have family that lives here in the United

22  States?

23  A.  Yes, I do.

24  Q.  Can you describe which family members you still have here?

25  A.  I have my brother here and his family is here, and I have

227

1    Dr. Ahuja and his whole family is here.

2    Q.  Can you describe to the jury exactly what your relationship

3    is to Dr. Ahuja?

4    A.  My wife is first cousins with his wife.  He's like a brother

5    to me and a father to my children probably.

6           MR. WEBB:  I'm just having trouble.  I couldn't hear

7    the last answer.

8           THE COURT:  Repeat your answer, please.

9           THE WITNESS:  Yes.  I got married in '94.  Our wives

10   are cousins.  They're like first sisters.  I got to know him at

11   that time first as a friend, now more like a brother over the

12   last 10, 12, 15 years.  And he's like a father to my children.

13   BY MS. SISKIND:

14   Q.  During your time working at HSBC, did you become familiar

15   with a division of the bank called NRI Services?

16   A.  Yes, I did.

17   Q.  What does NRI stand for?

18   A.  It's non-resident Indians.

19   Q.  What is the function of the NRI Services of the bank?

20          MR. SULLIVAN:  Your Honor, some of the jurors are

21   raising their hands.

22          THE COURT:  NRI?

23          THE WITNESS:  NRI stands for nonresidents Indians,

24   Indians residing outside the country.

25   BY MS. SISKIND:

228

1    Q.   So what was the function of the NRI Services division?

2    A.   They would help you with all your banking needs if you

3    needed in India.

4    Q.   And what types of people would they help?

5    A.   They would help anybody that wanted an account in India.

6    Q.   Do you know who was eligible for an NRI account?

7    A.   I would think that everybody would be eligible.  I mean, if

8    you wanted to have a bank account in India, that's called a

9    non-resident Indian bank account.

10   Q.   Did there come a time when you opened up an NRI account with

11   HSBC?

12   A.   Yes, I did.

13   Q.   Approximately when did you open that account?

14   A.   It would have to be in 2002 or 2003.

15   Q.   Did you also have an HSBC account in the United States?

16   A.   Yes, I did.

17   Q.   Did you receive statements for your HSBC-United States

18   account?

19   A.   Yes, I did.

20   Q.   Did you receive statements for your NRI account?

21   A.   Yes, I did.

22   Q.   How was your NRI account denominated in terms of currency?

23   A.   Initially it was in dollars, in the middle for a few years

24   it was in dollars and rupees, and when I moved back to India it

25   was all in rupees.

229

1    Q.  How were the funds in your NRI account invested?

2    A.  They were invested in a CD on a fixed deposit.

3    Q.  Did those CDs earn interest income?

4    A.  Yes, they did.

5    Q.  Was that interest income reflected on any statements you

6    received from the bank?

7    A.  No, I did not receive any statements from the bank.

8    Q.  A moment ago I asked you did you receive statements for your

9    HSBC-USA account.

10   A.  On interest income, I did not receive any statements.

11   Q.  Okay.  But listen to my question.

12        Did you receive statements in the mail or some other

13   way from HSBC-USA about your account?

14   A.  Yes, I did.

15   Q.  Did you receive statements from the bank regarding your NRI

16   account?

17   A.  Yes, I did.

18   Q.  When you had CDs, was that reflected on either of those

19   statements?

20   A.  Yes, they were.

21   Q.  On which of those, if any?

22   A.  They were reflected on the India statement.

23   Q.  Did HSBC-India ever issue you a Form 1099 for your interest

24   income?

25   A.  No, they did not.

230

1  Q.  Approximately how much interest income did you earn from the

2  CDs in your India account during the years 2004 through 2009?

3  A.  About 450,000.

4  Q.  Did you file tax returns with the IRS for those years?

10:33  5  A.  Yes, I did.

6  Q.  Did you report your HSBC-India interest income on those tax

7  returns?

8  A.  No, I did not.

9  Q.  Did you tell the IRS on those returns that you had a foreign

10:34  10  bank account?

11  A.  No, I did not.

12  Q.  Did you file a report of foreign bank and financial account,

13  FBAR, to tell the government you had those accounts?

14  A.  No, I did not.  But I did not know I was supposed to file

10:34  15  that.

16  Q.  Do you have an agreement with the government that relates to

17  your testimony here today?

18  A.  Yes, I do.

19  Q.  Can you tell the jury what your understanding of that

10:34  20  agreement is?

21  A.  I have to be truthful.  I have to testify here today.  I

22  have to file -- all the false returns that I had filed, I have

23  to amend them.  I have to pay all interest and taxes and

24  penalties.

10:34  25  Q.  What is your understanding of what will happen if you do all

231

1    of those things?

2    A.  I will not be prosecuted.

3    Q.  What is your understanding of what will happen if you don't

4    tell the truth or you don't do what the agreement requires?

5    A.  I can be prosecuted.

6    Q.  Now, when you were first interviewed by the government

7    before you testified in the grand jury, were you completely

8    truthful with the government?

9    A.  No, I was not.  I was very nervous.  I had taken this call

10   from Switzerland, and I had never gone through anything like

11   this.  It appeared there were a lot of inconsistencies when I

12   started out.  And towards the end of the conversation, we had

13   cleared up all of those inconsistencies.

14   Q.  And from that time when you first spoke with the government

15   going forward, is there anything, to your knowledge, that you

16   stated that was untruthful?

17   A.  (No response.)

18   Q.  After that first conversation with the government until

19   today, is there anything you can recall that might have been

20   untruthful that you told the government?

21   A.  No, I have not.

22   Q.  Now, have you filed the amended tax returns for the years

23   2004 to 2009?

24   A.  Yes, we have.  We were in the process of filing them.  We

25   discovered an error on Saturday.  We notified the DOJ of the

232

1    error.  It appears that my UK income -- UK earned income from

2    HSBC and the taxes associated with that were not on my U.S. tax

3    returns.

4    Q.  And what, if anything, are you doing about that issue right

5    now?

6    A.  Well, my counsel is looking into it.  I do not know what the

7    tax implications of that are.  We will file amended returns.

8    Q.  In terms of the amended returns that you filed already, did

9    you report the interest income that you earned from your

10   HSBC-India account?

11   A.  Yes, I did.

12   Q.  Was there anything else that you added when you filed your

13   amended returns besides the HSBC interest income?

14   A.  Yes, I did.  There were dividend incomes that I had earned

15   in India, there were other interest income of about 25,000,

16   dividend income of about 25,000, and I think wages of about

17   25,000.

18   Q.  And since filing your amended returns, have you been

19   required to pay any additional taxes?

20   A.  Yes.  I think I had paid about 70,000 in taxes.

21   Q.  Now, after you opened your NRI account with HSBC in India,

22   did you ever refer any friends or family members to the bank?

23   A.  Yes, I did.

24   Q.  Who did you refer in?

25   A.  There were a number of friends and family members and

233

1    including Dr. Ahuja.

2    Q.  To your knowledge, did Dr. Ahuja open a bank account, an NRI

3    bank account, with HSBC-India?

4    A.  Yes, I did.  Yes, he did.

10:37  5    Q.  Do you know approximately in what year that would have

6    occurred?

7    A.  No, I don't.

8    Q.  After --

9    A.  Approximately, maybe 2002, 2003 --

10:37 10         MR. WEBB:  I couldn't hear the answer at all.

11         THE WITNESS:  Approximately maybe 2002, 2003, but I do

12   not know exactly.

13   BY MS. SISKIND:

14   Q.  Now, after Dr. Ahuja opened that NRI bank account in India,

10:38 15   did you ever discuss his account with him?

16   A.  No, I did not.

17   Q.  Did you ever generally discuss financial matters with him?

18   A.  We would never get into specifics of how much we each earned

19   or what our taxes were or what our accounts were.  There were a

10:38 20   number of times where we would have general conversations on

21   markets, stocks, investing, but I do not know the specifics of

22   his financials.

23   Q.  Did you ever have any e-mail communications with Dr. Ahuja

24   on the subject of finances or investments?

10:38 25   A.  Many times.

234

1    Q.  What kinds of topics, if you can recall, would be in these

2    e-mails?

3    A.  It would be -- from one end, it would be from the economy,

4    general things, economy, movies, interest rates, many stocks,

5    and to other extremes like normal banter we would discuss and

6    chat about many things on e-mails.

7    Q.  About how frequently would you communicate by e-mail with

8    the defendant about finances or investments?

9    A.  There would be no pattern on this.  There could be times

10   where we could be going back and forth on e-mail four or five

11   times a day, and there could be weeks when we would not talk

12   about it.

13   Q.  Are you familiar with an e-mail address

14   natasha2@bloomberg.net?

15   A.  Yes, I am.

16   Q.  And as far as you know, who uses that e-mail address?

17   A.  Arvind does.

18   Q.  Is that Arvind Ahuja?

19   A.  Arvind Ahuja does, yes.

20   Q.  How about the e-mail address prouddad00@gmail.com?

21   A.  Arvind Ahuja does.

22   Q.  Have you received e-mails from Dr. Ahuja using both of those

23   e-mail addresses?

24   A.  Yes.

25   Q.  Do you know whether Dr. Ahuja trades in the stock market?

235

1    A.  Yes, he does.

2    Q.  How do you know that?

3    A.  We would be on vacations when he would just sort of

4    generally talk about he was doing trades or was busy doing

5    trades.

6    Q.  Have you ever seen or heard him making any trades?

7    A.  I have not seen him.  I might have heard him.

8    Q.  Are you familiar with something called Oxus Fund Management?

9    A.  Yes.

10   Q.  Can you explain to the jury what Oxus Fund Management is?

11   A.  Sure.  As I had mentioned, when I went back to India I was

12   starting to set up different businesses.  This is around

13   2007-2008.  I tried to set up a steel plant, I tried to set up a

14   warehousing business.  Both of those were unsuccessful.  I

15   joined up with a person who had returned from the U.S.  We were

16   trying to set up an asset management firm, and the name of the

17   firm was Oxus Management.

18   Q.  Can you spell Oxus?

19   A.  O-X-U-S.

20   Q.  It's Oxus Fund Management?

21   A.  It could be Oxus Investments.

22   Q.  What, if any, relationship did Dr. Ahuja have to Oxus?

23   A.  In 2007 or '8 I think he had invested -- he had invested

24   with me at Oxus Management.

25   Q.  Do you know how much Dr. Ahuja invested with you at Oxus?

236

1    A.   It was about $1 million.

2    Q.   Are you also familiar with something called HDFC?

3    A.   Yes, I am.

4    Q.   And what's that?

5    A.   HDFC is a bank in India.

6    Q.   How about MF Global?

7    A.   Yes.  MF Global is a stock brokerage in India just like a

8    Charles Schwab here.

9    Q.   Do you know whether Dr. Ahuja had any involvement with

10   MF Global?

11   A.   Yes, he did.  When I left Oxus, I was concerned about the

12   strategy that the fund manager was using, so we at that point in

13   time had called him up.  And I had an account with MF Global

14   that then we decided that it would be better to move the money

15   over to MF Global under his name.  And he wanted me to manage

16   that money.

17   Q.   In what country was the MF Global account located?

18   A.   It was located in India.

19   Q.   What, if anything, did you do to help him manage this

20   account?

21   A.   Well, between 2008 and 2009 I did not have a job, so I was

22   managing the account very actively.  I would be trading in that

23   account.  I had a power of attorney.  I would be making

24   decisions to invest in different stocks and different sectors.

25   Q.   Did any of the investments -- to your knowledge, did any of

237

1   the investments that Dr. Ahuja had through MF Global result in

2   earning income of some kind?

3   A.  Yes.  There would be capital gains and losses and dividends.

4   Q.  And, for example, dividends, if Dr. Ahuja had earned

5   dividends from that account, do you know how he would receive

6   them?

7   A.  Sure.  It would be in two forms.  It would be either in the

8   form of a physical check or it would be in the form of the bank

9   account that was tagged to this account.  So when you tag the

10  account, the dividends goes directly to the bank accounts.  Or

11  it could have also been received in cash -- in check form,

12  depending on the instructions of each of those securities we had

13  put it in.

14  Q.  Now, you said tagged to another account.  Do you know

15  whether Dr. Ahuja connected his MF Global account with any other

16  bank account?

17          MR. WEBB:  I'm going to object.

18          THE COURT:  Objection sustained.

19  BY MS. SISKIND:

20  Q.  Did there come a time when you had to obtain anything to

21  help Dr. Ahuja set up his MF Global account?

22  A.  Sure I did.  Initially when we did the documentation, they

23  had to get a leaf of his bank account so that the instructions

24  on the bank account had to be tagged to his MF Global account.

25  Q.  What do you mean, "a leaf"?

238

1    A.   A check leaf.

2    Q.   What, if any, involvement did you have with that?

3    A.   I go and collect that check leaf from the HSBC account.

4    Q.   When you went to collect it, where did you physically have

5    to go, if anywhere?

6    A.   I think it was their main branch in New Delhi.

7    Q.   Are you familiar with something called DLF?

8    A.   Yes, I am.  DLF is a real estate firm in India.

9    Q.   What, if any, connection do you have to DLF?

10   A.   My wife owns a couple properties there, one with her father

11   and one with Arvind.

12   Q.   Do you know when Dr. Ahuja would have made that investment

13   with DLF?

14           MR. WEBB:  Your Honor, I'm going to object to

15   relevance.

16           THE COURT:  Approach.

17           (At side bar on the record.)

18           THE COURT:  What is the relevancy?

19           MS. SISKIND:  At least one of the letters signed by

20   the defendant that the government is going to introduce that

21   come from the HSBC records show the defendant transferring money

22   from his HSBC-India account to DLF.

23           THE COURT:  At what point in time?

24           MS. SISKIND:  I have to look at the actual letter.

25           THE COURT:  Check it, please.

239

1    MR. WEBB:  My objection goes to there's nothing

2  charged in this indictment about any investment in DLF.  And I

3  don't understand what the relevancy is.  There's nothing charged

4  in this indictment about investment that -- if the government is

5  trying to suggest that there's unreported income from these

6  organizations, what counsel just did with the last series of

7  questions, that's not charged in this indictment and it's not

8  part of the case and I object.  It's very prejudicial, and I

9  object to these lines of questions about areas that are not

10  charged in this indictment, including what was asked about, Mann

11  Financial and what is now being asked about something called

12  DLF.

13    MS. SISKIND:  The defense, it's clear from their

14  opening that one of the arguments is going to be in closing that

15  the defendant did not know that he had bank accounts in India.

16    To counter that argument, the government is going to

17  offer evidence that he actively managed those accounts by, among

18  other things, corresponding with the bank in India, telling them

19  how to move his money around.  The government's going to

20  introduce letters signed by the defendant telling the bank to

21  send money to Oxus, telling the bank to send money to MF Global,

22  and telling the bank to send money to HDFC and to DLF.

23    Those letters the government will use to show that the

24  defendant actively managed his account and that he knew that the

25  account was located in India.  We're not going to offer anything

240

1    about unreported income in any of these.  These are so the

2    jury -- when the jury sees these letters they know what they

3    are.

4           MR. WEBB:  Actually, Counsel just misstated our

5    defense.  I told the jury in opening statement that Dr. Ahuja by

6    2004-2005 knew that this money had been transferred to India.

7    So our defense is not that he didn't know he had money in India.

8    I told the jury.  That's not my defense.

9           And so this is all being offered to try to show that

10   Dr. Ahuja engaged in other bad conduct in India because he had

11   business relationships which are not on his tax return.  He's

12   not contending and he's never contended that he doesn't know

13   that he's got money in India.

14          MS. SISKIND:  We're not suggesting any bad conduct,

15   and I don't think we're going to make any argument that he did

16   anything wrong with DLF --

17          MR. WEBB:  Just brought out --

18          THE COURT:  Go ahead.

19          MR. WEBB:  You just brought out that in Mann Financial

20   he earned profits on trades in that account.  And we have no --

21   I have no account statements or anything from Mann Financial.

22   Nothing to test this whatsoever.  And I don't know why you would

23   bring out that he earned profits on Mann Financial accounts that

24   he was managing and he got dividends unless you're trying to

25   show that he didn't report it on his tax return.

241

1        And, by the way, until right now I didn't know that

2    there was any profits in that account.

3        THE COURT:  Go ahead.

4        MS. SISKIND:  I don't know that there's any profits in

5    that account either.  I simply asked if it was connected to

6    another bank account such that if the defendant did earn

7    dividends where would they go.

8        THE COURT:  Give me a second.

9        (Brief pause.)

10        THE COURT:

11        (End of discussion at side bar.)

12        THE COURT:  I ask that the jury return to the jury

13    room at this time.  Do not discuss this case in the jury room.

14    We'll take a brief recess.  There's another matter I have to

15    take right away.  We'll be back.

16        THE BAILIFF:  All rise.

17        (Recess taken at 10:49 a.m., until 11:26 a.m.)

18        THE COURT:  Be seated, please.

19        I apologize for the interruption, but there was an

20    administrative matter I had to attend to.

21        At side bar we were discussing a line of inquiry by

22    the government to which the defense has objected.  I was looking

23    at the testimony -- I should say the question -- several

24    questions that the government asked and the responses, and it

25    would appear that the questions asked included an inquiry of the

242

1    witness concerning dividends and profits and how the same might

2    be made available to the defendant.  I gather that is the

3    essence of what the defense was getting at in its objection.

4              MR. WEBB:  Your Honor, Your Honor is correct, and let

5    me just flesh that out.  I actually went back as far as the last

6    five minutes of testimony of this witness by the government

7    talked about -- maybe the witness should not be --

8              THE COURT:  One second.  Would you please go to the

9    conference room?

10              (Witness temporarily excused.)

11              THE COURT:  You may proceed.

12              MR. WEBB:  The last five minutes of testimony by the

13    government elicited testimony from this witness -- I wasn't

14    quite sure where this was all going, but they covered Dr. Ahuja

15    having financial transactions with four different companies that

16    I believe have nothing to do with this case:  Oxus Investment

17    Fund, Mann Financial, a bank called HDFC, and a DLF real estate

18    company.

19              The government suggested in its questions -- in some

20    of the questions that these financial dealings may have

21    generated dividends and/or income and that there was some

22    relationship between that and the HSBC accounts.

23              I wanted Your Honor to know there is no charge in this

24    indictment at all that relates to any of those entities

25    whatsoever.  And not only are there no charges, but I couldn't

1   track where they were going because there are no records -- the

2   government has not produced any account records showing that

3   Arvind Ahuja had any account at any of those entities whatsoever

4   as far as I know.  So I got four different financial entities,

5   all of whom we have no financial records showing that he had

6   accounts there.

7          Just take the Mann Financial.  This witness testified

8   he didn't work at Mann Financial, I don't think he has any

9   connection to Mann Financial, and he started speculating that

10  there was dividends and interest that went back into the HSBC

11  account.  And I checked on the break, we have no records of Mann

12  Financial at all, no account records, nothing, and we have no

13  HSBC records showing any transfers like that occurring.

14         So this witness, without any personal knowledge

15  whatsoever, has thrown into the record this mush of information

16  and the only possible reason to do this is to prejudice

17  Dr. Ahuja.

18         And I move for a mistrial or in the alternative to at

19  least strike.  I want struck and the jury told to disregard.

20  Because now this jury is going to be massively confused.  In the

21  opening statement we were told this is a simple case, HSBC

22  interest.  Now we've introduced Oxus Investments, Mann

23  Financial, HDFC, and DLF in India, all those in India,

24  suggesting that Dr. Ahuja has financial relationships with all

25  of them when we've got no account records, zero, in connection

1    with any of those entities.  And I believe it's improper and

2    highly prejudicial.

3              THE COURT:  Ms. Siskind?

4              MS. SISKIND:  First, just to quickly address the

5    personal knowledge issue.  As far as MF Global, Mr. Bhasin just

6    testified he had power of attorney for the defendant on that

7    account.  So I think the foundational issue of personal

8    knowledge has been established.  And he testified he worked at

9    Oxus.

10             Moving onto the relevance issue.  I would direct the

11   court to what was originally charged in the superseding

12   indictment as Counts 2 through 5, which were the false-return

13   counts.  In those counts, the government alleges that the

14   defendant failed to report interest income from one or more

15   bank, securities, and other financial accounts located in India

16   and also that he failed to report the existence -- I'm sorry --

17   failed to report that he had an interest in or a signature or

18   other authority over bank, securities, and other financial

19   accounts in India.

20             Now, the defense filed a motion for a bill of

21   particulars in this case.  The government responded, and our

22   response is at Document 87.  And I would direct Your Honor to

23   page 6 of Document 87.

24             THE COURT:  Hold, please.

25             (Brief pause.)

245

1    THE COURT:  Where in the document?

2    MS. SISKIND:  Your Honor, it goes to page 6 of

3  Document 878, Question Number 3, which is the third line on the

4  page.  The defense asks us to identify by bank and account

5  number the alleged, quote, other undeclared financial accounts

6  in India.  And in our response we indicated MF Global, Oxus Fund

7  Management, and HDFC.

8    And if Your Honor goes to the next page, Question

9  Number 9, we are also asked to identify by bank and account

10  number the accounts for which Ahuja allegedly failed to report

11  holdings and related income.  And our response refers back to

12  our answer to Question 3 which identified MF Global, Oxus Fund

13  Management, and HDFC.

14    THE COURT:  All right.

15    MR. WEBB:  Your Honor, Mr. Kirsch has the document.

16  Would it be acceptable for him to respond to this?

17    THE COURT:  Go ahead.

18    MR. KIRSCH:  Just very briefly.  What the government

19  is trying to do is prove Count 1 of the conspiracy.

20  Paragraph 25 of the superseding indictment, Count 1, charges

21  that it was further part of the conspiracy that Ahuja used funds

22  from his undeclared HSBC accounts to make investments in India

23  and to open other undeclared financial accounts in India.

24    So what they're trying to do with this witness is tie

25  HSBC accounts to other accounts in India, which is Paragraph 25

246

1    of the indictment which is out.  Your Honor, they can't prove

2    the conspiracy after they dismissed it.

3              THE COURT:  Well, I don't believe this is necessarily

4    for the exclusive purpose of proving a conspiracy that is no

5    longer part of this case.  As the government has argued, the

6    remaining counts include an assertion that your client had

7    control over one or more accounts in India.  And it would appear

8    from the information just cited in Document 87 that this was

9    disclosed to the defense in response to your request for a bill

10   of particulars.

11             Hence, the objection is overruled to that extent.

12             Go ahead, Mr. Webb.

13             MR. WEBB:  Just briefly.  The testimony that he gave

14   that Mann Financial account where he never -- he said he had a

15   power of attorney, there's no foundation laid that he actually

16   has account statements and knows what profits or dividends were

17   earned from Mann Financial that somehow are not reported on

18   Dr. Ahuja's tax returns.

19             THE COURT:  Well, that doesn't mean that the testimony

20   is inappropriate or inadmissible at this stage.  If it should be

21   established that he does not have a proper foundation for the

22   testimony that he has given, you can -- you certainly have

23   options available to you.  Those options remain on the table.

24             The jury will be called in and we'll proceed.

25             THE BAILIFF:  The witness first?

247

1    THE COURT:  Oh, yes, the witness should be brought in

2  first.

3    Mr. Bhasin, please be sure to keep your voice up.

4    THE WITNESS:  Sure, thank you.

11:37  5    (Witness resumes the stand.)

6    THE BAILIFF:  All rise.

7    (Jury in at 11:37 a.m.)

8    THE BAILIFF:  Please be seated.

9    THE COURT:  Proceed.

11:38  10  BY MS. SISKIND:

11  Q.  Mr. Bhasin, I just want to remind you to keep your voice up

12  and speak slowly so we make sure the jury hears everything you

13  have to say, okay?

14  A.  Okay.

11:38  15  Q.  Before we took the break you were explaining what DLF retail

16  is.  Can you tell the jury again what DLF is?

17  A.  DLF is a large private real estate developer.  It's traded

18  on the Stock Exchange.  We bought two commercial properties from

19  them.  One is owned by my wife and her father, and one is owned

11:38  20  by my wife and Arvind.

21  Q.  That's Arvind Ahuja?

22  A.  Arvind Ahuja, yes.

23  Q.  Do you still have those investments?

24  A.  Yes, I do.

11:39  25  Q.  Moving on to a different subject, are you familiar with an

248

1   address in New Delhi, India, at 94, Jorbagh Street?

2   A.  Yes, I am.

3   Q.  And is that spelled J-O-R-B-A-G-H?

4   A.  Yes.

5   Q.  Who lives at 94, Jorbagh Street?

6   A.  My father-in-law.

7   Q.  And what is your father-in-law's name?

8   A.  Ravinder Varma, R-A-V-I-N-D-E-R, V-A-R-M-A.

9   Q.  To your knowledge, did Dr. Ahuja ever live at 94, Jorbagh

10  Street?

11  A.  No, he did not.  He would visit there and stay there.

12  Q.  Do you know whether he used that address for any other

13  purpose?

14  A.  The MF financial and the DLF properties might be addressed

15  to that address.

16  Q.  What do you mean the properties might be addressed to that

17  address?

18          MR. WEBB:  Your Honor, I'm going to object to

19  speculation if we don't have any documents or records.

20          THE COURT:  If there is no foundation, you can move to

21  strike.

22          MS. SISKIND:  I'll move on, Your Honor.

23          THE COURT:  Proceed.

24  BY MS. SISKIND:

25  Q.  Going to a different subject, did you ever assist the

249

1    defendant -- assist Dr. Ahuja with withdrawing cash from his

2    HSBC-India account?

3    A.  Yes, I did.

4    Q.  Can you describe what you did, to the jury?

5    A.  Sure.  It would have been probably where Dr. Ahuja would

6    have asked me to go to the bank account, to go to the bank

7    branch and withdraw the money from there.

8    Q.  Did you ever -- was Dr. Ahuja with you when you withdrew

9    cash from his account?

10             MR. WEBB:  Your Honor, I just object to foundation.

11   Time, date, place.

12             THE COURT:  Sustained.

13   BY MS. SISKIND:

14   Q.  Do you recall approximately when it would have been that you

15   assisted Dr. Ahuja as you just testified?

16   A.  I believe it would have been on one of his vacation trips.

17   I don't specifically recollect it, but I do remember that I had

18   gone and withdrawn cash for him.

19   Q.  Would that have been before or after you moved back to

20   India?

21   A.  Definitely after.

22   Q.  And what year was that again?

23   A.  I moved back in -- after March 2007.

24   Q.  Are you familiar with the address number 408 Romney House,

25   R-O-M-N-E-Y, on 47 Marsham Street in London?  That's

250

1  M-A-R-S-H-A-M.

2  A.  Yes, I am.

3  Q.  What is your familiarity with that address?

4  A.  That is a service apartment that I lived in when I was in

5  London from August and September 2006 to March or April 2007.

6  Q.  During the time period that you were living in London at

7  that address on Marsham Street, did Dr. Ahuja ever visit you

8  there?

9  A.  Yes, he did.

10  Q.  On approximately how many times did he visit you there

11  during that time you were living in the apartment?

12  A.  I think he had taken one vacation while we were there.  So

13  he would have come over many times to the house.

14  Q.  During that one vacation?

15  A.  During that one vacation.

16  Q.  And how about after you moved back to India?  Did you ever

17  have occasion to travel with Dr. Ahuja to London?

18  A.  Yes, once more.

19  Q.  And do you remember when that was?

20  A.  I think it was January 2010.  It was at my wife's 40th

21  birthday.

22  Q.  And who was on that trip?

23  A.  It was my family and Dr. Ahuja's family.  We were together

24  with our kids.

25  Q.  Now, during either time he visited you at Marsham Street,

251

1    during that trip or when you went to London for your wife's

2    birthday, did you ever see him withdraw cash in London from any

3    bank?

4    A.  Yes, I did.

5    Q.  And what bank was that?

6    A.  It was an HSBC Bank.

7    Q.  Now, I want to take you then to the summer of 2009.  Did you

8    have occasion to travel to the United States that summer?

9    A.  Yes, I did.  I was on vacation in the month of June 2009.

10   Q.  And during your vacation to the United States in June of

11   2009, did you see Dr. Ahuja?

12   A.  Yes, we did.  We stayed with them and we traveled with them.

13   Q.  Where did you travel?

14   A.  We traveled to California.

15   Q.  During the time that you were in the United States visiting

16   with Dr. Ahuja during June of 2009, did Dr. Ahuja ever say

17   anything to you about Forms 1099?

18   A.  Yes.  Once I was at a golf course with him, I was about to

19   tee off, and he said that he had received a 1099 from Citibank.

20   Q.  Did he say anything else?

21   A.  No, it was nothing else was said.

22   Q.  How did that statement come up in the course of playing

23   golf?

24   A.  It was very abrupt.  I was at the tee box.  And then we

25   moved on.

252

1    Q.   Prior to that conversation on the golf course in June of

2    2009 in California, had Dr. Ahuja ever told you about receiving

3    Forms 1099 from any bank?

4    A.   No, he has never.  I have never spoken to him about that.

11:44  5    Q.   And since that conversation in June of 2009 on the golf

6    course, has he ever mentioned Forms 1099 to you again?

7    A.   No, he has not.

8            MS. SISKIND:  Your Honor, may I approach the witness

9    with an exhibit?

11:44  10           THE COURT:  You may.

11           MS. SISKIND:  I'm going to hand you what has been

12   marked as Government Exhibit 8.

13           (Document tendered to the witness.)

14   BY MS. SISKIND:

11:45  15   Q.   And, Mr. Bhasin, if you could, take a look at that and tell

16   us if you recognize what is in Government Exhibit 8.

17   A.   Yes.  It is an e-mail from Arvind to me.

18   Q.   I'm sorry.  An e-mail from Arvind?

19   A.   Arvind Ahuja to my e-mail account, ramitbhasin@gmail.com.

11:45  20   Q.   What is the date of the e-mail?

21   A.   It's Saturday, July 4th, 2009.

22   Q.   And we'll get into the specifics in a minute, but generally

23   what is this e-mail regarding?

24   A.   There's no text to it.  It has an attachment.  And it says

11:45  25   HSBC Swiss bank asked clients to surrender secrecy.

253

1          MS. SISKIND:  Your Honor, the government moves to

2     admit Exhibit 8.

3          MR. WEBB:  My only objection is relevancy, Your Honor.

4          THE COURT:  Overruled.  Received.

5          (Exhibit 8 received in evidence.)

6          MS. SISKIND:  Your Honor, may we publish it on the

7     screen?

8          THE COURT:  Proceed.

9     BY MS. SISKIND:

10    Q.  Starting where it says "forwarded message," can you tell the

11    jury what they're looking at here?

12    A.  It says:  from Arvind Ahuja, natasha2@bloomberg.net,

13    Saturday, July 4th, 2009, no subject, to my e-mail address.

14    Q.  If we can look a little farther down the page, does this

15    e-mail contain any text?

16    A.  No, it does not.

17    Q.  Going back up to the top of the page for a minute, can you

18    just explain to the jury why it says "Geoffrey A. Cook" at the

19    top?

20    A.  Yes, it was sent from my e-mail address to Mr. Cook.

21    Q.  And is that the agent sitting in the courtroom?

22    A.  That's right.

23    Q.  Today?

24    A.  That's right.

25    Q.  And when did you send this to Agent Cook?

254

1    A.   It was April 12th, 2011.

2    Q.   Was there something in particular that happened on that

3    date?

4    A.   It was a date of the grand jury.

11:47    5    Q.   Is there anything attached to this e-mail?

6    A.   Yes, there is an attachment.

7    Q.   Let's take a look at that attachment.  Can you read -- it's

8    hard to see on the screen -- can you read the first two

9    paragraphs of this to the jurors?

11:47    10   A.   Sure.  HSBC's --

11             MS. SISKIND:  Maybe if we switch over to the Elmo.

12             THE COURT:  Let's try it.

13             MS. SISKIND:  Can everyone see that?

14   BY MS. SISKIND:

11:48    15   Q.   All right.  Mr. Bhasin, if you can start again.  First --

16             THE COURT:  Is it centered on your screens?

17             A JUROR:  The screen is strange.

18             THE COURT:  Howard, would you check it out, please.

19             (Brief pause.)

11:49    20             THE COURT:  Are all the screens out of sync?

21             MS. SISKIND:  May I proceed, Your Honor?

22             THE COURT:  Yes.

23   BY MS. SISKIND:

24   Q.   Mr. Bhasin, why don't you start actually by telling us --

11:50    25   telling the jury where this article comes from, if you know.

255

1    A.  This article comes from Bloomberg, it says below here.

2    Q.  And how can you tell?  Is there something in particular

3    about this that you can tell that it comes from Bloomberg?

4    A.  I use Bloomberg quite often and therefore I've seen this.

5    It's a news wire item.

6    Q.  Prior to this e-mail or after this e-mail, had Dr. Ahuja

7    ever sent you Bloomberg news articles?

8    A.  Many times.

9    Q.  And on what types of topics?

10   A.  It would reach from anything.  It could be Giants winning

11   the Superbowl.  It could be anything.

12   Q.  What is your understanding of Dr. Ahuja's use of Bloomberg?

13         MR. WEBB:  Well, objection.  I object to the form of

14   the question.

15         MS. SISKIND:  I'll rephrase.

16         THE COURT:  Objection sustained.

17   BY MS. SISKIND:

18   Q.  Are you familiar with something called the Bloomberg

19   terminal?

20   A.  Yes, I am.

21   Q.  What is a Bloomberg terminal?

22   A.  It's a stand-alone machine with a keypad, and it's

23   especially dedicated to Bloomberg service.  And it can be

24   downloaded either on a stand-alone basis or on to your computer.

25   Q.  Do you know whether Dr. Ahuja had a Bloomberg terminal,

256

1    either stand-alone or on his computer?

2    A.   Yes, he did.

3    Q.   And how do you know that?

4    A.   I think I've seen -- it has a very special keypad, and I've

5    seen that attached to one of his computers at his home.

6    Q.   Now, let's look at this article in particular.  What is the

7    date of this article?

8    A.   It says July 3rd, 2009.

9    Q.   And if you look back just quickly at the first page with the

10   e-mail, on what date did Dr. Ahuja send it to you, again?

11   A.   July 4th, 2009.

12   Q.   Now going back to the e-mail that's in front of you and on

13   the screen for the jurors, please read the first three

14   paragraphs of the news article that Dr. Ahuja sent you on

15   July 4th of 2009.

16   A.   "HSBC holdings PLC's Swiss private bank last September asked

17   clients and independent money managers to surrender their right

18   to banking secrecy protection in order to keep securities

19   invested in 28 countries.

20        "In countries where rules demand investor disclosure,

21   HSBC asked for permission to hand over the names of clients that

22   want to keep their investments, the Geneva-based bank said in a

23   letter that it e-mailed to Bloomberg News today.  Those

24   countries included Brazil, China, India, and Greece.

25        "Credit Suisse Group AG is also asking clients holding

257

1   French securities to let it release their details to France's

2   financial regulator.  While both banks are seeking to comply

3   with securities regulations, the moves may increase investor

4   concern after Swiss banking secrecy came under attack from the

5   U.S. and Europe this year."

6          MS. SISKIND:  I have no further questions, Your Honor.

7   May I retrieve the exhibits?

8          THE COURT:  You may.

9          MR. WEBB:  May I proceed, Your Honor?

10         THE COURT:  You may.

11                        CROSS-EXAMINATION

12  BY MR. WEBB:

13  Q.  Sir, my name is Dan Webb, and I'm one of the lawyers that

14  represents Dr. Ahuja in this case.  You and I have not met each

15  other; is that correct?

16  A.  We have not.

17  Q.  And I have some questions for you about your testimony.  If

18  I ask you a question that you don't understand or if I talk too

19  quickly, just stop me and I'll repeat the question.

20  A.  Thank you.

21  Q.  I just want to clarify some fundamental issues.  Am I

22  correct, at any time did you ever tell Dr. -- Strike that

23  question.

24         You talked about 1099 forms on your direct

25  examination; is that correct?

258

1    A.  That is correct.

2    Q.  At any time did you ever tell Dr. Ahuja that HSBC would not

3    be providing 1099 forms to Dr. Ahuja in connection with his HSBC

4    CDs?

11:55    5    A.  No, I did not.

6    Q.  As far as 1099 forms are concerned, at any time did

7    Dr. Ahuja ever tell you that he was aware that he was not

8    receiving 1099 forms from HSBC in connection with HSBC CDs?

9    A.  No, he did not.

11:56    10    Q.  And, sir, at any time did you ever tell Dr. Ahuja that HSBC

11    was not providing you with 1099 forms in connection with your

12    HSBC CDs?

13    A.  No, I did not.

14    Q.  So you never had any discussions with him at all about HSBC

11:56    15    1099 forms; is that correct?

16    A.  That is correct.

17    Q.  Now, over the years am I correct the only conversations that

18    you ever had with Dr. Ahuja about his HSBC CDs were occasionally

19    conversations with Dr. Ahuja in which he would sometimes

11:56    20    complain a little bit about service issues?

21    A.  That would be correct.

22    Q.  Thank you.  Now, I want to talk to you just for a few

23    minutes about the non-prosecution agreement that the government

24    asked you about on direct examination.  Okay?

11:57    25    A.  Okay.

259

1   Q.  Now, you told the jury that -- on direct examination that

2   you are here testifying under what is called a non-prosecution

3   agreement; is that correct?

4   A.  That is correct.

11:57  5   Q.  And that's an agreement that you and your lawyer negotiated

6   with the prosecutors at this table that they negotiated with you

7   and your lawyer; is that correct?

8   A.  That is correct.

9   Q.  And I'm going to show you that non-prosecution agreement.

11:57  10          Tom, can I have that exhibit?

11          MR. KIRSCH:  What's the tab?

12          MR. WEBB:  1.

13          Your Honor, may I approach the witness to hand him an

14  exhibit?

11:58  15          THE COURT:  You may.

16  BY MR. WEBB:

17  Q.  Sir, I'm handing you what is marked as Defendant's Exhibit

18  Number 2 --

19          THE COURT:  Just hand him the exhibit and go back to

11:58  20  the lectern.  That will be helpful.

21  BY MR. WEBB:

22  Q.  Sir, I've handed you an exhibit that's marked as Defendant's

23  Exhibit Number 2008.  Do you see that?

24  A.  Yes, sir.

11:58  25  Q.  And I'll give you an opportunity to look at this document

260

1    and ask you if this is your non-prosecution agreement.

2    A.  Yes, it is.

3    Q.  And did you sign the non-prosecution -- if you go to the

4    last page of the document, or the next-to-last --

5    A.  Yes, I did.

6    Q.  The last page of the document, do you see that you signed

7    this document?  Is that correct?

8    A.  That is correct.

9    Q.  And your lawyer signed the document; is that correct?

10   A.  That is correct.

11   Q.  And then the previous page you see that the prosecutors,

12   Tracy Johnson and John Sullivan, they signed the page, the

13   agreement.  Correct?

14   A.  That is correct.

15           MR. WEBB:  Your Honor, I offer this into evidence.

16           MS. SISKIND:  No objection, Your Honor.

17           THE COURT:  It's received.  2008.

18           MR. WEBB:  I'm offering into evidence Exhibit

19   Number 2008.

20           (Exhibit 2008 received in evidence.)

21   BY MR. WEBB:

22   Q.  Now, if I look --

23           MR. WEBB:  Can I call up the first page of that

24   document, James, please, for the jury to see?

25   BY MR. WEBB:

261

1   Q.  If you look at the first page of the exhibit, sir --

2           MR. WEBB:  James, can you call out the first

3   paragraph?  There, thank you.

4   BY MR. WEBB:

12:00   5   Q.  If you look at the first paragraph of that exhibit, there

6   is -- I'm going to read the first sentence to you, sir, just to

7   focus you on what I want to ask.

8           The first sentence:  "On the understandings specified

9   below, the Department of Justice, tax division, and the United

12:00   10   States Attorney's office for the Eastern District of Wisconsin,

11   collectively hereinafter the government, will not criminally

12   prosecute Ramit Bhasin for any crimes related to his ownership,

13   signature authority, or control over undeclared offshore

14   accounts that he has disclosed to the government for tax years

12:01   15   2004 and 2009, including accounts maintained at HSBC in India."

16           Do you see that, sir?

17   A.  Yes, that is correct.

18   Q.  Okay.  Now, so you understand that the government in this

19   agreement has agreed that the government will not criminally

12:01   20   prosecute you for the tax crimes described in this paragraph; is

21   that correct?

22   A.  That is correct.

23   Q.  These are tax crimes that you admitted to the government you

24   did commit for the years 2004 through 2009; is that correct?

12:02   25   A.  That is correct.

1    Q.  And when you -- under the terms of this agreement, you will

2    never face criminal prosecution for those tax crimes that you

3    admitted to the government; is that correct?

4    A.  That is correct.

12:02  5    Q.  And do you agree that the government has given you a very

6    valuable benefit by promising you that they will not prosecute

7    you for those crimes?

8    A.  Yes, I do.

9    Q.  And you recognize that if the government had prosecuted you

12:02  10   for those crimes you could have faced a lengthy jail sentence

11   and you will not face that now; is that correct?

12             MS. SISKIND:  Objection, Your Honor.  Can we approach?

13             THE COURT:  Approach.

14             (At side bar on the record.)

12:03  15            MS. SISKIND:  I'm in no way attempting to interfere

16   with Mr. Webb's perfectly acceptable right to cross-examine this

17   witness on his agreement.  I just want to make sure -- there's

18   certainly an issue with the jury knowing that jail time is a

19   possibility for these crimes.  And there's certainly a line

12:03  20   between cross-examining him on his non-prosecution agreements

21   and suggesting that the crimes which are the very crimes the

22   defendant is charged with can result in jail time, which is

23   certainly not a proper consideration for the jury.

24             MR. WEBB:  I wasn't -- I have to cross-examine this

12:03  25   witness on bias.  The bias --

263

1    THE COURT:  I understand.  The objection is overruled.

2    MR. WEBB:  Thank you.

3    THE COURT:  But you are on notice that you shouldn't

4    get into the particulars of the penalty.

5    MR. WEBB:  I just am going to -- that's why I used the

6    term "a substantial jail sentence" so I would not violate any --

7    Is that all right?

8    THE COURT:  I understand.  That's fine.

9    (End of discussion at side bar.)

10   THE COURT:  You may proceed.

11   MS. SISKIND:  Thank you.

12   BY MR. WEBB:

13   Q.  I'll just ask you the same question again.  If you forgot

14   the question I was just asking you, I take it that you were

15   aware when you entered into this agreement that if the

16   government had prosecuted you for the tax crimes that you

17   admitted you committed that you could face a substantial period

18   of time in jail.  Is that correct?

19   A.  I would say yes.

20   Q.  And did you consider the fact that you were not going to be

21   prosecuted and therefore you would not face a substantial period

22   of time in jail?  Did you consider that to be a significant

23   valuable benefit to yourself?

24   A.  Yes, I did.

25   Q.  Now, I want to talk to you about another benefit that I

264

1   think you received from this non-prosecution agreement, and that

2   is the benefit of keeping your job at the Royal Bank of

3   Scotland.  Let me start with this.

4           You are currently employed at the Royal Bank of

5   Scotland; is that correct, sir?

6   A.  Yes, I am.

7   Q.  And as of today as you sit here in our courtroom testifying,

8   you are still employed in that industry at that bank today; is

9   that right?

10  A.  That is correct.

11  Q.  In fact, I think your current job title, if I have it

12  correct, is that you are the head of markets for India and

13  Southeast Asia.  Is that the proper title?

14  A.  Plus I'm also responsible for all offshore trading.

15  Q.  Offshore trading?

16  A.  For all offshore -- by "offshore," I mean the seven

17  countries the Royal Bank of Scotland is in Asia-Pacific region.

18  That's Malaysia, Indonesia, Thailand, China, Korea, and India.

19  Q.  And I don't intend to get into details, but it's fair to say

20  that you believe you earn a good living for you and your family

21  from that job; is that correct?

22  A.  Yes.

23  Q.  And that job, by the way, is important enough that you

24  actually sometimes get quoted in certain financial publications;

25  is that correct?

265

1    A.   Yes.   People ask me many, many times on my opinions on the

2    markets.

3    Q.   And for example, I think I saw that you actually have been

4    on CNBC on occasion.   Is that correct?

12:07   5    A.   Many times.

6    Q.   And so if the government had prosecuted you for the tax

7    crimes of filing false income tax returns, you would have lost

8    your job at the Royal Bank of Scotland; is that correct?

9    A.   Most likely.

12:07   10   Q.   Because the Royal Bank of Scotland is a regulated bank, and

11   there's rules and regulations that would have led to your

12   termination; is that correct?

13   A.   Most likely.

14   Q.   And in fact, if the government had prosecuted you for the

12:08   15   tax crimes and you had lost your job at the Royal Bank of

16   Scotland because of your conviction, it would probably have been

17   very difficult for you to get another job in the banking

18   industry; is that correct?

19   A.   That would be correct.

12:08   20   Q.   And you pretty much have spent your entire adult life in the

21   banking industry to earn a living; is that correct?

22   A.   Other than the three years I was in India doing my own

23   businesses.

24   Q.   I said most of your life has been in banking.   Is that

12:08   25   correct?

266

1    A.   I would agree with that.

2    Q.   Now, have you disclosed this non-prosecution agreement to

3    the Royal Bank of Scotland?

4    A.   No, I have not.

5    Q.   So they don't know that you have this agreement.

6    A.   That is correct.

7    Q.   And if your bank knew that you had this agreement you would

8    probably be terminated; is that correct?

9    A.   I do not know that because I've not been charged for

10   anything.  I would have to be guilty of something before they

11   could do that.

12   Q.   Well, then why have you not disclosed this to your employer?

13   A.   Because I'm not supposed to.

14        I don't understand the question.

15   Q.   If you're being honest with your employer, do you think you

16   should tell your employer that you have admitted that you

17   committed serious tax crimes and got a non-prosecution

18   agreement?

19   A.   From what I understand, these are called tax adjustments.

20   And because I've not been charged for either criminal or civil

21   charges, therefore I don't need to disclose this.

22   Q.   Do you think being honest with your employer that you should

23   have disclosed this to your employer?

24   A.   I would think that this would be in the personal domain.

25   This is not in a regulated domain, so I have not done anything

267

1    wrong that I needed to disclose.

2    Q.  Sir, I'm not trying to argue.  You have admitted to the

3    jury, you admit that you have committed serious tax crimes in

4    the United States; is that correct?

5    A.  Yes.  By not filing -- by filing false returns.  Yes, I

6    have.

7    Q.  And you then got a non-prosecution agreement so you would

8    not be prosecuted; is that correct?

9    A.  That is correct.

10   Q.  And so the fact that you actually have admitted here in the

11   United States that you committed serious tax crimes, don't you

12   think the Royal Bank of Scotland would like to know that?

13   A.  I don't know how to answer that question.

14   Q.  Well, dig down kind of keep and think about it.  Don't you

15   think your bank would like to know if one of their top

16   executives has been convicted -- Strike that; I'm sorry -- has

17   been admitted that you committed serious tax crimes and you got

18   a non-prosecution agreement?  Don't you think your bank, the

19   Royal Bank of Scotland, would like to know that?

20   A.  I would say yes, maybe.

21   Q.  And you've chosen to conceal it from them; is that correct?

22   A.  I was not told that I was supposed to tell this.

23   Q.  Pardon me?

24   A.  I was not told that I'm supposed to tell this or that I'm --

25   I mean, these are personal matters.

268

1  Q.  Did the government tell you that you did not need to

2  disclose this to your bank?

3  A.  I've never discussed this with the government.

4  Q.  Did you tell the government that you had not disclosed to

12:11  5  the banking industry that you have admitted tax crimes and

6  you're still working in the banking industry?

7  A.  No, I've never told them that.

8  Q.  In return for the benefits that we've just described to the

9  jury, in return for those benefits you agreed to testify against

12:12  10  Dr. Ahuja.  Did you describe him as someone like a brother?

11  A.  Yes, I did.

12  Q.  You've agreed to testify against him in this proceeding; is

13  that correct?

14  A.  That is correct.

12:12  15  Q.  And but in order for you -- so the jury -- in order for you

16  to get this non-prosecution agreement from the government, you

17  had to convince the United States Department of Justice that you

18  had valuable testimony against Dr. Ahuja before they would give

19  you this agreement; is that correct?

12:12  20       MS. SISKIND:  Objection, Your Honor.  Calls for

21  speculation on what he might have to convince us of.

22       THE COURT:  Objection sustained.

23  BY MR. WEBB:

24  Q.  Well, let me ask you factually what happened.  Am I correct

12:12  25  what happened here is that in order -- in order for you to get

269

1    this agreement from the government, you had to go through a

2    process whereby you would tell -- whereby you did tell the

3    government in advance what you would have to offer in the way of

4    testimony against Dr. Ahuja before they would give you this

5    agreement?  Is that correct?

6    A.   These are technical questions, but I'll try to answer it the

7    best I can.

8         I had a conversation, a proffer, I don't know what

9    that's -- it's a proffer, a conversation.  I was asked many

10   questions to the best of my knowledge, and truthfully I answered

11   those.  After that, my lawyer and the Department of Justice came

12   up and said that this would be the agreement that was offered.

13        So I'm not sure what you're asking me.  I have never

14   spoken to the Department of Justice trying to convince them that

15   I should be given this.  Maybe my attorney has.  I'm not sure

16   about that.  I had a conversation, the next conversation I had

17   was before grand jury, and I had a conversation on Saturday.

18   That's the only conversations I've had with the Department of

19   Justice.

20   Q.   Let me unpack that a little bit so the jury understands.

21        You did go through a process of making what was called

22   a proffer of evidence; is that correct?

23   A.   If that is referred to the conversation, first conversation

24   I had with them, yes.

25   Q.   Yes.  At that time they had not yet agreed to give you what

1    you wanted; is that right?

2    A.   Agreed to give me what I want?

3    Q.   Did you want a non-prosecution agreement?

4    A.   We were just talking to them at that point in time.  I'm not

5    sure I was asking anything at that point in time.  I was just

6    having a conversation, is what I had understood from my lawyer.

7    Q.   Did you want a -- did you want the government to agree not

8    to prosecute you?

9    A.   Absolutely.

10   Q.   You wanted that, didn't you?

11   A.   I've already said that many times.

12   Q.   You wanted the agreement from the government, and you were

13   told that before they would agree to this they wanted to meet

14   with you and you would make a proffer; is that right?

15   A.   No, that was not correct.

16        I met them for the proffer and I believe this

17   agreement was given to me after the proffer, not before.  I did

18   not meet and agree with anything with them before.

19   Q.   That's what I'm -- let me try to be clear in my question.

20        At the time you met with the government and made a

21   proffer of evidence, you did not yet have this non-prosecution

22   agreement.

23   A.   That's correct.

24   Q.   Is that right?

25   A.   That is absolutely correct.

271

1    Q.  But you wanted a non-prosecution agreement.

2    A.  Yes.  I've already stated that many times.

3    Q.  I know.  So -- but when you met with them to give the

4    proffer, did you understand you were providing them with an

5    offer of evidence that they would consider in whether they would

6    give you this non-prosecution agreement?

7    A.  That would be fair to say.

8    Q.  Is that correct?

9    A.  Yes, that would be fair to say.

10   Q.  That's my point.

11   A.  That's fair to say.

12   Q.  So at that point in time, in fact, you actually signed an

13   agreement that you would give them an advanced proffer so they

14   could evaluate whether to give you this agreement; is that

15   right?

16   A.  That would be correct.

17            MR. WEBB:  Tom, can I have Tab 19?

18            May I approach the witness, Your Honor?

19            THE COURT:  You may.

20            (Document tendered to the witness.)

21   BY MR. WEBB:

22   Q.  Sir, I have now handed you another exhibit.  This one is

23   marked Defendant's Exhibit 2006.  Do you have that in front of

24   you now, sir?  Do you see the exhibit number at the bottom?

25   A.  Yes, I do.

272

1    Q.   And this is a document that at least says it's a proffer

2    agreement; is that correct?

3    A.   That is correct.

4    Q.   And if you go to the second page of that document, I believe

12:17  5    you'll see your signature and your lawyer's signature and

6    signatures of John Sullivan; is that correct?  Do you see the

7    second page?

8    A.   Yes, sir, that is correct.

9    Q.   Am I correct your signature is there?

12:17  10   A.   That's right, sir.

11   Q.   And John Sullivan, one of the prosecutors in this case, his

12   signature is there?

13   A.   That is correct.

14   Q.   And is the date March 10th?

12:17  15   A.   That is correct.

16   Q.   2011; is that correct?

17   A.   That is correct.

18           MR. WEBB:  I offer this into evidence.

19           MS. SISKIND:  No objection, Your Honor.

12:17  20           THE COURT:  It's received.

21           (Exhibit 2006 received in evidence.)

22   BY MR. WEBB:

23   Q.   Now, sir, this exhibit -- am I correct you signed this

24   agreement to make this proffer of evidence because you were

12:18  25   hoping that you would get eventually a non-prosecution

273

1    agreement?  Is that correct?

2    A.  Yes, sir.

3    Q.  And on this date, March -- where were you when you signed

4    the agreement --

5              MR. WEBB:  Can I call the first page of this exhibit

6    up, please?

7    BY MR. WEBB:

8    Q.  The heading on the agreement is "Proffer Agreement"; is that

9    correct?

10   A.  That is correct.

11   Q.  It's dated March 10th, 2011.

12            Where were you when you signed this document?

13   A.  I do not remember that, whether I was in India and this

14   document came to me when I signed it or whether I was in

15   Liechtenstein, Switzerland, when I signed it with my attorney.

16   Q.  Sir, I'm going to -- do you remember on the same day --

17   A.  Can I read this?

18   Q.  Of course, you can.  I'll wait till you're finished.

19            (Witness peruses document.)

20   A.  I probably would have been in Switzerland when I signed

21   this.

22   BY MR. WEBB:

23   Q.  You were in Switzerland?

24   A.  Yes, when I did the proffer.

25   Q.  So on the same day that you signed this, on the same day

274

1    that you signed this, you gave an interview to government

2    lawyers; is that correct?

3    A.  That would be correct.

4    Q.  And was that by telephone?

5    A.  That is correct.

6    Q.  You were in Switzerland?

7    A.  That is correct.

8    Q.  And the government prosecutors were in D.C., to the best of

9    your knowledge?

10   A.  That is correct.

11   Q.  You knew during that offer of evidence that you were going

12   to have to help the government develop evidence against

13   Dr. Ahuja or you would not get your non-prosecution agreement;

14   is that correct?

15   A.  That is not correct.

16   Q.  Well, did the government when they questioned --

17   A.  When I started the conversation, I thought it was all about

18   me.

19   Q.  Well, during the course of the interview, did they ask you

20   questions about Dr. Ahuja?

21   A.  They did.

22   Q.  In fact, did it appear to you that their questions were

23   focused on Dr. Ahuja?

24   A.  Yes, I would say that.

25   Q.  Were you concerned that day that if you did not give the

275

1    government something valuable that they would not give you your

2    non-prosecution agreement?

3    A.  My honest answer, sir, I've been very scared of this whole

4    process.  At no point in time was I thinking -- I was only

5    thinking of telling the truth, and that's when I agreed to have

6    the conversation with them.  It was not about trying to get

7    something out of something.  I was just trying to give

8    information that was asked of me, and truthfully.

9    Q.  If we look -- well, let me ask you --

10   A.  I did not know at that point in time that I would get the

11   other part right.

12   Q.  You did not know what?

13   A.  That I would get this agreement.

14   Q.  But you were making the proffer to get the agreement.  You

15   wanted the agreement, right?

16   A.  My proffer was about my own case.  Maybe I'm a little

17   confused here.  I'm sorry.  I don't understand.

18   Q.  Let me read --

19   A.  When we started this conversation, I had gone there to talk

20   about my case.  It's very fair to say that the majority of that

21   conversation happened to be about Dr. Ahuja, but I had gone -- I

22   did not have the understanding that I was going there to speak

23   about Dr. Ahuja to get a agreement, a non-prosecution agreement.

24   Q.  Well, let's see what the proffer says.  Do you see Paragraph

25   Number 1, sir?

276

1          MR. WEBB:  James, can you call that up?

2    BY MR. WEBB:

3    Q.  Paragraph Number 1 says:  "This is not a cooperation

4    agreement.  The client has agreed to provide the government with

5    information and to respond to questions so that the government

6    may evaluate the client's information."

7          Do you see that?

8    A.  Yes, sir.

9    Q.  The government wanted to evaluate what you told them; you

10   understood that.  Is that correct?

11   A.  That is correct.

12   Q.  I want to make sure that you understood that.  It says "so

13   that the government may evaluate client's information and

14   responses in making prosecutive decisions."

15          Do you see that?

16   A.  Yes.

17   Q.  You knew the government was trying to evaluate what

18   information you provided them in order to determine if they

19   would prosecute you or give you a non-prosecution agreement.

20   A.  That is very fair, sir.

21   Q.  I'm sorry.  Is that correct?

22   A.  That is correct.

23   Q.  And so when you were interviewed by the government, you

24   answered a lot of questions about Dr. Ahuja; is that correct?

25   A.  That is correct.

277

1   Q.  In fact, you told the jury on direct examination that you

2   said you had referred a number of people to HSBC who are of

3   India descent; is that correct?

4   A.  That is correct.

5   Q.  How many?

6   A.  Between five and ten.

7   Q.  Five and ten.  Was one of them your brother, Dr. Pramit

8   Bhasin?

9   A.  That is correct.

10  Q.  Did your brother open up HSBC CDs?

11  A.  That is correct.

12  Q.  And during this interview did you provide the government

13  with any -- strike the question.

14          Did the government ask you any questions about the

15  other -- other people of Indian descent that you had referred to

16  HSBC other than Dr. Ahuja?

17  A.  No, I do not remember that.

18  Q.  They only asked about Dr. Ahuja, based on your best

19  recollection; is that correct?

20  A.  That is correct.

21  Q.  And you didn't tell them anything about the other people

22  that you referred there; is that correct?

23  A.  We never had a --

24  Q.  They didn't ask you about it.

25  A.  They didn't ask me.

278

1    Q.   Now, sir, after you made this proffer of evidence, which was

2    on March -- that's on March 10, 2011; is that correct?

3    A.   That is correct.

4    Q.   Then about a month later on April 12, 2011, you signed your

5    non-prosecution agreement.

6    A.   That's correct.

7    Q.   Is that correct?

8    A.   That is correct.

9    Q.   So you were able to obtain from the government the agreement

10   you wanted; is that correct?

11   A.   That is correct.

12   Q.   And on the same day that you entered into this agreement

13   with the government, you went before the grand jury that same

14   day, April 12, 2011; is that correct?

15   A.   That is correct.

16   Q.   And at that time you testified against Dr. Ahuja before the

17   federal grand jury; is that correct?

18   A.   That is correct.

19   Q.   And during that grand jury testimony the government focused

20   their questions on Dr. Ahuja; is that correct?

21   A.   That is correct.

22   Q.   They didn't ask you any questions about your brother and his

23   accounts at HSBC, did they?

24   A.   They did not.

25   Q.   They did not ask you any questions about any of the other

279

1    people of Indian descent that you had sent to HSBC; is that

2    correct?

3    A.  That is correct.

4    Q.  Now, when you signed this non-prosecution agreement, the

5    government, you said, gave you something very valuable but you

6    had to agree to certain conditions and requirements in order to

7    get the non-prosecution agreement; is that correct?

8    A.  That is correct.

9    Q.  And if you -- you have the exhibit in front of you, the

10   non-prosecution agreement, trial Exhibit 2008.  Can you look at

11   that exhibit again, sir?  Do you have that in front of you now?

12   A.  Yes, I do.

13   Q.  As far as one of the conditions that the government had you

14   agree to that day, if you go to page 2, look at page 2,

15   Paragraph 2 --

16          MR. WEBB:  James, can you travel with me?  Page 2,

17   Paragraph 2 of that exhibit.  This is the non-prosecution

18   agreement, James.

19   BY MR. WEBB:

20   Q.  So we've called out on the screen Paragraph 2.  It says --

21   well, let's go to the top of the page.

22          It says "the conditions of this agreement are as

23   follows" and then there's certain conditions; is that correct?

24   A.  That is correct.

25   Q.  And Paragraph 2 says, "Ramit Bhasin shall file true and

280

1    accurate amended individual income tax returns, IRS Forms 1040X,

2    for the tax years 2004 through 2009, and pay all applicable

3    taxes, interest, and penalties.  Ramit Bhasin shall file true

4    and accurate FBARs for the calendar years 2004 through 2009."

5         You see that condition?

6    A.  That is correct.

7    Q.  You understood when you signed this agreement that you

8    promised the government that in return for not being prosecuted

9    that you would make sure that you would file true and accurate

10   amended tax returns for the years 2004 through 2009; is that

11   correct?

12   A.  That is correct.

13   Q.  Now, you were aware --

14        MR. WEBB:  James, call up Paragraph 5.

15   BY MR. WEBB:

16   Q.  Sir, I'll direct your attention to Paragraph 5 of the

17   agreement.  Do you have Paragraph 5 in front of you?  It's on

18   page 2.  Are you there?

19   A.  That is right.

20   Q.  Pardon me?

21   A.  Yes, sir.

22   Q.  Okay.  You were aware that in this agreement you had agreed

23   that if you violate this requirement and you don't file true and

24   accurate amended tax returns, the government would then have the

25   right -- in fact, it says "shall prosecute you for your federal

281

1    tax felonies."  Is that correct?

2    A.  That is correct.

3    Q.  And so it basically says here that "should you commit any

4    crimes as defined," et cetera, "or should it be determined that

5    he has given false or incomplete or misleading testimony or

6    information or should otherwise violate any provision of the

7    agreement," then it says you shall be subject to prosecution.

8         Is that correct?

9    A.  That's right.

10   Q.  So you were aware when you signed this agreement that if you

11   did not file true and accurate amended returns that the

12   government said they would prosecute you; is that correct?

13   A.  That is right.

14   Q.  Okay.  Now, I take it therefore you knew it was your

15   responsibility to file amended tax returns and to make sure that

16   you accurately and correctly reported all of the income that you

17   had in the tax years -- for the tax years 2004 to 2009.  Is that

18   correct?

19   A.  That is correct.

20   Q.  So the jury understands, you had already filed U.S. tax

21   returns for the years 2004 through 2009 with the IRS; is that

22   correct?

23   A.  Yes, sir.

24   Q.  I'll call those your original returns.  Are you with me?

25   A.  Correct.

282

1  Q.   And you filed tax returns in the United States for those

2  years because you were a United States citizen.

3  A.   That is correct.

4  Q.   And you knew that the government believed that you had left

5  off certain income from those tax returns; is that correct?

6  A.   That is correct.

7  Q.   And so your responsibility was to go back and look at those

8  returns and file amended returns that properly and correctly

9  reported your income for those years; is that correct?

10  A.   That is correct.

11  Q.   You were aware at the time you signed this agreement that

12  there were items of income that you had not reported on those

13  original returns when you filed them for 2004 through 2009; is

14  that correct?

15  A.   That is correct.

16  Q.   First of all, you knew that you had not -- you knew that you

17  had not reported some HSBC CD income, right?

18  A.   That is correct.

19  Q.   But there were other items of income you knew you hadn't

20  reported; is that correct?

21  A.   That is correct.

22  Q.   In the last few days while you have been here in the United

23  States getting ready --

24          When did you come to the United States to testify in

25  this case?

283

1    A.   Thursday evening.

2    Q.   When?

3    A.   Thursday evening, last Thursday.

4    Q.   Last Thursday evening.  And when -- after you met -- did you

5    meet with the government last week towards the end of the week?

6    A.   On Saturday morning.

7    Q.   Saturday morning.  At that time -- at some point in time

8    while you're meeting with the prosecutors over the weekend, did

9    you admit to them that you had violated your non-prosecution

10   agreement?

11   A.   Yes, I did.

12   Q.   Because what you told them is you had filed your amended tax

13   returns; is that correct?

14   A.   Yes.

15   Q.   So when you met with these prosecutors over this last

16   weekend, you had already filed your amended tax returns

17   reporting all the income that you had for 2004 through 2009; is

18   that correct?

19   A.   That is correct.

20   Q.   But on Saturday you told the prosecutors that you wanted

21   them to know that you had violated your non-prosecution

22   agreement because you had left off about $125,000 in unreported

23   income; is that correct?

24   A.   No.  I had told them that we had left -- let me start again.

25              We found out when we were going through the numbers

1    that the wage number came up 25,000.  It then triggered that

2    maybe on these returns, my UK filed tax returns had not been

3    brought up to the U.S. returns.  I immediately notified the

4    Department of Justice that there might have been error on the

5    returns because these incomes which I had earned from HSBC were

6    reported on UK returns but it might not have made it to the U.S.

7    returns.

8    Q.  I want to make sure that I understand.

9    A.  Okay.  Earned income in UK, working for HSBC, were reported

10   and filed by Deloitte & Touche in UK.  I had missed that it

11   seems on my U.S. returns that that information had not made it

12   up in the U.S. returns.

13   Q.  I'm going to try to make sure I understand.  Let me just

14   break it down.

15            You told the prosecutors -- well, first of all,

16   because you're a United States citizen when you worked at HSBC

17   in London, you had to report that income on your United States

18   tax return; is that correct?

19   A.  Yes, sir.

20   Q.  And you did report HSBC income.  You had a job at HSBC in

21   London, but you reported that income on your United States tax

22   return; is that correct?

23   A.  That is what we don't know yet.  That's what we are finding

24   out.  We are looking at that information.  We are trying to

25   evaluate it.  We found out that the UK earned income was not

285

1    reported on my U.S. taxes.

2    Q.   Because -- just so you know, I don't have all the

3    information but I'm going to find out now.   Okay?   You knew that

4    you're supposed to report your HSBC income on your United States

5    tax return; is that correct?

6    A.   That is correct.

7    Q.   And you moved to the UK in 2006 for HSBC?

8    A.   That is correct.

9    Q.   So in 2006, you go -- you move to the UK and work in London

10   at HSBC; is that correct?

11   A.   That is correct.

12   Q.   And you work there for 2006 and 2007.

13   A.   That's correct.

14   Q.   Is that right?

15   A.   That is correct.

16   Q.   And you earned substantial income from HSBC in London.

17   A.   That is correct.

18   Q.   And are you telling me that you did not report any of that

19   income on these amended tax returns that you filed?

20   A.   That is correct.

21   Q.   How much -- what was your total compensation from HSBC in

22   2006 and 2007 that you did not report on your amended tax

23   returns?

24   A.   Sir, we are looking at it.   It seems approximately 300,000

25   pounds of income was filed and reported in UK and paid at

286

1    38 percent that might not have been reported on the U.S. tax

2    return.

3    Q.  So can you convert that from pounds to dollars for the jury?

4    A.  300,000 would be approximately $450,000.

5    Q.  So there's approximately $450,000 of income that you did not

6    report when you filed your amended tax returns under your

7    non-prosecution agreement.

8    A.  Yes, sir.

9    Q.  Okay.  And you told the prosecutors about that just now, two

10   days ago.

11   A.  That's right.  When we were going over it, it appeared that

12   some item -- these returns had gotten missed out as not having

13   been reported on my U.S. taxes.

14   Q.  Let's talk about how that happened, then.

15        You keep looking over here at this table.  Is there a

16   reason why you're looking over at this table?

17   A.  Which table, sir?

18   Q.  I don't know where you're looking to.

19   A.  I'm not looking anywhere.

20   Q.  Okay.  When you had to file your amended tax returns -- when

21   you signed this non-prosecution agreement and promised that you

22   would file correct and accurate amended returns, you knew that

23   was a serious obligation on your part; is that correct?

24   A.  That is correct.

25   Q.  And so you actually went out and hired a professional

287

1  auditing firm to work with you and prepare your amended returns;

2  is that correct?

3  A.  That is correct, sir.

4  Q.  You hired the professional auditing firm of RSM McGladrey in

5  the United States to do that; is that correct?

6  A.  That is correct, sir.

7  Q.  And that's a well-known, respected auditing firm in the

8  United States; is that correct?

9  A.  That is correct, sir.

10  Q.  And you hired them so that they could work with you and make

11  sure that you filed accurate and correct amended returns; is

12  that correct?

13  A.  That is correct, sir.

14  Q.  What is the name of the person or persons at McGladrey that

15  you worked with in preparing your returns?

16  A.  I think it's Gabrielle Kaufmann.

17  Q.  I'm sorry.  I couldn't hear.

18  A.  I always referred to her as Gabby.  I don't remember her

19  full name.  I think it's Gabrielle Kaufmann, if I remember

20  correctly.

21  Q.  Can you spell the name as best you can?

22  A.  G-A-B-R-I-E-L-L-E, Kaufmann, K-A-U-F-M-A-N-N.

23  Q.  So an auditor by the name of Gabrielle Kaufmann is the

24  person that worked with you to file and make sure that your

25  amended tax returns were completely accurate and correct.

288

1    A.   That's right, sir.

2    Q.   Okay.

3    A.   And I also hired accountants in India.

4    Q.   Okay.  And you signed and filed those amended returns on

5    January 12, 2012; is that correct?

6    A.   That is correct.

7    Q.   That's several months ago, eight months ago.

8    A.   That is correct.

9    Q.   And at the time that you met with Ms. Kaufmann --

10   A.   I have not met with her.

11   Q.   Have you ever talked with her?

12   A.   Yes, I did.

13   Q.   Okay.  When you communicated with Ms. Kaufmann, she made it

14   clear to you that you had to be honest with her and tell you --

15   tell her what income items you had left off your returns; is

16   that right?

17   A.   That is correct.

18   Q.   Because her job is to file on your behalf accurate and

19   correct returns; is that right?

20   A.   That is right.

21   Q.   And so you told her about some HSBC income, right?

22   A.   Yes, sir.

23   Q.   And you told her about some other miscellaneous income items

24   that you had intentionally left off your tax return; is that

25   correct?

289

1    A.  No, that is not right.  I had filed all of those tax returns

2    in India.  In the way the tax treaties are set up, those items

3    were messed up.  For example --

4         I had not left off anything.  All of my taxes in India

5    were filed.  All my taxes in UK were filed.  I owed a

6    responsibility to the U.S. government in filing all of these

7    taxes in U.S. government.  That is where my mistake has been.

8    That is where -- that is where the error took place.  Every

9    jurisdiction I have filed I did not have a good accountant, a

10   global accountant because I was moving around in three

11   continents.  I messed up.  I messed up in not reporting what I

12   had earned in UK in U.S., and I messed up what I had not earned

13   in India and reporting it to U.S.  But I had reported according

14   to the local tax laws in every one of these countries that I was

15   in.

16   Q.  We're going to go through your amended returns here in just

17   a minute.

18        THE COURT:  All right.  Let's take a moment.  How much

19   additional time do you think you will need to complete your

20   examination of the witness?

21        MR. WEBB:  Your Honor, I have quite a bit to go here.

22        THE COURT:  That being so, we will break at this time

23   and reconvene at 1:30.

24        MR. WEBB:  Thank you.

25        THE COURT:  As per usual, do not discuss this case

290

1    among yourselves, avoid any communication with parties or people

2    you may see in the courtroom, and enjoy your lunch.

3              THE BAILIFF:  All rise.

4              (Jury out at 12:42 p.m.)

12:43  5       THE COURT:  Be seated, please.  Can the parties

6    project how much additional time you'll need for this witness,

7    just for planning purposes?

8              MR. WEBB:  Your Honor, I'm just looking at where I am.

9    It's going slower than I expected.  I'm going to say two hours.

12:43  10   I'm going to do the best I can to say two hours.

11             THE COURT:  All right.  At this stage can the

12   government project how much time it will need for redirect?

13             MS. SISKIND:  Based on the questions so far, I would

14   say no more than 10 minutes.

12:43  15        THE COURT:  All right.  Is there any other witness the

16   government has at the ready who may have travel issues?

17             MR. SULLIVAN:  Yes, Your Honor.  Ms. Vandana Katju

18   arrived last night from California and she is scheduled to fly

19   out today.  She's supposed to meet a van at about 3:40 to catch

12:44  20   about a 5:00 o'clock flight back to California.

21             THE COURT:  What I would suggest is that we interrupt

22   this witness's testimony at this stage and resume with

23   Ms. Katju.  All right?  I would assume from what I've heard

24   previously that you have only a short -- a few questions to ask

12:44  25   that witness.  Is that an accurate statement or assessment?

291

1          MR. SULLIVAN:  It's definitely not lengthy.  I don't

2   think --

3          THE COURT:  You're not talking about hours of

4   testimony.

12:44  5          MR. SULLIVAN:  No, no, no.  I'm talking about

6   20 minutes of direct.

7          MR. KIRSCH:  Your Honor, can I be heard on this?

8          THE COURT:  Surely.

9          MR. KIRSCH:  The cross-examination of her will be

12:44  10  fairly long, I think.  The government -- there's a big problem

11  with us cross-examining her today.  First of all, the government

12  has -- the government has told us that Mark Miller is going to

13  be the next witness, so obviously we've been busy preparing for

14  the cross-examination of Mr. Miller.

12:45  15          This morning the government told us for the first time

16  that will they may call Ms. Katju.  Now, yesterday was the first

17  time we heard her name on the witness list.  The government

18  provided us with an e-mail -- I think it was earlier this week,

19  it might have been Friday, with the witness order.  Ms. Katju

12:45  20  was not on it.  This morning the government provided us with a

21  five-page memorandum of interview that they conducted of

22  Ms. Katju last night for two hours.  And that was when I was in

23  court this morning, Your Honor, so I've been a little bit tied

24  up today.  I just don't think that we can -- I don't think that

12:45  25  it would be fair to require us to cross-examine this witness

292

1    today in front of the jury, given the circumstances.  And I just

2    don't see how she's going to make a bus at 3:30.  Your Honor,

3    this is kind of a big case and this is their only witness from

4    HSBC.  I think Ms. Katju should probably spend the night in

12:46    5    Milwaukee.

6            THE COURT:  Well, at this stage we will interrupt

7    Mr. Bhasin's testimony.  We will resume with Ms. Katju's

8    testimony and we'll see where it goes.  All right?

9            I'll see you at 1:30.

12:46    10            THE BAILIFF:  All rise.

11            (Recess taken at 12:46 p.m., until 1:36 p.m.)

12            (Jury in at 1:37 p.m.)

13            THE COURT:  Please be seated.

14            MR. WEBB:  Should I proceed, Your Honor?

01:38    15            THE COURT:  You certainly may.

16    BY MR. WEBB:

17    Q.  Sir, let's pick up right where we left off with our lunch

18    break.

19            We were asking you some questions about whether you

01:38    20    had violated your non-prosecution agreement by not reporting

21    $450,000 in income on certain tax returns.

22            Do you recall I was asking you some questions about

23    that?

24    A.  Yes.

01:38    25    Q.  And when you met with the tax preparer people from the

293

1    McGladrey firm and you told them about all the income that you

2    should report on your amended returns for 2006 and 2007, did you

3    tell them about the HSBC $450,000?

4    A.  No, I did not.

01:38  5    Q.  And, in fact, the only thing you told the McGladrey people

6    about for your '06 and '07 returns was your HSBC interest

7    income; is that correct?

8    A.  I don't remember, but all the things that were related to

9    India I told them.

01:39  10    Q.  Okay.  So -- well, let's look at your -- let's look at your

11    '06 amended tax return, then.

12             At Tab 28, Tom.

13             MR. WEBB:  May I approach the witness, Your Honor?

14             THE COURT:  You may.

01:39  15             (Document tendered to the witness.)

16             MS. SISKIND:  Your Honor, I would object to the use of

17    extrinsic evidence on the witness's returns, 608(b).

18             THE COURT:  Well, he has not offered the evidence.

19    BY MR. WEBB:

01:40  20    Q.  Sir, I've handed you trial Exhibit 2210, which I believe is

21    your amended United States individual income tax return for the

22    year 2006; is that correct?

23    A.  That is correct.

24    Q.  And this is one of the amended returns that you filed to

01:40  25    satisfy your obligations under the non-prosecution agreement; is

294

1   that correct?

2   A.  That is correct.

3   Q.  And this return is filed January 10th, 2012; do you see the

4   date there?

01:40   5   A.  That is correct.

6   Q.  And you filed this return because you had promised the

7   government that you would file accurate and complete amended tax

8   returns; is that correct?

9   A.  That is correct.

01:40   10  Q.  And the return is signed by you and signed also, I think, by

11  the McGladrey firm; is that correct?

12  A.  That is correct.

13          MR. WEBB:  I offer it into evidence, Your Honor.

14          MS. SISKIND:  Objection.  608(b), extrinsic evidence.

01:41   15          MR. WEBB:  This is not extrinsic evidence.  Could we

16  be heard?

17          THE COURT:  At side bar.

18          (At side bar on the record.)

19          THE COURT:  For what purpose are you offering the

01:41   20  exhibit?

21          MR. WEBB:  I'm offering the exhibit to prove that he

22  violated his non-prosecution agreement, Your Honor.

23          THE COURT:  He's already testified that he has not --

24  he did not provide all of the information he was required to

01:41   25  provide under the terms of his non-prosecution agreement.  So at

1    the very least it's cumulative.

2            MR. WEBB:  Well, I think I have a right also -- I have

3    a right to bring out what amount of money he actually did report

4    which is far less than $400,000.

5            THE COURT:  You can ask him, and they can object if

6    they believe appropriate to object.

7            Would you object?

8            MS. SISKIND:  We would certainly object to the exhibit

9    coming in.

10           THE COURT:  Would you object to --

11           MS. SISKIND:  How much other income he reported, no.

12           MR. WEBB:  I'll try it that way.  Thank you.

13           (End of discussion at side bar.)

14           THE COURT:  The objection is sustained.

15           You may proceed.

16   BY MR. WEBB:

17   Q.  Now, sir, am I correct that --

18           THE COURT:  Well, don't ask the question in that form.

19   BY MR. WEBB:

20   Q.  Is the amount of income that you reported on your 2006

21   amended tax return approximately $16,000 of HSBC interest?

22           And if you want to refresh your memory, you can look

23   at page 2.

24           (Witness peruses document.)

25   A.  That is correct.

1    BY MR. WEBB:

2    Q.  And what you didn't report, even after you filed your

3    amended returns as you're required to do -- you didn't report

4    the $450,000 from HSBC London; is that correct?

01:43   5    A.  That is correct.  As soon as I found out that we were

6    missing that, I notified DOJ on Saturday morning.

7    Q.  Well, let's talk about that.  So when you notified the

8    government that you had violated your plea agreement -- violated

9    your non-prosecution agreement with them, did they tell you that

01:43  10    you had -- that you were now going to be prosecuted?

11    A.  No, they have not said that.

12    Q.  Okay.  Under the -- let me get your --

13          James, can you call back up the non-prosecution

14    agreement which is Exhibit 2008, please.  And go to the second

01:44  15    page.  And can you highlight paragraph 5, please, James.

16    BY MR. WEBB:

17    Q.  So under paragraph 5 of your non-prosecution agreement, it

18    says here that if you violate any provision of this agreement

19    that you shall be subject to prosecution.

01:44  20          Do you see that?

21          It says "otherwise violate any provision of this

22    agreement, Ramit Bhasin shall thereafter be subject to

23    prosecution for federal criminal violation."

24          Do you see that?

01:45  25    A.  Yes, I do.

297

1  Q.  And the word "shall" is mandatory; that is, it says -- it

2  doesn't say they'll consider it.  It says they shall prosecute

3  you; is that correct?

4          MS. SISKIND:  Objection.

5          THE COURT:  Objection sustained.  Objection sustained.

6  BY MR. WEBB:

7  Q.  You've told us that you told the prosecutors you violated

8  the non-prosecution agreement; is that correct?  You just told

9  us that this morning.

10 A.  I told them that this was missing as we were going through

11 the checks.  And when we found out, we immediately notified the

12 DOJ.

13 Q.  So you knew you were in violation of the non-prosecution

14 agreement?

15 A.  Violation of -- I had not read this prosecution agreement to

16 the letter.  But my responsibility was to be truthful and file

17 amended returns.  As soon as I found out there was a mistake, I

18 pointed it out.

19 Q.  But you're supposed to file true and amended returns; is

20 that correct?

21 A.  I am supposed to file.

22 Q.  Is that correct?

23 A.  Yes, that's correct.

24 Q.  And you did not do that, did you?

25 A.  Yes, sir.  As soon as I found out a mistake, I immediately

298

1    notified.  We can -- we are going to refile the amended returns.

2    Q.  Has the government indicated to you in any way they are

3    going to prosecute you because you are in violation of the

4    non-prosecution agreement?

01:46    5    A.  No, sir, they have not.

6    Q.  Did you also violate the non-prosecution agreement in other

7    ways?

8    A.  I don't understand.

9    Q.  I'm asking you, besides the problem of filing amended

01:46   10    returns that were false, besides that, have you violated a

11    non-prosecution agreement in other ways other than that?

12    A.  I don't think so.

13    Q.  Well, let's look at the non-prosecution agreement again.

14            Call up paragraph 2 on page 2, James, if you could for

01:47   15    me.

16    BY MR. WEBB:

17    Q.  You also, as a condition to get your non-prosecution

18    agreement, you promised the government that you -- it says,

19    "Ramit Bhasin shall also file true and accurate FBARs for

01:47   20    calendar years 2004 through 2009."

21            Do you see that?

22    A.  Yes, sir.

23    Q.  You were aware that you promised the government that if they

24    would give you the non-prosecution agreement you would file what

01:47   25    are known as the FBAR reports with the United States Government;

299

1   is that correct?

2   A.  That is correct.

3   Q.  So this document when you made that promise was dated

4   April 12, 2011; is that correct, the non-prosecution agreement?

5   A.  That is correct.

6   Q.  And so we're now 16 months later in August of 2012; is that

7   correct?

8   A.  That is correct.

9   Q.  Have you filed the FBARs with the federal government as you

10  promised to do?

11  A.  Yes.

12  Q.  When did you file them?

13  A.  Very recently.  I don't remember the exact date.

14  Q.  Can you tell me approximately?

15  A.  Within the last 60 days.

16  Q.  Last 60 days.  And at the time that you filed the FBARs, did

17  you also send a check to the United States Government?

18  A.  I have not sent the check.

19  Q.  Oh, you haven't sent the check yet.

20  A.  No, sir.

21          MR. WEBB:  Well, can I call up paragraph 3 of the

22  non-prosecution agreement.

23  BY MR. WEBB:

24  Q.  Do you see paragraph 3 in front of you, sir?

25  A.  Yes.

300

1    Q.   It says -- one of the conditions for you to get your

2    non-prosecution agreement is that you promise that you would

3    agree that in order to resolve this civil liability relating "to

4    his failure to report undeclared bank accounts on his U.S.

5    individual income tax returns and FBARs for calendar years 2004

6    through 2009, he will pay a 50 percent penalty for the one year

7    with the highest aggregate balance as of June 30 in all of Ramit

8    Bhasin's offshore accounts that were not disclosed on his tax

9    returns and/or FBARs."

10             Do you see that?

11   A.   That is correct.

12   Q.   Am I correct that the amount -- the highest amount in your

13   HSBC CDs was approximately $2 million; is that correct?

14   A.   I do not remember that.  But I have given all this

15   information to the Department of Justice.

16   Q.   Do you recall testifying before a federal grand jury under

17   oath in this case?

18   A.   Yes, I did.

19   Q.   Do you remember if you told the grand jury that you believed

20   your HSBC-India foreign bank accounts totaled about $2 million?

21   A.   Yes, I did.

22   Q.   And does that refresh your memory?

23   A.   Okay.

24   Q.   And what I am asking you is:  If your HSBC CDs were about

25   $2 million, then under your promise to the government,

301

1    50 percent of $2 million would be $1 million; is that correct?

2    A.  Yes, sir.

3    Q.  So have you written a check to the United States Government

4    yet for $1 million to satisfy this promise that in order for you

01:50  5    to get your non-prosecution agreement that you would pay this

6    money to the U.S. Government?

7    A.  No, I have not written that yet.

8    Q.  You have not written that check yet.

9    A.  No.

01:50  10   Q.  And we're now 16 months after you signed this agreement.

11   A.  That is correct.

12   Q.  Did you also violate this agreement when you filed your

13   amended tax returns by setting forth on your amended tax returns

14   that the items of income that you left off your original returns

01:51  15   was a mistake, it was inadvertent; did you say that in your tax

16   returns?

17   A.  Yes, sir.

18   Q.  Okay.  So when you filed your amended tax returns, you told

19   the United States Government that you had made a mistake in not

01:51  20   reporting the HSBC interest; is that correct?

21   A.  That is correct.

22   Q.  And is that because you believed you had made a mistake?

23   A.  Yes, I believe I did.

24   Q.  It was inadvertent.  You didn't do anything intentionally

01:52  25   wrong.

302

1    A.  No, I did not.

2    Q.  And so you -- based on -- you told the McGladrey people

3    everything you had done in connection with not reporting your

4    HSBC interest; is that correct?

5    A.  Yes, sir.

6    Q.  And in talking to the McGladrey people, did they tell you

7    that what you had done in not reporting your HSBC interest was a

8    mistake and inadvertent?

9           MS. SISKIND:  I object, Your Honor, to the relevance.

10          THE COURT:  Objection sustained.

11   BY MR. WEBB:

12   Q.  Did the McGladrey people prepare your amended tax returns?

13   A.  Yes, they did.

14   Q.  Did they tell the U.S. Government that your failure to

15   report HSBC income was inadvertent?

16          MS. SISKIND:  Objection, Your Honor.

17          THE COURT:  Objection sustained.

18   BY MR. WEBB:

19   Q.  When you filed your amended tax returns, did you sign the

20   returns?

21   A.  Yes, I have.

22   Q.  And did you tell the -- did you tell the federal government

23   that it was inadvertent when you left off your HSBC income?

24   A.  Yes, I did.

25   Q.  And were you telling the truth when you said that to the

1    government?

2    A.  Yes, sir.

3    Q.  Okay.  So you are convinced in your own mind that your

4    failure to report your HSBC income was a mistake on your part,

5    inadvertently; is that correct?

6    A.  That is correct.

7    Q.  You did not do it intentionally and knowingly; is that

8    correct?

9    A.  That is correct.

10   Q.  On April 12, 2011, that's the day you appeared before the

11   grand jury, as we talked about this morning; is that correct?

12   A.  That is correct.

13   Q.  And you arrived in Milwaukee from India, spent some time

14   with the federal prosecutors, signed the non-prosecution

15   agreement, and went before the federal grand jury on that day.

16   A.  That is correct.

17   Q.  And offered testimony against Dr. Ahuja.

18   A.  That is correct.

19   Q.  And about two months later in June of 2011, did you and

20   your -- and two of your children and your wife go visit

21   Dr. Ahuja in the United States?

22   A.  Yes, I did.

23   Q.  And this would have been approximately in June of 2011; is

24   that correct?

25   A.  That is correct.

1    Q.  And you stayed at their house for a couple of weeks; is that

2    correct?

3    A.  That is correct.

4    Q.  You enjoyed their hospitality and graciousness?

5    A.  I always do.

6    Q.  And did you tell him that you had testified against him in

7    the grand jury?

8    A.  No, I did not.

9    Q.  You didn't tell him that.

10   A.  No.

11   Q.  And were you in his house actually with him when he got

12   indicted, in June of 2012?

13   A.  I believe it was the last day.  I'm not sure whether I was

14   in his house or in his father-in-law's house.

15   Q.  You were in his presence; is that fair to say?

16   A.  That is correct.

17   Q.  You saw the agony that had occurred; is that correct?

18   A.  Absolutely.

19   Q.  And did you tell him you were the one that went before the

20   grand jury and testified against him?

21   A.  No, I did not.

22   Q.  Let me talk about your testimony that you gave this morning

23   that you are the one who -- you told this jury this morning --

24   you told the jury this morning that you were the one that

25   arranged for Dr. Ahuja to contact a banker at HSBC to open up

305

1   CDs; is that correct?

2   A.  I had given his name, yes.  Referred.

3   Q.  You referred.

4   A.  Yes.

5   Q.  Is that correct?

6   A.  Yes.

7   Q.  You told the jury today that you referred him to someone at

8   HSBC after you started working at HSBC; is that correct?

9   A.  To the best of my recollection.

10  Q.  That's fine.  And you told him -- you told the jury this

11  morning that you actually opened up a HSBC CD after you joined

12  the bank; is that correct?

13  A.  I think that would be right.  I'm not sure whether it was

14  after or before.  I'm not sure about the date.

15  Q.  Okay.  I think I can help you.  So I'll give you dates.  Let

16  me try to refresh your memory.

17          Can I have Tab 5, Tom?

18          May I approach?

19          THE COURT:  You may.

20          (Document tendered to the witness.)

21  BY MR. WEBB:

22  Q.  I've handed you Defense Exhibit 2058, and I don't know -- I

23  don't think I need to introduce this into evidence.  I've shown

24  this to you to refresh your memory.

25          Does this appear to be an offer letter to you by HSBC

1    to come to work for them?

2    A.  Yes, it is.

3    Q.  It's dated April of '02?

4    A.  Yes.

5    Q.  So you would have started at HSBC sometime after April of

6    '02.

7    A.  That's correct.

8    Q.  Does it help you remember -- I know it's hard to remember.

9         Isn't that about in that time period?

10   A.  That's right.

11   Q.  How soon did you start after you got the offer letter, if

12   you remember?

13   A.  It would have to be within 30 days.

14   Q.  At that time you were working in HSBC-New York?

15   A.  When I got the letter, yes.

16   Q.  When you first started at HSBC, you started at HSBC in

17   HSBC-New York; is that correct?

18   A.  That is absolutely correct.

19   Q.  Okay.  And then if you don't remember, I'll show you

20   something to refresh.

21        Do you recall telling the grand jury that you opened

22   up your HSBC CD sometime in 2003?  Do you remember that?

23   A.  (No response.)

24   Q.  What year did you open your HSBC CD?

25   A.  I think I opened up an account with them and I think the

307

*Bhasin/Cross*
*Jury Trial - Vol 2 - 8/16/2012*

```
 1   CDs -- I don't remember.
 2   Q.   Okay.
 3         All right.  Could I have Tab 11.
 4   BY MR. WEBB:
 5   Q.   Do you recall testifying before the federal grand jury under
 6   oath on April 12, 2011?
 7   A.   Yes, I do.
 8   Q.   You were asked questions by the prosecutors; is that
 9   correct?
10   A.   That is right.
11   Q.   And in connection with that -- and you were under oath at
12   that time; is that correct?
13   A.   That is correct.
14         MR. WEBB:  I'm on page 7 of the grand jury at line 17.
15   BY MR. WEBB:
16   Q.   I'm going to see if these -- were you asked these questions
17   and did you give these answers, if you remember?
18         "Question:  Did there come a time when you opened
19   something called an NRI account, a bank account located at HSBC
20   in India?
21         "Answer:  Yes, I did.
22         "Question:  Can you explain to the grand jury how did
23   it come about that you decided to open this account?"
24         And you said:  "I think it's in about 2003 when I was
25   at HSBC."
```

01:59 (line 5)
02:00 (line 10)
02:00 (line 15)
02:00 (line 20)
02:00 (line 25)

308

1    Were you asked those questions and give that answer?

2  A.  Yes, I did.

3  Q.  So does that help refresh your memory that it was in -- if

4  you started in the bank in -- after April of '02, it may have

02:01   5  been sometime in '03 that you opened up that account; is that

6  fair to say?  Is that correct?

7  A.  To the best of my recollection, that's what I have said.  It

8  would be true.

9  Q.  Okay.  Now, after you opened -- you told the jury this

02:01   10  morning that after you opened up that account you started

11  referring some people of India descent to HSBC; is that correct?

12  A.  Yes, I did.

13  Q.  And you told the jury this morning that one of those people

14  that you referred to HSBC was Dr. Ahuja; is that correct?

02:01   15  A.  That is correct.

16  Q.  And you referred your brother and five or ten other people.

17  A.  That is correct.

18  Q.  So is it your testimony that Dr. Ahuja's first bank account

19  or contact at HSBC was sometime in 2003, to the best of your

02:02   20  knowledge?

21  A.  To the best of my knowledge, I don't know when he opened the

22  account.

23  Q.  Well, he opened it after you referred him there, right?

24  A.  That is correct.

02:02   25  Q.  Because he didn't -- I take it it's your testimony he didn't

309

1   have any relationship with HSBC at that time.

2   A.  I do not know that.

3   Q.  You don't know?

4   A.  I don't know if he had a relationship with HSBC or not.

5   Q.  I thought you said you were the one that referred him there.

6   A.  I do not know if he had local accounts or if they were

7   asked -- if they had gotten in touch with him.  I remember after

8   I joined I referred him to the NRI department.

9   Q.  Do you know whether Dr. Ahuja actually opened up an account

10  at HSBC and purchased CDs as early as 2001?  Do you know if he

11  did that?

12  A.  I would not know that.

13  Q.  Now, you told the jury this morning that you remembered a

14  conversation with Dr. Ahuja about a Citibank 1099 form when you

15  were golfing with him in June of 2009; is that correct?

16  A.  That is correct.

17  Q.  And you told the jury that you were golfing with him in

18  Pebble Beach, California -- in California; is that correct?

19  A.  That is correct.

20  Q.  Where were you golfing with Dr. Ahuja in June of '09 in

21  California?

22  A.  It would have been at one of the courses at Pebble Beach.

23  Q.  Pebble Beach?

24  A.  It could have been either Pebble Beach or the other course.

25  We played at two courses.

310

1   Q.   I just didn't hear the second course.  Pebble Beach is one;

2   is that correct?

3   A.   Yes.  Pebble Beach is one.  The second one I do not

4   remember.  We played at two courses on two different dates.

5   Q.   On this occasion when you played golf with him in Pebble

6   Beach in 2009, who was playing with you that day?

7   A.   Just the two of us.

8   Q.   Just the two of you?

9   A.   I think it was just the two of us.

10  Q.   Now, where -- had you flown from India to California?

11  A.   Yes, I did.

12  Q.   And so you fly from India -- did you land in Los Angeles?

13  A.   I think it was San Francisco.  I'm trying to remember.

14  Q.   Okay.  Your passport would tell you where you landed, would

15  it not?

16  A.   It would, sir.

17  Q.   And when you're in the grand jury, you told the grand jury

18  you had checked your passport.

19  A.   That's right.

20  Q.   And you told the grand jury that you landed -- you entered

21  the U.S. on June 2nd, 2009; do you recall that?

22  A.   That is correct.

23  Q.   Do you have your passport with you?

24  A.   I do.

25  Q.   Can you look at it?

311

1          (Witness complies.)

2   BY MR. WEBB:

3   Q.  Look at June 2nd, 2009.

4   A.  Yes.  There's a stamp here.

5   Q.  And where did you land?

6   A.  There were pages added on top of it, and I cannot read where

7   I landed.  It's too fine a print.

8          MR. WEBB:  Your Honor, can I approach?

9          THE COURT:  You may.

10         THE WITNESS:  It's just these new pages were added,

11  and there's a stamp in the middle, and I can't read that.

12  BY MR. WEBB:

13  Q.  When you were in the grand jury --

14         THE COURT:  One second.

15         MR. WEBB:  I apologize.

16  BY MR. WEBB:

17  Q.  Sir, when you were in the grand jury and told them you

18  looked in your passport and saw a stamp June 2nd, '09, can you

19  see that stamp there?

20  A.  No, I cannot.

21  Q.  You can't see it?

22  A.  I can't see the stamp right now because pages have been

23  added on top of it.  There are new pages.  I ran out of pages.

24  I asked the U.S. Government to put extra pages.  It seems they

25  had put it on top of that stamp.

312

1    Q.  So we can't tell where you landed in the U.S. in June of

2    '09.

3    A.  I cannot tear this page to see the stamp.

4            MS. SISKIND:  Your Honor, it's more of an issue with

5    tampering with the passport.  Okay.

6            THE COURT:  Side bar.

7            MS. SISKIND:  The stamp is there.

8            THE COURT:  Side bar.  You can't testify.

9            (At side bar on the record.)

10           THE COURT:  Is this an inquiry that you need that will

11   require him to look beyond what is easily visible in his

12   passport?

13           MR. WEBB:  I am not an expert on passports, and I'm

14   not trying to destroy his passport.  The reason I ask is I saw

15   his grand jury where he had looked at it, and you asked him the

16   question, and where did it show he landed?

17           MS. SISKIND:  I don't know because I asked him to look

18   at it.

19           What I can explain -- we looked at his passport on

20   Saturday, when we met with him.  It looks like the pages were

21   added since he testified in the grand jury.

22           THE COURT:  That's what he said.

23           MS. SISKIND:  And the State Department was so kind as

24   to put the pages on top of the stamp that is the operative stamp

25   in this testimony and, of course, taking apart the passport

313

1    would be an issue.  Now there are alternative ways of

2    establishing where he landed.  I just think --

3              THE COURT:  What is the relevance --

4              MR. WEBB:  I don't think he was in California golfing

5    with Dr. Ahuja in June of '09, and I'm trying to find out.  I

6    believe it's not correct testimony.  And they offered --

7              THE COURT:  Do you have anything other than your gut?

8              MR. WEBB:  Yes.  I have records showing they were in

9    Milwaukee.  And I'm going to ask him about it.  But I'm starting

10   with this because I don't think he landed in California and went

11   golfing.  I think he landed in New York and came to Milwaukee.

12   But I don't know that.

13             MS. SISKIND:  My recollection of his testimony on

14   direct -- we could obviously look at the transcript -- was that

15   in June of 2009 he came and stayed with the defendant in

16   Milwaukee and at some point they may have traveled together to

17   California.

18             I'm not sure whether he entered through New York, came

19   to Milwaukee, then California or came through California has any

20   bearing on whether he at some point made it to California and

21   got on a golf course with the defendant.

22             MR. WEBB:  He just told me he landed in San Francisco

23   and then played golf with him.  I'm cross-examining on it, and I

24   thought I would see it on his passport.  I didn't realize it was

25   blocked.

1          THE COURT:  Well, if there's -- do we have the

2    passport?

3          MS. SISKIND:  Yes.

4          THE COURT:  Could you get it, please?

02:09    5          MS. SISKIND:  He has it.

6          THE COURT:  Would you get it?

7          (Brief pause.)

8          MS. SISKIND:  I think this is the stamp that says

9    admitted -- I think it says "admitted Chicago."

02:09    10          THE COURT:  It says C-H-I.

11          MS. SISKIND:  That would be my interpretation of it.

12    It's this blue one that's underneath the page.  I think if you

13    then go --

14          THE COURT:  Off the record.

02:09    15          (Discussion off the record.)

16          THE COURT:  Back on the record.

17          The government has offered its view that this

18    particular stamp related to the witness's visit in relation to

19    the trip to Pebble Beach shows that the witness entered the

02:11    20    United States in Chicago.  The court is giving the defense

21    latitude to explore this very briefly.

22          However, because of the nature of the issue and the

23    probative value related to it, the court is not going to give

24    you an extensive amount of time to delve into this at this point

02:11    25    in time because the probative value is outweighed by the

315

1    consumption of time and the nature of the issue involved.

2             MR. WEBB:  I'd like to respond briefly on the record

3    to that.  As far as probative value, the government offered this

4    into evidence as a critical piece of evidence on a golf course

02:12  5    in Pebble Beach, California, in June of '09 to try to

6    incriminate Dr. Ahuja in knowing that he had not gotten 1099

7    forms.

8             I will make an offer of proof now that I have

9    documents and records that will establish that he was not in

02:12  10   Pebble Beach, California, and I intend -- but I can't do that

11   till my case, and all I'm trying to do is to cross-examine the

12   witness now --

13            THE COURT:  I understand that.  And my ruling is based

14   in large measure on what you said you have as evidence.  We'll

02:12  15   proceed accordingly.

16            (End of discussion at side bar.)

17            THE COURT:  You may proceed.

18            MR. WEBB:  May I approach to point out that one place

19   in the passport?

02:13  20            THE COURT:  Yes, you may.

21   BY MR. WEBB:

22   Q.  Mr. Bhasin, we were looking at your passport, and the

23   government was looking at it --

24            THE COURT:  Well, one second.  Would you show the

02:13  25   passport to the witness?

316

1          MR. WEBB:  Yes.

2          THE COURT:  Would you point to a particular area of

3   the passport that you have an interest in and then step back?

4          MR. WEBB:  I'll step back.  Please see that.

5   BY MR. WEBB:

6   Q.  Do you see that, what I pointed to?  Where it seems to say

7   "admitted Chicago"?

8   A.  Yes, sir.  "Admitted CHI."  I don't know what that is.

9   Q.  Do you know whether that is the stamp that's dated June 2nd,

10  2009, that you did not go to California, you flew to Chicago?

11  A.  That is the stamp we had looked at before because -- and it

12  said June 2nd.  Because the pages are there, I cannot verify

13  that right now.  It says, "Admitted CHI."

14  Q.  Is that Chicago?

15  A.  I don't know that, sir.

16  Q.  I'm just asking.

17  A.  I don't know that, sir.

18  Q.  Let me ask you this:  Is it not correct that in June of 2009

19  you were never in California with Dr. Ahuja; you were in

20  Milwaukee with him and his family and went to a water park?

21  Does that ring a bell with you?

22  A.  I had gone to the water park.

23  Q.  On the trip you went to the water park, you went to

24  Milwaukee, stayed in Milwaukee and went to a water park; is that

25  correct?

317

1   A.   On this particular trip?

2   Q.   In June of '09.

3   A.   Yes.  I checked with my wife, also.  We were in California.

4   That's what we think, we were in California.

5   Q.   You told the jury under oath that you played golf with him

6   in California and had this conversation; is that correct?

7   A.   That is correct.

8   Q.   If it turns out that the records show that you were in

9   Milwaukee and not in California, you couldn't have played golf

10   in California; is that correct?

11   A.   That would be correct.

12   Q.   Let me ask you a few questions about your banking career

13   that you talked about on direct examination a little bit.  Just

14   so I can get it clarified.

15         If I understand it correctly, as far as your financial

16   background and experience are you a CPA, certified public

17   accountant?

18   A.   I had passed that exam, yes.

19   Q.   Okay.  And your banking career started in the late 1980s

20   when you worked for Citibank; is that correct?

21   A.   That is correct.

22   Q.   And what is Citibank?  Just kind of describe the kind of

23   bank that it is, how large it is, et cetera?

24   A.   When I started with them in 1987, they were one of the

25   largest international banks.

318

1    Q.  Okay.

2    A.  That also had presence in U.S.

3    Q.  When you worked for them in the late 1980s, physically where

4    did you work?  I mean, what bank did you work in?

02:16    5    A.  I think it was Citibank N.A.  I think it was Citibank N.A.

6    Q.  Where did you work, what bank?

7    A.  New York.

8    Q.  You were in New York.

9    A.  Yes.

02:17    10    Q.  Citibank; is that correct?

11    A.  Absolutely.

12    Q.  You left for a while to go to the University of Chicago to

13    get a master of business administration.

14    A.  That is correct.

02:17    15    Q.  And then came back to Citibank to continue your banking

16    career.

17    A.  That is correct.

18    Q.  And when you went back to Citibank, you stayed at Citibank

19    from approximately 19 -- what year did you get back to Citibank?

02:17    20    A.  1991.

21    Q.  And how long did you stay there?

22    A.  Till 2002.

23    Q.  When you went to work at HSBC.

24    A.  That is correct.

02:17    25    Q.  And then from HSBC you've now gone to work for the Royal

319

1    Bank of Scotland with some other positions in-between.

2    A.  That is correct.

3    Q.  You left HSBC in London in the year 2007.

4    A.  That is correct.

5    Q.  And you told the jury you returned to India.

6    A.  That is correct.

7    Q.  And did you have a job waiting for you in India?

8    A.  No, I did not.

9    Q.  Were you terminated by HSBC?

10   A.  No, I was not.

11   Q.  So you returned to India with no job.

12   A.  That is correct.

13   Q.  And you moved your family back to India; is that correct?

14   A.  That is correct.

15   Q.  Do you believe it's correct to say that because of the years

16   of banking experience, you knew a lot more about how banks

17   operate than did Dr. Ahuja?

18           MS. SISKIND:  Objection.  Calls for speculation.

19           THE COURT:  Objection sustained.

20   BY MR. WEBB:

21   Q.  Did Dr. Ahuja ever work for a bank, to your knowledge?

22   A.  No, sir.

23   Q.  He has spent his career in medicine and not in banking; is

24   that correct?

25   A.  That is correct.

320

1    Q.  Now, the government asked you about this thing called FBARs

2    on direct examination; do you recall that?

3    A.  That is correct.

4    Q.  And your non-prosecution agreement talked about your

02:19    5    obligation now to file FBARs; is that correct?

6    A.  That is correct.

7    Q.  Back at the time that you had your HSBC CDs, when you had

8    your HSBC CDs, from 2003 forward, during those years, did you

9    have any idea what an FBAR was?

02:20    10    A.  I did not, sir.

11    Q.  None whatsoever, did you?

12    A.  I only found out after I got the letter from them.

13    Q.  And so when you did not file FBARs, during those years, you

14    were not doing anything that you believe was intentionally

02:20    15    wrong; is that correct?

16    A.  That is correct, sir.

17    Q.  You made a mistake, and it was inadvertent; is that correct?

18    A.  Absolutely.

19    Q.  And, by the way, during the years that you knew Dr. Ahuja,

02:20    20    he also had HSBC CDs, you never discussed the concept of FBARs

21    with him because you never heard of it before, correct?

22    A.  That is absolutely correct.

23    Q.  And he never raised it with you, did he?

24    A.  No, he did not.

02:20    25    Q.  So even with all of your banking experience, when you had

321

1    your actual CDs, you never heard of the concept called FBAR.

2    A.  No, sir.  I think it's pretty archaic.  I think -- I don't

3    think many, many people knew about it.  I'm sure now many people

4    know about it after 2010.  The first I heard is when I got the

5    letter.

6    Q.  But based on your experience in banking people had not heard

7    about it in the earlier years?

8    A.  I don't think my accountants knew about it.

9    Q.  Okay.  Sir, the government this morning showed you a

10   document called Government Exhibit 8, which was an e-mail that

11   Dr. Ahuja had sent you from -- about a Bloomberg article; do you

12   recall questions about that?

13   A.  That is correct.

14   Q.  In fact --

15            James, can I call up Government Exhibit 8, the e-mail.

16   I think it's dated July 3rd, 2009?  The front page is the

17   e-mail.  Can you blow that up for the jury?

18   BY MR. WEBB:

19   Q.  Am I right, do you have that in front of you?  Can you see

20   the screen?

21   A.  Yes, I can, sir.

22   Q.  So on Saturday, January 4, 2009, Dr. Ahuja sent you this

23   e-mail and attaches a Bloomberg article; is that correct?

24   A.  That is correct, sir.

25   Q.  And he doesn't make any comment, any statement; he just

322

1  sends it to you.

2  A.  That is correct, sir.

3  Q.  And you told the jury this morning that because of the

4  relationship between you and Dr. Ahuja he would frequently send

5  you Bloomberg articles that he thought you might be interested

6  in.

7  A.  That is correct, sir.

8  Q.  Is that correct?

9  A.  That's good reading.

10 Q.  Pardon me?

11 A.  I would be interested in.  I don't know.  It would be good

12 reading.  These were things we discussed.  I would agree with

13 you.

14 Q.  Things he thought you might want to read?

15 A.  News.  Things that were interesting.  I would leave it at

16 that.

17 Q.  Things that were interesting.

18 A.  That were interesting.

19 Q.  Okay.  And so there was nothing unusual about him sending

20 you a Bloomberg article.

21 A.  I received many, sir.

22 Q.  What?

23 A.  I have received many articles.

24 Q.  Sometimes he might send you three or four in a day; is that

25 correct?

1    A.   Absolutely.

2    Q.   This particular article relates to HSBC; is that correct?

3    A.   That is correct.

4    Q.   That's the place you worked at for a number of years; is

5    that correct?

6    A.   That is correct.

7    Q.   If we look at the Bloomberg article, which I know it's

8    hard -- can you pull that up?  We can't see it.

9              THE COURT:  Go to the Elmo.

10             MR. KIRSCH:  I think it's okay now.  Take a look at

11   the screen.

12             MR. WEBB:  I don't think so.

13             THE COURT:  It's on the screen.  You may turn around

14   the monitor that's on the table to your left.

15             MS. SISKIND:  Your Honor, I believe the jurors have

16   the same problem again with the screen.

17             THE COURT:  Is the monitor off kilter again?

18             MR. WEBB:  Shall I proceed, Your Honor?

19             THE COURT:  Yes.

20   BY MR. WEBB:

21   Q.   I just want to call out the second paragraph of this

22   Bloomberg article talks about "in countries where rules demand

23   investor disclosure, HSBC asked for permission to hand over the

24   names of clients that want to keep their investments, the

25   Geneva-based bank said in a letter that it e-mailed to Bloomberg

324

1  news today.  These countries include Brazil, China, India, and

2  Greece."

3          Do you see that?

4  A.  Yes, sir.

5  Q.  So India apparently was a country that demands disclosure of

6  names of people that invest in India; is that correct?

7  A.  I don't know that.  I'm reading this.

8  Q.  Is that what it says, anyway?  It says that there are

9  countries that demand disclosure.  Do you see that?

10 A.  That's the way it reads.

11 Q.  Do you know -- you live in India, right?

12 A.  That's right.

13 Q.  And you're a banker?

14 A.  That's right.

15 Q.  Is it correct that India is one of those nations that

16 demands the disclosure of investor names?

17         MS. SISKIND:  Objection.  Relevance.

18         THE COURT:  Approach.

19         (At side bar on the record.)

20         MR. WEBB:  The reason I --

21         THE COURT:  No, I'd like to hear her objection.

22         MS. SISKIND:  Your Honor, whether or not anything in

23 that e-mail is true is not the issue.  It's being offered to

24 show -- to show that this was an article that Dr. Ahuja chose to

25 forward to his family member Ramit Bhasin.  Whether or not what

1    the investment rules are --

2              THE COURT:  Is he asking for a legal conclusion?

3              MS. SISKIND:  Yes, Your Honor.

4              THE COURT:  Is he competent to offer a legal

5    conclusion?

6              MR. WEBB:  Actually it may not be legal -- as a banker

7    with 20-some years' experience, he may know that.

8              THE COURT:  You have to rephrase the question.

9    Sustained.

10             MR. WEBB:  I'll rephrase it.

11             (End of discussion at side bar.)

12             THE COURT:  Rephrase, please.

13             MR. WEBB:  I will.

14   BY MR. WEBB:

15   Q.  Sir, based on all your years of experience in banking, do

16   you know based on those years of experience whether or not India

17   is one of those countries where the rule demands investor

18   disclosure?

19   A.  I do not know that.

20   Q.  By the way, when Dr. Ahuja would time after time send you

21   Bloomberg articles, on this article did you ever have any

22   follow-up discussions with him about anything about this

23   article?

24   A.  Absolutely not.  I was moving my houses, and I don't even

25   recollect when I saw it.

326

1    Q.   Do you recall this morning the government asked you some

2    questions about your father-in-law's address in New Delhi,

3    India?

4    A.   Yes, I do.

02:29   5    Q.   And let's talk -- let me walk through the facts that I think

6    relate to that.  As far as that change of address --

7            MS. SISKIND:  Objection, Your Honor.  There's been no

8    testimony from him about a change of address.

9            THE COURT:  Lay a foundation, please.

02:29   10   BY MR. WEBB:

11   Q.   When you left your job in London and you moved back to India

12   and did not have a job, you started eventually working for a

13   company called Oxus Investments, or what's the name of the

14   company?

02:30   15   A.   I think it's Oxus Investments.

16   Q.   Okay.  Did you start working for that company?

17   A.   Yes, I did.

18   Q.   And did you actually -- well, did you start that company

19   with a gentleman by the name of Dr. Bhala?

02:30   20   A.   No, I did not start that.  He had -- he owned the company.

21   I was going to become a partner in that company.

22   Q.   And did you become a partner with him?

23   A.   No, I did not.

24   Q.   But did you work there thinking you might become a partner?

02:30   25   A.   That is correct.

327

1    Q.   And -- and how long did your relationship with Oxus and

2    Dr. Bhala last?

3    A.   I would say about seven or eight months.

4    Q.   After you started the company -- or strike that.

5         After you went to work for the company, did you

6    contact your friend Dr. Ahuja and ask him to invest some money

7    in Oxus?

8    A.   Yes.  We spoke about it.  And I was starting up a new

9    business, and he wanted to invest in the India growth story.  So

10   this would have been a good platform for him to do that.

11   Q.   You asked him to do it.  You're the one that asked him to

12   invest in Oxus.

13   A.   I don't remember if I asked him or I had told him that I was

14   starting to work for Oxus, and he always thought that I was a

15   good trader.  So he thought that that would be a good

16   opportunity and he wanted to invest money in India.

17        The point I'm raising is I do not remember

18   specifically asking him.

19   Q.   Did it help you to have him invest money in Oxus?

20   A.   Absolutely it did.

21   Q.   In fact, you told the jury this morning that you think he

22   invested about a million dollars.

23   A.   Yes, he did.

24   Q.   And you two were close friends at that time; is that

25   correct?

328

1    A.  That is correct.

2    Q.  Do you think he was trying to help you?

3    A.  I believe that he would try to help me any and every time

4    possible.

02:32  5    Q.  Over the next several months, did Oxus lose about 50 percent

6    of Dr. Ahuja's investment, about $500,000?

7    A.  Yes, it did because the market melted down in the summer of

8    2008.

9    Q.  And you then decided to terminate your relationship with

02:32  10   Oxus because you decided you could no longer trust Mr. Bhala's

11   ability to operate Oxus; is that correct?

12   A.  That is correct.  We had differences of opinion on strategy.

13   Q.  But at the time you decided to terminate with Oxus, your

14   friend Dr. Ahuja had already lost about $500,000 in the

02:32  15   investment; is that right?

16   A.  That is correct.

17   Q.  And you contacted Dr. Ahuja and explained to him your

18   concerns about Dr. Bhala; is that correct?

19   A.  That is correct.

02:33  20   Q.  And you recommended to Dr. Ahuja that we need to transfer

21   your money out of Oxus to a more secure place; is that correct?

22   A.  That is correct.

23   Q.  And you recommended to Dr. Ahuja you transfer the money to a

24   company called Mann Financial; is that correct?

02:33  25   A.  That is correct.

329

1    Q.   And Dr. Ahuja told you he would follow your recommendation;

2    is that correct?

3    A.   That is correct.

4    Q.   You then proceeded to assist and facilitate the transfer of

5    Dr. Ahuja's investment money from Oxus to Mann.

6    A.   Yes.   I got the account opened.

7    Q.   You took on the responsibility of trying to help Dr. Ahuja

8    get his money out of this problem place, Oxus, into a more

9    secure place because you thought his money would be better off

10   there; is that correct?

11   A.   That is correct.

12   Q.   And you felt some obligation because you're the one that got

13   him to invest or at least he invested in Oxus in the first

14   place; is that correct?

15   A.   That is correct.

16   Q.   And so you decided to kind of facilitate and help him by

17   making arrangements to get the money over to Mann Financial.

18   A.   That is correct.

19   Q.   In order for you to get an account for Dr. Ahuja at Mann

20   Financial in New Delhi, you found out that he needed to have an

21   address in New Delhi; is that correct?

22   A.   That is correct.

23   Q.   And, therefore, you told Dr. Ahuja that you wanted a letter

24   from HSBC in India that set forth an Indian address for

25   Dr. Ahuja; is that correct?

330

1   A.  That is correct.

2   Q.  And you were then going to provide that letter to Mann

3   Financial; is that correct?

4   A.  That is correct.

5   Q.  And eventually Dr. Ahuja followed your recommendation and

6   you got a letter from HSBC; is that correct?

7   A.  That is correct.

8   Q.  And it used your father-in-law's address as a correspondent

9   address; is that right?

10  A.  That is correct.

11  Q.  Now, that series of events that you just described, did that

12  have anything to do with trying to conceal any HSBC accounts in

13  India?

14  A.  No.

15  Q.  Nothing at all, did it?

16  A.  I don't think so.

17  Q.  It was done --

18  A.  I was just opening an MF Global account, that was it.

19  Q.  It was done because you wanted to try to protect his money

20  and get a Mann Financial account opened up.

21  A.  That is correct.

22  Q.  And so you're the one that came up with the Indian address

23  that happened to be your father-in-law.  You gave that address

24  to Dr. Ahuja; is that correct?

25  A.  What address?

331

1    Q.   The address of your father-in-law?

2    A.   I gave it to him?

3    Q.   Yes.  Did you provide the address of your father-in-law to

4    Dr. Ahuja as the address to use?

5    A.   Sorry.  I do not recollect providing that particular

6    address.  But it's a family home, so it's possible, yes.

7    Q.   Okay.  Well, the address that was used was your

8    father-in-law's address; is that correct?

9    A.   That is correct.

10             MR. WEBB:  May I have one second, Your Honor?

11             THE COURT:  Certainly.

12             (Defense counsel confer.)

13             MR. WEBB:  I have no more questions.

14             THE COURT:  Proceed.

15                      REDIRECT EXAMINATION

16   BY MS. SISKIND:

17   Q.   Mr. Bhasin, Mr. Webb was asking you about those original tax

18   returns that you filed for the years 2004 through 2009.  Do you

19   recall that?

20   A.   Yes.

21   Q.   Did you file false tax returns for those years?

22   A.   From what I understand now, yes, I did.

23   Q.   And then when you went to file amended returns, why did you

24   file amended returns?

25   A.   Because I was missing information from my accounts in London

332

1    and in India where I had filed the taxes, but it was never

2    reported on the U.S. tax returns.

3    Q.  At the time you had those amended returns prepared, did you

4    know that you were also missing the wages from the time at HSBC

5    in London?

6    A.  No, ma'am, I did not.

7    Q.  When did you first realize that that information was missing

8    from your amended tax returns?

9    A.  On Saturday morning when we talked about it, you mentioned

10   25,000 was the number in wages.  That's when something hit and

11   said this just doesn't sound right.  It seems we have a piece

12   missing.

13   Q.  Now, those wages that you now discovered were missing, how

14   much in total in wages do you think that was that wasn't

15   reported?

16   A.  I think the last time we looked at it, my counsel is looking

17   at it, it was 300,000 pounds or thereabouts, which was earned,

18   and there was earned income taxes taken out for about 130,000.

19   We're not very sure about it.  We are looking at it.

20   Q.  Now, that money you just said was taken out, on which

21   country's government were those taxes paid?

22   A.  UK.

23   Q.  Do you know whether you're also going to owe tax on that

24   money here in the United States?

25   A.  I do not know that.

02:39
02:39
02:39
02:39
02:39
02:40

1  Q.  Do you know whether you might be entitled to a refund after

2  you amend your returns?

3  A.  It's very possible.  We had a brief discussion.  It seems we

4  might have a refund; we might owe more; we don't know that.  We

5  have to look at tax treaties, and I believe it's incredibly

6  complicated.

7  Q.  Mr. Webb was asking you about some of the other things that

8  you're required to do under your non-prosecution agreement, and

9  he was asking you about the filing of FBARs and paying this FBAR

10 penalty; do you recall that?

11 A.  That is correct.

12 Q.  Based on your understanding of your agreement, was there

13 anything that required you to do those things before you walked

14 into court today?

15 A.  No, there was not.

16 Q.  And what is the status --

17 A.  I had to be honest, I had to amend the returns, and I had to

18 do them and pay the interest and penalties.

19 Q.  Do you have any understanding about when you're supposed to

20 pay?

21 A.  No.  We had no -- the paperwork or any -- there was no

22 discussion on any dates that I had to do -- that I had to have

23 this done by.

24 Q.  And what is the status of your work with the IRS right now

25 on the subject of your FBAR penalty and your unpaid taxes?

334

1    A.  We just discovered this.  We are going to look into it.  My

2    counsel is looking into it.  And then if amended returns need to

3    be filed, we'll file those.

4    Q.  But specifically on the issue of the FBAR and the FBAR

5    penalty, Mr. Webb asked you if you had written a check yet?

6    A.  I had not written a check yet.

7    Q.  And why is that?

8    A.  Because we had just very recently finalized it in the last

9    30 or 60 days.  I don't remember it.

10   Q.  And when you say "we," do you mean you and the IRS?

11   A.  Me, the IRS, and my attorney.  I've been traveling a lot,

12   and I've been -- I'm in-between moving from India to Singapore.

13   And it's been an incredibly tough time.

14   Q.  Now, when you filed your amended returns and you left off

15   the wages that you had earned from HSBC in the United Kingdom,

16   did you do that on purpose?

17   A.  No, ma'am.  Otherwise, I wouldn't have brought it up on

18   Saturday morning.

19   Q.  During the years that we're talking about for your taxes,

20   2004 to 2009, who prepared your tax returns those years?

21   A.  Okay.  In U.S. I had an accountant that was preparing my

22   U.S. tax returns.  Unfortunately, after this experience -- let

23   me just rephrase this.  I had never met my accountant for 13 or

24   14 years that he had filed the tax returns.  Incredibly busy.

25   We would send him the faxes.  We would bring it back, and we'd

335

1  get the tax returns.

2       I moved to the UK.  There were accountants filing it

3  there.  One of the accountants was Deloitte & Touche.  Then I

4  moved to India, and it was the Indian accountants that filed it.

02:42  5  I made an incredible bad decision on not having a global

6  accountant because I file in every jurisdiction, it seems, but I

7  have not compiled it back into U.S. taxes, as per my obligations

8  of being a U.S. citizen.

9  Q.  Now, those various tax professionals that you work with in

02:42  10  the U.S. and in the United Kingdom and in India, did any of them

11  ever raise the subject of FBARs with you?

12  A.  No, ma'am, they have not.  Let me correct.  With Gabrielle,

13  yes.  I believe when my counsel went back to even the

14  accountants I don't think they knew about it.  Certainly I

02:43  15  didn't get that advice in the UK.  And neither did I get that

16  advice in India.

17  Q.  So Gabrielle would be the person you're working with more

18  currently on your amended tax returns.

19  A.  That's correct.  And by then I had already known because I

02:43  20  had gotten a letter from DOJ on FBARs in 2010.

21  Q.  As far as the tax professionals you were working with during

22  the years 2004 through 2009, did any of them ever raise the

23  issue of FBARs with you?

24  A.  No, ma'am.  It's very unfortunate.  I wish they had.

02:43  25  Q.  Now, Mr. Webb was also asking you -- first, let me ask you

336

1    this:  In connection with this case and in connection with your

2    HSBC accounts, did you receive a letter from the government in

3    the summer of 2010?

4    A.  I did.

5    Q.  And what is your understanding of that letter?

6         MR. WEBB:  Objection to the content of the letter.

7    They can show him the letter.  I object.

8         THE COURT:  Objection sustained.

9    BY MS. SISKIND:

10   Q.  How did you come to learn that the federal government was

11   looking into your unreported HSBC income?

12   A.  Very unfortunate summer.  My father was discovered with

13   cancer.  I was coming to visit him.  My house in Scottsdale, the

14   tenants were changing.  I happened to be there because I was

15   trying to get it ready for the next tenant, and I saw this

16   letter lying there.  It's totally by coincidence.

17   Q.  And is that how you found out that the government was

18   looking into your unreported interest income?

19   A.  That is correct.

20   Q.  Do you know whether Dr. Ahuja received a similar letter?

21        MR. WEBB:  Objection.  Lack of foundation.

22        MS. SISKIND:  If he knows.

23        THE COURT:  Answer "yes" or "no."

24   BY MS. SISKIND:

25   Q.  Do you want me to repeat the question?

337

1  A.  Yes, please.

2  Q.  Do you know whether Dr. Ahuja received a similar letter?

3  A.  Yes or no?  I don't know.

4  Q.  Mr. Webb was asking you some questions about that comment

5  that Dr. Ahuja made to you regarding the Citibank 1099; do you

6  recall that?  The conversation on the golf course.

7  A.  Yes.

8  Q.  Mr. Webb was asking you if you were sure that you had been

9  to a golf course in California that summer; do you remember

10 that?

11 A.  Yes, ma'am.

12 Q.  Whether or not you were on the golf course, do you remember

13 Dr. Ahuja making that comment to you that we discussed on your

14 direct examination?

15         MR. WEBB:  Objection.  Leading.

16         THE COURT:  Overruled.

17 BY MS. SISKIND:

18 Q.  Do you recall Dr. Ahuja making that comment to you that we

19 discussed on direct examination?

20 A.  Yes, I do.

21 Q.  And what did he say?

22 A.  "I received a 1099 from Citibank."

23 Q.  Is there any doubt in your mind that he said that to you?

24 A.  No, there is no doubt in my mind.

25 Q.  And when did he say that to you?

338

1    A.   I was on a golf course.

2    Q.   I'm sorry.   When did he say that to you?   When?

3    A.   On the golf course at a tee box when I was starting to

4    swing.

5    Q.   Please listen to my question.   Not where.   When did he say

6    that to you, when in time?

7    A.   In June 2009.

8    Q.   Is there any doubt in your mind about that?

9    A.   There is no doubt in my mind.

10   Q.   Now, the address of your father-in-law's house in New Delhi,

11   India, 94, Jorbagh, Mr. Webb was asking you some questions about

12   that address as relates to your Mann Financial account; do you

13   remember that?

14   A.   That is correct.

15   Q.   I'll just ask:   Did you tell Dr. Ahuja to use -- or strike

16   that.

17           How did that come up in relation to the Mann Financial

18   account?

19   A.   I explain you something about the India postal system and

20   stuff like that.

21   Q.   Please answer my question.   How did that come up with

22   respect to the Mann Financial account?

23   A.   How did what come up?

24   Q.   The address of 94, Jorbagh.   Mr. Webb was asking you some

25   questions about that.

339

1    A.   That's right.

2    Q.   What is the relationship between the defendant, if any --

3    between the defendants -- between Dr. Ahuja's Mann Financial

4    account and the address 94, Jorbagh?

5    A.   That's an address that we very commonly use for all family

6    members.  There could be a lot of mail that goes there.

7    Q.   Did you tell Dr. Ahuja to use that address for the Mann

8    Financial account?

9    A.   He mentioned that.  I don't recollect it, but I must have.

10   I don't remember that.

11   Q.   How about Dr. Ahuja's HSBC-India account?  Did you tell

12   Dr. Ahuja to use 94, Jorbagh for his HSBC-India account?

13   A.   No, I did not.

14   Q.   Now, Mr. Webb asked you whether as a result of your

15   agreement with the government you understand that you will not

16   be prosecuted; do you remember that?

17   A.   That is correct.

18   Q.   What is your understanding of what will happen to you if you

19   do not testify truthfully in court today?

20   A.   That I could be prosecuted.

21          MS. SISKIND:  I have no further questions.

22          Oh, Court's indulgence.

23          (Government counsel confer.)

24   BY MS. SISKIND:

25   Q.   I want to just go back a minute to the wages from the United

340

1    Kingdom.  I think you testified -- court's indulgence.

2                (Government counsel confer.)

3                MS. SISKIND:  I apologize.

4    BY MS. SISKIND:

02:49    5    Q.  Not the wages, your interest income from HSBC.  How much in

6    total was it that you failed to report on your original tax

7    returns?

8    A.  450,000.

9    Q.  And how much additional do you owe in taxes?

02:49   10   A.  70,000.

11   Q.  What is your understanding of why you only owe 70,000 in

12   taxes on that money?

13   A.  Because after I moved in 2007, I've been filing all taxes in

14   India on my HSBC interest income.

02:49   15   Q.  When you say you were filing all the taxes on your HSBC

16   interest income, were you paying all the taxes in India?

17   A.  That is correct.  That is why I got -- I got a foreign tax

18   credit.

19   Q.  Is it a foreign tax credit?

02:49   20   A.  I believe that's what it's called.  If I pay in some

21   jurisdictions, I can bring those taxes back to the U.S.

22   Q.  When you filed your tax returns originally for the years

23   2004 for 2009, why did you take the risk of filing those returns

24   without the interest income from HSBC-India?

02:50   25                MR. WEBB:  Objection.  Form of the question.

341

1       THE COURT:  Sustained.

2   BY MS. SISKIND:

3   Q.  Why did you file false tax returns for those years?

4       MR. WEBB:  Same objection.

5       THE COURT:  Overruled.

6       THE WITNESS:  Why did I file --

7       THE COURT:  One second.  Rephrase your question so

8   it's absolutely clear.

9   BY MS. SISKIND:

10  Q.  For the years 2004 to 2009, why did you file false tax

11  returns?

12  A.  On the HSBC income, I think I thought I could get away with

13  it.  Or it was going to go under the radar.

14      On the incomes that were in UK and in India, I had a

15  poor accountant.  We didn't put those incomes in the U.S. tax

16  returns.  They were all paid in every jurisdiction that I was

17  in.

18      MS. SISKIND:  I have no further questions, Your Honor.

19                  RECROSS-EXAMINATION

20  BY MR. WEBB:

21  Q.  Sir, I just heard you explain that the reason you told the

22  government that you had filed false amended tax returns is

23  because something the government said to you on Saturday

24  morning?

25  A.  Yes.  When we were going through -- the government didn't

342

1    say that.  We were going through the numbers, and it was how

2    much was missed in interest income under each category.  The

3    wages popped up, and at the wages line it was 25,000.  That's

4    when it appeared.  That's when something didn't seem right.  And

02:52  5    I went back, and we started looking at the numbers.

6    Q.  I want to make sure.  What tax return were you looking at?

7    A.  We were -- we went back and looked at the UK tax return.

8    Q.  First of all, I want to back up.  You're in a meeting.  The

9    meeting you're talking about was a meeting between you and

02:53  10   federal prosecutors?

11   A.  That is correct.

12   Q.  And some of the lawyers -- who was present at the meeting?

13        THE COURT:  You can't volunteer.  It's up to the

14   witness.  You can't testify.

02:53  15        THE WITNESS:  All of them.

16   BY MR. WEBB:

17   Q.  All of them.  And they were going through items on your

18   amended returns with you; is that right?

19   A.  Yes.

02:53  20   Q.  And you came to one item that showed that HSBC income was

21   only $25,000?

22   A.  No.  We went through different categories.  HSBC interest

23   income, wages, other interest income, and dividends.

24   Q.  And when you saw the HSBC wages --

02:53  25   A.  It was not HSBC wages.  It was just the category that said

343

1    wages.

2    Q.  Wages.

3    A.  Yes.

4    Q.  You thought -- they showed you the wages, and it was only

5    $25,000.

6    A.  That is correct.

7    Q.  And you looked at that and said they now know that I filed a

8    false tax return; is that correct?

9    A.  No.

10   Q.  Sir, what was your annual income -- sir -- your annual

11   income from HSBC was up to $2 million a year; is that correct?

12   A.  On some of the years, yes.

13   Q.  So when you're looking at this tax return with the

14   government on Saturday morning and they point out to you that

15   it's only $25,000, that's extremely low, is it not?

16   A.  That is correct.

17   Q.  And you knew then that they knew that you had filed a false

18   tax return.

19   A.  No, sir.  We left the meeting.  I went back, and I started

20   reviewing the information.  My counsel called them on either

21   Saturday evening or Sunday morning, and that's when we notified

22   them that it appears that some of the income earned in UK might

23   have gotten messed up.

24   Q.  Sir, when the prosecutors showed you wages $25,000, the

25   prosecutors said to you, "You made a lot more money than that."

344

1    A.   They never said that to me.

2    Q.   They didn't?

3    A.   They did not say that to me, sir.

4    Q.   But you --

5    A.   We never discussed -- the question you're asking, we never

6    discussed the -- each one of the sub items.  We just reviewed

7    that on the amended tax returns.  There was 450,000 of interest

8    income missing, 25,000 of this category of dividends, 25,000 of

9    other interest income, and 25,000 wages.

10            I've been very, very nervous through this process, and

11   my mind has been frozen.  When I got back to the hotel room is

12   when I started thinking about this and said 25,000 is a very low

13   number, that's when I panicked.  I went immediately back to my

14   counsel.  The counsel got back to them and said that there must

15   be something wrong with it.  We started looking on Sunday.  This

16   is the sequence of events that took place.

17   Q.   When the government prosecutors pointed at $25,000 wages at

18   HSBC, you knew that they knew you made a lot more money at

19   HSBC --

20   A.   I'm sorry.  25,000 in wages.  It was never discussed HSBC

21   wages.  It was 25,000 in wages.

22   Q.   You were looking at a tax return for 2006 and 2007; is that

23   correct?

24   A.   We were looking at a compilation of the total misreporting

25   between 2004 and 2009.

345

1    Q.   In any event, your income each year that you worked at HSBC

2    was a lot more than $25,000.

3    A.   I would say so, sir.

4    Q.   And I just heard you tell the prosecutor right now on your

02:56    5    redirect examination that with the HSBC interest income you

6    thought you could get away with not reporting it.  Did you just

7    say that right now?

8    A.   Yes, I did.

9    Q.   But when you filed your amended tax returns, you told the

02:57    10    government just in January that it was inadvertent that you

11    didn't report your HSBC income; is that correct?

12    A.   That is correct, sir.

13    Q.   So just eight months ago when you filed your amended tax

14    returns you told our government on the amended tax returns that

02:57    15    your failure to record HSBC interest was inadvertent and now you

16    just told the prosecutor you did it intentionally.

17    A.   Okay, sir.  When I moved back to India, we converted a lot

18    of these CDs to INR, which is rupees.  The rupee interest rates

19    are much, much higher.  A large portion of this 450,000 is based

02:57    20    on rupee interest rates and taxes I had been paying there.

21    That's why my tax liability was only 70,000.

22           So you have to look at it in two different ways.  The

23    dollar CDs is what I'm referring to, and I thought I could get

24    away with it, is what I said.  When I was living in U.S. from

02:58    25    the years 2004 to 2006.  When I moved, I was filing all tax

346

1    returns, the U.S. return -- the U.S. interest rates are at

2    around 1 percent or 1 and a half percent.  The interest rates in

3    India are at about 8 percent or 9 percent.

4            So that was the difference.  That was the reason why

5    it was -- that I had filed for these, but I had not brought them

6    back to the U.S. taxes, but I also thought I could get away with

7    it because those three or four years that I was here in the U.S.

8    I had not reported it.

9    Q.  Let me just make sure.  When you filed your amended tax

10   returns in June -- I mean in January of this year -- stay with

11   me.

12           When you filed those amended tax returns, you told --

13   you signed a tax return when you were amending your returns and

14   you said under oath that the failure to report the HSBC interest

15   was inadvertent; is that correct?  You said that.

16   A.  That is correct, sir.

17   Q.  And when you said that were you telling the truth?

18   A.  That is correct, sir.

19   Q.  So you're telling the jury that when you failed to report on

20   your tax returns the HSBC interest income over the years, that

21   was a mistake inadvertent; is that what you're saying?

22   A.  That is correct, sir.

23   Q.  Now, the government asked you questions about why you

24   haven't paid the $1 million for the FBAR penalty.  Do you recall

25   those questions?  Do you recall the questions?

347

1    A.  Yes, sir.

2    Q.  And as I understood it you said you were too busy?

3    A.  On not paying it, sir?

4    Q.  Yes.

5    A.  No.  I said the reason why it got stretched out so long was

6    because I had been busy with other things.

7    Q.  That's what I said.  You're too busy to pay the million

8    dollars.

9    A.  No, sir.

10   Q.  Is that correct?

11   A.  I've not been too busy to pay the million dollars.

12   Q.  Well, then why can't -- can you write a check tomorrow and

13   pay the government the million dollars?

14   A.  I would not be able to do that.  I need some time to be able

15   to work that.

16   Q.  Have the prosecutors at any time said to you under that

17   non-prosecution agreement, "You agreed 16 months ago to pay a

18   million dollars, you haven't done it, you're in breach of the

19   agreement"; have they ever said that to you?

20   A.  No, sir.  But I never said in my agreement that I needed to

21   do that as of a certain date.

22   Q.  You got forever to do it?

23   A.  No, sir.

24   Q.  Well, let me ask -- go ahead.  I'm sorry.

25   A.  That's okay.  Please.

348

1   Q.  In fact, you just told the prosecutor a moment ago that if

2   you don't tell the truth here then the government can revoke

3   your non-prosecution agreement; is that right?

4   A.  That's right, sir.

03:00   5   Q.  Who is it that will make the decision as to whether you're

6   telling the truth and revoke the agreement?  The people at that

7   table make that decision; is that correct?

8   A.  That is correct.

9   Q.  The same people that have decided that you haven't breached

03:01   10   the agreement when you didn't report the $450,000; is that

11   right?

12   A.  That is correct, sir.

13   Q.  The same people who have decided even though you haven't

14   paid the million dollars you're not in breach; is that right?

03:01   15   A.  That is correct.

16   Q.  The golf course.  Now, on redirect -- I want to make sure I

17   got this golf course thing clear.

18        You told the jury on direct examination and on my

19   cross you vividly remember being on Pebble Beach in California

03:01   20   on the first tee of a golf course; is that right?

21   A.  I didn't say first tee.  I just said on the tee.

22   Q.  You were at the tee; is that right?

23   A.  That is right.

24   Q.  On Pebble Beach.

03:02   25   A.  To the best of my recollection, yes.

349

1    Q.  But now the government comes back and says, "Well, maybe it

2    took place somewhere else."  Are you saying that now it may have

3    taken place somewhere else?

4    A.  I'm still saying that, to the best of my recollection, that

5    is where we were.

6    Q.  In California on Pebble Beach in June of 2009.

7    A.  That's what I remember, sir.

8              MR. WEBB:  I have no more questions.  Wait a minute.

9              MR. KIRSCH:  Just one second.

10             (Defense counsel confer.)

11             THE COURT:  Does the jury need a break?

12             Counsel, how much additional time do you need?

13             MR. WEBB:  I can do this now or I can do it after a

14   break.  It's only going to be a couple minutes.

15             THE COURT:  Proceed.  It is imperative that we keep

16   moving.  We have some time limitations.

17             MR. WEBB:  I'll move very quickly.  I tried to move

18   very quickly.

19             THE COURT:  I understand.  I just want you to be

20   mindful of that.

21             MR. WEBB:  I respect that, and I will.

22   BY MR. WEBB:

23   Q.  When you filed your amended tax returns in January of this

24   year, you went back and amended the tax returns for years in

25   which you had not reported HSBC CD interest income; is that

1    correct?

2    A.  That is correct, sir.

3    Q.  From 2004 through 2009; is that correct?

4    A.  That is correct.

5    Q.  And in each of those years, you did have HSBC interest

6    income; is that correct?

7    A.  That is correct.

8    Q.  And it was in connection with HSBC interest earned on India

9    bank accounts?

10   A.  That is correct, sir.

11   Q.  Those are then foreign bank accounts.

12   A.  That is correct.

13   Q.  Or do you know if they're foreign bank accounts?

14   A.  I get a statement which says India on it.

15   Q.  When your tax preparer McGladrey filed your amended returns,

16   did they still tell the U.S. Government that you did not have

17   any foreign bank accounts?

18          MS. SISKIND:  Objection to what the tax preparer --

19          THE COURT:  Objection sustained.

20          MR. WEBB:  I'll change it.

21   BY MR. WEBB:

22   Q.  Did you tell the U.S. Government when you filed your amended

23   tax return in 2007 that you did not have any foreign bank

24   accounts?

25   A.  When I filed the tax returns, did I tell the government that

1    I did not have foreign bank accounts?

2    Q.  Yes.

3    A.  No, sir.  I did.  I told them I had foreign bank accounts.

4    Q.  Let me see if I can refresh your memory.

5              MS. SISKIND:  What is the number?

6              MR. WEBB:  2211.

7              (Document tendered to the witness.)

8    BY MR. WEBB:

9    Q.  Sir, I've handed you trial Exhibit 2211.  Do you have that

10   in front of you?

11   A.  Yes, sir.

12   Q.  And this is -- is this your 2007 amended tax return?  Look

13   at the top.

14   A.  Yes, sir.

15   Q.  Do you see 2007?

16   A.  That is correct, sir.

17   Q.  And you signed this; is that correct?

18   A.  That is correct.

19   Q.  Under oath?

20   A.  That is correct.

21   Q.  If you go into the return, just go into the return to the

22   page marked 7.  Have you found page 7?  There are page numbers.

23   I can help you if you can't find it.

24   A.  I can't find it.

25             MR. WEBB:  May I approach?

352

1        THE COURT:  Certainly.

2        (Brief pause.)

3   BY MR. WEBB:

4   Q.  Have you found the page marked 7?

03:07   5   A.  That's correct, sir.

6   Q.  And this is called Schedule B, "Interest and Ordinary

7   Dividends"; is that correct?  At the top?

8   A.  That is correct, sir.

9   Q.  And down at the bottom there's a question 7A that says, "At

03:08   10  any time during 2007, did you have any interest or signature or

11  other authority over a financial account in a foreign country"?

12  Do you see that question?

13  A.  That is right, sir.

14  Q.  And you checked "No"; is that correct?

03:08   15  A.  That is right, sir.

16  Q.  But you are -- on this same return your -- go to the page --

17  the third page into the exhibit.  Can you find the third page

18  into the exhibit?

19  A.  Yes, sir.

03:08   20  Q.  Do you see at the top were you tell the IRS, Schedule B --

21  that's the one we just looked at -- Schedule B increased by

22  $44,870 to include interest and dividends from foreign financial

23  accounts that were not included on the original return.  Do you

24  see that?

03:09   25  A.  Yes, sir.

1    Q.  And yet you still checked off you had no foreign accounts;

2    is that correct?

3    A.  My accountant prepared this.  I don't know.  We are filing

4    amended returns.  It is supposed to have all foreign accounts.

03:09    5    Q.  Are you saying you didn't make the mistake; your accountant

6    did?

7    A.  It appears that way.

8    Q.  It says you had no foreign bank accounts; is that correct?

9    A.  That's what it says here, sir.

03:09    10   MR. WEBB:  I have no more questions.

11   THE COURT:  Please note that any questions you ask

12   must be limited to the scope of the rebuttal.

13   FURTHER REDIRECT EXAMINATION

14   BY MS. SISKIND:

03:10    15   Q.  Mr. Webb was just asking you about your 2007 amended return.

16   And what is your reaction to seeing that the "No" box is

17   checked?

18   A.  It's wrong.  I'm a bit confused because we filed all of

19   these returns, and she has it.  It says right above there in the

03:10    20   HSBC Bank column that these are interest that has been filed for

21   these foreign bank accounts.  It also has -- that's right.  I

22   don't know if this was by error of the accountant.  Because we

23   reported everything.

24   Q.  When you went back to file your amended returns, what was

03:10    25   your intention with respect to disclosing foreign bank accounts

354

1    to the government?

2    A.  Everything, disclose everything.  And I have.

3    Q.  Now, Mr. Webb was asking you with respect to whether you

4    made a mistake or whether you were trying to get away with

5    something; do you remember that?  He was asking you whether --

6    in response to your comment; do you recall that?

7    A.  Yes.

8    Q.  When you were earning interest income from your HSBC-India

9    account, why did you think you could stay under the radar?

10   A.  These amounts were very small.  There was a part of it that

11   was just mistake.  I had a million dollars sitting in there with

12   interest of 1 percent that probably works out to about 10 or

13   $12,000 a year.  Taxes on that was 2 or $3,000.  This was not

14   something that we were trying to evade or do that.  These were

15   mistakes that happen.

16          I was paying 50 times, 60 times that kind of tax

17   return, more than that, on the income I had in here.  The

18   mistake that I think about when I look back is that I had filed

19   tax returns in different jurisdictions that were not lifted up

20   into my U.S. tax returns.

21          When I think about whether this income could have

22   gotten away, I probably in the back of my mind always knew that

23   I had money in India that was earning interest.  I just -- it

24   was so small or it was something that -- I don't remember.  To

25   the best of my recollection, I'm trying to take responsibility

                                                              355

1  for my actions here.  That's it.

2  Q.  Prior to getting a letter from the Department of Justice,

3  did you think the IRS would find out about this interest income?

4  MR. WEBB:  Objection to the form of the question.

5  THE COURT:  Objection sustained.

6  MS. SISKIND:  I have no further questions.

7  THE COURT:  Does the jury have any questions for the

8  witness?

9  (No response.)

10  THE COURT:  Very well.  We will take a recess at this

11  time.  Do not discuss the case in the jury room.  And you may

12  leave your notebooks in your chairs.

13  THE BAILIFF:  All rise.

14  (Jury out at 3:13 p.m.)

15  MS. SISKIND:  Can Mr. Bhasin be excused?

16  THE COURT:  Yes.

17  (Witness excused at 3:13 p.m.)

18  THE COURT:  Be seated.

19  You indicated previously that you had worked out the

20  issues concerning witnesses.  Where are you going next?

21  MS. SISKIND:  Ms. Vandana Katju will be next, and she

22  is here.  And I think she is either outside the courtroom or on

23  her way down right now.

24  THE COURT:  All right.  We'll take about 10 minutes

25  and resume.

356

1          MR. KIRSCH:  Your Honor?  We still had the

2    cross-examination issue depending on what comes up during her

3    direct examination.

4          THE COURT:  That's life.

03:14   5          MR. KIRSCH:  Pardon?

6          THE COURT:  That's life.  We'll take 10.

7          (Recess taken at 3:14 p.m., until 3:33 p.m.)

8          (Jury in at 3:33 p.m.)

9          THE COURT:  Please be seated.

03:33  10          THE REPORTER:  Raise your right hand, please.

11            VANDANA KATJU, GOVERNMENT WITNESS, SWORN

12          THE REPORTER:  Please state your name and spell your

13    name for the record.

14          THE WITNESS:  Vandana Katju, V-A-N-D-A-N-A.  My last

03:34  15    name is Katju, K-A-T-J-U.

16          MR. SULLIVAN:  May I approach the witness?

17          THE COURT:  Certainly.

18                     DIRECT EXAMINATION

19    BY MR. SULLIVAN:

03:34  20    Q.  Good afternoon, Ms. Katju.  Could you tell the members of

21    the jury where you are currently employed?

22    A.  I work for HSBC Bank.  I'm a branch manager in

23    San Francisco.

24    Q.  And how long have you been with HSBC Bank?

03:34  25    A.  For about 10 years.

                                                        357

1    Q.  And when you began your career 10 years ago, can you tell

2    the members of the jury where you began and what your job duties

3    were at the bank?

4    A.  I started in 2003 in HSBC-India.  I was an NRI services

5    officer.

6    Q.  And what does "NRI Services" mean?

7    A.  So NRI is a government of India coined word.  It means

8    "non-resident Indian," a person who is of India nationality but

9    not living in India.

10   Q.  And for how long were you employed at HSBC in India?

11   A.  Three years.

12   Q.  And did you have any other job titles during that three-year

13   period?

14   A.  Yes.

15   Q.  What were they?

16   A.  I was managing a team of sales people for about a year.  For

17   a couple of months I managed -- I was a teller supervisor and

18   operations manager for a branch, and for a couple months I

19   managed the IBC, which is the international banking center of

20   India.

21   Q.  And in connection with your employment during that

22   three-year period, did you become familiar with how the bank

23   maintained records of accounts in India?

24   A.  Yes, I did.

25   Q.  Could you just briefly explain to the members of the jury

358

1    how the bank did that?

2    A.   So -- could you explain to me what you mean by "records of

3    account" again?

4    Q.   Well, if a customer came in and wanted some information

03:36   5    about a balance, what would you do?

6    A.   Right.  So we had a -- systems, our computer systems, and we

7    would look it up on our computer system.

8    Q.   And did that computer system have a name?

9    A.   It was called the HUB.

03:37   10   Q.   H-U-B?

11   A.   That's right.

12   Q.   And at some point in time, did you have an opportunity to

13   come to the United States?

14   A.   Yes.

03:37   15   Q.   And tell us about that opportunity?

16   A.   I came in 2006 to the HSBC Asia Pacific representative

17   office, which was based in New York.

18   Q.   Now, does that have an acronym, the HSBC Asian/Pacific?

19   Does that have an acronym?

03:37   20   A.   HBAP.

21   Q.   H-B-A-P?

22   A.   That's right.

23   Q.   And what were your job duties in New York when you came to

24   New York in 2006?

03:37   25   A.   I was an NRI client services manager, so I managed a set of

1    clients that were assigned to me.

2    Q.  If HBAP stands for the Asia/Pacific Division, is HSBC part

3    of HBAP?

4    A.  To the best of my knowledge, it is considered part of HBAP,

5    Asia/Pacific.

6    Q.  And what about here in the United States?  Does the bank

7    here, HSBC Bank of the United States, have an acronym?

8    A.  Internally we call it HBUS, which is HSBC-US, which

9    HSBC-North America Holdings.

10   Q.  And are those separate entities, as far as you know, HBUS

11   and HBAP?

12   A.  As far as I know, yes.

13   Q.  And if a United States person wanted to open up an account

14   in India, could they do that through your representative office

15   in New York?

16   A.  We could not open accounts for HSBC-India.  We could refer.

17   We would collect the documentation, we send to India, and they

18   would open it there.

19   Q.  But could any United States citizen just open an account in

20   India?

21   A.  No.

22   Q.  Who could?

23   A.  So only if you are an NRI or a person of India origin could

24   you open an account in India.

25   Q.  And are you familiar with the practices of the

360

1    representative office in New York?

2    A.   Yes.

3    Q.   And are you familiar with how clients would send money in

4    the United States over to India?

03:39    5    A.   Yes.

6    Q.   How would they do that?

7              MR. KIRSCH:   Foundation.   Time.

8              THE COURT:   Sustained.   Proceed.

9    BY MR. SULLIVAN:

03:39    10   Q.   How long did you work in the rep office, from what period of

11   time?

12   A.   So I worked for the New York representative office from 2006

13   to 2007, and then I was in the California representative office

14   from 2007 to 2010.

03:40    15   Q.   So during that approximate four years of time, did you

16   assist U.S. citizens who had accounts in India send money to

17   India?

18   A.   We would give them any information they required to send

19   money to India.

03:40    20   Q.   Do you know how they could send money to India?   Are you

21   familiar with that?

22   A.   They could wire the money to India.   They could send it --

23   send a check to India.   They could send a check to the lockbox.

24   Q.   And are you also familiar with some of the bank forms that

03:40    25   you would assist customers fill out?

361

1    A.   Yes.

2    Q.   And once the customer filled out those forms, what would the

3    representative office do with those forms?

4    A.   The representative office would just forward everything to

5    HSBC-India.

6    Q.   And did you assist clients, U.S. citizens in the United

7    States, open accounts over in India?

8    A.   We could help them with all the information they needed to

9    fill out the forms.  The accounts would get opened with

10   HSBC-India.

11   Q.   And were those accounts --

12              THE COURT:  One second.  Let me interrupt.

13              Please respond to the question that is asked.  If

14   you're asked whether you know something, testify to what you

15   know.

16              THE WITNESS:  Okay.

17              THE COURT:  All right?

18              THE WITNESS:  Sorry.

19              THE COURT:  Proceed.

20   BY MR. SULLIVAN:

21   Q.   When a client set up an account -- when you assisted a

22   client set up an account here in the United States over in

23   India, where would the actual accounts be located?

24   A.   India.

25              MR. KIRSCH:  I'm going to object, relevance, to "a

362

1    client."  What client?

2              THE COURT:  Clarify, please.

3    BY MR. SULLIVAN:

4    Q.  Did you assist clients open up accounts in India during your

5    four-year period at the rep office?

6    A.  Yes.

7              MR. KIRSCH:  Same objection.

8              THE COURT:  Overruled.  It's foundation.  Go ahead.

9    BY MR. SULLIVAN:

10   Q.  And when those clients set up accounts through the rep

11   office, where would the actual accounts be located?

12   A.  India.

13   Q.  And what types of services would you provide to U.S.

14   customers in the United States that had accounts over in India?

15   A.  Say that again?

16   Q.  What kind of services would you provide to your clients who

17   were U.S. citizens that had accounts in India?

18   A.  Any banking-related service they required.

19   Q.  We covered opening accounts.  Can you think of any other

20   services?

21   A.  Sure.  If they needed checkbooks, they needed debit cards,

22   they wanted to make a balance inquiry.  You know, any other

23   service that they may require on their bank accounts.

24   Q.  Tell the members of the jury about debit cards.

25   A.  Well, debit cards are like ATM cards of using, which you can

363

1    withdraw money from your account.

2    Q.  And to which accounts would the U.S. clients that you

3    assisted with their debit cards -- to which accounts would those

4    debit cards be linked to?

03:43    5    MR. KIRSCH:  Objection.  Foundation.  Vague.

6    THE COURT:  Objection sustained.

7    BY MR. SULLIVAN:

8    Q.  Did you provide your U.S. based clients with assistance in

9    obtaining debit cards?

03:43    10    A.  If they asked for it, yes.

11    Q.  And if they used the debit card, it would be linked to some

12    account that would pay for it, correct?

13    MR. KIRSCH:  Objection.  Leading.

14    THE COURT:  Objection sustained.

03:43    15    BY MR. SULLIVAN:

16    Q.  Can you explain to the members of the jury how the debit

17    cards would work for U.S. customers that had India accounts?

18    MR. KIRSCH:  Objection.  Relevance.

19    THE COURT:  Objection sustained.

03:44    20    MR. SULLIVAN:  May we approach, Your Honor?

21    THE COURT:  Yes.

22    (At side bar on the record.)

23    THE COURT:  There's a lack of foundation for the

24    testimony that you just elicited.  There is no indication that

03:44    25    this witness knows how debit cards worked for U.S. customers.

364

1      MR. SULLIVAN:  That's what I'm trying to elicit, I

2  think.

3      THE COURT:  Well, you did not ask sufficient

4  foundation questions with respect to the same.  That's why I

5  sustained his objection.  You may proceed.

6      (End of discussion at side bar.)

7  BY MR. SULLIVAN:

8  Q.  Could your clients obtain debit cards linked to their India

9  accounts?

10  A.  Yes.

11  Q.  How did that work?

12  A.  They could request for it and then -- that there was a form

13  that they have to fill.  And the form had to be sent to India,

14  and India would send them the debit card.

15  Q.  And what procedure did you use when you got a customer

16  inquiry for a balance?

17  A.  We did not have HSBC-India screened in the U.S., so we would

18  have to reach out to HSBC-India for that.

19  Q.  And when you say "screened," what do you mean by screened?

20  A.  We had no access to HSBC-India systems, so we didn't really

21  know the details of a client account.  If a client wanted

22  details, then we had to speak to someone in HSBC-India.

23  Q.  Could you look at what's been marked for identification as

24  Government Exhibit 69, which is in front of you.  Are you

25  familiar with that, the underlying pages?

365

1  A.  Yes.

2  Q.  And what are those?

3  A.  So the first -- these are HUB screens.

4  Q.  And are those the records of account over in India?

03:46  5  A.  These are the customer inquiry screens for checking accounts

6  for clients, yes.

7  Q.  And did you -- or how frequently would you seek the screen

8  shots such as those when you were working in the representative

9  office for that four-year period?

03:47  10  A.  Not very frequently.

11  Q.  And when -- in what particular situation would you seek a

12  screen shot such as those?

13  A.  If the client --

14         MR. KIRSCH:  Objection, Your Honor.  Calls for

03:47  15  hearsay.  It's also irrelevant.

16         THE COURT:  Overruled.

17         THE WITNESS:  So if a client would have a more

18  complicated inquiry or he'd have a significant number of

19  accounts and we needed to actually physically look at the

03:47  20  screens and verify the information before we provided it to him.

21  BY MR. SULLIVAN:

22  Q.  And have you had an opportunity to look at all the screen

23  shots that are contained in Government Exhibit 69?  Have you

24  seen these before?

03:48  25  A.  Yes.

366

1    Q.   When did you see them?

2    A.   Yesterday night.

3    Q.   And can you identify those as -- all of those as being

4    screen shots that were obtained from India relating to an

5    individual's account here in the United States?

6    A.   These are screen shots of a client in HSBC-India.

7    Q.   And what is the name of the client reflected on those screen

8    shots?

9    A.   A. Ahuja and N. Ahuja.

10            MR. SULLIVAN:  Your Honor, we offer the admission of

11   the underlying screen shots of Government Exhibit 69.

12            MR. KIRSCH:  Objection.  Foundation.  Hearsay.

13            THE COURT:  Overruled.  They're received.

14            (Exhibit 69 received in evidence.)

15            MR. KIRSCH:  Can you tell me what pages you've

16   offered?  I got it.

17            MR. SULLIVAN:  Your Honor, we're going to have to use

18   the Elmo because these are negative colored, and if I could have

19   the assistance of Ms. Siskind, I'd really appreciate it.

20            MS. SISKIND:  Permission to --

21            THE COURT:  Yes.

22   BY MR. SULLIVAN:

23   Q.   Ms. Katju, if you could look at the first screen shot in

24   Government Exhibit 69.  And if we could focus on the top part of

25   the screen.  Do you see where it says "C34" there, C34?

367

1   A.   Yes.

2            THE COURT:   One second.   Is it clear on the jury

3   screen?   All right.   Go ahead.

4   BY MR. SULLIVAN:

5   Q.   Do you know what C34 means?

6   A.   Yes.

7   Q.   What does it mean?

8   A.   It's a summary of the client's accounts.

9   Q.   And does that reflect an account number?

10  A.   Yes.

11  Q.   And what is the account number?

12  A.   The full account number?

13           MR. SULLIVAN:   Your Honor, I apologize.   These should

14  be redacted, but it would be the last four digits.

15           THE WITNESS:   You want me to just mention the last

16  four digits?

17  BY MR. SULLIVAN:

18  Q.   Yes.

19  A.   So the first on the screen that you've put up there is only

20  one account, and the account -- last four digits of the account

21  number are 5006.

22  Q.   Before that sub-account, what are the four numbers before

23  that?   I can't see that from here, but --

24  A.   1035.

25  Q.   And what type of account is that?   It says --

1    A.   It's an NRE account.

2             MR. KIRSCH:  Your Honor, I'm going to object.  There

3    are things -- I ask that this -- well, I think there are things

4    that are supposed to be redacted on this document.

03:51 5             THE COURT:  Approach.

6             (At side bar on the record.)

7             MR. SULLIVAN:  Your Honor, I apologize.  When we have

8    these in our Sanction program and when we went to pull them up

9    on the screen, when I went to pull them up on the screen, they

03:51 10   weren't there.  So now we're doing the old fashioned paper way.

11   They're redacted in the Sanction program but they're not

12   redacted here.

13            MR. KIRSCH:  Your Honor --

14            THE COURT:  Do you have a black marker?

03:52 15            MR. KIRSCH:  Yeah.  What I'm concerned about is the

16   inquiry by customer line.

17            MR. SULLIVAN:  Oh, yeah.  That's redacted, too.

18            MS. SISKIND:  That will take us two minutes to make

19   that happen.

03:52 20            MR. SULLIVAN:  I apologize.

21            THE COURT:  Take care of it.

22            One other thing, did you submit a list of exhibits

23   that include these numbers?  Because the exhibit list I have in

24   front of me starts with the 200 numbers.

03:52 25            MS. SISKIND:  That was the defense exhibit list.  We

369

1    did give your deputy clerk a copy of the government exhibit list

2    in the format requested by Your Honor.

3              THE COURT:  Okay.  I will check with her to see where

4    it is.  Okay.

5              (End of discussion at side bar.)

6              THE COURT:  We will resume in a couple of moments.

7    You can stand, get water, or whatever rather than go back to the

8    jury room.  There are a couple of things that need to be

9    attended to.

10              (Discussion off the record.)

11              THE COURT:  We're ready.

12    BY MR. SULLIVAN:

13    Q.  I believe we were looking in the first screen shot in

14    Exhibit --

15              THE COURT:  One moment.  Go ahead.

16    BY MR. SULLIVAN:

17    Q.  And if you look at the line that has account number 1035 --

18              A JUROR:  We don't have it.

19              THE COURT:  No.  That's good.  Please approach.

20              (At side bar on the record.)

21              (Discussion off the record.)

22              (End of discussion at side bar.)

23              THE COURT:  It will be just a moment.

24              (Brief pause.)

25              THE COURT:  Can you move to some other testimony and

370

1    come back to the exhibit?

2              MR. SULLIVAN:  Yes, Your Honor.

3              THE COURT:  That would be helpful.  Let's proceed.

4    Time is of the essence.

5              MR. SULLIVAN:  Ms. Siskind, can you --

6    BY MR. SULLIVAN:

7    Q.  Ms. Katju, directing your attention to Government

8    Exhibit 42, can you identify that?

9    A.  Yes.

10   Q.  What is it?

11   A.  It's an account opening form for HSBC-India.

12   Q.  And did you look at this one last night?

13   A.  Yes.

14   Q.  And is this the standard account opening form that were used

15   by NRI clients in the United States to open bank accounts in

16   India?

17   A.  At that time, yes.

18   Q.  And who is the name of the accountholder listed at the top

19   of the page?

20             THE COURT:  One second.  You said "at that time," at

21   what time?

22             THE WITNESS:  Well, at the time of the account

23   opening, because the account opening form changes as, you know,

24   there are changes in laws and so on.

25             THE COURT:  Proceed.

371

1   BY MR. SULLIVAN:

2   Q.  And who is identified as the name of the customer who is

3   opening the account?

4   A.  Arvind Ahuja.

04:01   5        MR. SULLIVAN:  Your Honor, we offer the admission of

6   Government Exhibit 42.

7        THE COURT:  Is there any objection?

8        MR. KIRSCH:  Object to foundation, Your Honor.

9        THE WITNESS:  And --

04:01   10       THE COURT:  One second.

11       (Brief pause.)

12       THE COURT:  I'll sustain the objection at this point.

13  BY MR. SULLIVAN:

14  Q.  Directing your attention to the last page of that document,

04:01   15  do you see --

16       MR. KIRSCH:  Your Honor, I'm going to object to the

17  witness testifying from an exhibit that the foundation has not

18  been laid and has not been admitted in evidence.

19       THE COURT:  Objection sustained.

04:01   20       MR. SULLIVAN:  Your Honor, this is -- do we need to

21  approach?

22       MR. KIRSCH:  Your Honor, I object -- I'm going to

23  object to counsel testifying.

24       THE COURT:  Objection sustained.

04:02   25       MR. SULLIVAN:  May we approach?

1          THE COURT:  Approach.

2          (At side bar on the record.)

3          THE COURT:  Do you wish to be heard?

4          MR. KIRSCH:  Yes, Your Honor.  Objection.  Foundation.

5  This witness can't testify.  There's been -- Arvind Ahuja's name

6  has not been mentioned.  She doesn't know him; she's never met

7  him.  She can't recognize the handwriting on there; she can't

8  testify to who filled out the paperwork; she can't testify to

9  who signed the document.  This is hearsay, and they have not

10  laid a foundation for it with this witness.

11          MR. SULLIVAN:  The defense has stipulated that this is

12  admissible.  It is signed by the defendant.  And according to

13  the stipulation that was submitted with the pretrial conference

14  report, each party reserved a right to call a witness to explain

15  the evidence, including certain entries on the evidence.  And

16  this witness is familiar with what some of the entries mean in

17  terms of the bank.

18          THE COURT:  I note the stipulation reached by the

19  parties indicates that the various exhibits, including the

20  Exhibit 41, were kept and maintained in the ordinary course of

21  business.  Now, notwithstanding that, is it your assertion that

22  this document is not admissible?

23          MR. KIRSCH:  Yes, Your Honor.

24          THE COURT:  And on what ground beyond what you stated

25  thus far?

373

1    MR. KIRSCH:  Well, Your Honor, it's hearsay.  They

2  can't establish who signed it, who wrote it, certainly not with

3  this witness.  They've not laid the proper foundation for that.

4  They've not laid the proper foundation to when it was created,

04:04  5  who created it, how it was created.  They've not laid any of

6  those foundational elements, not with this witness, Your Honor.

7        They can't call somebody who doesn't know anything

8  about these things and ask her to testify to them.

9        MR. SULLIVAN:  That's why we have a business record

04:04  10  exception under 803(6).  This is the HSBC business record that

11  was the subject of lengthy pretrial hearings and the

12  stipulation.

13        THE COURT:  As I recall most of our discussions at the

14  hearing related to Exhibits 69 and 71.

04:05  15        MR. KIRSCH:  This has not come up at all, not one

16  time.

17        MR. SULLIVAN:  But this is part of the pretrial

18  stipulation.  They stipulated that all HSBC records were

19  admissible as 803(6).

04:05  20        MR. KIRSCH:  Your Honor, that's not right.  I think

21  this is part of the 803(6) ruling that the court made, which the

22  court denied the admission of these exhibits under 803(6).  Then

23  the government made an 807 motion on two exhibits, 69 and 71.

24        So this exhibit is out under the Court's 803(6)

04:05  25  ruling.  It was never re-raised by the government.  I've never

374

1    said a word about it.

2           MR. SULLIVAN:  Your Honor, they agreed that the

3    underlying business records, other than the e-mails, were

4    admissible under 803(6).

5           THE COURT:  I'm going to send the jury out.

6           (End of discussion at side bar.)

7           THE COURT:  I have to look at some materials, and it

8    may take a couple moments.  Could you please return to the jury

9    room?

10          THE BAILIFF:  All rise.

11          (Jury out at 4:06 p.m.)

12          THE COURT:  Please be seated.  Please remain informal

13   for a couple of moments.

14          (Discussion off the record.)

15          THE COURT:  All right.  Back on the record.

16          The court is going to sustain the defendant's

17   objection at this stage.  If the government wishes to solicit

18   additional testimony in an effort to establish a firm foundation

19   for the admission of the exhibit that's now before the court,

20   they may attempt to do so.

21          With that, we'll bring the jury back in unless you

22   need to be heard further.

23          MR. SULLIVAN:  Your Honor, the defendant filed a

24   response to the government's motion to admit documents pursuant

25   to Federal Rules of Evidence 801(d) and 803(6), Document 127 at

                                                              375

1    page 3, "The defendant hereby -- the defendant withdraws his

2    hearsay objections to the following exhibits."  It lists

3    Exhibit 42 --

4            THE COURT:  What's the number again?

04:14  5         MR. SULLIVAN:  It's Document 127, at page 3.

6            THE COURT:  One second.  Hold on.

7            (Brief pause.)

8            THE COURT:  All right.

9            MR. SULLIVAN:  Your Honor, this is the second time

04:15  10   they're trying to use gamesmanship to try to make the government

11   look bad.

12           THE COURT:  One moment.  Let me read what you're

13   referring to.

14           (Brief pause.)

04:15  15        THE COURT:  All right.  They're not asserting hearsay,

16   but that doesn't mean there is an adequate foundation.

17           MR. SULLIVAN:  Your Honor, they stipulated to it being

18   a business record, and it is a signed application which is

19   admissible as non-hearsay under 801(d)(2)(A).  And it came from

04:15  20   HSBC.  It has the HSBC Bates numbers.  And we have a

21   certification from HSBC under 902(11).

22           THE COURT:  Mr. Kirsch?

23           MR. KIRSCH:  Your Honor, with respect to that

24   document, that was a pretrial document based upon what we

04:16  25   believed the evidence would be at the time we filed the

376

1     document.  That has changed entirely.

2          To the extent that -- I don't have the document, but I

3     don't doubt that 42 -- that the government said 42 is in there.

4          Your Honor, we have no objection to 43, which is a

04:16   5     blank form, but we do have an objection to 42.  It's hearsay for

6     which there's no applicable exception, and they cannot lay the

7     foundation as the court has correctly ruled.

8          So to the extent that we've inadvertently listed 42 in

9     a pretrial motion a week or two weeks ago, Your Honor, we're

04:16  10     making the objection now.

11          MR. SULLIVAN:  Your Honor --

12          THE COURT:  Hold up, please.  I want to go back to the

13     last set of materials concerning the exhibits, and I think there

14     was something subsequent to that which came from the defense.

04:17  15          (Brief pause.)

16          THE COURT:  133 merely dealt with the conspiracy

17     issue.  The trial stipulation, Document 111, encompasses Exhibit

18     Number 42, where it says Exhibit Numbers -- and then it has 20

19     through 55 on the first page -- says, "business record

04:19  20     maintained by HSBC."  Page 2 of that stipulation in paragraph 2

21     reads, "each listed item was kept and maintained in the normal

22     and regular course of business pursuant to Rule 803(6) of the

23     Federal Rules of Evidence."

24          Now, it's my understanding that the defendant wished

04:19  25     to step back from some portion of that stipulation; is that

377

1    correct?

2          MR. KIRSCH:  Well, yes, Your Honor.  What had happened

3    was we filed that stipulation and we sent subsequent e-mails,

4    which are also attached to the government's brief, to make sure

04:20  5    that the record was clear that we were objecting to these

6    documents under 803(6)(a) because the stipulation -- Your Honor,

7    when I was looking at the pretrial exhibits after the

8    stipulation, which was never signed by the defendant, by the

9    way, was submitted to the court as part of the pretrial filings

04:20  10    I think in June, I was looking at the stipulation and realized

11    that it was somewhat ambiguous.

12          So two or three weeks before trial I sent an e-mail to

13    the government.  I sent a series of e-mails to the government,

14    on exactly what we believe the stipulation meant and what it

04:20  15    didn't mean.

16          So -- but, Your Honor, the pretrial -- I mean, we're

17    making the objection now.  And the record is clear the

18    government even attached my e-mails to their filings, which were

19    sent, you know, maybe a month ago.

04:20  20          THE COURT:  One second.  I see Exhibit A,

21    Document 127, page 2 of 2.  It's Document 127-1, page 2 of 2.

22    The e-mail above the name of -- which bears the name Michael A.

23    S-K-O-K-N-A, says, among other things:  "As discussed in our

24    e-mail exchange on Friday, below is a table containing a

04:21  25    breakdown of the government exhibits to which we will agree to

378

1    stipulate under FRE 803(6) as business record, left-hand column,

2    and those government exhibits to which we will not agree,

3    right-hand column."

4         The right-hand column says -- it lists Exhibit

5    Number 42 as an exhibit not stipulated to under 803(6).

6         MR. KIRSCH:  That's a lawyer with our law firm,

7    Michael Skokna

8         MR. SULLIVAN:  Could we have the date?

9         THE COURT:  The e-mail is dated July 30th, 2012,

10   8:54 a.m.  Addressed to Ms. Siskind.

11        MR. SULLIVAN:  A month later, 127 --

12        THE COURT:  127 is the same.  Page 3 of the brief or

13   of the exhibits?

14        MR. SULLIVAN:  Page 3 of 16 of the actual pleading.

15        THE COURT:  All right.

16        MR. SULLIVAN:  The table lists everything they're

17   objecting to.  And then underneath it, it says, "The defendant

18   withdraws his hearsay objections to the following exhibits."  It

19   lists Exhibit 42.

20        And this was in response to the government's motion to

21   admit evidence pursuant to 801(d) and 803(6), and we have the

22   certification of Scott Maciejewski, and we had his testimony

23   that these documents all were maintained by HSBC in the United

24   States.  And I feel like I've been ambushed here in front of the

25   jury.

379

1          THE COURT:  Well, I do note that the question which

2     gave rise to this discussion solicited a response that this was

3     Dr. Ahuja's paperwork, correct?

4          MR. KIRSCH:  Correct, Your Honor, and that is what

5     they absolutely cannot establish with this witness.  That's

6     correct.

7          MR. SULLIVAN:  But that doesn't deal with the

8     admissibility.

9          THE COURT:  No, it doesn't.

10         MR. SULLIVAN:  But the trial stipulation, the pretrial

11    stipulation said we could call -- each party reserved the right

12    to call any witness to explain any of this evidence, and this

13    witness can explain what is meant when certain boxes are

14    checked.  That's why I'm trying to use this witness with this

15    exhibit.

16         MR. KIRSCH:  Your Honor, perhaps they can use a blank

17    form and they can have this witness explain what boxes mean on

18    the blank form.

19         Your Honor, it is -- they can't establish the -- we're

20    arguing about pretrial stuff because they can't lay a foundation

21    and they can't establish through this witness the admissibility

22    of the record of 803(6).  So they're pointing to -- the court

23    correctly pointed to my e-mail.  They're pointing to an error

24    and saying we stipulated.  We clearly didn't.  We stipulated to

25    the blank form in 43.

380

1          THE COURT:  Well, you certainly did not stipulate that

2    this was Dr. Ahuja's paperwork.

3          MR. KIRSCH:  Correct.  No question.

4          THE COURT:  On the other hand, you are not asserting

5    that this particular document is hearsay.  And it is also -- it

6    has also been noted for the record that this document has been

7    provided pursuant to a subpoena as material, which was kept and

8    maintained by HSBC.

9          So it is a document retrieved pursuant to a government

10   subpoena and certified as an HSBC-maintained document, correct?

11         MR. KIRSCH:  Yes, Your Honor, but we are -- the court

12   said that we're not objecting to it as hearsay; we are objecting

13   to it as hearsay.  We are.  That's the whole point.

14         There's no -- 803(6) does not apply to this document

15   as the court indicated.  We are objecting.

16         Your Honor, Mr. Sullivan is waiving a pretrial filing

17   up in the air.  We're here in trial now.  If there was an error

18   made in that pretrial -- I'm objecting right now, right here.

19   And I said it in my e-mail of him.  He knew we were objecting to

20   that document.  We did not object to a blank form.

21         If there was an error in that document, Your Honor,

22   it's meaningless right now.  It's just meaningless.

23         MR. SULLIVAN:  May I be heard, Your Honor?

24         THE COURT:  You can.

25         MR. SULLIVAN:  That e-mail was over one month ago, and

381

1    then we litigated this for four days, and they withdrew their

2    objection.  And now -- now they want their cake and eat it too,

3    and they are trying to make the government look bad in front of

4    the jury.

04:27    5         THE COURT:  No.  The bottom line is they're trying to

6    defend their client as they're supposed to do.

7         MR. SULLIVAN:  But they agreed that this could come in

8    as a business record, and now they're saying that they don't

9    agree?  We have the certification.  Do we need to call

04:27   10    Mr. Maciejewski again and go through that whole thing?

11         MR. KIRSCH:  Your Honor, they tried to call him, and

12    they called him.  And, by the way, this document was filed

13    before all these pretrial matters were -- before the hearings.

14         And they called him, and he couldn't lay the

04:27   15    foundation -- he could not get over 803(6).  He couldn't do it.

16    So I guess they could call him again, and he still won't be able

17    to do it.

18         MR. SULLIVAN:  Your Honor, this is a business record

19    that was produced pursuant to a grand jury subpoena.  We have

04:27   20    the valid certification under 902(11).  It comes in as a

21    business record, and it's signed by the defendant.  And they

22    agreed when we reviewed all the exhibits after the conspiracy

23    ruling and they said this all is admissible.  And so if we're

24    going to litigate it all over again --

04:28   25         THE COURT:  I'm going to look back at the discussion

382

1    concerning these exhibits so that I can be as consistent and

2    accurate as possible.  I'm looking for where it talks about this

3    particular document.  I'll take a brief recess.

4         MR. KIRSCH:  Your Honor, if I could help the court, it

04:28    5    was the ruling on Friday afternoon at the end of the day to

6    which I'm referring.

7         THE COURT:  All right.  Very well.  You may relax.

8         THE BAILIFF:  All rise.

9         (Recess taken at 4:28 p.m., until 4:49 p.m.)

04:49    10        THE COURT:  The court has considered the arguments

11   that have been made by the parties, and it does conclude that

12   the government should be given an opportunity to lay a

13   foundation for testimony concerning this particular witness --

14   the testimony of this particular witness respecting Exhibit

04:50    15   Number 42.

16        The court does not find that it had ruled that this

17   particular exhibit is inadmissible or that testimony cannot be

18   offered respecting the same.

19        I note that the defense is asserting a hearsay

04:50    20   objection to this particular document.

21        And with that having been said, when the jury is ready

22   to come out, the government can proceed.  I don't believe that a

23   hearsay objection will necessarily preclude testimony from a

24   witness respecting this particular document.

04:51    25        If you'd like some clarification, I'll give you some

383

1    further clarification.

2         MR. KIRSCH:  Are these foundational questions going to

3    be asked now outside the presence of the jury?

4         THE COURT:  Well, it probably would be helpful to have

5    the foundation put in now so that we don't have unnecessary

6    testimony in front of jury.

7         Does the government wish to proceed with the jury out

8    of the room in an attempt to demonstrate whether or not there is

9    a basis upon which this exhibit may be received?

10        MR. SULLIVAN:  Well, Your Honor, we also have the

11   902(11) certification that these, in fact, are records that meet

12   the 803(6) business record exception.  And there's an attachment

13   to that certification which is found at document 125-5.

14        THE COURT:  All right, let me see if I can find that.

15        (Brief pause.)

16        THE COURT:  Has 125 been handed up?  My notebook goes

17   through 188.

18        MR. SULLIVAN:  No, this is Docket 125.  Docket 125-5.

19        THE COURT:  Oh, docket.  Okay.

20        MR. SULLIVAN:  It's where we attached the business

21   records certification to one of our pleadings.

22        MR. KIRSCH:  Your Honor, that was the same witness

23   that signed the certification that they called live.

24        THE COURT:  That was, yes, Mr. Maciejewski.

25        MR. KIRSCH:  He testified live that he had never

384

1    reviewed these documents.  Despite the fact that he signed a

2    piece of paper, I cross-examined him on that, and he didn't

3    review these.  He just testified to the process, but he didn't

4    testify about these documents, Your Honor.  You can't lay a

04:53  5    business records certification with a legal processing fellow

6    who has never reviewed the documents.  They had the wrong person

7    sign the 902(11) certification.

8              MR. SULLIVAN:  Your Honor --

9              THE COURT:  One moment.  Let me go through here.

04:53 10              (Brief pause.)

11              THE COURT:  Go ahead.

12              MR. SULLIVAN:  Your Honor, the hearings to deal with

13    hearsay objections and it centered around the e-mails --

14              THE COURT:  I understand that.  I want to focus on

04:55 15    this particular document and what you said concerning the

16    certification of Mr. Maciejewski.

17              MR. SULLIVAN:  Yes.  This exhibit is included in

18    Attachment A.  It lists all of the exhibits that are included.

19    It is Exhibit 42.  And this is a record of a regularly conducted

04:56 20    activity of HSBC.  Mr. Maciejewski testified that pursuant to a

21    grand jury subpoena they conducted a search of their records,

22    and that the records came from either the server or from the

23    shared directory or from actual hard paper files that were found

24    in the United States.  And this is a record of a regular

04:56 25    conducted activity.

385

1      And then in Document 125, after we filed this, the

2  defense withdrew their hearsay objection specifically, and so

3  when Your Honor ruled on Friday these -- the documents that they

4  withdrew their hearsay exception to were not part of your

5  ruling.

6      THE COURT:  I did not rule that this document could

7  not be received.  My ruling, if I recall it correctly, related

8  to whether or not the government had established that there was

9  a conspiracy which would allow the admission of certain e-mails

10  that were in a chain of materials that were part of our

11  discussion.

12      Now, this particular document purports to be something

13  other than an e-mail of an employee of HSBC, and it has been

14  produced in response to a subpoena to HSBC in New York, which

15  was asked to retrieve records that have been maintained in its

16  system and gathered during the ordinary course of its business.

17      The document purports to include information

18  concerning this defendant and bears two signatures on Bates

19  page 7785.  And those signatures appear to be the names Namrata

20  Ahuja, and then it appears to be an A something.  And I'm not

21  going to say I know exactly what that says, but it would appear

22  to be what would purport to be the signature of the defendant.

23      MR. SULLIVAN:  And the next page, too, there are

24  another couple of signatures.

25      THE COURT:  And that is true.  That's on Bates

386

1    page 7786.

2              MR. SULLIVAN:  And his name --

3              THE COURT:  So are you representing this to be a

4    document prepared by the defendant?

04:58    5              MR. SULLIVAN:  It's a document signed by the defendant

6    that was maintained in a regular course of business by HSBC,

7    and, therefore, it's admissible as both a business record and

8    under 801(d)(2)(a) as an admission of the defendant.

9              MR. KIRSCH:  Your Honor, it's not the defendant's

04:59   10    signature, and they can't establish it with this witness.

11             And the court can see that from the other documents

12    that the government has marked that purport to contain the

13    defendant's signature.  Those signatures look alike.  This one

14    looks totally different.

04:59   15             THE COURT:  Well, again, I'm not going to say what it

16    is.  It purports to be a signature that is represented to be the

17    signature of the defendant.

18             MR. KIRSCH:  But neither can this witness, Your Honor.

19    That's the issue.

04:59   20             THE COURT:  And that's why I began my discussion by

21    saying that this witness was being asked about whether or not

22    these -- this is a paper of the defendant.

23             MR. KIRSCH:  I agree.  I agree that we should proceed

24    with the foundational questions.

04:59   25             THE COURT:  So you can ask some additional questions,

387

1    but I do note the things that have been brought out here,

2    including your assertion that this is purportedly a statement of

3    the defendant or is purported to be a document prepared by the

4    defendant on forms of HSBC, that HSBC has produced in response

05:00    5    to a government subpoena which required HSBC-North America or --

6    what did you call it?

7                THE WITNESS:  HBUS.

8                THE COURT:  HBUS to retain in its system and it has

9    allegedly done so since January 2006.

05:00    10               All right.  Do you want to put anything else in the

11   record at this point in time before we return to the proceeding

12   in front of the jury?

13               MR. SULLIVAN:  So we're clear, we've -- so we've

14   already established through the certification that this is a

05:01    15   business record --

16               THE COURT:  Which was kept by HSBC.

17               MR. SULLIVAN:  I will continue asking questions to

18   make a foundation.

19               THE COURT:  A further foundation.

05:01    20               Do you want to add additional information to the

21   record as a foundation before the jury comes out?

22               MR. SULLIVAN:  Yes.

23               THE COURT:  All right.  Go ahead.

24                          VOIR DIRE EXAMINATION

25   BY MR. SULLIVAN:

388

1   Q.   Ms. Katju, are you familiar with this type of document

2   without looking at the names on it?

3   A.   The account opening form?

4   Q.   Yes.

05:01   5   A.   Yes.

6   Q.   And did you regularly use this account application when you

7   worked at the HSBC offices during the four years in the United

8   States?

9   A.   Yes.  Documents such as these.

05:02   10   Q.   And is there a date stamped here on the front page of

11   January 28th, 2008?

12   A.   Yes.

13   Q.   And what would happen when customers wanted to open up

14   accounts?  Would they fill out forms such as these?

05:02   15   A.   Yes.

16   Q.   And was that a part of the regularly conducted business of

17   HSBC in New York?

18   A.   So HSBC in New York wouldn't fill out the form.

19   Q.   Would HSBC-New York eventually get the form and then

05:02   20   transmit it to India?

21   A.   Yes.  Yes.

22   Q.   And on those forms did the bank require that the person who

23   was applying for the account who is listed at the top of the

24   form sign the form?

05:02   25   A.   There are two accountholders on this account.  Arvind Ahuja

389

1    and Namrata Ahuja.  Namrata Ahuja is second accountholder.  And

2    they have both signed.

3    Q.  And, as a matter of fact, when they signed, they actually

4    are signing a customer declaration where they are actually

5    declaring things that the bank is requiring before the bank will

6    even accept the application, correct?

7    A.  Correct.

8               MR. SULLIVAN:  Your Honor, we offer these as business

9    records signed -- purportedly signed by Arvind Ahuja because the

10   document speaks for itself.

11              MR. KIRSCH:  Can I ask her a question, Your Honor?

12              THE COURT:  Absolutely.

13                       VOIR DIRE EXAMINATION

14   BY MR. KIRSCH:

15   Q.  Ms. Katju, have you ever seen the signature of Dr. Ahuja?

16   A.  No.

17   Q.  So you have no idea who signed this document, do you?

18   A.  No.

19              MR. KIRSCH:  No further questions, Your Honor.

20              THE COURT:  The objection is overruled.  The court

21   will admit the exhibit over the objection of the defense.

22              We'll bring out the jury.

23              (Jury in at 5:04 p.m.)

24              THE COURT:  You may proceed.

25              MR. SULLIVAN:  Thank you, Your Honor.

390

1                    DIRECT EXAMINATION (Resumed)

2    BY MR. SULLIVAN:

3    Q.  Ms. Katju, I was directing your attention to Government

4    Exhibit 42 when we took a break.  And can you tell the members

05:04  5  of the jury what the purpose of this form is?

6    A.  To open an account with HSBC-India.

7    Q.  And whose name is listed at the top of the account?

8    A.  Arvind Ahuja.

9    Q.  And did the bank require that the applicants to open an

05:05  10  account had to sign this form?

11   A.  Yes.

12              MR. SULLIVAN:  Your Honor, we offer the admission of

13   Government Exhibit 42.

14              THE COURT:  Does the defense wish to be heard, or do

05:05  15  you have any objection you wish to voice at this time?

16              MR. KIRSCH:  Same objection.

17              THE COURT:  The objection is overruled.  It's

18   received.

19              (Exhibit 42 received in evidence.)

05:05  20  BY MR. SULLIVAN:

21   Q.  And if you look at the very top --

22              May we publish it, Your Honor?

23              THE COURT:  Yes.  How do you want to show it, by

24   computer?

05:05  25             MS. SISKIND:  By computer.

391

1          MS. JOHNSON:  Just one moment, Your Honor.  There are

2    some technical difficulties I just noticed.

3    BY MR. SULLIVAN:

4    Q.  In directing your attention to the top of the application

5    form, can you read into the record what it says at the very top

6    of the form?

7    A.  "Please open an account at your New Delhi branch as per

8    details below."

9    Q.  And is New Delhi in India?

10   A.  Yes.

11   Q.  And the name of the customer is Arvind Ahuja; is that

12   correct?

13   A.  Yes.

14   Q.  And moving down toward the middle of the page, what is the

15   account number reflected for where it asks for existing

16   HSBC-India account number?

17   A.  The client was an existing accountholder with us.

18   Q.  And do you see the account numbers listed in the middle of

19   the page there?

20   A.  Some of it is blocked.  Half of it you can see.

21          MR. SULLIVAN:  Your Honor, could you instruct the jury

22   on why we had to redact this?

23          THE COURT:  Members of the jury, there is certain

24   personal information that the court directs parties to screen

25   because this information will ultimately be placed on the docket

392

1    in this court and be available publicly.  And for the

2    preservation of a certain level of privacy, the court requires

3    the parties to mask portions of things such as Social Security

4    numbers and account numbers.  All right?

05:08    5    BY MR. SULLIVAN:

6    Q.  Do you see the last four digits of an account ending with

7    7002?

8    A.  I do.

9    Q.  And turning to the next page at the very top, where it says

05:08    10   "Choice of Account," do you see the box where it's checked "NRO

11   Savings"?

12   A.  Yes.

13   Q.  Can you explain to the members of the jury what "NRO" is?

14   A.  NRO is a type of account that can be opened in India.

05:08    15   Q.  And do you know whether that type of an account, the

16   interest on that account is taxable in India?

17   A.  It is taxable in India.

18   Q.  And moving down do you see where it says "Type of Account"

19   in the box checked as "Premier"?

05:08    20   A.  Yes.

21   Q.  And could you explain to the members of the jury what a

22   Premier account is?

23   A.  In India a Premier account is an account where the

24   accountholder has more than 25 lac of India rupees, which is

05:09    25   approximately equal to $50,000 or more.

393

1    Q.  And could you tell the members of the jury what type of

2    access to their account a Premier member would have?

3    A.  What kind of access?

4    Q.  Well, how about in terms of bank statements?  Would they

5    receive bank statements?

6    A.  Yes.

7           MR. KIRSCH:  Your Honor, I'm going to object.  They're

8    going back and forth between a generic general customer and this

9    account, and it's confusing and misleading.

10          MR. SULLIVAN:  I'll rephrase.

11          THE COURT:  Well, rephrase.

12   BY MR. SULLIVAN:

13   Q.  For the person who opened this account, Arvind Ahuja, given

14   that he checked the Premier box, would he be -- what type of

15   services would he receive in terms of monthly statements and

16   access to his account?

17          MR. KIRSCH:  Objection.  Speculation.

18   BY MR. SULLIVAN:

19   Q.  Do you know?

20   A.  As a Premier accountholder --

21          MR. KIRSCH:  Objection, Your Honor.  Speculation as to

22   Arvind Ahuja.

23          THE COURT:  Rephrase the question so it's clear

24   exactly what you're asking.

25   BY MR. SULLIVAN:

394

1  Q.  For any U.S. person who opened a Premier account over in

2  India, what type of access and financial information would they

3  have as -- because they were a Premier member?

4        MR. KIRSCH:  Objection as to "any person" if it

05:10  5  includes the defendant.

6        THE COURT:  Rephrase.

7  BY MR. SULLIVAN:

8  Q.  What type of access would a Premier accountholder have to

9  their account given their status as a Premier member?

05:10  10       MR. KIRSCH:  Same objection as if the government is --

11       THE COURT:  The objection is overruled.

12       MR. KIRSCH:  -- applies to the defendant.

13       THE COURT:  The objection is overruled.  Proceed.

14       THE WITNESS:  As A premier accountholder, they would

05:11  15  get monthly statements.

16  BY MR. SULLIVAN:

17  Q.  And what would those statements reflect?

18  A.  It would be a consolidated statement of all their accounts

19  with HSBC-India.

05:11  20  Q.  Would that include balances and accrued interest?

21  A.  It would include balances, interest earned.  If it's on a

22  savings account, it would be interest earned.  On fixed

23  deposits, I believe it would be -- which is CDs, on CDs it would

24  be principal amount and maturity amount, I believe.

05:11  25  Q.  And once the interest was credited, would that be reflected

395

1    on the statements?  Once the CD matured?

2    A.   If a CD matures, one of two things has to happen:  It must

3    either roll over into a new CD, and then it will appear; or they

4    choose to not hold the CD anymore, and it will not appear.

05:12  5    Q.   And is there any other type of access to a Premier account

6    that you're aware of?

7    A.   Premier account has a lot of facilities.  You'll have to be

8    more specific.

9    Q.   Well, could -- how could a Premier account customer get

05:12  10   access to their account to find information about their account;

11   is there another way to do it?

12              MR. KIRSCH:  Your Honor, I'm going to object.  This is

13   speculation.  Clearly she doesn't have the knowledge for this

14   testimony.

05:12  15              THE COURT:  Ask another question, please.

16   BY MR. SULLIVAN:

17   Q.   Are you familiar with the Internet?

18   A.   Yes.

19   Q.   Does that ring a bell?

05:12  20   A.   Internet banking?

21   Q.   Does a Premier account have access to Internet banking?

22   A.   Yes.

23   Q.   So could you explain to the members of the jury how someone

24   with a Premier account could access their account over the

05:13  25   Internet?

396

1    MR. KIRSCH:  Your Honor, this is all speculation.  And

2  foundation as to "Internet banking."

3    THE COURT:  Overruled.

4    MR. KIRSCH:  Time, place, when.

5    THE COURT:  Your objection is clear.  It's still

6  overruled.  Proceed.

7    THE WITNESS:  So all accountholders with HSBC,

8  irrespective of whether they're Premier or not, have Internet

9  banking access on which they can view all of their accounts.

10    MR. KIRSCH:  Objection.  Foundation.

11  BY MR. SULLIVAN:

12  Q.  And was that available --

13    THE COURT:  One second.

14    MR. KIRSCH:  Objection as to when Internet banking

15  even began at HSBC.  Foundation.

16    MR. SULLIVAN:  I'm asking that question.

17    THE COURT:  The objection is overruled, and you can

18  proceed.

19  BY MR. SULLIVAN:

20  Q.  Do you know --

21    THE COURT:  And resist editorialization.

22    MR. SULLIVAN:  Thank you, Your Honor.

23  BY MR. SULLIVAN:

24  Q.  Do you know when Internet access became available for

25  Premier accountholders?

397

1    A.   No.

2    Q.   If you go to the very last page of this exhibit, do you see

3    two signature blocks for customer signatures?

4    A.   Yes.

05:14   5    Q.   And you cannot identify those signatures; is that correct?

6    A.   No, sir, I cannot identify them.

7    Q.   And at the top of the page, it says "Customer Declaration"?

8    A.   Yeah.

9    Q.   Can you read any of the fine print there?

05:14   10   A.   No, sir.

11   Q.   Directing your attention to Government 43.  Do you have that

12   in front of you?

13   A.   Yes.

14   Q.   Do you recognize that?

05:14   15   A.   Yes.

16   Q.   What is that?

17   A.   It is the declaration the client signs, the disclosures.

18   Q.   Is that a blank declaration that's easier to read?

19   A.   Yes.

05:15   20        MR. SULLIVAN:  Your Honor, we move the admission of

21   Government Exhibit 43 into evidence.

22        MR. KIRSCH:  No objection.

23        THE COURT:  It's received.

24        (Exhibit 43 received in evidence.)

05:15   25   BY MR. SULLIVAN:

398

1   Q.  And if we zoom into the middle of the customer declaration

2   right above the bullet points, can you just read into the record

3   what it says before the bullet points?

4   A.  "I/we understand and acknowledge that."

5   Q.  And what does the third bullet point say?

6   A.  The third one?

7   Q.  The fourth one.

8   A.  "Under current U.S. tax laws, U.S. citizens and residents

9   are subject to tax on their worldwide income.  Please consult

10  your tax advisor regarding the tax treatment of these deposits

11  in USA or any other country where you are subject to tax,

12  including your country of residence/nationality."

13  Q.  And are you familiar with other types of accounts that U.S.

14  citizens could invest in in India other than NRO?

15  A.  Yes.  They could hold NRE accounts or FCNR accounts.

16  Q.  And let's start with FCNR accounts, what is that?

17  A.  Foreign currency nonresidents accounts.  These are CDs that

18  can be held in currencies -- in five currencies other than

19  Indian rupees.  So in foreign currencies to India.

20  Q.  And I know this is kind of a memory test, but can you

21  remember the five currencies other than rupees that a U.S.

22  citizen could hold in a certificate of deposit known as an FCNR?

23  A.  I can try.  U.S. dollars; pounds, Great Britain pounds;

24  Australian dollars; I think euros; and yen, I think.

25  Q.  And do you know whether or not the interest earned from an

399

1    FCNR account is taxable in India?

2    A.  It is not taxable in India.

3    Q.  And is there a third type of account that a U.S. citizen

4    could own in India?

5    A.  An NRE account.

6    Q.  NRE?

7    A.  Non-resident external.

8    Q.  And what type of account is that?

9    A.  It is held in India rupees.  It's a rupee denominated

10   account.  But you can only -- the only money that can be

11   credited into that account is either foreign currency or Indian

12   rupees from another NRE account.

13   Q.  And is that taxable in India, an NRE account?

14   A.  The interest on the NRE account is not taxable in India.

15   Q.  And earlier you testified that an NRO account -- well, just,

16   what is an NRO account?  What type of currency?

17   A.  It is denominated in Indian rupees, and you can credit both

18   Indian rupees and foreign currency into that account.

19   Q.  And is that taxable in India?

20   A.  Yes, it's taxable in India.

21   Q.  And do you know what the rate of tax was there?

22   A.  Approximately 30 percent.  About 30, 33 percent.

23   Q.  And was there anything a U.S. citizen could do to have that

24   tax rate reduced?

25   A.  Yes.  If the U.S. citizen signed a declaration stating that

400

1    they were aware of the dual taxation avoidance agreement, then

2    they could reduce the tax liability to 15 percent.

3    Q.  And that tax declaration, is that a form that you're

4    familiar with?

5    A.  I have seen it a couple of years ago.

6    Q.  And how was that form used in the United States

7    representative offices vis-a-vis the clients, the U.S. citizen

8    clients?

9    A.  So if the clients said that, you know, they would like to

10   pay the taxes in the U.S. and they'd like the tax liability in

11   India to be reduced, the only option was for them to attest on

12   that form.

13          MR. SULLIVAN:  Your Honor, at this time I'd like to

14   put on the screen a demonstrative exhibit entitled, "Accounts

15   Available to NRI Customers of HSBC-India."

16          THE COURT:  Is there any objection?

17          MR. KIRSCH:  Cumulative.  I think we've just gone over

18   this, Your Honor.  I don't know if we're gonna go over the same

19   ground we just went over.  The objection is cumulativeness.

20          THE COURT:  If it appears to be cumulative, I will

21   make haste.  In other words, I'll give them some latitude now,

22   but they're on notice.  I will exercise authority under

23   Rule 403.

24   BY MR. SULLIVAN:

25   Q.  Have you seen this chart before?

1    A.   Yes.

2    Q.   And is it accurate but for one thing?

3    A.   Yeah.  Where it says at 33 percent, it's at approximately

4    33 percent.  Around 33 percent.

05:21    5    Q.   So if we change it to "approximately 33 percent," that's an

6    accurate chart?

7    A.   Yeah.

8    Q.   Moving on.

9    A.   Also, any currency other than Indian rupees is not accurate.

05:21    10   There are only about five or six currencies.

11   Q.   For which line there?

12   A.   FCNR.

13   Q.   Only the five that you listed.

14   A.   Only the five or six currencies.  It's just as is.

05:21    15   Q.   If we make those corrections, that then would be an accurate

16   chart?

17   A.   Yes.

18   Q.   Moving on, directing your attention to Government

19   Exhibit 42.  Are you familiar with -- no, excuse me, 47.

05:22    20        Are you familiar with that document?

21   A.   Yes.

22   Q.   And what is that?

23   A.   This is the document that an NRO accountholder would sign if

24   he wanted his tax liability to be reduced from 30 percent to

05:22    25   15 percent.

1    Q.  Are you saying 30 percent?

2    A.  Three zero, yeah.  About 30 percent.  30, 33 percent.

3    Q.  So on that last chart, we would say approximately

4    30 percent.

05:22    5           And was it the bank's practice at that time that the

6    accountholder's name would be listed at the top of the form?

7           THE COURT:  One second.  At what time?

8    BY MR. SULLIVAN:

9    Q.  At the time that the document was signed.

05:23    10   A.  So I don't have a date on this form.

11   Q.  At the time, not the date.

12          At the time it was signed, was it the bank's procedure

13   that the customer's name had to be filled in at the top of the

14   form?

05:23    15          MR. KIRSCH:  Objection.  She just testified she can't

16   testify to when it was signed.

17          THE COURT:  Ask another question, please.

18   BY MR. SULLIVAN:

19   Q.  In paragraph 1, what period of time does this form cover?

05:23    20   A.  For the financial year 2008-2009.  That is the period from

21   1st day April 2008 to 31st March 2009.

22   Q.  And at the bottom of the form, does it indicate at what

23   point in time this form had to be submitted in order to take

24   effect?

05:24    25   A.  It will have to be submitted to the bank by 24th March 2008.

403

1    Q.  And was it the bank's procedure to put the name of the

2    client at the top of the form?

3    A.  It seems like it, yeah.

4    Q.  And did the bank require anyone -- did the bank then require

5    that person to sign this form?

6    A.  Yeah.

7         MR. KIRSCH:  Your Honor, I'm going to object based on

8    personal knowledge, "it seems like it."

9         THE COURT:  Sustained.

10   BY MR. SULLIVAN:

11   Q.  Did you have clients who actually filled out this form?

12   A.  I have not had this form filled out, to the best of my

13   knowledge, but I have known people who filled out this form,

14   other colleagues.

15        MR. KIRSCH:  Objection.  Based on -- any question will

16   be based on hearsay, Your Honor.  She doesn't know the form.

17        MR. SULLIVAN:  May I ask --

18        THE COURT:  You may ask additional questions.

19        MR. SULLIVAN:  Thank you, Your Honor.

20   BY MR. SULLIVAN:

21   Q.  When you transferred out to Fremont, California, did you get

22   a promotion?

23   A.  Yes.

24   Q.  What was your job -- what were your job duties then?

25   A.  I was managing a team of relationship managers.

404

1    Q.  Of approximately how many?

2    A.  It varied.  Let's say, approximately eight.

3    Q.  And do you have knowledge that those team managers under

4    your supervision had clients fill out this form?

05:25    5    A.  Yes.

6    Q.  So then are you familiar with the procedures relating to

7    this form?

8    A.  Yes.  I've not got one filled out myself, but I'm generally

9    familiar.

05:25    10           MR. SULLIVAN:  Your Honor, we offer the admission of

11    Government Exhibit 47.

12           MR. KIRSCH:  Objection.  Foundation.

13           THE COURT:  Approach.

14           (At side bar on the record.)

05:26    15           THE COURT:  Do you wish to be heard further respecting

16    foundation?

17           MR. KIRSCH:  Yes, Your Honor.  Just one thing.

18    They're trying to put in their case through a witness who has no

19    personal knowledge of these things.  And I object based on

05:26    20    foundation.  They can't lay the foundation for these records.

21           THE COURT:  Is there anything else you can offer as

22    foundation?

23           MR. SULLIVAN:  Yes, Your Honor.  This was another

24    exhibit listed that they withdrew their hearsay objection from,

05:26    25    and this is a list -- this is listed in the 902 --

405

1      THE COURT:  This is an exhibit with respect to which a

2   hearsay objection may have been withdrawn, but is there anything

3   else you wish to draw out from the witness respecting

4   foundation?

05:27  5      MR. SULLIVAN:  Yes, Your Honor.

6      THE COURT:  What?

7      MR. SULLIVAN:  That this document, if the U.S.

8   customer wanted to have their income tax rate reduced in India

9   for the -- she just said the NRO accounts -- that it was their

05:27  10   business practice that they would have to fill in this form,

11   sign it.  And then I can elicit from her that she would have

12   received this form in the representative office, and it would

13   have been transmitted to India.

14      And that this record was made in the representative

05:27  15   office because it was turned over pursuant to a grand jury

16   subpoena that's the subject of the 902(11) certification.

17      MR. KIRSCH:  Your Honor, they may be able to do that

18   with a blank form.  They can't do it with this form.  They

19   cannot establish -- they do not have a foundation to establish

05:27  20   those things and to make those arguments.

21      THE COURT:  Well, at the very least, she has not at

22   this point in time testified to those things that counsel has

23   just outlined as part of a foundation.

24      MR. SULLIVAN:  So I have to ask additional questions.

05:28  25      THE COURT:  The objection is sustained.

406

1          (End of discussion at side bar.)

2          THE COURT:  The objection is sustained.  You may ask

3     another question.

4     BY MR. SULLIVAN:

5     Q.  Ms. Katju, after a client signed this form, what would be

6     the next step in trying to have their income tax --

7          THE COURT:  One second.  Are you familiar with this

8     form?

9          THE WITNESS:  Yes, sir.

10          THE COURT:  Proceed.

11     BY MR. SULLIVAN:

12     Q.  You're familiar with this form; what would happen after the

13     client signed this form?

14     A.  It would be sent to India, HSBC-India.

15     Q.  And would it be sent through the representative office?

16     A.  Yes.  If the -- if it's being given to the representative

17     office.

18     Q.  And would this -- if this was turned over pursuant to a

19     subpoena, would that mean that it was kept in the United States?

20          MR. KIRSCH:  Objection.  Calls for speculation.

21          THE COURT:  Sustained.

22     BY MR. SULLIVAN:

23     Q.  And is this the type of document, though, that the bank

24     relied on in the ordinary course of business to transmit to

25     India to lower the tax rate of U.S. citizens who maintained

407

1    accounts over in India that were taxable?

2            MR. KIRSCH:  Objection.  Leading and calls for

3    speculation.

4            THE COURT:  It is leading.  I'll sustain the objection

5    on that ground.

6    BY MR. SULLIVAN:

7    Q.  Was this required -- was this record required based on your

8    knowledge of the practices in the representative office for

9    customers that wanted to reduce their income tax liability?

10           MR. KIRSCH:  Objection.  Leading.

11           THE COURT:  Sustained.

12   BY MR. SULLIVAN:

13   Q.  Why was this record -- how was this record used in the bank?

14   A.  This was used for clients to reduce the tax liability.

15   Q.  And did the record go through the rep office?

16   A.  Not always.

17   Q.  But if it did go through the rep office, would a record of

18   it have been made by the bank in the normal course of business?

19   A.  Yes.

20           MR. SULLIVAN:  Your Honor, we renew our offer of

21   Government Exhibit 47 into evidence.

22           MR. KIRSCH:  Same objection as to this document,

23   Your Honor.

24           THE COURT:  Overruled.  It is received.

25           (Exhibit 47 received in evidence.)

408

1    MR. SULLIVAN:  Your Honor, could we switch back now?

2    THE COURT:  To the computer?  Okay.

3    MR. SULLIVAN:  There it is.

4    BY MR. SULLIVAN:

5    Q.  And if we could zoom to the very top of the form that has

6    the name of the bank and the person who is applying for this.

7    What is the name of the bank for this tax declaration?

8    A.  The Hong Kong and Shanghai Banking Corporation Limited.

9    Q.  And which office is indicated?

10   A.  Mumbai office.

11   Q.  And what country is that located?

12   A.  India.

13   Q.  And who is the name of the person?

14   A.  Arvind Ahuja.

15   Q.  And can you read the sentence after the time period there?

16   What does that sentence say in paragraph 1?

17   A.  "I am/will be a nonresident within the meaning of the Income

18   Tax Act 1961 for the financial year 2008-2009; that is, the

19   period from 1st April 2008 to 31st March 2009.  I am a tax

20   resident of the USA within the meaning of the agreement for

21   avoidance of double taxation between India and USA, the tax

22   treaty for short, and, therefore, entitled to the benefits of

23   the tax treaty."

24   Q.  And what is the name that's printed underneath the signature

25   at the bottom of this letter of this tax declaration?

409

1    A.   Arvind Ahuja.

2    Q.   And finally moving on to Government Exhibit 54, do you have

3    that before you?

4    A.   I believe so.

05:33   5    Q.   To your knowledge, did the representative offices -- because

6    you worked in New York and Fremont, California -- ever forward

7    to India signed correspondence from clients in the United

8    States?

9    A.   So HSBC-India maintained a lockbox, and all correspondence

05:33   10   would go to the lockbox.  The lockbox would forward the

11   correspondence to the representative office in New York, and

12   New York would forward it to HSBC-India.

13   Q.   And can you identify Government Exhibit -- is that something

14   that related to the activities of the representative office?

05:34   15   A.   It looks like a correspondence that was possibly sent to

16   HSBC-India through the rep office.

17              MR. KIRSCH:  Objection to speculation.

18              THE COURT:  Sustained.

19   BY MR. SULLIVAN:

05:34   20   Q.   Do you see the initials in the area where it says,

21   "Received, 8/21"; do you see those initials?

22   A.   Yes.

23   Q.   Are you familiar with whose initials those are?

24   A.   They could be Pooja Shah.

05:34   25   Q.   Did she work with you in New York?

410

1       MR. KIRSCH:  Objection to speculation as to what they

2  could be.

3       THE COURT:  Objection sustained.

4  BY MR. SULLIVAN:

05:34   5  Q.  Are you familiar with -- did you work with anyone in the

6  New York representative office with the initials PS?

7  A.  Yes.

8  Q.  Who?

9  A.  Pooja Shah.

05:35   10  Q.  Was there anyone else in that New York office that had the

11  initials PS?

12  A.  Not to the best of my knowledge.

13  Q.  And if you look at Government Exhibit 53 -- do you have 53?

14  A.  I don't think so.

05:35   15       MR. SULLIVAN:  May I walk over there, Your Honor?

16       THE COURT:  Surely.

17  BY MR. SULLIVAN:

18  Q.  Do you know who Priti Dhanani is?

19  A.  Yes.

05:36   20  Q.  Who?

21  A.  She was my colleague in the New York representative office.

22  Q.  And what does that reflect, Government Exhibit 53, in

23  relation to the attached letter?  What does that reflect?

24  A.  It looks like she --

05:36   25       MR. KIRSCH:  Your Honor, I'm going to object to

411

1   speculation on something that has not been admitted.

2          THE COURT:  Sustained.

3          MR. SULLIVAN:  Your Honor, there's a reason why I

4   didn't have that with me.  I'm going to withdraw the questions

5   on 53.

6          THE COURT:  Very well.

7          MR. SULLIVAN:  I'm going to go back to 54.

8   BY MR. SULLIVAN:

9   Q.  Does the account number reflected in this letter correspond

10  to the application that is in Government Exhibit 42, which was

11  7002?  Please confirm that.

12  A.  So it looks like the customer identification number is the

13  same.

14  Q.  And can you compare the signature of this letter with the

15  signature on the last page of Government Exhibit 42?  The

16  question is:  Do they purport to be signed by the same

17  individual?

18          MR. KIRSCH:  Objection if she's not seen the

19  defendant's signature.

20  BY MR. SULLIVAN:

21  Q.  Do they just purport to be -- excuse me.

22          THE COURT:  The documents are what the documents are.

23          MR. KIRSCH:  Right.

24          THE COURT:  Ask another question.  No, I -- I will

25  change -- come to side bar, please.

412

1            (At side bar on the record.)

2            THE COURT:  Are you asking whether the printed name is

3    the same on each document?

4            MR. SULLIVAN:  Yes.  That's what I meant by

5    "purported."

6            MR. KIRSCH:  I think he's asking if the signature is

7    the same.

8            THE COURT:  No, that's what I was confused about, too.

9            MR. KIRSCH:  I'm sorry.  I was, too.

10            MR. SULLIVAN:  I will clarify.

11            THE COURT:  All right.

12            (End of discussion at side bar.)

13            THE COURT:  You may proceed.

14    BY MR. SULLIVAN:

15    Q.  Do the names that are printed beneath both signatures on

16    Government Exhibit 42 and Government Exhibit 54 -- are those the

17    same names that appear under those signatures?

18    A.  So there's no name printed on Exhibit Number 42.  It's not

19    under the signature, but there's a name on the first page.  Is

20    that what you're referring to?

21    Q.  I'm sorry.  I meant Government Exhibit 47.

22    A.  I'm confused.  Sorry.

23    Q.  Sorry.  No, that's my fault.

24            Can you look at Government Exhibit 47 and Government

25    Exhibit 54 and tell the members of the jury if the same name is

413

1    printed at the bottom of the form.

2    A.  Yes, it is.

3    Q.  And is that the same name that is on Government Exhibit 42,

4    the application?

5    A.  The top of the application, yes.

6    Q.  And does that received stamp with the initials PS indicate

7    anything -- based on the way records were received and then

8    transmitted to India, indicate anything?

9         MR. KIRSCH:  Your Honor, I'm going to object to

10   leading as to "transmission to India."

11        THE COURT:  Objection sustained.

12        MR. SULLIVAN:  I'll ask it this way.

13        THE COURT:  All right.

14   BY MR. SULLIVAN:

15   Q.  What does it mean, based on the procedures that were used in

16   the New York rep office, when something such as a letter was

17   stamped with this received stamp?

18   A.  To the best of my knowledge --

19        MR. KIRSCH:  Objection.  Speculation.

20        THE COURT:  Ask another question, please.

21   BY MR. SULLIVAN:

22   Q.  Do you know how -- why documents in the rep office would

23   have a stamp that say "received" on them?

24   A.  Again, to the best of my knowledge, this document --

25        MR. KIRSCH:  Objection --

414

1          THE COURT:  Go ahead.

2          THE WITNESS:  So this document --

3          THE COURT:  One second.  What is the basis for your

4     knowledge?

05:41   5          THE WITNESS:  We are talking about something that has

6     happened in 2006-2007.  It's 2012 now, Your Honor.  So it's very

7     hard for me to remember something that happened five, six years

8     ago.  So I'm relying a lot on memory.

9          THE COURT:  So are you saying that you do not have a

05:41  10     crystal clear recollection of what was occurring back then?

11          THE WITNESS:  Five, six years ago, not absolute

12     crystal clear.  And the representative office closed in 2010, so

13     it was two years ago.  Also, a lot of this is operational, and

14     in the Fremont office we didn't do any operations.  It was all

05:42  15     handled in the New York office.  So, again, I was in New York --

16     last I was in New York was in 2007.

17          THE COURT:  Proceed.

18     BY MR. SULLIVAN:

19     Q.  When you say "operational" -- the work was done by the

05:42  20     operational office, what do you mean?

21     A.  The operational office was in New York, so -- so the

22     lockbox, all the contents of the lockbox would go to New York

23     and New York would send it to India.  So the California office

24     would not be part of it.

05:42  25     Q.  So --

415

1    A.  So they would handle also for California the operations.

2    Q.  Do you know whether or not the operational office was part

3    of the representative office in New York?

4    A.  Yes.

05:42   5    Q.  And did they maintain business -- or did they maintain

6    records in the ordinary course of business that related to

7    account held by U.S. citizens in India?

8    A.  I believe so.

9    Q.  And who -- whose name is on this particular letter?

05:43   10   A.  So whose written the letter?

11   Q.  Yes.  Who wrote the letter?

12   A.  Arvind Ahuja.

13        MR. KIRSCH:  Objection.  Objection.  That's

14   speculation, Your Honor, as to who wrote --

05:43   15        MR. SULLIVAN:  I withdraw that question, Your Honor.

16        THE COURT:  All right.  The last response is stricken.

17   It cannot be considered by the jury.  Proceed.

18   BY MR. SULLIVAN:

19   Q.  For which account number and for which person was this

05:43   20   letter purportedly signed on behalf of?

21   A.  Arvind Ahuja.

22   Q.  Which account number?

23   A.  7002.

24   Q.  And is this the type of document that would be maintained in

05:43   25   the regular and ordinary course of business by HSBC in the

416

1    United States relating to documents that were sent to India?

2    A.  I believe so.

3         MR. SULLIVAN:  Your Honor, we offer Government

4    Exhibit 54.

5         MR. KIRSCH:  Objection, relevance, Your Honor.

6         THE COURT:  Overruled.  It's received.

7         (Exhibit 54 received in evidence.)

8    BY MR. SULLIVAN:

9    Q.  And if you look -- if we put this on the screen, can you

10   read into the record what the subject line says?

11   A.  I'm sorry.  This is 54?

12   Q.  Yes.

13   A.  "Change of correspondence address."

14   Q.  And the account number?

15   A.  7002.

16   Q.  And it's a very short letter.  Could you just read it into

17   the record, please?

18   A.  "With reference to the above subject, you are requested to

19   please change the correspondence address on all my accounts

20   under the customer ID -- 7002 to my India P2 address mentioned

21   below."  And address which is --

22        MR. SULLIVAN:  And, Your Honor, the defense has agreed

23   that we can unredact the address that is redacted now.

24        THE COURT:  Is that correct?

25        MR. KIRSCH:  That's fine, Your Honor.

417

1       THE COURT:  Very well.

2       MR. SULLIVAN:  May I approach the witness and show her

3   an unredacted version?

4       THE COURT:  Sure.

05:45   5       (Document tendered to the witness.)

6   BY MR. SULLIVAN:

7   Q.  Could you please read into the record the address listed in

8   that letter?

9   A.  "94, Jorbagh, New Delhi's, India, 11003."

05:45   10      MR. SULLIVAN:  With the court's indulgence.

11      (Government counsel confer.)

12      MR. SULLIVAN:  No further questions, Your Honor.

13      THE COURT:  Approach.

14      (At side bar on the record.)

05:46   15      THE COURT:  What is your pleasure with respect to this

16   witness?

17      MR. KIRSCH:  I can start with cross-examination.  I'll

18   go as long as you want to go.  I could certainly do five or ten

19   minutes of cross-examination.

05:46   20      THE COURT:  Ordinarily we could quit at 6:00 o'clock.

21      MR. KIRSCH:  Okay.  That's perfect.  I'll start.

22      THE COURT:  All right.  How much cross?

23      MR. KIRSCH:  Probably an hour or so, I guess.

24      THE COURT:  We're now slated to begin at 8:30

05:46   25   tomorrow.

418

1          MR. KIRSCH:  Yes, Your Honor.

2          THE COURT:  All right.

3          (End of discussion at side bar.)

4          THE COURT:  We're going to go for just a few more

5    minutes.  And we'll resume tomorrow morning at 8:30.

6                        CROSS-EXAMINATION

7    BY MR. KIRSCH:

8    Q.  Good afternoon, Ms. Katju.  My name is Tom Kirsch, and I'm

9    one of the lawyers that represents Dr. Ahuja.  And I have some

10   questions for you.

11         Ms. Katju, based on your employment at HSBC over the

12   past 10 years or so and based on your testimony here today

13   regarding your knowledge of their practices and procedures, will

14   you tell the jury why HSBC-USA never sent 1099 forms to

15   Dr. Ahuja?

16   A.  I have no knowledge of that.

17   Q.  You don't have any idea, do you?

18   A.  No.

19   Q.  Ms. Katju, you've never met Arvind Ahuja, have you?

20   A.  Not to the best of my knowledge.

21   Q.  You never recall meeting him, right?

22   A.  No, I don't recall meeting him.

23   Q.  You managed clients when you worked in the United States at

24   HSBC?

25   A.  That is correct.

                                                              419

1    Q.  He was not one of your clients, was he?

2    A.  No.

3    Q.  You've never spoken with him, have you?

4    A.  Not to my recollection.

05:48  5    Q.  You've never exchanged a single e-mail with him, have you?

6    A.  Not to my recollection.

7    Q.  You don't have any idea what his e-mail address is, do you?

8    A.  I do not know his e-mail address.

9    Q.  You don't have any idea what type of account Dr. Ahuja

05:48  10   opened at HSBC, do you?

11   A.  I did not.  But I was shown the account documents.

12   Q.  But you don't know -- well, we're going to get to that, but

13   you don't know -- by the way, you saw an account application,

14   right?

05:49  15   A.  Yeah.

16   Q.  You saw that, right?  You testified to that?

17   A.  Yeah.

18   Q.  Did the government ever show you a document that indicated

19   that an account was, in fact, opened?  You never saw that, did

05:49  20   you?

21   A.  I don't recall seeing one.

22   Q.  So you never saw a single document that suggested that an

23   account was opened with respect to that account application that

24   you testified to a few minutes ago; that's correct what I just

05:49  25   said?  You have to answer out loud so he can take it down.

420

1    A.   Yes.

2    Q.   You don't know when Dr. Ahuja began banking at HSBC, do you?

3    A.   I do not know.

4    Q.   You don't even know if that was before or after you started

5    working for the bank, do you?

6    A.   I do not know.

7    Q.   You don't know what type of account he opened when he began

8    banking at HSBC, do you?

9    A.   No.

10   Q.   You have no idea what he was told, do you?

11   A.   No.

12   Q.   You don't know who he met with, do you?

13   A.   No.

14   Q.   You don't have any idea what types of forms Dr. Ahuja filled

15   out when he opened an account at HSBC, do you?

16   A.   (No response.)

17   Q.   You don't know, do you?

18   A.   I don't know.

19   Q.   You have no idea when Dr. Ahuja's investments in CDs were

20   put in India, do you?

21   A.   No, I do not know.

22   Q.   Now, you worked -- I think you testified that you worked at

23   HSBC in India, correct?

24   A.   Yes.

25   Q.   And when was that again?

421

1    A.   2003 to about 2006.

2    Q.   Now, when you worked in India from 2003 to 2006, you did not

3    work with the HSBC-NRI representative offices in the United

4    States, correct?

5    A.   Correct.

6    Q.   So when you worked in India, you worked with NRI offices

7    located in other parts of the world; isn't that right?

8    A.   No.  So, for about a year I worked as an NRI services

9    officer, and my role would be to service all NRIs who walk into

10   a branch in India.  So I did not work with any representative

11   office in particular anywhere in the world.  I worked with all

12   HSBC-India clients who were NRIs who walked into the branch.

13   Q.   In India, right?

14   A.   In India.

15   Q.   So it's fair to say that you did not work with HSBC

16   representative offices in the United States when you --

17   A.   It's fair to say that.

18   Q.   When you were in India, correct?

19   A.   Yes.

20   Q.   I think you testified for about a year you worked in

21   New York as a relationship manager at the NRI office; is that

22   correct?

23   A.   That is correct.

24   Q.   And then you moved from New York to Fremont, California,

25   correct?

422

1   A.   Yes.

2   Q.   You have no knowledge whether Dr. Ahuja has ever been to

3   Fremont, California, do you?

4   A.   No.

05:52   5   Q.   And now you're a bank manager -- I'm sorry -- you're a

6   branch manager at the Montgomery Street branch in Fremont,

7   correct?

8   A.   In San Francisco.

9   Q.   In San Francisco.  But you manage one of the branches at

05:52   10   HSBC; is that right?

11   A.   That is right.

12   Q.   And HSBC has about 500 branches in the United States; is

13   that right?

14   A.   No.   They've significantly downsized.

05:53   15   Q.   At one time --

16   A.   About 400 branches.  They had about 400 branches at one

17   time, but now they've sold quite a few of those.

18   Q.   They've sold them off to other banks?

19   A.   Other banks.

05:53   20   Q.   But at one time they had about 400 branches in the United

21   States, right?

22   A.   Yes.

23   Q.   And that's not in the too far distant past.

24   A.   That's right.

05:53   25   Q.   Now, you testified that when you worked at HSBC in New York

423

1    you knew a person named Priti Dhanani?

2    A.  Dhanani, that's right.

3    Q.  Dhanani, I'm sorry.  And you've heard her name mentioned,

4    right?

05:53  5    A.  I knew her well.  She was my colleague.

6    Q.  And then you saw the initials of someone I think you said

7    was PS, was Pooja Shah; is that right?

8    A.  Yes.

9    Q.  And is that a male or a female?

05:54 10    A.  Female.

11    Q.  And so Ms. Shah, she worked with you in the NRI office in

12    New York; is that correct?

13    A.  That is correct.

14    Q.  And do you know an individual by the name of Ankush Tandon?

05:54 15    A.  I do.

16    Q.  Did he also work with you at NRI services in New York?

17    A.  That is correct.

18    Q.  And he worked at the same office as you and Ms. Pooja Shah.

19    A.  Yes.  He worked in the same office.

05:54 20    Q.  Okay.  And did you know his e-mail at the time when he

21    worked at the representative office was

22    ankush.k.tandon@US.HSBC.com?

23    A.  I can't testify to that.  It's either ankush.tandon or

24    Ankush some middle name Tandon.  I can't testify that that is --

05:55 25    that was his e-mail address.

424

1    Q.  Whether it's either ankush.tandon or ankush.k.tandon, you

2    know it was @US -- let me just finish.  He can't take us down

3    both at the same time -- @us.hsbc.com, right?

4    A.  Yes.

05:55    5    Q.  And you know that because your e-mail address was

6    @us.hsbc.com.

7    A.  Correct.

8    Q.  Now, you also had a United States telephone number; isn't

9    that right?

05:55   10    A.  Yes.

11    Q.  So you worked with Ms. Shah; is that right?

12    A.  Yeah.

13    Q.  Ms. Dhanani?

14    A.  Uh-huh.

05:55   15    Q.  Is that right?

16    A.  That's right.

17    Q.  And Mr. Tandon.

18    A.  Uh-huh.

19    Q.  Is that right?

05:55   20         When you met with the government yesterday, did they

21    tell you why they weren't calling as witnesses Ms. Dhanani,

22    Mr. Tandon, or Ms. Shah in this case?

23    A.  No.

24    Q.  Instead, they subpoenaed you, a branch manager, from

05:56   25    San Francisco, California, to come here to testify before this

425

1    jury, right?  That's what they did, right?

2    A.  Yes.

3    Q.  Against a man that you've never met, right?

4           MR. SULLIVAN:  Objection, Your Honor.  Relevance.

5           THE COURT:  Sustained.

6    BY MR. KIRSCH:

7    Q.  Ms. Dhanani --

8    A.  Katju.

9    Q.  I'm sorry, Ms. Katju.  Ms. Dhanani is not here.  We just

10   established that.

11          (General laughter.)

12   BY MR. KIRSCH:

13   Q.  Ms. Katju, I want to ask you:  You testified about the

14   number of branches that HSBC had in the United States, which was

15   approximately 400.  Is it fair to say that HSBC has thousands of

16   branches around the world?

17   A.  Fair to say that, yes.

18   Q.  Over 7,000, as a matter of fact; isn't that right?

19   A.  I'm not sure.  I'm sorry.

20   Q.  It's thousands, right?

21   A.  (No response.)

22   Q.  You have to answer in a word.

23   A.  Yes.

24   Q.  And HSBC has operations in over 80 countries around the

25   world; is that right?

426

1    A.  Approximately, yes.

2    Q.  Are you familiar with the bank Citibank?

3    A.  Yes.

4    Q.  That's also a large international bank comparable in size to

5    HSBC, right?

6    A.  I'm not -- well, maybe, probably.

7    Q.  Now, you know -- you know that HSBC, the bank that you

8    worked for, did not send 1099 forms to its NRI customers on

9    interest earned on their CD investments, right?

10   A.  Right.

11   Q.  You know that, right?

12   A.  Right.

13   Q.  Do you know that Citibank did send 1099 forms to its

14   customers on the CD interest income earned on those investments?

15   A.  I do know that, yes.

16   Q.  You do know that.  And did they?

17   A.  Yes, to the best of my knowledge.

18   Q.  I'd like to show you --

19          I'd like to put on the screen Government's Exhibit 42,

20   please.

21          James, can you pull that up?

22   BY MR. KIRSCH:

23   Q.  This is one of the exhibits that you testified to,

24   Ms. Katju.  Do you have that in front of you?

25   A.  Yes.

1          MR. KIRSCH:  Thank you, Your Honor.

2    BY MR. KIRSCH:

3    Q.  Do you see the handwriting that's in capital letters "Arvind

4    Ahuja" and then with an address?  Do you see that?

05:59    5    A.  Yes.

6    Q.  That address is in Greendale, Wisconsin, right?

7    A.  I don't know.

8    Q.  No, I'm saying you can read it, right?

9    A.  I can't read -- oh.  Yes, Greendale, Wisconsin, that's

05:59    10   right.

11   Q.  Okay.  I'd like you to look down to the date which says

12   January 20th --

13          Can you just blow that up a little bit bigger, James?

14   BY MR. KIRSCH:

06:00    15   Q.  Okay.  Do you see that handwriting down there, January 28th,

16   2008?  Do you see that?

17   A.  Yes.

18   Q.  Do you know who wrote that?

19   A.  No.

06:00    20   Q.  Do you see right above that the, "NRI status confirmed as

21   per passport copies enclosed"; do you see that?

22   A.  Yes.

23   Q.  And then there's a signature above that?

24   A.  Yeah.

06:00    25   Q.  And then right below that there's a, "scanned and sent on

428

1    January 28th, 2008"; do you see that?

2    A.  Yeah.

3    Q.  I'd like you to look at that handwriting; do you see that?

4    January 28, 2008?

5    A.  Yeah.

6    Q.  And now I'd like you to go up to the top where it says

7    New Delhi?

8    A.  Yeah.

9    Q.  You don't have any idea who filled out this form, do you?

10   A.  No.

11   Q.  You have no idea who wrote New Delhi on that form, do you?

12   A.  No.

13   Q.  And I think I asked you this earlier, but in case I didn't.

14   You don't know whether an account was ever opened with this

15   form, do you?

16   A.  That is right.

17   Q.  Ms. Katju, you offered some testimony about Premier

18   customers?  Do you recall that testimony?  You have to answer

19   out loud.

20   A.  Yes.

21   Q.  And do you recall being asked some testimony about

22   consolidated statements that showed interest and things like

23   that?

24   A.  That is correct.

25   Q.  You don't have any idea whether Dr. Ahuja ever received a

429

1   statement such as that, do you?

2   A.  (No response.)

3   Q.  You don't have any personal knowledge as to whether he

4   received such a statement, do you?

5   A.  As a Premier client, he should have receive those

6   statements.  I have no personal knowledge that he received it.

7   Q.  Did the government in its meetings with you before today --

8   by the way, you met with them twice, right?  Once on the phone,

9   right?

10  A.  Yes.

11  Q.  And once yesterday, right?

12  A.  Yes.

13  Q.  Is that right?

14  A.  That's right.

15  Q.  And at those meetings HSBC had four lawyers present, right?

16  A.  I'm sorry.  I was on the phone.  I don't know.

17          MR. SULLIVAN:  Objection.  Relevance.

18          THE COURT:  Objection sustained.

19          And with that I'd like to ask:  Do you have extensive

20  additional cross-examination?

21          MR. KIRSCH:  Your Honor, I may have -- it's hard to

22  say.  I may have 20 minutes --

23          THE COURT:  Well, if you have more than five minutes

24  of cross, we will break.

25          MR. KIRSCH:  I have more than five minutes,

430

1    Your Honor.

2              THE COURT:  We will break.

3              MR. KIRSCH:  Thank you.

4              THE COURT:  Would the jurors please take your

5    notebooks with you to the jury room, and as we have discussed

6    previously:  You may not discuss this case with anyone; you are

7    to keep in mind the admonition respecting the access and use of

8    media; you may not tweet, blog, or in any way correspond with a

9    person or with a machine respecting this case.

10             I'll see you tomorrow.

11             THE BAILIFF:  All rise.

12             THE COURT:  And, of course, don't visit anyplace that

13   may have been mentioned during the course of this trial.

14             (Jury out at 6:03 p.m.)

15             THE COURT:  Please be seated for a couple of moments.

16   I would appreciate an outline of what the government believes it

17   will be -- you may step down.

18             (Witness temporarily excused.)

19             THE COURT:  What the government believes it be able to

20   cover tomorrow.

21             MR. SULLIVAN:  Tomorrow we will move on to CPA Mark

22   Miller, and he will be somewhat of a medium-length witness.  And

23   then we anticipate having our summary witness,

24   Special Agent Geoffrey Cook.

25             And, Your Honor, as far as time goes, I think there's

431

1    an issue that Ms. Siskind wants to address about the

2    admissibility of all the letters that we have that were signed

3    by Dr. Ahuja.  Because that would make it go much faster.

4    Because if we have to -- well, I'll turn it over to her, if

5    that's all right.

6         But before I do that, Your Honor, I have to admit I

7    made a huge error.  I didn't go into the redacted screen shots

8    because they weren't redacted.  And now I have redacted

9    versions.  So I'd ask the court indulgence for some leeway to

10   cover the screen shots tomorrow.

11        THE COURT:  All right.  I'll provide you with latitude

12   in that regard.  Are you referring to the materials that we at

13   one point dealt with or are you talking about some additional

14   materials?

15        MR. SULLIVAN:  Well, Government Exhibit 69, and then I

16   also was gonna just cover 71.  They're the same type screen

17   shots, and not spend a lot of time on 71.

18        THE COURT:  I'll give you latitude.

19        MR. SULLIVAN:  Thank you, Your Honor.

20        THE COURT:  And so in order to accomplish that, there

21   are several ways:  One is to give you a chance to resume your

22   direct examination, and then have the defense continue with

23   cross-examination; or, alternatively, if the defense would

24   prefer -- and I'm going to give the defense the options -- you

25   can complete its cross-examination.  We will then give you an

432

1    additional opportunity to conduct direct, and the defense can

2    resume cross-examination.  That would then be limited to the

3    scope of this additional direct examination.

4           The defense doesn't have to answer right now, if you

5    want time to strategize.

6           MR. KIRSCH:  Okay.  We'll do that.  Thank you.

7           THE COURT:  All right.

8           MS. SISKIND:  Your Honor, can I address the issue

9    Mr. Sullivan raised?

10          THE COURT:  Surely.

11          MS. SISKIND:  The problem with Exhibit 42, whether it

12   was inadvertently put in the motion, whatever the reason was, it

13   obviously caused a delay in the trial.  And a delay while the

14   jury was sitting here.  It would be helpful to know from the

15   defense at this point if there's any other number referenced on

16   page 3 of Document 127 they're going to object to on hearsay

17   grounds when we move to admit it.

18          Certainly, foundation, relevance is a separate issue,

19   but on hearsay grounds.

20          THE COURT:  I think that is something that should be

21   addressed now if at all possible.

22          Can you tell us whether you know at this stage of any

23   additional hearsay objections to any one of these items?

24          MR. KIRSCH:  Your Honor, I can look at those tonight,

25   but I will tell you that if we do have any objection on hearsay

433

1    grounds to these documents, I think the court's already ruled.

2    So it would be basically just be preserving the objection.  I

3    don't think -- I think we've worked through this issue.

4              THE COURT:  All right.  I will see you in the morning.

06:07  5              MS. SISKIND:  Thank you, Your Honor.

6              THE COURT:  You will have to exit the building on the

7    east side, so you should take the elevator to the left.

8              (Trial concluded for the day at 6:08 p.m.)

9                            *   *   *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

434

1  UNITED STATES DISTRICT COURT

2  EASTERN DISTRICT OF WISCONSIN

3

4          I, JOHN T. SCHINDHELM, RMR, CRR, Official Court

5  Reporter for the United States District Court, Eastern District

6  of Wisconsin, do hereby certify that I reported the foregoing

7  proceedings, and that the same is true and correct in accordance

8  with my original machine shorthand notes taken at said time and

9  place.

10 Dated this 16th day of August, 2012

11 Milwaukee, Wisconsin.

12

13 _____
          Official Court Reporter

14        United States District Court

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2    PRELIMINARY JURY INSTRUCTIONS

3         BY THE COURT.................................... 177

4    OPENING STATEMENT

5         BY MS. JOHNSON.................................. 181

6    OPENING STATEMENT

7         BY MR. WEBB.................................... 186

8

9    WITNESS   EXAMINATION                              PAGE

10   RAMIT BHASIN, GOVERNMENT WITNESS

11        DIRECT EXAMINATION BY MS. SISKIND............... 224

12        CROSS-EXAMINATION BY MR. WEBB................... 258

13        REDIRECT EXAMINATION BY MS. SISKIND............. 332

14        RECROSS-EXAMINATION BY MR. WEBB................. 342

15        FURTHER REDIRECT EXAMINATION BY MS. SISKIND...... 354

16   VANDANA KATJU, GOVERNMENT WITNESS

17        DIRECT EXAMINATION BY MR. SULLIVAN.............. 357

18        VOIR DIRE EXAMINATION BY MR. SULLIVAN........... 388

19        VOIR DIRE EXAMINATION BY MR. KIRSCH............. 390

20        DIRECT EXAMINATION (RESUMED) BY MR. SULLIVAN..... 391

21        CROSS-EXAMINATION BY MR. KIRSCH................. 419

22

23                          * * * * *

24

25

436

```
 1                          E X H I B I T S

 2      NUMBER                  DESCRIPTION                OFFERED  ADMITTED

 3    8         7/4/09 Dhanani/Bhasin e-mails w/HSBC ........ 254    254

 4              article

 5    42        1/28/08 Account application.................. 391    391

 6    43        Blank customer declaration.................. 398    398

 7    47        Tax declaration signed by Ahuja for ......... 408    408

 8              financial year 2008-2009

 9    54        8/21/08 Letter signed by Ahuja re: .......... 417    417

10              Correspondence address

11    69        Summary of high balances w/screen prints .... 367    367

12              maintained in representative office

13    2006      3/10/11Ramit Bhasin proffer letter........... 273    273

14    2008      4/12/11 Ramit Bhasin non-prosecution ........ 261    261

15              agreement

16

17

18

19

20

21

22

23

24

25
```

437