UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

3    -----------------------------------------------------------------

4    UNITED STATES OF AMERICA,          )
                                        )        Case No. CR 11-135
5                    Plaintiff,         )        Milwaukee, Wisconsin
                                        )
6         vs.                           )        August 17, 2012
                                        )        8:30 a.m.
7    ARVIND AHUJA,                      )
                                        )        **VOLUME 3**
8                    Defendant.         )        PAGES 438-708

9    -----------------------------------------------------------------

10                     **TRANSCRIPT OF JURY TRIAL**
             BEFORE THE HONORABLE CHARLES N. CLEVERT, JR.
11           UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY

12   APPEARANCES:

13   For the Plaintiff
     UNITED STATES OF AMERICA:      Office of the US Attorney
14                                  By: TRACY M. JOHNSON
                                    517 E Wisconsin Ave - Rm. 530
15                                  Milwaukee, WI 53202
                                    Ph: 414-297-1580
16                                  Fax: 414-297-4394
                                    tracy.johnson@usdoj.gov
17
                                    United States Department of
18                                  Justice DC
                                    By: JOHN E. SULLIVAN
19                                      MELISSA S. SISKIND
                                    Tax Division - Ben Franklin
20                                  Station - PO Box 972
                                    Washington, DC 20044
21                                  Ph: 202-514-5196
                                    Fax: 202-616-1786
22                                  john.e.sullivan@usdoj.gov
                                    melissa.s.siskind@usdoj.gov
23
     U.S. Official Reporter:        JOHN T. SCHINDHELM, RMR, CRR,
24                                  johns54@sbcglobal.net

25   Proceedings recorded by computerized stenography,
     transcript produced by computer aided transcription.

438

APPEARANCES CONT'D:

For the Defendant                    Friebert, Finerty & St. John SC
ARVIND AHUJA:                        By: SHANNON A. ALLEN
(Present)                            Two Plaza East - Ste 1250 - 330 E
                                     Kilbourn Ave
                                     Milwaukee , WI 53202
                                     Ph: 414-271-0130
                                     Fax: 414-272-8191
                                     saa@ffsj.com

                                     Winston & Strawn LLP
                                     By: DAN K. WEBB
                                         THOMAS L. KIRSCH II
                                     35 W Wacker Dr
                                     Chicago , IL 60601-9703
                                     Ph: 312-558-5600
                                     Fax: 312-558-5700
                                     dwebb@winston.com
                                     tkirsch@winston.com

439

1          P R O C E E D I N G S (8:42 a.m.)

2          THE COURT:  Be seated, please.  Are there any matters

3    we need to address before the jury comes out?

4          MR. SULLIVAN:  There's just one brief matter,

5    Your Honor.  The parties have reached a stipulation regarding

6    the tax returns in this matter, and there is one issue relating

7    to Dr. Ahuja's 2010 tax return that the government would like to

8    use during its examination of the CPA Mr. Mark Miller.  And we

9    really only want to use the Schedule B and the attached pages

10   that reflect which bank accounts Dr. Ahuja reported on his 2010

11   return, and those would include bank accounts that were located

12   in India.

13         MR. WEBB:  Your Honor, we do object to the return

14   coming in, the 2010 return coming in filed in April of 2011.

15   What Dr. Ahuja knew in the year 2011 -- we object to the 2010

16   return coming into evidence, which was filed with the government

17   in April of 2012, because what Dr. Ahuja knew in 2011 about

18   foreign accounts after finding out from lawyers and accountants

19   about FBAR requirements and so far has no relevancy to what he

20   knew between 2006 to 2009.  And therefore, it's very prejudicial

21   and it has no relevancy whatsoever and we object to it.

22         THE COURT:  Well, it certainly has relevancy.  The

23   question is whether or not it's unfairly prejudicial.

24         MR. WEBB:  I didn't hear you.  I'm sorry.

25         THE COURT:  I said I believe it is relevant but the

440

1  issue is whether it is unfairly prejudicial.

2           MR. WEBB:  I respectfully -- what somebody knows in

3  2011 does not reflect what they knew between 2006 and 2009 after

4  they retained lawyers, et cetera.

08:45  5           THE COURT:  It may.  Why as an absolute does it have

6  no bearing on what a person knew previously?

7           MR. WEBB:  Well, because he got advice at that time

8  and -- but I accept Your Honor's -- but then its probative value

9  is so low that the prejudice outweighs it under 403, which I

08:45  10  think is at least an issue Your Honor is raising which I agree

11  with.  Because if it has any probative value under 401, it's

12  extremely low to try to reflect back on what he knew between

13  2006 and 2009, that it's unfairly prejudicial.  It's outweighed

14  by prejudice to him because a jury may misconstrue that evidence

08:45  15  and overweight it.

16           THE COURT:  I'd like to hear from the government

17  regarding the prejudice argument that was just raised.  Because

18  I think it's a significant one.

19           MR. SULLIVAN:  The government is eliciting this

08:46  20  evidence to prove that the bank accounts that the defendant

21  owned in India were reported on his 2010 return and it lists the

22  same account numbers that tie into the screen shots.  And so

23  it's probative of just the fact that these are the bank accounts

24  and they're located in India.  And Mark Miller -- Mr. Miller

08:46  25  will also testify that he was actually given some Indian bank

1    statements to prepare the return, which tends to show that these

2    accounts were in India.  Unless the -- that seems to be a big

3    issue in this case and I don't see how that's prejudicial at

4    all.

5            THE COURT:  Well, again, it depends on how the

6    information is being used.  I'd like to hear from the defense

7    respecting the account-ownership issue just underscored by the

8    government as the reason for offering the 2010 returns.

9            MR. WEBB:  Account-ownership issue is simply his

10   argument that it tends to prove Dr. Ahuja's knowledge.  What

11   Dr. Ahuja knew about account ownership in 2011 --

12           THE COURT:  He didn't talk about knowledge.  He didn't

13   talk about knowledge.  He talked about the issue of whether, in

14   fact, Dr. Ahuja owned accounts in India that are part of the

15   case in chief of the government.  The government's case in chief

16   includes the need to demonstrate that Dr. Ahuja, in fact, owned

17   accounts in India.

18           MR. WEBB:  And these tax returns add nothing.  They've

19   got the underlying HSBC records to show what accounts he owed in

20   India.

21           THE COURT:  But you take issue with those records and

22   what those records demonstrate.  Now, if there was no issue as

23   to whether, in fact, there were accounts in India and those

24   accounts reflect -- have the numbers that are shown in

25   Schedule B of the 2010 return, then your argument would have

442

1    more vitality.

2           MR. WEBB:  Your Honor, we actually have not -- we've

3    objected to the records coming in for all types of relevancy and

4    hearsay concerns; but whether a document uses a certain account

5    number, we have no way to dispute that.  An underlying document

6    from their records, we have no way to dispute that.  That's not

7    been an issue.  We've objected to the exhibits coming in, but

8    once they come in the government has that evidence that those

9    accounts are registered to Dr. Ahuja and they've got it right on

10   the face of the documents that are in evidence.

11          THE COURT:  Are you conceding that Dr. Ahuja had those

12   accounts -- the accounts -- let me make sure I'm absolutely

13   clear.

14          Are the account numbers on the Schedule B of 2010 the

15   same account numbers that you assert are reflected in the

16   earlier years that are at issue in this case?

17          MR. WEBB:  Can I consult with Mr. Kirsch for one

18   second?

19          THE COURT:  Yes.

20          (Counsel confer off the record.)

21          THE COURT:  Back the on the record.

22          MR. WEBB:  I've looked at the listing of accounts.  As

23   I said a few minutes ago, Your Honor, we have never suggested at

24   all so far during this trial that these accounts are, in fact,

25   registered under an underlying HSBC records to either Arvind

1    Ahuja or to his wife.  What we have presented is a defense as to

2    whether these are foreign accounts or foreign investments that

3    need to be disclosed on his tax returns, and quite frankly --

4    but if we put this into evidence, then I believe we're

08:51    5    infringing upon his Fifth Amendment rights because he's the only

6    one then that can go on the stand and explain that these

7    accounts here as far as why they went on his return is because

8    he got advice from lawyers after the government advised him of

9    this investigation.  And so I don't --

08:52    10           THE COURT:  I understand that argument, and you

11    essentially win on that argument.

12           The question we are dealing with now is whether these

13    accounts as reflected in the Schedule B of the 2010 return are

14    the same accounts or include accounts that the government is

08:52    15    asserting Dr. Ahuja owned during the tax years at issue.

16           MR. WEBB:  And we've never disputed that, and they've

17    got the underlying records.  They have the records showing these

18    account numbers coming from India that have the names, either

19    Namie Ahuja or Arvind Ahuja.  We've never tried to challenge

08:52    20    that once during the trial.

21           THE COURT:  Mr. Sullivan?

22           MR. SULLIVAN:  Your Honor, what we have is a certified

23    official record of the return that was filed with the IRS.  It

24    is --

08:52    25           THE COURT:  But what are the account numbers?

444

1    MR. SULLIVAN:  May I proffer to the Court the two

2  pages that the government would like to use?

3    (Documents tendered to the Court.)

4    MR. SULLIVAN:  And, Your Honor, for the record, this

08:53 5  is a statement that refers back to Schedule B, the reporting of

6  interest and dividends.  And that is -- the listing there are

7  the accounts that --

8    THE COURT:  Simply put, are any of the account numbers

9  on Schedule B of the 2010 return the same account numbers that

08:53 10 you believe -- or include any of the accounts that Dr. Ahuja

11 allegedly had in any one of the tax years at issue?

12    MR. SULLIVAN:  Yes, Your Honor.  In our response to

13 bill of particulars, the account numbers we listed range from

14 7002-261 all the way up through 278.  So some of the accounts

08:54 15 are the same accounts.  I note that that schedule has some

16 higher-numbered accounts which do not appear on the government's

17 bill of particulars response.  So the answer is yes.  It looks

18 like the majority of those accounts are.

19    THE COURT:  And is it your belief that you have other

08:54 20 evidence in the record supporting Dr. Ahuja's interest in these

21 accounts during the tax years at issue?

22    MR. SULLIVAN:  Yes.  They're reflected in the screen

23 shots, Government Exhibit 69 and 71, Your Honor.

24    THE COURT:  And those are documents that remain at

08:54 25 issue.

445

1          MR. SULLIVAN:  Yes.

2          THE COURT:  In part because of the defense --

3     defense's ongoing objection to the admission of those documents

4     under the residual hearsay rule or under any other rule of

5     evidence, correct?

6          MR. SULLIVAN:  That's correct.

7          MR. WEBB:  I'm not sure that's correct.

8          MR. KIRSCH:  Your Honor, can I address that issue?

9          THE COURT:  All right.  We will have to stop the tag

10    team.  I've indicated that, generally speaking, if there is an

11    issue to be addressed by a side, one attorney is to handle that

12    issue.

13         MR. KIRSCH:  I would just like to address the

14    objection that we had to 69 and 71, the screen shots.

15         THE COURT:  All right.

16         MR. KIRSCH:  Your Honor, we have never objected to

17    those documents for the premise that the account numbers or the

18    name on the screen shots were inaccurate.  What we discussed was

19    the interest rate and the interest rate and the amounts.  But

20    not -- Your Honor, the issue in this case, if the Court looks at

21    Government Exhibit Number 82, which will come into evidence,

22    this document is a document that was signed by Arvind Ahuja and

23    it lists CD numbers.  The government will prove, no doubt -- and

24    there's no dispute about this -- that these numbers that they're

25    talking about in the 2010 tax return are affiliated with

446

1    Dr. Ahuja.  There's no question about that.  They'll prove that

2    four times over.

3         The issue is whether they are accounts or whether

4    they're investments, and the issue is what Dr. Ahuja knew about

5    these things from '06 to '09.  Now the government wants to put

6    these tax returns in from 2011 and say, uh-huh, he must have

7    known from '06 to '09 that these were accounts and not

8    investments.

9         That's what they can't do under 403.  The issue is

10   not -- it is not at all the affiliation between Dr. Ahuja and

11   these accounts.  If that's the issue, the government certainly

12   does not need this tax return.  They've got evidence and we're

13   not arguing that.  We're not disputing that, Your Honor.

14        So that's the issue, particularly with respect to

15   67 -- or 69 and 71 and the other exhibits that the government

16   has.  There's no dispute that these numbers were affiliated with

17   Dr. Ahuja; the dispute is whether they were accounts or

18   investments and what he knew about that from '06 to '09.  What

19   he knew in 2011 after he had hired us and after he had hired an

20   accountant to look at these things, that is totally irrelevant

21   and extremely prejudicial.  I don't know how a jury could get

22   over that if they knew he knew in '11.  Well, I think that's it.

23        MR. SULLIVAN:  Your Honor, we're only offering these

24   two pages to show that the account numbers reflected on the 2010

25   tax return tie into the screen shots.  They fought for days and

447

1    days over that.  We now want to offer these because they tend to

2    show that the underlying screen shots are reliable, and we need

3    to do that because they --

4         THE COURT:  How do they show the underlying screen

5    shots are reliable?

6         MR. SULLIVAN:  Because the account numbers listed on

7    the attachment to the Schedule B for the 2010 return are, in

8    fact, the same account numbers in the screen shots.  And it

9    doesn't matter if they're investments or CDs.  The fact is that

10   they're just reporting interest income on the 2010 return.  And

11   no one can go into Dr. Ahuja's mind by looking at that, and

12   we're not going to argue that he then knew that they were -- I

13   don't know what we're going to argue, but we're just going to

14   argue that they --

15        THE COURT:  Well, you're not going to be given the

16   opportunity to argue most anything because that would be

17   unfairly prejudicial if you, for example -- okay, you're not

18   going to suggest that he had some additional knowledge.

19        MR. SULLIVAN:  We will not, Your Honor.  We're

20   offering these solely because they tend to show that the account

21   numbers in our screen shots are reliable and accurate because

22   they're the same account numbers.

23        MR. KIRSCH:  Your Honor, they have other evidence for

24   that.  They have Exhibit 82 which is not in dispute which

25   clearly shows the same numbers, and it's a letter signed by

448

1    Dr. Ahuja.  I can't figure out why they would possibly put in

2    this exhibit.  And, Your Honor, whether they argue it or not,

3    the inference is clearly there, that in 2010 Dr. Ahuja reports

4    these accounts on his tax return.  They don't need to argue it,

08:59    5    Your Honor.  They just don't need to argue it at that point.

6           THE COURT:  This is essentially cumulative evidence;

7    isn't that correct, Mr. Sullivan?

8           MR. SULLIVAN:  They have informed us that they're

9    objecting to all of our evidence where the defendant has signed

08:59    10   letters that we received from HSBC that reflect account numbers

11   on them.  They objected yesterday to three of our documents that

12   were signed by Dr. Ahuja.  We're not sure they're coming in

13   because we haven't had a ruling on that evidence, and so we

14   would --

09:00    15          THE COURT:  Okay, let me go back to the defense.  Is

16   the defense objecting to the admission of 82?

17          MR. KIRSCH:  No, we've not objected.  We've objected

18   where we believe objections are proper.  No.

19          THE COURT:  I'm sorry?

09:00    20          MR. KIRSCH:  I said no, we're not.  That comes in.

21   And it lists the CD numbers right there on it.

22          THE COURT:  Mr. Sullivan, in view of the fact they're

23   not objecting, what is the need for Schedule B of the 2010

24   return?

09:00    25          MR. SULLIVAN:  We can live without it, Your Honor, if

449

1   they will agree that all the letters signed by Dr. Ahuja

2   relating to his accounts in India that we received from HSBC

3   Bank are admissible without further objection.  And then we will

4   forego this.

09:01   5   THE COURT:  What position is the defense taking?

6   MR. KIRSCH:  Your Honor, I've never heard of anything

7   like that.  All the letters that are signed by Dr. Ahuja in the

8   history of the world?  I mean, we agree to 82.  Let's see what

9   else they offer and if they can lay the foundation for it.  But

09:01   10   Mr. Sullivan is saying that the issue is whether these account

11   numbers are tied to Dr. Ahuja.  82 does that.  I don't know what

12   other letters they're talking about, all the letters in the

13   history that have been signed by -- that seems a little bit of

14   an unfair trade.

09:01   15   THE COURT:  I would say I wouldn't enter that

16   agreement.  Come on.  Because you don't know -- you're not

17   telling him what you're referring to.  You have to be more

18   specific.

19   MR. SULLIVAN:  I can list the government exhibits I'm

09:01   20   referring to.  Government Exhibit 2, 3, 4, 5, 20.

21   THE COURT:  One second.  Let's go off the record for a

22   second.

23   (Discussion off the record.)

24   THE COURT:  We'll take a brief recess.

09:02   25   THE BAILIFF:  All rise.

450

1              (Recess taken at 9:02 a.m., until 9:10 a.m.)

2              THE COURT:  Do you wish to be heard?

3              MR. SULLIVAN:  Yes, Your Honor.  I'm pleased to report

4    the parties have reached an agreement.  In exchange for the

09:10  5    government not offering the 2010 tax return, the following

6    exhibits will be admissible as admissions of the defendant

7    because they are signed letters that refer to bank accounts

8    involving the accounts in this case:  Exhibits 2, 3, 4, 5, 20,

9    32, 46, 59, 61, 62, 80, 82, and 85.

09:11 10              And we would move the admission of those documents at

11   this time, Your Honor.

12              THE COURT:  Well, we'll have to do it in front of the

13   jury.

14              Is this an accurate recap of what you've agreed?

09:11 15              MR. KIRSCH:  It is.  I need to make the record clear,

16   Your Honor.  The defendant is not trading on the admissibility

17   of -- there's no in exchange for.  The defendant -- last night I

18   said that it would go faster because the Court has ruled on the

19   admissibility of these documents with respect.  To certain

09:12 20   documents we've made our objections, so without waiving our

21   objections that we've made, we agree that subject to the Court's

22   earlier rulings these documents will come in evidence.

23              So there's no exchange, but the Court -- I'm not going

24   to relitigate the issues over and over and over.  We've

09:12 25   litigated them; the Court's ruled; they're going to come in over

                                                              451

1    our objection.  So the government will have what they want.

2         So that's the defense position.  We believe these will

3    come into evidence subject to the Court's earlier ruling, over

4    objection.  That's -- and that's it.  So they'll come in.  So we

09:12    5    don't need the 2010 tax return.

6         THE COURT:  And the statement of Mr. Sullivan with

7    respect to as admissions, et cetera, is not part of your

8    stipulation; is that correct?

9         MR. KIRSCH:  Pardon?

09:12    10        THE COURT:  Mr. Sullivan said these documents are

11   being received as admissions, and I want to verify whether or

12   not that is part of the stipulation.  I believe it is not part

13   of your stipulation.

14        MR. KIRSCH:  Correct.  These are coming in evidence,

09:13    15   but we can certainly argue the weight of this evidence and those

16   sorts of things.  That's the issue.  They will come in evidence.

17   So it's cumulative.

18        MR. SULLIVAN:  Your Honor, I meant statements under

19   801(d)(2)(A), which says "statements of the defendant."

09:13    20        THE COURT:  I understand why you are offering them,

21   but the defense is not saying these constitute admissions.

22        MR. SULLIVAN:  Yes, I agree.

23        THE COURT:  All right.  Would you return these

24   exhibits, please?

09:13    25        MR. KIRSCH:  Your Honor, can I raise one more matter?

452

1    I think we've agreed that when we start Mr. Sullivan

2  is going to pick up his direct examination.  I think that will

3  be smoother.  But I would like the Court to explain what's going

4  on, and that's it, Your Honor.

09:14    5    THE COURT:  I will.

6    MR. SULLIVAN:  We'll get the witness, Your Honor.

7    THE COURT:  Very good.

8    MR. SULLIVAN:  Your Honor, do you want me to move

9  those exhibits in?

09:14    10    THE COURT:  Yes.

11    MR. SULLIVAN:  Okay, I will do that.

12    MR. KIRSCH:  Your Honor, are you going to ask us to

13  object in front of the jury or are you just going to admit them

14  subject to our prior objection?

09:14    15    THE COURT:  I will admit them and note "subject to

16  prior objections."

17    MR. KIRSCH:  Thank you, Your Honor.

18    THE COURT:  All right.

19    (Jury in at 9:15 a.m.)

09:15    20    THE BAILIFF:  Please be seated.  Come to order.

21    THE COURT:  Good morning, members of the jury.  I

22  apologize for the delay, but there were some matters I had to

23  attend to.

24    Also, I want to bring to your attention that at this

09:16    25  stage we are going to move backward a bit.  The Court is going

453

1    to allow the government to continue direct examination of this

2    witness and then we will go back to cross-examination.  From

3    time to time things like this occur, and I just want you to be

4    aware that we are handling matters in an unusual fashion, as if

5    the government had not ended its direct examination of

6    Ms. Katju.

7              The government may proceed.

8              MR. SULLIVAN:  Thank you, Your Honor.

9              Before we proceed, the government moves the admission

10   of the following government exhibits into evidence:  Exhibits 2,

11   3, 4, 5, 20, 32, 46, 59, 61, 62, 80, 82, and 85.

12             THE COURT:  They are received subject to the prior

13   objection of the defense.

14             (Exhibits 2, 3, 4, 5, 20, 32, 46, 59, 61, 62, 80, 82,

15   and 85 received in evidence.)

16   BY MR. SULLIVAN:

17          VANDANA KATJU, GOVERNMENT WITNESS, PREVIOUSLY SWORN

18                        DIRECT EXAMINATION

19   BY MR. SULLIVAN:

20   Q.  Good morning, Ms. Katju.  I remind you that you're still

21   under oath.

22             Do you see in front of you what we've talked about

23   yesterday, Government Exhibit 69?

24   A.  Yes.

25   Q.  And if you look at -- turn the first page over and look at

454

1   the underlying -- did you refer to those as screen shots

2   yesterday?

3   A.  I did.

4   Q.  And when you met with the government on I believe it was two

5   nights ago, did you review the screen shots in Government

6   Exhibit 69 which is already in evidence?

7   A.  Yes.

8   Q.  And do the first three pages relate to a specific day of the

9   screen shot?  Does it have a date and a time indicated?

10  A.  Yes.  9th September 2006.

11  Q.  And do the next four pages relate to a specific day and time

12  of the screen shot?

13  A.  Yes.  21st November 2007.

14  Q.  And do the next three pages relate to a specific date and

15  time of the screen shot?

16  A.  Yeah.  16 September 2008.

17  Q.  And finally, did the last three pages relate to a specific

18  date and time for a screen shot?

19  A.  Yes.  11th March 2009.

20  Q.  And directing your attention back to the first screen shot

21  dated September 9th, 2006 --

22          MR. SULLIVAN:  If we could get that on the screen.

23  BY MR. SULLIVAN:

24  Q.  I believe we now have a redacted version of that.  And in

25  the upper left-hand corner, can you tell the members of the jury

455

1    what INHSBC 0100 C34 means?

2    A.  C34 is the name of the screen that we are looking at.

3    IN HSBC 010, I'm not sure what that means.  But C34 is the

4    screen that we are looking at within the HUB system.

5    Q.  And for which account number is that?

6    A.  So we are looking at two customer ID.  One customer ID ends

7    with 1035, and the other customer ID ends with 7002.

8    Q.  Now, the 7002, are those reflected on the following two

9    pages?

10   A.  Yes.

11   Q.  But just on the first page, who is the client for account

12   1035?

13   A.  Arvind Ahuja and N. Ahuja.

14   Q.  And what type of account and what is the currency indicated?

15   A.  It is an NRE account.

16   Q.  And to remind the members of the jury, is that taxable in

17   India, the NRE account?

18   A.  No.

19   Q.  And moving on to the second page of the screen shot, at the

20   top it says the same thing except it also says C34, correct?

21   A.  Correct.

22   Q.  And again, what is a C34 screen shot?

23   A.  It's a summary of all the clients' accounts with HSBC-India.

24   Q.  And who is the client indicated and what is the account

25   number?

456

1   A.   A. Ahuja and N. Ahuja.  And did you say what is the account

2   number?  7002.  That is the customer ID under which all of these

3   accounts are held.

4   Q.   And the third line down says FCR, under "Type."  What is

09:22  5   FCR?

6   A.   FCR is FC and R CD.

7   Q.   The next column over where it says "Currency," what does INR

8   stand for?

9   A.   Indian rupees.

09:22  10   Q.   How about USD?

11   A.   U.S. dollars.

12   Q.   And if we go to the third page, do you see at the top on the

13   left part it says J93?

14   A.   Yes.

09:22  15   Q.   What is a J93?

16   A.   A summary of the client's CDs with us, with HSBC-India.

17   Q.   And as of September 9th, 2006, what is the account number

18   listed here?

19   A.   So the customer ID is 7002.  There are several account

09:22  20   numbers under that I.D.

21   Q.   And for the first one it says -- under "Currency" it says

22   GBP.  What does that refer to?

23   A.   Great Britain pounds.

24   Q.   And what is the amount reflected for Great Britain pounds?

09:23  25   A.   130,706.21 pounds.

457

1   Q.   And what is the interest rate reflected on that?

2   A.   4.43 percent.

3   Q.   And the accrued interest as of September 9th, 2006?

4   A.   3,306.21.

09:23   5   Q.   And there's a subtotal and then it goes on to -- in the

6   "Currency" column it lists USD for U.S. dollar.  Do you see

7   that?

8   A.   Yes.

9   Q.   And are these all certificates of deposits?

09:23   10   A.   Yes.

11   Q.   Could you explain to the members of the jury the numbers to

12   the right of the 7002 for all these entries?

13   A.   Each of these represent a different account number.

14   Q.   And for the U.S. dollar CDs, what is the subtotal indicated

09:24   15   for the dollar amount of certificates of deposits as of

16   September 9, 2006, for account 7002?

17   A.   U.S. dollars?

18   Q.   Yes.

19   A.   $5,087,245.79.

09:24   20   Q.   And in the right-hand column where it says "Interest

21   Accrued"?  You haven't had a chance to add up that interest,

22   have you?

23   A.   No.

24   Q.   I won't ask you about it.

09:24   25   A.   Thank you.

458

1   Q.  But would the interest accrued on one of these CDs that is a

2   FCNR, foreign currency non-resident, would that interest be

3   taxable in India?

4   A.  No, sir.

09:25    5   Q.  Directing your attention to Government Exhibit 71.

6   A.  Could you give me a minute?

7   Q.  Absolutely.

8   A.  Yes, sir.

9   Q.  Could you identify for the jury what is attached to the

09:25    10  first page there of Government Exhibit 71?

11  A.  The first page itself?

12  Q.  What is attached to the first page?

13  A.  These are more screen shots.

14  Q.  And for which account do those screen shots relate to?

09:25    15  A.  The first couple of pages seem to relate to 7002.  Then

16  there is 1035 as well.

17  Q.  And did you have a chance to look at those two nights ago?

18  A.  I did.

19  Q.  And are those the same type of screen shots that you used to

09:26    20  see when you were over in India working with the HUB system?

21  A.  Yes.  To the best of my memory.

22  Q.  And was the HUB system an accurate system, to the best of

23  your knowledge?

24  A.  Yes.

09:26    25  Q.  And do those relate to years 2006 through 2009?

459

1    A.  Yes, I think so.

2          MR. SULLIVAN:  Your Honor, we offer the admission of

3    Government Exhibit 71, the underlying screen shots.

4          MR. KIRSCH:  Your Honor, I think it's already been

5    admitted.

6          THE COURT:  It is in.

7          MR. KIRSCH:  We don't have to admit it twice.

8          MR. SULLIVAN:  That's all I have, Your Honor.

9                        CROSS-EXAMINATION

10   BY MR. KIRSCH:

11   Q.  Good morning, Ms. Katju.  I'm going to just pick up right

12   where I left off yesterday afternoon.  And yesterday afternoon

13   when we broke, we were talking about, I think, Government's

14   Exhibit 54.

15         MR. KIRSCH:  So, James, will you go ahead and call

16   that exhibit up?  And can you blow up the top part of that

17   exhibit, James, so we can talk about it?

18   BY MR. KIRSCH:

19   Q.  Okay.  Do you see that in front of you, Ms. Katju?

20   A.  I do.

21   Q.  Do you have a hard copy in front of you as well as the

22   screen?

23   A.  I do.

24   Q.  You can refer to whichever one is easier for you.  Now, this

25   letter that the government introduced into evidence yesterday

460

1    with the subject "Change of correspondence address" and then the

2    account number 7002, do you see that that's addressed to the

3    manager of HSBC-NRI Services?

4    A.  That is correct.

09:28  5    Q.  Now, Ms. Katju, you have absolutely no idea why this letter

6    was drafted, correct?

7    A.  Correct.

8    Q.  And you don't have any idea whether, in fact, any address

9    was ever changed, do you?

09:28  10   A.  You are right.  I do not know.

11   Q.  Now, do you see the reference in the letter on the bottom

12   line where it says "to my India P2 address"?

13   A.  Yes.

14   Q.  You know that P2 refers to a secondary address within the

09:28  15   HSBC records system, right?

16   A.  I believe so.

17   Q.  You don't know where this letter was sent, do you?

18   A.  No.

19   Q.  You don't even know who wrote the letter, do you?

09:29  20   A.  No.  I didn't evidence anyone writing the letter.

21   Q.  Now, Ms. Katju, I think you testified yesterday, but if you

22   didn't I'll ask you today, NRI service managers like you and

23   like Ms. Dhanani and Mr. Ankush Tandon would help customers with

24   paperwork and that sort of thing, correct?

09:29  25   A.  Correct.

461

1    Q.  And you would from time to time draft documents to sign; is

2    that correct?

3    A.  That is correct.

4           MR. KIRSCH:  Your Honor, at this point I'm going to

09:29   5    move to admit Government's Exhibit 53, and then I'd like to show

6    it to the witness.

7           MR. SULLIVAN:  No objection, Your Honor.

8           THE COURT:  It's received.

9           (Exhibit 53 received in evidence.)

09:29   10   BY MR. KIRSCH:

11   Q.  Let's walk through Government's Exhibit 53.

12          MR. KIRSCH:  James, can you go to 53 and can you pull

13   up the text of that document?

14   BY MR. KIRSCH:

09:30   15   Q.  Do you have that in front of you, Ms. Katju?  I think the

16   government showed it to you yesterday.

17   A.  Yes.

18   Q.  Do you see there the e-mail is from a lady named Priti

19   Dhanani?

09:30   20   A.  Yes.

21   Q.  We've talked about her a little bit yesterday, and I have

22   some more questions about her today.  But we'll talk about that

23   in a few minutes.

24          Do you see the date of the e-mail there, on Tuesday

09:30   25   August 19th?

462

1    A.   Yes.

2    Q.   And it's to Natasha?

3    A.   Yes.

4    Q.   And then the subject line says -- or the letter says, "Hi,

5    Natasha.  Request you to take a print of this letter and give it

6    to Sir.  He can sign and fax it on 212-525-2798.  Thanks.  Priti

7    Dhanani, assistant vice-president, NRI Services North America."

8         You see where it says the fax number, 212?  Do you see

9    that?

10        You have to answer out loud.

11   A.   Yes.

12   Q.   And you know that that is the area code for New York City,

13   correct?

14   A.   Correct.

15   Q.   Because you lived there and you worked there.

16   A.   I worked there.  I didn't live there.

17   Q.   I'm sorry.  You worked in New York City.

18   A.   Yes.

19   Q.   By the way, have you seen a single -- has the government

20   showed you even one single e-mail relating to Dr. Ahuja that you

21   ever sent?

22   A.   Relating to him?

23   Q.   Yeah, to him, to Dr. Ahuja.  Did you ever send an e-mail to

24   Dr. Ahuja?

25   A.   To Dr. Ahuja, no.

463

1   Q.  Did you ever receive an e-mail from Dr. Ahuja?

2   A.  I don't recall either sending or receiving.

3   Q.  Okay.  All right.  Now, do you see that there is an

4   attachment to this e-mail and it says letter.doc down at the

09:32  5   bottom of the e-mail?

6   A.  I see that.

7   Q.  Let's turn to the second page of the exhibit.  Do you see

8   that?

9   A.  Uh-huh.

09:32  10          MR. KIRSCH:  James, can you go to the second page of

11   that exhibit?  And can you pull up the text?

12   BY MR. KIRSCH:

13   Q.  All right.  That's a blank copy of Exhibit 54, correct?

14   A.  Yes.

09:32  15   Q.  You can compare them if you'd like.

16   A.  No.  I believe it is.

17   Q.  That's a blank copy of the letter, right?

18   A.  That looks like the blank of the letter, yes.

19   Q.  So Ms. Dhanani was the one who drafted this letter and sent

09:32  20   it to Dr. Ahuja for his signature, right?

21   A.  I can't really say because I don't have the attachment

22   directly attached to this.  But if it is, it probably is her.

23   Q.  You're saying that you can't -- I want you to look down at

24   the bottom of those pages.  Do you see in the first page of

09:33  25   Exhibit 53, it says HSBC-NRI and then it says "Document

464

1   Number 312"?

2   A.  Okay.

3   Q.  And then turn to the next page and it says "Document 313."

4   A.  Okay.

09:33   5   Q.  So if this is, in fact, the letter that was attached to the

6   e-mail on Government's Exhibit 53, then you would agree with me

7   that Ms. Dhanani drafted the letter.

8                THE COURT:  One second.

9                MR. KIRSCH:  I'm sorry.

09:33   10  BY MR. KIRSCH:

11  Q.  Then Ms. Dhanani drafted the letter, right?

12  A.  It's possible, yeah.

13  Q.  There's nothing unusual about that at all, is there?

14  A.  No.

09:33   15  Q.  Letters like this were drafted by NRI customer-service

16  representatives like you all the time, right?

17  A.  Only for extremely high-net-worth individuals and only if

18  they requested us to do that for them.

19  Q.  If they requested that you draft the letter.

09:34   20  A.  Yeah.

21  Q.  But the bank employee drafted it, right?

22  A.  We could draft the letter for them if they requested it.

23  Q.  Right.  And it would have been -- on this letter, it would

24  have been Priti who addressed it to the manager, HSBC-NRI

09:34   25  Services, right?

465

1    A.   Yes.  We would give them the text of what needs to be

2    written in the letter.

3    Q.   Right.  You as a bank employee would say this is the

4    information that needs to go into the letter, right?

5    A.   The client would tell us what they want.

6    Q.   Right.

7    A.   We would then draft it according to their requirement, if

8    that is what they wished us to do.

9    Q.   Right.  But when you drafted it, so -- I understand what

10   you're saying.  Priti Dhanani did not request the change of

11   correspondence address.  That's what you're saying, right?

12   A.   No.  I'm saying Priti Dhanani wrote this -- I don't know

13   what happened.

14   Q.   Right.

15   A.   But in my understanding -- how things used to happen in the

16   representative offices, if the client specifically requested us

17   to draft a letter for him, then we would do it.  She would not

18   have done it on her own accord.

19   Q.   Absolutely.  We agree with that.  She would not have just

20   drafted a letter and sent it to him without talking to him or

21   whatever first, right?

22   A.   Without him requesting it from her.

23   Q.   Right.  But I want you to focus just on the top part of the

24   record where it says "The Manager, HSBC-NRI Services."

25   A.   Right.

466

1    Q.  What you're suggesting or what you're saying is the client

2    would make a request, whether it's break a CD or change the

3    address or -- the client would make a request, right?

4    A.  Right.

09:35   5    Q.  And then it would be you or in this case Priti who would

6    address the letter to the appropriate person for that action to

7    take place.  Does that make sense?

8    A.  No.

9    Q.  Okay.  At the top of the letter where it says "The Manager,

09:36  10    HSBC-NRI Services" --

11    A.  Sure.

12    Q.  -- Ms. Dhanani would know to whom the letter was supposed to

13    be addressed, right?

14    A.  It's generic.  It's to the manager HSBC.

09:36  15    Q.  But she would have put "The Manager, HSBC-NRI Services" --

16    A.  Possible, yeah.

17    Q.  -- because she would have known to where this request needed

18    to be sent, right?

19    A.  Okay.

09:36  20    Q.  No, I'm asking you.  Is that right?

21    A.  It's a very -- so would Dr. Ahuja.

22    Q.  You don't know that, do you?

23    A.  It's going to India.

24    Q.  But there's nowhere on here that says that the letter is

09:36  25    going to India, right?

467

1    A.   Okay.  Well, it's going to India.

2    Q.   I know you're testifying to that now.  But you don't see

3    anywhere on here --

4    A.   It doesn't say anywhere that it's India.  That's right.

09:36  5    Q.   Nowhere on here does it say that it's going to India, right?

6    A.   No, that's right.

7    Q.   And if it was something that had to go to India, then

8    perhaps Ms. Dhanani would have wrote something about India in

9    the address, right?  Perhaps.  I'm saying perhaps.

09:37  10   A.   Well, not necessarily.

11   Q.   Okay.  But she may have or she may not have, right?

12   A.   Right.  So -- NRI Services is only a services offered in

13   India; it is not offered anywhere else in the world.

14   Q.   Okay.  Right.  We're going to talk about that in a minute.

09:37  15   We're going to talk about that in a minute.

16   A.   I'm sorry.

17   Q.   That's okay.  With respect to this address on this letter,

18   you would agree with me that this letter looks like --

19             THE COURT:  One second.

09:37  20             MR. KIRSCH:  I'm sorry.

21   BY MR. KIRSCH:

22   Q.   You testified that this letter appears that it was drafted

23   by Ms. Dhanani, from the e-mail.

24   A.   Yes.

09:38  25   Q.   And she would have been the one to address the letter to

468

1    whom it needed to go to, right?

2    A.  Yes.

3    Q.  All right.  Now, I'd like to talk about Ms. Dhanani for a

4    minute.  And NRI Services.

5 | 09:38    MR. KIRSCH:  And I move to admit Government's

6    Exhibit 38 and ask that it be published to the jury.

7    MR. SULLIVAN:  No objection, Your Honor.

8    THE COURT:  It's received.

9    (Exhibit 38 received in evidence.)

10 | 09:38    MR. KIRSCH:  James, can you pull that up, please?

11    THE WITNESS:  I'm sorry.  Which exhibit?

12    BY MR. KIRSCH:

13    Q.  I said James.

14    A.  Oh.

15 | 09:38    Q.  Do you want a copy of it?

16    A.  Which exhibit is this?

17    THE COURT:  Can you see it on your screen?

18    THE WITNESS:  I can see it on the screen, yes.

19    THE COURT:  She can see it.

20 | 09:38    BY MR. KIRSCH:

21    Q.  It's just a one-page, short e-mail.  But I want to go

22    through this.  Okay.

23    Do you see this e-mail is from Priti Dhanani?

24    A.  Yes.

25 | 09:39    Q.  And it's dated Monday, April 23, 2007.  Do you see that?

469

1   A.  Yes.

2   Q.  And it's sent to the e-mail address natasha2, correct?

3   A.  That's right.

4   Q.  And cc'd is Ankush Tandon, correct?

09:39   5   A.  Correct.

6   Q.  And then the e-mail subject line says "Statements."

7   A.  Yes.

8   Q.  And then I'd like to read the first few paragraphs of this.

9   It says:  "Dear Dr. Ahuja:  My name is Priti Dhanani and I work

09:39   10   with Ankush Tandon in the NRI team here in New York.  I refer to

11   your request for a composite statement of your Jersey

12   investments to Ankush."

13          Do you see that?

14   A.  Yes.

09:39   15   Q.  Do you see the reference there to Jersey investments?

16   A.  Yes.

17   Q.  Do you see that?

18   A.  Yes.

19   Q.  That would be a CD, right?

09:39   20   A.  I don't know.

21   Q.  You don't know to what she was referring when she said

22   "Jersey investments," do you?

23   A.  I do not.

24   Q.  She doesn't say in the e-mail "Jersey accounts," though,

09:40   25   does she?

1    A.  Not in this e-mail.

2    Q.  Now, you didn't write this e-mail, right?

3    A.  No.

4    Q.  You've never seen it before today, have you?

09:40  5    A.  I have seen it before, but it was shown by the other HSBC

6    lawyers to me.

7    Q.  It was shown by HSBC lawyers to you in preparation for your

8    testimony that you're going to give here today, right?

9    A.  It was for another purpose, but I've seen this once before.

09:40  10   Q.  Okay.  Now, do you have any idea what the difference is

11   between a foreign investment and a foreign account, under U.S.

12   law?

13   A.  No.

14   Q.  Now, I'd like to talk for a minute about Ms. Dhanani.  In

09:41  15   this letter does it appear to you that she's introducing herself

16   to Dr. Ahuja?

17   A.  Yes.

18   Q.  And she was a relationship manager at HSBC, just like you.

19   A.  That is correct.

09:41  20   Q.  So does it appear from this letter that she was Dr. Ahuja's

21   relationship manager?

22   A.  She doesn't say that in the e-mail.

23   Q.  But when you read the e-mail, can you conclude that from the

24   e-mail?  Why else would she be introducing herself to Dr. Ahuja

09:41  25   in this way?

471

1  A.  She could just be -- she may just need to, you know, do

2  something.  Ankush may have asked her to do something.  I can't

3  conclude that from the e-mail.

4  Q.  So maybe Ankush was Dr. Ahuja's relationship manager.

09:41  5  A.  Again, Ankush was the manager of the NRI Services office in

6  New York, so I don't know if he was his relationship manager.

7  Q.  But he may have been, right?

8  A.  He could have been.

9  Q.  All you know is that you were not, right?

09:42  10  A.  That is right.

11  Q.  Did you work with Ms. Dhanani?

12  A.  I did.

13  Q.  And did you also work with Mr. Tandon?

14  A.  Yes, I did.

09:42  15  Q.  In the same office.

16  A.  Yes, I did.

17  Q.  Performing essentially the same functions.

18  A.  That is right.

19  Q.  You worked with them in New York, correct?

09:42  20  A.  Correct.

21       MR. KIRSCH:  Your Honor, I'd like to move for the

22  admission at this point of Defense Exhibit 2203.

23       THE COURT:  Is there any objection?

24       MR. SULLIVAN:  I haven't been able to locate it yet,

09:42  25  Your Honor.

472

1    MR. KIRSCH:  Your Honor, it is --

2    THE COURT:  Give him a moment.

3    MR. KIRSCH:  All I'm seeking --

4    THE COURT:  Just show him what you're talking about.

09:43    5    MR. KIRSCH:  Yes, Your Honor.

6    (Counsel confer.)

7    MR. KIRSCH:  Your Honor, just so the record's clear,

8    I'm offering Exhibit Number 2203, pages 1, 2, and 3.

9    MR. SULLIVAN:  We object to the admission of these.

09:43    10    THE COURT:  What's the general ground?

11    MR. SULLIVAN:  Relevance.

12    THE COURT:  May I see the exhibit?

13    MR. KIRSCH:  Yes, sir.  And I can explain the

14    relevance to you.

09:43    15    THE COURT:  I'd just like to see it first.

16    MR. KIRSCH:  Your Honor, it is the first line under

17    "Experience" which is the relevant part of the exhibit.

18    (Document tendered to the Court.)

19    MR. KIRSCH:  I actually can just offer the first page,

09:44    20    Your Honor.

21    (Court peruses document.)

22    THE COURT:  Overruled.  It's received.

23    (Exhibit 2203 received in evidence.)

24    BY MR. KIRSCH:

09:44    25    Q.  Okay.  I'd like to show you --

473

1    MR. KIRSCH:  James, can you pull that up, 2203, and

2  show the first page to the witness?

3  BY MR. KIRSCH:

4  Q.  Ms. Katju, I'm showing you now what's been marked and

5  received in evidence as Defense Exhibit 2203.  Do you see that?

6  Would you like a copy, by the way?

7  A.  I see it.  That's fine.

8  Q.  I'm going to ask you some questions about it.  It appears to

9  be a resume of Priti Dhanani; is that right?

10  A.  It does, yes.

11    MR. KIRSCH:  James, can you blow up a little bit more

12  of the --

13    THE WITNESS:  May I get a copy, actually?  If you have

14  one.

15    THE COURT:  You can hand her this one.

16    MR. KIRSCH:  Yes.

17    (Document tendered to the witness.)

18    THE WITNESS:  Thank you.

19    MR. KIRSCH:  You're welcome.

20  BY MR. KIRSCH:

21  Q.  Okay.  I'd like you to look at the "Experience" line.  Do

22  you see that?

23  A.  Yes.

24  Q.  And do you see where it says "Vice President — NRI Services

25  New York, July 2009 — till date"?

474

1    A.  Yes.

2            MR. KIRSCH:  All right.  Now, James, can you go down

3    to the second entry which says "Associate Vice President — NRI

4    Services, May 2006 to June 2009"?

5    BY MR. KIRSCH:

6    Q.  Do you see that?

7    A.  Yes.

8    Q.  And just read these to yourself.  Do you see the general

9    description of the things that she did?

09:45   10            (Witness peruses document.)

11    BY MR. KIRSCH:

12    Q.  I point you to the second bullet point, "Coordinated regular

13    follow-up on Premier customer queries, referrals, and all

14    communications with affiliated branches in India."

09:45   15            Do you see that?

16    A.  Yes.

17    Q.  Were these generally the same types of duties that you held?

18    A.  Yes.

19            MR. KIRSCH:  James, can you highlight under

09:46   20    "Experience" the first line which starts "Hongkong & Shanghai

21    Banking Corporation"?  The whole line.  Okay.

22    BY MR. KIRSCH:

23    Q.  Do you see that?  Do you see where it says "Experience,"

24    Hongkong & Shanghai Banking Corporation, HSBC Bank," and then

09:46   25    she lists several things underneath what she did, including

475

1  "Vice President — NRI Services," "Associate Vice President — NRI

2  Services," et cetera.  Do you see that?

3  A.  Yes.

4  Q.  And do you see there where she indicates that she works for

5  HSBC Bank-USA?  Do you see that?

6  A.  Yes.

7  Q.  So these -- so if she's working for NRI Services, she's

8  working for HSBC Bank-USA, right?

9  A.  May I explain that?

10  Q.  Well, if you know.  She's working for HSBC-USA, right?

11  A.  (No response).

12  Q.  Go ahead.

13  A.  So we were all employed by HSBC Bank-USA, but we were

14  working for HSBC Asia Pacific representative office.

15  Q.  Right.  But the Asia Pacific representative office was --

16  you were employed -- you received a paycheck from HSBC-USA,

17  right?

18  A.  Actually --

19  Q.  If you can recall.

20  A.  Yes.  And I'm going to try.  Actually, our paychecks -- from

21  what I remember, our W-2 would say Giller Limited or something.

22  I don't think it would say HSBC Bank.

23  Q.  That could be the issue of the W-2.  Just focus --

24          THE COURT:  Slow down.

25          MR. KIRSCH:  I'm sorry.

476

1    BY MR. KIRSCH:

2    Q.  Just focus on her --

3    A.  Sure.  I think it said Giller.  It didn't say HSBC.

4    G-I-L-L-E-R.

09:47   5    Q.  It didn't say HSBC at all, right?

6    A.  Right.  In comparison to now when I worked for HSBC Bank, my

7    paycheck says HSBC Bank.

8    Q.  Okay.

9    A.  So -- yeah.

09:48   10   Q.  All right.  But do you see here where she represents on her

11   resume that she works for HSBC Bank-USA, right?

12   A.  I do.  But she also says she works for Hongkong & Shanghai

13   Banking Corporation Limited, which is HSBC.  This is HBAP.  This

14   is not H-U.S.  So U.S. is HSBC I think North America holdings.

09:48   15   So there is difference.

16   Q.  Okay.  Maybe I can help you with that because now I'm going

17   to move to admit Defendant's Exhibit 2057, pages 118, 119, and

18   120.

19           Do you need a copy of this?

09:49   20           THE WITNESS:  I'm sorry, I don't have these.

21           MR. KIRSCH:  I know.

22           MR. SULLIVAN:  Your Honor, may we approach?

23           THE COURT:  Certainly.

24           (At side bar on the record.)

09:50   25           MR. SULLIVAN:  Your Honor, we object to the admission

477

1    of these types of exhibits, and this is Defense Exhibit 2057, on

2    the ground that --

3           THE COURT:  Well, let's be very specific.  What are

4    you objecting to with regard to this exhibit?

5           MR. SULLIVAN:  That it's not relevant and to the

6    extent that it is relevant that it's so slight that it's

7    substantially outweighed by a waste of time, confusing the jury,

8    because this can't be tied to the defendant's state of mind.  I

9    think I know where Mr. Kirsch is going, I can appreciate that,

10   but he's trying to establish through these --

11          THE COURT:  Well, okay, let's hear what you have to

12   say.

13          MR. KIRSCH:  Your Honor, this document is

14   unquestionably relevant.  This document indicates that

15   Mr. Tandon, who the government is not calling as a witness, was

16   employed by HSBC Bank-USA.  The law was -- the judge will

17   instruct the jury on at the end of the case is that if an

18   account was maintained, if you're a domestic bank it's not a

19   foreign account under U.S. law.  And this account was maintained

20   through HSBC Bank-USA.  The documents the government's going to

21   introduce are e-mails and documents --

22          THE COURT:  One second.  You said this account.  The

23   document -- does this document refer to an account?

24          MR. KIRSCH:  No.  The document -- Mr. Tandon is on all

25   the e-mails.  You heard his name now several times.  This

478

1    document reflects that Mr. Tandon was employed by HSBC Bank-USA

2    in the United States.  So this is a critical piece of evidence

3    to establish that when Dr. Ahuja was maintaining his account he

4    was maintaining it through the United States, which means it's

5    not a foreign account for the purposes of the FBAR and the

6    purposes of Schedule B, or at least what he knew.  And he knew

7    that he was working with Ankush Tandon who was employed and who

8    worked in the United States.  And this document is as relevant

9    as the last document that we admitted.  This is just the Ankush

10   Tandon document.  It shows that he worked in the United States.

11   And there's no unfair prejudice.  This is our defense,

12   Your Honor.

13            THE COURT:  Again, why isn't that relevant?

14            MR. SULLIVAN:  Your Honor, it is relevant, but this

15   witness just testified that she worked in New York, serviced NRI

16   accounts in India, and worked for a different branch of the bank

17   which is listed --

18            THE COURT:  But why isn't this particular document --

19   why isn't this particular document concerning Mr. Tandon

20   relevant?

21            MR. SULLIVAN:  Because it doesn't go to the

22   defendant's state of mind.  There's no indication that the

23   defendant relied on this document to conclude that he had

24   U.S.-based investments.

25            THE COURT:  Hasn't the government offered exhibits

479

1      that include the name Mr. Tandon?

2                  MR. KIRSCH:  Yes, Your Honor.

3                  THE COURT:  The objection is overruled.

4                  (End of discussion at side bar.)

09:53  5           THE COURT:  The objection is overruled.

6                  MR. KIRSCH:  James, can you pull up 2203, page 1, the

7      document we were just looking at.

8                  THE COURT:  Just for the record, 2203 is received.

9                  (Exhibit 2057 received in evidence.)

09:53  10          MR. KIRSCH:  Your Honor, I think you mean 2057.

11                 THE COURT:  I stand corrected.

12                 MR. KIRSCH:  Thank you, Your Honor.

13                 James, can you pull down to that "Experience" line

14     where we were looking at Hong Kong --

09:53  15     BY MR. KIRSCH:

16     Q.   Okay.  Do you see this is Ms. Dhanani's resume, and it says

17     "Hongkong & Shanghai Banking Corporation Limited," and then in

18     parens it says "HSBC Bank" and then it says USA:

19                 You see that, right, Ms. Katju?

09:54  20     A.   Yes.

21     Q.   By the way, do you know if Ms. Dhanani was a U.S. citizen?

22     A.   Not to the best of my knowledge.

23     Q.   So you don't know.

24     A.   She was not a U.S. citizen.

09:54  25     Q.   Okay.  Now, I'd like to show you Defendant's Exhibit 2057,

480

1    page 118.

2          MR. KIRSCH:  And, Your Honor, just so the record's

3    clear, we only offered page 118, 119, and 120.  We didn't offer

4    the whole file.

5          THE COURT:  All right.

6          MR. KIRSCH:  James, can you pull this up?

7    BY MR. KIRSCH:

8    Q.  All right.  And I'd like to call your attention just to the

9    top of the letter.  All right, do you see this, ma'am?  It says

10   it's a letter from HSBC to the Department of Homeland Security;

11   do you see that?

12   A.  Yes.

13   Q.  It's regarding Ankush Tandon, and it says "L-1 petition

14   extension."  Do you see that?

15   A.  Yes.

16   Q.  You're familiar with the fact that "L-1 petition extension"

17   refers to like a work visa, correct?

18   A.  Correct.

19   Q.  And then the first line says "Dear Sir or Madam:  I am

20   pleased to present this letter in support of the attached L-1

21   petition extension request being filed on behalf of Mr. Ankush

22   Kumar Tandon."  Correct?

23   A.  Correct.

24   Q.  That's the Mr. Tandon that we had been talking about

25   earlier, right?

481

1    A.  Yes.

2         MR. KIRSCH:  Now I'd like to go to the second page of

3    that exhibit, James, in the first paragraph.

4    BY MR. KIRSCH:

09:55  5    Q.  Now, do you see there the first line?

6    A.  Yes.  I do.

7    Q.  And it says "Mr. Tandon has been employed with HSBC Bank-USA

8    in the United States in L-1 visa status since July 2004 and

9    presently holds the position of relationship manager-corporate

09:56  10   liabilities."  Correct?

11   A.  Correct.

12        MR. KIRSCH:  And then, James, if you can go to the

13   bottom of the last page, and I just want to show this signature

14   block.

15   BY MR. KIRSCH:

16   Q.  Do you see down there at the bottom where it says,

17   "Thank you for your cooperation.  Very truly yours, Cathy" -- I

18   think that's Hoch, H-O-C-H -- "AVP" --

19        That's assistant vice-president, right?

09:56  20   A.  Yes.

21   Q.  -- "Human Resources, Immigration Services."  Correct?

22   A.  Yes.

23   Q.  So she's indicating in this letter to the Department of

24   Homeland Security that Mr. Tandon was employed by HSBC Bank-USA,

09:56  25   correct?

482

1    MR. SULLIVAN:  Objection.  The letter speaks for

2    itself.

3         THE COURT:  Overruled.

4    BY MR. KIRSCH:

09:56    5    Q.  Is that correct?

6    A.  That seems correct.

7         MR. KIRSCH:  Your Honor, I now move to admit

8    Government's Exhibit 29.

9         MR. SULLIVAN:  No objection, Your Honor.

09:57    10         THE COURT:  29 is received.

11         (Exhibit 29 received in evidence.)

12         MR. KIRSCH:  James, can you pull this up?

13    BY MR. KIRSCH:

14    Q.  Ms. Dhanani, this is a one-page e-mail --

09:57    15    A.  Katju.

16    Q.  I'm sorry.  Ms. Katju.  I'm sorry.

17         Ms. Katju, at the bottom, the bottom of the page, I'd

18    like you to focus on the bottom of the page where there's an

19    e-mail from ahuja3803@aol.com.

09:57    20         MR. KIRSCH:  James, can you blow up that bottom part

21    of the page?  Okay.

22    BY MR. KIRSCH:

23    Q.  Do you see that e-mail from that e-mail address

24    ahuja3803@aol.com?

09:58    25    A.  Yes.

483

1   Q.  And it's dated June 13th, 2006?

2   A.  Yes.

3   Q.  And it's addressed to Mr. Ankush Tandon, correct?

4   A.  Correct.

5   Q.  And then it says "/HBUS," right?

6   A.  Yes.

7   Q.  That's HBUS, right?

8   A.  Yes.

9   Q.  That we talked about yesterday.

10  A.  It is.

11  Q.  And that's HSBC-USA.

12  A.  Correct.

13  Q.  And then you can see the e-mail is talking about a credit

14  card and a CD.  Do you see that?

15  A.  Yes.

16  Q.  And CD is a common abbreviation for a type of investment

17  called a certificate of deposit.  You know that, right?

18  A.  Yes.

19  Q.  There's no indication in this e-mail that anything was ever

20  sent to India, correct?

21  A.  Correct.

22  Q.  Ms. Katju, I'd now like to go to Government's Exhibit 42,

23  which we talked about a little bit yesterday and you talked

24  about it on direct examination.

25         Do you have that in front of you?

484

1    MR. KIRSCH:  James, can you pull up the first page?

2  BY MR. KIRSCH:

3  Q.  Do you see that, Ms. Katju?

4  A.  Yes.

5  Q.  Do you see down there on the bottom the stamp received on

6  January 8, 2008?  Do you see that?

7  A.  You mean scanned and sent?

8  Q.  I'm sorry.  Scanned and sent is correct.  Thank you.

9  A.  Yes.

10  Q.  I have a hard time looking at that screen.  You see where it

11  says "New Delhi" on there, correct?

12  A.  Yes.

13  Q.  You don't have any idea who wrote "New Delhi" on that

14  application, do you?

15  A.  No.

16  Q.  And you don't know when it was written on that application,

17  do you?

18  A.  No.

19  Q.  Ms. Katju, you testified yesterday about some Premier

20  account statements; do you recall that?

21  A.  Yes.

22  Q.  That show a summary of the defendant's accounts and those

23  sorts of things?

24  A.  Any Premier account holder's accounts.

25  Q.  For Premier account holders they receive statements,

485

1    correct?

2    A.   Correct.

3    Q.   Has the government shown you a single statement that

4    Dr. Ahuja may or may not have received in connection with his

5    Premier account?

6    A.   No.

7    Q.   I'm going to do that right now.

8             MR. KIRSCH:  Your Honor, I move to admit Government's

9    Exhibit 72.

10            MR. SULLIVAN:  No objection.

11            THE COURT:  72 is received.

12            (Exhibit 72 received in evidence.)

13   BY MR. KIRSCH:

14   Q.   Ms. Katju, because this is a bigger exhibit --

15            MR. KIRSCH:  Your Honor, may I approach and hand the

16   witness a copy?

17            THE COURT:  Surely.

18            MR. KIRSCH:  I think it will be easier if you have a

19   copy in front of you.

20            THE WITNESS:  Thank you.

21            MR. KIRSCH:  Can you blow up the top of that?  Just

22   the top, James, the header with the address on it.

23   BY MR. KIRSCH:

24   Q.   Okay.  Do you see there that this is what appears to be an

25   HSBC statement, Ms. Katju?

486

1  A.  Yes.

2  Q.  And do you see there it says -- on the right-hand side it

3  says "HSBC Premier," correct?

4  A.  Right.

5  Q.  And this particular one is dated November 27th, 2003,

6  through December 23rd, 2003.  Do you see that?

7  A.  Right.

8  Q.  And do you see the address is an address on Parkview Road in

9  Greendale, Wisconsin?

10  A.  Correct.

11  Q.  Now, you've never seen this before, correct?

12  A.  Correct.

13  Q.  I'm going to go through one of these statements with you,

14  and I'd like --

15      Can you turn to page 28071.

16      MR. KIRSCH:  James, can you go to that page?

17  A.  Yes, sir.

18  BY MR. KIRSCH:

19  Q.  Okay, are you there?

20  A.  Yes.

21      MR. KIRSCH:  James, can you pull up the header from

22  that page?

23  BY MR. KIRSCH:

24  Q.  All right.  Ms. Katju, do you see this is a statement from

25  February 27th, 2007, to March 23rd, 2007?  Do you see that?

487

1   A.   Yes.

2   Q.   It's mailed to -- what purports to be Arvind Ahuja at an

3   address on Parkview Road in Greendale, Wisconsin, correct?

4   A.   Correct.

10:02   5   Q.   This is similar to the earlier one that I just showed you

6   from 2003, but this is '07, right?

7   A.   Right.

8            MR. KIRSCH:  James, can you --

9            Your Honor, can I have one minute?

10:03   10            THE COURT:  Certainly.

11            (Defense counsel confer.)

12            MR. KIRSCH:  James, before we go down to the bottom, I

13   just want you --

14   BY MR. KIRSCH:

10:03   15   Q.   Ms. Katju, do you see underneath the date of the statement

16   there do you see where it says "Questions"?

17   A.   Yes.

18   Q.   It says, "Call 1-888-662-HSBC or write HSBC Fifth Avenue

19   Office"?

10:03   20   A.   Right.

21   Q.   And then it lists the relationship manager of Romanand Pawa.

22   A.   Right.

23   Q.   That's a New York address and phone number, right?

24   A.   That's right.

10:03   25            MR. KIRSCH:  James, can you blow that up?  Okay.  Can

488

1    you blow up --

2    BY MR. KIRSCH:

3    Q.  Well, do you see the account detail there, Ms. Katju?

4    A.  Yes.

5            MR. KIRSCH:  All right, James, can you blow up where

6    it says "Description of Transactions"?  You've got to do the

7    amounts too, please.

8    BY MR. KIRSCH:

9    Q.  Can you see that on the screen in front of you?

10           MR. KIRSCH:  James, can you make that any bigger on

11   the screen?

12           THE WITNESS:  I can see it on the actual page.

13   BY MR. KIRSCH:

14   Q.  Okay.  So you can look on the screen and the actual page.

15   Do you see the date March 5th, 2007?  Do you see that?

16   A.  Yes.

17   Q.  Does that indicate -- it says "RECD," right?

18   A.  Yes.

19   Q.  That means received.

20   A.  Uh-huh.

21   Q.  And then it says "US Bank - Wisconsin, Milwaukee."  Do you

22   see that?

23   A.  Yes, I see it.

24   Q.  And it has an amount, $500,000, right?

25   A.  Right.

489

1  Q.  So that indicates that on March 5th, 2007, a wire was

2  received into that account from US Bank in Milwaukee, Wisconsin,

3  for $500,000, right?

4  A.  Yes.

5  Q.  Now let's look at the next transaction.

6       Do you see the next transaction is 11 days later on

7  March 16th?  Do you see that?

8  A.  Yes.

9  Q.  And that shows that the money was moved from this account to

10  HSBC-India Mumbai, correct?

11  A.  Correct.

12  Q.  $500,000.

13  A.  Right.

14  Q.  Correct?

15  A.  Correct.

16  Q.  But the money -- this statement reflects that the money was

17  wired first to this HSBC account in New York, correct?

18  A.  Correct.

19  Q.  Ms. Katju, I'd like to now show you the last, the very

20  bottom part.

21       MR. KIRSCH:  James, can you pull up the statement on

22  the very bottom of this?  The small type on the bottom.  And can

23  you blow that up a little bit?

24  BY MR. KIRSCH:

25  Q.  Ms. Katju, I'm going to read that, the line on the bottom,

490

1    and I want to see if I read this correctly.

2         This statement states on the bottom of the statement:

3    "For deposit accounts opened at an HSBC Bank branch located in

4    California, Delaware, District of Columbia, Florida, New Jersey,

5    New York, Oregon, Pennsylvania, Washington, or for personal

6    accounts opened by telephone or Internet, the accounts are held

7    by HSBC Bank-USA, N.A."

8         Do you see that?

9    A.  Sure, yeah.

10   Q.  Ms. Katju, you testified on direct examination that you

11   don't know when Dr. Ahuja opened his account at HSBC, right?

12   A.  That is right.

13   Q.  You don't know where he opened it; is that right?

14   A.  That is right.

15   Q.  You don't know what type of an account it was when he opened

16   it.

17   A.  That's right.

18        MR. KIRSCH:  Your Honor, I'm now going to move to

19   admit Defendant's Exhibit 2101.

20        THE COURT:  Is there any objection?

21        MR. SULLIVAN:  One moment, Your Honor.

22        (Brief pause.)

23        MR. SULLIVAN:  No objection, Your Honor.

24        THE COURT:  It's received.

25        (Exhibit 2101 received in evidence.)

491

1    MR. KIRSCH:  Your Honor, may I approach the witness?

2    THE COURT:  You may.

3    MR. KIRSCH:  I ask that that document be published to

4  the jury.  James, you're ahead of me.

5    THE COURT:  Proceed.

6    MR. KIRSCH:  James, can you pull up the top part of

7  that document?

8  BY MR. KIRSCH:

9  Q.  Ms. Katju, you've not seen this before, correct?

10  A.  Correct.

11  Q.  All right.  Do you see the date, 8/17/01?

12  A.  Yes.

13  Q.  Up on the top right-hand corner?

14  A.  I do.

15  Q.  And do you see that this is a wire transfer form?  Do you

16  see that?

17  A.  It looks like a wire transfer form, yeah.

18  Q.  And what is the wire amount?

19  A.  Looks like the wire amount is $1,075,000.

20    MR. KIRSCH:  James, can you go down a little bit?

21  BY MR. KIRSCH:

22  Q.  All right.  Do you see the name Arvind Ahuja?  Do you see

23  that?

24  A.  Yes.

25  Q.  With the same Parkview Road address in Greendale, Wisconsin,

492

1    that we've seen on many documents now?

2    A.  Yes.

3    Q.  And do you see where this wire transfer went on August 17th,

4    2001?

5    A.  I'm sorry --

6    Q.  Do you see where this wire transfer went on August 17th,

7    2001?

8    A.  No, I can't tell from this where the -- it mentions HSBC

9    Bank New York, but it doesn't say that it went there.

10   Q.  Does it have any other recipient or any other bank indicated

11   that would have received the wire?

12   A.  (No response.)

13   Q.  I'm not asking you to testify that you know where the wire

14   transfer went.  I'm just asking you to look at the document.

15        Does the document indicate that $1,075,000 was

16   transferred to HSBC Bank in New York, then with a routing number

17   of 021001088?

18   A.  I cannot testify to that.  Because that is information --

19   there is information missing on this document.  So I can't

20   read -- I can't even read which bank it's gone out from.  So --

21        MR. KIRSCH:  Your Honor, can I have one moment?

22        THE COURT:  Certainly.

23        (Brief pause.)

24        MR. KIRSCH:  Your Honor, I think we have a stipulation

25   that I can state right now.

493

1        THE COURT:  Very well.

2        MR. KIRSCH:  The parties agree, Your Honor, that this

3   wire transfer reflects a wire transfer from US Bank in Milwaukee

4   to HSBC Bank in New York on August 17th, 2001.  And that's

10:11   5   pursuant to the documents received pursuant to subpoena, which I

6   don't need to admit and go through with this witness, subject to

7   that stipulation.

8        THE COURT:  Mr. Sullivan?

9        MR. SULLIVAN:  The United States agrees.

10:12   10        THE COURT:  Very well.  That's accepted.

11   BY MR. KIRSCH:

12   Q.  Ms. Katju, did you hear what I just said?

13   A.  I did.

14   Q.  Ms. Katju, did you know that Dr. Ahuja deposited all of his

10:12   15   CD investment money at HSBC in New York?

16   A.  No, I don't know that.

17   Q.  Now, Ms. Katju, you testified on direct examination and the

18   government asked you some questions about a lockbox that was

19   located at Buffalo, New York.  Do you recall that?

10:12   20   A.  Yes.

21   Q.  By the way, Buffalo is where HSBC is headquartered, right?

22   A.  Not to my knowledge.

23   Q.  HSBC has a large presence in Buffalo, New York.  You would

24   agree with me, right?

10:12   25   A.  HSBC has a large presence in Buffalo, yes.

494

1   Q.  And that's where the lockbox is located, right?

2   A.  Was located, yes.

3   Q.  Well, was -- during these relevant years that's where the

4   lockbox was, right?

5   A.  (No response.)

6   Q.  And I think you testified -- you testified -- do you

7   remember testifying in an earlier proceeding in this case?

8   Remember you were over the phone.  You testified under oath in

9   earlier proceedings.  Do you recall that?

10  A.  Yes.

11  Q.  And the lockbox that was located in Buffalo, New York, was

12  used for customers to transfer money to India; is that correct?

13  A.  One of the uses.

14  Q.  There were other -- I'm just talking about the transfer of

15  money.  Transfer of money to India was the lockbox, right?

16  A.  That was one of the ways.

17  Q.  Okay.  Let me ask you.  Ms. Katju, I can show you your prior

18  testimony if you want me to, but I'll just ask you --

19          THE COURT:  Just -- just --

20          MR. KIRSCH:  I'll just ask the question, Your Honor.

21  BY MR. KIRSCH:

22  Q.  On August 10th, 2011 -- that was last Friday -- do you

23  remember being on the phone here?

24  A.  Yes.

25  Q.  And I asked you the following question when you were on the

495

1    phone.  I asked:  "Ms. Katju, when you worked in the

2    representative office at New York, did you ever help transfer

3    money to India to open a CD?"

4         And you gave the following answer:  "ANSWER:

5    Customers would transfer money to India by the lockbox and the

6    CD would be opened in India."

7         And then you said:  "So if customer wanted any

8    information for the process, yes, we would provide that

9    information to them."

10        Do you remember giving that answer?

11   A.  I do.

12   Q.  And that's accurate, isn't it?  Customers would transfer

13   money to India via the lockbox.

14   A.  Okay.  So in a majority of the cases customers would

15   transfer money through a lockbox, but customers could also wire

16   money directly into their accounts.

17   Q.  Directly to India, right?

18   A.  Directly to India.

19   Q.  Okay.  But the wire transfer that you just saw that I just

20   showed you on the HSBC Bank statement was a wire transfer to

21   New York.  You can look at it if you like.  It's the bank

22   statements in front of you.

23   A.  There were two wire transfers, one to New York and one from

24   New York to India.

25   Q.  Right.  So the money came --

496

1   A.   One from a local bank -- from what I remember, one from a

2   local bank to HSBC in New York and one from HSBC-New York to

3   HSBC in India.  Right?

4   Q.   That's correct.

10:15  5        But the money was not wire-transferred from US Bank in

6   Milwaukee to HSBC in India, correct?

7   A.   Correct.

8   Q.   It was transferred to HSBC in New York.

9   A.   That's what it looks like.

10:16  10  Q.   You have no knowledge that Dr. Ahuja ever used any lockbox

11  in Buffalo; is that correct?

12  A.   I have no knowledge.

13  Q.   You don't even know if he knew about a lockbox in Buffalo,

14  do you?

10:16  15  A.   No, I don't.

16  Q.   Ms. Katju, the government asked you some questions about

17  Indian tax.  Do you recall that?

18  A.   Sure.  I mean, refresh me.

19  Q.   I will.  You're not a tax expert in India, are you?

10:16  20  A.   I am not a tax expert in any country.

21  Q.   But you've heard -- you've heard the -- the words "tax

22  deducted at source," right?

23  A.   Yes.

24  Q.   And you know what that means is that when you're earning

10:16  25  interest on certain accounts --

497

1          THE COURT:  One second.  You can't testify.

2          MR. KIRSCH:  I'm sorry.

3          THE COURT:  Members of the jury, there are some rules

4     that we have to apply.  I think I mentioned earlier that the

10:17  5     statements of the lawyers are not evidence in the case and that

6     during openings and closings what the attorneys say is not

7     evidence.

8          Now, when questions are asked by lawyers, they cannot

9     be taken as evidence.  And if an attorney says, "Would you agree

10:17  10    with me," the attorney is, in effect, testifying.  I instruct

11    the lawyers at the outset that they can't do that.  So if I

12    interrupt an attorney when he or she says something like that or

13    sets forth in preliminary fashion what the lawyer believes to be

14    evidence and I interrupt, I'm not just trying to be rude; I'm

10:17  15    merely trying to enforce the rule that the attorney cannot

16    testify.

17          Proceed.

18          MR. KIRSCH:  Thank you, Your Honor.  I will not do

19    that.  I'm trying not to.

10:18  20    BY MR. KIRSCH:

21    Q.  Ms. Katju, I want to ask you some questions about tax

22    deducted at source, okay?  You're familiar with what that is,

23    right?

24    A.  Yes.

10:18  25    Q.  And that means that India goes into the account and actually

498

1    withdraws tax money from the account, right?

2    A.   That India deducts tax on the interest earned on the

3    account.

4    Q.   India deducts -- you said it better than I did.   India

5    deducts the tax on the interest earned, correct?

6    A.   Correct.

7    Q.   And then the tax is payable in India, right?

8    A.   Correct.

9    Q.   And I think the government showed you a form which was

10   Government Exhibit 11 that contained the defendant's name on it.

11   Do you recall that form?  You may have it in front of you.

12   A.   Did you say Exhibit 11?

13   Q.   Yes, 11.

14   A.   I don't have it.  I'm sorry.

15   Q.   Okay.  Just bear with me for one minute.

16              (Brief pause.)

17   BY MR. KIRSCH:

18   Q.   I'm sorry.  That's the wrong exhibit.

19              MR. KIRSCH:  Your Honor, can I approach the witness?

20              THE COURT:  Absolutely.

21              (Brief pause.)

22              MR. KIRSCH:  Your Honor, for the record, it's 47.

23              THE COURT:  Thank you.

24   BY MR. KIRSCH:

25   Q.   Okay.  Do you see that, Ms. Katju?

499

1    A.   I do.

2    Q.   And that's a form with respect to tax deducted at source,

3    right?

4    A.   It affects the tax deducted at source.

10:20  5    Q.   But it acknowledges that tax will be deducted at the source,

6    meaning in India, right?

7    A.   No, it's not an acknowledgement of that.  Tax would be

8    deducted at source even without a client's signature.

9    Q.   They don't even need to agree.  India government will just

10:20 10   assess the tax, right?

11   A.   That is right.

12   Q.   That just lowers the rate of tax from approximately

13   30 percent to about 15 percent, right?

14   A.   Correct.

10:20 15   Q.   And that's because the U.S. income tax rate on interest

16   income is about 15 percent, right?

17   A.   I don't know why it is.

18   Q.   Okay.  So you just know what it is, you don't know why.  Are

19   you familiar with what's called the foreign tax credit in the

10:20 20   United States?

21   A.   No.

22   Q.   Have you ever heard the terms "foreign tax credit" before?

23   A.   I have a vague understanding based on my own tax returns,

24   which I am unwilling to testify to because I am not a CPA.

10:21 25   Q.   Do you have an understanding -- let me just ask you if this

500

1    is your understanding.

2              Do you have an understanding that if you pay tax in

3    one country you get a credit for that tax on your U.S. tax

4    returns?

5    A.   I have an understanding that as long as your CPA says that

6    you can get tax credit for, you know, the taxes that you pay in

7    another country, you can get -- if you've paid tax in one

8    country you don't have to pay it in the other, but only if your

9    CPA agrees to it.  My CPA tells me that the taxes that I pay in

10   India I can get a credit for it in the U.S.

11   Q.   And you take that credit, right?

12   A.   I do.

13   Q.   And that credit has nothing to do whether it's an account or

14   an investment or wages; it applies, right?

15   A.   I'm not sure -- I don't know because I don't earn any of

16   those.  Now, we are only -- I'm testifying to my personal

17   knowledge.  This is not professional at all.  So I don't earn

18   any income in India so I have no knowledge of those things.

19   Q.   But you pay tax in India because you're an Indian citizen.

20   A.   I am not -- well, I don't want to bring my --

21   Q.   I understand.  I'm not trying to pry into that.

22   A.   Yeah.

23   Q.   You get a foreign tax credit and that's the extent of your

24   knowledge; is that right?

25   A.   That is right.

501

1    Q.   Okay.  Ms. Katju, I want to ask you some questions now --

2    I'm almost finished on the screen shots that you testified to

3    this morning.

4    A.   Okay.

5    Q.   And I think you testified that you saw those for the first

6    time the night before you testified, correct?

7    A.   What are we looking at?

8    Q.   The screen shots.

9    A.   Which exhibit?

10   Q.   69 and 71.

11   A.   Yes.  I saw them two days ago.

12   Q.   So the night before last, right?

13   A.   That's right.

14   Q.   Now, Ms. Katju, from these screen shots you don't have any

15   idea -- well, you don't have any idea whether Dr. Ahuja has ever

16   seen a single screen shot, do you?

17   A.   No.

18   Q.   I think you testified that these screen shots were generated

19   by the HUB computer system.

20   A.   That's right.

21   Q.   Is that right?  And when you worked in New York, you did not

22   have access to the HUB system, correct?

23   A.   Correct.

24   Q.   You did not input the information into the HUB system; is

25   that right?

502

1    A.   That is right.

2    Q.   And Mr. Sullivan asked you a lot of information about

3    amounts and interest rates.  Do you recall that?

4    A.   Yeah.

10:24    5    Q.   You have no way to verify the accuracy of the information,

6    correct?

7    A.   No.

8                MR. KIRSCH:  Your Honor, if I could just ask that --

9                Well, will you bring up Government Exhibit 69?

10:24    10                MR. HERRITY:  The chart?

11                MR. KIRSCH:  The screen shots.  But we need to use a

12    redacted version.  James, do you have a redacted version?

13                MR. HERRITY:  We do.

14                MR. KIRSCH:  Thank you.

10:24    15    BY MR. KIRSCH:

16    Q.   I just want to show you one of the screen shots.

17    A.   Sure.

18                MR. KIRSCH:  And could you go to the second page,

19    please, where it lists -- I'm just looking for a page where it

10:24    20    lists several CDs.

21                MR. SULLIVAN:  We need to go to the government's --

22                MR. KIRSCH:  He can do it.

23                THE COURT:  Wait a minute.  I have the government

24    monitor up.

10:25    25                MR. KIRSCH:  Okay.

                                                                    503

1    BY MR. KIRSCH:

2    Q.  Okay.  Can you see that, Ms. Katju?

3    A.  Yes.

4    Q.  And do you see there up there at the top --

5            THE COURT:  One moment, please.  For the record, we're

6    looking at Exhibit 69.  Go ahead.

7            MR. KIRSCH:  Thank you, Your Honor.

8    BY MR. KIRSCH:

9    Q.  Ms. Katju, do you see up there on the top it says "Customer

10   Number" and then it says 7002?

11   A.  Yes.

12   Q.  And underneath that it says "Account Number" and then it

13   lists a series of different numbers below that.  Do you see

14   that?

15   A.  Yes.

16   Q.  And what those numbers represent are individual certificates

17   of deposit investments, correct?

18   A.  Correct, certificates of deposits.

19   Q.  Okay.

20           MR. KIRSCH:  Your Honor, could I just have one moment,

21   please?

22           (Defense counsel confer.)

23           MR. KIRSCH:  Thank you, Your Honor.

24           Thank you, Ms. Katju.  I have no further questions.

25           THE COURT:  Redirect?

504

1                    REDIRECT EXAMINATION

2    BY MR. SULLIVAN:

3    Q.  Ms. Katju, with reference -- you were asked questions about

4    TDS, tax deducted at the source.  Now, is the tax -- is that tax

5    deduction applicable to those FCNR CDs?

6    A.  No.

7    Q.  And would they be applicable to the NRE accounts?

8    A.  No.

9    Q.  So is it fair to say -- which accounts would they be

10   applicable to?

11   A.  NRO accounts.

12   Q.  And to your knowledge, did the customer in the United States

13   who signed the tax declaration, did they have to make any

14   representation or promise about their U.S. taxes in order to get

15   the lower rate?

16           MR. KIRSCH:  Your Honor, I'm going to object to the

17   extent that it calls for speculation.  She's not -- she

18   testified she's not a tax expert.

19           THE COURT:  One second.  Do you wish to be heard at

20   side bar?

21           MR. SULLIVAN:  No.

22           THE COURT:  All right.  Objection sustained.

23   BY MR. SULLIVAN:

24   Q.  Do you have personal knowledge relating to when you worked

25   in San Francisco and you had the eight people working under you

505

1    where they obtained these tax declarations signed by HSBC

2    customers in the United States so they could lower their tax

3    rate to 15 percent, do you have knowledge of that?

4    A.  Yes.

10:28    5    Q.  And did the person who signed the tax declaration, what are

6    they representing in order to get that?  Do you know?

7            MR. KIRSCH:  Objection.  Speculation.  Calls for

8    hearsay.

9            THE COURT:  Objection sustained.

10:29    10   BY MR. SULLIVAN:

11   Q.  What is your understanding of what the U.S. -- the person in

12   the United States has to do or has to promise to the government

13   in India to get the lower tax rate?

14           MR. KIRSCH:  Same objection.  Calls for hearsay.

10:29    15           THE COURT:  Objection sustained.

16   BY MR. SULLIVAN:

17   Q.  To your knowledge, did the India government agree to lower

18   the tax rate from approximately 30 percent to 15 percent for a

19   given class of U.S. citizens?

10:29    20           MR. KIRSCH:  Objection.  Calls for speculation as to

21   what the Indian government agreed to do, and also she's not a

22   tax expert.

23           THE COURT:  Sustained.

24   BY MR. SULLIVAN:

10:29    25   Q.  Do you know why the Indian government would lower it from 30

506

1    percent to 15 percent?

2              MR. KIRSCH:  Objection.  For all those reasons.

3              THE COURT:  Sustained.

4              MR. SULLIVAN:  I'm going to move on, Your Honor.

5    BY MR. SULLIVAN:

6    Q.  You were asked whether you had personal knowledge of whether

7    Dr. Ahuja ever used the lockbox in New York.  Do you recall

8    those questions?

9    A.  Yes.

10   Q.  Given the bank statements you just saw today, the ones for

11   Government Exhibit 72, do you have knowledge regarding whether

12   Dr. Ahuja ever wire-transferred money to India?

13   A.  So are these the Exhibit 72?  I'm sorry.  I'm a little

14   confused about it.

15             MR. KIRSCH:  Your Honor, I'm afraid that's calling for

16   a legal conclusion.  The documents stand for themselves as to

17   where the money was wired and when.

18             THE COURT:  Objection sustained.

19   BY MR. SULLIVAN:

20   Q.  Did the -- when Mr. Kirsch asked you to look at the wire

21   transfer coming from Milwaukee to New York, was there another

22   record indicating that money was wire-transferred outside of the

23   United States?

24   A.  Yes.

25   Q.  Where did the money go?

507

1   A.   India.

2   Q.   You were asked whether -- do you know whether Dr. Ahuja

3   deposited all his CD money in New York, and you said no.  Do you

4   recall that question?

5   A.   Yes.

6   Q.   Based on the screen shots in Government's Exhibit 69 and 71,

7   where are the CDs that are reflected in those bank records

8   located?

9   A.   The CDs on the bank records in 69 and 71 are in HSBC-India.

10            MR. SULLIVAN:  Your Honor, may I approach the witness?

11   I have two exhibits.

12            THE COURT:  Surely.

13            (Document tendered to the witness.)

14   BY MR. SULLIVAN:

15   Q.   And could you take a look at Government Exhibit 50.  This is

16   already in evidence.  This is Government Exhibit 50.

17            Which bank account --

18            MR. SULLIVAN:  Could we publish Government Exhibit 50,

19   please?  It's not in evidence?

20            THE COURT:  Hold on, please.  Let me check my list.

21            (Brief pause.)

22            THE COURT:  50 is not in.

23            MR. SULLIVAN:  I'll lay a foundation, Your Honor.

24   BY MR. SULLIVAN:

25   Q.   Does that letter, is that purportedly signed by Dr. Arvind

508

1  Ahuja?

2  A.  The name at the end of the signature is Arvind Ahuja.

3  Q.  Does that relate to the same account, the HBUS account, that

4  is the records of Government Exhibit 72?  Is that the same

5  account number?

6  A.  The account number has been --

7  Q.  The last four digits.

8  A.  Yeah, the last four digits are the same.

9       MR. SULLIVAN:  Your Honor, we move the admission of

10  Government Exhibit 50 into evidence.

11       MR. KIRSCH:  No objection.

12       THE COURT:  50 is received.

13       (Exhibit 50 received in evidence.)

14       MR. SULLIVAN:  And if we can get that on the screen.

15       THE COURT:  You should be able to see it up here too.

16  BY MR. SULLIVAN:

17  Q.  Could you just read that very short letter into the record,

18  please.

19  A.  "Dear sir.  With reference to the above subject, you are

20  requested to please close my above checking account with you.

21  Please issue a banker's check for the balance in the account.

22  Thanking you."

23       MR. SULLIVAN:  With the court's indulgence.

24       (Brief pause.)

25  BY MR. SULLIVAN:

509

1    Q.  And if you look at the bottom of the page, can you --

2            MR. SULLIVAN:  Is there a way to rotate that?  It

3    appears upside down right now.

4    BY MR. SULLIVAN:

5    Q.  Can you read it upside-down?

6    A.  Yes.

7    Q.  What is the date reflected on the bottom of the page?

8    A.  July 24th, 2008.

9    Q.  So does that letter reflect that the defendant closed his

10   HBUS New York account in July of 2008?

11           MR. KIRSCH:  Objection, Your Honor, as to what --

12   objection.

13           THE COURT:  Objection sustained.

14   BY MR. SULLIVAN:

15   Q.  Do you now know when the defendant closed his HBUS account

16   in New York based on this exhibit?

17           MR. KIRSCH:  Objection.  Assumes a fact not in

18   evidence.

19           THE COURT:  Objection sustained.

20   BY MR. SULLIVAN:

21   Q.  If we could, go to Government Exhibit 72, the HBUS USA bank

22   statements for Dr. Arvind Ahuja.  Directing your attention to

23   page 02803 --

24           We'll put it on the screen.

25   A.  Okay.

510

1   Q.  -- 028035.  And if we could look at the top right portion,

2   where it says "Relationship Manager," do you know a Keisha S.

3   Davis?

4   A.  No.

5   Q.  Did she work in the NRI Services rep office in New York?

6   A.  No.

7           MR. KIRSCH:  Your Honor, I'm going to object.  This is

8   in 2004.  This witness testified that she was in India in 2004.

9   No personal knowledge.  I'm going to object.

10          THE COURT:  Have you gotten to what you want?  The

11  reason I blanked the screen is it was going through matters that

12  are not in evidence.

13          MR. SULLIVAN:  No, this is in evidence, Your Honor.

14          THE COURT:  No, there were -- as you were getting to

15  that document.

16          MS. SISKIND:  No.

17          MR. SULLIVAN:  The whole exhibit is in evidence,

18  Your Honor.

19          THE COURT:  I thought those were different exhibits.

20          MR. SULLIVAN:  No, this is Government Exhibit 72.

21          THE COURT:  So they're all part of a group exhibit.

22          MR. SULLIVAN:  Yes.

23          THE COURT:  All right, go ahead.

24  BY MR. SULLIVAN:

25  Q.  Do you see the statement that's dated April 25th, 2007, from

511

1  May 23rd, 2007?

2  A.  I do.

3  Q.  And do you know a relationship manager by the name of Kevin

4  Logan?

5  A.  I do not.

6  Q.  During that time period did you work in the NRI Services rep

7  offices in New York?

8  A.  Yes.

9  Q.  Did this individual work for the NRI Services office in

10  New York?

11  A.  This period is between the period I worked in New York and

12  California.  But for that period, a Kevin Logan did not work in

13  either of the offices.

14  Q.  And directing your attention to Government Exhibit 29, where

15  it reflects --

16        MR. SULLIVAN:  I might be mistaken.  Is Government

17  Exhibit 29 in evidence?

18        MS. JOHNSON:  Yes.

19  BY MR. SULLIVAN:

20  Q.  And if you look at the top of that -- that's probably the

21  wrong exhibit.  But when you used e-mail, did you use an e-mail

22  address that had HBUS in it?

23  A.  Yes.

24  Q.  And could you explain to the members of the jury why your

25  e-mail address would have HBUS in it?

512

1    A.  I don't know.  We were employed in the U.S., and all U.S.

2    employees had HBUS as part of the e-mail address.  That's the

3    best I can say.

4    Q.  Let me ask it this way.  Were you able to use an e-mail

10:40  5    address in India when you were stationed in the United States?

6            MR. KIRSCH:  Objection.  Personal knowledge,

7    Your Honor.  I'm not even -- the question is confusing.

8            THE COURT:  Objection sustained.

9    BY MR. SULLIVAN:

10:40  10   Q.  When you were in India, did you use an e-mail address that

11   had a different address other than HBUS in your e-mail?

12   A.  Yes.

13   Q.  What address was that?

14   A.  I believe it was HBAP.

10:40  15   Q.  Do you know whether or not using your e-mail address with

16   HBAP you could use the HSBC servers in the United States?

17           MR. KIRSCH:  Objection.

18           THE WITNESS:  I do not know.

19           MR. KIRSCH:  Personal knowledge.  I withdraw the

10:40  20   objection, Your Honor.  The answer can stand.

21   BY MR. SULLIVAN:

22   Q.  And you were asked questions about Government Exhibit 2057.

23           MR. SULLIVAN:  Could we just get that on the screen

24   really briefly?

10:41  25           MS. JOHNSON:  Defense exhibit.

513

1          MR. SULLIVAN:  It's a defense exhibit.

2          THE COURT:  2057.  Can you call it up?

3   BY MR. SULLIVAN:

4   Q.  Do you remember being asked questions about this application

5   to the Department of Homeland Security for Mr. Ankush Tandon?

6   A.  Yes.

7   Q.  Do you know whether or not the defendant ever saw this?

8   A.  No.

9   Q.  Were you -- did you get a visa through the Department of

10  Homeland Security when you were here?

11  A.  Yes.

12  Q.  And who sponsored you to get that visa?  Which entity?

13  A.  I believe the same entity as Ankush.  So HSBC-USA.

14  Q.  Do you know -- do you know why HBUS was the sponsor in the

15  United States as opposed to HBAP?

16          MR. KIRSCH:  Objection.  Relevance and also

17  speculation.

18          THE COURT:  Objection overruled.

19          THE WITNESS:  I don't know the answer to that.

20  BY MR. SULLIVAN:

21  Q.  I'm going to move on to Defense Exhibit 2203, which is the

22  Priti Dhanani resume.  Do you remember being asked questions

23  about that?

24  A.  Yes.

25          MR. SULLIVAN:  And if we could get that on the screen.

514

1  And if we could blow up the portion, the experience portion,

2  which is kind of about one-third of the way down the front of

3  the page.

4  BY MR. SULLIVAN:

5  Q.  Do you see where it says, right underneath "Experience,"

6  "Hongkong & Shanghai Banking Corporation, Ltd."?  Do you see

7  that?

8  A.  I do.

9  Q.  Is that HBUS?

10  A.  No.

11  Q.  What is that?

12  A.  It is HSBC-India HBAP, not HBUS.

13  Q.  And then yesterday do you recall being asked questions about

14  Ms. Priti Dhanani, Mr. Ankush Tandon, and Ms. Pooja Shah?

15  A.  Yes.

16  Q.  And is Mr. Ankush Tandon, is he still working in New York

17  for the bank?

18  A.  No.

19  Q.  Do you know where he's working?

20  A.  I believe he's in Bombay, in India.

21  Q.  How about Ms. Priti Dhanani?  Is she still working for the

22  bank in New York?

23  A.  No.

24  Q.  Do you know where she is?

25  A.  I believe she also is in Bombay, India.

10:43
10:43
10:44
10:44
10:44

515

1  Q.  How about Ms. Pooja Shah?  Do you know where she is?

2  A.  No.

3  Q.  Then yesterday you were asked about all the different HSBC

4  branches here in the United States and all over the world.  Do

5  you remember those questions?

6  A.  Yes, sir.

7  Q.  When you were here in the United States in the New York

8  representative office and in the Fremont, California,

9  representative office, which branch around the world did you

10  primarily conduct business with?

11  A.  That's a very hard question to answer.  Could you rephrase

12  that?

13  Q.  I'm going to have to rephrase that.

14        When you were employed in the representative offices

15  in New York, did you work with any branches outside of the

16  United States?  I mean by banks --

17  A.  We worked primarily with the branches in HSBC-India.

18  Q.  And finally, do you remember being asked questions about

19  Government Exhibit 42, which is the application?

20  A.  Yes.

21  Q.  And then you were asked whether or not --

22        MS. JOHNSON:  Your Honor?

23        MR. SULLIVAN:  Could we get that on the screen,

24  Your Honor?

25        THE COURT:  Wrong screen here.

516

1    BY MR. SULLIVAN:

2    Q.  Do you remember being asked whether or not you had any

3    knowledge that that was tied to any new accounts?  Do you recall

4    that?

5    A.  The NRI opening form.

6    Q.  It should be on the screen, Government Exhibit 42.

7    A.  Right.

8    Q.  Does that reflect that this is tied to an existing account,

9    that exhibit?

10   A.  It looks like there is an existing account.

11   Q.  What is the account number reflected on that?

12   A.  So it looks like it's -- I can see 002, 006, and the rest of

13   it has been removed for privacy reasons, I guess.

14   Q.  But do you see the 7002 account?

15   A.  I do.  I don't see the 7.  I see something there and 002,

16   006.  The 7 is not that visible, sorry.

17   Q.  And then finally you were asked questions about the Citibank

18   1099s.  Do you recall that?

19   A.  Yes.

20   Q.  And you said you had knowledge that Citibank was issuing

21   1099s?

22   A.  I believe Citibank could issue 1099s.  Unless -- to the best

23   of my knowledge.

24   Q.  But you worked for HBAP; is that correct?

25   A.  I worked for HSBC, that's right.

517

1   Q.  So how would you know that Citibank was issuing 1099s?

2   A.  Because they had a branch next door.

3   Q.  And --

4        MR. KIRSCH:  Your Honor -- I just -- I wanted to make

5   sure -- that answer was a little unclear so I wanted to ask the

6   court reporter to repeat it, if that's okay.

7        THE COURT:  Please read the question and the answer

8   back.

9        (Record read.)

10  BY MR. SULLIVAN:

11  Q.  But I think the question yesterday was with respect to an

12  NRI account in India.  Do you know whether Citibank was issuing

13  1099s for NRI accounts in India?

14  A.  I believe they were.

15  Q.  And if somebody applied for an NRI account in India at

16  Citibank, would they know that the money would be going over to

17  India?

18        MR. KIRSCH:  Your Honor, we're on to speculation.

19  Objection.

20        THE COURT:  Let me ask her.

21        Do you have any personal knowledge respecting what

22  occurred at Citibank concerning NRI accounts?

23        THE WITNESS:  I have not --

24        THE COURT:  Just answer yes or no.

25        THE WITNESS:  I don't understand the question.

518

1          THE COURT:  Do you know based upon your personal

2     knowledge and experience whether Citibank issued 1099 accounts

3     with regard to NRI matters?

4          THE WITNESS:  Yes, they did.

5          THE COURT:  Do you know from personal knowledge?

6          THE WITNESS:  I don't have an account with Citibank,

7     but I know --

8          THE COURT:  Do you know from personal knowledge?

9          THE WITNESS:  From personal knowledge, yes.

10          THE COURT:  All right.  The objection is overruled.

11    Proceed.

12    BY MR. SULLIVAN:

13    Q.  Is that because --

14          THE COURT:  The answer may stand.

15    BY MR. SULLIVAN:

16    Q.  Is that because part of your duties were trying to get new

17    deposits for HSBC in India?  Was that part of what you were

18    doing here in the United States?

19    A.  We were servicing clients and because of that if the

20    deposits -- if clients would increase their deposit balances

21    then, you know, that would be because of our services.  But I

22    know because I had friends who worked for Citibank and NRI

23    Services and they mentioned that they give 1099s.  That's how I

24    know.

25          THE COURT:  Approach.

519

1          (At side bar on the record.)

2          THE COURT:  Do the parties wish to be heard respecting

3     her response concerning Citibank?

4          MR. KIRSCH:  Your Honor, it's not disputed that

5     Citibank issued 1099s, so I'm not sure what the point is here.

6     We have 1099s.  They're going to come in through Mark Miller.

7     Citibank did it.  It's not disputed, I don't know where we're

8     going with this.

9          MR. SULLIVAN:  Where I'm trying to go, and maybe we

10    won't go there --

11         THE COURT:  Do you have any objection to her response

12    concerning Citibank?

13         MR. SULLIVAN:  That she learned about it from her

14    friends?

15         THE COURT:  Yes, because it's hearsay.

16         MR. SULLIVAN:  No, I don't have any objection.

17         THE COURT:  All right, we'll proceed.  Off the record.

18         (Discussion off the record.)

19         (End of discussion at side bar.)

20         THE COURT:  Unless the jury needs a break urgently, we

21    will take just a couple more minutes and finish up with this

22    witness.  Do we need a break?  All right, let's proceed.

23    BY MR. SULLIVAN:

24    Q.  And to your knowledge, when individuals set up NRI accounts

25    at Citibank, do you know where the deposits would be located?

520

1    A.  If they were NRI accounts, they would be located in India.

2          MR. SULLIVAN:  That's all I have, Your Honor.

3                    RECROSS-EXAMINATION

4    BY MR. KIRSCH:

5    Q.  Ms. Katju, you know that the acronym HSBC stands for

6    Hong Kong Shanghai Banking Corporation.  That's the H, the S,

7    the B, and the C, right?

8    A.  Well, to the best of my knowledge we don't use the full form

9    anymore.  We just use the acronym.

10   Q.  Right.  But you agree with me that that is the acronym for

11   the Hong Kong Shanghai Banking Corporation.

12   A.  Used to be.

13   Q.  Okay.  Ms. Katju, you testified -- the government lawyer

14   asked you if you knew where Ankush Tandon was, and you said that

15   he was located maybe in Bombay.  And you asked -- you were asked

16   where Ms. Dhanani was, and you said she may be in Bombay.  Do

17   you recall that?

18   A.  Yes.

19   Q.  When was the first time the government asked you where

20   Mr. Tandon and where Ms. Dhanani were located?

21   A.  This was the first time they asked me.

22   Q.  Right now on the witness stand on redirect examination,

23   right?

24   A.  I believe so, yes.

25   Q.  Do you know that Mr. Ramit Bhasin lives in New Delhi, India?

521

1    A.   Who?

2    Q.   Do you know Ramit Bhasin?

3    A.   You might not be pronouncing the name right.

4         MR. SULLIVAN:  Objection.  Beyond the scope.

5    Relevance.

6         THE COURT:  Objection sustained.  And any response

7    given is stricken.  Anything that is stricken cannot be

8    considered.  Proceed.

9    BY MR. KIRSCH:

10   Q.   Okay.  Do you know an individual by the name of Ramit Bhasin

11   or Bhasin?

12   A.   I do.

13   Q.   B-H-A-S-I-N, correct?

14   A.   Correct.

15   Q.   Do you know that he lives in New Delhi, India?

16   A.   I do not know that.

17        THE COURT:  Wait.  That -- the Court notes this is

18   beyond the scope of what the government just went into.  There

19   was no discussion of Mr. Bhasin.

20        MR. KIRSCH:  Can I just make a record very quickly?

21        THE COURT:  Side bar.

22        MR. KIRSCH:  Just --

23        THE COURT:  Side bar.

24        (At side bar on the record.)

25        MR. KIRSCH:  Your Honor, I've got to establish a

522

1    record on this.  We're going to ask for a missing witness

2    instruction on Ms. Dhanani and Mr. Tandon.

3            THE COURT:  But you're going into this concerning

4    Mr. Bhasin, and that's what I'm -- I'm trying to restrict

5    this -- I'm giving you guys a lot of latitude on both sides, but

6    at some point it's got to stop.

7            MR. KIRSCH:  That's fine.  I was just going to ask her

8    where she lives, but I can withdraw it.  I think that's

9    established.  We'll move on.  I'm sorry.  I'm withdraw the

10   question.

11           THE COURT:  Okay.

12           (End of discussion at side bar.)

13           MR. KIRSCH:  Your Honor, I'll withdraw the question

14   about where Mr. Bhasin is living.

15           And with that, I have no further questions.

16           THE COURT:  Very well.  Are there any questions from

17   the jury?

18           (No response.)

19           THE COURT:  If not, you are excused.  Have a wonderful

20   trip back to California.  I was in San Francisco a couple weeks

21   ago.

22           (Witness excused at 10:55 a.m.)

23           THE COURT:  We will take a break at this time.  You

24   may leave your notebooks in your chairs.  As usual, do not

25   discuss the case in the jury room.

523

1          THE BAILIFF:  All rise.

2          (Jury out at 10:55 a.m.)

3          THE COURT:  Be seated for a moment, please.

4          Is Mr. Miller scheduled to testify next?

5          MR. SULLIVAN:  Yes, Your Honor.

6          THE COURT:  How much time do you think he will take?

7          MR. SULLIVAN:  My direct should be about 45 minutes.

8          THE COURT:  All right.  And do you anticipate

9    extensive cross-examination?

10          MR. WEBB:  Pretty extensive.  I would say two hours.

11          THE COURT:  All right.  Well, we will try to get

12    through the government's direct.  We'll then take a break after

13    the government's direct.  All right?

14          MR. WEBB:  Yes.

15          THE COURT:  Hopefully we will be back in session

16    within 10 to 15 minutes.  It's taking this jury at least 15

17    minutes to refresh.

18          MR. WEBB:  Yes.

19          THE COURT:  All right?

20          (Recess taken at 10:56 a.m., until 11:13 a.m.)

21          (Jury in at 11:13 a.m.)

22          THE BAILIFF:  Please be seated.

23          THE REPORTER:  Raise your right hand, please.

24            MARK MILLER, GOVERNMENT WITNESS, SWORN

25          THE REPORTER:  Please state your name and spell your

524

1   name for the record.

2           THE WITNESS:  My name is Mark William Miller.  Last

3   name is spelled M-I-L-L-E-R.

4                         DIRECT EXAMINATION

5   BY MR. SULLIVAN:

6   Q.  Good morning, Mr. Miller.

7   A.  Good morning, Mr. Sullivan.

8   Q.  Could you tell the members of the jury what you do for a

9   living?

10  A.  I'm a tax shareholder of a public accounting firm here in

11  Brookfield known as Kolb+Co.  I'm one of the tax partners with

12  the firm, and we have 14 partners.  I'm one of those 14

13  partners.

14  Q.  And how long have you been preparing tax returns?

15  A.  I started my career in 1981 after graduating from college.

16  And I started my career with an organization known as Peat,

17  Marwick, Mitchell, now known as KPMG, an international

18  accounting firm.  I spent three years with that organization

19  preparing tax returns, at which time I left that organization

20  and joined the firm that I'm with now for the last 28 years,

21  Kolb+Co.

22  Q.  And did you prepare returns for Dr. Arvind Ahuja for the tax

23  years 2006 through 2009?

24  A.  Yes.  I was -- I've been in charge and responsible for his

25  account since he became a client of the firm in 2001, and in the

1    years you just referenced I was the signer of the returns in

2    each of those years.

3    Q.  And could you look around the courtroom -- and I know this

4    is rude to do in public, but could you -- do you see Dr. Ahuja

5    in the courtroom today?

6            MR. WEBB:  We'll stipulate they obviously know each

7    other.

8            THE COURT:  Proceed.

9            MR. SULLIVAN:  May the record reflect, though, that

10   the witness has identified the defendant?

11           THE COURT:  It so notes.

12   BY MR. SULLIVAN:

13   Q.  Could you give the jury a little bit of background on what

14   type of services you've rendered -- or when did you start

15   rendering tax services for Dr. Ahuja?

16   A.  As I mentioned, Dr. Ahuja became a client of our firm in the

17   year 2001.  Our firm provides a number of services for him.  We

18   provide accounting and tax services for his medical practice,

19   for some business interests or some investment partnerships,

20   personal family returns.  We do retirement plan administration

21   and payroll services for both him and his medical practice.  And

22   we've been doing that since the year 2001, and we filed federal

23   and state returns for him.

24   Q.  And do you still provide services -- accounting and tax

25   services to Dr. Ahuja, your firm?

526

1    A.   Yes, we do.

2    Q.   And are you the partner in charge of that -- all those

3    engagements?

4    A.   Yes, I am.  Obviously on the accounting side I have members

5    of our firm that specialize in the accounting area, and I don't

6    directly oversee.  We don't issue an audited financial

7    statement.  We only do some compiled financial statements.  But

8    from a tax standpoint, I am fully responsible and his tax

9    advisor.

10   Q.   And given the size of the client and the amount of work that

11   you do for Dr. Ahuja and his related entities, is he considered

12   a large client in terms of bringing revenue into your firm?

13   A.   He's certainly above average in terms.  I have a busy

14   practice.  I've got well over 100 clients that I service.  In

15   our firm we say that every client is an important client of the

16   firm whether they generate $5,000 of revenue or $50,000 of

17   revenue a year.  We treat them, you know, provide them the

18   highest quality service that we can.

19          But Dr. Ahuja and his business entities would be an

20   important client to the firm.  Some of those services are

21   provided to his entire neurosurgery group of which he has four

22   partners.  And so, you know, we are engaged to do the work for

23   that entire group of doctors as part of the engagement.

24   Q.   But could you tell the members of the jury in terms of an

25   approximate dollar amount, how much revenue per year are the

527

1    engagements relating to Dr. Ahuja?

2    A.   You know, I don't have those figures in front of me.  On his

3    medical practice, we're on a monthly retainer that we generate

4    between 2,500 and $3,000 a month.  But we also perform services

5    above the scope of that engagement and bill on an hourly basis

6    for those services.

7    Q.   What I'm trying to get at is just a ballpark figure, just so

8    the jury can get an understanding of how much revenue your

9    firm --

10            THE COURT:  Approach, please.

11            (At side bar on the record.)

12            THE COURT:  What is the relevance of this and how

13   significant is it?  Because it's taking up a lot of time.

14            MR. SULLIVAN:  I know.  It just goes to bias.  I'm

15   just trying to show the jury that he has somewhat of a stake in

16   the outcome of this litigation because it's my understanding

17   that it is a very large client.

18            THE COURT:  All right.

19            MR. WEBB:  Your Honor, I didn't object, but this is

20   not a witness that either side is contending I think is bias, so

21   I think we're wasting too much time.

22            THE COURT:  Apparently he is.  Apparently he is.

23            MR. SULLIVAN:  I just think it's relevant for the jury

24   to consider, and I will move on once he gives the ballpark

25   figure.

528

1    MR. WEBB:  Well, actually, I do -- I wasn't going to

2   object, but I do object because there's no contention that he's

3   a biased witness and so we're wasting time and I object.

4    THE COURT:  I'm going to sustain the objection.

5    (End of discussion at side bar.)

6    THE COURT:  Please ask another question.

7    MR. SULLIVAN:  Thank you, Your Honor.

8   BY MR. SULLIVAN:

9   Q.  Did there come a time when your firm received a grand jury

10  subpoena requiring the firm to provide records relating to

11  Dr. Arvind Ahuja?

12  A.  Yes.

13  Q.  And did you -- did your firm, in fact, turn over the work

14  papers relating to at least tax years 2006 through 2009 pursuant

15  to that subpoena?

16  A.  Yes, we did.

17  Q.  And what types of documents did Kolb+Co keep in the work

18  papers that were provided?

19  A.  We maintain our records in what we call an electronic file

20  cabinet.  We're a paperless firms, as most firms are becoming

21  today.  And so we have a software package that we would refer to

22  as "CaseWare," C-A-S-E-W-A-R [sic], so that's where we maintain

23  our records.

24    And in those records we would include any source

25  documents provided by the client pertinent to the return.  We

529

1  have what we would refer to as preparer open points,

2  review points for the people that are working on the return that

3  they can list questions that they have yet to address or items

4  that they've seen in a review capacity that need to be addressed

5  or corrected.  Someone put something in the wrong line or wrong

6  number or it could be a technical issue.  We have sections that

7  include carry-forward notes so if something we come across in

8  the current year that may have relevance into the next year or

9  future years, we would make notes of that.  Any type of

10  memorandums or research related to the -- to the tax return for

11  that year that we thought were pertinent to our file.

12       And then the tax return itself, we are required under

13  our regulations to maintain a copy of those returns, and that is

14  not housed in that CaseWare file but in a program called

15  Document that is separate from that.  And all of those records

16  were provided pursuant to the subpoena.

17  Q.  Did the work papers include copies of letters and tax

18  organizers that were sent to Dr. Ahuja in the mail?

19  A.  They do.  Our firm sends out to all of our returning clients

20  what we refer to as a tax organizer.  So if you're familiar with

21  working with a paid professional for your return, a tax

22  organizer is something to help a client accumulate the

23  information to submit to us so that we can be efficient in the

24  tax return preparation.

25       For a returning client, that document would be what we

530

1    call pro forma.  It would have all of the names and addresses

2    and children and birth dates and any bank accounts that were

3    opened in the prior year, any investments in partnerships or

4    LLC's or S corporations, it would show the last year amount paid

5    for real estate taxes, home mortgage interest.  So it's an item

6    that one facilitates that.

7            And then second, at the beginning of that organizer

8    probably has 40 to 60 questions to help trigger people to make

9    sure they aren't missing a deduction or a credit.  Did you

10   refinance your home during the year or did you buy an electronic

11   car?  Did you -- you know, questions of that nature.

12           And so that is mailed out to all of our clients along

13   with a cover letter along with a sheet of paper explaining the

14   option for filing your returns electronically, which the

15   government has mandated now.

16           And then we also have a separate piece of -- that goes

17   out with that that we would refer to as a tax return reminder

18   list that might have six, eight items on it that we want to

19   highlight or call to a client's attention.

20           And so those would get mailed out typically at the

21   very end of the year in December to the client.

22           In the case of the Ahujas, they never completed a tax

23   organizer --

24           MR. SULLIVAN:  Could you instruct the witness to just

25   answer my question?

1      THE COURT:  It is important that you listen to the

2 question and try to confine your response to what is asked.

3      THE WITNESS:  Okay, thank you.

4      THE COURT:  Proceed.

11:24  5 BY MR. SULLIVAN:

6 Q.  With respect to the tax organizers that were mailed to

7 Dr. Ahuja, did those tax organizers include questions relating

8 to foreign bank accounts?

9 A.  There's a question in that section in the question area that

11:24 10 asked if the client has any foreign bank or foreign financial

11 account.

12 Q.  And to your knowledge, did -- you mentioned that the tax

13 reminder list that would go out at the year end, did the tax

14 reminder list ever include information relating to the filing

11:24 15 requirements for what's known as an FBAR?

16 A.  Only for the year 2009.

17 Q.  And did the work papers include things such as agendas?

18 A.  They could.

19 Q.  Have you seen agendas in the work papers relating to

11:25 20 Dr. Ahuja?

21 A.  Yes, I have.

22 Q.  And what were those used for?

23 A.  When I would meet with Dr. Ahuja -- I would typically meet

24 anywhere from two to four times a year to discuss both business

11:25 25 and personal planning, and I would frequently put together a

532

1    short agenda of items that we would talk about at the meeting,

2    and I might take notes.  If they were pertinent to the tax

3    return filing, they would be included in the tax return work

4    papers.  Sometimes they might be housed in another area, but we

5    generally try to put those documents into the CaseWare file.

6    Q.  And what was your protocol when you had a meeting that had

7    an agenda that was typed up in advance of the meeting?  Who

8    would you -- would you provide anyone with copies of the agenda

9    during the meeting?

10   A.  I would typically -- those meetings would be in the presence

11   of both Dr. Ahuja and his controller, Tom Branch, since Tom was

12   primarily responsible for the tax return, gathering of the

13   information for us.  So the two of them would both be present.

14   I would typically come to the meeting with a copy of that agenda

15   for myself, would provide a copy to Dr. Ahuja and to Mr. Branch.

16   At the end of that meeting, I would typically take back the

17   agenda from Dr. Ahuja because --

18   Q.  The question was:  Did you provide -- who would you provide

19   them to?

20   A.  Dr. Ahuja and Mr. Branch.

21   Q.  And are there e-mails contained in the work papers?

22   A.  They can be.

23   Q.  When --

24   A.  Sometimes e-mails are maintained in a folder where you have,

25   you know, e-mails for various clients, and you would store

533

1    e-mails in there.  Sometimes they would be stored in Document.

2    Sometimes they would be stored in the CaseWare file.  There's

3    not necessarily a strict protocol.

4    Q.  Well, would you ever use e-mails to communicate with some of

5    your staff accountants regarding the information that was

6    provided by the client?

7    A.  Certainly.

8    Q.  And would that then become part of your work papers because

9    it reflected what the client told you?

10   A.  Again, sometimes those e-mails would be housed in your

11   e-mail folder by client.  Sometimes they could be stored in our

12   software known as Document, where we keep a number of documents.

13   And sometimes if they were pertinent to a tax return filing,

14   they would find their way into the CaseWare file.

15   Q.  But if you sent an e-mail to one of your staff accountants

16   relaying what Dr. Ahuja told you and that ended up in the work

17   papers, would that be considered reliable information that the

18   staff accountant would rely on in preparing the return for the

19   given year?

20   A.  I would think so.

21   Q.  And were all these records that we've gone over here, were

22   they kept and maintained in your firm's normal course of

23   business?

24   A.  Yes, they were.

25           MR. SULLIVAN:  I will move on to --

534

1  BY MR. SULLIVAN:

2  Q.   In connection with the preparation of the 2006 and 2009 tax

3  returns, did Dr. Ahuja ever tell you that he had millions and

4  millions of dollars over in India?

11:28  5  A.   No, he did not.

6  Q.   In connection with the preparation of those same tax

7  returns, did he ever tell you that he had millions and millions

8  of dollars of interest income from certificates of deposit over

9  in India?

11:29  10  A.   That was not discussed.

11  Q.   Before you are Government's Exhibit 12, 13, 14, and 15 which

12  are the original tax returns for tax years 2006 through 2009

13  that were filed with the IRS and bear the defendant's signature.

14         MR. SULLIVAN:   Your Honor, at this time pursuant to

11:29  15  stipulation the government offers those exhibits into evidence.

16         THE COURT:   Is there any objection to 12, 13, 14, and

17  15?

18         MR. WEBB:   No objection.

19         THE COURT:   They're received.

11:29  20         (Exhibits 12, 13, 14, and 15 received in evidence.)

21  BY MR. SULLIVAN:

22  Q.   And directing your attention to the first return there,

23  Government Exhibit 12, which is the 2006 tax return for Arvind

24  Ahuja and Namrata Lahiri, what is the amount of taxable interest

11:30  25  reported on Line 8a?

535

1   A.   $91,580.

2   Q.   And if you turn to page 2, do you see your signature at the

3   bottom of page 2?

4   A.   Yes, I do.

11:30   5   Q.   And do you see the signature of Dr. Ahuja above yours?

6   A.   Yes, I do.

7   Q.   And I know it's hard to read, and I do have reading glasses.

8   I have a spare pair if you would like them.

9   A.   I'm good.

11:30   10   Q.   Would you like them?

11   A.   I'm good.

12   Q.   Could you read into the record what it says right above the

13   signature of Dr. Ahuja?

14   A.   "Under penalties of perjury, I declare that I have examined

11:30   15   the return and the accompanying schedules and statements, and to

16   the best of my knowledge and belief, they are true, correct, and

17   complete.  Declaration of preparer (other than taxpayer) is

18   based upon all information of which preparer has any knowledge."

19   Q.   And so when you signed that return you were not aware of any

11:31   20   offshore bank accounts that Dr. Ahuja held; is that correct?

21   A.   That is correct.

22   Q.   And if you turn to Schedule B, which is the schedule for

23   interest and ordinary dividends, do you see that?

24   A.   Yes, I do.

11:31   25   Q.   Do you see at the bottom where it says, "Part III Foreign

536

1  Accounts and Trusts"?

2  A.  Yes, I do.

3  Q.  And do you see the question that says, "At any time during

4  2006, did you have an interest in or a signature or other

5  authority over a financial account in a foreign country, such as

6  a bank account, securities account, or other financial account?"

7  Do you see that?

8  A.  Yes, I do.

9  Q.  And what is the answer indicated to that question?

10  A.  No.

11  Q.  And if you could turn to -- well, at the top of that page

12  does it say, for "Interest," "See Statement 14"?

13  A.  Yes, it does.

14  Q.  Could you turn to Statement 14, please?

15  A.  I'm ready.

16  Q.  Do you see that the seventh line down reports interest

17  income from HSBC Bank-USA?

18  A.  Yes, I do.

19  Q.  What is the amount of interest income reported?

20  A.  $396.

21  Q.  Directing your attention to Government Exhibit 13, which is

22  the 2007 return filed by Dr. Arvind Ahuja, do you see that?

23  A.  Yes, I do.

24  Q.  Can you explain to the members of the jury what a Form 8879

25  is?

1  A.  The IRS has mandated taxpayers to file their tax returns

2  electronically, and accounting firms or tax preparation firms

3  that prepare a certain number are generally required to file all

4  returns electronically unless they contain information and

5  schedules and items that aren't eligible for electronic filing.

6         So this form is something that we provide to the

7  client along with their completed tax return, and they sign and

8  return it authorizing us to file the return electronically on

9  their behalf.

10        So instead of filing a paper return with the physical

11 signature, it's electronically transmitted to the government,

12 and this form gives us the authorization to electronically file

13 the return.

14 Q.  And again, if you want to borrow reading glasses, but can

15 you look where it says -- the first sentence under Part II,

16 "Taxpayer Declaration and Signature Authorization," what does

17 the first sentence say?

18 A.  It says, "Under penalties of perjury, I declare that I have

19 examined a copy of my electronic individual income tax return

20 and accompanying schedules and statements for the tax year

21 ending December 31, 2007, and to the best of my knowledge and

22 belief, it is true, correct, and complete."

23 Q.  And did you, in fact, provide Dr. Ahuja with a copy of this

24 electronically filed tax return for 2007?

25 A.  We are required to provide clients with a copy of any tax

538

1    return that we prepare.  I do not know, but I believe that

2    during this period of time we were providing those on a CD disk

3    as opposed to a paper copy of the return.  But he would have

4    been provided one of those two.

11:34  5    Q.  So the answer would be yes?

6    A.  Yes.  But I don't know what the form is.

7    Q.  And at the bottom of the page -- it's upside-down again, but

8    can you read -- or explain to the jury why it has what it has at

9    the bottom?

11:35  10   A.  This would be a form that has been faxed back to our office

11   from his medical practice office, the WM Neurosurgical, Tom

12   Branch.  That would be the phone fax number.  So this return

13   would have been couriered, picked up, delivered to his office in

14   some form, would have been given to him with instructions to

11:35  15   either mail back -- or in this case they faxed back the

16   electronic authorization -- electronic signature authorization

17   for us to file the return.

18   Q.  And do you see next to the signature line, does that purport

19   to bear Dr. Ahuja's signature?

11:35  20   A.  Yes, it does.

21   Q.  And directing your attention to page 1 of the return, on

22   Line 8a, what is the amount of taxable interest reported for

23   2007 by Dr. Ahuja?

24   A.  I'm sorry.  I was looking at the -- flipping through.  Could

11:36  25   you repeat your question?

1    Q.  On page 7 -- I'm going pretty fast.  On page 7, Line 8a,

2    what is the amount of taxable interest reported?

3    A.  $52,078.

4    Q.  And turning to Schedule B, what is the amount of interest

5    income reported for HSBC Bank-USA?

6    A.  $167.

7    Q.  And is the foreign bank account question on Part III checked

8    no?

9    A.  That is correct.

10    Q.  Directing your attention to Government Exhibit 14, what is

11    the amount of interest -- taxable interest reported on Line 8a?

12    A.  $68,422.

13    Q.  And on page 2 does this return bear your signature?

14    A.  Yes, it does.

15    Q.  And does it bear the signature of Dr. Ahuja?

16    A.  Yes, it does.

17    Q.  And on Schedule B, is the foreign bank account question

18    checked no?

19    A.  Yes, it is.

20    Q.  And on statement Number 16, which is reflected as interest,

21    is there an amount reported for HSBC Bank-USA?

22    A.  Yes, it is.

23    Q.  What is the amount?

24    A.  $51.

25    Q.  And is it parenthetically noted that that account was

540

1   closed?

2   A.  Yes, it is.

3   Q.  Did you ever discuss with Dr. Ahuja why he closed that bank

4   account?

5   A.  No.  That would not be part of our process.  It's an

6   internal note for us to know next year --

7   Q.  The question is:  Did you ever discuss with him why he

8   closed that?

9   A.  No, I did not.

10  Q.  What?

11  A.  No, I did not.

12  Q.  And right below it, do you see that there is interest income

13  reported for Citibank, N.A.?

14  A.  Yes, I do.

15  Q.  And the amount is $3,722?

16  A.  Correct.

17  Q.  And what does Citibank, N.A., stand for?

18  A.  I believe it refers to Citibank North America.  That would

19  have been the name of the payor on the source document you

20  receive.

21  Q.  And directing your attention to government 10, is that the

22  source document?  It would be in a folder.

23  A.  Oh.  That is correct.

24  Q.  Was that part of your work papers?

25  A.  Yes, it was.

541

1    MR. SULLIVAN:  Your Honor, we offer Government

2  Exhibit 10 into evidence.

3    MR. WEBB:  No objection.

4    THE COURT:  10 is received.

5    (Exhibit 10 received in evidence.)

6  BY MR. SULLIVAN:

7  Q.  And if we can focus in on just the lower portion there, that

8  is a Form 1099-INT for 2008?

9  A.  Correct.

10  Q.  And based on your -- is it 28 years of experience?

11  A.  28 with my current firm, but 31 if you don't want to age me

12  too much.

13  Q.  Based on your years of experience and your knowledge of when

14  1099s are issued, approximately when would -- is there a time

15  when a bank has to issue a 1099 by?

16  A.  Financial institutions are required to issue a Form 1099 if

17  the amount paid exceeds $10 and they are required to file

18  that -- issue that to the recipient by January 31st of the

19  following year and are required to provide a copy of that to the

20  government by February 28th of the following year.

21  Q.  And do you know whether or not Dr. Arvind Ahuja ever saw

22  this 1099 that's reflected in Government Exhibit 10?

23  A.  I do not know that.

24  Q.  And is this report interest income of $3,722 that's

25  reflected on the attachment to the Schedule B that we just went

542

1   over?

2   A.   That is correct.

3   Q.   And so did your firm rely on this document to report this as

4   interest income?

5   A.   Absolutely.

6   Q.   Did Dr. Ahuja ever tell you that this account was an account

7   over in India?

8   A.   No, it wasn't and I don't know that to be factually correct.

9   Q.   The question, I believe, was --

10           THE COURT:   Read back the question, please.

11           (Record read.)

12           THE WITNESS:   No.

13   BY MR. SULLIVAN:

14   Q.   Directing your attention back to the 2008 tax return, could

15   you just hold up the return.   And for the record, how thick is

16   that return in inches?

17   A.   Inch and a half.   An inch and a half.

18   Q.   And can you explain to the members of the jury why that

19   return is so thick?

20   A.   Well, obviously he is a man who has accumulated some wealth

21   and he has lots of investments.   The majority of the thickness

22   would be reporting of transactions of sales of futures or

23   securities.   And there's probably 100 pages of those

24   transactions included in the return.

25   Q.   And based on your meetings with Dr. Ahuja and all of the

543

1    transactions that are reflected on that tax return and all the

2    tax returns you've prepared for him, do you know whether or not

3    Dr. Ahuja engages in the trading of stocks?

4    A.  Yes, he does.

5    Q.  And how would you describe him in terms of the way he

6    trades?

7                MR. WEBB:  Objection.  Relevancy.

8                THE COURT:  Overruled.  Overrule.  Proceed.

9                THE WITNESS:  Can you repeat the question?  I'm sorry.

10   BY MR. SULLIVAN:

11   Q.  In terms of trading, how would you characterize the level of

12   trading?

13   A.  Certainly in the year 2008 he was a very active trader.  It

14   shows on Schedule D where you report gain and loss transactions

15   that he had over $245 million worth of trades.  So these are

16   short-term trades in and out of positions.

17                MR. SULLIVAN:  This is Government Exhibit 78, page 21.

18   BY MR. SULLIVAN:

19   Q.  Do you remember when you testified before the grand jury

20   that you referred to Dr. Ahuja -- and this is line 24 -- as a

21   day trader?

22   A.  That would be a correct characterization.

23   Q.  Do you know whether or not he traded in futures?

24   A.  Yes, he did.

25   Q.  And did Dr. Ahuja include a statement in his 2008 tax return

544

1  relating to his intention to elect a certain type of status as a

2  trader?

3  A.  We prepared the statement.  It was included in the return he

4  signed.  But he's not electing trader status.  He's electing to

5  mark to market these securities, which is slightly different --

6  all of his holdings with respect to the election.

7  Q.  Moving on to Government Exhibit 15.  Excuse me -- yes, 15,

8  which is the 2009 tax return for Dr. Ahuja.

9       What is the amount have of taxable interest that is

10  reported on Line 8a?

11  A.  $242,872.

12  Q.  And prior to the preparation -- well, let's just finish

13  this.  Does Dr. Ahuja's signature appear on page 2 of this

14  return?

15  A.  Yes, it does.

16  Q.  Does yours?

17  A.  Yes, it does.

18  Q.  Is the "no" box checked on Schedule B to the foreign bank

19  account question?

20  A.  Yes, it is.

21  Q.  And if Dr. Ahuja had told you -- did Dr. Ahuja -- we already

22  covered that.  If Dr. Ahuja had told you that he had foreign

23  bank accounts, even as early as 2006 and '7 when you were

24  preparing the 2006 return, so -- for all years, if he told you

25  that he had a foreign bank account, what would you have done?

545

A.  We would have verified that the account was, in fact, a

foreign bank account.  If we determined that to be correct, then

we would inform him that that box needs to be checked yes, that

he needs to indicate the name of the country.

And I should also mention that you only have to do

that if the value of the accounts at any point during the year

exceed $10,000.  If they do, then there's a filing separate from

your income tax filing that's filed with the Department of

Treasury known as a Form TDF 90.22-1, and it's a report of

foreign bank or financial account.  And it must be filed by

June 30th, not the normal tax return deadline.

Q.  And had Dr. Ahuja told you that he had hundreds of thousands

of dollars of interest income, would you have prepared these

2006 through 2009 returns differently?

A.  We would have reported whatever interest income figures he

provided to us.  So if it was hundreds of thousands, we would

have reported hundreds of thousands.

Q.  And would that have affected the calculation of taxable

income and the amount have of tax due and owing to the United

States?

A.  Yes, it would.

Q.  And do you know what type of tax rate Dr. Ahuja was in for

these four years?

A.  Generally he's in the highest tax rate, which would be

35 percent.  At least that's the current top tax rate.

546

1    Q.   How about for 2006 through 2009?

2    A.   He would be in the top tax rate.  The only caveat would be I

3    believe in one year he was in the alternative minimum tax, which

4    can affect the tax rate that he pays.

5    Q.   Well, do you know what the top tax rates were for these

6    years?

7    A.   I believe that they were 35 percent in each of these years.

8    Q.   And on the subject of FBARs, foreign bank account report,

9    did there come a time when Kolb+Co decided to do anything about

10   advising their clients in that area?

11   A.   Yes.  The -- do you want me to expand?

12   Q.   Yes.

13   A.   The FBAR is not a new filing, it goes back to the 1970s.  I

14   believe in the year 2003 the enforcement of the FBAR reporting

15   requirements was turned over to the IRS, and in 2009 it became a

16   pretty hot topic in the publications and discussions.

17          Our firm had a tax attorney come in from one of the

18   major law firms in the area, give a brown-bag presentation.

19   There were heightened awareness, expanded penalties, significant

20   civil and criminal penalties associated with failure to file it,

21   so we educated ourselves, our staff, and we tried to alert

22   clients to that.  We had the -- a couple-sentence paragraph in

23   that tax reminder that accompanied the tax organizer, notifying

24   taxpayers that if they had foreign financial accounts that there

25   was a reporting requirement and that the IRS imposes strict

547

1    penalties and fines for failure to do so.  And on a case-by-case

2    basis we would have conversations with clients if there was any

3    reason to concerning the foreign bank reporting requirements.

4    Q.  Did you ever have a conversation with Dr. Ahuja concerning

5    the FBAR reporting requirements during 2009?

6    A.  I have a general recollection of a meeting that was held I

7    believe in August of 2009 in which it was an agenda item.  And

8    my recollection is, is that I would have told him that there are

9    new penalties -- enhanced penalties regarding reporting of

10   foreign bank or foreign financial accounts and that if he has

11   any that we would need to address those.

12   Q.  And what, if anything, did the doctor say in response when

13   you told him about the reporting requirements?

14   A.  My recollection of the discussion is that he informed me

15   that there were a couple of banker brokerage accounts that he

16   wanted to check into, that he would get back to me if he had

17   determined that he had a foreign account, and that there was

18   nothing that we needed to do at that time.

19   Q.  And did he ever get back to you after that meeting to tell

20   you about any foreign bank accounts in India?

21   A.  I don't have a specific recollection of him doing so.  It's

22   possible that he -- since most of the tax information was

23   provided to us through Tom Branch that he had a discussion with

24   him.

25            MR. SULLIVAN:  Your Honor, can -- can you instruct the

548

1    witness --

2            THE COURT:  The last portion of the answer respecting

3    Tom Branch is stricken.

4            Please, remember to listen to the question and answer

5    the question as asked.

6            THE WITNESS:  Thank you.

7            THE COURT:  Proceed.

8            THE WITNESS:  Can you please reask the question?

9            THE COURT:  Would you read it back, please.

10           (Record read.)

11           THE WITNESS:  I do not have a recollection of that

12   discussion and there's no notes in our files indicating that I

13   had such a discussion with him.

14   BY MR. SULLIVAN:

15   Q.  Did he ever tell you about an entity called Oxus Fund

16   Management in India?

17   A.  No.

18   Q.  Did he ever mention anything about MF Global in India?

19   A.  I know he has a MF Global account I believe in Chicago.  I

20   was never told there was an MF Global account apart from that

21   that would be in India.

22   Q.  How about an account at HSBC in Jersey?

23   A.  We reviewed earlier that he reported interest from HSBC, but

24   I don't know if that was -- I assume it was an account in the

25   United States, not in India.  He did not specifically indicate

549

1   to me that he had an HSBC account in India.

2   Q.  Well, did he ever mention an HSBC account on the Island of

3   Jersey, which is -- do you know where Jersey is?

4   A.  I forgot.  You had mentioned it to me in our grand jury

5   testimony, but I don't recall.

6   Q.  But he never mentioned anything about having a financial

7   account there?

8   A.  No.

9   Q.  Can you identify Government Exhibit 17?

10  A.  This is an e-mail that I sent to a tax senior who works with

11  me in Dr. Ahuja's --

12         MR. WEBB:  Your Honor, can I object?  We had a hearing

13  about this.  May I be heard at side bar?

14         THE COURT:  One second.  Let me look at it.

15         MR. SULLIVAN:  Your Honor, we withdraw that.  I was

16  just reminded of the prior ruling.

17         THE COURT:  Proceed.

18  BY MR. SULLIVAN:

19  Q.  Directing your attention to Government Exhibit 18, can you

20  identify what that is?

21  A.  Can I take a minute to look through it?

22  Q.  Absolutely.

23         (Witness peruses document.)

24  A.  This would be a summary of the year-end planning items that

25  we wanted to call to Dr. Ahuja's attention, separated into two

1   sections, recommendations that we might be making regarding a

2   corporate tax planning, and the second section regarding

3   personal tax planning.  And this summary of what our thoughts

4   were was then used as a lengthy agenda for a meeting with

5   Dr. Ahuja and Tom Branch.

6           MR. SULLIVAN:  Your Honor, we offer Government

7   Exhibit 18 into evidence.

8           MR. WEBB:  We have no objection.

9           THE COURT:  18 is received.

10          (Exhibit 18 received in evidence.)

11  BY MR. SULLIVAN:

12  Q.  And if you look at the first page, Mr. Miller, do you see at

13  the top it says "2009 Year-end Tax Planning agenda"?

14  A.  Yes, I do.

15  Q.  Can you tell the members of the jury when you would have met

16  with Dr. Ahuja?

17  A.  Obviously it was sometime before December 25th, because I

18  have a notation that he was going to be traveling and gone at

19  the end of the year.  I would expect that this meeting would

20  have occurred in the first couple of weeks of December, as we

21  normally wait to do tax planning until we have enough of the

22  year behind us that we can be working with accurate projections.

23  Q.  And if you -- and was this -- pursuant to your protocol, was

24  this provided to -- was anyone else at the meeting?

25  A.  Tom Branch would have been at that meeting.

551

1    Q.  And would you have provided a copy of this agenda to

2    Dr. Ahuja and Mr. Branch to use during the meeting?

3    A.  That would be my general protocol.

4    Q.  And if you turn the page to page 2, do you see the last item

5    at the bottom of the page?

6    A.  Yes, I do.

7    Q.  And it says, "Remember we will have an FBAR reporting for

8    any foreign bank accounts."  Do you see that?

9    A.  Yes, I do.

10   Q.  And can you tell the members of the jury why this item was

11   listed on the agenda for the meeting with Dr. Ahuja?

12   A.  I believe that this item would have been included because of

13   the meeting that we had earlier in the year in August where

14   there was some question as to whether or not there were any

15   foreign bank accounts.

16          But I also believe that this is probably as much a

17   note to our staff that it's something that we need to follow up

18   on because it says "remember we will have" a filing, so it's

19   probably working with Andrea Heise on the tax planning that if

20   we determine that there are any foreign bank accounts that we

21   have to remember that there would be an FBAR reporting.

22   Q.  And during the meeting, did you cover this item on the

23   agenda?

24   A.  I cannot tell whether that occurred.  I see that I've taken

25   a number of notes from that meeting along the way, but there's

552

1   no notes that were indicated for the items H, I, J, and K.

2   Q.  But you can confirm that this was, in fact, handed to the

3   defendant at the beginning of the meeting?

4           MR. WEBB:  Objection.  He said it was his normal

5   practice.

6           THE COURT:  One second.  You can't testify.

7   Overruled.  Proceed.

8   BY MR. SULLIVAN:

9   Q.  Did you hand this out at the beginning of the meeting with

10  Mr. Branch and Dr. Ahuja?

11  A.  I don't have a specific recollection of providing them an

12  agenda.  I said that it was my normal protocol to provide them

13  with an agenda.

14  Q.  Do you recall an occasion when you did meet with Dr. Ahuja

15  and had a written agenda where you did not hand the agenda out?

16  A.  I don't know that I have had an agenda at every meeting.

17  Again, it would be my normal protocol if I had a written agenda

18  that I would provide Tom Branch and Arvind Ahuja with a copy.

19  Q.  So this is a written agenda.  Did you -- pursuant to your

20  normal protocol, did you hand this out at the beginning of the

21  meeting?  That's the question.

22          MR. WEBB:  I object.  He just answered the question.

23  Objection.  Asked and answered.

24          THE COURT:  Sustained.

25          Ask another question, please.

553

1    BY MR. SULLIVAN:

2    Q.  During the meeting, did Dr. Ahuja ever tell you that he had

3    any foreign bank accounts in India or Jersey?

4    A.  I have no recollection of that discussion.  And I believe

5    that if the discussion occurred and he had indicated he did or

6    didn't have an account, I would have made a handwritten notation

7    of that disposition of that item.

8    Q.  And directing your attention to the next exhibit, Government

9    Exhibit 19, can you identify what that is?

10   A.  Exhibit 19 contains two pages.  The first page is our cover

11   letter which outlines the scope of the services that we are

12   going to be performing in connection with the preparation of

13   returns.  The second item is what I referred to as our tax

14   return reminders, which is a list of items that we want to call

15   to the attention of our clients in completing the tax organizer

16   or providing us information otherwise for them to address.

17          MR. SULLIVAN:  Your Honor, we offer Government

18   Exhibit 19 into evidence.

19          MR. WEBB:  We have no objection.

20          THE COURT:  It's received.

21          (Exhibit 19 received in evidence.)

22   BY MR. SULLIVAN:

23   Q.  And if we look at Government Exhibit 19 on the screen, I

24   just want to clarify one thing, Mr. Miller.  Are these two

25   documents, are -- they're not necessarily sent out at the same

554

1    time to the client, are they?

2    A.   They would be.   They would accompany the tax organizer.   So

3    the normal ordering would be the cover letter identifying the

4    scope of our services, the tax return reminders, the third page

5    would be that electronic filing notification, and the fourth

6    would be the packet other tax organizer which could be 20 pages

7    long.

8    Q.   And with respect to page 1 of Government Exhibit 19, what is

9    the date of the letter?

10   A.   December 29th, 2009.

11   Q.   And so that would be shortly after you had the meeting with

12   Dr. Ahuja in person; is that correct?

13   A.   That is correct.

14   Q.   And I know it's hard to read, but what are the first two --

15   or no, what are the first three sentences in the second

16   paragraph, if we can blow that up?

17   A.   "We will prepare your 2009 federal and state tax returns

18   using the information you provide.   The tax returns will be

19   prepared solely for their submission to the appropriate tax

20   authorities.   It is your responsibility to provide all the

21   information required for the preparation of complete and

22   accurate returns."

23           Do you want me to go further?

24   Q.   No.

25   A.   Okay.

555

1  Q.  Why do you advise your clients of that?

2  A.  So that we can prepare a complete and accurate return.

3  Q.  And what does the last sentence of that paragraph state?

4  A.  "Since you are ultimately responsible for the completeness

5  and accuracy of your tax returns, you should carefully review

6  the returns before you sign and mail them."

7  Q.  And finally, on the second page, which is entitled "Tax" --

8  "2009 Tax Return Reminders -- Please return your tax organizer

9  to us by March 1, 2010."

10         Do you recall if this was mailed to Dr. Ahuja the way

11  it looks now or was it on different colored paper?

12  A.  We had the sheet in a different color of paper.

13  Q.  And why do you use a different color of paper?

14  A.  So that it stands out.

15  Q.  And first of all, do you know whether Dr. Ahuja ever

16  provided the tax organizers back to the firm?

17  A.  I believe he never did complete or return them.

18  Q.  But you do not know whether or not Dr. Ahuja ever read the

19  mail that you sent him, do you?

20  A.  I do not.

21  Q.  And what does it say in the -- in the fourth paragraph there

22  about foreign bank account reporting, FBAR?  Could you just read

23  that into the record, please?

24  A.  "The Treasury Department and the IRS impose strict rules on

25  the reporting of foreign bank accounts that you own, control, or

556

1   have signature authority over.  Please inform us if you have any

2   such accounts so that the appropriate separate filings can be

3   made.  Severe penalties may be imposed on noncompliance with

4   these FBAR filings."

5       MR. SULLIVAN:  With the Court's indulgence?

6       (Government counsel confer.)

7       MR. SULLIVAN:  No further questions, Your Honor:

8       THE COURT:  We will take our luncheon break at this

9   time.  We will resume in 45 minutes.  Please do not discuss this

10  case outside of jury deliberations which will take place at the

11  end of all proceedings.

12      THE BAILIFF:  All rise.

13      (Jury out at 12:04 p.m.)

14      THE COURT:  Mr. Miller, you are not to discuss your

15  testimony with anyone.

16      THE WITNESS:  Including my attorney?

17      THE COURT:  Including your attorney.

18      THE WITNESS:  Thank you.

19      THE COURT:  Until you have completed your testimony.

20  Then, of course, you can talk with your attorney, but you're not

21  to talk with anyone else or relay any information to anyone

22  about what you've said in this courtroom at this time.

23      Do you understand?

24      THE WITNESS:  I understand.

25      THE COURT:  Take a break until 12:45.  12:50.

557

1      (Lunch recess taken at 12:06 p.m., until 12:56 p.m.)

2      (Jury in at 12:56 p.m.)

3      MR. WEBB:  May I proceed, Your Honor?

4      THE COURT:  You may proceed.

12:57   5      MR. WEBB:  Thank you.

6                    CROSS-EXAMINATION

7   BY MR. WEBB:

8   Q.  Good afternoon, sir.  My name is Dan Webb, and I think you

9   know I'm one of the lawyers that's representing Dr. Ahuja in

12:57  10   this proceeding.  And I'm going to ask you some questions about

11   your testimony.

12      You told the jury that you have been preparing

13   Dr. Ahuja's tax returns for -- is it now 11 years?

14   A.  2001 to present.

12:57  15   Q.  Okay.  I think that's about 11 years.  And you described in

16   some detail the different types of work that you do for

17   Dr. Ahuja as well as his medical practice and business; is that

18   correct?

19   A.  That is correct.

12:57  20   Q.  And I take it you've gotten an opportunity, for example --

21   because you have done work for his medical business, you've

22   learned quite a bit about his medical practice; is that correct?

23   A.  That would be correct.

24   Q.  Give the jury an overview of your knowledge of the nature of

12:57  25   his medical practice.

558

1    A.   Well, Dr. Ahuja is a world renowned neurosurgeon.  When I

2    was introduced to him early on, I learned that he performed

3    certain neurosurgical procedures that few people in the world

4    are able to perform, and so he's very well respected in his

5    industry.

6            He's the head of the St. Luke's Hospital neurosurgery

7    practice.  He's often featured by the hospital in television

8    commercials, in print advertising when they want to promote

9    their neurosurgical practice.

10           He's an extremely hard worker.  He works 12, 14,

11   16 hours a day, oftentimes six or seven days a week.  And he's

12   just well respected in his field.

13   Q.   In fact, when you would meet with him over the years in

14   these tax planning meetings, would those meetings -- were they

15   often over in his medical office?

16   A.   Almost exclusively we would meet at his medical office.

17   Q.   During those meetings, typically how often would he be

18   interrupted during those meetings?

19   A.   You know, typically he would arrive at the meeting maybe 15

20   to 30 minutes late.  We would schedule it.  He might be involved

21   in surgery and is coming -- you know, it's unpredictable, his

22   schedule.

23           So he would have me meet.  I would meet with

24   Mr. Branch, who is his corporate controller.  We would sit and

25   wait for Arvind for 15 minutes, or whatever it would take for

559

1    him to arrive.

2          Typically he would come in his medical scrubs, and

3    he'd have his pager with him.  He frequently would have his

4    pager go off, and there's a phone in the room.  And he'd have to

12:59   5    go and call and check on the status of a patient because

6    oftentimes the meetings were -- you know, we would get it going

7    like 5:30.  He'd have somebody come in, knock on the door and

8    come in and bring him a meal for him to eat before he goes back

9    to his procedures.  He'd have his iPhone with him.  I think he's

12:59   10   kind of addicted to it.  And so he'd be maybe sending e-mails or

11   responding to e-mails.

12          And then Tom Branch oftentimes had difficulty getting

13   ahold of him as well.  And so in the course of those meetings

14   would bring a stack of invoices or things that needed to be

01:00   15   signed, and they would be put in front of Dr. Ahuja, and he

16   would sign those as we progressed in the meeting.

17   Q.  It might be considered a little chaotic sometimes?

18   A.  Oftentimes, yes.

19   Q.  Did you also -- because of your work for him, you became

01:00   20   familiar with the formation of the neurosurgery group at

21   St. Luke's Hospital?

22   A.  Yes.

23   Q.  Tell the jury about that.

24   A.  It's my understanding that he founded the neurosurgical

01:00   25   group at St. Luke's Hospital.  When I started he had one

560

1  associate neurosurgeon as part of his practice.  He had a

2  separate service corporation set up to operate his medical

3  practice.  And he had one associate doctor as part of the group,

4  at that time Dr. Cully White.

5  What he would do is he would recruit someone that's

6  through the residency program, bring them into his practice, and

7  would make him a contract employee for one to two years.  During

8  that period of time, he would mentor that person, train the

9  person.  And at the end of that typically two-year period of

10  time, he'd make an assessment.  If the person had the medical

11  skills, had the culture fit, integrity to become a partner, he

12  would admit that person to become an equal partner with him in

13  the neurosurgical group.

14  As they continued to grow and expand that group, they

15  now have five full-time members.  And in that transition stage,

16  when a person would first become his equal partner, he would

17  continue to involve that person in some of his cases, call them

18  to assist on cases, or maybe let him take call as they were

19  building their practice to help generate the revenue for them to

20  become successful.

21  So it's now a group of five surgeons.  It's one of the

22  largest revenue producer groups in St. Luke's Hospital, and they

23  employ probably 40 to 50 employees, which would be billers,

24  schedulers, PAs, office personnel, controller, office manager,

25  and a number of people like that.

561

1    Q.   Now, you've also -- because you've worked with him, tell the

2    jury a little bit about his family.

3    A.   Well, Dr. Ahuja is married to his lovely wife Namie.  It's

4    been his only wife, to my knowledge.  They have two daughters.

01:02  5    They have a daughter Natasha, who is a recent graduate from

6    college, and is going to be attending graduate school.  Their

7    other daughter is Anya, and Anya is a high school student.

8    They're both very intelligent young ladies.

9           He's an avid sports fan.  He loves the Packers and the

01:02  10   Bucks.  He's very philanthropic, gives a fair amount of money to

11   charity.  He's actively involved in the Steve Nash Foundation.

12   Steve Nash is the professional basketball player.  And that's an

13   organization that serves underprivileged and underserved youths

14   around the world.  And if you go to the website of that

01:02  15   organization, you'll find the Ahujas are listed as a key

16   contributor.  So they're community minded, and they're

17   philanthropic.

18   Q.   And where do they live?

19   A.   They live in Greendale.

01:03  20   Q.   Now, let me change a little bit of gears here.  You've

21   talked about the fact that you've been preparing Dr. Ahuja's tax

22   returns for now on 11 years.  Is Dr. Ahuja the person who

23   selected you to be his professional tax preparer?

24   A.   Yes, he is.

01:03  25   Q.   And based on your qualifications and your professional

562

1    background, do you believe that Dr. Ahuja has had the right to

2    rely upon you as a professional and qualified tax preparer over

3    the years?

4            MR. SULLIVAN:  Objection.  Relevance what his belief

5    is.

6            THE COURT:  Objection sustained.

7    BY MR. WEBB:

8    Q.  Well, let's talk about your qualifications.  Let's explain

9    your qualifications to the jury, as far as whether you were

10   qualified to prepare his tax returns.

11           As far as you being selected by Dr. Ahuja, you've

12   worked as a tax preparer and -- for -- did you say 30 years?

13   A.  Since 1981.

14   Q.  And are you licensed as a certified public accountant?

15   A.  I am a licensed CPA in the State of Wisconsin.

16   Q.  Now, what is a CPA?

17   A.  CPA is a certified public accountant, somebody who has gone

18   to school, received a degree, has taken sufficient coursework in

19   the field in order to qualify and sit for the CPA exam.

20           When I took the exam, it was a 2 1/2 day exam with

21   five parts on the CPA exam, and I passed the exam my first

22   attempt in November of 1981.  I was actually a recipient of an

23   Elijah Watt Sells award for having one of the top 100 scores in

24   the country on that exam.

25           And then after you satisfy a work requirement -- at

563

1    that time it was three years of work experience -- then you

2    would be granted -- and pass an ethics test, you would be

3    granted your CPA license.

4    Q.  And you told us you were employed at Kolb+Company, and

5    you're one of the partners in that company; is that correct?

6    A.  That's correct.

7    Q.  Kolb is a large accounting firm in Wisconsin; is that

8    correct?

9    A.  Kolb+Company is largest locally owned CPA firm in the city

10   of Milwaukee.  We have approximately 90 professionals, and we

11   have 14 partners.  I'm one of five tax shareholders within the

12   group, and I was head of the tax division of the firm for a

13   10-year period of time.

14   Q.  Do you agree that Kolb has an excellent reputation for

15   producing high quality work product in connection with preparing

16   tax returns for its clients?

17   A.  I guess I would say in the business community, whether

18   they're talking about bankers, law firms, we're highly

19   respected.  Our firm has won a number of awards.  Our marketing

20   department has done a good job, and I believe we've won

21   17 awards over the last 17 years, for being one of the top

22   accounting firms in the area, top workplaces, top work family

23   life balance.  We've won a business and ethics award from --

24   the Torch Award given by the Better Business Bureau.

25   Q.  Now, your current position, are you -- is the current

564

1    position called managing director of Kolb+Co Financial Advisory

2    Services?  Is that the right title?

3    A.  That is the second role that I have within the organization.

4    Q.  Okay.

5    A.  We also have a financial advisory firm.  I'm a registered

6    investment advisor, and I'm the managing director of that.  We

7    provide fee-based financial planning, risk management, wealth

8    management services.  But my primary duties are a member of the

9    tax department as a tax shareholder.

10   Q.  Are you still the head or you were the head of the tax

11   department?

12   A.  I was the head of the department for the last 10 years.

13   Q.  And what is your responsibilities as the head of the tax

14   department?  What do you do?

15   A.  I certainly do client service, is the thing that I love the

16   most.  The reason that after 10 years I handed off the baton to

17   a younger partner is there's, you know, some administrative

18   duties associated with being the head of the department in

19   personnel and recruiting, and, you know, my love and enjoyment

20   is more in the client service and interacting with clients and

21   taxes.

22   Q.  And are you a member of several professional accounting

23   organizations?

24   A.  I'm a member of the Wisconsin Institute of CPAs and the

25   American Institute of CPAs, that's our state and national

565

1    organization.

2    Q.  And so do you believe that when Dr. Ahuja selected you

3    11 years ago to prepare his tax returns that you were --

4            MR. SULLIVAN:  Same objection, Your Honor.

5            MR. WEBB:  I haven't asked the question.

6            THE COURT:  Objection's overruled.  Proceed.

7    BY MR. WEBB:

8    Q.  Do you believe that you were well qualified to take on the

9    assignment to prepare his tax returns?

10   A.  Yes, I do.

11   Q.  So the first year that you prepared the tax returns, you

12   said, was 2001.

13   A.  As a firm, yes.

14   Q.  As a firm; is that correct?

15   A.  Right.

16   Q.  And you're still preparing his tax returns today; is that

17   correct?

18   A.  That is correct.

19   Q.  And describe the type of tax returns that you prepare for

20   Dr. Ahuja?

21   A.  We prepare for him personally his federal and state income

22   tax returns, we prepare returns for one of his two daughters,

23   who has a filing requirement, we prepare the federal and state

24   returns for his medical practice, we prepare the federal and

25   state income tax returns for the group of neurosurgeons

566

1    together, we prepare a tax return for some investment

2    partnerships that he's involved with, we prepare some returns

3    for several trusts that had been established for his children.

4    Q.   Now, I want to talk to you a little bit with the jury about

01:09  5    the tax-preparation process and how you obtained information

6    from Dr. Ahuja so that you could prepare his tax returns.  So

7    let me go through that with just some questions.

8          You've described to us that Dr. Ahuja was a very busy

9    neurosurgeon and you described that; is that correct?

01:09  10   A.   That is correct.

11   Q.   Now, tell the jury, over the years as you worked with

12   Dr. Ahuja as far as his tax returns whether they were filed on

13   time or did you often get extensions to file his tax returns?

14   What happened over the years?

01:09  15   A.   It would be an understatement to say that it was an

16   important thing for Dr. Ahuja to file a timely return.  It was

17   really an expectation of our engagement.  He believed very

18   strongly in filing on time and paying his taxes on time, and the

19   only year in which an extension had been filed, I believe, was

01:10  20   2008 because there was an outside K-1 that he didn't -- wasn't

21   available to complete the return.  And that return was done by

22   the end of the -- before the end of the month.

23   Q.   So other than that one occasion, he files his returns on

24   time and doesn't even take the normal extensions people often

01:10  25   get; is that fair to say?

567

1    A.  Especially for someone with the complexity of his return,

2    yes.

3    Q.  As far as obtaining and getting information to you so that

4    you can prepare his tax return, at some point in time did

01:10  5    Dr. Ahuja actually hire a professional person to work for him to

6    help get tax information for you?

7    A.  That was not his sole role, but Tom Branch, who is his

8    corporate controller, was a former employee of our firm, had

9    worked on the account from an accounting standpoint, not in the

01:11  10   tax area, and he joined his medical practice as controller.  And

11   one of his significant job responsibilities was to coordinate

12   and accumulate all the information and to provide it to us for

13   the preparation of his returns.

14   Q.  Now, when did Dr. Ahuja hire Tom Branch to do -- among other

01:11  15   things, to help gather information for tax returns?  What year

16   did that happen in?  As best as you can recall.

17   A.  I would say he's been there at least six or seven years.

18   Q.  And can you describe for the jury Tom Branch's professional

19   background?

01:11  20   A.  Tom Branch is also a CPA.  He had work experience before

21   coming to our firm.  He had spent two years with our firm in the

22   accounting area working primarily on medical practices.  And

23   when the opportunity came to join Dr. Ahuja's medical practice,

24   he took it with our blessing, and we continue to work together

01:12  25   today.

568

1    Q.  Now, can you describe your observations of -- what is it Tom

2    Branch did in connection with helping obtain and gather

3    information that needed to be gathered so you could accurately

4    prepare the tax returns each year?

5              MR. SULLIVAN:  Your Honor, objection.  Foundation.

6              THE COURT:  Please go back and establish a foundation.

7    BY MR. WEBB:

8    Q.  Sir, did you work closely with Tom Branch over the last six

9    or seven years?

10   A.  Both myself as well as our staff.

11   Q.  And in working with him, do you have a clear knowledge and

12   understanding of the types of tax materials that he provided to

13   you and your firm?

14   A.  Yes.  He provided 95 percent of the information pertinent to

15   the filing of the tax returns.

16   Q.  Can you describe for the jury the type of tax information

17   that Tom Branch gathered for Kolb that related to the

18   preparation of Dr. Ahuja's tax returns?

19   A.  He would get all of the source documents, W-2s, Form 1099s,

20   report of interest and dividends, he would provide the brokerage

21   account statements, reporting all the capital gains and losses

22   to be reported on the return.  He would gather the

23   Schedule K-1's from entities that we would refer to as being a

24   flow-through entity, either a partnership or an S Corporation or

25   an LLC that are not separate tax paying entities but rather the

01:12
01:12
01:12
01:13
01:13

569

1    income flows through to the owners and is reported on a

2    Schedule K-1.  So he would gather that information.

3         He would gather the majority of the information

4    relative to the itemized deductions, which would be charitable

5    contributions, you know, mortgage interest, real estate taxes.

6    On occasion Dr. Ahuja's wife Namie would provide us some of the

7    itemized deduction information as it relates to real estate

8    taxes, but for the vast majority of information, it would be

9    provided by Tom Branch.

10   Q.  Now, during those -- during the years that you've worked --

11   well, let me strike the question.

12        This case involves interest income and what are the

13   types of tax forms that report interest income?

14   A.  Well, interest income would generally be reported on a

15   Form 1099 interest.  I had mentioned earlier that financial

16   institutions in the United States are required to issue a 1099

17   if they pay more than $10 of interest during the tax year.  But

18   he could also have interest income being reported from a

19   partnership, investment partnership, or his service corporation

20   if those entities were also generating taxable interest income.

21   Q.  And when those type of entities generate interest income, is

22   that called a K-1 form?

23   A.  The K-1 would report items other than interest income, but

24   that would certainly be one item that would be reported.

25   Q.  As far as receiving the K-1s and 1099 forms that are needed

570

1   to report interest income on Dr. Ahuja's tax returns, was Tom

2   Branch the person that was the source of obtaining those type of

3   tax forms and getting them to you and your staff each year?

4   A.  Yes, he was.

5   Q.  And, for example, in all the years that you worked for

6   Dr. Ahuja, did he ever personally come to your office or you go

7   to his office and he provide you any 1099 forms?

8   A.  Not to my recollection.

9   Q.  Or any K-1 forms.

10   A.  No.

11   Q.  That was -- appeared to be Tom Branch's job?

12   A.  That is correct.

13   Q.  Now, would it be correct to describe Tom Branch as kind of

14   the go-to person to get tax information that you needed in

15   connection with preparing Dr. Ahuja's federal and state income

16   tax returns?

17   A.  That would be correct.  During that crunch time period of

18   getting the returns done, we're in communication with Tom Branch

19   on a daily basis.  He would stop sometimes in the morning and

20   drop off information, he would fax us information, but he was

21   the person that we coordinated the tax filing with.

22   Q.  So during that tax preparation time, what time period is

23   that, roughly?

24   A.  Well, again, since the K-1s and interest income and W-2

25   forms aren't really available until at least after January,

1    generally in the February-March timeframe.  The crunch period

2    would be on an individual tax return probably from March 1st to

3    April 15th.

4    Q.  And during that time period when you are really in the

5    crunch time, how often would your office interact with Tom

6    Branch?

7    A.  Probably daily.

8    Q.  And besides getting forms to you like 1099s and K-1s,

9    et cetera, did Tom Branch also sometimes put together schedules

10   containing information that you needed to prepare Dr. Ahuja's

11   tax returns?

12   A.  Yes, he would, especially in the area of his security

13   transactions.  He maintained the schedules of the tax basis for

14   determining gain or loss, he would maintain the record of those

15   to the extent they weren't provided on a brokerage account

16   statement.

17        Many of those required some significant Excel

18   spreadsheets, where there would be adjustments to the basis for

19   amortization of municipal bond premiums, for original issue

20   discounts.  And I'm probably losing most of the people as to

21   what these are.  But these are required adjustments to the basis

22   of those investments.

23   Q.  And sometimes when you're preparing tax returns and you're

24   going through everything, if you came up with something that you

25   couldn't locate or if it was missing and you wanted to find out

572

1    where it was, who would you contact?

2    A.   Tom Branch.

3    Q.   Now -- now, you testified on direct examination about a

4    document called a tax organizer that you indicated Dr. Ahuja did

5    not use over the years.

6    A.   That is correct.

7    Q.   Is that correct?

8    A.   That is correct.

9    Q.   I want to ask you some questions about that testimony that

10   you gave on direct examination.  The purpose of the tax

11   organizer was for you to provide a method to clients so that

12   they could gather information together that you would need to

13   prepare tax returns; is that correct?

14   A.   That is correct.

15   Q.   And did sometimes clients have their own method of gathering

16   tax information?

17   A.   Definitely.  I would say probably 20 percent or more of our

18   clients do not fill out a tax organizer.  Some just, you know,

19   have a folder similar to these, and as they get 1099s and W-2s,

20   they would put them in the folder.  You get the proverbial

21   shoebox.  That doesn't occur frequently in a firm like ours

22   because our billing rates would be too expensive to have us go

23   through that process.

24           Some clients have long sheets of paper, and they list

25   out their charitable contributions, their sources of interest

573

1    and dividends.  Some just provide us with the source documents.

2         In the case of Tom Branch, we had evolved to a system

3    where we had a comprehensive Excel spreadsheet that we called

4    our inventory of items, and it would list all of the items that

01:20   5    were needed to prepare the return based upon the prior year.

6    And it was kind of a live document that would be transferred

7    back and forth from our firm to Tom Branch because he would

8    accumulate information.  And we would say, you know, the

9    account's closed or, you know, we had the 1099 or the K-1.  So

01:20   10   it was kind of the working document used to accumulate all the

11   information.

12   Q.  Now, as far as Dr. Ahuja's process of having somebody like

13   Tom Branch, who was paid in part to help work with you to gather

14   information, is that better or worse than a tax organizer?

01:20   15   A.  Well, it certainly is better for our standpoint.  There

16   would be no way that we could file a timely return with the

17   amount of time and hours that it takes our firm and Tom Branch

18   to accumulate the information to be able to do that.  That was

19   important.  It's important to have a CPA involved.  I wouldn't

01:21   20   say important, but I would say helpful.

21        Tom Branch, because he worked at our firm for a couple

22   of years, understood our processes, our method of gathering

23   information.  So, you know, that was certainly helpful, and his

24   ability to put together the Excel schedules that were needed

01:21   25   with computations on them, having him available was certainly

574

1    beneficial.

2         I'd say I maybe have one or two other clients that

3    have a person of that caliber that can provide in an organized

4    form the information we need to do the tax returns.

5    Q.  And so the fact that Dr. Ahuja chose to have somebody like

6    Tom Branch be the tax organizer and to get things together for

7    you, as opposed to filling out a form that your company sent to

8    him, did you find that to be any disadvantage at all?

9    A.  No, I would consider it to be an advantage.

10   Q.  Now, the government -- and so the government showed you,

11   like, a tax organizer form you send out every year, and

12   Dr. Ahuja didn't sign it and didn't send it back in.

13   A.  No, he never returned it.  And so internally what we would

14   do is print off another copy off of our software so that we

15   could use it as kind of the accordion folder that we could put

16   the W-2s behind the appropriate page, the K-1s behind the

17   appropriate pages.  So we printed off a second copy in our

18   office to use it to accumulate and organize the information that

19   Tom Branch would provide us.

20   Q.  Over the years did you find that the ability to get tax

21   information from Mr. Branch so that you could prepare the tax

22   returns -- did you find it to be a good system?

23   A.  Yes, it was.

24   Q.  In fact, let's just take 1099s because this case is about

25   1099s.  As you sit here in that witness chair today, are you

575

1    aware of any occasion that a payor of interest sent a 1099 or

2    similar form to Dr. Ahuja that ever fell through the cracks and

3    didn't get to you and get on the tax return?

4    A.   I would say no.  Form 1099s that are issued, copies of them

5    go to the government, and they have a computer matching system.

6    So that the government knows to look on your return.  They're

7    electronically filed, they can match them up.  And I never

8    remember an occasion where we received a notice from the IRS

9    saying that the return -- that they had reported to the

10   government an amount that was not included on his personal tax

11   return.

12   Q.   So, to the best of your knowledge as his tax preparer, as

13   far as interest is concerned and payers of interest sending the

14   required forms to the taxpayer, to Dr. Ahuja, you're not aware

15   today that Dr. Ahuja's system worked and those 1099s got to you

16   and the interest got on the return; is that a correct statement?

17   A.   That is correct.

18   Q.   Now, as far as -- now, I take it since Dr. Ahuja never sent

19   back the tax organizer -- by the way, that tax organizer is 15,

20   20 pages long; is that correct?

21   A.   For someone with the level of investments and activities of

22   Dr. Ahuja, that would be correct.

23   Q.   And you don't have any basis to decide one way or the other

24   whether he even looked at that over the years; is that correct?

25   A.   I would have no knowledge.

576

Q.  In fact, the form that the government showed you this

morning, there was a reminder letter that went out with the tax

organizer that mentioned foreign tax accounts.  Do you have any

reason -- do you have any knowledge that Dr. Ahuja would even

have seen that since he never -- he never returned the tax

organizer, did he?

A.  I have no knowledge that he received it.

            MR. SULLIVAN:  Your Honor, calls for speculation.

            THE COURT:  Overruled.

            THE WITNESS:  I have no knowledge that he would have

ever read that tax reminder.

BY MR. WEBB:

Q.  Thank you.  By the way, I know you're a busy tax preparer,

but what you just described is the fact that Dr. Ahuja had two

professionals that he paid money to to help get these tax

returns ready.  You're one and you have a whole staff working

for you, and he hired somebody inside his own operation.

            How many of your clients have two professionals

working on getting --

            MR. SULLIVAN:  Objection.  Irrelevant.

            THE COURT:  Sustained.

BY MR. WEBB:

Q.  Now, let me ask you, this case does involve CDs.  And just

to make sure that we get in the record, clearly you're familiar

with CDs because of your preparation of tax returns; is that

577

1    correct?

2    A.   That is correct.

3    Q.   And, well, let me start with this:  Can you describe for the

4    jury what is a certificate of deposit?  I should start first, is

5    CD a shorthand phrase that we sometimes hear used for what's

6    called a certificate of deposit?

7    A.   That is correct.

8    Q.   What is a certificate of deposit?

9    A.   Another name for it is a time deposit.  What that means is

10   that an investor -- I would assume always in like a savings and

11   loan or in a bank, a depositor would invest money or put money

12   in a bank, and they would put it in a time deposit that had a

13   stated maturity to that.

14          And so it wasn't like a demand deposit or your

15   checking account or savings account where you could go in and

16   take out the money any time you wanted.  A certificate of

17   deposit has a fixed maturity.  It could be three months, two

18   years, five years, whatever.  Typically the interest rate that

19   is paid on a certificate of deposit is higher than on a savings

20   account because you're tying up a person's money and their

21   access to the money.  And, in fact, I believe in all cases a

22   certificate of deposit would have an early withdrawal penalty

23   feature that if you chose to take the money out of the account

24   before the term that you agreed to, there would be a penalty

25   forfeiture of some or all of the interest that you earned.

578

1   Q.  Now, if I invest in a CD, if I deposit money with a bank and

2   invest in a CD for two years, say, when do I get my interest?

3   A.  It can depend.  Some certificates of deposit will pay

4   interest on a periodic basis.  Generally they are paid at the

5   end and, oftentimes, added into the CD balance.  Normally near

6   the term of the certificate of deposit the investor would

7   receive a notice of maturity that your CD is coming due on such

8   and such a date; that you can pull the money out if you wish.

9   If you fail to take action, then it will automatically renew

10  generally for a similar period of time, whatever the prevailing

11  interest rate is at the time of what we would call roll over.

12  Q.  And so is it common that investors leave their money in CDs

13  and it just roles over and the interest and principal just rolls

14  over to another term?

15              MR. SULLIVAN:  Objection.  Foundation.

16              THE COURT:  Sustained.

17  BY MR. WEBB:

18  Q.  I want to ask you about -- the government asked you about

19  1099 forms on their direct examination.  So I'm going to ask you

20  some questions about 1099 forms and I'm going to -- as the

21  government did, they showed you one Citibank 1099 form, and I'll

22  talk to you about that.

23              But let's start with the general.  As far as 1099

24  forms are concerned, maybe I should start with the general:

25  What is a 1099 form?

579

1    A.   It's an information document that reports from the payor to

2    the recipient of the information the amount of interest or

3    dividends depending upon the nature of the investment, and it's

4    reported to the taxpayer on a calendar-year basis, and is

5    provided to the recipient for inclusion on their income tax

6    return and a copy of that document is provided to the federal

7    government so that they have something to match up against and

8    make sure people are reporting their income.

9    Q.   And under our system of regulations for tax purposes, there

10   are different kinds of forms for different types of income.  W-2

11   forms, for example, what are they for?

12   A.   W-2 forms are for wages.  You can have 1099 interest.  1099

13   dividends reporting dividends.  1099 miscellaneous or

14   nonemployee compensation, royalty income, rental income.

15   There's a number of different 1099 forms.

16   Q.   Are all of these tax forms that are required by our

17   government, by our laws, our regulations -- are they all

18   designed so that the taxpayer gets notified of how much money

19   should be reported on his or her tax return?

20   A.   That would be correct.

21   Q.   And without those forms a taxpayer might not know exactly

22   how much salary they earned or how much interest they earned or

23   how much dividends they had; is that correct?

24   A.   That would be correct.

25        MR. SULLIVAN:  Objection.  Calls for foundation.

580

1    Speculation.

2         THE COURT:  The objection is sustained.  The answer is

3    stricken.  You may go back, if you wish.

4    BY MR. WEBB:

5    Q.  I'll just ask you, then:  As far as the purpose based on

6    your experience as a tax preparer, what -- from the standpoint

7    of the taxpayer, what is the purpose of obtaining forms like

8    W-2s or K-1s or 1099s?

9    A.  The purpose is to provide the taxpayer with the information

10   necessary to include on their income tax return.

11   Q.  Based on your experience in preparing tax returns for

12   individuals, do individuals -- in order to advise you of how

13   much wages they earned, do you get their W-2 Form?

14   A.  Yes, we do.

15   Q.  And do you get their 1099 forms?

16   A.  Yes, we do.

17   Q.  And K-1 forms?

18   A.  Yes, we do.

19   Q.  And are those -- what do you -- how much reliance do you

20   place on those forms in determining what to report on an

21   individual's tax returns?

22   A.  We would rely on them for the proper inclusion of the item

23   in the tax return.

24   Q.  That's 100 percent reliance, right?

25   A.  That would be correct.

581

1    Q.   I mean, that is where you get your information; is that

2    correct?

3    A.   Yes, it is.

4    Q.   If a taxpayer told you they were just gonna guess at how

5    much interest they earned on a given bank account, what would

6    you tell them?

7    A.   I would tell them that the payor of that information is

8    required to file a copy of that document with the government,

9    and if what you report differs from what is reported to the

10   government, you can expect to get a notice.  And there's an

11   automatic assumption of negligence on the part of the taxpayer

12   if you don't report the amount that is reported to the

13   government.  Whether it's careless neglect or didn't receive it

14   in the mail, I mean, it's a pretty tough standard.

15   Q.   So the taxpayer -- it's important to the taxpayer that these

16   payors send the taxpayer these forms; is that correct?

17   A.   Absolutely.

18   Q.   And the -- as far as interest income is concerned and 1099

19   forms, under what circumstances do U.S. banks -- when are they

20   required to send out a 1099 form?

21   A.   Financial institutions, again, are required to issue a 1099

22   to a recipient of income from that institution if the amount is

23   $10 or more.  They're required to issue that to the recipient by

24   January 31st so they have ample time to include it, but the --

25   actually filing the form with the government, I believe, it's

582

1  February 28th.

2  Q.  You mentioned that.  So are those rules kind of designed to

3  make sure that the taxpayer gets the forms in time to prepare

4  for the tax deadline?

5  A.  That is correct.  And most people don't wait till

6  April 15th.  Most people try to file their returns -- they have

7  refunds coming, they want to file in January or February.  So if

8  someone's return is as complex as the Ahujas, they can't file

9  until April 15th, but I would think that the majority of the

10  people in this room are getting that information and trying to

11  file their returns much earlier than that.

12  Q.  Now, as far as Dr. Ahuja and his -- we're gonna go through

13  some of his 1099 forms, but based on your recollection, did he

14  get a substantial number of 1099 and similar forms each tax year

15  reporting interest to him?

16  A.  Yes.

17  Q.  And the person that brought you those forms, you said, was

18  Tom Branch.

19  A.  That is correct.

20  Q.  Would he bring them all to you -- would he bring all of them

21  to you at one time or did he bring them to you periodically as

22  he received them based on your recollection?

23  A.  Definitely periodically as received.

24  Q.  And then how did your firm maintain them?  You kept them

25  somewhere to maintain them?

583

1    A.   Right.   I mentioned earlier that we would use the tax

2    organizer as kind of the document that we would use to filter in

3    the appropriate source documents behind the page that was

4    related to that income reporting.

5    Q.   Now --

6    A.   And ultimately that entire group when complete would be

7    scanned into our -- the file I mentioned before, CaseWare, our

8    electronic filing cabinet.

9    Q.   So as far as 1099s, the government showed you this morning.

10   They showed you a 1099 form that is dated in -- I think for the

11   tax year 2008 for an account at Citibank; is that correct?

12   A.   That is correct.

13   Q.   Did you actually remember now whether -- did you -- because

14   I know you've had to go through your records to get ready to

15   testify in this case.

16         From looking at your, records does it appear that

17   you -- that Kolb+Co received 1099 forms for Dr. Ahuja's Citibank

18   account in two different tax years, 2008 and 2009?  Is that

19   correct?

20   A.   That is correct.

21   Q.   I'm going to show you all -- the government showed you one.

22   I'm going to show you -- I think there's three in total, but

23   I'll walk through them with you.

24         Let me start with 2009 and I'll move backward to 2008

25   and we'll go through all of them.

584

1          Can I have Tab 10, Tom.

2          MR. WEBB:  May I approach the witness, Your Honor?

3          THE COURT:  Certainly.

4          (Document tendered to the witness.)

5    BY MR. WEBB:

6    Q.  Sir, I'm handing you what is marked as Government Exhibit

7    11, which are two 1099 forms for Citibank for interest income

8    for the year 2009, and I offer the exhibit into evidence.

9          MR. SULLIVAN:  No objection.

10          THE COURT:  It's received.

11          (Exhibit 11 received in evidence.)

12   BY MR. WEBB:

13   Q.  Mr. Miller, I wanted to direct your attention to the second

14   page.  The exhibit consists of two 1099 forms for the year 2009

15   for Citibank; is that correct?

16   A.  That is correct.

17   Q.  So I'm going to start with the second one.  And do you have

18   that in front of you?

19          And, James, can you call that up on the screen?  It's

20   the second page of trial Exhibit 11.

21          MR. KIRSCH:  Your Honor, I think we may be in the

22   wrong -- thank you.

23          MR. WEBB:  We're in the wrong what?

24          MR. KIRSCH:  The wrong connection.

25          THE COURT:  The wrong screen.

585

1      MR. KIRSCH:  We got it.

2      THE COURT:  I have multiple -- just so people know, I

3  have a touchscreen.  And there are multiple things in front of

4  me, and I'm trying to touch the right screen.

5      MR. WEBB:  Thank you very much, Your Honor.

6  BY MR. WEBB:

7  Q.  Do you have -- you have a screen there.  Can you see it on

8  the screen, too?  So you have the hard copy and the screen.

9  A.  Yes, I do.

10  Q.  Okay.  Now, Mr. Miller, I want to walk through this with you

11  with the jury and explain a 1099 form.  We're gonna walk through

12  it.  How did this 1099 form get from -- strike the question.

13      The recipient of this 1099, as we look at the

14  document, there's a recipient box; is that correct?

15  A.  That is correct.

16  Q.  And who is that?

17  A.  Arvind Ahuja.

18  Q.  And it's mailed to his home address in Greendale, Wisconsin;

19  is that correct?

20  A.  Correct.

21  Q.  And then how did you get this into your possession?

22  A.  This would have been provided to us by Tom Branch.

23  Q.  Okay.  And the payor, there's a box actually on the 1099

24  called the payor box; is that correct?

25  A.  Payer?

586

1   Q.  P-A-Y-E-R, payer.

2   A.  Correct.

3   Q.  And what is supposed to be included in that box?

4   A.  That is the name of the financial institution that paid the

5   interest to the recipient.

6   Q.  And in this case it's Citibank.  Citibank in New York; is

7   that correct?

8   A.  Correct.  It's Citibank N.A., which I believe stands for

9   North America.  The address is New York.

10  Q.  Right.  Is this a -- what's called a U.S. payer?

11  A.  Yes, it would be.

12  Q.  And so this Citibank is governed by the regulations and laws

13  you described earlier to the jury about sending out 1099s on

14  deposits that were made in their bank by Dr. Ahuja that earned

15  interest; is that correct?

16  A.  That is correct.

17  Q.  And now, I notice there's an identification number filled in

18  on the box.  Do you see that identification number?

19  A.  There are actually two.

20  Q.  Why don't you read them both off?

21  A.  The number or what they mean?

22  Q.  Both.  I'm sorry.  The number and what they do mean.

23  A.  Okay.  The first box reports the payer's identification

24  number.  This would be the employer identification number for

25  Citibank N.A.; and it's 13 -- the wrong one's up on the screen

587

1    here.  Looks like 5286470.

2    Q.  I think you have -- I think that's right.

3    A.  And in the box next to it, it says "Recipient's

4    Identification Number," and that would be, in this case, the

5    Social Security number of the recipient Dr. Arvind Ahuja.

6    Q.  And part of that has actually been taken out on the one on

7    the screen; do you see that?

8    A.  I'm sure for confidentiality purposes.

9    Q.  The one you have in your hand, does it have -- do you have

10   his full number there?

11   A.  It is.

12   Q.  Okay.  And do you recognize that as his Social Security

13   number?

14   A.  I do.

15   Q.  And so as far as this Citibank account is concerned, does it

16   appear that Arvind Ahuja had the bank in his own name at his own

17   address with his own Social Security number?

18   A.  That is correct.

19   Q.  Now, if we go to the -- look at box -- there's a box that

20   says "Box 7"; do you see that?

21   A.  I do.

22   Q.  And it says, "Foreign country or U.S. possession," and the

23   word "India" appears in that box; is that correct?

24   A.  That is correct.

25   Q.  And then right next to it is a "Box 6" that says, "Foreign

588

1    tax paid $37,859.66."  Is that correct?

2    A.  Yes, it is.

3    Q.  Now, as you were preparing Dr. Ahuja's tax returns for the

4    year 2009, when would you have been examining and looking at

5    this 1099?

6    A.  In April of 2010.

7    Q.  April of 2010.  And at the time that you looked at it and

8    had to understand what it was; is that correct?

9    A.  Uh-huh.

10   Q.  And based on what you read on this Citibank Form 1099, did

11   you believe, based on your years of experience, that this was a

12   1099 form that was reporting to Dr. Ahuja interest income on a

13   foreign bank account?

14   A.  No.  I would not interpret that would be interest income on

15   a foreign bank account.

16   Q.  And explain why to the jury.

17   A.  I don't believe a foreign institution has a requirement to

18   issue Form 1099s to a U.S. taxpayer.  So I believe this to be a

19   U.S. account holding a foreign security.  And, therefore, it's

20   still taxable on that in the United States, but I don't consider

21   this to be a foreign bank account.

22   Q.  And I want to explain that to the jury -- for the jury to

23   understand.  As a professional CPA and someone very experienced

24   in the preparation of federal income tax returns, is there a

25   fundamental distinction between a United States taxpayer having

589

1  a domestic U.S. account that makes a foreign investment and the

2  taxpayer having a foreign account for purposes of reporting on

3  federal tax returns?  Is there a difference?

4  A.  Yes, there is.  But the distinction would be more pertinent

01:43  5  to the requirement to file the FBAR report than the individual

6  income tax return.

7  Q.  But for purposes of whatever, for federal reporting

8  purposes, is there a difference between a domestic account

9  having a foreign investment and having a foreign bank account?

01:44  10  A.  Yes, there is.

11  Q.  And can you explain the difference to the jury.

12  A.  This is a complicated area in terms of the FBAR, but if I

13  could explain it this way.  There are all kinds of people that

14  may, as a U.S. taxpayer, hold a brokerage account, in a mutual

01:44  15  fund, in a savings account, might hold a foreign investment.

16  But if that investment is held in a institution located in the

17  United States, it's not a foreign bank account.  But the

18  investment may be a foreign investment.  Taxpayers are required

19  to report their income that they earn worldwide on the U.S.

01:44  20  income tax return regardless of the source.

21          So if you're an employee in a foreign country, if you

22  have real estate in a foreign country, if you have securities in

23  a foreign country, you have to report all of that income on your

24  personal return regardless of its source.  That other country

01:44  25  may also have jurisdiction to tax that income.  And if they tax

590

1    that income, then the taxpayer is allowed to claim a credit for

2    the tax paid to that foreign country so that that same income is

3    not taxed in essence twice.

4    Q.   If you receive a 1099 form like this one that you interpret

01:45   5    in looking at it to be a domestic account -- that is, Citibank

6    is a domestic account; is that correct?

7    A.   That is, I believe, to be correct, yes.

8    Q.   And if you interpreted this 1099 as being a domestic account

9    that made some type of foreign investment in India, this

01:45   10   would -- would this require on Dr. Ahuja's 1040 form, on

11   Schedule B, to check the box that asked the question:  "Does the

12   taxpayer have a foreign account"?  Would you check the box "yes"

13   or "no"?

14   A.   No.

01:45   15   Q.   You would check the box "no," because this is not a foreign

16   account; is that correct?

17   A.   That is correct.

18   Q.   This is a domestic account that's making a foreign

19   investment.

01:46   20   A.   That is correct.

21            MR. SULLIVAN:  Objection, Your Honor, may we approach?

22            THE COURT:  Certainly.

23            (At side bar on the record.)

24            MR. SULLIVAN:  The government objects because I

01:46   25   believe now we've crossed the line into this witness doesn't

1    have the necessary knowledge.  I think it's calling for a legal

2    conclusion.

3            THE COURT:  That's an appropriate objection.

4            MR. WEBB:  Your Honor, this witness has said he's had

5    30 years of experience, and he's the one that interpreted.  My

6    defense is he interpreted this --

7            THE COURT:  Let me go back and look at the precise

8    question that was objected to, but I believe the objection is

9    appropriate.

10           (Brief pause.)

11           THE COURT:  The question asked was whether or not this

12   was a domestic account that made a foreign investment.  There's

13   no indication that this witness has personal knowledge that this

14   is, in fact, a domestic account that made a foreign investment.

15   So to the extent that he's saying that this witness has not been

16   shown to have the ability to offer testimony respecting that, I

17   sustain the objection.  That's the only objection I'm

18   sustaining.  And I'll strike the response.

19           (End of discussion at side bar.)

20           THE COURT:  The court is sustaining the objection.

21   The court is striking the last response given by the witness

22   characterizing what is set forth in this exhibit as a foreign

23   investment.

24   BY MR. WEBB:

25   Q.  Sir, when you looked at this document, you had to make a

1    decision on what to check -- how to fill out Dr. Ahuja's tax

2    return; is that correct?

3    A.  That is correct.

4    Q.  And one of the things you had to decide is that there's a

5    question on Schedule B that asked if the taxpayer has a foreign

6    account; is that correct?

7    A.  That is correct.

8    Q.  And you checked the box no for the year 2009; is that

9    correct?

10   A.  That is correct.

11   Q.  You're the one that checked the box; is that correct?

12   A.  Our firm did, and I signed the return, yes.

13   Q.  Your firm did.  That's correct.

14        And Dr. Ahuja did not check that box no; you checked

15   it no.

16   A.  That would be correct.

17   Q.  And you told the jury a moment ago that you interpreted --

18   based on your years of experience, you interpreted this document

19   to be a domestic account making a foreign investment --

20        MR. SULLIVAN:  Same objection, Your Honor.

21        MR. WEBB:  He interpreted.

22        THE COURT:  One second.  Ask the witness what he did.

23   BY MR. WEBB:

24   Q.  How did you interpret the document?

25   A.  I would interpret this document as being a domestically

593

1    opened account maintained at Citibank N.A. in New York; that

2    that investment was made in a foreign investment in India; that

3    the taxpayer received $122,000 of interest income that would be

4    reportable; and he also paid $37,000 in foreign taxes to India

5    that he'd be able to claim a credit for on his 2009 tax return.

6    Q.  And by interpreting that the way you did, the proper way to

7    answer the question on Schedule B is to check no; is that

8    correct?

9    A.  Correct.

10   Q.  Now, as far as this issue of whether something is a domestic

11   account making a foreign investment or is a foreign account, is

12   that something -- is that something that actually is an issue

13   that has been discussed among professional groups that has

14   caused some confusion?

15   A.  Absolutely.

16   Q.  Explain that.

17   A.  In 2009 was kind of the heightened alert --

18           MR. SULLIVAN:  Objection.  Relevance.

19           THE COURT:  Objection sustained.  The response is

20   stricken.

21   BY MR. WEBB:

22   Q.  In 2009 did our government issue certain regulations to try

23   to clarify this area?

24           MR. SULLIVAN:  Objection.  If this goes to the law, we

25   object.

594

1      THE COURT:  Approach.

2          (At side bar on the record.)

3          THE COURT:  I asked the parties to approach because

4    there was prior testimony that the firm received some -- had

5    some sessions regarding FBARs in 2009.  And so I'm wondering

6    whether or not you're mindful of that with respect to your

7    objection.

8          MR. SULLIVAN:  Well, there are two grounds.  One is

9    relevance because if the defendant didn't know about the

10   regulations it's not relevant to his state of mind.  And then,

11   number two --

12         THE COURT:  No.  But if there is prior testimony on

13   the subject, why would it be irrelevant for the defense to ask

14   about this at this point?

15         MR. SULLIVAN:  Only if it bears on the defendant's

16   state of mind.  Was it communicated to the defendant.

17         THE COURT:  No.  If it was relevant earlier, why is it

18   not relevant now?

19         MR. WEBB:  I'm not offering this to show what was

20   communicated to the defendant at all.  You brought this up on

21   direct examination about enhanced enforcement.

22         MR. SULLIVAN:  Oh, then I must be mistaken.  Objection

23   withdrawn.

24         THE COURT:  Very well.

25         (End of discussion at side bar.)

595

1    THE COURT:  The objection is withdrawn.  You may

2    proceed.

3    BY MR. WEBB:

4    Q.  Sir, are you familiar with United States department known as

5    FinCEN?

6    A.  FinCEN is known as the Financial Crimes Enforcement Network.

7    Q.  And have they issued a bulletin or ruling trying to clear up

8    this area?

9    A.  It was issued in response to a lot of uncertainty among tax

10   practitioners in this 2009 era.  There was a lot of confusion as

11   to what was or what was not a foreign bank account.  And so tax

12   practitioners, experienced tax practitioners wrote to the

13   government asking for clarification on that issue, and in March

14   of 2011 they issued a final rule that --

15   MR. SULLIVAN:  Objection, Your Honor.  Timeframe.

16   That's 2011.

17   THE COURT:  Objection sustained.  We'll strike the

18   reference to 2011.  Proceed.

19   THE WITNESS:  Okay.  They issued a ruling attempting

20   to answer practitioners' questions on the subject.  And they

21   indicated that --

22   THE COURT:  One second.  Approach.

23   (At side bar on the record.)

24   THE COURT:  Does the defense have any foreknowledge

25   regarding whether or not these rules were all issued after the

596

1    indictment?  If so it's irrelevant.

2          MR. WEBB:  I'll tell you what my understanding is.

3    I'm trying to find out.  It's that this confusion that he's

4    talking about existed in 2009, which is why the federal

5    government had this enhanced enforcement effort --

6          THE COURT:  What I'm getting at is the testimony

7    concerning what IRS has said since the indictment came down.

8          MR. WEBB:  I'm gonna ask him the question about his

9    direct examination in 2009, because --

10          THE COURT:  All right.  I'm going to strike the

11    testimony regarding this ruling.  Actually --

12          MR. KIRSCH:  Your Honor, the indictment was returned

13    in June of 2011.  The witness testified that the FinCEN ruling

14    regarding the confusion that existed in earlier years was issued

15    in March of 2011.  So to answer the court's question the ruling

16    was issued prior to the indictment being returned.

17          THE COURT:  But it was not issued before the relevant

18    year, which was 2009, correct?  Is that correct?

19          MR. SULLIVAN:  That is correct, Your Honor.  The last

20    relevant conduct is June 30th, 2010.  The failure to file an

21    FBAR for 2009.

22          MR. WEBB:  I'm not offering this on my client's state

23    of mind.  I'm offering it on this tax preparer reached a

24    judgment --

25          THE COURT:  I understand that.  But I'm going to

1   strike all the testimony regarding the ruling.  He may have his

2   motivations and may have exercised his judgment with respect to

3   certain matters, but what the Internal Revenue Service did after

4   the relevant tax year is irrelevant.

5         In making my ruling, I'm also mindful of the earlier

6   comments you made regarding periods after the relevant tax year,

7   relevant tax period -- relevant period, the last of which was

8   2009.  Earlier there was -- the government tried to get in some

9   testimony regarding periods after 2009, and you objected.

10        MR. WEBB:  I'm not sure -- I'm not saying I didn't.

11  I'm just --

12        MR. KIRSCH:  Can I mention one thing?  Your Honor,

13  that was with respect to the tax returns, and that was

14  irrelevant and unduly prejudicial to show what the defendant did

15  after 2010 and 2011.  This is to show that the confusion over

16  what was a financial account existed in '09 and '08 and '07.

17        THE COURT:  But what the IRS did in light of any

18  confusion that may have existed and discussed after the relevant

19  tax year is not relevant.

20        MR. WEBB:  Then maybe -- before I go back out, I want

21  to be sure what I can do based on what happened on direct.  So

22  can I ask --

23        THE COURT:  You can ask him about things that he did,

24  but what the IRS did with respect to issuing rulings is not

25  relevant because it took place after 2009.

1      MR. WEBB:  Okay.

2      THE COURT:  That's what I'm getting at.

3      MR. WEBB:  Okay.

4      (End of discussion at side bar.)

5      THE COURT:  The court is striking all testimony by

6  this witness respecting anything the Internal Revenue Service

7  may have done after 2009.  Proceed.

8  BY MR. WEBB:

9  Q.  I'm going to direct your attention to the time period 2006

10  to 2009.  That time period.

11      On the issue that we're talking about now -- and

12  you're explaining why you checked the box no -- can you tell

13  this jury what was the state of knowledge among tax preparers on

14  the difference between a foreign account and a domestic account

15  making a foreign investment?

16      THE COURT:  One second.  Go ahead.  I didn't want him

17  to answer.

18      MR. SULLIVAN:  Objection, Your Honor.

19      THE COURT:  Objection sustained.

20  BY MR. WEBB:

21  Q.  Do you believe that you had good reason to check the box no,

22  sir, based on what you knew at the time?

23  A.  With respect to this 1099?

24  Q.  Yes.

25  A.  Yes.

599

1    Q.  For the reason you just explained to the jury.

2              THE COURT:  One second.  Ask another question.

3              The court is requiring another question based upon the

4    earlier rulings that I've made.

5              Go ahead.  Ask another question, please.

6              MR. WEBB:  About what?

7              THE COURT:  Ask another question.  The question you

8    ask I'm not allowing you to ask based upon the rulings that were

9    made at side bar.

10   BY MR. WEBB:

11   Q.  As far as your --

12             THE COURT:  One second.  If you would like to go and

13   look at the question as asked, it may be helpful.  Check the

14   realtime.

15             MR. WEBB:  I don't have it right in front of me.  I'm

16   sorry.  I apologize, Your Honor.

17             (Record reviewed.)

18             (At side bar on the record.)

19             THE COURT:  You were inviting the witness to recount

20   what he's testified to earlier -- you were including what he

21   testified to earlier that I struck as a basis for his answer,

22   and that's the reason I ruled as I did.

23             MR. WEBB:  I'm not going to bar any order.  The

24   witness has testified why he checked the box no.

25             THE COURT:  Yes.

600

1          MR. WEBB:  That's not been struck.

2          THE COURT:  Yes.

3          MR. WEBB:  That's in the record as far as why he

4    checked the box the way he did.  I thought you -- I have a

5    right -- it's critical to my defense to show.  As far as whether

6    or not when he checked the box yes that I had to limit my

7    question to 2006 to 2009 and describe what he understood to be

8    the view among tax preparers, and I thought I had limited it to

9    the right time period.

10          THE COURT:  No.  Your question as asked encompassed

11    everything that he had said previously.  That would include

12    matters that had been stricken.  Okay.  I'm going to rephrase

13    the question.

14          You have to rephrase the question just so it's clear

15    exactly what he was relying upon and that he was not, in fact,

16    relying upon anything that has been stricken.

17          MR. WEBB:  I got it.

18          (End of discussion at side bar.)

19    BY MR. WEBB:

20    Q.  During this relevant time period, 2006 to 2009, on the issue

21    of whether something is a foreign account or a domestic account

22    making a foreign investment, can you describe for the jury the

23    state of knowledge in your profession on that issue?

24          MR. SULLIVAN:  Objection.

25          THE COURT:  Objection sustained.  Let me clarify.  He

601

1    can testify to what knowledge he has.

2    BY MR. WEBB:

3    Q.  What is your knowledge about where things were at that time,

4    during these relevant years?

5    A.  My understanding of the law at that time was that if you

6    have an account that is maintained in a financial institution

7    located in the United States, even though it may hold an asset,

8    an interest in a foreign security, that that would be considered

9    a domestic U.S. account and not a foreign bank account for FBAR

10   reporting purposes.

11   Q.  Do you believe your view was consistent with the view of

12   your profession?

13            MR. SULLIVAN:  Objection.  It doesn't -- relevance.

14            THE COURT:  Objection sustained.

15   BY MR. WEBB:

16   Q.  Now, when you look at the 1099 that's on the screen, it was

17   clear to you that some type of an investment had been made in

18   India; is that correct?

19   A.  Correct.

20   Q.  And did you know whether that was an investment in a CD?

21   A.  Not from this 1099.

22   Q.  Okay.  Although it is -- Citibank is a bank, right?

23   A.  Correct.

24   Q.  And so if it was an investment in a CD in a foreign country,

25   would that change how you check the box?

602

1    A.  As I stated, if this is a domestic financial institution

2    located in the United States, the facts that it would hold a

3    foreign investment would not be considered a foreign bank

4    account for FBAR reporting purposes.

02:04   5    Q.  Thank you.  Now, by the way, are there a number of reasons

6    why investors make foreign investments?

7           MR. SULLIVAN:  Objection, Your Honor, relevance.

8           THE COURT:  Objection sustained.

9    BY MR. WEBB:

02:05   10   Q.  In connection with preparing Dr. Ahuja's tax returns, are

11   you aware that Dr. Ahuja would sometimes invest in foreign

12   currencies?

13   A.  Yes, he would.

14   Q.  Explain what he invested in.

02:05   15   A.  He might purchase either a euro dollars, British pounds.

16   These were investments that he held in a U.S. account, I

17   believe, at MF Global.  He would invest in a foreign currency,

18   maybe because you feel that the exchange rates between the

19   countries -- one country's economy is stronger than the other.

02:05   20          MR. SULLIVAN:  Objection as to how he might feel.

21          THE COURT:  Objection sustained.

22          The witness has no basis for testifying to what

23   someone else's knowledge or intent was.  Unless that person has

24   shared that with him.  So any comment by the witness concerning

02:06   25   what someone else thought and in particular what Dr. Ahuja

603

1    thought with respect to these matters are to be disregarded by

2    the jury.  You may proceed.

3    BY MR. WEBB:

4    Q.  Listen.  Answer the question based upon what you knew about

02:06  5    his investments in foreign currencies.

6    A.  He had investments that he made in British pounds, in euro

7    dollars, and maybe other currencies that -- I don't remember

8    specifically which ones.

9    Q.  Okay.  Now, on this 1099 form, there's an indication, when

02:06  10   you say it, that there was a foreign tax paid; is that correct?

11   A.  That is correct.

12   Q.  A foreign tax is paid on the investment that was made in

13   India; is that correct?

14   A.  That is correct.

02:06  15   Q.  Whatever the investment was in India, the fact that there's

16   a foreign tax paid, did that make -- did you believe that made

17   this a foreign account?

18   A.  I did not.

19   Q.  Why not?

02:06  20   A.  You can purchase investments in securities in another

21   country that doesn't make it a foreign tax account, but that

22   country may still have jurisdiction for taxing.  I could acquire

23   stock in Nestle, which is a Switzerland company, and it could

24   pay a dividend, and Switzerland would be able to tax that

02:07  25   dividend.  And as a U.S. taxpayer, I would be required to report

604

1    the entire amount of the dividend, and I could claim a credit

2    for the taxes paid to Switzerland.  It could be Telefonos de

3    Mexico; it could be Toyota in Japan.

4    Q.  Now, you told the jury -- Strike the question.  I think

5    you've answered it.

6          Now, as far as Citibank is concerned, let me go to

7    the -- you have trial Exhibit 11 in front of you?  We've been

8    talking about the second page of it; is that correct?

9    A.  Correct.

10          MR. WEBB:  James, can you call up the first page?

11   BY MR. WEBB:

12   Q.  This is trial Exhibit 11.  This is another 1099 reporting

13   interest income for Citibank, this time for $7,853; is that

14   correct?

15   A.  Correct.

16   Q.  Now, how did you get this 1099 form?

17   A.  It was provided to us by Tom Branch as a part of the

18   collection of source documents for the preparation of the

19   returns.

20   Q.  And does this also show that the -- the bank, Citibank, is a

21   U.S. payor?

22   A.  I interpret Citibank North America with a New York

23   address -- I would interpret this to be a domestic financial

24   institution.

25   Q.  And this also the recipient is Arvind Ahuja at his home

605

1    address; is that correct?

2    A.   Correct.

3    Q.   And this shows the same thing, that there was a foreign

4    country or U.S. possession, India, and it shows a foreign tax

5    credit; is that correct?

6    A.   That is correct.

7    Q.   And how did you interpret this 1099 form as far as whether

8    this was a foreign bank account or whether this was a domestic

9    account making a foreign investment?

10   A.   I interpreted it to be a domestic account making a foreign

11   investment for the same line of reasoning that the other 1099.

12   Q.   Now, I also want to show you the 2008 return -- or 1099,

13   which is -- I'm going to find it here in just a moment so I give

14   you the right exhibit number to call up, James.

15              It's Exhibit 10.

16   BY MR. WEBB:

17   Q.   Do you now have on the screen -- this is in evidence, and

18   the government showed this to you this morning, correct?

19   A.   Yes.

20   Q.   And this is for the year 2008; is that correct?

21   A.   Yes, it is.

22   Q.   And this has -- the payor -- payer is Citibank North

23   America; is that correct?

24   A.   Correct.

25   Q.   Which you believe to be a U.S. domestic account; is that

606

1   correct?

2   A.   Correct.

3   Q.   And it's payable to Dr. Ahuja and his home address, and this

4   also shows -- this shows interest income of $3,722.  It shows

02:11   5   that it's a foreign country, India.  It shows a foreign tax

6   paid, correct?

7   A.   Correct.

8   Q.   It also shows an early withdrawal penalty; is that correct?

9   A.   In Box 2.

02:11   10   Q.   Do you see that?

11   A.   I do.

12   Q.   And that indicates to you that this is likely a CD; is that

13   correct?

14   A.   That is correct.

02:11   15   Q.   And how did you interpret this form as far as whether this

16   is a foreign bank account or a domestic account making a foreign

17   investment?

18   A.   I believed it to be a financial institution account located

19   in the United States on the basis of the payer address, and a

02:11   20   name that is a U.S. financial institution.  And I don't believe

21   that a foreign country would have had a requirement to issue a

22   1099 if it was to a U.S. taxpayer if it was a foreign account.

23   Q.   And so you checked -- so for 2008 on the tax return you

24   checked the box no as far as whether Dr. Ahuja had a foreign

02:12   25   account; is that correct?

607

1  A.  That is correct.

2  Q.  Because of how you interpret the difference between a

3  foreign account and a domestic account making a foreign

4  investment; is that correct?

5  A.  That is correct.

6  Q.  And, by the way, to this day do you believe your judgment

7  was correct about this?

8  A.  I do.

9  Q.  Again, for 2008, Dr. Ahuja was not the one who checked the

10  box no; it was you or people connected with your firm; is that

11  correct?

12  A.  That is correct.

13  Q.  Now -- now, the 1099 forms that I've showed you from

14  Citibank, two in 2009 and one in 2008, because Citibank sent the

15  1099 forms to Dr. Ahuja, those 1099 forms found their way to

16  you; is that correct?

17  A.  That is correct.

18  Q.  And then did you ensure that they got reported on his

19  federal income tax -- on Dr. Ahuja's federal income tax returns

20  for the year 2008 and 2009?

21          MR. SULLIVAN:  Your Honor, asked and answered.

22          MR. WEBB:  No, I didn't ask it.

23          THE COURT:  Overruled.

24          THE WITNESS:  All of the -- the three accounts that

25  you mentioned, the one for 2008 and the two for 2009, were

608

1    properly reported on the respective year's tax returns.

2    BY MR. WEBB:

3    Q.  And you checked that to be sure; is that correct?

4    A.  Yes, I did.

5    Q.  And, therefore, is the proper amount of tax paid on it?

6    A.  Yes, it would be.

7    Q.  Now, by the way, let me ask the obvious:  If a taxpayer

8    doesn't get a 1099 form from a financial institution, then that

9    1099 form cannot be given to you; is that correct?

10   A.  That would be correct.

11   Q.  Now, as far as 1099 forms and Dr. Ahuja are concerned and

12   his tax returns, you indicated earlier when I was asking you

13   questions that, because of the nature of his investments, he

14   actually got a significant number of 1099 and related forms

15   reporting interest to him each year; is that correct?

16   A.  That is correct.

17   Q.  And you told the jury earlier that, to the best of your

18   knowledge, every time you got a 1099 form it ended up on his tax

19   return; is that correct?

20   A.  That is correct.

21   Q.  I want to go into the issue of what the number was.  To

22   provide -- just to show the jury an example, I'm going to show

23   you the 2009 federal income tax return which is Government

24   Exhibit 15.

25            Can you call Exhibit 15 up, James?

609

1    And can you find Exhibit B.  I think I can give you the page

2    number.  Page 8.  Can you find page 8?  Take the blowup down

3    just for a minute.

4    BY MR. WEBB:

5    Q.  So this is Schedule B of Dr. Ahuja's federal income tax

6    return for 2009; is that correct?

7    A.  Yes, it is.

8    Q.  And the first part of Schedule B, the first thing it asked

9    for is Part I called "Interest"; is that correct?

10   A.  That's correct.

11   Q.  And you're supposed to list all the items of interest the

12   taxpayer has in Section 1; is that correct?

13   A.  That is correct.

14   Q.  And because of the large number of 1099s and other forms,

15   you decided to put that on a separate statement to attach to the

16   return; is that correct?

17   A.  That would be a function of our tax software that if the

18   number of accounts exceeds the number of lines available they

19   would put all those accounts on a statement supporting the

20   number reflected on that return.

21   Q.  And so this says "See Statement 14"; is that correct?

22   A.  That is correct.

23   Q.  So if we want to show the jury the actual number of

24   different interest 1099s and similar forms, we need to go to

25   Statement 14, correct?

610

1   A.  Correct.

2   Q.  So I've now called up for the jury Statement 14 from this

3   tax return.  And tell the jury what they're looking at on the

4   screen.

5   A.  It's probably actually a two-page statement.  I don't even

6   think that this --

7   Q.  We'll go to the second page.  Look at the first page and now

8   go to the second.  He's got both pages up right now.

9   A.  It's a listing of the payer, as we previously described, the

10  financial institution or payer of the information for those

11  entities that paid interest to Dr. Ahuja and were included on

12  the tax return.  Some of the entries come from a Schedule K-1,

13  as we had talked earlier about that as opposed to a Form 1099.

14  Q.  But all of the entries on the first page here, all the way

15  down, then over on the next page down to where it says, "Tax

16  Exempt Interest," those are all, basically, tax forms that

17  Dr. Ahuja received and Tom Branch brought to your office for

18  this tax year; is that correct?

19  A.  Correct.

20  Q.  And then because you actually had the 1099 form, you

21  reported the interest incomes correctly on his tax return; is

22  that correct?

23  A.  That is correct.

24  Q.  And if Dr. Ahuja didn't get a 1099 form from someone and it

25  didn't get to you, you would have no way to know to report it;

611

1    is that correct?

2    A.  I guess that would be correct.

3           MR. SULLIVAN:  Your Honor, asked and answered.

4           THE COURT:  Objection sustained.  Move on, please.

5    BY MR. WEBB:

6    Q.  Sir, to show the jury for each of the relevant years -- to

7    kind of simplify this and shortcut it, I'm not going to show

8    you -- you prepared all of his returns for the relevant tax

9    years here that the government's charged Dr. Ahuja with, 2006 to

10   2009; is that correct?

11   A.  Correct.

12   Q.  Before we came to court today, did I ask you if you could

13   prepare a summary chart that would break down year by year that

14   sets forth a listing of the total payers for each year that sent

15   tax forms to Dr. Ahuja that reported interest income?

16   A.  That is correct.

17          MR. WEBB:  And can I have Tab 41, Tom.

18          May I approach the witness, Your Honor?

19          THE COURT:  You may.

20   BY MR. WEBB:

21   Q.  Sir, I'm going to hand you what is marked --

22          THE COURT:  Please take it up there, give it to him,

23   and ask your question when you get back.

24          (Document tendered to the witness.)

25   BY MR. WEBB:

612

1    Q.  Sir, I've handed you what I have marked as Defendant's

2    Exhibit 2216, and is this something that you had prepared as a

3    summary of the Forms 1099 and Schedule K-1s reporting interest

4    income for the relevant tax years 2006, 2007, 2008, and 2009?

5    A.  That is correct.

6    Q.  And did you prepare this -- to the best of your knowledge,

7    have you prepared this summary accurately so it correctly

8    reflects the total number of 1099s or K-1s each year that report

9    interest income to Dr. Ahuja for each year?

10   A.  It reflects that, yes.

11            MR. WEBB:  I offer the exhibit into evidence.

12            MR. SULLIVAN:  No objection.

13            THE COURT:  It's received.

14            (Exhibit 2216 received in evidence.)

15   BY MR. WEBB:

16   Q.  Just to show it to the jury --

17            James, call up page 1 of the exhibit, first page for

18   2006.

19   BY MR. WEBB:

20   Q.  For 2006, sir, why don't you explain what you put on the

21   schedule.

22   A.  The schedule has two separate columns.  In the first column

23   we are listing the reported interest on Form 1099s.  In the

24   second column we are listing the reported income either on a

25   Schedule K-1 or a grantor trust letter that is issued in lieu of

613

1  a Schedule K-1 for certain types of trusts.

2        And so in the year 2006 there were 12 1099s received

3  and there were 11 K-1s received that reported interest income

4  for a total of 23 reporting entities.

5  Q.  So in this particular tax year, Dr. Ahuja received

6  23 different tax forms that reported interest income to him; is

7  that correct?

8  A.  That is correct.

9  Q.  And your firm received each one of them; is that correct?

10  Received the 1099s and K-1s?

11  A.  From Tom Branch.

12  Q.  They're in your files; is that correct?

13  A.  That is correct.

14  Q.  And you then -- did you make certain that they were included

15  on Dr. Ahuja's 2006 federal tax return?

16  A.  We did.

17  Q.  And paid the appropriate amount of tax.

18  A.  We did.

19  Q.  Go to the next page of the exhibit.

20        If I could, James, this is for 2007.

21  BY MR. WEBB:

22  Q.  Why don't you explain to the jury the schedule you prepared

23  for 2007.

24  A.  The schedule for 2007 parallels the scheduled prepared for

25  2006.  Reporting in the left-hand column the number of 1099s,

614

1  reporting interest that was included in his tax return; the

2  second column reporting the items recording interest income on

3  Schedule K-1 or grantor trust letters issued in lieu of a

4  Schedule K-1.  The number of 1099s issued reporting interested

5  income was 7.  The number of K-1s reporting interest income is

6  11, and the total of those is 18.

7  Q.  So for the year 2007, Dr. Ahuja received 18 different tax

8  forms reporting interest income to him; is that correct?

9  A.  That is correct.

10  Q.  And for each one Tom Branch brought it to you, and they're

11  in your files; is that correct?

12  A.  That is correct.

13  Q.  And because you received them, received the forms, you then

14  caused all of these tax forms to be recorded on his tax return

15  for 2007.

16  A.  We did.

17  Q.  And paid the appropriate amount of tax.

18  A.  We did.

19          MR. WEBB:  James, go to the next one, 2008.

20  BY MR. WEBB:

21  Q.  This is for the year 2008.  Again, why don't you summarize

22  for the jury what you placed on this chart.

23  A.  It's in the same format as the prior two years.  So if I can

24  drop to the bottom, there were 15 accounts reported on

25  Form 1099s that reported interest income that were included on

615

1    the return, and there were 14 Schedule K-1s that reported

2    interest income to Dr. Ahuja or his wife Namie for a total of

3    29 reporting interest income on the return.  And they were all

4    included in his tax return, and I believe the tax has been fully

02:24    5    properly paid on those accounts.

6    Q.  Let's go to 2009.  And explain what's on this summary chart

7    for 2009.

8    A.  Same format as the prior two years.  We have 14 different

9    payors issuing Form 1099s to the doctor or his wife, reporting

02:25    10    interest income, and we have 18 Schedule K-1s reporting interest

11    income for a total of 32 reporting entities reporting interest

12    income were included on his return and the taxes were paid.

13    Q.  Thank you.  Let me go to another issue that you talked about

14    on direct examination which is that the -- well, income tax

02:25    15    returns for Dr. Ahuja were due each year on April 15th; is that

16    correct?

17    A.  That is correct.

18    Q.  And you've explained earlier that he did not want to get

19    extensions, and so your job was to file them on time; is that

02:25    20    correct?

21    A.  That is correct.

22    Q.  And because he wanted the returns filed on time, as you

23    approached the April 15th date of each year, were you sometimes

24    in somewhat of a mad scramble to get all his tax returns done?

02:26    25    A.  Not only his, but, you know, we're obviously serving many,

1  many clients, and our staff is working 70, 80 hours a week

2  during the last two weeks of April.

3  Q.  And tell the jury as far as each April -- in mid-April of

4  each of these tax years, 2006, 2007, 2008, and 2009,

5  approximately how many tax returns are you preparing for

6  Dr. Ahuja's signature?

7  A.  It grew in the later years, but it would be 20 to 28 in the

8  later years.

9  Q.  Okay.  And this would include his personal income tax

10  returns and income tax returns on partnerships and trusts; is

11  that correct?

12  A.  That is correct.

13  Q.  And can you tell the jury the procedure so that, as we get

14  close to mid-April, what procedure did Kolb+Co follow to

15  complete his tax return on time and to get the returns over to

16  Dr. Ahuja so they could be signed on or about April 15th?  What

17  procedure did you follow?

18  A.  Because the tax returns went down to the last day or two in

19  every situation, there was not time to mail the returns.  So

20  either Tom Branch would stop by our office in the morning on his

21  way to work and pick up returns, or we would have the returns

22  couriered to Dr. Ahuja's office.

23        Tom Branch would be the recipient of those and at a

24  break in the schedule during the day would provide the returns

25  to Dr. Ahuja for signature.

617

1    Q.  Now, to show the jury the volume of tax returns that would

2    be given to Dr. Ahuja to sign somewhere in mid-April of 2015,

3    can I have the --

4            Can I have --

5            (Counsel confer.)

6    BY MR. WEBB:

7    Q.  Sir, I'm going to hand you the tax returns that I believe

8    were prepared for the year 2007, just as an example, to show the

9    jury.

10           May I approach the witness?

11           THE COURT:  You may.

12           (Document tendered to the witness.)

13   BY MR. WEBB:

14   Q.  I'm handing you a group of exhibits.

15           THE COURT:  Please remain close to a mic when you

16   speak.

17           MR. WEBB:  I will, Your Honor.

18   BY MR. WEBB:

19   Q.  Do these appear to be the tax returns for the year 2007 that

20   would have been due to be filed on or about April 15th?

21   A.  Yes, they are.

22   Q.  And so we don't take up the jurors' time, did we look at

23   this in advance?  Are there 16 tax returns in here?  Maybe you

24   ought to look at it quickly and just confirm what's in there.

25           (Witness peruses document.)

618

1    A.   That is correct.  In addition, he -- in one or more of these

2    years, he may have filed a gift tax return that would not have

3    been prepared by our return -- firm, which also would have been

4    filed at that time.

5    BY MR. WEBB:

6    Q.   So that would be included in the pile or the group; is that

7    correct?

8    A.   That is correct.

9    Q.   Now --

10             THE COURT:  One second, you need to clarify.

11             MR. WEBB:  Yes.

12             THE COURT:  He needs to clarify.  You said the group.

13   What group?

14             MR. WEBB:  I'm sorry.  The exhibits that I've handed

15   you.

16             I apologize, Your Honor.

17   BY MR. WEBB:

18   Q.   For the record, I've handed you -- and I'll make a record

19   right now, Your Honor.

20             I've handed you the 2007 tax returns that Dr. Ahuja

21   would have had to sign on or about April 15th; is that correct?

22   A.   That is correct.

23   Q.   And there are 16 returns; is that correct?

24   A.   That is correct.

25   Q.   For the record, have I handed you Defense Exhibit 2127,

619

1   2123, 2124, 2130, 2140, 2132, 2128, 2129, 2125, 2131, 2122,

2   2133, Defense Exhibit 2138, Defense Exhibit 2139, Defense

3   Exhibit 2141, and Defense Exhibit 2126?  Did I read correctly

4   the exhibit you have in front of you?

02:31   5   A.  It parallels exactly.

6   Q.  And Dr. Ahuja had to sign each one of those returns; is that

7   correct?

8   A.  There may be a return that would be signed by a Trustee, but

9   he would have been the one coordinating getting that signature.

02:31   10   I believe there's one trust that he's not the Trustee of.

11   Returns are prepared for him and delivered to him.

12   Q.  But the vast majority he has to personally sign; is that

13   correct?

14   A.  That is correct.

02:32   15   Q.  Now, if we just want to look at just one of the returns, the

16   federal return, if you look in there, I think the federal return

17   is trial Exhibit 2122; is that correct?  The group of exhibits

18   that I gave you, it's the federal return 2122.

19   A.  Correct.

02:32   20   Q.  For 2007.

21   A.  Correct.

22   Q.  And just that tax return in and of itself, if you look at --

23   it's almost 100 pages; is that correct?

24   A.  Yeah.

02:32   25   Q.  If you go to the last page, it says page 96.

A.   It would probably be a little bit longer than that because there are some attachments in there that aren't numbered pages. So, yes, approximately.

Q.   Might be a little bit over 100 pages; is that what you're saying?

A.   Correct.

Q.   And, by the way, as far as the returns that he would be given to sign, if -- go to that federal return, I put a yellow Post-It -- do you find the yellow Post-It I put there?

A.   I do.

Q.   That's on the Schedule B that has that question at the bottom of the Form 7A that says:  "Do you have an interest or signature over a foreign account"; do you see that?

A.   I do.

Q.   So that's one page among hundreds of pages he would be presented to sign; was that correct?

A.   That is correct.

Q.   And as far as the number of returns he would have been given each year in mid-April, I've shown you this one as an example for 2007, but based on your knowledge -- and they're in evidence -- would he have gotten the same number of returns, approximately, more or less, for 2006, 2007, 2008, and 2009?

A.   2006 would be similar.  I believe in 2008 or '9 it would increase.

Q.   It would increase.

621

1      Now, during the government's direct examination, the

2 government asked you some questions about a meeting that you had

3 with Dr. Ahuja in August of 2009 where you mentioned to

4 Dr. Ahuja, as you told during the direct examination, about the

5 government had some enhanced interest in foreign tax accounts.

6 A.  Can you clarify the question?  The -- I think what you're

7 referencing is --

8      THE COURT:  One second.  If you didn't understand the

9 question --

10      MR. WEBB:  I'll rephrase it.

11 BY MR. WEBB:

12 Q.  Do you recall a conversation that occurred in August of 2009

13 in Dr. Ahuja's office and the subject matter of foreign tax

14 accounts was discussed?

15 A.  That is correct.

16 Q.  And you described that conversation to the jury in direct

17 examination?

18 A.  I believe so.

19 Q.  Do you actually remember that meeting I mean do you actually

20 remember -- like was this one of the meetings where he came in

21 in scrubs and was interrupted three or four times, or do you

22 remember this particular meeting?

23 A.  I only have a general recollection of the meeting, not a

24 specific one.  I meet with Dr. Ahuja on his business and

25 personal two to four times a year, and with his medical group

622

1    generally another two or four.  So, you know, it's one of four

2    to eight meetings that I would have had with him throughout the

3    year, and there's nothing that stands out specifically, but I

4    believe the meeting occurred based upon the e-mail that I sent.

5    Q.  Now, at that time when Dr. Ahuja told you that he would

6    check out a couple of accounts -- do you recall that?

7    A.  I see that in the notes, yes.

8    Q.  And at that time, by the way, did Dr. Ahuja have anything in

9    front of him to take any notes on, if you remember?

10   A.  I don't ever remember an occasion where Dr. Ahuja brought in

11   a pad of paper to take notes.  Never asked me for a sheet of

12   paper from my pad to take any notes.  Tom Branch is typically

13   there, and that probably would have been more falling on his

14   responsibility.

15   Q.  Tom Branch was in the meeting; is that correct?

16   A.  That is correct.

17   Q.  And Tom Branch, if someone was going to get back to you as a

18   follow-up, who would you expect that person to be?

19   A.  Tom Branch.

20   Q.  Am I correct, you actually never personally ever discussed

21   with Arvind Ahuja that on Schedule B there's that one question

22   at the bottom of the form called 7A that the government

23   called -- did you ever discuss that specific question on the tax

24   return with Dr. Ahuja?

25   A.  No, I did not.

623

1   Q.  Did you ever even use the term "FBAR" with Dr. Ahuja, that
2   you can remember?
3   A.  To the best of my recollection, I wouldn't have used the
4   word "FBAR" in a meeting with a client.  That would be a term
5   that we use among tax practitioners to describe it.  I think my
6   general protocol is to try to speak in as basic of terms as I
7   can to a client.  And I would have probably referred to it as
8   new rules regarding reporting of foreign bank or foreign
9   financial accounts.
10  Q.  And the testimony that you gave the jury earlier about the
11  difference between a domestic account making a foreign
12  investment and an actual foreign account that has to be reported
13  for federal tax purposes, did you ever try to explain that area
14  to him?
15  A.  I did not.  I think that would have come up at the point in
16  time that an issue or a potential account that I felt might be a
17  foreign account -- at that point in time I would do some more
18  questioning, investigation to establish that and then discuss
19  that with my client.
20  Q.  Well, in your discussion with Dr. Ahuja, did you ever have
21  any indication that he had a level of knowledge of taxes that he
22  would know the difference between a domestic account making a
23  foreign investment and a foreign account, as you just explained
24  it to this jury?
25          MR. SULLIVAN:  Objection, Your Honor.

624

1    THE COURT:  Objection sustained.

2    MR. WEBB:  Can I call up Government Exhibit 18,

3    please?

4    BY MR. WEBB:

5    Q.  This is another exhibit the government showed you during

6    direct examination.  I just want to ask you a couple questions

7    about.

8    Do you have that in front of you or do you want me --

9    A.  I have it in front of me.

10   Q.  Now, I believe you told the jury on direct examination --

11   THE COURT:  Rephrase.  Rephrase.

12   BY MR. WEBB:

13   Q.  Sir, as far as Exhibit 18 is concerned, do you recall that

14   counsel showed this to you during your direct examination?

15   A.  Yes, I do.

16   Q.  And I believe, if I understood your testimony correctly,

17   you've described this as a document that had some agenda items

18   for Dr. Ahuja and also some notes for your staff; did I

19   understand that correctly?  Explain what this document is.

20   A.  Okay.  As I indicated earlier, I believe this to be a

21   summary of our major tax planning recommendations focused in two

22   areas:  Corporate tax planning ideas, and individual tax

23   planning ideas.  It is a much more detailed agenda than I

24   normally would prepare for a meeting, and I believe that this

25   was documenting what our plan was going to be.  And I used it to

625

1    take to the meeting as the agenda.

2           But I also, in reviewing it in more detail, see that

3    it would appear that some of the items on the agenda are more

4    notes for things that we need to do than things that would

5    necessarily be brought up at the meeting.

6           An example would be having, you know, Andrea prepare

7    the inventory of items to be provided to Tom Branch.  That would

8    not be a substantive item that I would, you know, waste time in

9    a meeting with Dr. Ahuja to discuss.

10          MR. WEBB:  Call up the second page of the agenda,

11   James.  And call out -- actually, call out maybe from G on down.

12          Before you do that, just wait a minute.

13   BY MR. WEBB:

14   Q.  It looks like you often take notes next to agenda items; is

15   that correct?

16   A.  That is correct.

17   Q.  If we see that you took notes next to an agenda item, is

18   that some indication that you actually talked about the issue

19   with Dr. Ahuja?

20   A.  I believe that to be correct.

21   Q.  And if we don't see any notes next to an agenda item, is

22   that an item that you likely did not discuss with Dr. Ahuja?

23   A.  I probably -- if I asked an item and I received a response

24   to a question, I would note it on the agenda.

25   Q.  So I'm just looking at the agenda.  The government called

626

1   your attention -- James, can you call up -- G on down.

2   A.   Uh-huh.

3   Q.   The government asked you about the last agenda item:

4   "Remember we will have a FBAR reporting for any foreign bank

5   accounts."

6            Do you see that?

7   A.   I do.

8   Q.   I notice that the last several items on the agenda from H,

9   I, J, and K don't appear to have any notes on them; is that

10  correct?

11  A.   That is correct.

12  Q.   By the way, as you sit here now, do you actually remember

13  this meeting and what items you discussed with him?

14  A.   I only have a general recollection of the meeting.

15  Q.   But do you actually remember the specific items that you

16  talked about with him on that day?

17  A.   I do not.

18  Q.   For example, you have no recollection of whether you ever

19  got to Item K; is that correct?

20  A.   That is correct.

21  Q.   And you see no notes next to Item K.

22  A.   Correct.

23  Q.   Nor J or I or H, as far as I can see.  Am I reading that --

24  A.   Correct.

25  Q.   Would that be an indication that you might not have gotten

627

1    that far down on the agenda?

2    A.  Certainly is possible.

3         MR. WEBB:  Okay.  You can take that down, James.  Let

4    me go to a little different topic.

5    BY MR. WEBB:

6    Q.  At my request did I ask you to prepare a summary chart of

7    Dr. Ahuja's federal income tax returns between 2002 and 2009,

8    which are the years that he received HSBC interest income, based

9    on what we know in this case today, so that you could summarize

10   for the jury certain key information on his return for those

11   years?

12   A.  You did.

13        MR. WEBB:  Tab 42, Tom.  And I'll give you the exhibit

14   before I show it.

15        May I approach the witness, Your Honor?

16        THE COURT:  You certainly may.

17        (Document tendered to the witness.)

18        MR. SULLIVAN:  Your Honor, may we approach?

19        THE COURT:  You may.

20        (At side bar on the record.)

21        MR. SULLIVAN:  Your Honor, I believe that Mr. Webb is

22   going to use this and then another exhibit to show the jury what

23   he said in opening that the defendant underreported his tax

24   liability by only 1.8 percent over the years, and we object on

25   grounds of relevancy because the way this case has been charged

628

1     it's about what he didn't report, not about what he did report.

2         And I would note that the tax returns for 2006 -- or

3     actually '5, '6, '7, '8, and '9 will be -- are in evidence and

4     will be in evidence, and they can make whatever arguments they

5     want, but we object to any charts that would seem to suggest

6     that taxpayers can selectively report their income because they

7     make a lot of money or something.

8         MR. WEBB:  First of all, this is a summary chart from

9     exhibits the government has offered into evidence and are now in

10    evidence.

11        Number two --

12        THE COURT:  One second.

13        MR. WEBB:  The entire case involves -- Judge --

14    involves his willfulness, Your Honor, and his knowledge.  The

15    fact that it was a small amount of money compared to what he

16    reported as taxes is highly relevant.

17        I heard counsel to say I can argue it, but I can't use

18    a chart.  I have a right under the rules of evidence to

19    summarize evidence --

20        THE COURT:  Let me just get to the bottom line.

21        Objection's overruled.

22        MR. WEBB:  Thank you.

23        THE COURT:  How much more --

24        MR. WEBB:  20 minutes, 10 minutes.

25        THE COURT:  We're going to take a break.  We've been

629

1  going for about two hours.

2        MR. WEBB:  That's fine.

3        THE COURT:  All right.

4        (End of discussion at side bar.)

5        THE COURT:  It's time for our break.  Please return to

6  the jury room and, of course, do not discuss this case.

7        THE BAILIFF:  All rise.

8        (Jury out at 2:48 p.m.)

9        THE COURT:  You may step down.  Do not discuss your

10  testimony with anyone during the break.

11        Also I ask the parties to consider where we are in the

12  testimony and to report, before the jury comes out, what

13  additional testimony you'll be eliciting today and how much time

14  you believe that testimony will take.  I want to gauge how long

15  we will go because I need to notify GSA regarding the need to

16  leave the utilities on either after 5:00.  We certainly will not

17  go past 6:00, and I'm inclined to quit at about 5:00.

18        We'll take our break.

19        (Recess taken at 2:49 p.m., until 3:21 p.m.)

20        (Jury in at 3:21 p.m.)

21        THE COURT:  Proceed.

22  BY MR. WEBB:

23  Q.  Sir, we're going to pick up right where we left off before

24  the afternoon break.  I handed an exhibit, do you have Defense

25  Exhibit 2215?

630

1    A.  I do.

2    Q.  I asked you whether you prepared a summary chart that

3    summarized some certain information from all of Dr. Ahuja's

4    federal income tax returns during the years 2002 through 2009,

5    the years in which he has HSBC income.  And you did do that; is

6    that correct?

7    A.  I did.

8    Q.  And you have that exhibit in front of you now; is that

9    correct?

10   A.  I do.

11        MR. WEBB:  Your Honor, the government has offered into

12   evidence the defendant's federal income tax returns for the

13   years 2006, 2007, 2008, and 2009.  I would now like to offer

14   into evidence the 2002 federal income tax return which is

15   Defense Exhibit 2224; the -- Dr. Ahuja's federal income tax

16   return for 2003, which is Defense Exhibit 2225; Dr. Ahuja's 2004

17   federal income tax return, which is Defense Exhibit 2226; and

18   Dr. Ahuja's 2005 federal income tax return, which is Defense

19   Exhibit 2227.  I offer those exhibits.

20        MR. SULLIVAN:  No objection, Your Honor.

21        THE COURT:  They're received.

22        (Exhibits 2224, 2225, 2226, 2227 received in

23   evidence.)

24        MR. WEBB:  With that I offer into evidence Defense

25   Exhibit 2215.  The summary chart.

631

1       MR. SULLIVAN:  No objection, Your Honor.

2       THE COURT:  It's received.

3       (Exhibit 2215 received in evidence.)

4       MR. WEBB:  James, can I call that up?  Can you make

5   that bigger?  I think the jury can probably see it.

6   BY MR. WEBB:

7   Q.  So why don't you summarize what you've done here on your

8   summary chart for the tax years 2002 through 2009.

9   A.  I was asked to provide the summary chart reflecting the

10  client's taxable income, amount of federal taxes paid, effective

11  tax rate, number of pages that the return was, and the method of

12  filing.

13      If you read down the chart, in the first year in the

14  first row in the year 2002, the client's taxable income as

15  reported on the federal income tax return that our firm paid was

16  $11,835,471.  The amount of federal income taxes reflected on

17  the tax return and paid in that year are $4,538,967.

18      The next column reflects the client's effective

19  federal income tax rate for that year.  That is dividing the

20  federal taxes paid by the amount of federal taxable income.  So

21  in the year 2002 on that 11 million and change taxable income,

22  he paid the effective tax rate of 38.35 percent.  The number of

23  pages in the federal tax return that year were 22.  And we filed

24  that tax return electronically that year.

25  Q.  I think you misspoke.  I think number of pages is 29?

632

1    A.  I'm sorry.

2    Q.  You said 22.

3    A.  Oh, 29, yes.

4    Q.  You don't have to read off the rest of the numbers.

03:25    5    A.  I understand.  So over the course of the one, two, three,

6    four, five, six, seven -- eight years, he reported total taxable

7    income of over $125 million.  We reported and he paid federal

8    income taxes of over $44 million.  And the average effective

9    federal tax rate on that income was 35.28 percent.

03:25    10    Q.  Now, thank you for summarizing that.  And as far as the

11    column about the average effective rate over those years is

12    35.28 percent, that's an average.  Like some years he was at

13    38 percent, et cetera, but it averages out at that rate; is that

14    correct?

03:26    15    A.  That is correct.

16    Q.  For those years.

17        What is the -- what is the top, what's called the

18    marginal tax rate in the United States?

19    A.  Currently it's 35 percent.

03:26    20    Q.  And for how many years has it been that?

21    A.  Quite a while.  Prior to the -- what we call the Bush tax

22    cuts reduced the tax rates.  It's possible in the year 2002 was

23    the year in which we had higher tax rates where the maximum rate

24    would have been 39.6 percent.

03:26    25    Q.  So for the last several years in the United States the top

1  marginal tax rate in the United States has been at 35 percent.

2  A.  That is correct.

3  Q.  And Dr. Ahuja actually pays a little over that.

4  A.  In some indications, yes.  And in average, I guess,

5  slightly.

6  Q.  Let me go to a little different topic.  Government counsel

7  when he examined you on direct examination, do you remember he

8  asked you a number of questions as to whether Dr. Ahuja had

9  failed to disclose certain information to you regarding HSBC

10  interest earned on certain CDs.  Do you recall those questions?

11  A.  I do.

12  Q.  In light of those questions, let me ask you this:  As far as

13  you working with Dr. Ahuja and the people that work for him, as

14  far as being able to obtain information that you felt you needed

15  to correctly and accurately report his income and calculate his

16  taxes, did you have any problems over the years in getting the

17  information you needed?

18  A.  I did not.

19  Q.  Ever once?  That you can remember.

20  A.  I did not.

21  Q.  Pardon me?

22  A.  I did not.

23  Q.  During those 12 years that you worked with Dr. Ahuja, did

24  you ever believe that Dr. Ahuja was intentionally concealing

25  information from you that would prevent you from accurately

634

1    preparing his tax returns?

2             MR. SULLIVAN:  Objection, Your Honor.  That's for the

3    jury.

4             THE COURT:  Objection sustained.

5    BY MR. WEBB:

6    Q.  In light of the questions the government asked you, can you

7    just describe -- how would you describe Dr. Ahuja's efforts to

8    comply with tax laws during those years?

9    A.  I would consider them to be above normal for clients.  I can

10   cite a couple of examples where I felt that Dr. Ahuja and his

11   wife Namie --

12            MR. SULLIVAN:  Your Honor, belated objection to this.

13            THE COURT:  I will bar further testimony in response

14   to the question.  You may ask additional questions.  There was

15   no objection earlier.  You may proceed.

16            MR. WEBB:  I shouldn't ask the same question.

17            THE COURT:  You may ask another question.

18            MR. WEBB:  Thank you.

19            THE COURT:  In other words, further narrative is not

20   appropriate.

21            THE WITNESS:  Am I able to respond?

22            THE COURT:  No, you cannot say anything else until

23   another question is proffered.

24   BY MR. WEBB:

25   Q.  In your 11 years of preparing tax returns for Dr. Ahuja in

635

1  light of counsel's question, did you ever have any reason to

2  question his honesty in providing you with information?

3  A.  No, I did not.

4  Q.  By the way, as far as you and your firm are concerned, if

03:29  5  you concluded that a client was intentionally concealing

6  information from you that you needed to prepare returns

7  correctly, would you continue to prepare returns?

8  A.  We would withdraw from the engagement.

9  Q.  And are you still preparing Dr. Ahuja's tax returns?

03:29  10  A.  Yes, we are.

11  Q.  One last topic, and then I'll be done.

12  Obviously, you're here testifying.  So you're aware of

13  the charges that were filed against Dr. Ahuja by the government

14  in this case.  You're generally aware, anyway; is that correct?

03:30  15  A.  That is correct.

16  Q.  And are you generally aware that when -- after Dr. Ahuja

17  found out that HSBC interest income was not on his tax returns

18  that he filed amended tax returns?

19  A.  That is correct.

03:30  20  Q.  And, sir, at my request have you compared Dr. Ahuja's

21  originally filed tax returns between 2002 and 2009 and compared

22  them with the amended returns that he filed for the same years?

23  Have you made that comparison?

24  A.  I have.

03:30  25  Q.  And did I ask you to prepare a summary chart that would

636

1    summarize that comparison?

2    A.  You did.

3    Q.  And I'm going to show you now --

4         Tab 25, Tom.

5    BY MR. WEBB:

6    Q.  Let me show you --

7         May I approach the witness, Your Honor?

8         THE COURT:  You certainly may.

9         (Document tendered to the witness.)

10   BY MR. WEBB:

11   Q.  Sir, I've shown you Defense Exhibit 2092.  Is this a summary

12   chart you prepared comparing Dr. Ahuja's original filed federal

13   income tax returns with his amended tax returns to summarize

14   through that comparison the change in tax?

15   A.  I have.

16   Q.  And did you prepare -- to the best of your knowledge did you

17   prepare this accurately by comparing the amended returns to the

18   original returns?

19   A.  I have.

20   Q.  Now, in order to use that chart, I'm going to offer the

21   amended returns into evidence.

22        THE COURT:  One second, please.  Remain near the mic

23   when you're speaking.

24        MR. WEBB:  I apologize, Your Honor.  May I leave to

25   get the amended returns?  And I'll return.

637

1          THE COURT:  Absolutely.

2          MR. WEBB:  Your Honor, I'm now going to offer into

3    evidence the amended tax returns for Dr. Ahuja's 2002, amended

4    tax return, Defense Exhibit 2084; the 2003 amended return is

03:33    5    2085, the 2004 --

6          THE COURT:  Hold, please.

7          MR. WEBB:  I'm sorry.  I'll slow down.

8          THE COURT:  I'm trying to get to my exhibit chart

9    because I have to mark this down.

03:33   10          MR. WEBB:  I'm wait.

11          (Brief pause.)

12          THE COURT:  Go ahead, please.

13          MR. WEBB:  2002, amended return is Defense

14   Exhibit 2084.

03:33   15          For the 2003 amended return, it's Defense

16   Exhibit 2085.

17          For the 2004 amended returns, it's 2086 -- Defense

18   Exhibit 2086.

19          For the 2005 amended return, it's Defendant's

03:34   20   Exhibit 2087.

21          For the 2006 amended returns, it's Defense

22   Exhibit 2088.

23          For the amended returns for 2007, it's Defense

24   Exhibit 2089.

03:34   25          For the 2008 amended returns, it's Defense

638

1    Exhibit 2090.

2           And for the 2009 amended returns, it's Defense

3    Exhibit 2091 -- Defense Exhibit 2091.

4           I offer those defense exhibits.

5           MR. SULLIVAN:  No objection.

6           THE COURT:  Each is received.

7           (Exhibits 2084, 2085, 2086, 2087, 2088, 2089, 2090

8    received in evidence.)

9           MR. WEBB:  May I approach the witness, Your Honor?

10          THE COURT:  Absolutely.

11   BY MR. WEBB:

12   Q.  Sir, I've now handed you the amended tax returns with the

13   exhibit numbers I just read in the record, and I don't think --

14   you had a chance to review those before you came here today so

15   that you could compare them to the original tax returns; is that

16   correct?

17   A.  That is correct.

18   Q.  And it was from that comparison that you were able to

19   accurately prepare Defendant's Exhibit 2092; is that correct?

20   A.  That is correct.

21          MR. WEBB:  So I offer Defense Exhibit 2092.

22          MR. SULLIVAN:  No objection.

23          THE COURT:  Received.

24          (Exhibit 2092 received in evidence.)

25          MR. WEBB:  And, James, can I call that up, please?

639

1  BY MR. WEBB:

2  Q.  This is small.  Mr. Miller, you write small.  Is that what

3  accountants do?

4         Can that be blown up at all?  Not really.

5  BY MR. WEBB:

6  Q.  I guess let's -- maybe James can kind of go along the

7  horizontal as you talk.  Why don't you explain what -- can you

8  explain what you have on your chart?

9  A.  The purpose of this schedule is to compare the amount of

03:35  10  federal income taxes paid on the originally filed return

11  compared to the amended tax return that was filed to include the

12  additional interest income on HSBC accounts.  And the columns

13  are from the years 2002 through the years 2009.

14         So, for example, in the first column in the year 2002

03:36  15  the federal income taxes paid on the original return was

16  $4,538,967.  The federal income taxes paid on the amended return

17  that was filed reflected a federal income tax liability of

18  $4,555,543.  The change in tax as a result of the filing of the

19  amended return was $16,576.

03:36  20         We then have computed the percentage of the tax that

21  was underpaid by dividing the change in the tax compared to the

22  originally filed return, and in that case it is .365 percent,

23  which is less than 1 percent.

24         If you look across the years to the final column,

03:37  25  which is the total taxes --

640

1  Q.  Let's -- we'll go across so the jury can see it.

2  A.  Okay.  In the year 2003 the federal income taxes paid on the

3  originally filed return was $5,730,000, on the amended return it

4  was $5,738,000.  The increase in tax was $7,000.  At this point

5  I'm rounding my numbers to the nearest thousand.  And the

6  percentage of tax that was underpaid was .135 percent.

7       In the year 2004 the originally filed return reflected

8  a tax liability of $7,700,000, the amended return reflected a

9  federal tax liability of $7,704,000.  The underpaid tax of less

10  than $4,000.  And the percentage of tax underpaid was .048

11  percent.

12       2008 taxpayer paid $4,771,000 on the originally filed

13  return.  The amended return reflected --

14  Q.  I think you said 2008.

15  A.  2005.

16  Q.  I think you want to just -- I think the jury now sees the

17  way you have the numbers.  If we go across for each year you've

18  done the same calculation to come up with the percentage; is

19  that correct?

20  A.  That is correct.

21  Q.  And if we go across the screen -- James, slowly, so the jury

22  can see it -- the percentages change from one year to the other;

23  is that correct?

24  A.  That is correct.

25  Q.  So if we come across to the last year and then go to the --

641

1   go all the way to the end, you've done a total so the jury can

2   see the total effect of the HSBC interest income not being

3   reported on Dr. Arvind Ahuja's tax returns; is that correct?

4   A.  That is correct.

03:39  5   Q.  Why don't you summarize the totals for those years based on

6   the comparison of the amended returns to the original returns.

7   A.  Over the eight-year period the federal income taxes reported

8   and paid on the original filed returns was $44,376,000; on the

9   amended returns the federal income taxes reported and paid was

03:39  10  $45,180,000, representing an increase in taxes paid over the

11  eight years on the amended returns of $804,000, which reflected

12  less than 2 percent, 1.8 percent of his total tax liability.

13          MR. WEBB:  May I have one second, Your Honor?

14          THE COURT:  Certainly.

03:40  15          (Defense counsel confer.)

16          MR. WEBB:  I have no more questions.  Thank you,

17  Mr. Miller.

18                  REDIRECT EXAMINATION

19  BY MR. SULLIVAN:

03:40  20  Q.  You said you are familiar with the charges in this case?

21  A.  In general terms.

22  Q.  And so do you realize that Dr. Ahuja is charged with filing

23  false tax returns that did not report all his income?

24  A.  I believe that to be true.

03:41  25  Q.  And with respect to chart, Defense Exhibit 2092, how much

642

1  unreported income did you add up for the years 2005 through

2  2009?

3  A.  One, I didn't report the amount of unreported income.  The

4  schedule that was just reviewed was the additional income taxes

5  that were due -- was due.  And I don't have the amount from 2005

6  to 2009.  I have it from 2002 to 2009.

7  Q.  Well, if you look at this chart, the years 2002, 2003, and

8  2004 show very little unreported tax, correct?

9  A.  About 26 or $7,000.

10  Q.  And so if you -- you don't know how much unreported income

11  Dr. -- how much income Dr. Ahuja did not report on his tax

12  returns for tax years 2005 through 2009?

13  A.  I do not -- we did not prepare the amended returns.

14  Q.  Would $2.7 million be in the ballpark?

15  A.  If the taxes -- unpaid tax is in the neighborhood of

16  $800,000 and he was paying at a 35 percent tax rate, that

17  2 1/2 million is possible.

18  Q.  And did you just testify that you never had a problem with

19  Dr. Ahuja's tax returns?

20  A.  I testified that I never had a reason to question the

21  information that was provided to us, that it was full and

22  complete.

23  Q.  Is a $2.7 million of unreported income -- is that a reason

24  to question or to -- does that indicate there was a problem with

25  those returns?

643

1          MR. WEBB:  Objection.  Argumentative.

2          THE COURT:  Objection sustained.

3    BY MR. SULLIVAN:

4    Q.  And if you look at the 2007 year on this chart, the

5    amount -- the percentage of tax underpaid is roughly

6    4.3 percent; do you see that?

7    A.  I do.

8    Q.  And then in 2008 it goes down to 1.8 percent.  Do you see

9    that?

10   A.  I do.

11   Q.  And then it goes up to 4.1 percent in 2009?

12   A.  I see that.

13   Q.  And does that indicate to you that there was just more

14   unreported income in 2007 on a percentage basis as opposed to

15   2008?

16   A.  No, it would not.

17   Q.  Why not?

18   A.  Because the percentage of tax, if your tax liability is much

19   lower in one year versus another due to income unaffected by the

20   unreported interest income, would affect that percentage.

21   Q.  But if you look at Defense Exhibit Number 2215, the effect

22   of federal tax rate for all three of these years is roughly

23   35 percent, isn't it?

24   A.  That is correct.

25   Q.  So the effective tax rate wouldn't affect the analysis,

644

1    would it?

2    A.  No.  I think it still would.  Because the base in which the

3    comparison is made is on -- for example, in the year 2007, the

4    percentage of tax is -- underreported is a percentage of roughly

5    $3 million of income, where in 2008 it's 10 million.  So if you

6    had the same amount of unreported income, that percentage would

7    be higher in 2007 because the base tax liability is less.

8    Q.  So these percentages have nothing to do with the amount of

9    unreported income; is that what you're saying?

10   A.  The percentages don't.  Percentages are percentages that --

11   changing the tax liability as a result of the amended return is

12   a percentage of the originally filed tax, which has factors

13   other than the tax on that interest itself.

14   Q.  Mr. Miller, in August of 2009, did you inform Dr. Ahuja of

15   the FBAR reporting requirements?

16            MR. WEBB:  Your Honor, this is repeating the direct

17   examination.  I object to repeating the direct examination.

18            THE COURT:  You should limit your redirect to the

19   scope of the cross.

20   BY MR. SULLIVAN:

21   Q.  On cross-examination did you indicate that you did not have

22   a very good recollection of the meeting in August of 2009?

23   A.  No, that's not what I testified.  I said I had a general

24   recollection of the meeting.

25   Q.  And I'm asking you in August of 2009, did you inform

645

1    Dr. Ahuja of the FBAR reporting requirements?

2    A.  I do not believe that I used the terminology "FBAR."  I

3    believe that I informed him that there were new strictly

4    enforced rules and penalties that failure to report foreign bank

5    or foreign financial accounts can result in substantial

6    penalties.

7    Q.  And when you testified before the grand jury, Exhibit 78,

8    page 17, line 24, do you recall being asked the following

9    question and giving the following answer:

10           "Question:  In August of 2008 you did inform him of

11   the FBAR reporting requirements?

12           "Answer:  That is correct."

13           Do you recall that testimony?

14   A.  I do.

15   Q.  And when you gave that testimony, Dr. Ahuja was not in the

16   grand jury room, was he?

17   A.  That is correct.

18   Q.  Sir, Mr. Miller, for tax years 2006 through 2009, who was

19   ultimately responsible for ensuring that all income was reported

20   on those returns -- on Dr. Ahuja's returns?

21   A.  The taxpayer is ultimately responsible for filing a complete

22   and accurate return.

23   Q.  So the taxpayer would be Dr. Ahuja?

24   A.  Well, it's also signed by Namie Namrata Ahuja.  It's a joint

25   return.

646

1      MR. SULLIVAN:  Could we get Government Exhibit 11 on

2  the screen?

3  BY MR. SULLIVAN:

4  Q.  Do you recall being asked questions about the Forms 1099

5  from Citibank?

6  A.  I do.

7      MS. SISKIND:  Your Honor, can we have the government

8  computer on the screen?

9  BY MR. SULLIVAN:

10  Q.  Do you recall all the questions about why did you treat this

11  as a U.S.-based bank account and not check the "No" box?

12  A.  I do.

13  Q.  And is it because you just assumed that this was a

14  U.S.-based account?

15  A.  That would be based upon my 31 years of experience or

16  however many it was at that time, that if a Form 1099 is

17  issued --

18  Q.  The question is:  Did you just assume that it was a

19  foreign-based account?

20  A.  A domestic-based account?

21  Q.  Did you just assume that this was just a U.S.-based account,

22  yes, U.S.-based account.  You just assumed it, right?

23  A.  No.  That's not correct.

24  Q.  Well, do you recall on page 42 you were asked:  "All right.

25  So it's fair to say that you just assumed that this was a

647

1    U.S.-based account?

2        "Answer:  Yes."

3        Do you recall that testimony?

4    A.  I believe my testimony also -- grand jury testimony

5    indicated that that was based on 31 years of experience.

6    Q.  And you didn't conduct any additional research into the

7    matter.  You just looked at the 1099 form, correct?

8    A.  I looked at who the payer was, being a U.S.-based financial

9    institution.  I looked at the address of the payer being in

10   New York, and I'm aware that U.S. financial institutions are

11   required to issue a Form 1099 if interest in excess of $10 a

12   year is paid, and I believe that institutions outside the United

13   States are not required to issue a 1099.  And, therefore, I

14   concluded that this was a U.S.-based account.

15   Q.  And do you specifically recall going through that analysis

16   or could it be the case that one of your staff accountants

17   actually just put this on the return without you looking at

18   this?

19   A.  No.  I would have done a review of the return.

20   Q.  And did you look at the bottom of the page of this document?

21   A.  I can't say that I looked at it.  It wouldn't necessarily be

22   something that my staff person or I in review of the return

23   would look at those items.  We're focused in on the interest

24   income that's being reported on the account.

25   Q.  So you just didn't notice that it said "Citibank NRI

648

1    Business"?

2    A.  I did not.

3    Q.  And at that time did you know what Citibank NRI meant?

4    A.  I did not, and I do not now.

5            MR. SULLIVAN:  No further questions, Your Honor.

6                    RECROSS-EXAMINATION

7    BY MR. WEBB:

8    Q.  I just have a couple questions.

9            Can you call that up?

10            MS. SISKIND:  Top half?

11            MR. WEBB:  Yes.  Thank you.  Thank you for doing that.

12    BY MR. WEBB:

13    Q.  Counsel just asked you whether you just assumed that this is

14    a U.S.-based account.  There is a list of who the payer is; is

15    that correct?

16    A.  That is correct.

17    Q.  Is there any doubt in your mind that that's a U.S.-based

18    bank?

19    A.  Citibank N.A.?

20    Q.  Yes.

21    A.  There's no doubt.

22    Q.  And as far -- by the way, you've explained what you said to

23    Dr. Ahuja about the enhanced focus on foreign bank accounts.

24    Did you say anything different in the grand jury about that?

25    A.  Not to my knowledge.

649

1          MR. WEBB:  I have no more questions.

2          MR. SULLIVAN:  One follow-up?

3          THE COURT:  One.  I'm counting.

4                    FURTHER REDIRECT EXAMINATION

5   BY MR. SULLIVAN:

6   Q.  Mr. Miller, the income was properly reported because it was

7   reported on a 1099, correct?

8   A.  Are you asking if I included this amount in the doctor's

9   taxable income for 2009?

10  Q.  You already testified that you did.  So the income was

11  properly reported, right?

12  A.  That is correct.

13  Q.  But you didn't know if that was really -- those were really

14  CDs that were invested over in India.  You just didn't know

15  that, did you?

16  A.  I believed because of the fact that there's a foreign tax

17  credit and an indication of India that the account held a

18  foreign investment in a financial institution located in the

19  United States.

20  Q.  But no one ever told you that those were CDs over in India;

21  is that correct?

22  A.  No.  And I'm not sure that that would have changed my

23  conclusion.

24          MR. SULLIVAN:  No further questions.

25          THE COURT:  That was three.

650

1           (General laughter.)

2           THE COURT:  Does the jury have questions of the

3    witness?  You are to write them out.  They are to be written and

4    handed to the bailiff.

03:53    5           A JUROR:  It's not a question of the witness but a

6    question about something --

7           THE COURT:  Any question you wish to raise has to be

8    written.

9           (Brief pause.)

03:54   10           THE COURT:  And any question that I will read has to

11   be directed to this witness who has to be competent to testify

12   with respect to the same.

13           (Jury questions tendered to the court.)

14           THE COURT:  Please approach.

03:55   15           (At side bar on the record.)

16           (Discussion off the record.)

17           THE COURT:  Do we have objections to either one of

18   these questions being asked by the court?

19           MR. SULLIVAN:  None from the government.

03:56   20           MR. WEBB:  I don't think this witness has knowledge

21   about -- the government chose to charge between 2006 and 2009,

22   but we filed amended returns, which we're required to do all the

23   way back to the time.  So there's no question that this witness

24   is not in a position to understand what the reason is for the

03:56   25   underpaid taxes, which is that there was a failure -- I object

651

1    to the question.

2         THE COURT:  You're saying that the witness is not

3    competent to testify to what is asked in that particular

4    question which is:  "What was the reason for underpaid taxes in

03:57  5    years 2002 to 2005 as shown in Exhibit 2092"?  Is that correct?

6         MR. WEBB:  Yes.  I don't know that he has the personal

7    knowledge to answer the question.

8         MR. SULLIVAN:  I disagree.  He probably knows

9    because -- oh, he didn't do amended returns so he might not

03:57  10    know.  I don't know.  I think we should ask him.

11         MR. WEBB:  I don't think we should ask him a question

12    that we don't think he has personal knowledge of.

13         THE COURT:  I will inquire whether or not he has

14    personal knowledge respecting the reasons for unpaid taxes for

03:57  15    years 2002 to 2005, and at that point I will inquire as to

16    whether it's a yes-or-no answer.

17         MR. WEBB:  I also don't know what the relevancy is.

18         THE COURT:  That's a different story.

19         MR. WEBB:  I'm just raising it because I don't know

03:57  20    what the relevancy is since they only charged 2006 to 2009.

21         THE COURT:  But didn't you just put in the tax returns

22    for 2002, 2003, 2004, and 2005?

23         MR. WEBB:  I did, Your Honor, to show the comparison.

24    Yes, I did.

03:58  25         MR. SULLIVAN:  Your Honor, it's entirely relevant

652

1    because if it's unreported income from these same accounts, then

2    it's just evidence that goes to willfulness.  It would be

3    similar to 404(b) evidence.  And under the 403 analysis, it is

4    not the type of evidence that's --

5            THE COURT:  Unfairly prejudicial.  It's not unfairly

6    prejudicial since you put it in.

7            MR. WEBB:  Well, I've made my objections, Your Honor.

8            THE COURT:  Now, there's another question that I

9    believe that I will not ask.  That will question is:  "Does the

10   grand jury have access to -- does the jury have access to the

11   grand jury report"?

12           The obvious answer is no.  I think they're talking

13   about the transcripts of the grand jury proceeding.  And this

14   witness is not competent to answer that question.

15           MR. WEBB:  I agree with Your Honor.

16           THE COURT:  So I will not ask it.

17           MR. SULLIVAN:  The government concurs.

18           THE COURT:  The defense has no objection to the third

19   question which is:  "Who provided the tax information to Kolb

20   before Branch was hired?"

21           MR. WEBB:  I don't object.

22           THE COURT:  All right.

23           (End of discussion at side bar.)

24                         JURY EXAMINATION

25   BY THE COURT:

653

1    Q.  Please listen carefully to the question.  Do you know the

2    reason for underpaid taxes in years 2004 to 2005 as shown on

3    Exhibit 2092?  Answer "yes" or "no."

4    A.  Yes.

5    Q.  What is the basis for that knowledge?

6    A.  The amended returns that were filed.

7    Q.  Who provided the tax information to Kolb before Mr. Branch

8    was hired for Dr. Ahuja?

9    A.  I do not remember.  My role --

10   Q.  If you do not remember, that's all you need to say.

11            THE COURT:  The parties may ask questions of the

12   witness within the scope of these questions that have been asked

13   by the court.  The court did not ask the latter question as it

14   has concluded that it would be inappropriate to do so under the

15   rules that apply to this case.

16                    FURTHER REDIRECT EXAMINATION

17   BY MR. SULLIVAN:

18   Q.  So are you saying that the jurors can just look at the

19   amended returns that are now in evidence and there will be an

20   explanation for the reason for the unreported income on those

21   returns?

22   A.  Yes, there would be.

23   Q.  Do you know what the unreported income comes from from 2004

24   and 2005?  Based on those amended returns.

25   A.  I could look at them.

654

1    Q.  Well --

2    A.  I believe it's to be interest income from HSBC accounts.

3    Q.  Offshore accounts?

4    A.  I believe so.

04:01  5                    FURTHER RECROSS-EXAMINATION

6    BY MR. WEBB:

7    Q.  Tell the jury what was the reason.

8    A.  I believe it was interest income earned on HSBC accounts

9    that was not previously reported.

04:02  10   Q.  And what was the reason for that?

11   A.  Because there was no 1099 that was received by our firm

12   knowing that the income existed.

13                    MR. WEBB:  Thank you.

14                    THE COURT:  You may step down.

04:02  15                   THE WITNESS:  Thank you.

16                    (Witness excused at 4:02 p.m.)

17                    THE COURT:  Do you have a witness ready at this time?

18                    MS. SISKIND:  Yes, Your Honor.  The United States

19   would call Special Agent Geoffrey Cook.

04:02  20                   THE REPORTER:  Raise your right hand, please.

21                      GEOFFREY COOK, GOVERNMENT WITNESS, SWORN

22                    THE REPORTER:  Please state your name and spell your

23   name for the record.

24                    THE WITNESS:  Geoffrey Cook, G-E-O-F-F-R-E-Y, last

04:03  25   name Cook, C-O-O-K.

                                                                    655

1                        DIRECT EXAMINATION

2    BY MS. SISKIND:

3    Q.  Good afternoon, Agent Cook.

4    A.  Good afternoon.

5           MS. SISKIND:  With the court's permission, can I bring

6    the witness the exhibits he'll need during his testimony?

7           THE COURT:  Absolutely.  Or he can get them himself,

8    if he wants to exercise his muscles.

9           (Brief pause.)

10   BY MS. SISKIND:

11   Q.  Agent Cook, can you tell the members of the jury how you are

12   employed?

13   A.  I'm a Special Agent with the IRS Criminal Investigation.

14   Q.  How long have you been an IRS Special Agent?

15   A.  My enter-on-duty date is September 24th, 2009.  So in

16   another month or so, it will be three years.

17   Q.  Can you describe your educational background, please?

18   A.  In 2005 I graduated from Fairfield University, cum laude,

19   with a bachelor's degree in accounting and minors in mathematics

20   and economics.  In 2009 I graduated from the University of

21   Colorado law school with my law degree.

22   Q.  And other than your undergraduate studies, do you have any

23   training or experience in tax or accounting?

24   A.  Yes, I do.

25   Q.  And what is that?

656

1    A.   In-between the period that I was enrolled at Fairfield

2    University and the University of Colorado, I worked for KPMG as

3    a federal tax associate.

4    Q.   And what kind of work would you do there?

5    A.   Prepare tax returns for large corporate clients.

6    Q.   And what type of training did you receive to become an IRS

7    Special Agent?

8    A.   I went through seven months of training at FLETC.

9    Q.   Can you spell what FLETC is?

10   A.   FLETC is F-L-E-T-C.  It stands for the Federal Law

11   Enforcement Training Center.  It's based in Glynco, Glynn

12   County, Georgia.

13   Q.   What kind of training do you receive there to become an IRS

14   Agent?

15   A.   Broadly speaking, we receive two different types of

16   training.  There's classroom training, and there's field

17   training.  The classroom training would go into things like

18   relevant statutes that we investigate and also applicable laws

19   such as the Constitution.  The field training would be how to

20   conduct interviews, how to conduct search warrants, how to

21   execute arrest warrants, that sort of thing.

22   Q.   What types of cases do you investigate?

23   A.   As an IRS CI Special Agent, we investigate violations,

24   potential criminal investigations of the internal revenue code,

25   which is Title 26 of the U.S. Code.  We also investigate

657

1  potential violations of other related financial violations -- of

2  other -- such as money laundering, wire fraud, identity theft.

3  And we assist in investigations -- the financial side of

4  investigations regarding public corruption, narcotics

5  violations, and that sort of thing.

6  Q.  And when you said IRS CI, is that IRS Criminal

7  Investigation?

8  A.  Yes.

9  Q.  Are you the IRS case agent assigned to the investigation of

10 Dr. Arvind Ahuja?

11 A.  Yes, I am.

12 Q.  Approximately when were you first assigned to that

13 investigation?

14 A.  June 2010.

15 Q.  Is that an approximate date?

16 A.  It is.  Certainly.

17 Q.  As part of your investigation of Dr. Ahuja, did you

18 interview witnesses?

19 A.  Yes, I did.

20 Q.  And have you reviewed documents?

21 A.  Yes, I have.

22 Q.  In general during the course of your duties as an IRS

23 Special Agent, how do you generally come to obtain documents in

24 the course of an investigation?

25 A.  Through the use of a subpoena.

658

1  Q.  And what's a subpoena?

2  A.  A subpoena is a document -- is an order from a court

3  saying -- asking for records or for testimony from a particular

4  individual or entity.

5  Q.  Now, turning to this case, can you tell the members of the

6  jury in what city and state the defendant resides?

7  A.  Greendale, Wisconsin.

8  Q.  To your knowledge, is the defendant a United States citizen?

9  A.  Yes, he is.

10  Q.  And do you know approximately how long he's been in this

11  country?

12  A.  Close to 40 years.

13  Q.  Where was he born?

14  A.  India.

15  Q.  Have you reviewed records relating to the defendant's

16  finances for the approximate time period 2006-2009?

17  A.  Yes, I have.

18  Q.  And have you reviewed documents relating to types of

19  investments that he made during that time period?

20  A.  Yes.

21  Q.  Please take a look at what's been marked as Government

22  Exhibit 58.  Do you recognize this document?

23  A.  Yes, I do.

24  Q.  What is it?

25  A.  This is a document from Texas Energy Holdings.  It is

659

1    instructions for investors and a subscription agreement.

2    Q.  Does this document relate to any particular investor?

3    A.  Yes, it does.

4    Q.  And to which investor does it relate?

04:08    5    A.  The defendant Dr. Arvind Ahuja.

6    Q.  And is there a date on this agreement?

7    A.  Yes, there is.

8    Q.  What's the date?

9    A.  February 16th, 2009.

04:08    10    Q.  How did you obtain this document?

11    A.  We sent a subpoena to Texas Energy Holdings.

12         MS. SISKIND:  Government moves to admit Exhibit 58.

13         MR. KIRSCH:  Objection.  Relevance and cumulativeness

14    of what's been testified to by Mr. Miller.

04:08    15         MS. SISKIND:  I believe it's the subject of a pretrial

16    motion, Your Honor.

17         THE COURT:  One second.

18         (Brief pause.)

19         THE COURT:  Approach.

04:09    20         (At side bar on the record.)

21         THE COURT:  Why is it irrelevant?

22         MR. KIRSCH:  Well, Your Honor, this was the subject of

23    an earlier motion by the court.  The government kind of plowed

24    through with Mark Miller.  We raised this in a pretrial motion,

04:10    25    and we asked that the witness Mark Miller not be permitted to

660

1    testify about Dr. Ahuja's investments that he was a day trader

2    and those sorts of things because they were irrelevant.  The

3    court reserved ruling on that issue.

4          The government plowed right through that on the direct

04:10  5    examination of Mark Miller.

6          Now, this document, which shows his trading and

7    investment habits is -- is cumulative to what Miller testified

8    to, and it's also irrelevant.

9          Number one and number two.

04:10  10          Number three, the witness has no personal knowledge to

11    these documents.  If the government is just going to have the

12    witness read documents that are admitted or in evidence --

13          THE COURT:  That's a different issue.  Why is it

14    irrelevant?  Particularly in light of the testimony that you

04:10  15    brought out concerning Dr. Ahuja's trading over the years.  You

16    brought it out during the examination of the accountant.

17          MR. KIRSCH:  No, Your Honor.  The government did that.

18    I think the government did that.  That's what I'm saying.  We

19    made a motion on this.  The government during its direct

04:11  20    examination plowed right through that despite the court's

21    earlier ruling.

22          THE COURT:  One at a time.

23          MS. SISKIND:  First, Your Honor, I thought Your Honor

24    had ruled when this came up that while Mr. Miller's testimony --

04:12  25          THE REPORTER:  Please begin your colloquy again.

661

1    MS. SISKIND:  First, Your Honor, this document was the

2  subject of a ruling already by this court.  The court reserved

3  the ruling on certain testimony of Mr. Miller, but found that

4  this document, Exhibit 58, was relevant.  The issue of the

5  defendant's investments was raised by both parties during

6  Mr. Miller's testimony.  It was highlighted by the summary chart

7  presented by the defense, which listed the sheer number of 1099s

8  and K-1s the defendant received.

9    THE COURT:  The objection is overruled.

10    The objection is overruled.

11    (End of discussion at side bar.)

12    MS. SISKIND:  Your Honor, may we admit Exhibit

13  Number 58?

14    THE COURT:  It's received.

15    (Exhibit 58 received in evidence.)

16  BY MS. SISKIND:

17  Q.  What is the title of the document that the jury is looking

18  at on the screen, focussing on the top of the page?

19  A.  "Texas Energy Holdings, Inc., North Texas Drilling Program,

20  Instructions to Investors and Subscription Agreement."

21  Q.  And if we turn to the next page, do you see the subscription

22  agreement?

23  A.  Yes, I do.

24  Q.  Can you just, without reading the first paragraph, summarize

25  what's going on in this agreement?

662

1    MR. KIRSCH:  Your Honor, I'm going to object.  It

2  stands for itself.  The witness has no --

3    THE COURT:  The objection is sustained.

4  BY MS. SISKIND:

04:13  5  Q.  I'm going to direct your attention to the third page of this

6  exhibit.  Do you see a paragraph number 4?

7  A.  Yes, I do.

8  Q.  Can you read the line of handwriting on paragraph 4?

9  A.  "Neurosurgeon, occupation.  Personally run most of my own

04:13  10  investments.  Have numerous oil and gas programs in place."

11  Q.  And if you go two more pages into the exhibit, to the page

12  that says page 5 of 12 at the bottom, do you see a signature?

13  A.  Yes, I do.

14  Q.  And what, if any, printed name appears next to the

04:14  15  signature?

16  A.  Dr. Arvind Ahuja.

17  Q.  And on what date was this document signed?

18  A.  3/20/09.

19  Q.  Now, have you reviewed records relating to domestic bank

04:14  20  accounts maintained by the defendant at HSBC?

21  A.  Yes, I have.

22  Q.  Have you reviewed records relating to domestic bank accounts

23  maintained by the defendant at any other financial institution?

24  A.  Yes, I have.

04:14  25  Q.  At what bank in this country does the defendant maintain the

663

1   majority of his accounts?

2   A.  US Bank.

3   Q.  Is that a local bank here in Milwaukee?

4   A.  Yes, it is.

5         MR. KIRSCH:  Your Honor, I'm going to object to the

6   basis for that.  Most of his accounts.  I have no idea what

7   that's based on.  I object to foundation.

8         THE COURT:  I'll let the answer stand.  You may cross

9   if you wish.  Proceed.

10  BY MS. SISKIND:

11  Q.  Can you turn to what's already in evidence as Government's

12  Exhibit 72?  What is Government Exhibit 72?

13  A.  These are bank statements from HSBC-USA.

14  Q.  Do they pertain to a particular accountholder?

15  A.  Yes.

16  Q.  Which accountholder would that be?

17  A.  Arvind Ahuja.

18  Q.  Flipping through this exhibit, can you tell the jury the

19  range of dates that is covered by these statements?

20  A.  Yes.  It begins November 27th, 2003, and ends

21  on August 12th, 2008.

22  Q.  To your knowledge, did HSBC-USA provide the government with

23  any statements earlier than November 27th, 2003?

24  A.  No.

25  Q.  Now, I want you to go to the statement for October 27 of

664

1  2005 to November 25th, 2005, which is page 26.  In the computer

2  it's Bates number ending 28052.  Do you have that?

3  A.  Yes, I do.

4  Q.  Do you see a transaction for November 3rd, 2005?

5  A.  Yes.

6  Q.  Can you describe what this transaction refers to?

7  A.  It's a wire transfer.

8          MR. KIRSCH:  Your Honor, I'm going to object.  Can we

9  approach?

10          THE COURT:  Certainly.

11          (At side bar on the record.)

12          MR. KIRSCH:  Your Honor, I'm going to make an

13  objection to this line of testimony as improper.  The

14  government --

15          THE COURT:  What in particular are you referring to "a

16  line of testimony"?  Any inquiry of the witness respecting what?

17          MR. KIRSCH:  Well, I think what the government is

18  doing is trying to make a closing argument through this witness.

19  They've put a witness on the witness stand --

20          THE COURT:  It's clear that he's a summary witness.

21          MR. KIRSCH:  Right.  And he's just reading from

22  selective documents that have been admitted in evidence.  The

23  documents stand for themselves.  The government can't just call

24  a witness to just read selective documents in evidence.  It's a

25  closing argument.  They can do that at closing, but this witness

04:16 (line 5)
04:16 (line 10)
04:17 (line 15)
04:17 (line 20)
04:17 (line 25)

665

1    has no personal knowledge of the information contained in these

2    documents.  All he can do is read them, and that's improper

3    through this witness.

4              MS. SISKIND:  Your Honor, during the testimony of

5    Vandana Katju, the defense cross-examined her by, among other

6    things, showing her one wire transfer transaction out of these

7    bank records.

8              THE COURT:  The government may proceed.  The objection

9    is overruled.

10              (End of discussion at side bar.)

11              THE COURT:  Overruled.

12    BY MS. SISKIND:

13    Q.  We were looking at the transaction for November 3rd of 2005.

14    Do you see that?

15    A.  Yes, I do.

16    Q.  Can you describe what is happening with this transaction, to

17    the best of your knowledge?

18    A.  $1 million is being wired into this HSBC-USA account from an

19    account at US Bank in Wisconsin from Arvind Ahuja.

20    Q.  Do you see a transaction from four days later on

21    November 7th of 2005?

22    A.  Yes, I do.

23    Q.  And what is the nature of that transaction?

24    A.  $1 million is being wired to India for placement of a new

25    FCNR deposit.

666

1  Q.  Now, in the November 7 of 2005 transaction, do you see an

2  account number ending with the numbers 4417?

3  A.  Yes, I do.

4  Q.  Based on your investigation, do you know what that account

5  number is?

6  A.  Yes, I do.

7  Q.  What is it?

8          MR. KIRSCH:  Objection.  Foundation.

9          THE COURT:  What is the foundation?

10          MS. SISKIND:  He's conducted an investigation --

11          THE COURT:  He has to demonstrate some foundation for

12  his testimony.  You may proceed and establish whether or not

13  there's a foundation for him to respond to the question before

14  the question can be answered.  Proceed.

15  BY MS. SISKIND:

16  Q.  During the course of your investigation, have you become

17  familiar with account numbers associated with the defendant's

18  HSBC-India accounts?

19  A.  Yes, I have.

20  Q.  Have you also become familiar more generally with account

21  numbers relating to HSBC-India?

22  A.  Yes, I have.

23  Q.  And what is your familiarity with the account number ending

24  4417?

25          MR. KIRSCH:  Objection.  Foundation.  Could call for

667

1    hearsay.  Objection.

2         THE COURT:  Rephrase.

3    BY MS. SISKIND:

4    Q.  Do you know what the account number ending 4417 is used for?

5    A.  Yes, I do.

6         MR. KIRSCH:  Objection.  Foundation.

7         THE COURT:  I won't sustain the objection as raised,

8    but I will require that another question be asked.  There's

9    another basis for the court's ruling.

10   BY MS. SISKIND:

11   Q.  When -- based on your investigation, when individuals would

12   wire transfer funds to HSBC-India, did those funds go directly

13   to accounts in their name?

14        MR. KIRSCH:  Objection.  What customers?  And

15   Your Honor -- objection.

16        THE COURT:  The objection is sustained.

17   BY MS. SISKIND:

18   Q.  Do you know whether the account number ending 4417 is

19   associated with the defendant personally?

20        MR. KIRSCH:  Objection.  Leading.  And foundation.

21        THE COURT:  Overruled.

22        THE WITNESS:  Yes, I do know.

23   BY MS. SISKIND:

24   Q.  And is this account number associated with the defendant?

25        MR. KIRSCH:  Objection, Your Honor, foundation.

668

1    There's no foundation.  Objection.

2              THE COURT:  One objection is fine.  Sustained.

3    BY MS. SISKIND:

4    Q.  I want you to turn to another wire transfer.  If you look at

5    the statement -- it's on page 45, the entire exhibit, the

6    statement that starts February 27, 2007.  Do you have that?

7    It's Bates number 28071.

8    A.  Yes, I do.

9    Q.  Do you see a set of transactions that occurred on March 5th,

10   2007 and March 16th, 2007?

11   A.  Yes, I do.

12   Q.  And what is the nature of those transactions?

13   A.  On March 5th, $500,000 is wired into Dr. Ahuja's HSBC-USA

14   account from a US Bank account.  On March 16th, 2007 $500,000 is

15   wired to an HSBC-India account for further credit to Arvind

16   Ahuja, customer number for placement of a new FCNR USD for

17   367 days with HSBC-New Delhi.

18   Q.  Do you see a customer number referenced in the middle of

19   that wire instruction?

20   A.  I do.

21   Q.  What are the last four digits?

22   A.  0702.  07002.  7002.

23   Q.  Just the last four digits of the account numbers.

24              In reviewing the bank statements in Exhibit 72, were

25   the two transactions we just talked about the only wire

669

1    transfers referenced in these bank statements?

2    A.  No.

3    Q.  I'm going to have you take a look at what's been marked for

4    identification as Government Exhibit 68.  And do you

5    recognize -- you can take it off the screen.  I don't think it's

6    in evidence yet.

7            What is Government Exhibit 68?

8    A.  This is a summary chart that I prepared.

9    Q.  And what does this chart summarize?

10   A.  Wire transfers from Dr. Ahuja's HSBC-USA account to

11   Dr. Ahuja's HSBC-India accounts.

12           MR. KIRSCH:  Your Honor, I'm going to object to the

13   characterization.  It's not what's been established with this

14   witness.  I object.

15           THE COURT:  I'll look at it closely.

16           (Brief pause.)

17           THE COURT:  Objection sustained.

18   BY MS. SISKIND:

19   Q.  What is the title of the summary, Agent Cook?

20   A.  "Wire Transfers From HSBC-USA to HSBC-India."

21   Q.  Is this summary a fair and accurate depiction of wire

22   transfers from Exhibit 72 between the defendant's HSBC-USA

23   account and HSBC-India?

24   A.  Yes, it is.

25           MS. SISKIND:  Government moves to admit Exhibit 68.

670

1      MR. KIRSCH:  I'm going to object.

2      THE COURT:  Please approach.

3      (At side bar on the record.)

4      MR. KIRSCH:  Your Honor, I don't know what this is

5  purporting to show.  I also don't know what "memo" means.  I

6  don't know what that means "memo."

7      MS. SISKIND:  I can have the agent explain it further

8  before he admits it.  I can proffer that it's taken from the

9  wire transfer instructions in each thing.  There's nothing on

10  here that doesn't come from Exhibit 72.

11      THE COURT:  I sustained the objection because I note

12  that this refers to HSBC Bank's Swift.  Doesn't say "India."

13  All of these references on the memo are not to India.

14      MS. SISKIND:  I understand, Your Honor.  Let me take a

15  look at that wire transfer instruction and see if there's

16  something there.

17      THE COURT:  What does "memo" mean; do you know?

18      MS. SISKIND:  What is written -- the text of the wire

19  transfer instructions.

20      THE COURT:  All right.

21      MR. KIRSCH:  I object to the characterization of the

22  bank records that are in evidence.  Also, Your Honor, I circled

23  "Swift."  I don't know what country.  I never heard of "Swift."

24      MS. SISKIND:  I don't think "Swift" is a country,

25  Your Honor.

671

1          THE COURT:  Do you need a couple moments?

2          MS. SISKIND:  After the word "Swift" it says,

3  "HSBC-IN."  HSBC-India.

4          MR. KIRSCH:  Your Honor, I'd just also note that this

04:26    5  is HSBC-India's account.  That's not what's been established.

6  They have the bank records.  They don't need a summary exhibit

7  for this.

8          THE COURT:  I'll give you a couple moments.  I'll give

9  you a short break.

04:26   10          MS. SISKIND:  I can just take him through the wire

11  transfers instead of using the chart.

12          THE COURT:  Proceed.

13          (End of discussion at side bar.)

14          THE COURT:  The objection is sustained.

04:27   15  BY MS. SISKIND:

16  Q.  Can you go back to Exhibit 72, the bank records.

17  A.  Yes.

18  Q.  I want to take a look at -- we looked at two wire transfers

19  already.  I want to look at a third.  If we could go -- court's

04:27   20  indulgence.

21          If you could go to the Bates number ending 28069?  Do

22  you have that?

23  A.  I do.  It appears that they're a little out of order.

24  Q.  All right.

04:28   25  A.  Yes, I do.

672

1  Q.  And do you see a transaction on January 29th, 2007?

2  A.  Yes, I do.

3  Q.  What is the nature of that transaction?

4  A.  A $425,000 wire transfer from US Bank Milwaukee to this

5  HSBC-USA account.

6  Q.  And what, if anything, happened on January 31st, 2007 with

7  respect to this account?

8  A.  There's a wire transfer of $500,000 to HSBC-India Mumbai,

9  Arvind Ahuja, for placement of a new FCNR U.S. deposit for

10 367 days with HSBC New Delhi.

11 Q.  If you could go to the statement for June 26th, 2007, it's

12 Bates number ending 28076.  Do you see a transaction on

13 July 25th, 2007?

14 A.  Yes, I do.

15 Q.  What happened on that date?

16 A.  $400,000.  There was a wire transfer of $400,000 into this

17 account from a US Bank account in the name of Arvind Ahuja and

18 Namrata Ahuja.

19 Q.  Can you turn to the next statement, which is Bates number

20 ending 28007, the statement for July 26th, 2007 through

21 August 23rd, do you see a transaction on July 30th of that year?

22 A.  Yes, I do.

23 Q.  What, if anything, happened in that transaction?

24 A.  There's a wire transfer for $400,000 from this bank account

25 to New Delhi in the name of Arvind Ahuja for four new NRO

673

1    deposits for USD for $100,000 each for 400 days with

2    HSBC-New Delhi.

3    Q.  If you could go to the statement for October 25th through

4    November 27th, 2007.  It's page 28082.  Do you see a transaction

04:30  5    on November 6, 2007?

6    A.  Yes, I do.

7    Q.  What happened in that transaction?

8    A.  There was a wire transfer into this account of $500,000

9    originating from US Bank Arvind Ahuja and Namrata Ahuja.

04:30  10   Q.  What, if anything, happened the next day?

11   A.  There was a $500,000 wire transfer out of this account to

12   Arvind Ahuja HSBC-India for a placement of five new NRO deposits

13   for USD 100,000 cash for 731 days with HSBC-New Delhi.

14   Q.  If you go to the statement for March 26, 2008 through

04:30  15   April 23rd, 2008, and look at the second page of that statement,

16   which is Bates number 28091.  Do you see a transaction on

17   April 16, 2008?

18   A.  Yes, I do.

19   Q.  And what is the nature of that transaction?

04:31  20   A.  There is a $550,000 wire transfer into this account.

21   Source, US Bank, Arvind Ahuja and Namrata Ahuja.

22   Q.  What, if anything, happened the next day on April 17th,

23   2008?

24   A.  There was a $500,000 wire transfer out of this account to

04:31  25   HSBC-India, beneficiary Arvind Ahuja, for placement of INR NRO

674

1    CTD deposit in units of INR 45 lacs, L-A-C-S, each for 400 days

2    with HSBC New Delhi.

3    Q.  Now, the last wire transfers I want to ask you about are on

4    the statement for May 24th to June 24th of 2008, which is

5    page 28093.

6    A.  Okay.

7    Q.  Do you see a transaction for June 16th of 2008?

8    A.  Yes, I do.

9    Q.  And what happened on that date?

10   A.  $750,000 was wire transferred into this account, originating

11   US Bank, Arvind Ahuja, Greendale, Wisconsin.

12   Q.  What, if anything, happened the next day on June 16th, 2008?

13   A.  $750,000 was transferred out of this account for placement

14   of INR NRO CTD deposits in units of INR 1 crore, each for two

15   years with HSBC New Delhi India.  Crore is spelled C-R-O-R-E.

16   Q.  And do you know what a crore is as it relates to currency

17   generally?

18   A.  Yes, I do.

19   Q.  What is it?

20   A.  10 million, I believe.

21   Q.  10 million of what?

22   A.  In this instance rupees.

23   Q.  The account statements we were just looking at for the --

24   what account were those for?

25   A.  This was for the HSBC-USA Premier account.

675

1    Q.   Is the defendant's HSBC-USA account still open?

2    A.   No, it is not.

3    Q.   If we could go to what I believe is already in evidence as

4    Exhibit 50, the letter is short.  So can you please -- starting

5    with the top with, "The manager," can you read it to the jury?

6    A.   "The manager" --

7               MR. KIRSCH:  Your Honor, I'm going to object.  He

8    can't do anything but read this.  It's cumulative.  We've

9    already read it to the jury.

10              THE COURT:  In the interests of time, the jury can

11   read it.  Proceed.

12   BY MS. SISKIND:

13   Q.   Do you see a date on that exhibit?  Looking at the bottom of

14   the page.

15   A.   Yes, I do.

16   Q.   And what is the date on there?

17   A.   July 24th, 2008.

18   Q.   Do you know approximately when the defendant closed his

19   HSBC-USA account?

20   A.   Yes, I do.

21   Q.   And when did that happen?

22   A.   Around July 2008.

23   Q.   Now, have you reviewed screen shots of bank records in this

24   case?

25   A.   Yes, I have.

676

1    Q.  In reviewing those screen shot records, did you see screen

2    shots reflecting certificates of deposit held by the defendant

3    after July of 2008?

4    A.  Yes, I did.

04:35    5    Q.  Other than those screen shots, more generally have you

6    reviewed records relating to the defendant's HSBC-India account?

7    A.  Yes, I have.

8    Q.  Did you receive those records from the bank in India?

9    A.  No, I did not.

04:35    10    Q.  How did you receive them?

11    A.  We received them because they were stored in the United

12    States, so the HSBC-USA provided them to us.

13    Q.  In response to any particular request?

14    A.  A subpoena.

04:35    15    Q.  In terms of the documents you received from the subpoena,

16    can you tell by looking at a document if it came from that

17    production?

18    A.  Yes.

19    Q.  And how can you tell that?

04:35    20    A.  On the lower right corner of each sheet of paper, there is a

21    number that we call a Bates stamp, and it's usually some letters

22    followed by some numbers that describes where we got it.  And

23    that describes where we got it.

24    Q.  If we could put up Exhibit 50 on the screen again for a

04:35    25    moment.  Looking at the lower right-hand corner of the page, do

677

1    you see something that relates to what you were just talking

2    about?

3    A.  Yes, I do.

4         THE COURT:  For clarity, would you spell Bates?

5         THE WITNESS:  B-A-T-E-S.

6    BY MS. SISKIND:

7    Q.  And is this the type of Bates number that you associate with

8    the production from HSBC?

9    A.  Yes, it is.

10   Q.  Are there any other Bates numbers you associate with that

11   production?

12   A.  Yes.

13   Q.  And what would that be?

14   A.  HSBC-DOJ.

15   Q.  Were you able to review bank statements for the defendant's

16   HSBC-India account?

17   A.  No, I was not.

18   Q.  Why not?

19   A.  The bank records are located in India.

20   Q.  Were any statements --

21        MR. KIRSCH:  Your Honor, I'm going to object.

22   Personal knowledge.

23        MS. SISKIND:  I'll ask a different question.

24        THE COURT:  All right.  The response is stricken, and

25   it must be disregarded.  Please proceed.

678

1    BY MS. SISKIND:

2    Q.   Among the records produced to the government by HSBC, which

3    I believe you testified were maintained in the United States,

4    did those records contain any statements for the defendant's

5    bank accounts at HSBC-India?

6    A.   No, they did not.

7    Q.   When you -- did you attempt to calculate the amount of funds

8    that the defendant had in his bank accounts at HSBC-India?

9    A.   Yes, I did.

10   Q.   Can you take a look at Government Exhibit 69.  Do you

11   recognize the first page of Exhibit 69?

12   A.   Yes, I do.

13   Q.   And what is it?

14   A.   This is a summary chart that I prepared for the high

15   balances in Ahuja's HSBC-India accounts.

16   Q.   Does it relate to any particular years?

17   A.   Yes.

18   Q.   To what years?

19   A.   2006, '7, '8, and '9.

20   Q.   Is this summary a fair and accurate depiction of your

21   calculations of the high balances in the defendant's HSBC-India

22   accounts for those years?

23   A.   Yes, it is.

24   Q.   And if while you're on cross-examination the defense

25   attorneys point out any errors in your calculations, are you

679

1    willing to fix those?

2    A.   Of course.

3            MS. SISKIND:   Government moves to admit the first page

4    of 69.   I believe the rest is in evidence already.

5            MR. KIRSCH:   Your Honor, I have no objection to the

6    chart itself.   I have an objection to the characterization on

7    the top of the chart.   But I have no objection to where it says,

8    "Year," "Approximate High Balance," and "Source."   That I have

9    no objection to.

10           THE COURT:   It's received over the objection.

11           (Exhibit 69 received in evidence.)

12   BY MS. SISKIND:

13   Q.   So let's take a look at that chart.   If you could start out

14   by telling the jurors how it is that you calculated the

15   approximate high balance for each year.

16   A.   The first thing that I did is I looked at all the screen

17   shots that we had received for Dr. Ahuja's accounts in India,

18   and I entered them all into Microsoft Excel so I was able to

19   sort them by account number, currency type, the date the screen

20   shot was taken.

21           And once I had done that, I was able to sort them.

22   And I sorted them by account number, by the date of the screen

23   shot, and also by the currency, and what I was able to

24   approximate using currency exchange rates for 12/31 of each year

25   is the high balance for 2006 through 2009.

680

1    Q.  Now, before I go through the numbers with you, are you

2    familiar with something called an FBAR?

3    A.  Yes, I am.

4    Q.  During the course of your duties as an IRS Special Agent,

5    have you become familiar with what the purpose of an FBAR is?

6    A.  Yes.

7    Q.  What is the purpose of an FBAR?

8            MR. KIRSCH:  Objection.  Relevance.

9            THE COURT:  Overruled.

10           THE WITNESS:  To disclose an interest in foreign

11   accounts to the U.S. Government.

12   BY MS. SISKIND:

13   Q.  Who is required, if you know, to file an FBAR?

14   A.  U.S. taxpayers that have offshore accounts that total more

15   than $10,000 in aggregate at any point during the year.

16   Q.  And when you say "in aggregate," what do you mean?

17   A.  I mean, you can have one account that's worth $11,000, you

18   can have 11 accounts that are worth $1,000, and that would

19   trigger the filing requirement.

20   Q.  So taking a look at this chart, based on your calculations,

21   what was the approximate high balance across the defendant's

22   HSBC-India accounts during the year 2006?

23   A.  $5,343,246.86.

24   Q.  And how about 2007?

25   A.  $8,695,095.12.

681

1    Q.   2008?

2    A.   $8,416,363.43.

3    Q.   And 2009.

4    A.   $8,760,948.35.

04:41  5    Q.   And what is the significance of the source column at the

6    right-hand side of this chart?

7    A.   These are the Bates numbers that we were just speaking

8    about.  They reference the screen prints that I used to compile

9    this chart.

04:41  10   Q.   And are all the screen prints referenced that you in this

11   chart used -- are those contained in Exhibit 69 following this

12   chart?

13   A.   Yes.

14   Q.   How are the funds in the defendant's HSBC-India account

04:41  15   invested?

16   A.   They were invested in a variety of ways, mostly in

17   certificates of deposit.

18   Q.   And those are referred to as CDs?

19   A.   Yes.

04:41  20   Q.   Do CDs generate interest income?

21   A.   Yes, they do.

22   Q.   Did you review any e-mails or letters from the defendant on

23   the subject of CDs?

24   A.   Yes, I did.

04:41  25   Q.   If we can look at what already is in evidence as Exhibit 29.

682

1    Is this one of those e-mails?

2    A.  Yes, it is.

3    Q.  And without going through the whole e-mail, do you see a

4    question contained within the e-mail that's at the bottom of the

5    page?

6    A.  Yes, I do.

7    Q.  What is the question?

8    A.  "Is there a CD due June 14th?  Thanks."

9    Q.  And from what e-mail address was this question sent?

10   A.  Aahuja3803@aol.com.

11   Q.  And is the e-mail signed in any way?

12   A.  Yes.

13   Q.  What does it say?

14   A.  Under the question, it says, "Let me know thanks, AA."

15   Q.  Can you take a look at what is already in evidence as

16   Government Exhibit 20?

17   A.  Yes.

18   Q.  What is Government Exhibit 20?

19   A.  These are letters from 2005 that reference FCNR deposits

20   with HSBC India.

21   Q.  What are FCNRs?

22   A.  Foreign currency non-residents.

23   Q.  Looking at the second page of this exhibit, Bates

24   number 27700, do you have that?

25   A.  Yes, I do.

683

1   Q.   What is the dollar amount in U.S. dollars of the CD at issue

2   in this letter?

3   A.   $1 million.

4   Q.   And if you go down to the last paragraph, do you see an

5   account number referenced?

6   A.   Yes, I do.

7   Q.   Can you make out what the last four digits of that account

8   number are?

9   A.   7002-256.

10  Q.   Does this letter bear signatures?

11  A.   Yes, it does.

12  Q.   And what names are typed underneath the signatures?

13  A.   Dr. Arvind Ahuja and Namrata Ahuja.

14  Q.   Go to the next page of this exhibit, do you see a similar

15  letter?

16  A.   Yes, I do.

17  Q.   Does this letter also appear to be signed by the defendant

18  and his wife?

19  A.   Yes.

20  Q.   And what is the first paragraph of the letter say?

21  A.   "I have placed an amount of USD 1.8205 million on June 17th,

22  2005 in an FCNR deposit with a maturity date of June 19, 2006,

23  under FCNR account with a HSBC-India's New Delhi branch."

24  Q.   What is the date the on that letter?

25  A.   August 9th, 2005.

684

1    Q.  When you were reviewing the screen shots in this case, did

2    you find references to the two FCNR deposits referenced in these

3    August 9th, 2005 letters?

4    A.  Yes, I did.

5    Q.  And what did you find?

6    A.  I found that there were two deposits in these amounts,

7    $1 million and $1.8205 million with the maturity dates

8    referenced on these letters.

9    Q.  And in the screen shots, did those deposits pertain to the

10   same account number that's referenced in the letters?

11   A.  Yes.

12   Q.  What interest rates was the defendant receiving on his CD

13   investments with HSBC-India?

14   A.  It varied.  It was anywhere from 3 percent to 10.8 percent.

15   Q.  I want to have you take a look at what is already in

16   evidence as Government Exhibit 82.  What is Government

17   Exhibit 82?  How many pages are in it, first?

18   A.  There are two pages.

19   Q.  And starting with the first page, what is this?

20   A.  The first page, it is a letter.

21   Q.  Directed to anyone in particular?

22   A.  The manager, HSBC-NRI Services USA.

23   Q.  Does the letter bear signatures?

24   A.  Yes, it does.

25   Q.  And what names are typed below the signatures?

685

1    A.   Arvind Ahuja, Namrata Ahuja.

2    Q.   And what is the subject of this letter?

3    A.   "NRO CD Encashment Requests, 7002."

4    Q.   And in the body of the letter, do you see a list of CD

04:46   5    numbers and maturity dates?

6    A.   Yes, I do.

7    Q.   If we go to the next page, do you see another letter here?

8    A.   Yes, I do.

9    Q.   And do you see signatures on this page?

04:46   10   A.   Yes.

11   Q.   What names appear below the signatures?

12   A.   Arvind Ahuja, Namrata Ahuja.

13   Q.   And what is the date of this letter?

14   A.   8 October 2009.

04:47   15   Q.   Do you also see CD numbers referenced in this letter?

16   A.   Yes, I do.

17   Q.   Were you able to locate these CD numbers in the screen

18   shots?

19   A.   Yes, I was.

04:47   20   Q.   And were you able to calculate the approximate value of the

21   certificates of deposit referenced in this letter?

22   A.   Yes.

23   Q.   And approximately what was the value of all of the

24   deposits -- all 35 CDs referenced in these two letters?

04:47   25   A.   Slightly more than $3 million.

686

1    Q.   And have you take a look at -- I'm sorry.

2         Looking back at the first page of Exhibit 82, can you

3    just read the one line of text that appears under the subject?

4    A.   "With reference to the captioned subject request you to

5    encash the following CDs on maturity and credit them to the NRO

6    savings account number 6905007 in the name of Namrata Ahuja."

7    Q.   And is the letter on the next page making a similar request?

8    A.   Yes.

9    Q.   In reviewing the bank records produced by HSBC regarding the

10   defendant, did you see any letters or other documents regarding

11   transfers of funds from the defendant's HSBC-India account?

12   A.   Yes, I did.

13   Q.   Let's look at what's in evidence as Government Exhibit 80.

14   What is Government Exhibit 80?

15   A.   It's a letter.

16   Q.   Addressed to whom?

17   A.   The manager, HSBC-NRI Services.

18   Q.   And who is it from?

19   A.   Dr. Arvind Ahuja.

20   Q.   Do you see a date on this letter?

21   A.   Yes, I do.

22   Q.   And what is the date on this letter?

23   A.   28 January 2008.

24   Q.   What is the subject that this letter relates to?

25   A.   Issuance of cashier's order.

687

1  Q.  And can you read the body of the letter?

2  A.  Yes, I can.

3  Q.  And what does it say?

4  A.  "With reference to the above subject, you are" --

5          THE COURT:  The jury can read it.

6  BY MS. SISKIND:

7  Q.  Now, do you see a reference to 20 million rupees in the body

8  of this e-mail?

9  A.  Yes, I do.

10  Q.  Prior to testifying today, did you perform some currency

11  calculations for foreign currencies to determine their value in

12  U.S. dollars?

13  A.  Yes, I did.

14  Q.  And can you take a look in that connection at Exhibit 91.

15          THE COURT:  Approach.

16          (At side bar on the record.)

17          THE COURT:  The witness was asked whether or not he

18  had made certain calculations.  It's unclear when in time those

19  calculations were made, and inasmuch as currency rates and

20  exchanges fluctuate dramatically from time to time -- I have a

21  concern.

22          MS. SISKIND:  I'll lay a better foundation,

23  Your Honor.

24          THE COURT:  All right.

25          MS. JOHNSON:  You made reference to 91.

688

1    MS. SISKIND:  I think I gave it to your clerk this

2  morning.

3    THE COURT:  Thank you.

4    (End of discussion at side bar.)

5    THE COURT:  You may proceed.  I do need to talk to

6  counsel about the list I just received.

7  BY MS. SISKIND:

8  Q.  Do you have Exhibit 91 in front of you?

9  A.  Yes, I do.

10  Q.  What is Exhibit 91?

11  A.  It is a summary of currency conversions that I made related

12  to specific transactions.

13  Q.  When did you perform these calculations?

14  A.  Recently in preparation for this trial.

15  Q.  Approximately within the last week?

16  A.  Approximately, yes.

17  Q.  When you -- and does this chart relate to any particular

18  transactions?

19  A.  Yes, it does.

20  Q.  And does it relate to particular government exhibit numbers?

21  A.  Yes, it does.

22  Q.  When you were doing the currency conversions, how did you

23  decide what interest -- what conversion rate to use?

24  A.  I used a historical interest rate on the date of the

25  transaction that we were looking at.

689

1    Q.  So, for example, Exhibit 80 referring to a transaction on

2    January 28th, 2008, what currency exchange rate would you have

3    used?

4    A.  The currency exchange rate between Indian rupee and

5    U.S. dollar on January 28th, 2008.

6            MS. SISKIND:  Your Honor, the government moves to

7    admit the currency conversions in Exhibit 91.

8            THE COURT:  Received.

9            (Exhibit 91 received in evidence.)

10   BY MS. SISKIND:

11   Q.  Based on your calculations, what is the value -- if we could

12   go back to Exhibit 80 and have that on the screen.

13            MS. JOHNSON:  Yes.

14   BY MS. SISKIND:

15   Q.  Based on your currency calculations as contained in

16   Government Exhibit 91, what is the value of the -- what was the

17   value as of January 28th, 2008 of the 20 million rupees that

18   Dr. Ahuja wanted to be transferred to Oxus Fund Management?

19   A.  $508,260.

20   Q.  If we could go to what is already in evidence as Government

21   Exhibit 3.  What is Government Exhibit 3?

22   A.  It is a letter to the manager, HSBC-NRI Services.

23   Q.  From whom?

24   A.  Dr. Arvind Ahuja.

25   Q.  And what's the date on the letter?

690

1   A.   13 February 2008.

2   Q.   What's the subject?

3   A.   Issuance of cashier's order.

4   Q.   Do you see a reference in this letter to 10 million Indian

5   rupees?

6   A.   Yes, I do.

7   Q.   Did you calculate the value in U.S. dollars of 10 million

8   rupees as of February 13th, 2008?

9   A.   Yes, I did.

10   Q.   And is that contained in your chart in Exhibit 91?

11   A.   Yes, it is.

12   Q.   What is the -- as of February 13th, 2008, what was the value

13   of the 10 million Indian rupees that the defendant was directing

14   be transferred to Oxus Fund Management?

15   A.   $252,210 U.S. dollars.

16   Q.   Can you go to what is already in evidence as Government

17   Exhibit 4.  And what is Exhibit 4?

18   A.   It is a letter to the manager, HSBC-NRI Services.

19   Q.   From whom?

20   A.   Dr. Arvind Ahuja.

21   Q.   And what is the date on this letter?

22   A.   13th March 2008.

23   Q.   In this letter do you see a reference to 20 million rupees?

24   A.   Yes.

25   Q.   Did you calculate what the value in U.S. dollars was of

691

1    20 million rupees as of March 13th, 2008?

2    A.  Yes, I did.

3    Q.  Is that calculation also in Exhibit 91?

4    A.  Yes.

04:55    5    Q.  What was the value on March 13th, 2008 of the 20 million

6    rupees that the defendant was directing be transferred to Oxus

7    Fund Management?

8    A.  494,740 U.S. dollars.

9    Q.  In total between Exhibits 3, 4, and 8 (sic), what was the

04:55    10    approximate total value of the funds that these letters direct

11    be sent to Oxus?

12    A.  I'm sorry.  3, 4, and 80?

13    Q.  3, 4 and 80.  Thank you.

14    A.  A little more than $1 million.

04:55    15    Q.  If you take a look at what is already in evidence as

16    Government Exhibit 46.

17    A.  Yes.

18    Q.  Go to the second page of the new Exhibit 46.

19          MR. KIRSCH:  Your Honor, objection.  Cumulative.  The

04:56    20    jury has the exhibits and the conversion chart.

21          THE COURT:  Overruled.  Move quickly, please.

22    BY MS. SISKIND:

23    Q.  What is Exhibit 46?

24    A.  It is a letter to the manager, HSBC-NRI Services, from

04:56    25    Arvind and Namrata Ahuja.

692

1    Q.  Based on your calculations -- sorry.

2         Do you know what the approximate date on that -- do

3    you know the approximate date associated with this letter?

4    A.  Not just from looking at this letter, no.

5    Q.  Is there anything that would refresh your recollection as to

6    the date of this letter?

7    A.  Yes.

8    Q.  And what would that be?

9    A.  That would be the letter -- or, I'm sorry -- the e-mail that

10   this letter was attached to.

11        MS. SISKIND:  May I approach the witness?

12        THE COURT:  Yes.

13   BY MS. SISKIND:

14   Q.  Having looked at that e-mail, does that refresh your

15   recollection as to the approximate date of the letter in

16   Exhibit 46?

17   A.  Yes, it does.

18   Q.  And what is that date?

19   A.  February 7th, 2008.

20   Q.  What was the approximate value of 10 million rupees as of

21   that date, according to your calculations?

22   A.  253,610 U.S. dollars.

23   Q.  Can you go to what's in evidence as Government's Exhibit 2?

24   And what is Exhibit 2?

25   A.  This is a letter to the manager, HSBC-Delhi, dated 9 January

693

1    2008 from Dr. Arvind Ahuja.

2    Q.  And did you calculate what the approximate value of the

3    rupee amount in this letter was as of that date?

4    A.  Yes, I did.

5    Q.  And what was it?

6    A.  $131,147.35.

7         MS. SISKIND:  Keep going, Your Honor?  Thank you.

8    BY MS. SISKIND:

9    Q.  Can you go to what is already in evidence as Exhibit 61.

10   Starting with the first page of this exhibit, what is this?

11   A.  This is an e-mail from Priti R. Dhanani on July 31st, 2009.

12   Q.  And is there something attached to this e-mail?

13   A.  Yes, there is.

14   Q.  And can you go to the attachment?  And tell the jury what

15   the second page of this exhibit is.

16   A.  It's a letter to the manager at HSBC-NRI Services, signed --

17   I'm sorry -- from Arvind Ahuja and Namrata Ahuja.

18   Q.  And does this letter reference an amount in euros, a little

19   more than 14,000 euros?

20   A.  Yes, it does.

21   Q.  What was the value of this amount of euros as of the date of

22   this letter?

23   A.  $21,161.83.

24   Q.  And do you see the name of a company that's the subject of

25   this letter?

694

1    A.  Yes, I do.

2    Q.  And do you know from the course of your investigation what

3    Lanza & Baucina Ltd. is?

4    A.  I see it.  It's -- it is a boutique travel agency out of

5    London that plans travel to Italy.

6    Q.  Can you go to Exhibit 85, please.  What is Exhibit 85?

7    A.  It is a letter to the manager HSBC-New Delhi, dated 6

8    October 2009 from Dr. Arvind Ahuja.

9    Q.  Is there an account number or a customer number referenced

10   in the subject line?

11   A.  Yes.

12   Q.  And can you read the subject line?

13   A.  "Withdrawal of cash from 7002-007."

14   Q.  And do you see a reference to Ramit Bhasin in this letter?

15   A.  Yes, I do.

16   Q.  If you look at what is already in evidence as Government

17   Exhibit 5.  What is Government Exhibit 5?

18   A.  It is a letter to the manager HSBC-New Delhi, from

19   Dr. Arvind Ahuja.

20   Q.  And what is this letter regarding?

21   A.  The urgent issuance of NRO checkbook.

22   Q.  Do you see a reference to Ramit Bhasin in this letter?

23   A.  Yes, I do.

24   Q.  In what context?

25   A.  The final statement says, "I hereby authorize Mr. Ramit

695

1    Bhasin to collect the checkbook on my behalf upon valid

2    identification."

3    Q.  Now, I want to move on and talk about another HSBC account

4    and ask whether you are familiar with a country by the name of

5    the Bailiwick of Jersey.

6    A.  Yes, I am.  I'm not sure if it's an independent country, but

7    I am familiar with the Bailiwick of Jersey.

8    Q.  What is Jersey?

9    A.  Truthfully, I don't know exactly what Bailiwick is.  But

10   Jersey does not refer to the U.S. state of New Jersey.  Jersey

11   is a small island in the English channel that's part of the UK,

12   and it's right next to Normandy France.  It's an island.

13   Q.  Can you take a look at what's already in evidence as

14   Government's Exhibit 62?

15   A.  Yes.

16   Q.  To whom is this letter directed?

17   A.  The manager HSBC-Jersey.

18   Q.  On what date?

19   A.  September 21st, 2009.

20   Q.  And is the letter signed?

21   A.  Yes, it is.

22   Q.  By whom?

23   A.  Dr. Arvind Ahuja and Namrata Ahuja.

24   Q.  And what is the subject of this letter?

25   A.  "Account closure request, AC number 0953, customer ID 1731."

696

1   Q.  And can you just read the first sentence of the letter?

2   A.  "With reference to the captioned subject, request you please

3   close all the accounts under the above customer I.D."

4   Q.  And then if you could just read the last sentence of that

5   paragraph.  Starting with, "Please."

6   A.  "Please transfer the proceeds through a GBP draft and

7   courier the same to my below mentioned U.S. address."

8   Q.  If you go to what is in evidence as Exhibit 38.  What is

9   this?

10  A.  This is an e-mail between -- this is an e-mail.

11  Q.  From whom?

12  A.  Priti Dhanani.

13  Q.  And to whom is it addressed?

14  A.  Natasha2@bloomberg.net.

15  Q.  Do you see a reference to Jersey in the second sentence of

16  the e-mail?

17  A.  Yes, I do.

18  Q.  What does the second sentence say?

19  A.  "I refer to your request for a Composite statement of your

20  Jersey investments to Ankush."

21  Q.  Now, if you go back to Exhibit 62 for a moment, when the

22  defendant is writing about Jersey, does he refer to it as

23  investments?

24          MR. KIRSCH:  Objection as to when the defendant was

25  writing about.  Your Honor, we have testimony in this case as to

697

1    who wrote -- objection as to who wrote the letter.

2            THE COURT:  Objection sustained.

3    BY MS. SISKIND:

4    Q.  The letter that bears signatures above the typed name

5    "Arvind Ahuja" in Exhibit 62, how does this letter refer to the

6    money in Jersey?

7    A.  "Request you please close all the accounts under the above

8    customer I.D."

9    Q.  Now, with respect to the accounts in Jersey, did you review

10   any letters and e-mails regarding debit and credit cards

11   associated with that account?

12   A.  Yes.

13   Q.  Can you go to what's been marked for identification as

14   Government Exhibit 21?

15            We can take that off the screen.

16            What is Government Exhibit 21?

17   A.  This is an e-mail chain from July 8th, 2005 to July 21st,

18   2005.

19   Q.  And who are the participants in this e-mail chain?

20   A.  Ankush Tandon, aahuja3803@aol.com, and Kathryn Whittingham.

21   Q.  What is the subject line on this e-mail chain?

22   A.  "Important Premier Client Arvind Ahuja."

23   Q.  And do you see a reference to the name "Arvind" in the

24   second e-mail from the top on the page?

25   A.  Yes, I do.

698

1  Q.  In what context?  Is it part of the salutation of that

2  e-mail?

3  A.  Yes, it is, right before it says "Dear."

4       MS. SISKIND:  Government moves to admit Exhibit 21.

05:05  5       THE COURT:  It's received.

6       MR. KIRSCH:  Your Honor, I don't know what the

7  relevance of this is.

8       THE COURT:  Please approach.

9       (At side bar on the record.)

05:06  10       THE COURT:  On the record.

11       What is the objection?

12       MR. KIRSCH:  Your Honor, I don't see any mention of

13  any account in here.  It just says, "Please pay my credit card."

14       THE COURT:  All right.  What is the relevance?

05:06  15       MS. SISKIND:  Twofold, Your Honor.  First, this e-mail

16  chain, which the defendant is apart, tends to show his access to

17  funds in offshore bank accounts.  It's part of the government's

18  proof in this case that he knew he had offshore accounts and

19  accessed those funds.

05:07  20       Another issue was raised, I believe, during the

21  cross-examination of Vandana Katju about a distinction between

22  investments and accounts, and that was a set of last two letters

23  we looked at.

24       In this e-mail chain, which eventually gets forwarded,

05:07  25  starts with the defendant and eventually is forwarded back to

699

1   him in the end.  This woman Kathryn Whittingham, who works for

2   HSBC offshore, refers to it as "an account."

3          MR. KIRSCH:  Your Honor, I don't see any mention.

4   That's the objection.  There's nothing in here that talks about

05:07   5   offshore accounts.  It just says, "Subject":  "The charge

6   reached its limit.  Can you pay all of it and raise the limit.

7   E-mail me if possible.  Thanks, AA.  All will be paid in pounds.

8   Thanks, AA."

9          It's not talking about any of his bank accounts or

05:07   10   access to any money -- I mean, I don't know what account -- what

11   credit card he's talking about.

12          THE COURT:  It's certainly not irrelevant.  The weight

13   may be afforded this -- certainly it may be attacked and may be

14   subject to dispute, but it is relevant.  So I will overrule the

05:08   15   objection.

16          With that said, off the record.

17          (Discussion off the record.)

18          (End of discussion at side bar.)

19          THE COURT:  The objection is overruled.

05:08   20          MS. SISKIND:  Government moves for the admission of

21   Exhibit 21.

22          THE COURT:  21 is received.

23          (Exhibit 21 received in evidence.)

24          THE COURT:  Members of the jury, that concludes our

05:09   25   trial day.  I look forward to seeing you Monday at 8:30.  As

700

1    we've discussed previously, you may not communicate with anyone

2    in any form by any means or visit anyplace that may have been

3    mentioned during the course of this trial.

4         Take your notebooks with you and have a good weekend.

05:09   5         THE BAILIFF:  All rise.

6         (Jury out at 5:09 p.m.)

7         THE COURT:  You may step down.

8         (Witness temporarily excused.)

9         THE COURT:  Is there anything we need to address at

05:10  10    this point?

11         (No response.)

12         THE COURT:  Good.  Have a great weekend.

13         MS. SISKIND:  Thank you, Your Honor.  You too.

14         THE COURT:  Oh -- back on the record.  I note that on

05:10  15    the 13th there were some accounts that were mentioned without

16    any redaction of the particulars.  Are the parties aware of that

17    occurrence?

18         MS. SISKIND:  No, Your Honor.

19         THE COURT:  Would you like to come up?  Mr. Kirsch?  I

05:11  20    believe this relates to matters on pages -- on page 243?

21         MR. KIRSCH:  Your Honor, can I request that at the end

22    of the trial, to the extent that exhibits have been put in and

23    shown to the jury, we'll just redact them all for the record at

24    the close of the trial.

05:11  25         THE COURT:  We have taken care of some of that, but I

701

1    certainly will entertain that, but I want you to be aware of the

2    need to redact certain information that otherwise may be

3    appropriate for exclusion from the public record.

4              MR. KIRSCH:  Thank you, Your Honor.

05:11  5          THE COURT:  All right.  And you think there may have

6    been something else.

7              MS. SISKIND:  Your Honor, something about an exhibit

8    list.

9              THE COURT:  Yes, the exhibit list.  The government

05:12  10   handed up an exhibit list.  I do ask the parties to confer to

11   verify the numbers of the exhibits that you believe you've

12   offered or have been offered during the course of the trial so

13   that we can just double-check and verify what is in and what is

14   not in.  And that way when we get to the close of the case, it

05:12  15   will simplify matters and expedite getting the exhibits that are

16   appropriate to the jury.

17             MR. KIRSCH:  We'll do that, Your Honor.

18             THE COURT:  Also, you may want to take into

19   consideration something else.  I don't know whether or not it's

05:12  20   your intention to provide hardcopies of all of the exhibits that

21   have been admitted for use by the jury during deliberation or

22   whether you would be offering computerized versions on disc.

23             I do urge you to consider the computerized -- using

24   the computerized versions because it will expedite the use of

05:13  25   the exhibits in the jury room.  And in light of my experience

702

1    with the government and its computers in the past, I know that

2    the government doesn't provide its computers for use by the

3    jury.  I know the defense probably doesn't want the jury to use

4    its computers.  So you have to figure out ways in which to

05:13    5    produce the materials in digital form so that the jury can view

6    them.

7            We do have tech people who have worked with those

8    matters in the past, and we do have an Apple machine that we can

9    use in the jury room.

05:13    10            So I'm pointing out the issue and suggesting that you

11    try to work it out.  Our tech people will be available to assist

12    you, if necessary.

13            MR. KIRSCH:  Thank you, Your Honor.

14            MR. SULLIVAN:  Thank you.

05:14    15            (Trial adjourned for the day at 5:14 p.m.)

16                            *    *    *

17

18

19

20

21

22

23

24

25

703

1  UNITED STATES DISTRICT COURT

2  EASTERN DISTRICT OF WISCONSIN

3

4          I, JOHN T. SCHINDHELM, RMR, CRR, Official Court

5  Reporter for the United States District Court, Eastern District

6  of Wisconsin, do hereby certify that I reported the foregoing

7  proceedings, and that the same is true and correct in accordance

8  with my original machine shorthand notes taken at said time and

9  place.

10  Dated this 17th day of August, 2012

11  Milwaukee, Wisconsin.

12

13  _____
          Official Court Reporter

14        United States District Court

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2   WITNESS   EXAMINATION                                      PAGE

3   VANDANA KATJU, GOVERNMENT WITNESS

4        DIRECT EXAMINATION BY MR. SULLIVAN...............   454

5        CROSS-EXAMINATION BY MR. KIRSCH.................    460

6        REDIRECT EXAMINATION BY MR. SULLIVAN............    505

7        RECROSS-EXAMINATION BY MR. KIRSCH...............    521

8   MARK MILLER, GOVERNMENT WITNESS

9        DIRECT EXAMINATION BY MR. SULLIVAN..............    525

10       CROSS-EXAMINATION BY MR. WEBB...................    558

11       REDIRECT EXAMINATION BY MR. SULLIVAN............    642

12       RECROSS-EXAMINATION BY MR. WEBB.................    649

13       FURTHER REDIRECT EXAMINATION BY MR. SULLIVAN.....   650

14       JURY EXAMINATION BY THE COURT...................    653

15       FURTHER REDIRECT EXAMINATION BY MR. SULLIVAN.....   654

16       FURTHER RECROSS-EXAMINATION BY MR. WEBB..........   655

17  GEOFFREY COOK, GOVERNMENT WITNESS

18       DIRECT EXAMINATION BY MS. SISKIND...............    656

19

20                          * * * * *

21

22

23

24

25

```
                    E X H I B I T S

 1

 2   NUMBER              DESCRIPTION              OFFERED ADMITTED

 3   2      1/9/08 Ahuja letter re: DLF....................454    454

 4   3      2/13/08 Ahuja letter re: Oxus..................454    454

 5   4      3/13/08 Ahuja letter to HSBC re Oxus...........454    454

 6   5      Ahuja to HSBC letter re: Checkbook.............454    454

 7   10     2008 Form 1099-INT from Citibank...............542    542

 8   11     2009 Form 1099-INT from Citibank...............585    585

 9   12     2006 Form 1040 for Arvind and Namrata Ahuja.....535   535

10   13     2007 Form 1040 for Arvind and Namrata Ahuja.....535   535

11   14     2008 Form 1040 for Arvind and Namrata Ahuja.....535   535

12   15     2009 Form 1040 for Arvind and Namrata Ahuja.....535   535

13   18     2009 Year-end planning agenda...................551   551

14   19     12/29/09 Kolb+Co letter with 2009 tax return ...554   554

15          reminders

16   20     6 /17/05 term deposit notice....................454   454

17   21     7/8/05 & 7/21/05 Ahuja and Tandon e-mails.......700   700

18   29     6/13-14/06 Ahuja-Tandon e-mails re: CDs.........483   483

19   32     11/16/06 Ahuja letter to HSBC re: Debit card....454   454

20   38     4/23/07 E-mail from Dhanani re: Jersey .........469   469

21          account

22   46     2/7/08 Dhanani e-mail w/attached letter.........454   454

23   50     7/24/08 letter signed by Ahuja re: Closure of ..509   509

24          NY acct

25   53     8/19/08 E-mail from Dhanani re: ................462   462
```

                                                              706

```
             Correspondence address..........................
58   2/16/09 Texas Energy Holdings, Inc. ............ 662    662
     Instruction to investors and subscription
     agreement
59   7/21/09 Ahuja letter re: Lanza................. 454    454
61   7/31/09 Dhanani e-mail with letter re: Wire ....454    454
     transfer to Lana & Baucina
62   9/21/09 Ahuja letter to HSBC re: Jersey ........454    454
     account
69   Page 1 only - Summary of high balances .........680    680
     w/screen prints
72   Statements for HSBC-USA Bank Acct# .............486    486
     610-75244-8
80   1/28/08 Ahuja letter to HSBC re: Oxus...........454    454
82   10/8/09 NRO CD encashment requests .............454    454
85   10/6/09 Letter signed by Ahuja to HSBC..........454    454
91   Currency conversions............................690    690
2057 Tandon HSBC employment records..................480    480
2084 2002 amended returns and payment information....639    639
2085 2003 amended returns and payment information....639    639
2086 2004 amended returns and payment information....639    639
2087 2005 amended returns and payment information....639    639
2088 2006 amended returns and payment information....639    639
2089 2007 amended returns and payment information....639    639
2090 2008 amended returns and payment information....639    639
```

707

```
 1   2091   2009 amended returns and payment information.... 639    639
 2   2092   Summary comparing 2002-2009 Forms 1040 and ..... 639    639
 3          2002-2009 Forms 1040X
 4   2101   2001 US Bank wire transfer....................... 491    491
 5   2203   Priti Dhanani Resume............................ 473    473
 6   2215   Miller summary chart............................ 632    632
 7   2216   2006-2009 1099 and K-1 Summar Chart............. 613    613
 8   2224   2002 Ahuja tax return........................... 631    631
 9   2225   2003 Ahuja tax return........................... 631    631
10   2226   2004 Ahuja tax return........................... 631    631
11   2227   2005 Ahuja tax return........................... 631    631
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

708