```
 1              UNITED STATES DISTRICT COURT

 2           FOR THE EASTERN DISTRICT OF WISCONSIN

 3  ----------------------------------------------------------

 4  UNITED STATES OF AMERICA,        )
                                     )      Case No. CR 11-135
 5                  Plaintiff,       )      Milwaukee, Wisconsin
                                     )
 6       vs.                         )      August 20, 2012
                                     )      8:30 a.m.
 7  ARVIND AHUJA,                    )
                                     )      VOLUME 4
 8                  Defendant.       )      PAGES 709-879

 9  ----------------------------------------------------------
```

**TRANSCRIPT OF JURY TRIAL**
BEFORE THE HONORABLE CHARLES N. CLEVERT, JR.
UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY

APPEARANCES:

For the Plaintiff
UNITED STATES OF AMERICA:    Office of the US Attorney
                             By: TRACY M. JOHNSON
                             517 E Wisconsin Ave - Rm. 530
                             Milwaukee, WI 53202
                             Ph: 414-297-1580
                             Fax: 414-297-4394
                             tracy.johnson@usdoj.gov

                             United States Department of
                             Justice DC
                             By: JOHN E. SULLIVAN
                                 MELISSA S. SISKIND
                             Tax Division - Ben Franklin
                             Station - PO Box 972
                             Washington, DC 20044
                             Ph: 202-514-5196
                             Fax: 202-616-1786
                             john.e.sullivan@usdoj.gov
                             melissa.s.siskind@usdoj.gov

U.S. Official Reporter:      JOHN T. SCHINDHELM, RMR, CRR,
                             johns54@sbcglobal.net

Proceedings recorded by computerized stenography,
transcript produced by computer aided transcription.

```
1    APPEARANCES CONT'D:

2    For the Defendant            Friebert, Finerty & St. John SC
     ARVIND AHUJA:                By: SHANNON A. ALLEN
3    (Present)                    Two Plaza East - Ste 1250 - 330 E
                                  Kilbourn Ave
4                                 Milwaukee , WI 53202
                                  Ph: 414-271-0130
5                                 Fax: 414-272-8191
                                  saa@ffsj.com
6
                                  Winston & Strawn LLP
7                                 By: DAN K. WEBB
                                      THOMAS L. KIRSCH II
8                                 35 W Wacker Dr
                                  Chicago , IL 60601-9703
9                                 Ph: 312-558-5600
                                  Fax: 312-558-5700
10                                dwebb@winston.com
                                  tkirsch@winston.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

710

1          P R O C E E D I N G S (8:39 a.m.)

2          THE COURT:  Good morning.

3          IN UNISON:  Good morning.

4          THE COURT:  The jury is ready.  Are you ready to

5     proceed?

6          MR. KIRSCH:  Yes, Your Honor.

7          MS. SISKIND:  Your Honor, we passed to the Court two

8     stipulations which we propose on read to the jury after Agent

9     Cook's testimony.  What is Your Honor's preference?  Would

10    Your Honor read them or should we --

11         THE COURT:  The parties.  The parties should read

12    them.

13         MS. SISKIND:  Thank you, Your Honor.

14         (Jury in at 8:40 a.m.)

15         THE COURT:  Good morning.

16         IN UNISON:  Good morning.

17         MS. SISKIND:  May I proceed, Your Honor?

18         THE COURT:  You may proceed.

19      GEOFFREY COOK, GOVERNMENT WITNESS, PREVIOUSLY SWORN

20                    DIRECT EXAMINATION

21    BY MS. SISKIND:

22    Q.  Good morning, Agent Cook.

23    A.  Good morning.

24    Q.  When we left off on Friday, we were about to talk about

25    Government Exhibit 21.  Do you have that there?

711

1    A.  Yes, I do.

2           MS. SISKIND:  If we could have that on the screen.

3    BY MS. SISKIND:

4    Q.  What is Government Exhibit 21?

08:41 5    A.  This is an e-mail chain which begins on July 8th, 2005, and

6    which ends Thursday, July 21st, 2005, between ahuja3803@aol.com,

7    and Ankush Tandon.

8    Q.  And are there any other participants in this e-mail chain?

9    A.  Yes, there is.

08:42 10   Q.  Who would that be?

11   A.  Kathryn Whittingham.

12   Q.  Starting with the first e-mail in the chain on page 3, who

13   is that e-mail from?

14   A.  That e-mail is from aahuja3803@aol.com and it is signed

08:42 15   "aa."

16   Q.  And what is the date of that e-mail?

17   A.  July 8th, 2005.

18   Q.  Can you tell from looking at this e-mail chain what, if

19   anything, Ankush Tandon did with this e-mail from aahuja3803

08:42 20   regarding charge card limits?

21   A.  Yes, I can.  It appears he forwarded the e-mail to Kathryn

22   Whittingham and the Premier support unit at offshore, HBOS,

23   H-B-O-S, at HSBC.

24   Q.  And what does HBOS stand for?

08:42 25   A.  HSBC offshore.

712

1    Q.  And can you tell from looking at this e-mail chain whether

2    Ms. Wittingham increased the defendant's credit card limit as he

3    requested?

4    A.  Yes, she did.

08:43  5    Q.  And was this fact communicated back to Dr. Ahuja?

6    A.  Yes, it was.

7    Q.  How can you tell?

8    A.  On the first page of the three pages, Ankush Tandon sends an

9    e-mail back to aahuja3803 and he forwards the conversation and

08:43  10   says, "Dear Arvind.  Please note.  Thanks, Ankush."

11   Q.  And did the defendant respond to that e-mail?

12   A.  Yes.

13   Q.  And what, if anything, did he say?

14   A.  "Thanks aa."

08:43  15   Q.  Now, can you the take a look at what's been marked for

16   identification as Government Exhibit 22.  Do you have that?

17   A.  Yes, I do.

18   Q.  What is Government Exhibit 22?

19   A.  This is an e-mail back and forth between Ankush Tandon and

08:43  20   aahuja3803.  It begins -- both e-mails are dated 30

21   September 2005.

22   Q.  And directing your attention to the first e-mail in the

23   chain, who is that e-mail from?

24   A.  Starting at the bottom, it is from Ankush Tandon, HSBC.

08:44  25            MS. SISKIND:  Your Honor, the government moves for the

713

1  admission of Government Exhibit 22.

2          MR. KIRSCH:  No objection, Your Honor.

3          (Exhibit 22 received in evidence.)

4          MR. KIRSCH:  It's fine.  It's fine.

**08:44**  5          MS. SISKIND:  If we could have that on the screen.

6  BY MS. SISKIND:

7  Q.  Generally, what does this e-mail chain relate to?

8  A.  A credit card limitation increase.

9  Q.  Does that credit card relate to any particular account?

**08:44**  10  A.  Yes, it does.

11  Q.  And which account does it relate to?

12  A.  HSBC-India and HSBC-Jersey.

13  Q.  I want you to take a look at what's already in evidence --

14          MR. KIRSCH:  Your Honor, I'm going to object to that

**08:45**  15  testimony.  That's not what this document states.

16          THE COURT:  One second.  One second.  You don't have

17  any need to argue.  Approach.

18          (At side bar on the record.)

19          MR. KIRSCH:  My objection is the document stands for

**08:45**  20  itself.  It doesn't reference -- I don't think it references

21  accounts anywhere in these documents.  You can look at the

22  e-mail from down at the bottom that says "Dear Arvind and

23  Namrata."

24          THE COURT:  Sustained.

**08:46**  25          (End of discussion at side bar.)

714

1    BY MS. SISKIND:

2    Q.  In the --

3                THE COURT:  One second.

4                The last testimony is stricken and has to be

5    disregarded.

6                Proceed.

7    BY MS. SISKIND:

8    Q.  In the e-mail that begins "Dear Arvind/Namrata," can you

9    read the first sentence, please?

10   A.  "Please do let me know the outstanding items with the

11   HSBC-India check and with HSBC-Jersey and I will have them

12   resolved on priority."

13   Q.  Now, moving on, do you have what's already in evidence as

14   Government Exhibit 32?

15   A.  Yes.

16   Q.  And what is Government Exhibit 32?

17   A.  This is a letter dated November 16th, 2006, addressed to the

18   Premier Department, HSBC-Jersey.

19   Q.  And do you see signatures on this letter?

20   A.  Yes, I do.

21   Q.  Do you see names both typed and written below those

22   signatures?

23   A.  Yes.

24   Q.  What names appear there?

25   A.  Arvind Ahuja and Namrata Ahuja.

715

1    Q.  What does the first sentence of this letter say?

2    A.  "We are Premier clients with HSBC-Jersey."

3    Q.  And what, if anything, is this letter requesting?

4    A.  It is requesting PIN numbers, P-I-N, to be "couried" to an

08:47  5    address in the UK.

6    Q.  Can you look at what's been marked for identification as

7    Government Exhibit 35.

8              MS. SISKIND:  It's not in evidence yet, Ms. Johnson.

9    BY MS. SISKIND:

08:48  10   Q.  Do you have that in front of you?

11   A.  Yes, I do.

12   Q.  What is Government Exhibit 35?

13   A.  It is an e-mail from Ankush Tandon to aahuja3803@aol.com,

14   dated November 17, 2006.

08:48  15             MS. SISKIND:  Government moves for the admission of

16   Exhibit 35.

17             MR. KIRSCH:  No objection.

18             THE COURT:  35 is received.

19             (Exhibit 35 received in evidence.)

08:48  20   BY MS. SISKIND:

21   Q.  How does the date on this e-mail compare to the date on the

22   letter we just looked at in Exhibit 32?

23   A.  It's one day after.  The letter in Exhibit 32 is dated

24   November 16, 2006, and this e-mail is dated November 17th, 2006.

08:48  25   Q.  And what is the subject line of the e-mail on November 17th?

716

1  A.  Address in London.

2  Q.  And what, if anything, does Mr. Tandon say in this e-mail?

3  A.  "You are welcome.  We also got confirmation that the credit

4  card PINs would be delivered to the UK address."

5  Q.  In the course of reviewing documents that were produced to

6  the government by HSBC, did you come across any document

7  suggesting how funds in the defendant's HSBC-Jersey account were

8  spent?

9  A.  Yes, I did.

10  Q.  If you can, look at what is already in evidence as

11  Government Exhibit 59.

12  A.  Okay.  I have it.

13  Q.  What is Government Exhibit 59?

14  A.  This is a letter dated July 21st, 2009, to the branch

15  manager at HSBC-Jersey, from Namrata Ahuja and Arvind Ahuja.

16  Q.  What does the first line of this or first sentence of this

17  letter say?

18  A.  "Dear sir, we the undersigned, Arvind and Namrata Ahuja,

19  request that you please wire transfer 14,686.20 euros from our

20  pound account.  The account number is 0953."

21  Q.  And the -- were you able to calculate the -- what the value

22  of that amount of euros was on July 21st, 2009?

23  A.  Yes.

24  Q.  And are those currency conversions in what's already in

25  evidence as Exhibit 91?

717

1    A.   Yes.

2    Q.   What was the value of that amount of euros on that date?

3    A.   $20,845.45.

4    Q.   And with this letter in Exhibit 59, to whom are the Ahujas

5    directing that that $20,000 be transferred?

6    A.   Lanza & Baucina Limited.

7    Q.   And can you remind the jury what that is?

8    A.   That is a travel agency based in London that offers tours to

9    Italy.

10   Q.   If you could, go back to what's already in evidence as

11   Government Exhibit 62.  Might be the next document in your pile.

12        Can you remind the jury what Exhibit 62 is?

13   A.   This is a letter to the manager, HSBC-Jersey, on

14   September 21st, 2009, from Arvind Ahuja and Namrata Ahuja.

15   Q.   And what does this letter relate to?

16   A.   The account closure request for account number ending 0953,

17   customer ID ending 1731.

18   Q.   And what does the first sentence of this letter say?

19   A.   "With reference to the captioned subject, request you please

20   close all the accounts under the above customer I.D."

21   Q.   What, if anything, did the Ahujas direct that the bank do

22   with the funds from that account?

23   A.   To "transfer the proceeds through a GBP," Great British

24   pound, "draft and courier the same to my below mentioned U.S.

25   address."

718

1    Q.   And in reviewing the records produced by the bank, did you

2    find such a check?

3    A.   Yes.

4    Q.   Can you look at what's marked for identification as

5    Exhibit 64?

6    A.   Yes.

7    Q.   What is Exhibit 64?

8    A.   This is a check from HSBC offshore, dated 19th October 2009,

9    to Mr. A and Mrs. NL Ahuja.

10            MS. SISKIND:   Government moves for the admission of

11   64.

12            MR. KIRSCH:   No objection.

13            THE COURT:   64 is received.

14            (Exhibit 64 received in evidence.)

15   BY MS. SISKIND:

16   Q.   Now, looking at the top of this check, do you see a website

17   address that appears to the right of the HSBC logo?

18   A.   Yes, I do.

19   Q.   Can you read that web address, please?

20   A.   Www.offshore.hsbc.com.

21   Q.   And how much is this check for that HSBC offshore sent to

22   the Ahujas?

23   A.   4,696.71 pounds.

24   Q.   Did you calculate what the value of that figure was on

25   October 19th, 2009?

1    A.  Yes, I did.

2    Q.  And how much was that in U.S. dollars?

3    A.  $7,702.26.

4    Q.  In your review of records produced by HSBC, did you see any

5    references to the country Mauritius?

6    A.  Yes.

7    Q.  Can you look at what's already in evidence as Government

8    Exhibit 20?  And if we go to the second page of that exhibit, to

9    whom is the letter on this page addressed?

10   A.  The manager, The Hongkong & Shanghai Banking Corporation

11   Limited, Offshore Banking Unit.

12   Q.  And in any particular country?

13   A.  Yes, two lines down, Mauritius.

14   Q.  If you could go down to the second-to-last paragraph in this

15   letter, can you read what it says in the first sentence?

16   A.  "I further authorize you to open account with HSBC

17   Mauritius."

18   Q.  And are there signatures on this page?

19   A.  Yes.

20   Q.  What, if any, names appear typed below the signatures?

21   A.  Dr. Arvind Ahuja and Namrata Ahuja.

22   Q.  And how about on the next page, the last page of Exhibit 20?

23   Do you see another letter?

24   A.  Yes, I do.

25   Q.  To whom is this letter addressed?

720

1    A.   The Manager, the Hongkong & Shanghai Banking Corporation,

2    Ltd., Offshore Banking Unit.

3    Q.   In what country?

4    A.   Mauritius.

08:54  5    Q.   And looking down to the second-to-last paragraph, can you

6    read the first sentence?

7    A.   "I further authorize you to open an account with HSBC

8    Mauritius."

9    Q.   Is this letter signed?

08:54  10   A.   Yes.

11   Q.   What names appear typed below the signatures?

12   A.   Dr. Arvind Ahuja, Namrata Ahuja.

13   Q.   And what is the date of these two letters to HSBC Mauritius?

14   A.   August 9th, 2005.

08:54  15   Q.   Have you reviewed the defendants 2006 to 2009 tax returns?

16   A.   Yes.

17   Q.   Are those the returns that are in evidence as Exhibits 12

18   through 15?

19   A.   Yes.

08:55  20   Q.   Have you also reviewed portions of his 2005 tax return?

21   A.   Yes, I have.

22   Q.   Did the defendant report any interest from HSBC-India on his

23   2005 through 2009 returns?

24   A.   No.

08:55  25   Q.   On his 2008 and 2009 returns specifically, did he report any

1    interest income from any other foreign bank?

2    A.  No.

3    Q.  Any bank besides HSBC?

4    A.  Yes, he reported interest from other banks.

5    Q.  And which foreign bank did he report interest income from in

6    2008 and 2009?

7    A.  Citibank India.

8    Q.  And did you review the 1099s from Citibank India?

9    A.  Yes, I have.

10   Q.  I want you to take a look at what's been marked for

11   identification as Government Exhibit 57.  What is Exhibit 57?

12   A.  This is an account-opening document for Citibank NRI

13   Business.

14   Q.  Does this account application relate to any particular

15   individual?

16   A.  Yes.

17   Q.  And who would that be?

18   A.  Arvind Ahuja.

19   Q.  Do you see a date on this application?

20   A.  Yes, I do.

21   Q.  And what is the date?

22   A.  10/16/2008.

23          MS. SISKIND:  Government moves for the admission of

24   Exhibit 57.

25          MR. KIRSCH:  No objection.

722

1       THE COURT:  57 is received.

2       (Exhibit 57 received in evidence.)

3  BY MS. SISKIND:

4  Q.  Now, looking at the top of the page under where it says

5  "Citibank NRI Business, Wealth Management for the Global

6  Indian," what is the title of this form?

7  A.  "Citibank Rupee and FCNR Deposit Account Application."

8  Q.  And what is the name that appears in the first line?

9  A.  Arvind Ahuja.

10  Q.  Does Dr. Ahuja give any particular e-mail address in the

11  information?

12  A.  Yes.

13  Q.  And what is that?

14  A.  Natasha2@bloomberg.net.

15  Q.  What, if anything, is listed for Dr. Ahuja's nationality and

16  country of residence at the top of this form?

17  A.  American, USA.

18  Q.  And if you go to the third page of this exhibit, do you see

19  a copy of a passport?

20  A.  Yes, I do.

21  Q.  And whose passport appears there?

22  A.  Dr. Arvind Ahuja's.

23  Q.  And what is the country of issue for this passport?

24  A.  United States.

25  Q.  Turning to the next page, do you see a check?

723

1    A.  Yes, I do.

2    Q.  And on whose account is this check drawn?

3    A.  Arvind Ahuja or Namrata L. Ahuja.

4    Q.  What is the amount for which this check is made out?

08:57   5    A.  $1 million.

6    Q.  And what is the date of it?

7    A.  10/16/08.

8    Q.  Now, if you could go back to the second page, do you see a

9    signature?

08:58  10    A.  Yes, I do.

11    Q.  And do you see several paragraphs of writing above that

12    signature?

13    A.  Yes, I do.

14    Q.  Prior to testifying today, did you help prepare a visual aid

08:58  15    that highlights some of the language in those paragraphs?

16    A.  Yes.

17            MS. SISKIND:  If we could have Exhibit B,

18    demonstrative B.

19    BY MS. SISKIND:

08:58  20    Q.  And is this that visual aid?

21    A.  Yes, it is.

22    Q.  Can you read for the jury the paragraph that's been

23    highlighted from this page?

24    A.  "It shall be my/our responsibility to educate

08:58  25    myself/ourselves and to comply" --

724

1   Q.  Could you slow down, please?

2   A.  "It shall be my/our responsibility to educate

3   myself/ourselves and to comply with all relevant laws,

4   regulations, and rules applicable to my/our use of offshore

5   wealth services, including any tax, foreign exchange, or capital

6   controls, and for any reporting or filing requirements that may

7   apply as a result of my/our country of citizenship, domicile of

8   residence, or the location where offshore wealth services

9   activities may be conducted.  Offshore wealth services means any

10  product or services provided to individual consumers who reside

11  in countries other than the country in which the providing

12  business is located."

13  Q.  Now, if you go to the fifth page of Government Exhibit 57,

14  do you have that?

15  A.  Yes.

16  Q.  As what is the title of this document, in the upper

17  left-hand corner?

18  A.  "NRI Account Statement of Arvind Ahuja."

19  Q.  And do you see several columns that start "Product," "At,"

20  "Currency," and so forth?

21  A.  Yes.

22  Q.  What is listed under the "At" column?

23  A.  IND.

24  Q.  And if you look down at the bottom of the form, do you see a

25  definition of what that code IND stands for?

725

1    A.  Yes.

2    Q.  And what does IND mean on this form?

3    A.  Your account with Citibank N.A. India branch.

4    Q.  In your review of the documents from Citibank, have you

5    reviewed other account applications in addition to the one in

6    Exhibit 57?

7    A.  Yes.

8    Q.  If you could, go to what's been marked for identification as

9    Defendant's Exhibit 2060.  Do you have that?

10   A.  Yes, I do.

11   Q.  What is that document?

12   A.  This is a Citibank NRI business rupee checking/savings

13   account application form.

14   Q.  For which account holder?

15   A.  Arvind Ahuja.

16   Q.  And do you see a date stamped in the middle of the page?

17   A.  Yes.

18   Q.  And what is the date of this application?

19   A.  October 16th, 2008.

20        MS. SISKIND:  Government moves for the admission of

21   Defendant's Exhibit 2060.

22        MR. KIRSCH:  Your Honor, can I see a copy of it?

23        (Counsel confer.)

24        MR. KIRSCH:  No objection.

25        THE COURT:  It's received.

726

1      (Exhibit 2060 received in evidence.)

2   BY MS. SISKIND:

3   Q.  Do you see a -- sorry.

4        Going to the fourth page of this document, do you see

5   a signature?  I'm sorry.  The fifth page of this document.

6   A.  Yes, I do.

7   Q.  And what is the date that appears below the signature?

8   A.  10/16/2008.

9   Q.  Now, can you tell by looking at the bottom of page 5 how

10  this account or where this account was applied for?

11  A.  Yes, I can.

12  Q.  And what does the form indicate?

13  A.  There's a stamp and the stamp says New York, New York,

14  original seen and verified.  There's a box that's checked.  "Met

15  in person" is checked, and "Signed in my presence" is checked.

16  Q.  And as you're flipping through this document, do you see any

17  forms -- copies of forms of identification for Dr. Ahuja?

18  A.  Yes.

19  Q.  What do you see?

20  A.  I see a driver's license from the State of Wisconsin.

21  Q.  And looking at the next page?

22  A.  A passport for Arvind Ahuja.

23  Q.  If you could go to page 3, what type of account is Dr. Ahuja

24  opening with this form?

25  A.  An NRO account.

727

1  Q.  And what is indicated to be the amount credited to this

2  account?

3  A.  300,000.

4  Q.  Do you see a Part C in this Section 6 on the top of the

5  form?

6  A.  Yes, I do.

7  Q.  What is Part C?

8  A.  It is part of the application which asks the question "City

9  in which you want to hold the account.  Tick only one."

10  Q.  And do you see an X next to something in that section?

11  A.  Yes, I do.

12  Q.  What is checked regarding the city in which the defendant

13  wanted his account to be held?

14  A.  New Delhi.

15  Q.  Can you go to page 6 of this exhibit.  Do you see Section 9,

16  declarations?

17  A.  Yes, I do.

18  Q.  Does this declaration on this Citibank account contain the

19  same language we looked at in your visual aid a moment ago, in

20  paragraph 2?

21  A.  Paragraph 9 of this one?

22  Q.  Section 9, paragraph 2 on page 6 of the exhibit.

23  A.  Yes, it is.

24  Q.  Now, moving on to a different subject, did you attempt to

25  estimate the amount of interest income that the defendant earned

728

1     from his HSBC-India account during the years 2006 through 2009?

2     A.  Yes, I did.

3     Q.  Can you take a look at what's been marked for identification

4     as Government Exhibit 71, the first page?

5     A.  Yes.

6     Q.  What is Government Exhibit 71?

7     A.  This is a summary of the unreported interest calculation

8     that I did.

9     Q.  Is this summary a fair and accurate depiction of your

10    interest income calculation?

11    A.  Yes, it is.

12           MS. SISKIND:  Government moves for the admission of

13    the first page of 71.  The remaining pages are in evidence.

14           THE COURT:  Is there any objection?

15           MR. KIRSCH:  Yes.  If it's an estimate, Your Honor, I

16    object to foundation.

17           THE COURT:  One second.

18           (Brief pause.)

19           THE COURT:  Approach.

20           (At side bar on the record.)

21           MS. SISKIND:  I think Your Honor doesn't have the most

22    up-to-date copy.  I gave a new one to your courtroom deputy.  It

23    looks like these dates.

24           THE COURT:  Do you wish to be heard respecting

25    foundation?

729

1    MS. SISKIND:  Yes, Your Honor.  I can ask one more

2  question.  I think he will testify that he was only able to

3  estimate unreported income, and there were certain limitations

4  he faced in reaching his calculations.  But this is the

5  calculation he was able to come up with, and he later learned by

6  looking at the defendant's amended returns that the amount of

7  interest income is actually much higher than he was able to

8  calculate.

9    THE COURT:  What is -- what do you anticipate

10  respecting the bases for the estimates?

11    MS. SISKIND:  The screen shots, Your Honor, his review

12  of the screen shots.

13    THE COURT:  All right.  I'll sustain the objection at

14  this stage.  You may proceed.

15    (End of discussion at side bar.)

16    THE COURT:  The objection is sustained.

17  BY MS. SISKIND:

18  Q.  When trying to calculate interest income, how come your

19  calculations are only an estimation as opposed to some

20  definitive calculation of interest income?

21  A.  Because of the lack of availability of records that I had to

22  make the calculation.

23  Q.  What records did you have?

24  A.  I had the screen shots that we've seen that are located on

25  the server at HSBC in the United States.

730

1  Q.  And what kind of challenges were posed by using those screen

2  shots as opposed to a different source of information to make

3  your calculations?

4  A.  If I had monthly statements for each month for all the

09:08  5  years, I would have what I would consider to be complete

6  records.  However, using only the screen shots, it doesn't come

7  every month for all four years.  For some years you only get a

8  few screen shots, a handful of these screen shots, and for

9  others I'll get two or three screen shots in a one-month period.

09:08  10  So there are gaps in the information that I needed to make an

11  accurate calculation.

12  Q.  Did the bank in producing records pursuant to the grand jury

13  subpoena provide monthly account statements?

14  A.  No.

09:08  15  Q.  What did they provide to you regarding interest income?

16  A.  The screen shots that we've already seen.

17          MS. SISKIND:  The government moves for the admission

18  of Exhibit 71.

19          MR. KIRSCH:  No objection.

09:08  20          THE COURT:  Received.

21          (Exhibit 71 received in evidence.)

22  BY MS. SISKIND:

23  Q.  Now, can you explain to the jury how it was that you used

24  the screen shots to estimate unreported interest income for

09:09  25  those years?

731

1   A.  As I said on Friday, one of the first things I did with all

2   of the screen shots was type them into Microsoft Excel in order

3   to allow me to sort them by account number, by date, by maturity

4   date, and by currency.

5           And the first thing I did was sort them into currency

6   and into year so I'd be able to compare -- to compare like

7   items.  Then I pulled the interest figure from each screen shot

8   for the most -- for the latest screen shot available of the year

9   for each account number and used that figure, converted the

10  figures using the exchange rate of 12/31 for each year into U.S.

11  dollars, and then subtotaled them.

12  Q.  And if on cross-examination defense counsel points out any

13  errors in your calculation, will you make those changes to your

14  summary?

15  A.  Yes.

16  Q.  What is the significance of the "Source" column on the

17  right-hand side of this chart?

18  A.  The source represents the same Bates numbers, B-A-T-E-S,

19  that we referenced on Friday, and that just refers to the

20  individual screen shots that I used.

21  Q.  And are all of the screen shots that you used in making your

22  calculations contained on the subsequent pages in Exhibit 71?

23  A.  Yes.

24  Q.  Can you go through each year and tell the jury how much

25  unreported interest income you were able to calculate for those

732

1    years?

2    A.  2006, $191,365.38.

3            2007, $355,797 U.S. dollars, 54 cents.

4            2008, $385,594.54.

5            2009, $293 --

6    Q.  I'm sorry.  I think you have the wrong chart.  I'm going to

7    give you the Exhibit 71 that's in evidence.

8    A.  Sure.

9            (Document tendered to the witness.)

10   A.  Okay.

11   BY MS. SISKIND:

12   Q.  Can you read those numbers again?

13   A.  2006, $191,365.38.

14           2007, $355,063.27.

15           2008, $384,1183.06.

16           And 2009, $294,892.82.

17   Q.  And can you just explain to the jury why it was you had some

18   other numbers on a chart you were reading off of?

19   A.  Yes.  I made a couple corrections.  In reviewing the chart

20   that I previously prepared I made a couple corrections to it,

21   and it looks like this is the older chart, not the most recent

22   one.

23   Q.  So based on your revised calculations, what is the total

24   amount of unreported interest income you were able to attribute

25   to the defendant's HSBC-India accounts using the screen shots?

733

1    A.  $1,225,504.53.

2    Q.  After you made -- let me ask you this.  When did you first

3    attempt to make calculations of unreported interest income?  At

4    what point in your investigation?

09:12    5    A.  I probably began this process in January of 2011, and I

6    would have come up with the first screen that we saw around

7    March 2011.

8    Q.  Now, after you made -- started making these calculations

9    between January and March of 2011, did you come across any

09:12    10    evidence that suggested the defendant's total unreported

11    interest income was actually higher than $1.2 million for those

12    years?

13    A.  Yes, I did.

14    Q.  And what evidence would that be?

09:12    15    A.  The amended tax returns for 2006 through 2009.

16    Q.  Did you review amended tax returns for those years?

17    A.  Yes, I did.

18    Q.  Did you also review the amended tax return filed by the

19    defendant for the year 2005?

09:13    20    A.  Yes.

21    Q.  And are those the tax returns that are already in evidence

22    as Defendant's Exhibits 2087 through 2091?

23    A.  Yes.

24    Q.  When did the defendant file amended tax returns for those

09:13    25    years?

1   A.   May 2011.

2   Q.   And directing your attention to July 2010, a little less

3   than a year earlier, what, if anything, happened with respect to

4   your investigation of the defendant?

09:13   5   A.   The Department of Justice mailed Dr. Arvind Ahuja a letter

6   notifying him of the investigation.

7   Q.   Now, if you could, take a look at, for example, the 2005

8   amended return in Defendant's Exhibit 2087.

9   A.   Okay.

09:13   10   Q.   Do you see a part called "Explanation of Changes" on the

11   third page?

12   A.   Yes, I do.

13   Q.   Can you read what the explanation is for why this amended

14   return was filed?

09:14   15   A.   "The taxpayer's original 2005 income tax return did not

16   account for all their foreign bank accounts and the interest

17   income earned by these accounts during 2005.  The taxpayers are

18   amending their 2005 tax return to correct the omission."

19   Q.   Did you see a similar explanation to this on the remaining

09:14   20   amended returns?

21   A.   Yes, I did.

22   Q.   And did these returns, in fact, report interest income from

23   HSBC?

24   A.   Yes.

09:14   25   Q.   And on Schedule B, Part III, the foreign bank account

735

1  question, what box was checked regarding whether the defendant

2  had foreign bank accounts during the years 2005 through 2009?

3  A.  Yes.

4  Q.  The "Yes" box is checked?

5  A.  Yes.

6  Q.  Does the defendant indicate in what countries he held

7  foreign bank accounts during those years?

8  A.  United Kingdom and India.

9  Q.  After the defendant filed amended tax returns for the years

10  2005 through 2009, was he required to pay additional tax to the

11  IRS?

12  A.  Yes.

13  Q.  And are there actually copies of checks within each of these

14  exhibits that correspond to each amended return?

15  A.  Yes.

16  Q.  Have you compared the defendant's 2005 to 2009 tax returns

17  as originally filed with the figures on the amended returns?

18  A.  Yes.

19  Q.  Can you look at what's been marked for identification as

20  Government Exhibit 70?

21  A.  Okay.

22  Q.  What is Exhibit 70?

23  A.  This is a summary chart that compares the interest income

24  originally reported on the original Forms 1040 and the interest

25  income reported on the amended Forms 1040X.

736

1    Q.   And what years are covered by this summary?

2    A.   2005 through 2009.

3             MS. SISKIND:   The government moves for the admission

4    of Exhibit 70.

5             MR. KIRSCH:   No objection.

6             THE COURT:   70 is received.

7             (Exhibit 70 received in evidence.)

8    BY MS. SISKIND:

9    Q.   Can you tell the jury what the source of the information in

10   each column is?

11   A.   The first column, "Interest Income Per Form 1040," that's

12   going to be the original Forms 1040, the interest income per

13   Form 1040X.  That 1040X refers to the amended return.  And the

14   unreported interest income would be the difference between the

15   two columns.

16   Q.   What is the total amount of interest income that the

17   defendant failed to report on his 2005 original tax return?

18   A.   $719,079.

19   Q.   How about 2006?

20   A.   $315,858.

21   Q.   2007?

22   A.   $463,480.

23   Q.   2008?

24   A.   $699,946.

25   Q.   2009?

737

1    A.  $566,660.

2    Q.  And what is the total amount of interest income that the

3    defendant failed to report on his tax returns for the years 2005

4    through 2009?

5    A.  $2,765,023.

6            MS. SISKIND:  I have no further questions.

7            MR. KIRSCH:  Your Honor, can I just have one minute?

8    I need to look at something.

9            THE COURT:  Absolutely.

10           (Brief pause.)

11                        CROSS-EXAMINATION

12   BY MR. KIRSCH:

13   Q.  Good morning, Agent Cook.

14   A.  Good morning.

15   Q.  Agent Cook, I've got some questions for you about your

16   testimony and about some of the documents that you've talked

17   about on your direct examination over the past couple of days,

18   and I'm going to talk to you about a lot of the documents that

19   Ms. Siskind just showed you.

20           But before we talk about those documents in any

21   detail, I'd like you to tell the jury from where you got those

22   documents.  The HSBC documents.

23   A.  From HSBC.

24   Q.  In the United States.  Correct?

25   A.  Correct.

738

1    Q.  Sir, you testified on direct examination, I believe, that

2    all of the documents were -- that are Bates-labeled HSBC NRI or

3    HSBC-DOJ that are in this courtroom here came from HSBC in the

4    United States.  Correct?

09:20    5    A.  Correct.

6    Q.  All of the HSBC documents in this case, every single one

7    that you walked through on direct examination and every single

8    one that we're going to go through during cross-examination,

9    were maintained at HSBC in the United States.  That's correct,

09:21    10    isn't it?

11    A.  Or a copy of them.

12    Q.  So you have an original that was not maintained?

13    A.  No.  Just to be clear, I'm not sure where precisely an

14    original document would have been maintained.  But if through an

09:21    15    e-mail or for some other reason a copy of a document was

16    maintained in HSBC in the United States, that's how I would have

17    received the document.

18    Q.  Sir, do you remember testifying on Friday afternoon on

19    direct examination, Ms. Siskind asked you the following

09:21    20    question:

21         "QUESTION:  Among the records produced to the

22    government by HSBC, which I believe you testified were

23    maintained in the United States, did those records contain any

24    statements for the defendant's bank accounts at HSBC?

09:21    25         "ANSWER:  No, they did not."

739

1     I can show you the transcript if you'd like to see it.

2  A.  No.  I do remember testifying.

3  Q.  Do you remember that?

4  A.  Yes.  Yes.

09:21  5  Q.  Do you remember her asking you and specifically saying "I

6  believe you testified they were maintained in the United

7  States"?  Do you recall that?

8  A.  I do.  But I just want to be clear.  Is this referring to

9  the HSBC-USA account statements?

09:22  10  Q.  Let me read it again.

11  A.  Okay.

12  Q.  "QUESTION:  Among the records produced to the government by

13  HSBC" --

14     Okay?

09:22  15  A.  Yes.

16  Q.  You agree with me that means all of the records produced to

17  the government by HSBC, right?

18  A.  Sure.

19  Q.  -- "which I believe you testified were maintained in the

09:22  20  United States."  Correct?

21  A.  Correct.

22  Q.  So on cross-examination your testimony is the same as it was

23  on direct examination, that these records were maintained in the

24  United States, correct?

09:22  25  A.  Yes.

740

1    Q.  Sir, you have no evidence, none, that any of these documents

2    ever went to India.  Isn't that right?

3    A.  Of course, testimony.

4    Q.  There's no evidence on any of these documents -- there's no

5    testimony.  You sat here for four days.  There's no testimony in

6    this case that one single document was ever sent to India.

7              THE COURT:  Rephrase.  Rephrase, please.

8    BY MR. KIRSCH:

9    Q.  Sir, there's been no testimony --

10             THE COURT:  Rephrase.

11   BY MR. KIRSCH:

12   Q.  Sir, you have no evidence and no personal knowledge that any

13   of these documents ever went to India, do you?  The answer is

14   no, isn't it?

15   A.  When you say "personal knowledge," does that include

16   conversations that I had with other people?

17   Q.  No.  Sir, you have no personal knowledge yourself that any

18   of these documents ever went to India, correct?

19   A.  Yes, I do.

20   Q.  You have -- you know that these documents went to India

21   based on the documents and the testimony in this courtroom.

22   A.  Yes.  There's corroboration between documents --

23   Q.  Sir, I'm not asking you --

24             THE COURT:  One second.  Approach.

25             (At side bar on the record.)

741

1    THE COURT:  I interrupted for several reasons.  The

2  first is, as phrased you're inviting him to give hearsay.  So I

3  just wanted you to be alert to that.

4    MR. KIRSCH:  Yeah, I don't want to do that.  And I'm

5  trying to ask based on his personal knowledge.

6    THE COURT:  I understand that.

7    MR. KIRSCH:  -- and I ask that you just instruct him

8  to answer the question based on his personal knowledge, not what

9  others may or may not have said to him.

10    THE COURT:  Based upon -- if I were to ask him to do

11  that it would invite him to give hearsay.  I think what you're

12  trying to do is ask him whether or not he has direct information

13  as opposed to personal knowledge, because personal knowledge can

14  encompass with reference to hearsay.

15    MR. KIRSCH:  Okay.  I'll ask it that way.

16    THE COURT:  Secondly, please be careful about

17  injecting your opinion or testifying.  The way that you're

18  phrasing your questions, you are putting into the questions your

19  interpretation of what has transpired.  So please be careful.

20    MR. KIRSCH:  Okay.

21    (End of discussion at side bar.)

22    THE COURT:  Proceed.

23  BY MR. KIRSCH:

24  Q.  Sir, I'm going to ask you based on what you've seen and

25  observed.

742

1    A.  Okay.

2    Q.  Do you have any direct knowledge that any of these documents

3    were maintained in India?

4    A.  No.

09:25   5    Q.  None of these documents were obtained from HSBC-Jersey, were

6    they?

7    A.  No.

8    Q.  None of the documents were obtained by Citibank India or any

9    Citibank branch in India, correct?

09:26   10   A.  To my knowledge.

11   Q.  Sir, now we walked through these letters, and I'm going to

12   go through these with you in some detail, but I'd like you to --

13          MR. KIRSCH:  First, James, can you pull up Government

14   Exhibit 53.

09:26   15          Your Honor, I think the computer is on -- thank you.

16   BY MR. KIRSCH:

17   Q.  Okay, sir.  Agent Cook, do you see Government Exhibit 53?

18   A.  I don't.  This is still turning on.  Yes, I do.

19   Q.  Okay.  That's an e-mail from Priti Dhanani to

09:27   20   natasha2@bloomberg.net; is that correct?

21   A.  Yes.

22   Q.  And do you see there it indicates an attachment, a letter

23   down at the bottom?

24   A.  Yes.

09:27   25          MR. KIRSCH:  James, can you go to the second page of

743

1   that letter or that e-mail?  And blow up that letter.

2   BY MR. KIRSCH:

3   Q.  Do you see that letter?

4   A.  Yes, I do.

5   Q.  It's unsigned, correct?

6   A.  Correct.

7   Q.  And it's addressed to the manager, HSBC-NRI Services,

8   correct?

9   A.  Yes.

10  Q.  The letters that have been introduced as exhibits in this

11  case that are similar to this all take a similar form, correct?

12  A.  Yes.

13  Q.  Now, sir, you don't have any direct knowledge or personal

14  knowledge as to who drafted these letters, do you?

15  A.  Correct.

16  Q.  And as you've gone through these exhibits, you see that

17  several of the letters that have been admitted in this case are

18  drafted HSBC-USA or HSBC-NRI, correct?

19  A.  Yes.

20  Q.  I'd like to show you Exhibit 82, which you testified about

21  on direct examination.

22          MR. KIRSCH:  And if you can, pull up the text of that

23  letter, James.

24  BY MR. KIRSCH:

25  Q.  First, at the very top, this was the letter that you

744

1    testified to on direct examination that had to do with CDs that

2    were maturing.  Do you see that?

3    A.  Yes, I do.

4    Q.  And do you see the CD numbers there?

09:28    5    A.  Yes, I do.

6    Q.  You're familiar with those numbers, correct?

7    A.  Yes.

8    Q.  They appear on some of the screen shots that you've put into

9    evidence in 69 and 71, correct?

09:29    10   A.  Yes.

11   Q.  Do you see there they're referred to as CD numbers?

12   A.  Yes.

13   Q.  Can you tell the jury to whom that letter was addressed?

14   A.  The manager, HSBC-NRI Services USA.

09:29    15   Q.  And these are talking about NRO CDs, correct?

16   A.  Correct.

17   Q.  And the CDs are going to be credited to NRO savings,

18   correct?

19   A.  Correct.

09:29    20   Q.  And NRO accounts were taxable in India, correct?

21   A.  Yes.

22   Q.  Now, I'd like you to go down to --

23        MR. KIRSCH:  Just scroll down on that page a little

24   bit, James.  And blow up that stamp.

09:29    25   BY MR. KIRSCH:

745

1    Q.  Does that stamp, sir, indicate to you where this letter was

2    received?

3    A.  Yes.  Sighted, yes.

4    Q.  Where?

09:29  5    A.  HSBC NY rep office.

6    Q.  New York, New York, correct?

7    A.  Correct, yes.

8    Q.  Sir, you've walked through a series of e-mails this morning,

9    and I want to show you some of those e-mails.  If we can start

09:30  10   with Number 22, Government Exhibit 22.

11            MR. KIRSCH:  James, you've got to blow up the bottom

12   half of the e-mail, please.  Okay.

13   BY MR. KIRSCH:

14   Q.  That's, of course, the e-mail that's been admitted in

09:31  15   evidence, sir.  Do you see the bottom is an e-mail from Ankush

16   Tandon?

17   A.  Yes.

18   Q.  Do you see that?  To the e-mail address aahuja3803@aol.com.

19   A.  Yes.

09:31  20   Q.  Sir, when you read that e-mail -- tell the jury the e-mail

21   address from which that e-mail was sent.

22   A.  Ankush.k.tandon@us.hsbc.com.

23   Q.  And then there's a reply to that e-mail that you talked

24   about, and to whom is the reply e-mail sent?

09:32  25   A.  The same e-mail address, ankush.k.tandon@us.hsbc.com.

746

1  Q.  Do you see down there at the bottom of the e-mail -- the

2  full address got cut off, but do you see where it says Ankush

3  Tandon, HSBC, 452 Fifth Avenue?

4  A.  Yes, I do.

09:32  5  Q.  You know that to be an address in New York, New York,

6  correct?

7  A.  Yes.

8  Q.  I'd like to show you what's been admitted as Defendant's

9  Exhibit 2057.  Do you recognize this as the letter from -- I'm

09:33  10  sorry -- to the Department of Homeland Security from HSBC,

11  requesting a visa, a work visa for Ankush Tandon?

12  A.  Yes, I do.

13  Q.  I'd like to go to the second page of that letter in the

14  first paragraph.

09:33  15       Do you see there in the first line of that paragraph

16  where it indicates, "Mr. Tandon has been employed with HSBC

17  Bank-USA N.A. in the United States since July 2004"?

18  A.  Yes.

19  Q.  You don't have any reason to dispute that, do you, sir?

09:33  20  A.  No.

21  Q.  I'd now like to show you Defendant's Exhibit 2203.  Sir, do

22  you recognize this to be the resume of Priti Dhanani?

23  A.  Yes.

24  Q.  Now, you've met Priti Dhanani, have you not?

09:34  25  A.  Yes.

747

1    Q.  You interviewed her in this case?

2    A.  Correct.

3    Q.  You met with her for about four or five hours one day,

4    didn't you?

5    A.  Yes.

6    Q.  And that was after Dr. Ahuja had been indicted, right?

7    A.  Correct, yes.

8    Q.  You met with her at either your office or Mr. Sullivan's

9    office in Washington, D.C., did you not?

10   A.  That's correct.

11   Q.  She was represented by two lawyers from New York?

12   A.  I believe so, yes.

13   Q.  Now, under her experience --

14         MR. KIRSCH:  James, can you blow that up?

15   BY MR. KIRSCH:

16   Q.  Do you see where it indicates that she works at HSBC

17   Bank-USA?

18   A.  Right.  I see -- yes.

19   Q.  Sir, I'd now like to show you what you talked about this

20   morning.  I'd like to show you Government's Exhibit 32.

21         MR. KIRSCH:  And if you can, blow that up, James.

22   BY MR. KIRSCH:

23   Q.  Do you remember talking about this document this morning on

24   direct examination?

25   A.  Yes, I do.

748

1  Q.  And you'd agree -- does this letter look similar in form to

2  the letter in Government's Exhibit 53 that was blank and

3  unsigned and sent by Priti Dhanani?  I can show you that letter

4  if you'd like.

09:35  5  A.  Yes, it looks similar, yes.

6  Q.  You don't have any idea who wrote this letter or who

7  addressed it, correct?

8  A.  No.

9  Q.  And you testified on direct examination that this was

09:36  10  dealing with the issuance of PINs for credit card numbers,

11  correct?

12  A.  Correct.

13  Q.  You retrieved this document or received this document from

14  HSBC-USA, right?

09:36  15  A.  Correct.

16  Q.  Let's go to Government Exhibit 35.  Sir, this was the e-mail

17  that I think you testified to on direct examination that was

18  sent a day later to aahuja3803, indicating that the credit card

19  PINs would be delivered, correct?

09:36  20  A.  Yes.

21  Q.  From whom was the letter sent?

22  A.  Ankush K. Tandon.

23  Q.  The same Ankush K. Tandon that worked at HSBC-USA, correct?

24  A.  Correct.

09:36  25  Q.  I'd now like to show you -- I think you testified on Friday

749

1    about Government Exhibit 42, which is an account application --

2    application.  You've seen this document before, have you not?

3    A.  Yes.

4    Q.  And you see there on the front where it says "NRI status

5    confirmed as per passport copies enclosed," "Scanned and sent on

6    January 8" -- or 28, 2008:

7    A.  Yes, I do.

8    Q.  I'd like --

9          MR. KIRSCH:  James, can you pull up the last page of

10   that document.  It's Bates number 7784.  Down at the bottom.

11   Can you blow up the stamp?

12   BY MR. KIRSCH:

13   Q.  Do you see that, sir?

14   A.  Yes, I do.

15   Q.  Now, this document you obtained from HSBC-USA, correct?

16   A.  Correct.

17   Q.  Do you see there where it indicates HSBC Bank-USA, South

18   Asian Banking, New York, New York?

19   A.  Yes, I do.

20   Q.  Sir, I'd like to show you Government Exhibit 62 which you

21   testified about this morning.  Do you recall your testimony

22   about that document, sir?

23   A.  Yes, I do.

24   Q.  And this document, this letter from September 21, 2009,

25   looks similar in form to the blank letter in Government

750

1  Exhibit 53, correct?

2  A.  Correct.

3  Q.  You don't have any idea who wrote this letter, correct?

4  A.  Correct.

5  Q.  Do you see in the middle of the page an address,

6  6321 Parkview Road, Greendale, Wisconsin?

7  A.  Yes.

8  Q.  You know that to be Dr. Ahuja's home address here in

9  Greendale, correct?

10  A.  Correct.

11  Q.  So this letter indicates that he wanted the money just sent

12  to him at his house in Greendale, Wisconsin, correct?

13  A.  Correct.

14  Q.  This document -- I may have asked this but if I haven't,

15  this document was obtained from HSBC-USA, correct?

16  A.  Correct.

17  Q.  Sir, you have -- did you serve a subpoena on HSBC-India?

18  A.  No.

19  Q.  You didn't?

20  A.  No.

21  Q.  You didn't think that it would be important to retrieve

22  documents from HSBC-India as part of your investigation?

23  A.  I would have loved to.  That would have been great.

24  Q.  But you didn't do it.

25  A.  My subpoena authority or the subpoena authority from the

751

1    court doesn't extend beyond the U.S.

2    Q.  Well, sir, let's talk about that for a few minutes.  You

3    testified that you've been an IRS Agent for almost three years,

4    right?

09:40   5    A.  Correct.

6    Q.  And you've testified that you received training in Glynco,

7    Georgia, for seven or eight weeks, correct?

8    A.  Seven months.

9    Q.  Seven months' training.

09:40   10   A.  Correct.

11   Q.  Correct?  So you are familiar with the process called

12   letters rogatory, correct?

13   A.  I am not.

14          MS. SISKIND:  Objection, Your Honor.  Calls for legal

09:40   15   testimony.

16          THE COURT:  Overruled.

17   BY MR. KIRSCH:

18   Q.  Sir, you've never heard of the process known as legals

19   rogatory?

09:40   20   A.  No.

21   Q.  Well, let me ask you some questions about that process.

22   Sir, as an IRS special agent --

23          THE COURT:  One second.  Ask another question, please.

24   BY MR. KIRSCH:

09:41   25   Q.  Sir, as an IRS --

752

1        MR. KIRSCH:  Your Honor, I -- I'll ask another

2   question.

3   BY MR. KIRSCH:

4   Q.  As an IRS special agent, you spent seven months in Glynco,

5   Georgia.  You're the case agent on this case, correct?

6   A.  Yes.

7   Q.  Are you aware that the letters rogatory process --

8        THE COURT:  One second.  Approach, please.

9        (At side bar on the record.)

10       THE COURT:  Would you please tell me where you're

11  going?

12       MR. KIRSCH:  Yes.  Your Honor, we're going to call a

13  witness who is going to talk about the letters rogatory process.

14  But we want to -- I want to establish with him that the letters

15  rogatory process is available on the website, that there are

16  treaties between India and the United States.

17       THE COURT:  He's already testified he's not familiar

18  with it.  Ask another question, please.

19       MR. KIRSCH:  Your Honor, can I for the record --

20       THE COURT:  You have to move on.  Under Rule 403 I'll

21  require you to move on.  If you're asking him about legal

22  processes, he's not the lawyer.

23       MR. KIRSCH:  I'm not going to ask him about the

24  process.

25       THE COURT:  And you are trying to inject into the

753

1    record something that this witness has no knowledge of and you

2    can't do that.

3            MR. KIRSCH:  Your Honor, I will not ask him a single

4    question about the process.  I just want --

09:42  5        THE COURT:  Your question said -- let me talk about

6    the process.  You just -- in your question, you asked about the

7    process.

8            MR. KIRSCH:  I'll take that -- I don't want to ask him

9    any questions about the process because he's not familiar with

09:42  10   it.

11           THE COURT:  That's the point.

12           MR. KIRSCH:  Okay.

13           (End of discussion at side bar.)

14   BY MR. KIRSCH:

09:43  15   Q.  Sir, are you familiar with the Department of Justice

16   Internet website?

17   A.  I know they have one.  I certainly haven't been to it

18   recently or frequently.

19   Q.  Have you ever looked at it?

09:43  20   A.  Yes.

21   Q.  Have you ever seen any reference to letters rogatory on the

22   Department of Justice website?

23   A.  I don't even know how to spell that.

24   Q.  Sir, are you familiar with the Department of Justice

09:43  25   Criminal Resource Manual?

754

1    A.  No, I'm not.

2    Q.  Have you ever seen the Department of Justice's Criminal

3    Resource Manual?

4            MS. SISKIND:  Objection.  Asked and answered.

5            MR. KIRSCH:  That's a different question, Your Honor.

6            THE COURT:  Overruled.

7    BY MR. KIRSCH:

8    Q.  Have you ever seen it?

9    A.  No.

10   Q.  When reviewing the Department of Justice's website, have you

11   ever seen a link to their Criminal Resource Manual?

12   A.  No.

13   Q.  Sir, are you familiar with the treaty on mutual legal

14   assistance in criminal matters signed between India and the

15   United States in October of 2001?

16   A.  I know what an MLAT is, which is that mutual legal

17   assistance treaty.  I'm not very familiar with U.S.-India 2001.

18   Q.  In the course of your investigation in this case, as part of

19   your investigative process, you did not familiarize yourself

20   with the ways in which evidence can be obtained by the

21   government in foreign countries?

22   A.  I did.

23   Q.  But you never looked -- you don't even know how to spell

24   letters rogatory.

25   A.  No.

755

1    Q.   You don't know anything about the Department of Justice's

2    Criminal Resource Manual.

3    A.   No.

4    Q.   Do you know anything about the Department of Justice's

5    office of international affairs?

6    A.   I do.

7    Q.   Did you discuss with them letters rogatory?

8    A.   No.

9    Q.   Did you ask anybody in the State Department about letters

10   rogatory?

11   A.   No, I did not.

12   Q.   Are you familiar, sir, with the term Interpol?

13   A.   Yes, I am.

14   Q.   Tell the ladies and gentlemen of the jury what Interpol is.

15   A.   I'm familiar with the term.  I'm not familiar of how broad

16   their jurisdiction is.  I believe it stands for "international

17   police."

18   Q.   Is that all you know about Interpol is what it stands for?

19   A.   I know very little about Interpol, but I can tell you that I

20   believe it's shared resources among countries.  But that is

21   about it.

22   Q.   That's the extent of your knowledge.

23   A.   Yes.

24   Q.   You never looked into that as part of the course of your

25   investigation here, correct?

756

1   A.  No, I did not.

2   Q.  Sir, are you familiar with the Hague Convention?

3   A.  Once again, I've heard the name before.

4   Q.  But that's it.

09:46   5   A.  That's it.

6   Q.  You didn't think that it was important in the course of this

7   investigation to familiarize yourself with those treaties

8   between India and the United States that deal with obtaining

9   evidence, including testimony in foreign countries, did you?

09:46   10   A.  Correct.

11   Q.  Are you familiar with the Indian Central Bureau of

12   Investigation?

13   A.  No.

14   Q.  You never issued a subpoena to HSBC-India in this case,

09:46   15   right?

16   A.  Correct.

17   Q.  You just subpoenaed HSBC; is that right?

18   A.  I'm not sure what the exact language was, but HSBC in the

19   United States I know.

09:47   20   Q.  And these documents that have been admitted in evidence are

21   what you received from the United States, correct?

22   A.  Yes.

23   Q.  And you never pursued any other form of investigation in

24   India, correct?

09:47   25   A.  Correct.

757

1    Q.  Sir, you gave some testimony this morning -- well, let me

2    ask you this.  Let me start with this.

3              Yesterday you told the jury -- I say yesterday --

4    Friday.  Friday you told the jury what an FBAR filing is,

5    correct?

6    A.  Correct.

7    Q.  And -- so that is a form, right?

8    A.  Yes.

9    Q.  One page, essentially --

10   A.  Correct.

11   Q.  -- that reports certain foreign accounts, correct?

12   A.  Correct.

13   Q.  You're aware that there's no tax due with an FBAR, right?

14   A.  Yes, I am.

15   Q.  So when an FBAR is filed on June 30th of each year to folks

16   who have a reporting obligation, they pay no tax with the filing

17   of the FBAR, right?

18   A.  That's correct.

19   Q.  You spent some time this morning walking through some

20   Citibank documents in some detail, and I want to go through

21   those documents with you.

22             We can start with 57.

23             MR. KIRSCH:  James, can you call out the top of the

24   page?

25   BY MR. KIRSCH:

1    Q.  Do you see there a date of October 16, 2008?

2    A.  Yes, I do.

3    Q.  You testified on direct examination -- I can show you the

4    exhibit if you like, but I think you have it in front of you.

5    You testified on direct examination that that was the same date

6    that the application in defendant's Exhibit 2060 was stamped,

7    correct?

8    A.  Correct.

9            MR. KIRSCH:  If you go to page DOJ Citi-16, James?

10   BY MR. KIRSCH:

11   Q.  Do you see that check?

12   A.  Yes, I do.

13   Q.  For a million dollars?

14   A.  Correct.

15   Q.  Comparing these two documents now that you've just seen,

16   does that indicate to you that the Citibank CDs were purchased

17   around on or about October 16th, 2008?

18   A.  Yes.

19   Q.  Now, sir, I think you've testified that you've reviewed the

20   tax returns that were filed in this case.

21   A.  Correct.

22   Q.  And you reviewed Dr. Ahuja's 2008 and 2009 tax returns,

23   correct?

24   A.  Correct.

25   Q.  And you've also received and reviewed the 1099 forms that

759

1    you subpoenaed from Mr. Miller who testified here on Friday,

2    right?

3    A.  Correct.

4    Q.  Now, sir --

5    09:50        MR. KIRSCH:  James, can you go back to the first page

6    of 57.

7    BY MR. KIRSCH:

8    Q.  From your review of those tax returns and from your review

9    of the 1099 forms that Mr. Miller received, you know that the

10   09:51   income that was received on these Citibank CDs was reported on

11   Schedule B, correct?

12   A.  Correct.

13   Q.  The income was there for the IRS to see it, right?

14   A.  Yes.

15   09:51   Q.  There's -- you don't dispute that the tax was calculated

16   correctly, do you?

17   A.  No.

18   Q.  And you don't dispute that tax was paid on these Citibank

19   accounts, correct?

20   09:51   A.  Correct.

21   Q.  I think you testified on direct examination that the

22   documents reflect that the accounts were applied for in

23   New York, correct?

24   A.  Yes.

25   09:52   Q.  And that's the exact same thing that's reflected in

760

1    Government Exhibit 42, which deals with HSBC, the last page,

2    correct?  I can show that to you if you'd like.

3    A.  No.  I'll take your word for it, that's correct.

4    Q.  Do you remember I showed it to you and it was stamped HSBC

09:52    5    Bank-USA --

6    A.  I do.

7    Q.  -- N.A. --

8    A.  Yes.

9    Q.  -- South Asian Banking, New York, New York.

09:52    10    A.  Yes.

11    Q.  I think you testified, sir, that of the Citibank, the two

12    applications that you showed the jury, either one or both of the

13    accounts were NRO accounts, correct?

14    A.  I remember that, yes.

09:52    15    Q.  And NRO is the type of account that was taxable in India; is

16    that right?

17    A.  Correct.

18         MR. KIRSCH:  Your Honor, can I have one minute?  I

19    need to look at an exhibit that's at my table.

09:53    20         THE COURT:  Surely.

21         (Brief pause.)

22         MR. KIRSCH:  Thank you, Your Honor.

23    BY MR. KIRSCH:

24    Q.  Sir, I have what I need.  Sir, I want to ask you some

09:54    25    questions about the screen shots that are in evidence as

761

1    Government's Exhibit 69 and 71.  Do you have those in front of

2    you, sir?

3    A.  I do, yes.

4    Q.  Now, sir, you have no personal knowledge or direct knowledge

5    of how those records were created, correct?

6    A.  Correct.

7    Q.  You have no personal knowledge or direct knowledge of when

8    they were created, right?

9    A.  Aside from the date on top of them.

10   Q.  Yeah, you can just read the screen shot, right?

11   A.  Correct.

12   Q.  But you don't know if that was actually the date the screen

13   shot was produced or if that reflects the account or the value

14   of a CD on a particular date, do you?

15   A.  Based on Ms. Katju's testimony, I believe and know this to

16   be date that the screen shot was taken.

17   Q.  But that's what you have to rely on, correct?

18   A.  Correct.

19   Q.  You heard Ms. Katju's testimony that she didn't know whether

20   these screen shots were accurate.

21   A.  No, I didn't hear that.

22   Q.  You didn't hear that testimony?

23   A.  I don't believe that was what I remember from Ms. Katju's

24   testimony.

25   Q.  Okay.  Well, we have -- well, you don't know whether the

762

1    screen shots are accurate, right?

2    A.   You know, I have corroborating evidence from screen shots

3    tied to other transactions that make me believe they're very

4    accurate.

5    Q.   But, sir, you've made mistakes with respect to the screen

6    shot calculations in this case, have you not?

7    A.   Yes.

8    Q.   And some of those mistakes were due to inaccurate

9    information contained in the screen shots, correct?

10   A.   Incorrect.

11   Q.   That's not correct?

12   A.   That's not correct.

13   Q.   Sir, you were asked on direct examination, do you remember,

14   by Ms. Siskind, if there were any errors in your calculations

15   that you would correct them, correct?

16   A.   Yes.

17   Q.   And you said you would because you're familiar with e-mails,

18   are you not, where accounts or CD numbers were changed on the

19   screen shots, correct?

20   A.   Yes, correct.

21   Q.   And interest rates were changed, correct?

22   A.   Correct.

23   Q.   And the amounts in the CDs were changed, correct?

24   A.   Yes.

25   Q.   And this was a result of e-mails that you reviewed and that

763

1  you obtained from HSBC in New York, correct?

2  A.  Correct.

3  Q.  Indicating that some of the information in some of those

4  screen shots did not reflect accurately what was happening with

09:58  5  some of the CDs, correct?

6  A.  Well, it depends on what you mean by "happening with some of

7  the CDs."

8  Q.  Well, sir, let me --

9  MR. KIRSCH:  Your Honor, may I approach?

09:58  10  THE COURT:  You may.

11  BY MR. KIRSCH:

12  Q.  Let me show you an e-mail, sir, that's Bates-stamped

13  HSBC-NRI 893, from Priti Dhanani's --

14  THE COURT:  Please do not walk and talk.

09:58  15  MR. KIRSCH:  Sorry, I forgot.

16  BY MR. KIRSCH:

17  Q.  Sir, will you read that e-mail?  Just read it to yourself.

18  A.  Okay.

19  (Witness peruses document.)

09:58  20  A.  Okay.

21  BY MR. KIRSCH:

22  Q.  Now, do you have that?

23  A.  Yes, I do.

24  Q.  So now does that remind you that there was some information

09:59  25  contained in these screen shots that did not accurately reflect

764

1    the information in the CDs?

2    A.   In the CDs, I'm not sure.  But the screen shots accurately

3    reflected the information that was in the system.

4    Q.   Sir, what you're telling the jury is that the screen shot is

5    an accurate picture of the computer as the computer existed on a

6    particular day, right?

7    A.   That's correct.

8    Q.   But the information in the computer on a particular day may

9    have in instances been inaccurate, correct?

10   A.   Yes.  Correct.

11   Q.   Just so we're clear, that's what these documents reflect,

12   correct?

13   A.   Correct.

14   Q.   So you would agree with me --

15              THE COURT:  Rephrase.

16              MR. KIRSCH:  I'm sorry, Your Honor.

17   BY MR. KIRSCH:

18   Q.   Sir, the information contained in the screen shots -- not

19   just the picture itself, the information contained in the screen

20   shots -- you have evidence that suggests that that information

21   was not always accurate, correct?

22   A.   No more or less accurate than any other bank.

23   Q.   Well, sir, I'm not asking about any other bank.  You've

24   reviewed screen shots from other banks and tested them for

25   accuracy in the course of this investigation?

765

1    A.   Of course not.

2    Q.   Okay.  So you have personal knowledge of your own bank

3    messing up screen shots?

4    A.   Not screen shots.  But of course, everyone's had an

5    experience where the bank doesn't get a deposit perfectly

6    correct and you have to follow up.

7    Q.   You've had that experience where bank statements have been

8    wrong?

9    A.   Not necessarily a bank statement but something coming back.

10   I think almost everyone has.

11   Q.   Let's focus on the screen shots in this case.  I'll ask my

12   question again.

13   A.   Okay.

14   Q.   Do you agree with me --

15            THE COURT:  No, he doesn't have to agree with you.

16            MR. KIRSCH:  I'm sorry, Your Honor.  It's a bad habit.

17   You're going to break it, though.

18            THE COURT:  You're right.

19            (General laughter.)

20   BY MR. KIRSCH:

21   Q.   Sir, the screen shot that you have in front of you as

22   Government Exhibit 69 and 71 do not always accurately reflect

23   the information with respect to the CDs reflected in those

24   screen shots, correct?

25   A.   Yes.

766

1  Q.  But you relied on them in performing your calculations for

2  this jury, correct?

3  A.  Yes.

4  Q.  Despite the fact that you know that they contain inaccurate

5  information.

6  A.  Correct.

7          MR. KIRSCH:  Your Honor, may I approach?

8          THE COURT:  You certainly may.

9          MR. KIRSCH:  Your Honor, may I have just one minute?

10          (Defense counsel confer.)

11  BY MR. KIRSCH:

12  Q.  Sir, you were asked about the amended returns in this case,

13  correct?

14  A.  Yes.

15  Q.  And those -- by the way, you have no -- the amended returns

16  are accurate as far as you know, correct?

17  A.  Yes.

18  Q.  And you've checked.  You checked the amended returns, right?

19  You're familiar with them.

20  A.  Yes.

21  Q.  Sir, those amended returns were paid -- I'm sorry -- they

22  were filed before Dr. Ahuja was indicted in this case, correct?

23  A.  Correct.

24  Q.  And with those amended returns he paid late-payment

25  penalties, correct?

767

1    A.  Correct.

2    Q.  And he also paid interest on the underpayment amount,

3    correct?

4    A.  Yes.

10:03    5    Q.  All paid at the same time, correct?

6    A.  Yes.

7    Q.  And actually, they were paid -- the payments were made in

8    March, I believe, correct?

9    A.  I don't have direct knowledge of that, but --

10:03    10    Q.  In any event, the amended tax returns were filed before

11    Dr. Ahuja was indicted in this case, correct?

12    A.  Correct.

13            MR. KIRSCH:  Your Honor, I have no further questions.

14                    REDIRECT EXAMINATION

10:03    15    BY MS. SISKIND:

16    Q.  Now, Agent Cook, Mr. Kirsch was asking you about bank

17    statements at the beginning of his cross-examination.  Do you

18    recall that?

19    A.  Yes, I do.

10:04    20    Q.  Just so we're clear, what, if any, monthly bank statements

21    were you able to review regarding HSBC?

22    A.  The HSBC-USA account for a certain period, I believe it

23    ended in 2008, but I had monthly statements for that Premier

24    account in the United States.

10:04    25    Q.  And are those monthly account statements what we talked

768

1    about on Friday in Government Exhibit 72?

2    A.   Yes.

3    Q.   Were you able to review any monthly account statements for

4    any HSBC-India accounts?

5    A.   No, I was not.

6    Q.   Were you able to review any monthly account statements for

7    any HSBC-Jersey accounts?

8    A.   No.

9    Q.   And do you have Exhibit 72 with you?

10   A.   Yes, I do.

11   Q.   What are the last four digits of the account number that

12   these monthly statements pertain to?

13   A.   244-8.

14   Q.   I want to take you -- first let me ask you this.  In your

15   investigation did you receive documents from Citibank?

16   A.   Yes, I did.

17   Q.   Mr. Kirsch was asking you about this.  And just to be clear,

18   where did the record come from for Citibank?

19   A.   United States.

20   Q.   And by looking at a document can you tell whether it came

21   from Citibank?

22   A.   Yes, I can.

23   Q.   And what about a document and the Bates number in particular

24   indicates that it came from Citibank?

25   A.   It will have a notification such as DOJ-CITI.

769

1    Q.  Now, Mr. Kirsch was asking you about some letters and where

2    the letters were addressed.  Do you recall that?

3    A.  Yes, I do.

4    Q.  I want to take you through a couple letters that we already

5    talked about but just go through them quickly, starting with

6    Government Exhibit 32.

7           MS. SISKIND:  If we could switch over to the

8    government computer, Your Honor.

9    BY MS. SISKIND:

10   Q.  To whom is this letter addressed?

11   A.  Premier department, HSBC-Jersey.

12   Q.  Do you see an account number or -- I'm sorry -- a credit

13   card number referenced in this letter?

14   A.  Yes, I do.

15   Q.  Does that number correspond in any way to the number on the

16   HSBC-United States account statements?  The number that you just

17   read to the jury.

18   A.  No, it does not.

19   Q.  And what names appear below the signatures on this letter to

20   HSBC-Jersey?

21   A.  Arvind Ahuja, Namrata Ahuja.

22   Q.  Government Exhibit 59.  You can look at it on the screen.

23   To whom is this letter addressed?

24   A.  The branch manager at HSBC-Jersey.

25   Q.  Do you see names typed next to the signatures?

770

 1   A.  Yes, I do.

 2   Q.  What names are those?

 3   A.  Namrata Ahuja, Arvind Ahuja.

 4   Q.  Do you see an account number in the body of this letter?

 5   A.  Yes, I do.

 6   Q.  Is that the defendant's HSBC-United States account number?

 7   A.  No, it is not.

 8   Q.  Government Exhibit 62.  Who is that letter -- to whom is

 9   that letter addressed?

10   A.  The manager, HSBC-Jersey.

11   Q.  And do you see names typed below the signatures?

12   A.  Yes, I do.

13   Q.  What names are those?

14   A.  Arvind Ahuja, Namrata Ahuja.

15   Q.  Do you see both an account number and a customer ID number

16   referenced in the subject line of this letter?

17   A.  Yes, I do.

18   Q.  Are either of those the defendant's HSBC-United States

19   account number?

20   A.  No.

21   Q.  Government Exhibit 5.

22        MR. KIRSCH:  Your Honor, I'm going to object as

23   repetitive of the direct examination.

24        THE COURT:  Overruled.

25   BY MS. SISKIND:

771

1    Q.  To whom is this letter addressed?

2    A.  The manager, HSBC-New Delhi.

3    Q.  Do you see a name below the signature?

4    A.  I do.

10:07   5    Q.  What name is that?

6    A.  Dr. Arvind Ahuja.

7    Q.  Do you see an account number in the body of this letter?

8    A.  Yes.

9    Q.  Is that the defendant's HSBC-United States account number?

10:07   10    A.  No, it is not.

11    Q.  Government Exhibit 2.  To whom is this letter addressed?

12    A.  The manager, HSBC-Delhi.

13    Q.  What name is typed below the signature?

14    A.  Dr. Arvind Ahuja.

10:08   15    Q.  Do you see an account number in there?

16    A.  Yes, I do.

17    Q.  Is that the defendant's HSBC-United States account number

18    that we saw in Exhibit 72?

19    A.  No, it is not.

10:08   20    Q.  Government Exhibit 85.  To whom is this letter addressed?

21    A.  The manager, HSBC-New Delhi.

22    Q.  Do you see a name typed below the signature?

23    A.  Yes, I do.

24    Q.  And what name is that?

10:08   25    A.  Arvind Ahuja.

772

1  Q.  Do you see an account number in the subject line?

2  A.  Yes, I do.

3  Q.  Is that the defendant's HSBC-United States account number?

4  A.  No, it is not.

5  Q.  Were any of these letters signed by Priti Dhanani?

6  A.  No.

7  Q.  Were any of them signed by Ankush Tandon?

8  A.  No.

9  Q.  Were any of the letters you reviewed relating to the

10  defendant's account signed by Priti Dhanani?

11  A.  No.

12  Q.  Were any of them signed by Ankush Tandon?

13  A.  No.

14  Q.  Did any of the letters relating to the defendant's

15  HSBC-India or HSBC-Jersey account reference that New York

16  account number we saw in Exhibit 72?

17  A.  Yes.

18  Q.  And which letter was that?

19  A.  I'm sorry.  Can you repeat that?

20  Q.  Sure.  Any of the letters relating to the management of the

21  defendant's HSBC-India or HSBC-Jersey accounts, did any of them

22  reference the account number we saw in Government Exhibit 72?

23  A.  Yes.

24  Q.  And what letter was that?

25  A.  To transfer funds.

773

1    Q.  From where to where?

2    A.  USA to India.

3    Q.  Now, Mr. Kirsch was asking you about the account application

4    in Government Exhibit 42.

5            MS. SISKIND:  If we could have that on the screen?

6    BY MS. SISKIND:

7    Q.  And he was asking you about a stamp on one of the pages

8    indicating it had been received in New York.  Do you recall

9    that?

10   A.  Yes, I do.

11   Q.  Can you go to the top of that page and read what it says at

12   the top of the page?

13   A.  "Please open an account at your New Delhi branch as per

14   details below."

15   Q.  And does Exhibit 42 bear signatures?

16   A.  Yes, it does.

17   Q.  And what names are listed near the signatures?

18           MS. SISKIND:  If we could go to the page with the

19   signatures.

20   BY MS. SISKIND:

21   Q.  Are there any names listed near the signatures on that page?

22   A.  There are the signatures themselves listed to the first and

23   second applicant.

24   Q.  And then if you go back to the first page, do you see the

25   names of the applicants?

774

1  A.  Yes, I do.

2  Q.  And what are the names of the applicants on Government

3  Exhibit 42?

4  A.  Arvind Ahuja and Namrata Ahuja.

5  Q.  Now, Mr. Kirsch was asking you about the office of

6  international affairs and treaties and things of that nature.

7  Do you recall that?

8  A.  Yes, I do.

9  Q.  As an IRS special agent, do you personally have the final

10  say in what means of evidence gathering are used in a particular

11  criminal tax case?

12         MR. KIRSCH:  Objection.

13         THE COURT:  Approach.

14         (At side bar on the record.)

15         THE COURT:  What's the objection?

16         MR. KIRSCH:  Well, Your Honor, unless she's going to

17  put on evidence as to who made decisions not to pursue letter

18  rogatories and subpoenas, I need to explore this with him and

19  get into the process by which he could have followed had he

20  known about it.  This opens the door to my line of

21  cross-examination.  She's now trying to imply that maybe

22  somebody else shut him down in trying to obtain a letters

23  rogatory.  And it's improper.  He can't say who or who doesn't

24  make final decisions.  He can say what he did and what he didn't

25  do, but that's all he can do.

775

1    THE COURT:  I'll overrule the objection.  But I am

2  going to limit you regarding --

3    MS. SISKIND:  This is the only question.

4    THE COURT:  Okay, because this is redirect it has to

5  be limited to the scope of the cross.  He was limited on his

6  cross-examination; therefore, you can't go very much further.

7    MS. SISKIND:  Your Honor, I just want to make it

8  clear.

9    THE COURT:  All right.

10    MR. KIRSCH:  Then I'm going to ask questions about

11  that and whether letters rogatory or subpoenas were pursued in

12  this case and who made the decisions.

13    THE COURT:  You already asked him questions about

14  that.  I'm not going to allow that.

15    MR. KIRSCH:  But --

16    THE COURT:  If you have rebuttal, rebuttal has to be

17  related to her -- I'm sorry -- it has to be related to her

18  redirect, and her redirect at this point in time is limited only

19  to whether or not he had the final say.

20    MR. KIRSCH:  Okay.

21    (End of discussion at side bar.)

22    THE COURT:  Overruled.

23    MS. SISKIND:  Your Honor, I'm just waiting for the

24  juror to return from getting a drink of water.

25    THE COURT:  Okay.

776

BY MS. SISKIND:

Q.  So, Agent Cook, I'll ask you that question again.

As an IRS special agent, do you personally have the final say in what types of evidence gathering are used in any given criminal tax case?

A.  No.

Q.  I want you to take a look at Government Exhibit 57. Mr. Kirsch was asking you about that.  You can look at it on the screen.

What is the written in the upper left-hand corner of this document?

A.  "Citibank NRI Business, Wealth Management For the Global Indian."

Q.  Looking at Defendant Exhibit 2060, which we don't have in the computer but you had in front of you during your direct examination.

THE COURT:  Do you want to display it?

MS. SISKIND:  Actually, that would be -- you know, I'll come back to this and we'll do the Elmo last and I'll do something else first.

THE COURT:  I can put the camera on it if you want it.

MS. SISKIND:  Okay.

THE WITNESS:  It's right here.

BY MS. SISKIND:

Q.  What does it say in the upper left-hand corner of this

777

1   document?

2   A.   "Citibank NRI Business, Wealth Management For the Global

3   Indian."

4   Q.   What type of account application is this?

5   A.   Rupee checking/savings account.

6   Q.   If you go to the third page, Mr. Kirsch I believe was asking

7   you if this account was applied for in New York.  Do you recall

8   that?

9   A.   Yes, I do.

10  Q.   And what is your understanding of where this account was

11  applied for?

12          MR. KIRSCH:  Your Honor, objection.  Foundation.

13          THE COURT:  Objection sustained.

14  BY MS. SISKIND:

15  Q.   If you look at the bottom of the fifth page of this exhibit,

16  do you see two little X marks underneath the picture in the

17  bottom half of the page?

18  A.   Yes, I do.

19  Q.   Can you read what appears next to those X's?

20          THE COURT:  Would you move that up, please?  Move that

21  away from you.

22  BY MS. SISKIND:

23  Q.   What appears next to those X's?

24  A.   "The customer has been met in person and the documents have

25  been verified against the originals."  "The customer has been

1    met in person and he/she signed the application in my presence."

2    Q.  And then looking to the right of that, do you see the stamp

3    that Mr. Kirsch was asking you about?

4    A.  Yes, I do.

5    Q.  And at what location would the application have been signed?

6    A.  New York.

7    Q.  I want you to flip back, though, to the third page of this

8    exhibit.  Focusing on Section C at the top of the page, what is

9    Section C?  What kind of information is it asking for?

10   A.  The city in which you want to hold the account.

11   Q.  And what is checked?

12   A.  New Delhi.

13   Q.  Now, Mr. Kirsch was asking you about the screen shots in

14   this case.  Do you recall that?

15   A.  Yes, I do.

16   Q.  He was asking you about an e-mail that ended in the Bates

17   Number 893.  Do you recall that?

18   A.  I do, yes.

19   Q.  What did that e-mail indicate regarding interest rates?

20   A.  That the interest rate on the system was too low.

21   Q.  And what, if anything, based on your review of that e-mail,

22   did the bank do after learning the interest rates were too low?

23   A.  They corrected it.

24   Q.  Was there any change in CD numbers as a result of the change

25   in interest rate?

779

1    A.  Yes.

2    Q.  Did you take that e-mail into account when reaching your

3    computations of interest income in this case?

4    A.  Yes, I did.

5    Q.  How did that e-mail affect your computation of interest

6    income?

7    A.  Well, it reduced it.

8    Q.  Reduced it in what way?

9    A.  The interest income -- oh, I pulled the account out.  I had

10    originally included the account that was earning that interest,

11    and I pulled it after that.

12    Q.  And so the e-mail that Mr. Kirsch was asking you about, the

13    CDs referenced in there are no longer part of your calculations?

14    A.  That's correct.

15    Q.  And overall, what was the change in your interest income

16    calculation from your original calculation to the one we looked

17    at in court today?  You can take a look at them if you'd like.

18            (Witness peruses document.)

19    A.  On the original one that I had, it was $1,226,206.  And then

20    on the current one, it's $1,225,504.  It's less than a thousand

21    dollars difference.

22    BY MS. SISKIND:

23    Q.  The interest income figures from the defendant's amended tax

24    returns, are those lower or higher than the interest number you

25    came up with?

780

1   A.   Higher.

2        MS. SISKIND:   I have no further questions.

3                 RECROSS-EXAMINATION

4   BY MR. KIRSCH:

5   Q.   Sir, on redirect examination Ms. Siskind asked you some

6   questions about the Citibank accounts.  Do you recall that?

7   A.   Yes, I do.

8   Q.   Just so it's clear, sir, the interest from those accounts,

9   the interest income from those Citibank CDs was reported on

10  Schedule B and tax was paid on that amount, correct?

11  A.   That's correct.

12  Q.   Ms. Siskind asked you just now about the screen shots and

13  asked you whether the e-mail that I showed you reduced the

14  computation of the interest income, and you testified that it

15  did, right?

16  A.   Correct.

17  Q.   So, sir, when you discovered that some of the information

18  was inaccurate on those screen shots, it actually affected your

19  computations in this case, right?

20  A.   Correct.

21  Q.   Ms. Siskind asked you some questions about whether you make

22  final decisions with respect to investigations.

23  A.   Correct.

24  Q.   Do you recall that?  Sir, do you know whether an IRS

25  superior ever made a decision not to issue a subpoena to HSBC in

781

1    India or not to pursue a letters rogatory?  I'm just asking you

2    if you know.

3    A.  No.

4    Q.  Do you know whether the prosecutors at this table ever made

5    a decision not to issue a subpoena to HSBC-India or pursue a

6    letters rogatory in this investigation?

7    A.  No.

8    Q.  Sir, Ms. Siskind walked through a bunch of letters with you,

9    and I'm not going to show you those letters again; we've seen

10   them numerous times throughout the course of this trial.

11            But, sir, you don't know who wrote those letters, do

12   you?

13   A.  Correct.

14   Q.  You don't know who addressed those letters, correct?

15   A.  Correct.

16   Q.  And you have no idea why some of those letters are addressed

17   to HSBC-USA and others are addressed to HSBC branches in

18   New Delhi and Jersey, correct?

19   A.  Well, I know why they're addressed that way.

20   Q.  You know why they're addressed that way?

21   A.  Correct.

22   Q.  Was that based on something that somebody told you?

23   A.  Well, that's where they were going.

24   Q.  Sir, you don't -- you received all of the documents in this

25   case from HSBC-USA, correct?

782

1    A.  Correct.

2    Q.  You have no direct knowledge that any document ever went to

3    India because you didn't receive any document from India,

4    correct?

5    A.  Correct.

6    Q.  So those letters that are addressed to HSBC-USA, you don't

7    know why they were addressed to HSBC-USA, do you?

8    A.  Well, I do know why they were addressed to HSBC-USA.

9    Q.  You do.  Okay.

10            Did you write the letters, sir?

11   A.  No, I did not.

12   Q.  Sir, I'd like to show you Government's Exhibit 82.

13            MR. KIRSCH:  Is it on the correct system, James?  Can

14   you pull it up?

15            MR. HERRITY:  We need to change over.

16            MR. KIRSCH:  Your Honor, can you switch to the

17   defense?

18   BY MR. KIRSCH:

19   Q.  Do you see that letter, sir?

20   A.  Yes, I do.

21   Q.  Do you see it says "The Manager, HSBC-NRI Services, USA"?

22   A.  Yes, I do.

23   Q.  Did you address this letter?

24   A.  No, I did not.

25   Q.  Do you know who addressed it?

783

1  A.  No.

2  Q.  Do you know where this letter was received?

3  A.  Ultimately?

4  Q.  Yes.

5  A.  No.

6  Q.  Where did you get it?

7  A.  From HSBC.

8  Q.  USA, right?

9  A.  Correct.

10  Q.  And do you see a stamp on there that says "Original

11  Sighted"?  Do you see that?

12  A.  Yes, I do.

13  Q.  Sir, you have no direct evidence whatsoever that this letter

14  ever went anywhere outside of the United States, do you?

15  A.  Correct.

16  Q.  And you know why this letter was addressed to HSBC-USA?

17  A.  No.

18  Q.  But that's what you just told this jury is you knew why

19  these letters were addressed to whom they were addressed to,

20  right?

21  A.  Correct.

22  Q.  But you have no idea why these letters were addressed --

23  Strike that.

24      You don't know -- the one letter I showed you, sir,

25  you don't know why it was addressed to HSBC-NRI Services USA,

1    right?

2    A.   Correct.

3    Q.   So do you want to take back that prior answer?

4    A.   No.   I think in the beginning you had asked me do you know

5    why the letters are addressed to why they are.   And I answered

6    in general terms, yes, I do know why the letters are addressed

7    why they are.   If you pull out each individual letter and ask me

8    follow-up questions on each individual address, then certainly I

9    can't give you specific information on why they were addressed

10    there.

11    Q.   Because you don't know why this letter was addressed to

12    HSBC-NRI Services, USA, correct?

13    A.   Correct.

14         MR. KIRSCH:   Your Honor, may I have just one minute?

15         (Defense counsel confer.)

16         MR. KIRSCH:   No further questions, Your Honor.

17         MS. SISKIND:   Your Honor, can I ask one follow-up

18    question?   Actually only one.

19         THE COURT:   I'm counting.

20                    FURTHER REDIRECT EXAMINATION

21    BY MS. SISKIND:

22    Q.   Agent Cook, was the HSBC-NRI Services representative office

23    located in the United States?

24    A.   Yes, it was.

25         MS. SISKIND:   No further questions.

785

1          THE COURT:  Does the jury have questions of the

2     witness?  If so you may submit them to the bailiff.

3          (Jury questions tendered to the Court.)

4          THE COURT:  Approach.

5          (At side bar on the record.)

6          (Discussion off the record.)

7          MR. KIRSCH:  I think 3 is a proper question:  In your

8     investigation were you able to confirm whether or not he

9     received 1099 forms?

10         THE COURT:  Does the government agree regarding 3?

11         MS. SISKIND:  That's fine.

12         THE COURT:  Mr. Kirsch again.

13         MR. KIRSCH:  Your Honor, I think that I have this one

14    page with four questions on it.  I think Question 3 is a

15    two-part question.  I think both parts can be asked, and I think

16    that -- I think that Question 4 can be asked.  They can see that

17    from the tax returns, but they can ask Agent Cook.  I don't know

18    if Question Number 2 is appropriate:  What prompted an

19    investigation?

20         THE COURT:  I will not read Question 2.

21         MR. KIRSCH:  And I don't know if Question 1 is

22    appropriate either.

23         THE COURT:  I will not read Question 1.

24         MR. KIRSCH:  That takes care of that one.  And I think

25    on this one, I think in this one, Your Honor, there's --

786

1          THE COURT:  Read the question, please.

2          MR. KIRSCH:  The question is:  When the defendant

3    submitted amended tax returns for 2005 to 2009, did he include

4    any 1099 forms from his HSBC-India or Jersey accounts?

5          What I would suggest, Your Honor, is that the question

6    be modified to ask Agent Cook is:  When a tax return is

7    submitted to the IRS, does the taxpayer submit 1099 forms with

8    the return?

9          THE COURT:  Does the government agree?

10          MS. SISKIND:  Yes, Your Honor.

11          THE COURT:  That is how I will ask it.

12          MR. KIRSCH:  Thank you, Your Honor.

13          THE COURT:  Does the government have any disagreement

14    with what the defense stated?

15          MS. SISKIND:  No, Your Honor.

16          THE COURT:  All right.  So for clarification of the

17    questions submitted by the jury, the Court will ask Question 3.

18    The Court will not ask about the scope of the investigation,

19    which is Question 1.  The Court will not ask about what prompted

20    the investigation, which is Question 2.  The Court will not ask

21    Question 4, which inquires whether Dr. Ahuja applied for a

22    foreign tax credit for 2002 to 2009.

23          MR. KIRSCH:  Your Honor, I thought we agreed 4 should

24    be asked.

25          MS. SISKIND:  I think you indicated, Mr. Kirsch --

787

1    MR. KIRSCH:  I don't think that's an improper

2    question.  He's going to say yes.

3    MS. SISKIND:  That's fine.

4    THE COURT:  All right.  So I will ask -- I will read

5    Question 3 and Question 4, and I will also modify Question 5 to

6    inquire whether taxpayers submit -- are to submit 1099 forms

7    with amended tax returns.  Is that agreed?

8    MR. KIRSCH:  Yes, Your Honor.

9    MS. SISKIND:  Yes, Your Honor.

10   THE COURT:  Very well.

11   (End of discussion at side bar.)

12                          JURY EXAMINATION

13   BY THE COURT:

14   Q.  Agent Cook, in your investigation were you ever able to

15   confirm whether or not Dr. Ahuja received 1099-INT forms from

16   HSBC for NRI India accounts?

17   A.  Yes, I was.

18   Q.  Were you able to confirm whether or not he received such

19   forms from a Jersey account?

20   A.  Yes, I was.

21   Q.  Do you know whether Dr. Ahuja ever applied for a foreign tax

22   credit from 2002 to 2009?

23   A.  Yes, I do.

24   Q.  When taxpayers submit amended tax returns, do they

25   ordinarily include 1099 forms?

788

1    A.  I'm uncertain.

2           THE COURT:  The parties may follow up.

3                    FURTHER REDIRECT EXAMINATION

4    BY MS. SISKIND:

5    Q.  Agent Cook, the Court asked you whether you were able to

6    determine if the defendant received Forms 1099 from NRI Services

7    or Jersey.  Did he receive Forms 1099 from either HSBC-India or

8    HSBC-Jersey?

9    A.  No.

10           MS. SISKIND:  No further questions.

11           MR. KIRSCH:  I have no questions, Your Honor.

12           THE COURT:  Members of the jury, we will take our

13    break at this time.

14           As I said earlier, the Court makes decisions as to

15    whether certain questions submitted by the jury will be read,

16    and the Court exercised its responsibility in that regard and

17    only asked certain questions that were submitted.

18           We will take a recess.  As usual, please do not

19    discuss the case.

20           THE BAILIFF:  All rise.

21           (Jury out at 10:34 a.m.)

22           THE COURT:  You may step back.

23           (Witness excused at 10:34 a.m.)

24           THE COURT:  Please be seated.

25           Has the government prepared a witness?

789

1    MS. SISKIND:  No, Your Honor.  The only remaining

2 evidentiary issue are the two stipulations we submitted to the

3 Court.  I propose reading those when the jury returns.  Then

4 subject to a verification that all of our exhibits that we think

5 were admitted, were actually admitted, the government will rest.

6    THE COURT:  All right.  What we will do is give the

7 parties a chance to go over the exhibits with the clerk and to

8 make sure that they are all accounted for.  We'll do that before

9 the jury comes back.  All right?

10    MS. SISKIND:  Thank you, Your Honor.

11    THE COURT:  But also before the jury comes back and

12 the stipulations are read, I will entertain any comments the

13 parties may wish to make.  All right?

14    MS. SISKIND:  Your Honor, on the stipulations can I

15 retrieve them from the Court so I can read them, the signed

16 versions to the jury?

17    THE COURT:  Absolutely.

18    MS. SISKIND:  Thank you, Your Honor.

19    (Recess taken at 10:35 a.m., until 10:57 a.m.)

20    THE COURT:  Be seated, please.

21    We're back on the record.

22    I'd like to first inquire whether the parties had a

23 chance to review the exhibits with the clerk and confirm that

24 all exhibits that you wish to offer have indeed been offered?

25    MS. SISKIND:  Your Honor, we have made that review and

790

1    all of the exhibits we wish to offer are reflected on the

2    Court's list.

3              THE COURT:  All right.  Is the defense in agreement?

4              MR. KIRSCH:  Yes, Your Honor.

5              THE COURT:  All right.  Are there additional matters

6    over and above the need to address the stipulations?

7              MR. KIRSCH:  Your Honor, there's just one short

8    matter.  In response to the foreign tax credit question, the

9    parties have reached a stipulation that we'd like to read to the

10   jury in lieu of calling Mark Miller and Agent Cook to explain

11   the foreign tax credit.  I'd like to read this in front of the

12   jury, but can I read it for you first?

13             THE COURT:  Sure, go ahead.

14             MR. KIRSCH:  This is what I'd like to say:  "In

15   response to the Court's questions read to the witness, the

16   parties stipulate and agree that Dr. Ahuja did take a foreign

17   tax credit, including a foreign tax credit for taxes paid in

18   India on the Citibank CDs.  However, he did not take a foreign

19   tax credit for any tax paid to foreign countries on interest

20   earned on the HSBC CDs."

21             THE COURT:  Is that the stipulation the government has

22   entered with the defense?

23             MS. SISKIND:  Yes, Your Honor.  We would propose one

24   modification.  Maybe just to say:  "If called as a witness, Mark

25   Miller would testify that."

791

1    Frame it in those terms so it's not us saying it, it
2    would have been what a witness would say.

3    MR. KIRSCH:  I can add that.  So I'll say:  "The
4    parties stipulate and agree that if recalled as a witness Mark
5    Miller would testify that Dr. Ahuja did take a foreign tax," and
6    I'll read the rest of the paragraph.

7    THE COURT:  All right.  Are you ready to proceed?

8    MR. WEBB:  Your Honor, let me raise just one issue.

9    THE COURT:  Please stay in front of a mic.

10    MR. WEBB:  Yes, Your Honor.

11    Logistically when the jury comes back in then the
12    government -- we'll read this stipulation that Mr. Kirsch just
13    read off, the government has two short administrations to read,
14    and then the government rests, as I understand it.  Is that
15    correct?

16    THE COURT:  That is my understanding.

17    MR. WEBB:  And then we have prepared a written Rule 29
18    motion for judgment of acquittal on a variety of issues.

19    THE COURT:  You may tender that at this point, if
20    you'd like.

21    MR. WEBB:  And we can do so.  And then just to explain
22    to Your Honor exactly, we had made a decision over the weekend
23    that we will not be calling Dr. Ahuja and we will not be calling
24    therefore character witnesses to testify.

25    We will be calling one witness that will not be a

792

1    particularly long witness who is a former agent of the IRS who

2    is being called for two purposes:  One is to explain how to get

3    evidence in a foreign country; and also there's some golf course

4    records that he's going to summarize for the jury that the

5    government had said they don't have any objection to that we

6    obtained from Pebble Beach over the weekend.

7            But then we will be resting our case shortly after

8    that witness testifies.

9            And just as far as schedule for the day, we talked to

10   the government over the weekend.  I'll speak on behalf of both

11   of us but the government can correct me if I'm wrong, that in

12   order for us to make sure that we've got all the exhibits lined

13   up that would go back to the jury -- also in order to be able to

14   try to ask for time for some oral argument on the Rule 29

15   motion, and to try to work out some -- we've got some issues on

16   instructions that I think we might be able to work out before we

17   have an instruction conference with Your Honor, that we, the

18   parties, would like to request that we engage in all those

19   activities this afternoon and that we do closing arguments

20   starting first thing tomorrow morning, if that's acceptable to

21   the Court.

22           THE COURT:  That's acceptable to the court.

23           MR. WEBB:  Thank you.

24           MR. SULLIVAN:  Thank you, Your Honor.

25           THE COURT:  The jury will thank you as well.

793

1      All right.  Please bring out the jury.

2              (Jury in at 11:03 a.m.)

3              THE COURT:  Mr. Kirsch?

4              MR. KIRSCH:  Your Honor, the parties have reached a

5      stipulation which I would like to read to the jury.

6                       STIPULATIONS BETWEEN THE PARTIES

7              MR. KIRSCH:  In response to the Court's questions read

8      to the witness, the parties stipulate and agree that if recalled

9      as a witness Mark Miller would testify that Dr. Ahuja took a

10     foreign tax credit, including a foreign tax credit for taxes

11     paid in India on the Citibank CDs; however, he did not take a

12     foreign tax credit for any tax paid to foreign countries on

13     interest earned on the HSBC CDs.

14             Thank you, Your Honor.

15             THE COURT:  Proceed.

16             MS. SISKIND:  And I have two additional stipulations

17     to read to you.  The first:  United States of America, through

18     its undersigned attorneys, and the defendant, through his

19     undersigned attorneys, hereby agree and stipulate that

20     Government Exhibits 12-15 and Defendant's Exhibits 2224-2227 are

21     the defendant's U.S. individual income tax returns, Forms 1040,

22     for the calendar years 2002-2009, and Defendant's Exhibits

23     2084-2091 are the defendant's amended U.S. individual income tax

24     returns, Forms 1040X, for the calendar years 2002-2009, all of

25     which were filed by the defendant and received by the Internal

794

1    Revenue Service.

2         The second stipulation:  The United States of America,

3    through its undersigned attorneys, and the defendant, through

4    his undersigned attorneys, hereby agree and stipulate to the

5    following factual and evidentiary matters:

6         If called at trial, a witness from the United States

7    Department of Treasury, Financial Crimes Enforcement Network,

8    would testify as follows:

9         A report of foreign bank and financial accounts is

10   commonly referred to as an FBAR.

11        FBARs are due on June 30th following the close of the

12   calendar year.

13        A search of the records maintained by the United

14   States Department of Treasury indicates that no FBARs were filed

15   by the defendant, Arvind Ahuja, or his wife for the calendar

16   years 2006-2009.

17        THE COURT:  Members of the jury, just for

18   clarification, evidence is testimony of witnesses given in court

19   both on direct and cross-examination, regardless of who calls a

20   witness; exhibits received into the trial; and as was just

21   noted, stipulations.  Any facts to which the parties agree or

22   stipulate must therefore be treated as evidence in the case.

23        Does the government have anything else at this time?

24        MR. SULLIVAN:  Nothing further, Your Honor.

25        At this time, the government rests its case.

795

1          THE COURT:  Very well.

2          Members of the jury, that will complete the evidence

3    that you will hear today.

4          MR. WEBB:  Your Honor, could we be briefly heard at

5    side bar?

6          THE COURT:  Yes.

7          (At side bar on the record.)

8          MR. WEBB:  Your Honor, our -- we have a witness here

9    that's come in.

10          THE COURT:  Oh, that's right.  Okay.

11          MR. WEBB:  Could I file the Rule 29 motion, you would

12    accept it, enter and continue it for argument.  And I'm not

13    making any waiver by putting one witness on the stand.

14          THE COURT:  No.  You have submitted the motion.  I

15    take the motion under advisement.

16          MR. WEBB:  Thank you.  And I'll proceed with a witness

17    and then we'll be done for the day.

18          THE COURT:  The record will reflect the submission of

19    the motion.  But just for clarity, this does confirm that the

20    Rule 29 motion may be made before the offer of any evidence by

21    if defense.

22          MR. WEBB:  We're not waiving anything by going forward

23    with a witness.

24          THE COURT:  Absolutely not.  And we will also have a

25    colloquy with your client respecting his right to testify.

796

1       MR. WEBB:  I do understand that.

2           (End of discussion at side bar.)

3       THE COURT:  I got ahead of myself.  There is one

4   witness who will be called at this time.

5       Mr. Webb?

6       MR. WEBB:  Yes, Your Honor.  In light of the

7   government's resting its case, we have a witness who is here

8   from out of town, and we would ask the Court's indulgence to

9   call him at this time.

10      THE COURT:  Very well.  Proceed.

11      MR. WEBB:  He's on his way in at this moment,

12  Your Honor.

13      THE REPORTER:  Raise your right hand, please.

14          RONALD BRAVER, DEFENSE WITNESS, SWORN

15      THE REPORTER:  Please state your name and spell your

16  name for the record.

17      THE WITNESS:  It's Ron Braver, B-R-A-V-E-R.

18                  DIRECT EXAMINATION

19  BY MR. WEBB:

20  Q.  Mr. Braver, would you please tell the jury by whom are you

21  currently employed?

22  A.  Ron Braver and Associates.

23  Q.  And in which city is that business located?

24  A.  Chicago.

25  Q.  Please describe the nature of the business of Ron Braver and

797

1  Associates.

2  A.   I perform forensic accounting investigations and dispute

3  services.

4  Q.   Now, by whom were you employed before Ron Braver and

5  Associates?

6  A.   I worked for an international accounting firm known as Grant

7  Thornton LLP.

8  Q.   And when did you begin your employment at Grant Thornton?

9  A.   October 2010.

10  Q.   And you remained employed at Grant Thornton until you set up

11  the business Ron Braver and Associates; is that correct?

12  A.   Correct.   July of this year.

13  Q.   July of this year.

14  A.   Correct.

15  Q.   Now, tell the jury, you -- Grant Thornton was in October

16  of 2010?

17  A.   Correct.

18  Q.   Tell the jury what you did before October 2010.

19  A.   Sure.   From October of 1984 through September of 2010 I was

20  an IRS Agent, first as a revenue agent.   Beginning in September

21  of 1985 I became a special agent and later a supervisory special

22  agent.

23  Q.   So that you had a 25-year career at the Internal Revenue

24  Service; is that correct?

25  A.   That's correct.

798

1   Q.  And in October of 2010 did you then retire from your

2   government service?

3   A.  I did.

4   Q.  And that's when you entered the private sector.

5   A.  I did.

6   Q.  For the last two years or so.

7   A.  Correct.

8   Q.  Now, why don't you just -- we don't need to get into a lot

9   of detail, but when you are with the IRS, when you were a

10  revenue agent, what are your duties as a revenue agent?

11  A.  I was in the employee plans and exempt organization group

12  for 11 months.

13  Q.  And you said at some point you became what is known as a

14  special agent of the IRS; is that correct?

15  A.  That's correct.

16  Q.  I think that's the same position Mr. Cook -- do you know --

17  Mr. Cook just testified.  Do you know Mr. Cook at all?

18  A.  I do not.

19  Q.  I believe he also is a special agent of the IRS.

20          When you were a special agent -- you were a special

21  agent of the IRS from when to when, approximately?

22  A.  September of 1985 through around January of 2007.

23  Q.  And during that 22-year time period, can you just describe

24  for the jury what your duties were, generally what you did.  Not

25  going into specific cases, but generally what do you do as a

1    special agent for the IRS during those 22 years?

2    A.   Sure.  You investigate allegations of income tax evasion or

3    income tax charges and allegations of money laundering.

4    Q.   And where were you assigned during those years?

5    A.   Initially, I was assigned in Dallas.  After two years, I was

6    in Chicago.

7    Q.   Now, you then said in 2007 through the remainder of your

8    career at the IRS, what was your position or title?

9    A.   I was a supervisory special agent.

10   Q.   And what does the supervisory special agent do?

11   A.   It supervises special agents.

12   Q.   Okay.  And where did you work when you were supervising

13   special agents?

14   A.   In the Chicago area.

15   Q.   Now, besides the background you just provided to the jury,

16   are you a CPA?

17   A.   I am.

18   Q.   And do you have other specialties that you're certified for?

19   A.   I am.  I'm a certified fraud examiner, I'm a certified

20   anti-money-laundering specialist.  That's it.

21   Q.   And as far as your educational background is concerned, why

22   don't you summarize it for the jury.

23   A.   I have a bachelor of science in accounting and a master's in

24   taxation.

25   Q.   Now, during our trial Agent Cook has told the jury that he

800

1  was not aware of any way that an IRS agent could obtain evidence

2  in India in connection with an investigation he was conducting.

3  Based on -- factually do you agree or disagree with that

4  testimony?

11:13  5  A.  I would disagree.

6  Q.  And I want you to tell the jury during the years that you

7  were an IRS special agent, did you frequently obtain evidence in

8  a foreign country?

9  A.  I did.

11:13  10  Q.  And can you just summarize for the jury the different

11  methods and ways IRS special agents have to obtain evidence in

12  foreign countries if they feel it's necessary on a case?

13  A.  Sure.  You have your manual, which kind of -- the IRS

14  manual, which lays out different methods that you can use to

11:14  15  obtain evidence.  And you have the IRS international section of

16  the criminal investigation that also assists you in helping you

17  obtain records overseas.

18       There's various methods using Interpol, your foreign

19  attaches that are stationed around the country, around the

11:14  20  world, and again the international section.  And you use letters

21  of interrogatory.  There's various treaties with various

22  countries, and you can do it both informally and formally.

23  Q.  Now, you mentioned the terms "letters rogatory"?

24  A.  Correct.

11:14  25  Q.  I would like you to -- can you explain to the jury what are

801

1   letters rogatory and how can they be used by a special agent of

2   the IRS to obtain evidence in a foreign country?

3   A.   Okay.  It's a formal request.  You prepare it as an agent,

4   it's reviewed by your supervisor, it goes through the proper

5   channels to the country in question, and then you can request

6   either testimony or documents or both.

7   Q.   And it is a formal process; is that correct?

8   A.   Yes.

9   Q.   Does it go through a court?

10  A.   It can go through a court or it could go through

11  law-enforcement methods as well, using Interpol or your attaché.

12  Q.   So there's two different ways to use letters rogatory to get

13  evidence in foreign countries.

14  A.   Correct.

15  Q.   For example -- and you said that you can use the letters

16  rogatory to get both documents in foreign countries and

17  testimony; is that correct?

18  A.   Correct.

19  Q.   And if you obtain -- if you want to obtain testimony in a

20  foreign country to be presented here in the United States, are

21  you able to take depositions in the foreign country that then

22  can be sworn testimony that can be presented in a court of law

23  in the U.S.?

24  A.   Yes.

25  Q.   And what process do you follow to obtain documents, for

802

1    example, by letters rogatory?  How do you do that?

2    A.  Same method.  It's a formal request.  You request it from

3    that country, and the country responds formally in writing.

4    Q.  Now, you mentioned the IRS manual.  Is there a manual called

5    the IRS special agents manual?

6    A.  It's an IRS manual; it's part 9 of the manual.  The general

7    public can see it.  You can get it on the Internet.

8    Q.  Are IRS special agents trained on what's in their manual?

9    A.  Absolutely.

10   Q.  And this process is actually laid out in the manual.

11   A.  Correct.

12   Q.  And that manual is actually -- you could go on the Internet

13   today and find it if you wanted it; is that correct?

14   A.  Yes.

15   Q.  Now, the -- you mentioned that not only IRS agents -- that

16   letters rogatory process, you called that kind of a formal

17   process; is that correct?

18   A.  Correct.

19   Q.  Can you explain to the jury, can IRS agents often obtain

20   evidence in a foreign country through a less formal process?

21   A.  They can make inquiries in a less formal process.

22   Q.  Explain that process.

23   A.  We have agents stationed overseas in various countries.  In

24   these various countries, say in Hong Kong, when I was an agent

25   and a supervisor, handled India.  So if you wanted to contact --

1     if you wanted information from India, you would contact your

2     attaché in Hong Kong or the international section in Washington,

3     and they'd help you obtain or find the best method to obtain

4     those records.

5     Q. Now, over the years when you were a special agent or a

6     supervisory special agent during those 20-some years, did you

7     frequently obtain evidence from foreign countries through both

8     the formal and the informal process?

9     A. Frequently would be -- on numerous occasions.

10     Q. That's fine. On numerous occasions.

11     A. Yes.

12     Q. And did you do it both formally with letters rogatory and

13     informally with the process you just described?

14     A. Yes.

15     Q. And, for example, during your career as a special agent, did

16     you obtain evidence through letters rogatory from the nation of

17     India?

18     A. Yes.

19     Q. And as far as who makes the initial decision that it may be

20     necessary to try to go through a process to obtain evidence in a

21     foreign country, what role does the case agent -- when you were

22     a case agent -- or Mr. Cook as the case agent -- what role does

23     the case agent play in that process?

24     A. A significant part. Your job is to -- to determine or

25     uncover evidence to determine whether the allegations are true

804

1    or false.  It's up to you to find -- and you work closely with

2    your supervisor, and if it's a grand jury case you work closely

3    with the U.S. Attorney's Office.  But it's your responsibility

4    to prove or disprove or to make an effort to do so.

5    Q.  Okay.  Now, let me go to a little different subject matter.

6           During the years that you were an IRS special agent,

7    did you have occasion to testify as a summary witness where you

8    would be called upon to explain voluminous documents in a court

9    of law?

10   A.  Yes.

11   Q.  And in connection with that, have you also testified as an

12   expert in cases as a special agent?

13   A.  Yes.

14   Q.  At the end of last week, did I contact you and ask you if

15   you would come to Milwaukee and provide testimony in connection

16   with some documents that we were obtaining from the Pebble Beach

17   golf club in California that related to some testimony that was

18   presented towards the end of last week from a witness by the

19   name of Ramit Bhasin?

20   A.  Yes, you did.

21   Q.  And did you agree to be retained and to take on that

22   engagement to explain the records to the jury?

23   A.  Yes, I did.

24   Q.  Now, over the weekend, did I provide you with certain

25   records from the Pebble Beach Golf Course from June 1, 2009,

805

1  through June 30, 2009, that showed the names of people who

2  golfed at the Pebble Beach Golf Course in June of 2009?

3  A.  Yes, you did.

4  Q.  And did I show you some testimony from Ramit Bhasin where he

5  testified last week that he recalled a particular conversation

6  about a Citibank 1099 form in June 2009 while he was golfing on

7  the Pebble Beach Golf Course in California with Dr. Ahuja?  Did

8  I show you that testimony?

9  A.  Yes, you did.

10  Q.  And did I ask you to review the records produced by the

11  Pebble Beach Golf Course folks to determine if the golf course

12  records showed two people, Ramit Bhasin and/or Dr. Arvind Ahuja,

13  golfing on any day between June 1, 2009, and June 30, 2009, at

14  the Pebble Beach Golf Course?

15  A.  You showed it to me, and I did not see anybody with those

16  names.

17  Q.  I asked you to do that anyway; is that correct?

18  A.  Yes.

19  Q.  Now, let me show you --

20         Can I have Defense Exhibit 2228?  It's the binder of

21  the Pebble Beach --

22         (Defense counsel confer.)

23         MR. WEBB:  May I approach the witness, Your Honor?

24         THE COURT:  You certainly may.

25         (Document tendered to the witness.)

806

1  BY MR. WEBB:

2  Q.  Sir, I have handed you what's marked as trial Exhibit 2228,

3  and I'll ask you are these the documents that you reviewed to

4  determine if Dr. Arvind Ahuja and/or Ramit Bhasin are shown as

5  golfing on the Pebble Beach Golf Course any time between June 1,

6  2009, and June 30, 2009?  Are those the documents that I showed

7  you?

8  A.  Yes, they are.

9  Q.  And did you understand that we obtained these documents from

10  a subpoena served upon the Pebble Beach Golf Course after Ramit

11  Bhasin testified?

12  A.  Yes.

13        MR. WEBB:  I offer them into evidence.

14        MR. SULLIVAN:  No objection, Your Honor.

15        THE COURT:  They're received.

16        (Exhibit 2228 received in evidence.)

17  BY MR. WEBB:

18  Q.  Now, these are voluminous documents, and so I'm just going

19  to -- do the documents in there cover each and every day from

20  June 1, 2009, to June 30, 2009, showing the people who golfed at

21  the Pebble Beach Golf Club?

22  A.  Yes.

23  Q.  And in doing -- each day is represented there, each day from

24  1 to 30, June 30.  Is that correct?

25  A.  That's correct.

807

1   Q.  And so did you review carefully each and every page of this

2   exhibit to search for, to determine if you saw any record that

3   Dr. Arvind Ahuja or Ramit Bhasin are shown in the records as

4   golfing at the Pebble Beach Golf Course on any day between

5   June 1 and June 30, 2009?

6   A.  I do not see them golfing on any day, based on these

7   records.

8   Q.  Their names are not in the golf records; is that correct?

9   A.  They are not.

10  Q.  Now, I'm going to show you another exhibit also produced by

11  the golf course for the year earlier in July of 2008, which is

12  Exhibit 2229.

13          MR. WEBB:  May I approach the witness?

14          THE COURT:  You may.

15          (Document tendered to the witness.)

16  BY MR. WEBB:

17  Q.  Sir, I have now handed you what is marked as trial

18  Exhibit 2229.  And based on your review, does this appear to be

19  some records for the year 2008 showing Dr. Ahuja and Ramit

20  Bhasin being at Pebble Beach between July 2nd and July 5th,

21  2008?

22  A.  Yes.

23          MR. WEBB:  And I offer them into evidence.

24          MR. SULLIVAN:  No objection.

25          THE COURT:  Received.

808

1        (Exhibit 2229 received in evidence.)

2        MR. WEBB:  Now, James, may I call up the first page of

3   that Exhibit 2229?

4   BY MR. WEBB:

11:26  5   Q.   Based on the certification from Pebble Beach that you

6   observed, is this a screen shot of a search that was done by

7   Pebble Beach to determine whether Arvind Ahuja and Ramit Bhasin

8   ever stayed at Pebble Beach between March of '08 and the current

9   date?

11:26  10  A.   I believe August 17th, yes.

11  Q.   That was a couple days ago.

12  A.   Right.

13  Q.   So they did a search of all their records to see whether

14  Arvind Ahuja and Ramit Bhasin actually stayed at Pebble Beach

11:26  15  anytime in the last four years.

16  A.   Correct.

17  Q.   And based on the document that's on the screen, can you

18  explain to the jury when did the Pebble Beach people determine

19  that Dr. Arvind Ahuja and Ramit Bhasin were at Pebble Beach?

11:27  20  A.   Between July 2nd, 2008, and July 5th, 2008.

21  Q.   And there were no other records indicating they were there

22  at any other time; is that correct?

23  A.   That's correct.

24  Q.   And if you go to the second page of this exhibit of

11:27  25  Exhibit 2229 --

809

1    MR. WEBB:  Can you call that up, James?  I know this

2    is hard to read.  James, if you go down a bit you'll see a

3    record of -- you'll see -- James, you'll see PB links and some

4    charges.  If you go up maybe the first one-third of the page.  I

5    think it will show up on the screen.

6    BY MR. WEBB:

7    Q.  It's a little small, but, sir, do you see that there's a

8    record that on July 3rd of '08 that Dr. Ahuja pays for two

9    people to golf on the Pebble Beach links golf course, and the

10   charges are there; is that correct?

11   A.  Yes.  On July 3rd, 2008.

12   Q.  That's on July 3rd; is that correct?

13   A.  Correct.

14   Q.  And there are some other miscellaneous charges, but it

15   appears that these two gentlemen are at Pebble Beach Golf Course

16   on July 3rd of 2008; is that correct?

17   A.  That's correct.

18   Q.  Now, as far as having a conversation about Citibank 1099s,

19   Agent Cook, I'll represent to you, just testified that Dr. Ahuja

20   opened up his Citibank account in October of 2008.  That

21   testimony was just presented to the jury.

22   A.  Okay.

23   Q.  And did I show you actually that document last night, the

24   exhibit, showing Dr. Ahuja opened up the Citibank account on

25   October 16th, 2008, with a deposit of $1 million?

11:27  (line 5)
11:28  (line 10)
11:28  (line 15)
11:28  (line 20)
11:29  (line 25)

810

1    A.   Yes.

2    Q.   Now, so the jury understands, so that account was opened

3    several months after they played golf in 2008 at Pebble Beach;

4    is that correct?

5    A.   That's correct.

6    Q.   And can you explain to the jury -- Strike that.

7         Are you familiar with when banks such as Citibank

8    would -- when would Arvind Ahuja have received his first 1099

9    form from making that deposit at Citibank in October of 2008?

10   A.   Sometime before February of 2009 and after January of 2009.

11   Between January and February of 2009.

12   Q.   So Dr. Ahuja would not have even received any 1099 for

13   months after that golf course event in July; is that correct?

14   A.   Correct.

15   Q.   Just one other brief area.

16         At my request, sir, have you reviewed certain defense

17   exhibits, specifically 2190 and 2195, so that you could

18   summarize for the jury some information about HSBC, which is a

19   bank that's in issue in this case?  Did you look at those

20   documents?

21   A.   Yes, I did.

22   Q.   Let's start with, is it clear from the documents reviewed

23   that HSBC is an international bank?

24   A.   Yes.

25   Q.   Where is the parent -- is the name of the parent corporation

811

1    that -- is the name of the parent corporation called HSBC

2    Holdings PLC?

3    A.   Yeah.  It's a holding company.

4    Q.   And where is the parent corporation located?

5    A.   In London.

6    Q.   And do they have several thousand affiliated banks in many

7    countries across the world?

8    A.   Correct.

9    Q.   And among the different banks that they have as affiliated

10   banks, is one of them in the United States that's called

11   HSBC-USA?

12   A.   Yes.

13   Q.   And is that a United States chartered bank subject to the

14   laws of the United States?

15   A.   Yes.

16   Q.   And just even HSBC-USA itself here in the United States,

17   does it have many, many branches across the United States?

18   A.   It does.

19   Q.   And is one of them in New York City?

20   A.   Yes.

21   Q.   And did you also determine that they have an affiliated bank

22   called -- in India called HSBC-India?

23   A.   Yes.

24   Q.   And do they also have an affiliated bank in the Channel

25   Islands called HSBC-Jersey?

812

1    A.  Yes.

2              MR. WEBB:  I have no more questions.

3                        CROSS-EXAMINATION

4    BY MR. SULLIVAN:

11:32  5    Q.  Good morning, Mr. Braver.  How are you?

6    A.  Good.  How are you doing today?

7    Q.  I'm John Sullivan.  I'm with the U.S. Department of Justice,

8    and I represent the United States in this matter.

9              You were asked questions about 1099s from Citibank.

11:32  10   Do you recall that?

11   A.  Yes.

12   Q.  In your 25 years of experience as an IRS special agent, did

13   you ever have occasion when a foreign-based bank issued a 1099?

14   A.  Foreign-based bank?  You know, it's kind of a tricky

11:33  15   subject, what you mean by foreign-based bank.  Do they have

16   entities in the United States or do they not have entities in

17   the United States?

18   Q.  Well, you're familiar with UBS in Switzerland, I take it,

19   from your experience, correct?

11:33  20   A.  Yes.

21   Q.  And you know they have branches here in the United States,

22   UBS; is that correct?

23   A.  I do.

24   Q.  And do you realize that in February of 2009 they entered

11:33  25   into a deferred prosecution agreement --

1          MR. WEBB:  Objection.

2          THE COURT:  That's beyond the pale.  Ask another

3     question.

4          MR. SULLIVAN:  Withdrawn, Your Honor.

11:33  5     BY MR. SULLIVAN:

6     Q.   Do banks in Switzerland issue Forms 1099 to U.S. customers

7     who maintain Swiss bank?

8          MR. WEBB:  Your Honor, I'm going to object.  It's

9     outside the scope.

11:33  10          THE COURT:  Approach.

11          (At side bar on the record.)

12          THE COURT:  I'd like to hear why this is not beyond

13     the pale.

14          MR. SULLIVAN:  They raised the issue of 1099s.

11:34  15     Citibank had an NRI office that assisted U.S. customers set up

16     accounts in India.

17          THE COURT:  The issue is with respect to banks other

18     than ones that are under discussion in this case.

19          MR. SULLIVAN:  I will restrict it to banks under

11:34  20     discussion in this case.

21          THE COURT:  All right.

22          MR. WEBB:  Your Honor, I asked no questions about

23     banks in Switzerland.

24          THE COURT:  That's why that's now off limits.

11:34  25          MR. SULLIVAN:  Got it.

1                (End of discussion at side bar.)

2                THE COURT:  The question has been withdrawn.  Proceed.

3  BY MR. SULLIVAN:

4  Q.  Sir, are you familiar with the fact that HSBC in India is a

5  separate legal entity than the bank here in the United States

6  called HSBC-North America USA?

7  A.  Yes.

8  Q.  And does HSBC in India issue 1099s on deposits that are

9  maintained in India?

10  A.  I don't know.  I mean, does that person have an account in

11  the United States or not have an account in the -- there's a lot

12  of different questions that would have to be answered for me to

13  give an accurate answer.

14  Q.  For individuals that maintain bank accounts over in India,

15  does HSBC-India, to your knowledge, issue 1099s to the United

16  States?

17  A.  You're saying those individuals are U.S. citizens or they

18  live in the United States?  They have residency in the United

19  States?  I'm not -- there's a lot of different questions.

20  Q.  No.  The question is, sir:  For deposits that are over in

21  India, does HSBC-India issue Forms 1099-INT for interest income

22  to the United States of America?

23              MR. WEBB:  Your Honor, that assumes facts not in

24  evidence, and I object.

25              THE COURT:  Overruled.

815

1    THE WITNESS:  I don't know if they do --

2    THE COURT:  Is there any other objection?  I'm not

3  sure I fully understand the objection.

4    MR. WEBB:  Your Honor, my objection is if -- I don't

5  want to argue in front of the -- objection.  Relevancy.

6    THE COURT:  Overruled.

7    THE WITNESS:  You asked me if it's a U.S. citizen with

8  deposits over --

9    MR. SULLIVAN:  Could the court reporter please read

10  the question.

11    (Record read.)

12    THE WITNESS:  Whose deposits?  I can't answer that

13  without -- you're just saying any deposits in India?

14  BY MR. SULLIVAN:

15  Q.  Any deposits in India.

16  A.  From who?  From a U.S. citizen or an individual that lives

17  in the United States or someone who lives in the United Kingdom?

18  Q.  Can you just answer the question, sir?  Do they issue 1099s?

19    THE COURT:  Rephrase your question.

20    THE WITNESS:  Thank you.

21  BY MR. SULLIVAN:

22  Q.  For deposits that are maintained over in India, that are

23  physically located in India, does HSBC-India issue 1099s INT to

24  the Internal Revenue Service of the United States of America?

25  A.  I don't know.

816

1    Q.  Do you think they do?

2            MR. WEBB:  Object to the form of the question.

3            THE COURT:  Sustained.

4    BY MR. SULLIVAN:

5    Q.  Based on your 25 years of experience as an IRS special

6    agent, can you name one foreign country where the banks in that

7    foreign country issue 1099s to the IRS?

8    A.  Again, if -- if I don't live in the United States and I'm

9    not a U.S. citizen --

10           THE COURT:  One second.  Do you understand the

11   question which was posed?

12           THE WITNESS:  I do not.  I'm sorry.

13           THE COURT:  All right.  Ask another question.

14   BY MR. SULLIVAN:

15   Q.  You were a special agent with the IRS for 25 years, correct?

16   A.  Correct.

17   Q.  And in any of your investigations, did any of the people

18   that you were investigating have foreign-based bank accounts?

19   A.  Yes.

20   Q.  Which countries?

21   A.  Isle of Mann in the Cayman Islands, India, South Africa.

22   Numerous countries.  Hong Kong.

23   Q.  And to your knowledge, did any of those countries ever issue

24   Forms 1099 for the people that you were investigating to the

25   Internal Revenue Service of the United States?

817

1       MR. WEBB:  Object to the form of the question.

2       THE COURT:  Objection sustained.

3   BY MR. SULLIVAN:

4   Q.  To your knowledge, did those foreign banks ever issue 1099s

5   and submit a copy of it to the Internal Revenue Service of the

6   United States?

7   A.  Not to my knowledge.

8   Q.  You testified that you were given portions of Mr. Bhasin's

9   testimony in this case; is that correct?

10  A.  Correct.

11  Q.  And it wasn't clear which portions you were provided, but

12  were you provided the portion of his testimony where he was

13  asked this question and gave this answer:

14      "QUESTION:  If it turns out that the records show that

15  you were in Milwaukee and not in California, you couldn't have

16  played golf in California; is that correct?

17      "ANSWER:  That would be correct."

18      Were you provided with this portion of the transcript?

19  A.  No.

20  Q.  Is it possible that Ramit Bhasin was mistaken and that in

21  the summer of 2009 he actually was in the Milwaukee area?

22      MR. WEBB:  Objection.

23      THE COURT:  Sustained.

24      MR. SULLIVAN:  I'll move on, Your Honor.

25  BY MR. SULLIVAN:

11:39  (line 5)
11:40  (line 10)
11:40  (line 15)
11:40  (line 20)
11:41  (line 25)

818

1    Q.  As part of your investigation, you didn't canvass all the

2    golf courses in the greater Milwaukee area to confirm that

3    Mr. Bhasin and Dr. Ahuja did not play golf in the -- in June

4    of 2009 in this area, did you?

11:41    5    A.  I did not.

6    Q.  You testified that when you were an IRS special agent that

7    it was your responsibility as an agent to either prove or

8    disprove the allegations in the particular matter that you were

9    investigating.  Do you recall that?

11:41    10    A.  I do.

11    Q.  And are you aware that the basic allegation in this case is

12    that Dr. Ahuja failed to report $2.7 million of interest income

13    over the period 2005 through 2009?

14            MR. WEBB:  Objection.  Scope.

11:41    15            THE COURT:  Objection sustained.

16    BY MR. SULLIVAN:

17    Q.  You were asked questions about obtaining evidence located in

18    a foreign country.  Do you recall that?

19    A.  I do.

11:42    20    Q.  Did you ever have a situation in the cases that you

21    investigated involving undeclared offshore bank accounts where

22    the bank in the foreign country maintained a representative

23    office here in the United States?

24    A.  Yes.  I did.

11:42    25    Q.  And were you able to obtain records from that representative

819

1    office that were helpful in your investigation of the person you

2    were investigating?

3    A.   In these cases, I obtained or I attempted to obtain

4    information from oversees bank accounts as well.

11:42    5    Q.   I'll reask the same question:  Were you ever able to get

6    relevant information from the representative office that was

7    located in the United States?

8    A.   I was able to get relevant or complete information would be

9    my --

11:43    10    Q.   I believe I said relevant.

11    A.   There's a lot of sources of evidence, and you try to get

12    all --

13            THE COURT:  Please -- one second.  Please listen to

14    the question.  If you don't understand the question, we can have

11:43    15    the question reasked or recrafted.

16            Would you read back the last question?

17            (Record read.)

18            THE WITNESS:  Yes.

19    BY MR. SULLIVAN:

11:43    20    Q.   And are you familiar with the evidence that was gathered in

21    this case from the representative office of HSBC-India that was

22    located in the United States?

23            MR. WEBB:  Objection.  Scope.

24            THE COURT:  Sustained.

11:44    25    BY MR. SULLIVAN:

820

1  Q.  Sir, isn't it true that the United States of America cannot

2  use a grand jury subpoena to obtain evidence located in a

3  foreign country?

4  A.  That's correct.

5          MR. SULLIVAN:  That's all I have, Your Honor.

6                    REDIRECT EXAMINATION

7  BY MR. WEBB:

8  Q.  Very briefly, sir.  When Counsel was asking you questions

9  about whether or not an entity like a bank in a foreign country

10 and whether a 1099 would be issued, you said to Mr. Sullivan,

11 "It might depend on whether the U.S. citizen had a domestic

12 account related to the account in the foreign country"; is that

13 correct?

14 A.  That's correct.

15 Q.  Would you please explain why that's important in connection

16 with whether the U.S. bank should issue a 1099 for the accounts

17 that are in a foreign country?

18          MR. SULLIVAN:  Objection.  Foundation.

19          THE COURT:  Objection sustained.

20 BY MR. WEBB:

21 Q.  Well, sir, when you told Mr. Sullivan -- Strike the

22 question.

23          I know you haven't sat through this trial, but I will

24 represent to you --

25          THE COURT:  One second.  No.  Change the form of the

821

1    question.

2              MR. WEBB:  I will.

3    BY MR. WEBB:

4    Q.  Sir, when you said to Mr. Sullivan it would depend on

5    whether the U.S. citizen had an account in the United States,

6    what were you referring to in connection with 1099s?

7    A.  He had an account in the United States, U.S. entities should

8    be issuing 1099s.

9    Q.  Even for accounts that are in foreign countries affiliated

10   with the US Bank?

11   A.  Again, it's a technical question and I would have to do more

12   research on it.

13   Q.  But at least has that been your experience?

14   A.  Yes.

15   Q.  Now, you mentioned that it's one thing to talk about

16   obtaining relevant evidence.  But when you're an IRS special

17   agent, are you supposed to try to obtain complete evidence?

18   A.  Correct.

19   Q.  Why is that important?

20   A.  You want to make sure that you have all the evidence to

21   prove or disprove you.  You want -- you need to know all the

22   facts.

23   Q.  And the matters that you said you handled where you were

24   able to get some documents from the U.S. when it involved

25   foreign bank accounts, you said you still wanted to get

822

1    information from the foreign country; is that correct?

2    A.  Correct.

3    Q.  Is that --

4    A.  Well, go ahead.

11:46    5    Q.  Why is that?

6    A.  Because as a special agent and as a supervisor, you want to

7    make sure -- anytime you have a case involving international

8    assets or income, you want to contact the international group

9    and the attaché and make sure that you obtain whatever records

11:47    10    are available.

11           MR. WEBB:  I have no more questions.

12                    RECROSS-EXAMINATION

13    BY MR. SULLIVAN:

14    Q.  Have you ever heard the expression "I'm calling off the

11:47    15    dogs"?

16           MR. WEBB:  I'm going to object on relevancy.

17           THE COURT:  Overruled.

18           THE WITNESS:  Have I heard the expression?  Yes, I

19    have.

11:47    20    BY MR. SULLIVAN:

21    Q.  And that basically means that --

22           THE COURT:  Well, you can't testify.

23           MR. SULLIVAN:  I withdraw that.

24    BY MR. SULLIVAN:

11:47    25    Q.  What does that mean to you, sir?

823

1    A.  Calling off the dogs?

2    Q.  Yes.

3    A.  Ending your investigation.  Making a determination.

4    Q.  And once you ended your investigation and were satisfied you

5    had sufficient evidence to make a recommendation to prosecute,

6    what would you do?

7    A.  I'd prepare a report and submit that recommendation.  But

8    your investigation isn't completed until --

9            MR. SULLIVAN:  Your Honor, I ask that the witness be

10   instructed to answer my question.

11           MR. WEBB:  He was answering the question.

12           THE COURT:  He was answering the question.  Proceed.

13           THE WITNESS:  Your investigation isn't complete

14   until -- until it's finalized -- until either you don't

15   prosecute or you prosecute and -- so you never stop

16   investigating, in my opinion.

17   BY MR. SULLIVAN:

18   Q.  But in this particular case, it wasn't your call to make

19   regarding whether to refer the case for prosecution; is that

20   correct?

21   A.  Absolutely.

22   Q.  That was Special Agent Cook's call, right?

23   A.  Correct.

24   Q.  And what is the IRS procedure for once the Internal Revenue

25   Service decides it's going to refer a case for prosecution?

824

1    What happens next?

2    A.   It's a long process, but it goes to the supervisor who

3    reviews it.   After that, it goes to general counsel within the

4    IRS, they review it with a recommendation, that recommendation

5    is given back to the supervisor to review, and then it goes to

6    the special agent in charge in that office with a

7    recommendation.   Special agent in charge is -- would then either

8    sign or not sign the report or the recommendation and forward it

9    or not forward it.   Then it would go to Department of Justice

10   Tax Division.   From Department of Justice Tax Division, it could

11   go to the U.S. Attorney's Office or to -- Department of Justice

12   could make a determination to prosecute or not prosecute.

13   Q.   And is the purpose of all those reviews to ensure that

14   there's sufficient evidence --

15             THE COURT:   One second.   Approach.

16             (At side bar on the record.)

17             THE COURT:   I'm troubled by the line of questioning

18   that you're asking at this point in time.   I'd like to hear from

19   the defense.

20             MR. WEBB:   Two things.   One, it's completely

21   irrelevant.   And number two, it's outside the scope.

22             THE COURT:   You may be heard.

23             MR. SULLIVAN:   Your Honor, they are trying to suggest

24   through the testimony of this witness that the government,

25   especially Special Agent Cook, did an incomplete investigation

825

1    because they didn't get the records from India.  This witness

2    has personal knowledge about the review function and how many

3    layers there are that go beyond Special Agent Cook's.  And I'm

4    going to end here, Your Honor.  I'm not going to go deep into

5    this, but the bottom line is that these cases -- he will be able

6    to testify they don't go forward unless there's a determination

7    made that there's adequate evidence to go forward.

8           THE COURT:  I'm going to sustain the objection.

9           (End of discussion at side bar.)

10          THE COURT:  Ask another question, please.

11   BY MR. SULLIVAN:

12   Q.  And, sir, in connection with your testimony are you being

13   paid today?

14   A.  I am.

15   Q.  Approximately how much money have you been paid by the

16   defense in connection with your investigation in this case and

17   your testimony today?

18   A.  I have not billed yet for this.  I bill at $250 an hour.

19   Q.  And so approximately how much will you be paid?  How much

20   will you bill the defense in connection with your testimony

21   today?

22   A.  A rough estimate, around $5,000.  Not for today.  In my

23   preparation.

24          MR. SULLIVAN:  No further questions.

25          MR. WEBB:  I have no more questions.

826

1       THE COURT:  One second.  Does the jury have questions

2    of the witness?

3            (No response.)

4       THE COURT:  None.  You're excused.

5            (Witness excused at 11:52 a.m.)

6       THE COURT:  Are there additional witnesses at this

7    time?

8       MR. WEBB:  Not at this time.  May we be heard briefly

9    at side bar, very, very briefly?

10      THE COURT:  Yes.

11           (At side bar on the record.)

12      MR. WEBB:  I had told you earlier that this is my last

13   witness.

14      THE COURT:  That's why I phrased it as I did.

15      MR. WEBB:  I know you did.  I'll be candid with the

16   Court, I was surprised by the implication that they played golf

17   in Milwaukee, which I didn't think that was their position.  But

18   I do have a witness from the Milwaukee golf course which I may

19   have to call.  I don't know yet.  I'm going to have to evaluate

20   that.  But I have the records showing --

21      THE COURT:  Your case is still open.

22      MR. WEBB:  I just wanted you to be aware of that.

23   Thank you.

24           (End of discussion at side bar.)

25      THE COURT:  I faked you out the last time.  That was

827

1   the last witness of the day.  You will have the afternoon to

2   enjoy the weather, or go home and work.  Or to go back to work.

3   But in any event, I look forward to seeing you tomorrow at 8:30.

4   As usual, please take your notebooks with you; do not do any

5   research; do not communicate with anyone electronically, orally,

6   or in any other manner; and of course, do not visit anyplace

7   local that may have been mentioned during the course of the

8   trial.

9           I'll see you tomorrow.

10          THE BAILIFF:  All rise.

11          (Jury out at 11:54 a.m.)

12          THE COURT:  Be seated, please.

13          The defense mentioned -- well, it did submit a Rule 29

14   motion, and we also need to discuss the defendant's possible

15   testimony in this case.

16          How do you wish to proceed?  Do you wish to address

17   the Rule 29 motion after lunch and then address whether or not

18   the defendant will be testifying or is there some other manner

19   in which you would prefer to go forward?  Mr. Webb?

20          MR. WEBB:  Your Honor, I don't think it makes any

21   difference to us.  The defendant can be advised at any point

22   that you want.  But we can also do that this afternoon.  I think

23   it might make sense to come back after whatever luncheon recess

24   you have to argue the Rule 29 motion, and we can deal with the

25   defendant at that same time, if that's acceptable to the Court.

828

 1            THE COURT:  We will take our luncheon break.  We will

 2      resume at 1:00 o'clock:

 3            MR. WEBB:  Thank you.

 4            THE COURT:  All right.

 5            (Recess taken at 11:56 a.m., until 1:03 p.m.)

 6            THE COURT:  The defendants have submitted a motion for

 7      a judgment of acquittal under Rule 29 of the Federal Rules of

 8      Criminal Procedure.  The court will entertain argument at this

 9      time.

10            MR. KIRSCH:  Thank you, Your Honor.

11                          RULE 29 MOTION

12            MR. KIRSCH:  Your Honor, I'd like to address this in

13      three parts and -- really in four parts.

14            And for some of the parts, I rely on the briefs to a

15      heavier extent.  So if you have questions, of course, I'm happy

16      to answer any questions.  But there are particular areas that

17      I'd like to focus on.

18            And the four parts, Your Honor, are parts -- the first

19      part is that the indictment should be dismissed with respect to

20      the failure to identify foreign accounts on both Schedule B and

21      the FBAR because of lack of notice.

22            And we've included that argument in Section 2 of our

23      brief.  And I think it sets out our argument pretty clearly

24      there.

25            The second part of our argument that I'm going to

829

1    address -- and I'll address these in reverse order -- but the

2    second part of the argument is the Counts 1 through 4,

3    underreporting interest income earned on interest at HSBC, which

4    is the bank that is at issue here with respect to interest.

5    The third part of my argument is Counts 1 through 4

6    with respect to failing to report on Schedule B interest in a

7    foreign financial account.

8    And then the third part where I'd like to start in

9    some detail is the FBARs, Count 5 through 8.

10    Your Honor, the FBAR counts should not be a part of

11    this case.  In Joint Proposed Instruction Number 27 that was

12    filed with the court in July, July 12, Document Number 112 --

13    it's page 35 of that document -- and I think the government and

14    the defendant, when we submit our new instructions, we still

15    agree that this is a correct statement of the law.

16    The mens rea requirement for an FBAR violation is

17    willful.  And the government -- as indicated in this

18    instruction, the government has to prove that the defendant

19    acted willfully, if he knew it was his legal duty to file an

20    FBAR and intentionally failed to do so.

21    Your Honor, there is no evidence in the record that

22    the defendant knew he had a legal duty to file an FBAR.  The

23    only evidence with respect to this is Mark Miller's testimony

24    about a meeting that he had with the defendant in August of

25    2009.

830

1    So as an initial matter, '08, '07, and '06 are out.

2    He can't possibly know of a legal duty -- there's absolutely no

3    evidence that he knew of any legal duty to file an FBAR before

4    2009.  So those years have to be out.

5    In August of 2009, Mr. Miller testified that he had a

6    meeting with the defendant and Tom Branch, and he very clearly

7    testified that he mentioned that there were some foreign bank

8    reporting requirements, but he did not mention FBAR reporting

9    requirements.  And he explained that he wouldn't do that because

10   he wouldn't explain to his clients that they had reporting

11   obligations on certain or particular forms.

12   So -- and, Your Honor, you may recall Mr. Bhasin's

13   testimony on this point when Mr. Bhasin said, "I have no idea

14   what an FBAR is.  It's archaic.  I never knew about it."

15   Although that doesn't reflect on the defendant's

16   knowledge, it does reflect in general that the defendant would

17   have no way to know he had to file an FBAR.

18   So our argument with respect to Counts -- with respect

19   to the FBAR counts in '06, '07, and '08, is there is absolutely

20   no evidence in the record that the defendant knew it was his

21   legal duty to file an FBAR and intentionally failed to do so.

22   And so, Your Honor, those counts must be dismissed and

23   should not go to the jury.

24   And with respect to 2009, the argument is --

25   THE COURT:  Let me interrupt you and ask you about the

831

1    2006 return.

2         MR. KIRSCH:  Yes, Your Honor.

3         THE COURT:  That's Exhibit 12.  On page 4 of that

4    exhibit, which is a 1040 for 2006, at line 7a it says -- above

01:09  5    7a it says:  "You must complete this part if you had over $1500

6    in taxable interest or ordinary dividends; or, (b), had a

7    foreign account; or, (c), received a distribution from or were a

8    grantor of or a transferor to a foreign trust."

9         7a goes on to read:  "At any time during 2006, did you

01:09  10   have an interest in or a signature or other authority over a

11   financial account in a foreign country such as a bank account,

12   securities account, or other financial account?"

13        In light of that, can you say that there's no evidence

14   in this record regarding your client's obligation, if any --

01:09  15        MR. KIRSCH:  Yes, Your Honor.

16        THE COURT:  -- to file an FBAR?

17        MR. KIRSCH:  Yes, Your Honor.  I think that actually

18   supports my point.

19        The government has to prove -- the mens rea here is

01:10  20   willful.  It's very clear.  And the government has to prove that

21   the defendant knew that it was his legal duty to file an FBAR.

22        I'm going to address Schedule B because there's no

23   evidence that the defendant knew of this question on Schedule B.

24        THE COURT:  Well --

01:10  25        MR. KIRSCH:  But there's no --

832

1       THE COURT:  Wait a minute.  Wait a minute.  To say

2   that he had no knowledge of this question ignores page 3 where

3   it says:  "Under penalty of perjury, I declare that I have

4   examined this return and accompanying schedules and statements,

01:10   5   and to the best of my knowledge and belief, they are true,

6   correct, and complete.  Declaration of preparer or other

7   taxpayer is based on all information of which preparer has any

8   knowledge."

9       MR. KIRSCH:  Your Honor, I recognize that.  But

01:11   10   Schedule B does not reflect any obligation to file an FBAR.

11   2006 --

12       THE COURT:  There's a certification that the person

13   has examined the return and that it is complete and that this

14   return for 2006 includes information respecting foreign

01:11   15   accounts.  It has a response that your client has certified to

16   be accurate and complete and reflection of his knowledge.

17       MR. KIRSCH:  Your Honor, I -- I agree that's reflected

18   on the 1040 form.  There was no FBAR form filed, which is a

19   separate form.

01:11   20       THE COURT:  Yeah.  I understand that.

21       MR. KIRSCH:  And there's no indication in this tax

22   return whatsoever that he had an obligation to file an FBAR.

23   There's nothing in here that indicates he has an obligation to

24   file an FBAR.

01:11   25       Now, the Schedule B I was going to talk about

833

1 separately, but that relates to Counts 1 through 4, not Counts 5

2 through 9.

3    THE COURT:  Okay.  Go ahead.

4    MR. KIRSCH:  So the government has to prove that he

01:12 5 knew it was a legal duty to file an FBAR.  That's very specific.

6    And with the willfulness standard, that's what they

7 have to prove.  And they can't prove it with respect to the

8 FBAR.

9    And I submit that even in 2009 the evidence that they

01:12 10 have, which is Mark Miller's testimony that he had a general

11 conversation about the need to report foreign bank accounts,

12 does not tell the defendant or put the defendant on notice that

13 he had a legal duty to file an FBAR.  Schedule B in Counts 1

14 through 4 are separate, and they're different.

01:12 15    THE COURT:  So you are asserting that notwithstanding

16 reference to foreign accounts in Schedule B, the government has

17 not shown that there is any other information that your client

18 had respecting any obligation to file a separate form respecting

19 foreign accounts.

01:13 20    MR. KIRSCH:  Correct.  And in particular an FBAR form.

21 It's not just a separate form.  It's got to be very specific,

22 and that's an FBAR form.

23    And so there's just -- there's no evidence that he

24 knew of an obligation to file an FBAR form.

01:13 25    Putting Schedule B aside for a minute, that's my

834

1       argument with respect to Counts 5 through 9.

2              Now, with respect to Counts 1 through 4, I rely on the

3       brief to a heavy extent here, but there are two parts of 1

4       through 4.  Part 1 is the interest income.

01:13  5              And, Your Honor, I submit to you that the evidence is

6       overwhelming that, if 1099s have been received from HSBC, the

7       income would have been reported on the tax returns; and,

8       therefore, the government cannot satisfy its burden in this case

9       of proving that the defendant acted willfully on that part or

01:14  10      those parts of Counts 1 through 4.

11             And then with respect to the Schedule B part of 1

12      through 4, the court correctly pointed out that the defendant

13      signed the returns under penalties of perjury, but Mark Miller

14      testified the manner in which the defendant signed and reviewed

01:14  15      the returns, and he testified that he never discussed Schedule B

16      with him.  And he testified that he was the one that checked the

17      box "No."

18             And, Your Honor, I respectfully suggest that's the

19      same manner in which Ramit Bhasin's amended tax return had a box

01:14  20      that was checked "No" from 2007.

21             So, Your Honor, I just don't -- I don't think that the

22      government can prove a willful violation by simply pointing to

23      the fact that the defendant signed a return.  I don't think that

24      meets their burden.  I think they've got to prove he knew --

01:14  25      now, there's two things.  They got to prove he knew of an

835

1    obligation to report interest income, but he did report interest

2    income.  So I'm focused on the foreign account.  They have to

3    prove that he knew he had an obligation to report foreign

4    accounts.

5            Now, in '09, August of '09, they have Miller's

6    testimony regarding a general conversation that year.  And I

7    think even with respect to those -- with respect to those

8    foreign accounts, Miller testified that it wasn't until '09 that

9    he even made anybody aware of any filing obligations.

10           But even then he didn't discuss Schedule B; he didn't

11   discuss the question at 7a, and he was the one that checked the

12   box "No."

13           So I think, Your Honor, what should be dismissed from

14   this case are Counts 5 through 9 in total, and I think the

15   second part of Counts 1 through 4, which are failing to disclose

16   a financial interest in a foreign account, should also be

17   dismissed.

18           And then I rely on my brief with respect to the other

19   arguments, with the notice argument and also the interest income

20   from HSBC argument, which I suggest is Part I of Counts 1

21   through 4.

22           THE COURT:  Does the government wish to respond first

23   with respect to the FBARs?

24           MS. SISKIND:  Yes, Your Honor.  There was several

25   pieces of evidence in this case that showed the defendant was

836

1    aware of the duty to file an FBAR.

2              First, the tax return itself asking questions on

3    Schedule B about foreign accounts.  In particular the 2007,

4    2008, and 2009 tax returns.  If Your Honor looks at the

01:16    5    Schedule B, they specifically make reference following the

6    foreign bank account question to the form number for an FBAR.

7    It was actually right on the Schedule B.

8              By the defendant certifying that he was aware of the

9    contents of his tax return, he was also certifying that he was

01:17    10   aware of the FBAR form number that is contained after the

11   foreign bank account question on the Schedule B.

12             The defendant was also aware that his accountant

13   wanted information about foreign bank accounts.  Mr. Miller

14   testified that every year Kolb+Co sent out a tax organizer that

01:17    15   contained, among other things, questions about foreign bank

16   accounts.  And the -- and Mr. Miller also testified that the

17   issue was specifically raised in two face-to-face meetings with

18   the defendant in August and December of 2009.

19             It's a combination of direct knowledge of the FBAR

01:17    20   filing requirement and willful blindness, because Mr. Miller

21   testified that had the defendant just told him that he had a

22   foreign account then Mr. Miller would have looked into the

23   matter further, determined whether the defendant had $10,000,

24   such that the filing threshold was met, and then would have, if

01:17    25   the defendant wanted him to, prepared an FBAR.

837

1    Because the defendant concealed the existence of his

2    foreign accounts from his accountant, no such form was prepared.

3    He concealed those accounts when every year he received that tax

4    organizer asking him for questions -- for information about

5    foreign bank accounts and still did not tell Mr. Miller that he

6    had foreign accounts.

7    He concealed that information in August of 2009 when

8    he told Mr. Miller that he would follow up on a few bank or

9    brokerage accounts, and then never did so.

10    He concealed that information in December of 2009 when

11    the FBAR reporting requirement was a specific agenda item on the

12    year-end tax planning meeting and still the defendant did not

13    speak up and tell his accountant that he had foreign accounts.

14    If he had told his accountant about those accounts, an

15    FBAR would have been prepared.  And so that is the willful

16    blindness component.

17    The actual knowledge component is the tax returns

18    themselves, which he certified that he had knowledge of, which

19    requests information about foreign bank accounts.  And for three

20    of the years specifically mentioned the form number for the

21    FBAR.

22    THE COURT:  So are you suggesting that your evidence

23    respecting the FBAR requirement is greater with regard to tax

24    years 2007, 2008, and 2009?

25    MS. SISKIND:  I think it's strong for all of the

838

1    years, Your Honor.  It's specifically mentioned on the form in

2    three of those years, but in all four years, the defendant

3    received a tax organizer asking him for information about

4    foreign accounts.  In all four years --

5            THE COURT:  Does -- can you point to anything in the

6    tax organizer that makes it clear that the defendant knew there

7    was a separate form he was required to submit respecting foreign

8    bank accounts?

9            MS. SISKIND:  Your Honor, the tax organizer was not in

10    evidence.  We have the testimony of Mr. Miller regarding what

11    the tax organizers said.

12            THE COURT:  But I do not recall Mr. Miller saying

13    anything about an FBAR requirement.  Did I miss something?

14            MS. SISKIND:  No, Your Honor.  This is where the issue

15    of willful blindness comes in.  His accountant was asking him

16    for foreign bank account information on that tax organizer.

17            Mr. Miller testified that had the defendant told him

18    about a foreign account, Mr. Miller would have made further

19    inquiries to make him aware of the FBAR requirement.  So it's

20    knowledge based on willful blindness, not investigating the

21    situation because not wanting to learn about that particular

22    requirement.

23            THE COURT:  So you acknowledge there is no indirect --

24    there is no direct evidence that Dr. Ahuja knew of a particular

25    form he had to file with his 2006 tax return respecting foreign

839

1    account interest.

2            MS. SISKIND:  No direct evidence for 2006, Your Honor.

3            THE COURT:  All right.  And is there anything that

4    goes beyond the Schedule B of the 2006 form and the fact

01:21  5    Mr. Miller's firm, Kolb+Co, provided materials to their clients,

6    including Dr. Ahuja, requesting that they report interest which

7    would then be reflected in any tax returns filed by the tax

8    preparer?

9            MS. SISKIND:  No, Your Honor.

01:21  10            THE COURT:  Well, how can you say specifically that

11    Dr. Ahuja knew about this form?

12            MS. SISKIND:  Your Honor, for 2007, 2008, and 2009 the

13    defendant signed the tax returns acknowledging that he was

14    familiar with their contents and that they were true, accurate,

01:22  15    and complete.

16            The standard for a Rule 29 is to view the evidence in

17    the light most favorable to the government.

18            THE COURT:  I understand that.

19            MS. SISKIND:  So that suggests that he signed that

01:22  20    return knowing of its contents.

21            The contents of the 2007, 2008, and 2009 returns

22    included a reference to the FBAR.  It's right there on the

23    Schedule B under the foreign bank account question.

24            THE COURT:  Are you aware of any case law which

01:22  25    discusses whether or not a defendant in a criminal tax case may

840

1    be convicted on evidence which does not include any particulars

2    respecting the FBAR form?

3         MS. SISKIND:  Your Honor, I believe there's case law

4    that when a defendant signs a tax return he's presumed to have

5    knowledge of its contents.

6         THE COURT:  I'm talking specifically about the FBAR

7    form.

8         MS. SISKIND:  No, Your Honor.

9         THE COURT:  And so the theory of the government is

10   that the mere execution -- I should say, preparation of a tax

11   return which certifies under penalty of perjury that a taxpayer

12   has examined the return and that it is complete is enough to

13   support a conviction if the FBAR form is not submitted along

14   with the return.

15        MS. SISKIND:  Yes.  That is the government's position,

16   Your Honor, because by signing the form he acknowledged that the

17   contents were complete, and that he was familiar with the

18   contents.

19        And for 2007, '8, and '9 on Schedule B it says that

20   there was information about filing requirements for a form

21   TDF 90-22.1, which is the FBAR.

22        So the notice to him with the filing requirement is

23   right there on the tax return that he certified that he's

24   familiar with.

25        THE COURT:  But that only applies to 2007 and

841

1    thereafter, correct?

2            MS. SISKIND:  Yes, Your Honor.

3            THE COURT:  Inasmuch as 2006 does not mention the

4    form, why should this court conclude, even viewing the evidence

01:25    5    in the light most favorable to the government, that Dr. Ahuja

6    knew that he had to file that form?

7            MS. SISKIND:  Your Honor, for that year his knowledge

8    is established, essentially, by willful blindness.  The fact

9    that he deliberately concealed his foreign bank accounts from

01:25    10    his accountant, despite receiving a tax organizer that asked for

11    information about that.  Had he provided -- and Mr. Miller

12    testified that had the defendant told him "I have a foreign bank

13    account," Mr. Miller would have taken steps to determine whether

14    an FBAR was required.

01:25    15            By concealing that information, he took away the

16    possibility that Mr. Miller would prepare that form because why

17    would Mr. Miller prepare it if the defendant didn't tell him

18    there are foreign bank accounts?

19            THE COURT:  All right.  Let's move on.

01:25    20            MR. KIRSCH:  Your Honor, may I be heard first to 2006?

21            THE COURT:  Surely.

22            MR. KIRSCH:  Your Honor, that turns the standard on

23    its head.  The fact that something was mailed -- and may have

24    been mailed -- they don't have the 2006 tax organizer.  It's not

01:26    25    in evidence.  So we have no idea what it said.

842

1    The fact that something may have been mailed to

2  somebody that they're going to show that that was willful

3  blindness?  They can't even prove that it was mailed; they can't

4  prove that it was received; they can't prove that he looked at

5  it.  There's just --

6    THE COURT:  When you say something may have been

7  mailed, are you referring to the 1099s?

8    MR. KIRSCH:  No, no.  In 2006 -- first of all, I don't

9  think the testimony supports the government's argument.  The

10  government put in one single tax organizer from 2009.

11    The '06 tax organizer is not in evidence.  We don't

12  know what it says.  We don't know if it asked about foreign

13  accounts.  We don't know if it was mailed to the defendant.  We

14  don't know if the defendant received it.  We don't know if the

15  defendant looked at it and read it.

16    We do know that the defendant never filled them out

17  and never used them.  To say that willful blindness is the

18  failure to receive mail, Your Honor, that standard is one

19  that -- there's just no way that can be the standard for

20  willfulness in 2006.

21    So 2006 has got to go.

22    2007 through 2009 should also go for this reason:

23  Your Honor, the government wants to suggest to you that the

24  standard for willfulness is signing a tax return.  That

25  decidedly is not the standard.  There are misdemeanor tax

1    violations for filing erroneous tax returns, for making a

2    mistake.

3         The government's argument to this court is that it

4    should accept the argument that whenever a taxpayer makes a

5    mistake on a tax return, no matter how simple it is, no matter

6    how irrelevant it is -- and keep in mind with the FBAR there's

7    no tax due -- so no matter how insignificant the error is, the

8    government can prove willfulness, just based on the inference

9    from him signing the tax return.

10        That cannot be the law.  It can't be the law.  It

11   would apply -- that is so broad and it would be so sweeping.

12   Imagine a perjury -- everything the government -- well, you made

13   a mistake.  We can infer, we just infer that it was deliberate

14   and that it was willful.  And we don't need anything else but

15   your signature on the bottom of this form that Mark Miller

16   testified he never reviewed the forms, he never looked -- Mark

17   Miller testified he checked "No" on the box.

18        So there's no way that the government can say just

19   because he signed the form we should be able to get up in front

20   of this jury and the court should accept the standard that

21   signing a form under a penalty of perjury can necessarily lead

22   to willfulness because that's all their evidence.  Your Honor,

23   that cannot be the law.  It just cannot be the law.

24        And I don't think they have a single case in the

25   United States to support that argument that signing a tax return

844

1    under penalty of perjury is enough by itself to satisfy the

2    willfulness requirement.

3            And, Your Honor, they put on Mark Miller; they put on

4    four days of evidence.  They never put on any evidence including

01:29    5    tax organizers or anything else from '06, '07, '08 -- and '08.

6    And even the tax organizer from '09, Mark Miller testified that

7    Dr. Ahuja, like, about 25 percent of his clients did use the tax

8    organizer.

9            The government can't prove that Tom Branch didn't

01:29    10   receive the tax organizer and throw it in the garbage.  I mean,

11   to say that you can infer willfulness from the fact that mail

12   might have been sent to somebody's residence when there's no

13   evidence that it was read, that it was filled out, Your Honor,

14   that just turns the standard.  It wipes willfulness right out of

01:29    15   the statute.  It turns the standard right on its head.

16           I just don't think there's any way these FBAR

17   violations can survive, particularly considering even Mark

18   Miller's testimony -- I wasn't gonna get to this, but I'll just

19   mention it.

01:29    20           With respect to Schedule B, the questions on

21   Schedule B, Mark Miller testified he never told Dr. Ahuja about

22   those questions.  Dr. Ahuja --

23           THE COURT:  Let me ask you this.

24           MR. KIRSCH:  Yes.

01:30    25           THE COURT:  Is there a requirement -- is the

845

1    government's theory -- perhaps, I should ask this of the

2    government and not you.

3             Is the government's theory that it is the form that

4    Dr. Ahuja was required to submit or something else?  And in

01:30  5    particular whether it was only essential that he report the

6    foreign accounts on his Schedule B?

7             MS. SISKIND:  Your Honor, there's two separate issues.

8    Counts 1 through 4 of the indictment charge one of the bases for

9    returns being false is failure to report it on Schedule B.

01:30  10            Counts 5 through 8 charge him with failure to file an

11   FBAR.

12            So he fully was supposed to file his bank account in

13   two different places, one on the Schedule B and one on the FBAR.

14            So as far as the FBAR, we do need to prove

01:31  15   willfulness, which was intentional violation of a known legal

16   duty, the duty being to report his foreign bank accounts on the

17   FBAR.

18            And we've proven that through the statements on the

19   forms, on the tax returns themselves for '07, '8 and '9, the

01:31  20   existence of the tax organizers.

21            And certainly Mr. Kirsch points out alternative

22   inferences that can be drawn from the tax organizers, maybe the

23   defendant didn't see them, maybe they got thrown out.  But

24   that's not the standard on Rule 29.  It's evidence in the light

01:31  25   most favorable to the government.  The fact that there are

846

1   adverse inferences that could cause the jury to acquit doesn't

2   bear on whether there's sufficient evidence to survive a Rule 29

3   motion.

4          MR. KIRSCH:  Your Honor, respectfully the jury can't

5   make an inference from no evidence.  There's just no evidence

6   that he saw these.  I mean, if they had somebody that testified

7   he saw them, he received them, he reviewed them, he discussed

8   them, then the jury could make the inference.

9          I submit the jury might be able to make the inference

10  that he knew about it.  Here they can't even show that.  And

11  they've not put them in evidence.  We don't know what they said

12  in '06, '07, and '08.  We don't know if they asked about foreign

13  accounts.  They certainly didn't ask about FBARs, we know that.

14         There's just -- they can't just say because something

15  exists -- I mean, that's the whole purpose of Rule 29.  I mean,

16  if they can say, "Well, we just said it exists so we can throw

17  it up and see what the jury thinks," there would be no Rule 29.

18         THE COURT:  All right.  What's your next issue?

19         MR. WEBB:  Your Honor, the next issue -- and this is

20  sort of the same issue.  So it can be more streamlined.

21         The next issue is the Schedule B, and it's,

22  essentially, the same argument.  Although I think the court has

23  to rely on the undisputed testimony of Mark Miller, that Mark

24  Miller testified he never discussed Schedule B with the

25  defendant.

847

1    Now, the defendant signed the tax returns.  That's not

2  in dispute here.  He signed them under penalty of perjury.

3  That's not in dispute.  But, Your Honor, I don't think that's

4  the test for willfulness.  That would mean that -- in every

5  single tax case in America if a taxpayer made a mistake, the

6  government could charge the case under 26 U.S.C. 7206, bring it

7  into a federal court, and then say, "Well, it may have been the

8  simplest mistake in the world, but the defendant signed the

9  returns.  So we get to present it to the jury; we get to let the

10  jury decide whether the defendant acted willfully."

11    So '06, '07, and '08 with respect to Schedule B,

12  that's all they've got.  All they've got is the signed returns.

13    In '08 they've got a conversation with Mark Miller --

14  I'm sorry -- '09, August of '09 they've got a conversation with

15  Mark Miller.  So '09 is a little different because of the

16  conversation, but, again, Mark Miller never mentions Schedule B,

17  and he doesn't know about the reporting obligation on

18  Schedule B.

19    But in '06, '07, '08, they can't even show that he has

20  a reporting obligation anywhere with respect to foreign tax

21  accounts.  They can't even prove that he knew it, let alone that

22  he knew it and then willfully disregarded it.

23    And, Your Honor, I respectfully suggest -- I know

24  Rule 29 motions are rarely granted, but Rule 29 is there for a

25  purpose, and it's there for a purpose for cases like this where

848

1    the inferences the government is asking the jury to make is not

2    based on the evidence.

3            And there is no evidence that Dr. Ahuja knew about any

4    reporting requirement for foreign bank accounts in '06, '07, and

5    '08, and there's no evidence.  And, in fact, the evidence is the

6    opposite that he knew about Schedule B and Part III of

7    Schedule B in 2009.

8            So '06, '07, '08, clear.  I think '09 should go as

9    well.  But I think that -- well, Your Honor, that's our

10   position.  Unless the court has any questions, I'll stop.

11           THE COURT:  Not now.  Is there anything else from the

12   government?

13           MS. SISKIND:  On the Schedule B issue, just that

14   unlike with the FBAR issue, where it was only on three of the

15   returns, the foreign bank account question is on all four of the

16   returns.  The defendant signed the returns acknowledging that he

17   knew what it contained.  The question was on there.  The

18   reasonable inference to be drawn from that, viewing it in the

19   light most favorable to the government, is that he knew that the

20   return asked him for questions about foreign bank accounts.

21           That combined with the tax organizers, the meetings in

22   2009, where even after being directly asked by his accountant

23   about foreign accounts, he still didn't tell his accountant,

24   that speaks volumes about his mental state going back through

25   all of the years and his concealment of those accounts.

849

1     THE COURT:  All right.  Is there anything more in

2 opposition to the motion?

3     MR. KIRSCH:  Unless the court has questions, I'll rely

4 on the brief with respect to the underreporting of interest

01:36     5 income.

6     THE COURT:  I'll listen to what the government has to

7 say with respect to the unreported income.  If there's nothing

8 further --

9     MS. SISKIND:  Your Honor, the defense is pointing to

01:36     10 this lack of a 1099 from HSBC as if receiving a 1099 from a bank

11 is somehow a necessary condition to reporting interest income on

12 a tax return.  There really has been no dispute he didn't get a

13 1099, but that doesn't mean he didn't know that the accounts

14 existed and that he was earning interest income from them and

01:36     15 that he had an obligation to report that interest income on his

16 tax returns.

17     The account opening forms that the government has put

18 in, both from -- particularly Exhibit 42 from HSBC-India -- it

19 makes clear on the form that he's opening a bank account in

01:36     20 India.  It's an NRI account application, non-resident Indian.

21 That's an account in India.

22     He knew that it was an account in India because he

23 knew -- he knew that wasn't just some investment from his

24 HSBC-USA account.  You heard Agent Cook testify today that the

01:37     25 account number off of those HSBC-United States bank statements,

850

1  that's not the same as his India account, that's not the same as

2  his Jersey account.  Those were separate bank accounts.

3      And he knew that those accounts were earning interest

4  income because he was investing them in certificates of deposit.

5      We saw an e-mail from the defendant to Ankush Tandon

6  asking whether a CD had matured.  We saw a tax declaration

7  signed by the defendant in which he acknowledged that he's the

8  beneficial owner of interest income from that account, and that

9  he was a tax resident of the United States.  And that's

10  Exhibit 47.

11      We also saw that he was wire transferring millions of

12  dollars from the United States to an account in India, that he

13  was writing letters to the bank referring to his account at both

14  HSBC-India and in Jersey.

15      So he knew he had foreign accounts.  He knew that the

16  money in those accounts was invested in certificates of deposit.

17  He knew that he was receiving interest income.  And when he

18  signed Exhibit 42, the NRI account opening form, he signed a

19  customer declaration in which he acknowledged his responsibility

20  to report his worldwide income.

21      Both that form and the two account opening forms from

22  Citibank we looked at earlier today advised the defendant

23  regarding his -- the necessity to consult his tax advisor for

24  further information, which, of course, he did not do in this

25  case.

851

1      So all of those facts taken together and the -- all

2  those facts taken together, the fact that he knew that he had

3  foreign accounts that were not the same as his U.S. account, he

4  knew they were CDs, and he knew that he had to report that

5  interest income, which I'll also add he knew he had to report

6  foreign interest income because he also reported the foreign

7  interest income from Citibank when they sent him a 1099.

8      So the court should not look at this 1099 as some kind

9  of magic bullet that because he didn't receive it that destroys

10  the whole case.  There is ample other evidence to establish that

11  he knew he had interest income and that he knew he had to report

12  that interest income on his tax return.

13      THE COURT:  I will take the motion under advisement.

14  I do anticipate looking more closely at the issues, and if I can

15  come to a conclusion respecting any one or more of the counts

16  before this matter is submitted to the jury, you will be so

17  advised.

18      Let's turn to the next matter for consideration, and

19  that is the matter of the testimony of the defendant during the

20  trial.  At side bar the defense indicated that it may have made

21  a decision as to whether or not the defendant will testify.

22      Does the defense wish to be heard at this time?

23      MR. WEBB:  Your Honor, I would confirm what I told you

24  at side bar that I have advised the defendant about his right to

25  testify, made it clear to him that it's his decision, and he is

1    waiving the right to testify in this proceeding.

2              THE COURT:  Do you wish to query your client on the

3    record?

4              MR. WEBB:  Yeah, I can do so, Your Honor, just to make

01:40  5    a record.

6              Doctor -- just go ahead and sit down.

7              Doctor, over time have I on several occasions advised

8    you of your right in this case to provide testimony to the jury

9    if you desire?

01:40  10             THE DEFENDANT:  Yes, you have.

11             MR. WEBB:  Did I tell you that at the end of the day

12   it's ultimately your decision and only you can make that

13   decision?

14             THE DEFENDANT:  Yes, you have.

01:40  15             MR. WEBB:  And have you told me that fully knowing

16   that it is your decision and fully understanding you have a

17   right to testify that you have made the decision not to testify

18   and you are waiving your right to testify in this proceeding?

19             THE DEFENDANT:  Yes, I am.

01:41  20             THE COURT:  Dr. Ahuja, has anyone used any threat,

21   force, or intimidation to get you to give up your right to

22   testify in this case?

23             THE DEFENDANT:  No, they have not.

24             THE COURT:  Do you feel that you have been pressured

01:41  25   in any way by your lawyers or any other person, including your

853

1    spouse or children, regarding whether you should testify?

2         THE DEFENDANT:  No, I have not.

3         THE COURT:  And do you recognize that you are giving

4    up your right to address this jury during the course of this

5    trial by not testifying?

6         THE DEFENDANT:  Yes, I am.

7         THE COURT:  Very well.  The court accepts the

8    defendant's waiver of his right to testify in this case.  It

9    appears that that decision was freely and voluntarily made.

10                   JURY INSTRUCTION CONFERENCE

11        THE COURT:  With that, I turn next to the subject of

12   jury instructions.  It's my understanding that the parties are

13   desirous of having some off-the-record discussions in order to

14   determine whether or not there are issues the court will need to

15   address concerning the instructions.

16        MS. SISKIND:  Yes, Your Honor.  And to that end, just

17   as you were walking out on the bench this afternoon, I e-mailed

18   your law clerk with the most recent version --

19        THE COURT:  You're trying to break records here.

20        MS. SISKIND:  Yes, Your Honor.  I e-mailed your law

21   clerk.

22        THE COURT:  Speed is good but not necessarily in

23   speech.

24        MS. SISKIND:  Your Honor, as you were walking out this

25   afternoon, I was just on the computer e-mailing your law clerk

854

1    the most recent version of the jury instructions.  And it might

2    be helpful for Your Honor to have them while we're talking.

3              THE COURT:  Is the most recent version one that the

4    defense has signed off on?

5              MS. SISKIND:  There are some still outstanding issues

6    in that packet, but for the most part, we are in agreement.

7              THE COURT:  Mr. Webb, or, Mr. Kirsch?

8              MR. WEBB:  I'll let Mr. Kirsch address it.

9              MR. KIRSCH:  Your Honor, that's correct.  I think it

10   will be easiest if we work off that version.  I have three

11   proposed instructions that I'd like to hand up to the court:

12   One is agreed upon; one is the theory of the defense; and then

13   one is an instruction that we disagree on.  It's our version of

14   the willfulness instruction.

15             THE COURT:  All right.

16             MR. KIRSCH:  Can I do that now, Your Honor?

17             THE COURT:  Surely.

18             MR. KIRSCH:  Now, the one that we agree upon, there

19   was a minor modification.  I just had to hand write it in.

20             So, Your Honor, for the record -- I'm going to hand

21   you up one instruction that's Joint Proposed Instruction

22   Number 24, "Reportable Accounts Definition," and I'll just write

23   on it "Agreed."  That is the one that we have agreed to.

24             And then the next one is entitled, "Theory of the

25   Defense."

855

1    And the next one is Joint Proposed Instruction 21, but

2 I'm going to change that to say, "Defense Proposed Instruction

3 Number 21, Definition of 'Willfully.'"

4    And I'll give them to you in that order, Your Honor.

01:44  5    (Documents tendered to the court.)

6    THE COURT:  I assume the government has looked at

7 these instructions?

8    MS. SISKIND:  We have, Your Honor.

9    THE COURT:  Do you have any comments, first of all,

01:45  10 with regard to the theory of defense instruction?

11    MS. SISKIND:  We have no objection to it.  We would

12 recommend that it be put in the jury instructions after the

13 instruction about what the indictment charges but before

14 Your Honor gets into the elements of the crimes.

01:45  15    THE COURT:  Mr. Kirsch?

16    MR. KIRSCH:  Your Honor, that's fine, wherever you

17 think it fits.  I think that's a fine place for it.

18    THE COURT:  And with regard to the Defense Proposed

19 Instruction 21, I note this is referencing the pattern

01:45  20 instructions with the modification.

21    MS. SISKIND:  Your Honor, the actual willfulness

22 instruction in the pattern is much more general than the

23 instruction proposed by the defense.  It contains the same first

24 sentence, but then the pattern instruction has a second sentence

01:45  25 which reads:  "The defendant acted willfully with respect to a

856

1  particular income tax return if he knew it was his legal duty to

2  file a truthful individual tax return and intentionally filed a

3  false return."

4      So the pattern instruction speaks generally of the

5  defendant's knowledge of his legal duty to file a true and

6  accurate tax return.

7      The instruction proposed by the defense speaks in much

8  more specifics about particular lines.  So we would ask that we

9  go with the pattern instruction.

10      THE COURT:  What is the reason -- or what are the

11  reasons for these specific lines that are mentioned in your

12  instruction, Mr. Kirsch?  I note lines 8A, 9A, and 22.

13      MR. KIRSCH:  The indictment.  I think, Your Honor, the

14  reason -- the willfulness instruction -- I agree with what

15  Ms. Siskind said, the willfulness instruction is general.

16      But the indictment is specific.  The government can't

17  charge in the specific and prove in the general.  And so the

18  defense should not have to bear the burden of explaining to the

19  jury what willfulness means.

20      The indictment -- Your Honor, this language -- what I

21  did when I modified the definition of willfulness instruction, I

22  took the government's instruction -- I think it's 16 -- and I

23  think this was an agreed-upon instruction -- that describes the

24  charges in Counts 1 through 4 and 5 through 9.  And I literally

25  just cut and pasted right into the willfulness instruction what

857

1    they have to prove.

2            So this is unquestionably a correct statement of the

3    law.  This is what they have to prove.  And I think the

4    government just wants the advantage of having a very vanilla and

5    very general willfulness instruction because they don't want to

6    have to prove specifically what was charged in the indictment.

7            And I think that would be a huge disadvantage to the

8    defense.  And I think what we have done here is correctly set

9    forth the law.

10            So, respectfully, Your Honor, I think this is the

11    instruction that the court should give on definition of willful.

12            And, of course, Your Honor, as the court knows, the

13    pattern instructions for things like this, they don't take into

14    account the specifics charged in any one indictment.  If that

15    was the case, they wouldn't be a pattern.

16            THE COURT:  Hold, please.

17            (Brief pause.)

18            THE COURT:  I'm inclined to give the instruction as

19    tendered by the defense.  We'll look more closely at it, but at

20    this point, it seems to me that it's an appropriate instruction.

21            Is there anything else?

22            MR. KIRSCH:  Your Honor, with respect to the --

23    Ms. Siskind and I, we spent the lunch hour going over the

24    instructions.  And we went through the -- we worked off the

25    version that, I think, Ms. Siskind e-mailed to your law clerk.

858

1    And if the court has that --

2              THE COURT:  I have it in hand.

3              MR. KIRSCH:  I can just -- if I can just go through.

4    I think I can go through these very quickly and identify the

5    issues.

6              First with Instruction Number 9, it's the defense

7    position that the court should give this missing witness

8    instruction, and that the court should name Priti Dhanani and

9    Ankush Tandon as missing witnesses.

10             So that's the first -- that's the first -- let me make

11   sure that there are none before that that we agree should come

12   out of this version, Your Honor.

13             Well, I guess if we go to Instruction Number 2,

14   there's a little bracket --

15             THE COURT:  Well, let's -- before we go to another

16   instruction, I'm not certain that there is sufficient evidence

17   in the record to support an instruction of this sort, inasmuch

18   as there is no showing that it was within the power of the

19   government to bring Dhanani and Tandon into the court.

20             According to the testimony, each is an Indian citizen,

21   and there is no indication that they are now in this country or

22   otherwise subject to subpoena.

23             Can you point me to anything beyond that to indicate

24   that they are, indeed, in this country and available to testify?

25             MR. KIRSCH:  Two things, Your Honor.  I brought out

859

 1   during the cross-examination of Agent Cook that he interviewed

 2   Ms. Dhanani in Washington, D.C.

 3          THE COURT:  Yes.  But that doesn't address whether she

 4   was available on the date of trial or at any point during the

 5   course of this trial.

 6          MR. KIRSCH:  Well, that may be so, Your Honor, but the

 7   government -- I also brought out the testimony on

 8   cross-examination from Agent Cook that she was interviewed after

 9   the indictment was returned in this case.

10          THE COURT:  That still doesn't indicate that she was

11   available at the outset or at any point during the course of the

12   trial.

13          MR. KIRSCH:  But what it does indicate is that the

14   government could have served her with a trial subpoena.  You

15   asked about trial subpoenas.  The government could have served

16   her with a trial subpoena and chose not to.  That's issue number

17   one.

18          So the court could have compelled her to be here for

19   trial had the government exercised its power to issue a subpoena

20   when it interviewed her in September of 2011, after the

21   indictment had been returned.

22          And, Your Honor, they didn't do it.  They chose not to

23   do it.

24          The second issue, of course, is the letters rogatory

25   process.

1        THE COURT:  Let's not move on.  I'd like to nail this

2   down.

3        MR. KIRSCH:  Yes, Your Honor.

4        THE COURT:  Does the government wish to respond to the

5   Instruction Number 9 as proposed by the defense?

6        MS. SISKIND:  Yes, Your Honor.  First, to pick up on

7   the subpoena issue, even if the government had served her with a

8   trial subpoena when she was interviewed, serving someone with a

9   subpoena is different than enforcing that subpoena when trial

10  comes.  And she is back in India.  There's no telling whether

11  she would have come to trial with that subpoena or not,

12  particularly in light of the inability to enforce that subpoena.

13       Agent Cook can't get on a plane and go to India and

14  arrest her when she doesn't show up.  The U.S. Marshals can't do

15  that if she doesn't show up.  And there has been no showing --

16  and the case law requires this -- that to get the missing

17  witness instruction, which is highly disfavored in this circuit,

18  the instruction -- the pattern jury instructions start out by

19  saying, "It is the view of the committee that a missing witness

20  instruction should not be given unless there are extraordinary

21  circumstances."

22       The case law looks to whether the defense tried to

23  access the witness, because the case law says that, if a witness

24  is equally unavailable to both parties, then the missing

25  instruction is not appropriate.

861

1    So she's out of the country.  Even if she had been

2    served with a subpoena, there's no telling whether she would

3    have come to court or not, and certainly enforcement resources

4    wouldn't have been brought to bear because she's in a foreign

5    country.  And there's been no showing that the defense has even

6    tried to get her to voluntarily come here to testify in court.

7         THE COURT:  How do you reply, Mr. Kirsch?

8         MR. KIRSCH:  Well, Your Honor, the government's

9    resting on a standard that if served she might not have shown

10   up.  That's true for a witness, I guess, that lives down the

11   street.  That's not the test.

12        The government could have served her and deliberately

13   chose not to.  The government could have also exercised its

14   power through letters rogatory.  And the court can take judicial

15   notice of that.  Had they wanted to bring Ms. Dhanani here, they

16   could have done it.  Particularly considering the country in

17   which she is in, India, is not necessarily a hostile country to

18   the judicial system in the United States.

19        They could have had her here.  They chose not to get

20   her here, and this is the purpose for the missing witness

21   instruction.  This is the extraordinary purpose.

22        MS. SISKIND:  Your Honor, can I make one response?

23        THE COURT:  Surely.

24        MS. SISKIND:  The defense has made no effort to

25   contact -- that we know of -- to contact Ms. Dhanani or secure

862

1    her testimony.  They could have moved under Rule 15 to take a

2    deposition of her in India and present that at trial.  But

3    absent a showing that the defense attempted to interview the

4    witness, the case law suggests that a missing witness

5    instruction is not appropriate.

6            *United States vs. Disantis*, D-I-S-A-N-T-I-S, a Seventh

7    Circuit case from 2009, 565 F.3d 354 at page 364.

8            "The defendant was not entitled to the missing witness

9    instruction when he failed to subpoena the witness."

10           So it's not just whether the government had access,

11   it's also whether the defendant could have independently gained

12   access to the witness.  And when the witness is equally

13   unavailable to both parties, the Seventh Circuit has said that

14   the missing witness instruction is not appropriate.

15           THE COURT:  The government's citation of *Disantis*

16   appears to be accurate.  And I note that at page 364 of the

17   *Disantis* decision, the Seventh Circuit wrote, and I quote:  "A

18   district court has broad discretion in refusing to give missing

19   witness instructions which are generally disfavored."  I'll omit

20   the citation.  Quote:  "To establish entitlement to a missing

21   witness instruction, a defendant must prove two things:  First,

22   that the absent witness was particularly within the government's

23   power to produce; and, second, that the testimony would have

24   elucidated issues in the case and would not merely have been

25   cumulative."  Citation is to *Gant*, 396 F.3d at page 910 as well.

863

1    Quoting *U.S. vs. Valles*, V-A-L-L-E-S.

2            Now, from what has been asserted here by the defense,

3    the government failed to issue a subpoena -- a trial subpoena to

4    Dhanani and Tandon and as a consequence did not produce them,

5    regardless of whether they would have been -- well, without

6    regard to what they would have testified to.

7            There is nothing here in this record to show that

8    these witnesses would have testified unfavorably with respect to

9    the government. Moreover, there appears to be evidence -- there

10   is evidence in the record indicating that persons are outside of

11   the United States, and that they're not within the control of

12   the United States Government.

13           In fact, I further note that these individuals were

14   the subject of requests by HSBC to allow them to remain in the

15   United States for a limited period of time. I do not recall

16   anything to indicate that these individuals remain in the United

17   States and accept the representation that they are outside of

18   the United States at this point in time.

19           And, hence, I'm not inclined to give this missing

20   witness instruction on the record in this particular case.

21           I will look further, obviously, because I do not have

22   the opportunity to do anything other than a cursory research

23   with respect to this particular issue based upon the citation

24   that was just noted by the government.

25           Let's move to the next instruction.

864

1          MR. KIRSCH:  Your Honor, Instruction Number 2.  I

2    think that both parties agree that the bracketed language should

3    come out.  I don't think the court's taken judicial notice of

4    anything in this trial.

02:01    5          THE COURT:  I do not recall doing so.  So that's

6    correct.

7          MR. KIRSCH:  And then in Instruction Number 3, the

8    bracketed language regarding the defendant's testimony should

9    come out.

02:01   10          THE COURT:  Correct.

11          MR. KIRSCH:  The next one, Your Honor, is Instruction

12    Number 13.  I think the parties are in agreement that that

13    should come out.  There's been no character --

14          Your Honor, can I have just one minute?

02:02   15          THE COURT:  Surely.

16          (Defense counsel confer.)

17          MR. KIRSCH:  Your Honor, with respect to 13, I was

18    just thinking as we were talking.  Your Honor, can I just -- I

19    would like to look at the record tonight on Mark Miller's

02:02   20    testimony.  There was no character evidence per se, but he may

21    have given opinion evidence.  So this instruction --

22          THE COURT:  He did.

23          MR. KIRSCH:  So can we just -- we have to fill in the

24    blank.  Can we just reserve this one for now?

02:03   25          THE COURT:  Surely.

865

1      MR. KIRSCH:  And I guess the same for 15.  We'll have

2  to look at what --

3      THE COURT:  What day did Mr. Miller testify?

4      MR. KIRSCH:  He testified on Friday.

5      (Brief pause.)

6      MR. KIRSCH:  Your Honor, the next issue is Number 20.

7  And this was a unanimity -- this is a unanimity instruction.

8  This came up at the pretrial conference.  We had submitted --

9  and I think we've argued this.  I think the court reserved

10  ruling.  Both parties presented a unanimity instruction.

11      (Brief pause.)

12      MR. KIRSCH:  Your Honor, I see, if you're looking at

13  what you have in front of you, looking at Instruction Number 20,

14  the first one is Government's Proposed Instruction Number 20,

15  and then the second one is Defendant's Proposed Instruction

16  Number 20.  And we discussed this one.  This one existed at the

17  time of the pretrial conference, and it's the defendant's

18  preference for this instruction that we use the Seventh Circuit

19  pattern, which is our proposed instruction.

20      And at the pretrial conference, the court's ruling

21  was, "I'll pass on this and issue a ruling."

22      THE COURT:  Is the government in agreement with the

23  defense, or does it believe that a different instruction should

24  be given with regard to unanimity?

25      MS. SISKIND:  I think we can go with the pattern

866

1    instruction on this.

2            THE COURT:  All right.

3            MR. KIRSCH:  And then, Your Honor, the next issue is

4    Instruction Number 21, which the court's already decided, that's

5    the willfulness issue.  So we would --

6            And then, Your Honor, with Joint Proposed Instruction

7    Number 24, I've handed up the modified version of that that

8    we've agreed on, for Instruction Number 24.

9            And then I think the last issue -- well, Your Honor,

10   there's issue Number 26.  And the government would like to

11   include the ostrich instruction, and the defense opposed the

12   ostrich instruction.

13           This is not -- the standard here is willfulness.  The

14   ostrich instruction would not be appropriate in this case.  The

15   definition of knowing is used -- actually.  I'm not even -- I'm

16   not -- I wonder if this -- we may have to look at this

17   instruction more closely.  This would have clearly been in the

18   instructions when the conspiracy count was in.

19           But to give an ostrich instruction would totally

20   confuse the willfulness.  I don't think the court could give --

21   even if the court needs to define "the defendant knew" because

22   it may be used in these instructions, I don't think in this case

23   where the standard for all eight counts is willfulness that the

24   court could give the ostrich instruction.  That would, of

25   course, obliterate the willfulness standard.

1      THE COURT:  Does the government wish to weigh in on

2  this particular instruction?

3      MS. SISKIND:  Yes, Your Honor.  We still request the

4  ostrich instruction.  It applies particularly to the FBAR

5  counts.  As charged in the indictment, the FBAR counts say that

6  Arvind Ahuja did unlawfully, willfully, and knowingly fail to

7  file the FBAR.  So it is important to further define

8  "knowingly."

9      And as we discussed in the context of the Rule 29

10  argument, there are issues about how the government is proving

11  knowledge of the FBAR requirement that rely -- that the ostrich

12  instruction would help explain.

13      THE COURT:  All right.  I understand.

14      MR. KIRSCH:  Your Honor, I don't mind defining

15  "knowingly" as the word is defined in the first paragraph.  But

16  I think the issue is only with respect to whether the court

17  should give the ostrich instruction with the second paragraph,

18  and the government can't say that they have to prove willfully

19  and knowingly and then take away willfully with the ostrich

20  instruction.

21      THE COURT:  Well, I would agree that the second

22  portion of the instruction as crafted with the brackets would be

23  inappropriate.

24      Would the government take exception to that?

25      MS. SISKIND:  Yes, Your Honor.  It does not modify

868

1   willfully.  Willfulness is intentional violation of a known

2   legal duty.  So in addition to proving willfulness, we need to

3   prove that he knew he had a legal duty to file an FBAR.

4           THE COURT:  But the second portion of the instruction,

5   which has the brackets, says, "You may infer knowledge from a

6   combination of suspicion and indifference to the truth."

7           It's the "indifference to the truth" portion of the

8   instruction that appears to be inappropriate, because you are

9   asserting willful conduct and not just an indifference on the

10  part of this defendant.

11          MS. SISKIND:  Yes, Your Honor.  We can withdraw that

12  part of the instruction.

13          THE COURT:  All right.

14          MR. KIRSCH:  Your Honor, I think the only issues --

15  Your Honor, could we just have one moment to confer?

16          THE COURT:  Off the record.

17          (Discussion off the record.)

18          MR. KIRSCH:  Your Honor, there's two more issues.

19  I'll let the government address them, that the government wants

20  two more instructions.

21          MS. SISKIND:  Your Honor, at the time of the final

22  pretrial conference, there was three other instructions the

23  government proposed and the defense objected to, one of which

24  the court ruled outright Your Honor was not going to give.

25  There were two that the court reserved ruling on, and I would

869

1    like to revisit those at this time.

2         And it's Document Number 114 on ECF.  They were

3    separate because they were not joint instructions.

4         THE COURT:  One moment.

5         (Brief pause.)

6         THE COURT:  What pages?

7         MS. SISKIND:  Page 3 would be the first instruction,

8    Document 114.

9         THE COURT:  This is the fraud and false statements

10   instruction?

11        MS. SISKIND:  Yes.  We are asking for an additional

12   instruction that the government is not required to prove a tax

13   deficiency in order to sustain its burden of proof on 7206.1.

14        THE COURT:  All right.  The defendant did certainly

15   argue that this case is one where he has paid his taxes and has

16   offered proof that amended returns were submitted, along with

17   payments.

18        That being so, can the defense indicate why this

19   wouldn't be an appropriate instruction?

20        MR. KIRSCH:  Yes, Your Honor.  I think those two

21   things are addressing different issues.

22        This instruction would state, with respect to Counts 1

23   through 4, the government's not required to prove that any

24   additional tax was due.  But the government's proved that by the

25   amended instructions.

870

1    So the fact that there was additional tax due is not

2  at issue.  So the amended returns are actually the reason that I

3  argued at the pretrial conference and I'm arguing now, this

4  instruction is entirely unnecessary.

5    First of all, it only applies to Counts 1 through 4,

6  and we have amended tax returns, and there's been a lot of

7  evidence that there was additional tax due.  So that's not an

8  issue in the case.  There's just no reason to instruct the jury

9  on this when it's just not at issue.

10    THE COURT:  And wouldn't the instruction make clear to

11  the jury that it's not an issue?

12    MR. KIRSCH:  Well, I'm not sure.  It could just

13  confuse the jury as to why there's an instruction on this.  I

14  mean, if the court was -- I think it would just confuse the

15  jury.

16    THE COURT:  I disagree.  There's nothing about this

17  instruction that's confusing.  It certainly would make crystal

18  clear that a tax due -- the government is not obligated to show

19  that there was or there is a tax due.

20    So I will give this instruction.

21    All right.  What's the next issue, Ms. Siskind?

22    MS. SISKIND:  The other instruction would be the one

23  on page 5 of Document Number 114, regarding punishment.  The

24  court also reserved ruling on this instruction after the final

25  pretrial conference.  And in light of testimony in this case, we

871

1    are renewing our request for this now.

2             In Mr. Webb's cross-examination of Mr. Bhasin, the

3    issue was raised about how Mr. Bhasin might have to go to jail

4    if he had not cooperated with the government.

5             While certainly that was appropriate cross-examination

6    of a cooperating witness, it may have planted a seed in the

7    jury's mind on the issue of punishment, and it should be made

8    clear to the jury that that is not a proper consideration when

9    reaching a verdict in this case.

10            THE COURT:  Mr. Kirsch, can you tell me why I should

11   not give this instruction?

12            MR. KIRSCH:  Yes, Your Honor.  There's no pattern

13   instruction on this.

14            THE COURT:  I know.

15            MR. KIRSCH:  In the Seventh Circuit.  The Seventh

16   Circuit --

17            THE COURT:  But I have given this instruction in other

18   cases.  So I'd like to know why it would be inappropriate here

19   in light of the testimony that was brought out and the

20   cooperation of Mr. Bhasin was the subject of substantial cross,

21   particularly with regard to his agreement with the government

22   concerning prosecution.

23            MR. KIRSCH:  Yes, Your Honor.  That testimony had to

24   do with benefits that he received in obtaining the

25   non-prosecution agreement.

872

 1        Your Honor, my objection to this instruction is that

 2   there's no Seventh Circuit pattern.  The Seventh Circuit has not

 3   seen fit to include this in the pattern instructions, and it's

 4   unnecessary.

02:14   5        THE COURT:  One second.  Something just occurred to

 6   me.  It says, "It should never be considered by the jury in any

 7   way in arriving at an impartial verdict."

 8        Well, a benefit, i.e., punishment of a witness, is

 9   something that can be considered.

02:15  10        MR. KIRSCH:  Correct, Your Honor.  Correct.

11        THE COURT:  So as written, this would have -- this is

12   not correct.  There would have to be a modification.

13        MS. SISKIND:  Your Honor, we could add something.  I

14   would point out that it does say, "punishment for the offenses

02:15  15   charged in the indictment in this matter."  So it does specify

16   that it's only punishment for this case.  But we could add a few

17   words to make it clearer and resubmit it.

18        THE COURT:  I think it really should be clarified

19   because there might be a tendency to -- for the jury to overlook

02:15  20   any benefit that Mr. Bhasin may have received from the

21   government in assessing whether or not he was truthful.

22        MS. SISKIND:  We'll make that change, Your Honor.

23        THE COURT:  All right.

24        MS. SISKIND:  I think that concludes our disputes on

02:16  25   jury instructions.

                                                              873

1    MR. KIRSCH:  I think that's it.  We can work with the

2    government.  We would ask that -- we'll try to add a sentence in

3    this instruction to address the testimony of Mr. Bhasin, but we

4    may be able to submit something that we agree upon.

5    THE COURT:  Lastly, are there any other instructions

6    that you want to discuss?

7    MS. SISKIND:  No, Your Honor, not from the government,

8    Your Honor.

9    MR. KIRSCH:  No, Your Honor.

10   THE COURT:  I'd like to have you clarify at this point

11   whether you wish to argue before or after the instructions are

12   given?

13   MS. SISKIND:  The government's preference would be for

14   Your Honor to instruct the jury and then go to closing arguments

15   so that we can refer to your instructions in closing arguments.

16   THE COURT:  Well, I just want to point out that the

17   jury will have copies of the instructions in hand in the jury

18   box during your closing arguments.

19   MS. SISKIND:  Yes, Your Honor.

20   THE COURT:  Unless -- if the court has given the

21   instructions already.

22   MS. SISKIND:  Yes, Your Honor.

23   MR. WEBB:  My objection to that is that the parties

24   are always free to argue -- we will know what your instructions

25   are going to be after we argue so that we can argue and

874

1    faithfully set forth your instructions and we're honor bound not

2    to misstate the instructions.

3          But if you instruct them beforehand and they have the

4    jury instructions, that is very distracting as they focus on the

5    arguments of lawyers.

6          And so I object to instructing them before and would

7    strongly prefer that you instruct them afterwards.

8          THE COURT:  Well, I can certainly instruct them not to

9    look at the instructions and actually to put them down.  So that

10   shouldn't be a problem.

11         Is there any other reason not to instruct before

12   closing arguments?

13         MR. WEBB:  No.

14         THE COURT:  I'll think about what you've had to say.

15         We will work on the instructions and try to put them

16   into an appropriate form and e-mail them to you so that you can

17   make sure they're letter perfect and that there's nothing --

18   well, may I suggest -- perhaps I would suggest that you update

19   them in light of our discussions.  That would make it easier.

20         You have them in your computers.  And, to be very

21   honest, my judicial assistant -- my regular judicial assistant

22   is on vacation.  So there's a very practical reason for asking

23   you to do the first cut based upon our discussions.

24         And I will let you know, perhaps, a little later this

25   afternoon where I stand with regard to the other matters,

875

1       including the FBAR.

2               All right.

3               MR. KIRSCH:  Yes, Your Honor.

4               THE COURT:  Thank you greatly.  I will see you

02:19   5   tomorrow morning.

6               MR. WEBB:  Thank you, Your Honor.

7               THE BAILIFF:  All rise.

8               THE COURT:  Oh, would you please make sure that you

9       give phone numbers to my clerk so that we can call you, if

02:19   10  necessary, later today.

11              (Trial adjourned for the day at 2:19 p.m.)

12                          *    *    *

13

14

15

16

17

18

19

20

21

22

23

24

25

876

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN


          I, JOHN T. SCHINDHELM, RMR, CRR, Official Court

Reporter for the United States District Court, Eastern District

of Wisconsin, do hereby certify that I reported the foregoing

proceedings, and that the same is true and correct in accordance

with my original machine shorthand notes taken at said time and

place.

Dated this 20th day of August, 2012

Milwaukee, Wisconsin.

_____
                Official Court Reporter
                United States District Court

```
 1                      I N D E X

 2   RULE 29 MOTION

 3        BY DEFENDANTS....................................   829

 4   JURY INSTRUCTION CONFERENCE

 5        IN OPEN COURT...................................   854

 6

 7   WITNESS   EXAMINATION                              PAGE

 8   GEOFFREY COOK, GOVERNMENT WITNESS

 9        DIRECT EXAMINATION BY MS. SISKIND...............   711

10        CROSS-EXAMINATION BY MR. KIRSCH.................   738

11        REDIRECT EXAMINATION BY MS. SISKIND.............   768

12        RECROSS-EXAMINATION BY MR. KIRSCH...............   781

13        FURTHER REDIRECT EXAMINATION BY MS. SISKIND.....   785

14        JURY EXAMINATION BY THE COURT...................   788

15        FURTHER REDIRECT EXAMINATION BY MS. SISKIND.....   789

16   STIPULATIONS

17        BETWEEN THE PARTIES.............................   794

18   RONALD BRAVER, DEFENSE WITNESS

19        DIRECT EXAMINATION BY MR. WEBB..................   797

20        CROSS-EXAMINATION BY MR. SULLIVAN...............   813

21        REDIRECT EXAMINATION BY MR. WEBB................   821

22        RECROSS-EXAMINATION BY MR. SULLIVAN.............   823

23

24                          * * * * *

25
```

878

```
1                        E X H I B I T S

2    NUMBER              DESCRIPTION           OFFERED  ADMITTED

3    22      9/30/05-10/3/05 Ahuja/Tandon/HSBC e-mails re . 714      714

4            credit limit

5    35      11/17/06 Tandon e-mail re credit card PINs.... 716      716

6    57      Documents re Citibank account #140407......... 723      723

7    64      10/19/09 HSBC check to Ahuja for 4696.71 ..... 719      719

8            British Pounds

9    70      Summary comparing interest income on Forms ... 737      737

10           1040 and 1040X

11   71      Summary of unreported income w/screen prints . 731      731

12           maintained in representative office

13   2060    Citibank Account # 3-222 opening materials.... 727      727

14   2228    Pebble Beach Golf Course info................. 807      807

15   2229    Pebble Beach records for 2008................. 809      809

16

17

18

19

20

21

22

23

24

25
```

879