```
 1                    UNITED STATES DISTRICT COURT

 2               FOR THE EASTERN DISTRICT OF WISCONSIN

 3  ----------------------------------------------------------------

 4   UNITED STATES OF AMERICA,          )
                                        )      Case No. CR 11-135
 5                     Plaintiff,       )      Milwaukee, Wisconsin
                                        )
 6        vs.                           )      August 21, 2012
                                        )      8:30 a.m.
 7   ARVIND AHUJA,                      )
                                        )      VOLUME 5
 8                     Defendant.       )      PAGES 880-1047

 9  ----------------------------------------------------------------

10                    TRANSCRIPT OF JURY TRIAL
             BEFORE THE HONORABLE CHARLES N. CLEVERT, JR.
11           UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY

12  APPEARANCES:

13   For the Plaintiff
     UNITED STATES OF AMERICA:     Office of the US Attorney
14                                 By: TRACY M. JOHNSON
                                   517 E Wisconsin Ave - Rm. 530
15                                 Milwaukee, WI 53202
                                   Ph: 414-297-1580
16                                 Fax: 414-297-4394
                                   tracy.johnson@usdoj.gov
17
                                   United States Department of
18                                 Justice DC
                                   By: JOHN E. SULLIVAN
19                                     MELISSA S. SISKIND
                                   Tax Division - Ben Franklin
20                                 Station - PO Box 972
                                   Washington, DC 20044
21                                 Ph: 202-514-5196
                                   Fax: 202-616-1786
22                                 john.e.sullivan@usdoj.gov
                                   melissa.s.siskind@usdoj.gov
23
     U.S. Official Reporter:       JOHN T. SCHINDHELM, RMR, CRR,
24                                 johns54@sbcglobal.net

25   Proceedings recorded by computerized stenography,
     transcript produced by computer aided transcription.
```

```
 1    APPEARANCES CONT'D:

 2    For the Defendant              Friebert, Finerty & St. John SC
      ARVIND AHUJA:                  By: SHANNON A. ALLEN
 3    (Present)                      Two Plaza East - Ste 1250 - 330 E
                                     Kilbourn Ave
 4                                   Milwaukee , WI 53202
                                     Ph: 414-271-0130
 5                                   Fax: 414-272-8191
                                     saa@ffsj.com
 6
                                     Winston & Strawn LLP
 7                                   By: DAN K. WEBB
                                         THOMAS L. KIRSCH II
 8                                   35 W Wacker Dr
                                     Chicago , IL 60601-9703
 9                                   Ph: 312-558-5600
                                     Fax: 312-558-5700
10                                   dwebb@winston.com
                                     tkirsch@winston.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

881

1          P R O C E E D I N G S (8:41 a.m.)

2          THE COURT:  Case No. 2012-CR-135, United States vs.

3   Arvind Ahuja.  Please state your appearances for the record.

4          MR. SULLIVAN:  John Sullivan, Melissa Siskind, Tracy

08:42  5   Johnson, and Special Agent Geoffrey Cook for the United States.

6          THE COURT:  Good morning.

7          MR. SULLIVAN:  Good morning.

8          MR. WEBB:  Your Honor, Dan Webb, Tom Kirsch, and

9   Shannon Allen are present and so is the defendant, Dr. Ahuja.

08:42  10         THE COURT:  Good morning to all of you as well.

11         Yesterday we had argument on the defendant's motion

12  for a judgment of acquittal, and the government responded to

13  that motion orally.  After we ended our formal session I

14  reviewed the materials on file and considered the evidence in

08:42  15  the record and shared with the parties informally what the Court

16  envisioned this morning.

17         I also gave to the government an opportunity to review

18  the record and to determine whether or not it wishes to cite any

19  additional materials in the record which support the

08:43  20  government's belief that it has demonstrated beyond a reasonable

21  doubt that the defendant is guilty of all the remaining charges

22  in this case.

23         The Court further noted and placed on the docket its

24  determination respecting one of the instructions that the

08:43  25  defendant requested; that is, a missing witness instruction.

882

1    The Court advised with respect to the instruction that it will

2    not give a missing witness instruction and cited *U.S. vs.*

3    *Disantis* as the basis for that decision.  I also took into

4    account the case law that has cited to *Disantis* and the basis

5    for the defendant's claim that a missing witness instruction is

6    warranted, particularly with regard to two of the employees of

7    HSBC which the Court concluded are not in the control of the

8    United States or available to testify in this case.

9           With that said, I turn to the government to inquire

10   whether or not it wishes to be heard further.

11          MS. SISKIND:  Your Honor, we do not have anything

12   further to submit on the 2006 tax year.  We have found case law

13   regarding -- that supports Your Honor's statements on the

14   telephone conference yesterday evening regarding the 2007, 2008,

15   and 2009 tax years, cases specifically dealing with what kind of

16   evidence supports willfulness in an FBAR case and how the

17   statement on the Schedule B is a fact from which the Court can

18   infer willfulness.  And I provide those cases to the Court.

19          THE COURT:  If you wish to place them in the record,

20   it would be certainly something that would provide further

21   grounds for the government's view that it has satisfied its

22   burden of proof.

23          MS. SISKIND:  The first case, Your Honor, is generally

24   about the significance of a signature on a tax return.  It's

25   *United States vs. Harper*, which is 458 F 2.d 891, beginning at

08:44
08:44
08:44
08:45
08:45

1   page 894.  It's a Seventh Circuit case from 1972 which speaks

2   generally about what kind of inferences can be drawn from a

3   signature on a tax return.  The case says, "While it is true

4   that proof of a signature alone on a tax return is insufficient

08:45  5   by itself to make knowledge of the contents of that return

6   attributable to the signer, it is equally true that knowledge

7   may be inferred from the facts and circumstances of the case and

8   that the signature at the bottom of the return is prima facie

9   evidence that the signer knows of the" -- "knows the contents of

08:46  10  the return."

11      We would point the Court to two cases specifically

12  dealing with failures -- with willful failures to file FBARs.

13      The first case is *United States vs. Sturman*,

14  S-T-U-R-M-A-N.  It's 951 F 2.d 1466.  It's a Sixth Circuit

08:46  15  opinion from 1991.  And I would direct the Court starting at

16  page 1476.  The court concludes that in that case there was

17  ample evidence of willfulness with respect to an FBAR charge,

18  based on the fact first that the defendant concealed his foreign

19  bank accounts, and second that there was a statement on

08:46  20  Schedule B regarding the FBAR requirement specifically directing

21  the signer of the return to the instructions for the FBAR.

22      The other case I would cite to the Court is *United

23  States vs. Williams*, 2012 Westlaw 2948569, a Fourth Circuit

24  opinion from 2012.  And that case talked about evidence from

08:47  25  which willfulness may be inferred regarding the FBAR, and it

884

1    speaks specifically of the defendant's signature on a tax return

2    as being prima facie evidence that he knew the contents of the

3    return, and at a minimum, line 7a's directions to see

4    instructions for exceptions and filing requirements for Form TDF

5    90-22.1.  And the court found that that statement in the tax

6    return that the defendant had signed put the defendant on notice

7    of the FBAR requirement.

8         And the court goes on to note in that opinion that

9    there is nothing in the record indicating the defendant ever

10   consulted those instructions or followed what the form said.

11   The mere fact that he signed the return, that the return

12   contained instructions to go and review the FBAR, was sufficient

13   to establish his knowledge of the FBAR requirement and that his

14   failure to file as willful.

15        THE COURT:  Does the defense wish to be heard further?

16        MR. KIRSCH:  Your Honor, just briefly.  First of all,

17   you *U.S. vs. Williams* is a civil case.

18        Your Honor, we filed this morning and I sent to your

19   law clerk a supplemental brief citing supplemental authority for

20   our points for the 2007 and 2008 tax years.  I have a copy that

21   I can hand up to the Court.

22        THE COURT:  Please.  Ordinarily, just so that you know

23   what our local rules provide, when something is submitted at the

24   last minute a hard copy should be delivered to chambers.  In any

25   event, I invite the submission.

1          (Document tendered to the court.)

2          THE COURT:  I assume the government has seen the

3     submission and that was one of the reasons for citing the case

4     law that you just referenced?

5          MS. SISKIND:  That is correct, Your Honor.

6          THE COURT:  Well, I'm satisfied the government has --

7          MR. KIRSCH:  Your Honor, can I make a record on one

8     point?

9          THE COURT:  Yes.

10          MR. KIRSCH:  I'd just like to make -- first of all, I

11    think we generally agree with the law, Your Honor.  In fact, we

12    submitted to the Court last night a supplemental instruction on

13    this law.

14          But, Your Honor, if the Court looks at page 3 of my

15    brief, this is the critical paragraph with respect to 2007 and

16    2008.  Your Honor, the issue here is the evidence with respect

17    to 2007 and 2008.  The government just stated and the law is

18    unequivocally clear that signing the tax return by itself is not

19    enough to find willfulness under the law.  It's not enough by

20    itself.

21          Mark Miller -- if the Court looks at Paragraph 3 of my

22    brief, Mark Miller -- and the government has not responded to

23    this.  This is undisputed.  Mark Miller did not testify that

24    Arvind Ahuja ever received a tax return for -- or tax organizer

25    for '06, '07, or '08.

1    THE COURT:  I'm certainly mindful of that, and in

2    fact, that was part of the discussion that we had yesterday.

3    But I have concluded at the very least the government

4    has failed to prove its case against the defendant with regard

08:51  5    to tax year 2006.  The defendant's motion is therefore granted

6    and Count 6 of the superseding indictment is dismissed.

7    With regard to the balance of the indictment, the

8    Court will maintain that under advisement.  And I do so because

9    I want to get to the testimony that may be offered, and I'll

08:52 10    give you a chance to be heard further with respect to these

11    matters after I've had a chance to review the case law that

12    you've submitted and can at that point in time take into account

13    the particulars of the authorities that you rely upon and any

14    additional argument that may be appropriate.

08:52 15    MR. KIRSCH:  Thank you, Your Honor.  We're ready to

16    proceed with our first witness whenever the court is so

17    inclined.

18    THE COURT:  All right.  Bring in the jury, please.

19    (Jury in at 8:53 a.m.)

08:53 20    THE COURT:  Good morning all.

21    THE REPORTER:  Raise your right hand, please.

22    JENNIFER ANN BECK, DEFENSE WITNESS, SWORN

23    THE REPORTER:  Please state your name and spell your

24    name for the record.

08:53 25    THE WITNESS:  Jennifer Ann Beck, J-E-N-N-I-F-E-R,

887

1    A-N-N, B-E-C-K.

2              MR. KIRSCH:  May I proceed, Your Honor?

3              THE COURT:  You certainly may.

4                        DIRECT EXAMINATION

08:53    5    BY MR. KIRSCH:

6    Q.  Good morning, Ms. Beck.

7    A.  Good morning.

8    Q.  Ms. Beck, to explain why you're here, yesterday in court,

9    court proceedings yesterday --

08:54   10             THE COURT:  Just ask the question, please.

11             MR. KIRSCH:  Yes, Your Honor.

12    BY MR. KIRSCH:

13    Q.  Ms. Beck, to explain why you're here, will you tell the jury

14    where you're employed?

08:54   15    A.  I'm employed at Tuckaway Country Club.  It's a private club

16    in Franklin, Wisconsin.

17    Q.  And what is your position at Tuckaway Country Club?

18    A.  I'm the general manager.

19    Q.  How long have you been there?

08:54   20    A.  Five years.

21    Q.  Is Dr. Arvind Ahuja a member of Tuckaway Country Club?

22    A.  Yes, he is.

23    Q.  Will you explain to the jury what Tuckaway Country Club is?

24    A.  Tuckaway Country Club is a private club.  We have 18 holes

08:54   25    of golf, a swimming pool, tennis courts, and a clubhouse, and

888

1    it's a private membership.

2    Q.  Was Dr. Ahuja a member of the club in June of 2009?

3    A.  Yes, he was.

4    Q.  What's the significance of it being a private club?

08:55 5    A.  Private club means that it's not open to the public.  So in

6    order to be a member, you have to go through different -- a

7    different membership application and then you have the rights to

8    the club.

9    Q.  As the general manager, are you familiar with the club's

08:55 10   policy about guests using the club and playing golf at the club?

11   A.  Yes, I am.

12   Q.  Is it permitted?

13   A.  Yes, it is.

14   Q.  If a member brings a guest, is there a charge for the guest

08:55 15   to play golf, commonly referred to as a greens fee?

16   A.  Correct.  Sometimes it's a greens fee, sometimes it's a

17   guest fee, but there's always a charge.

18   Q.  There is a fee.

19   A.  Uh-huh.

08:55 20   Q.  And I want to call your attention to June of 2009.  And I

21   want to ask you, what was the fee for a guest to play golf at

22   Tuckaway Country Club in June of 2009?

23   A.  $85.  And that was for the green fee and cart fee combined.

24   Q.  Now, if a member brings a guest to play golf at Tuckaway, is

08:56 25   the member or guest able to pay for the guest's golf fee or

1    green fee by cash or credit card?

2    A.  No.

3    Q.  Is your country club known as what's called a noncash club?

4    A.  Correct.

5    Q.  What does that mean?

6    A.  It means that all charges that a member would have has to

7    flow through their account.

8    Q.  Ms. Beck, did I ask you to bring a record with you today

9    when you came to testify?

10   A.  Yes.

11          MR. KIRSCH:  Your Honor, may I approach the witness?

12          THE COURT:  You may.

13   BY MR. KIRSCH:

14   Q.  Before I do, for the record, Ms. Beck, I'm going to hand you

15   what I've marked as Defense Exhibit 2204 and ask you if you

16   recognize this document.

17   A.  Yes, I do.

18   Q.  Is that the record that you brought with you today pursuant

19   to my request?

20   A.  Yes.

21          MR. KIRSCH:  Your Honor, I move to admit Exhibit 2204.

22          MS. SISKIND:  No objection.

23          THE COURT:  It's received.

24          (Exhibit 2204 received in evidence.)

25          MR. KIRSCH:  And I ask it be published, James, for the

890

1    jury.

2    BY MR. KIRSCH:

3    Q.  Ms. Beck, you have a record in front of you, but there's

4    also going to be a record on the screen.  So whichever is more

08:57  5    handy, you can refer to that while I'm asking you questions.

6          Will you explain to the jury what this document is?

7    A.  This is a statement that is issued monthly to the member,

8    and it states all the charges and any payments that the

9    individual has made.

08:57  10   Q.  Now, I'd like to --

11         MR. KIRSCH:  James, can you highlight the statement

12   date and the member number?  Right up here.

13   BY MR. KIRSCH:

14   Q.  Okay.  Ms. Beck, whose account is this?

08:58  15   A.  This is Dr. Ahuja's.

16   Q.  And do you see the statement date there that's highlighted

17   on the screen of June 30th, 2009?

18   A.  Yes.

19   Q.  So for what months are charges reflected on this statement?

08:58  20   A.  June of 2009.

21   Q.  I'd like to just walk through the statement very quickly

22   with you.  Do you see the entry of a beginning balance on

23   June 1st and then a payment on June 23rd; do you see that?

24   A.  Yes, I do.

08:58  25   Q.  Were those charges and payment for expenses incurred in May

891

1   of 2009, or at least prior to June 1st of 2009?

2   A.  Prior to June 1st.

3   Q.  Now, then you see a charge called "minimum spending" for

4   $175 -- $170.50; do you see that?

5   A.  Yes.

6   Q.  I want to talk about that in one minute.  But first I'm

7   going to ask you, by looking at this document, can you determine

8   from this record whether or not Dr. Ahuja brought a guest to

9   play golf at Tuckaway Country Club in June 2009?

10  A.  From this statement, I can tell you that Dr. Ahuja did not

11  use the club at all or play golf in 2009, June of 2009.

12  Q.  And, first, with respect to the golf, you can see that

13  because there's no charge for $85; is that correct?

14  A.  Correct.

15  Q.  If Dr. Ahuja had been charged a guest fee, it would appear

16  on that statement, correct?

17  A.  Correct.

18  Q.  Now, you see a monthly minimum charge for $170.50?

19  A.  Yes.

20  Q.  Will you explain to the jury what that reflects?

21  A.  That is unspent -- it's an unspent amount that the member is

22  charged.  So in a quarter a member has to spend at least $300 in

23  food and beverage dining at the club.  And because Dr. Ahuja did

24  not spend that, he was charged what the balance of the $300,

25  which is 170.50.

1    Q.   So that means in the second quarter of 2009, which would be

2    April, May, and June, members have to spend a minimum of $300.

3    A.   Correct.

4    Q.   And because Dr. Ahuja did not meet his minimum by June 30th,

5    he was charged for the balance; is that right?

6    A.   Correct.

7    Q.   Does the monthly minimum -- can guest fees count toward the

8    monthly minimum?

9    A.   Ours is a quarterly minimum.

10   Q.   I'm sorry.

11   A.   And, no, guest fees -- it's only food and beverage.  No

12   guest fees.

13   Q.   So, Ms. Beck, from looking at this record, can you tell

14   whether Dr. Ahuja had any charges while at the club in June of

15   2009?

16   A.   There were absolutely no charges in June of 2009.

17             MR. KIRSCH:  Your Honor, may I have one minute?

18             THE COURT:  Certainly.

19             (Defense counsel confer.)

20   BY MR. KIRSCH:

21   Q.   Ms. Beck, I just have a few more questions.  Do you see

22   Dr. Ahuja's address on the statement there?

23   A.   Yes.

24   Q.   In Greendale, Wisconsin?

25   A.   Correct.

893

1    Q.  Are you aware that that's approximately five to ten

2    minutes -- the country club is approximately five to ten minutes

3    away from that house?

4    A.  Correct.

5                MR. KIRSCH:  I have no further questions, Your Honor.

6                THE COURT:  Cross?

7                MS. SISKIND:  Government has no questions for this

8    witness.

9                THE COURT:  Thank you very much.  You may step down.

10   You can leave it there.

11               THE WITNESS:  Okay.

12               (Witness excused at 9:01 a.m.)

13               THE COURT:  Does the defense have any additional

14   witness at this time?

15               MR. WEBB:  Your Honor, we do not.  We rest our case

16   and are ready to proceed.

17               MR. KIRSCH:  Your Honor, we actually --

18               MR. WEBB:  We have to offer exhibits.

19               MR. KIRSCH:  We actually have some exhibits to offer

20   that have been used in the course of the trial, Your Honor.

21               For the record, defense moves to admit Defense

22   Exhibit 2214, 2233, 2234, 2235, and 2236.

23               THE COURT:  Is there any objection?

24               MS. SISKIND:  I'm not sure what those are, Your Honor.

25               MR. KIRSCH:  Your Honor, if I can confer for one

894

1    minute, I can show her my list.

2            THE COURT:  All right.  Go ahead.

3            (Counsel confer.)

4            MS. SISKIND:  No objection.

09:02 5            THE COURT:  They're received.

6            (Exhibits 2214, 2233, 2234, 2235, and 2236 received in

7    evidence.)

8            THE COURT:  Does the government have additional

9    witnesses?

09:03 10            MR. SULLIVAN:  Nothing further, Your Honor.

11            THE COURT:  I apologize to the jury.  I didn't give

12    you a chance to ask questions of the witness.

13            That concludes the evidence in the case.

14            Members of the jury, would you please return to the

09:03 15    jury room at this time.

16            THE BAILIFF:  All rise.

17            (Jury out at 9:03 a.m.)

18            THE COURT:  Please be seated.

19            Are there additional matters that need to be addressed

09:04 20    before we turn to the subject of instructions?

21            MS. SISKIND:  Your Honor, the only issue is that once

22    it's decided which counts are going to go to the jury we just

23    want to make sure everyone is on the same page which count is

24    which count number so that everything is clear.

09:04 25            MR. KIRSCH:  Your Honor, I think with respect to the

895

1    jury instructions, without waiving our objections made

2    yesterday, yesterday we submitted a set of final instructions to

3    the court which, I think, reflects the court's ruling and

4    accurately -- I think it accurately reflects the court's rulings

09:04    5    on the issues with respect to the jury instructions.

6            And we submitted last night to the court a

7    supplemental instruction, and I have that.  I didn't put a

8    number on it, Your Honor, because I didn't know where you wanted

9    to fit it into the instructions so I didn't put a number on it.

09:05    10           But other than that, without waiving the objections we

11   made previously, I think you have all the jury instructions that

12   the parties -- that reflect your rulings.

13           THE COURT:  Have you gone over those instructions with

14   the government?

09:05    15           MR. KIRSCH:  Oh, yes, Your Honor.  I think --

16   Ms. Siskind -- we worked hard on these yesterday.  And

17   Ms. Siskind sent those to the court by PDF last night.

18           We have not received the court's final version, but

19   we've sent you what we think is our final version, which

09:05    20   reflects the court's rulings.

21           THE COURT:  I just got a note from my JI saying that

22   there are no jury instructions in the post office box.  Did you

23   e-mail them to our PO?

24           MS. SISKIND:  Your Honor, we e-mailed them to

09:05    25   Ms. Granville.

896

1      MR. KIRSCH:  I also printed a set, if the court wants.

2  I only brought one set with me, Your Honor, but I can hand this

3  up, if you want it.  If you want to make a photocopy, whatever

4  you want, I have it.

09:05  5      THE COURT:  One second.

6      (Brief pause.)

7      THE COURT:  No.  She did not receive it.  So why don't

8  we take a few moments to see what has happened to the

9  instructions.  And if you have a hard copy, I'll look at what

09:06  10  you have in hard copy, but we will need them in electronic form

11  so that they can be finalized.

12      MS. SISKIND:  Your Honor, is there a better e-mail

13  address to use to make sure --

14      THE COURT:  We have what's called a post office box

09:06  15  where all formal filings are supposed to go.

16      (Document tendered to the court.)

17      THE COURT:  I would like to meet with counsel in my

18  conference room, and we can go over any of the details that need

19  discussion.  And once we know exactly which direction we're

09:07  20  going, we'll place things on the record.

21      At this point in time, have the parties revised their

22  estimate of how much time they need to argue?

23      MR. SULLIVAN:  For the government, Your Honor, the

24  closing should be probably 35 minutes and the rebuttal probably

09:08  25  25.  So we've come down.

897

1    THE COURT:  I duly note you have.

2         Mr. Webb?

3         MR. WEBB:  Your Honor, I really haven't come down.  I

4    stayed up pretty much all night trying to cut back on this.  I'm

5    going to do it as fast -- as efficient as I can.  There's a lot

6    of documents in evidence I need to explain.  It's going to be

7    somewhere between an hour and a half and two hours.  I tried to

8    bring it down as best I can.  I'm going to continue to do that.

9    As I listen to the government's case, I may be able to cut back

10   some.  And so I'm going to work very hard at it, Your Honor.

11        THE COURT:  All right.  I want you to do what you have

12   to do to get your points across to the jury, but I also want you

13   to be as efficient as possible.

14        We'll take a brief break and I'll meet you in the

15   conference room.

16        THE BAILIFF:  All rise.

17        (Recess taken at 9:09 a.m., until 11:49 a.m.)

18        THE COURT:  Be seated, please.

19        I have released the jury until 1:00 o'clock.  That way

20   the arguments of counsel will not be split.

21        You've also been handed copies of the instructions,

22   the superseding indictment with modifications, and the verdict

23   form.

24        It has come to my attention that there was a

25   typographical error in the superseding indictment with respect

898

1    to Schedule B.

2            Do the parties wish to be heard respecting the same?

3            MR. SULLIVAN:  Yes, Your Honor.  It would be

4    considered surplusage.  But the parties have agreed that we're

5    going to change Part II to Part III because it doesn't affect

6    the line item and the schedule.

7            So with the consent of the defense, we would go and

8    change it to Part III.

9            THE COURT:  You ask that the indictment be amended to

10   modify the language referring to that portion of Schedule B

11   where information is requested of the taxpayer.

12           MR. SULLIVAN:  Yes.  It originally said, "Schedule B,

13   Part II, line 7a."  It should be, "Schedule B, Part III,

14   line 7a."

15           THE COURT:  Mr. Webb?

16           MR. WEBB:  Yes, Your Honor.  I noticed this this

17   morning.

18           I understand the government's going to do what they

19   just said they're going to do, which is, I guess, to amend the

20   indictment because of some error.

21           What I don't know, and I've had no time to look at, is

22   whether I have any rights because it's not being done by the

23   grand jury.

24           I don't want to relinquish that right, but I don't

25   want to hold up these proceedings.  If the government is

899

1  confident that the law is clear on this, I'm ready to go

2  forward.  But I'm not going to just sit here and relinquish some

3  right that I have.

4          The government's, I think, position is that this is a

5  typographical error, and that the case law would allow them to

6  do this without going back before the grand jury.  I'm not in a

7  position to dispute the case law, but I'm not in a position to

8  agree to it because I just don't know.

9          THE COURT:  You're not stipulating.

10         MR. WEBB:  I'm not stipulating.

11         THE COURT:  All right.  I note the government request.

12 I am satisfied that the reference to Part II of Schedule B is

13 erroneous; it is not substantive; it appears to be a

14 typographical error only.  And, therefore, I do order that the

15 superseding indictment be amended to refer to Schedule B,

16 Part III, line 7a.  And we'll proceed accordingly.

17         Now, with regard to the verdict form, is there any

18 disagreement with the verdict form as now crafted?

19         MS. SISKIND:  Not from the government, Your Honor.

20         MR. KIRSCH:  Yes, Your Honor.

21         There is one -- it looks like just a typographical

22 error.

23         Count 1, 2, 3, and 4 say "not guilty" first and then

24 "guilty," which is the way it should be, but 5, 6, and 7 say

25 "guilty" first and "not guilty" second.  So they need to be

900

 1    consistent, I think, Your Honor.

 2              THE COURT:  Absolutely.  So they will be flipped.

 3              5, 6, and 7, where a verdict is requested, will be

 4    flipped.

 5              Is there anything else?

 6              That's why I like to have multiple sets of eyes on

 7    these documents.

 8              MR. KIRSCH:  No, Your Honor, nothing else that we

 9    could see.

10                   JURY INSTRUCTION CONFERENCE

11              THE COURT:  All right.  With regard to the

12    instructions, are there any objections to the instructions or

13    corrections that should be made?

14              I'll first direct the question to the government.

15              MS. SISKIND:  No, Your Honor.

16              THE COURT:  Mr. Kirsch?

17              MR. KIRSCH:  Your Honor, without repeating our prior

18    exceptions, which we'd like to preserve for the record, we have

19    no objections to these instructions, subject to that.

20              THE COURT:  Would you just reiterate your objections

21    so that the record will contain the essential arguments all at

22    one portion of the transcript?

23              MR. KIRSCH:  Your Honor, I don't have them all with

24    me.  I know --

25              THE COURT:  Just generally.

901

1          MR. KIRSCH:  I know that we had -- well, first of all,

2     we object to the jury being instructed on Counts 7 -- let me

3     just say the years.

4          THE COURT:  You moved to dismiss Counts 7 -- actually,

11:54    5     you filed a motion for a judgment of acquittal.

6          With respect to any count that was subject to your

7     judgment of acquittal, you are asserting that there should be no

8     instruction.  Correct?

9          MR. KIRSCH:  Yes, Your Honor.

11:55   10          Just so the record is clear, we think there should be

11    a judgment of acquittal on all counts of the superseding

12    indictment.

13          What we discussed this morning and raised this morning

14    is a judgment of acquittal on -- the principal argument dealt

11:55   15    with the FBAR violations for 2007 and 2008.

16          And I think the government and the defendant disagree

17    over the issue of the knowledge and circumstances.  The defense

18    position is that goes to knowledge of the FBAR requirement, not

19    just knowledge and circumstances generally of the case.

11:55   20          THE COURT:  That's duly noted.  And as indicated in

21    chambers and yesterday, as well as earlier this morning, the

22    Court is taking these matters under advisement.  Hence, it is

23    appropriate that the jury be instructed to deliberate with

24    respect to all of the remaining counts.

11:56   25          Is there anything else?

902

1    MR. KIRSCH:  Your Honor, there was -- I'm looking

2   through these very quickly.  There was the punishment

3   instruction that we had objected to.

4    THE COURT:  I believe that was corrected to include an

5   instruction that referenced Mr. Bhasin as well as the defendant.

6    MR. KIRSCH:  That's correct, Your Honor.  But we

7   would -- we don't think that instruction should be given at all.

8   We agree with the correction, but we still think the punishment

9   instruction should not be given.  And of course, we object, the

10   missing witness instruction we want to preserve that objection.

11    THE COURT:  That is duly noted and it is again noted

12   here.

13    MR. KIRSCH:  And we objected to Instruction Number 22.

14   And, Your Honor, I'm going through it very quickly, but I think

15   that's it.  I think all the other instructions we were able to

16   work out.

17    THE COURT:  Well, take a couple of moments so that you

18   don't have to rush.  If there is something else that needs to be

19   noted, I'd like to have it noted before we break and before the

20   jury gets back because when they return I would like for the

21   arguments to begin.

22    MR. KIRSCH:  There's nothing that I can think of,

23   Your Honor.

24    THE COURT:  Do you want to take a few more minutes?

25    MR. KIRSCH:  No, I don't think I have to.  I don't

903

1    want to waive the arguments that I made yesterday with respect

2    to the instructions.

3            THE COURT:  You're not waiving any arguments.  As I

4    said, your arguments have been preserved.  But for the sake of

5    the record and to assist in review of the record, it would be

6    helpful to have everything at one point in the record.

7            MR. KIRSCH:  Your Honor, there's nothing else.

8    There's nothing else.

9            THE COURT:  Does the government wish to say anything

10   with respect to the instructions that were just mentioned by

11   Mr. Kirsch?

12           MS. SISKIND:  Your Honor, as to the instruction

13   regarding punishment, as we stated yesterday, we believe that's

14   appropriate in light of the cross-examination of Mr. Bhasin

15   regarding punishment he could have faced if he was not part of a

16   non-prosecution agreement with the government.

17           As to the instruction as to tax loss, as we stated

18   yesterday, that instruction is appropriate because there has

19   been some charts put into evidence, and we expect argument from

20   the defense on the amount of tax the defendant paid over these

21   years.

22           As to the missing witness instruction, for the reasons

23   we cited in court yesterday, including the *Disantis* case, the

24   missing witness instruction is not appropriate because Priti

25   Dhanani and Ankush Tandon are in India and outside of the

904

1     subpoena power of the court.

2             THE COURT:  Very well.

3             MR. KIRSCH:  Your Honor, can I just have one second?

4     I just want to look up something very quickly.

5             THE COURT:  Absolutely.

6             MR. WEBB:  While he's doing that, can I -- yesterday

7     we had the discussion about whether you were going to instruct

8     the jury before or after closing arguments.

9             THE COURT:  I will instruct the jury after closing

10    arguments, and the instructions will be handed out at that time.

11            (Brief pause.)

12            MR. KIRSCH:  Your Honor, the -- I just noticed this.

13    Instruction Number 13.

14            THE COURT:  All right.  Give me a moment.  Go ahead.

15            MR. KIRSCH:  The wrong bracketed language was

16    included.  Down at the bottom says, "If that statement was made

17    under oath, you may also consider it as evidence of the truth of

18    the matters contained in that prior statement."

19            But what the government is referring to is

20    Mr. Miller's testimony before the grand jury, but he was not --

21    there's no evidence in the record that he was under oath when he

22    testified before the grand jury.

23            THE COURT:  I don't think you need to have specific

24    testimony that he was under oath.

25            MR. KIRSCH:  I'm not sure, then, what you would need.

905

1      THE COURT:  Let me -- would you, Kris --

2      MR. KIRSCH:  The objection, Your Honor, is there's no

3   evidence that the statement of Mr. Miller was made under oath.

4   So I think the other bracketed language should be used, not this

5   bracketed language.

6      THE COURT:  Which other language?

7      MR. KIRSCH:  Well -- Your Honor, I don't have the

8   pattern instructions with me.  It's a Seventh Circuit pattern

9   instruction, and there are two sentences, one for statements

10  made not under oath and one for statements that were made under

11  oath.

12     THE COURT:  I believe you're referring to pattern

13  instruction 3.09 which has two bracketed sections first states,

14  and I quote:  "You may not use it as evidence of the truth of

15  the matters contained in that prior statement."

16     The second, and I quote, reads:  "If that statement

17  was made under oath you may also consider it as evidence of the

18  truth of the matters contained in that prior statement."

19     MR. KIRSCH:  So, Your Honor, from the transcript, I'll

20  just read the questions and answers.

21     THE COURT:  What page?

22     MR. KIRSCH:  Page 645, starting with line 21.

23     "QUESTION:  On cross-examination did you indicate that

24  you did not have a very good recollection of the meeting in

25  August of 2009?

906

1    "ANSWER:  No.  That's not what I testified.  I said

2    that I had a general recollection of the meeting.

3    "QUESTION:  And I'm asking you in August of 2009, did

4    you inform Dr. Ahuja of the FBAR reporting requirements?

5    "ANSWER:  I do not believe that I used the terminology

6    FBAR.  I believe that I informed him that there were new,

7    strictly enforced rules and penalties, that failure to report

8    foreign bank and financial accounts can result in substantial

9    penalties.

10    "QUESTION:  And when you testified before the grand

11    jury, Exhibit 78, page 17, line 24, do you recall being asked

12    the following question and giving the following answer?

13    "QUESTION:  In August of 2008 you did inform him of

14    the FBAR reporting requirements?

15    "ANSWER:  That is correct.

16    "Do you recall that testimony?

17    "ANSWER:  I do.

18    "And when you gave that testimony, Dr. Ahuja was not

19    in the grand jury room, was he?

20    "ANSWER:  That is correct."

21    There's no evidence when the witness made that

22    statement he was under oath, and therefore the jury instruction

23    cannot reflect "If that statement was made under oath, you may

24    also consider it as evidence of the truth of the matters

25    contained in that prior statement."

907

1          The government failed to ask Mr. Miller if he was

2   under oath when he testified before the grand jury.  So I think

3   the other -- the alternative language needs to be used about a

4   statement that was not made under oath.

12:05   5          THE COURT:  Does the government wish to comment?

6          MS. SISKIND:  Yes, Your Honor.

7          First, I don't have the commentary to this pattern

8   instruction in front of me so I don't know whether the drafters

9   of the pattern instruction had any comment on whether the fact

12:05   10  that the person was under oath has to be elicited at trial.

11          But in any event, that can be remedied in one of two

12  ways:  One, we can put into evidence the first few lines of the

13  grand jury transcript where he is sworn in under oath.

14  Alternatively, Your Honor can take judicial notice of the fact

12:05   15  that witnesses when they go in the grand jury are under oath.

16          THE COURT:  How does the defense respond?

17          MR. KIRSCH:  May I have just one moment, Your Honor?

18          THE COURT:  Surely.

19          (Defense counsel confer.)

12:06   20          MR. KIRSCH:  Your Honor, we think the other sentence

21  ought to be added in addition to this, that -- this last

22  sentence, "If that statement was made under oath, you may also

23  consider it as evidence of the truth of the matters contained in

24  that prior statement," has to stay in the instruction because

12:07   25  Mr. Bhasin was impeached with his grand jury testimony regarding

908

1   golf at Pebble Beach.

2          And we did ask the appropriate question of whether he

3   was under oath when he made that prior statement, so we've got

4   to have that with respect to Bhasin.

5          But with respect to Miller, I think the additional

6   sentence should be added that the statement was not made under

7   oath.  That's our position.

8          THE COURT:  What is your position regarding the Court

9   taking judicial notice of Mr. Miller being under oath when

10  testifying before the grand jury, particularly in light of your

11  acknowledgement that Mr. Bhasin was under oath before the grand

12  jury?

13         MR. KIRSCH:  Your Honor, well, I don't know the case

14  law on that.  I don't know what the law is, whether the Court is

15  permitted to take judicial notice of that.  So I guess I would

16  just preserve the objection for the record.

17         And I have nothing more to say unless the Court has

18  any questions.

19         THE COURT:  All right.  Then I will take judicial

20  notice that grand jury witnesses are under oath.  If that is so,

21  then we need to modify one of the instructions, and I believe we

22  should add judicial notice to the instruction -- earlier

23  instruction regarding what is evidence.

24         MR. KIRSCH:  Well, Your Honor, I don't -- I don't

25  believe that's necessary.  I don't believe it's necessary to add

909

1    it to the instruction to complicate things.  We respect --

2              THE COURT:  But then the jury won't really have a --

3    an understanding as to what the import of judicial notice is.

4              MR. KIRSCH:  Can I have one moment, Your Honor?

12:08    5              THE COURT:  Certainly.

6              (Defense counsel confer.)

7              THE COURT:  Let me note that the proposed

8    instructions, and in particular Number 2, includes the language

9    that I would reinsert if judicial notice is taken.

12:10    10              MR. KIRSCH:  Your Honor, our position on judicial

11   notice would be that we would object to the Court taking

12   judicial notice.  I think judicial notice are facts like the

13   City of Milwaukee is in Wisconsin.  It's a proven fact;

14   everybody knows it.  But we don't have any knowledge as to

12:10    15   whether Mr. Miller was actually sworn in that day.

16              THE COURT:  Then I will reopen the evidence.

17              MR. SULLIVAN:  Government Exhibit 78.

18              MR. WEBB:  Does it say he's sworn?  I don't have it.

19              MR. SULLIVAN:  Yes, it does.  Your Honor, on page 3 of

12:10    20   Government Exhibit 78 it says, "Mark Miller, called as a witness

21   herein, having been first duly sworn" --

22              THE COURT:  One second.  Let me look for the exhibit

23   list.  Do you have the exhibit list, Kris?

24              MR. KIRSCH:  Your Honor, we'll withdraw our objection.

12:11    25   The transcript does reflect that Mark Miller was duly sworn so

910

1    we'll withdraw our objection.  And Instruction 13 can remain as

2    is and we have no objection and there's no need to take judicial

3    notice of anything.

4            THE COURT:  Very well.  For the record, is the

5    government offering 78?

6            MS. SISKIND:  Not unless there's a need to, Your

7    Honor, which if the objection is withdrawn there'll be no need

8    to offer it.

9            THE COURT:  Very well.  We'll proceed accordingly.

10           Let me just verify several things.

11           Number one, Dr. Ahuja, you've heard considerable

12   discussion respecting whether or not the Court should allow this

13   instruction to be read, and your attorneys have indicated their

14   views with respect to these matters and have withdrawn their

15   objections to the instruction concerning statements of --

16   inconsistent statements of witnesses.

17           Do you understand what has been said regarding that

18   matter?

19           THE DEFENDANT:  Yes, I do.

20           THE COURT:  Do you have any disagreement with your

21   attorneys that you want to place on the record independent of

22   what they've said?

23           THE DEFENDANT:  (No response.)

24           THE COURT:  Do you disagree with what they've said?

25           THE DEFENDANT:  I'm just thinking through it, sir.

911

1    THE COURT:  All right.  I'll give you a few moments to

2  do so.

3        (Brief pause.)

4        THE DEFENDANT:  I'm ready.

12:13    5        MR. KIRSCH:  We're ready, Your Honor.

6        THE DEFENDANT:  I completely agree with them, and I

7  also agree with impeaching Ramit Bhasin.

8        THE COURT:  All right, it's noted.

9        Is there anything else we need to address at this

12:13   10  point?

11        MR. SULLIVAN:  Just one point of clarification,

12  Your Honor.  Government counsel will refer to Mr. Miller's

13  testimony as being under oath.  And given that that is a fact, I

14  just want to know if the defense is going to object or if that's

12:13   15  appropriate for us to do during argument.

16        MR. KIRSCH:  Your Honor, we agree that he was under

17  oath.

18        THE COURT:  All right.  I will see you at

19  1:00 o'clock.

12:13   20        THE BAILIFF:  All rise.

21        (Lunch recess taken at 12:13 p.m., until 1:02 p.m.)

22        THE COURT:  One second.

23        MR. WEBB:  Your Honor, I was told my client was stuck

24  in the security line.  He will be here in one minute.

01:02   25        THE COURT:  All right.  Be seated.

912

1        (Brief pause.)

2        THE COURT:  Are you now ready?

3        MR. WEBB:  We're ready, Your Honor.

4        (Jury in at 1:03 p.m.)

5        THE BAILIFF:  Please be seated.

6        THE COURT:  Members of the jury, we are now ready for

7    closing arguments.  The government may proceed.

8        MR. SULLIVAN:  Thank you, Your Honor.

9              GOVERNMENT CLOSING ARGUMENT

10       MR. SULLIVAN:  May it please the Court, Counsel.

11       MS. SISKIND:  The computer, Your Honor?

12       THE COURT:  Go ahead.

13       MR. SULLIVAN:  Ladies and gentlemen of the jury, good

14   afternoon.

15       On behalf of the United States of America, I want to

16   thank you for your patience and attention throughout this trial.

17       We're now at the point of the case where you're going

18   to hear closing arguments.  And then you're going to get this

19   case, and you're going to have to decide, as charged in Counts 1

20   through 4, whether the defendant, Dr. Arvind Ahuja, willfully

21   filed false tax returns for tax years 2006 through 2009, and,

22   whether, as charged in Counts 5, 6 and 7, whether the defendant

23   willfully failed to file FBARs for tax years 2007, 2008, and

24   2009.

25       And at the outset, I want to say I agree with what

913

1    Ms. Johnson said at the beginning of this case:  This is not a

2    complicated tax case.  This case is about concealment.  It's

3    about false statements.  It's about a wealthy doctor who

4    maintained undeclared offshore bank accounts in India and

5    Jersey; that he had millions and millions of dollars in them,

6    who concealed those accounts and the related income earned in

7    those accounts from his accountant and the IRS, and who, during

8    the relevant years, filed false tax returns and didn't file

9    FBARs that he knew he was required to file under the law.

10           And what I want to do right now is review with you the

11   elements of the offenses, the things we have to prove, and

12   summarize with you the evidence that we submit proves and

13   establishes those elements beyond a reasonable doubt.

14           And with respect to Counts 1 through 4 there are five

15   elements that the government has to prove:

16           First:  That Dr. Ahuja made a tax return or caused a

17   tax return to be made.

18           There is no dispute that these tax returns were

19   prepared by Mark Miller and filed with the IRS.  These are in

20   evidence as Government Exhibits 12, 13, 14, and 15.  And you

21   will get all the evidence when you go back to deliberate.

22           Two:  That the return was signed under penalties of

23   perjury.  There's no dispute on this issue either.

24           Each of these returns above Dr. Ahuja's signature

25   states, "Under penalties of perjury, I declare that I have

914

1  examined this return and the accompanying schedules and

2  statements and, to the best of my knowledge and belief, they are

3  true, correct, and complete."

4      Third:  That Dr. Ahuja filed the tax returns or caused

5  the tax returns to be filed with the IRS.

6      The parties stipulated to this fact.  You can even see

7  on these returns that they're file stamped, "received by the

8  IRS."

9      Fourth:  That the income tax return was false as to a

10  material matter.

11      Now, there are two false material matters alleged in

12  the indictment.  The first is that Dr. Ahuja failed to report

13  all his income on lines 8A, 9A, and line 22.  And those lines,

14  again, are on the very front of these returns.

15      8A, if you recall, is taxable income -- interest.

16      9A, ordinary dividends.

17      And line 22, total income.

18      It also alleges a second false material matter.  And

19  that is on Schedule B of these returns, which is the statement

20  or schedule for interest and ordinary dividends, Part III of the

21  returns asks about foreign bank accounts.  And the indictment

22  alleges that line 7a is false because all these returns are

23  checked "no."

24      For it to be material, it's got to be a matter that

25  affects the bottom line.  Does it affect the tax liability?

915

1    You heard Mark Miller say, "Had I been told about the

2    defendant's unreported income, I would have added it to the

3    return, and the tax liability would have gone up."

4    So clearly that's a material matter.

5    On the second part of the return where the foreign

6    bank account question is asked, a line on a tax return that is

7    capable of influencing the verification of the accuracy of the

8    return is also a material matter.

9    There, if you checked the "no" box and you really have

10   foreign bank accounts, that can affect the IRS's ability to

11   verify the accuracy of the return because they won't know that

12   there are foreign bank accounts, and they won't know whether to

13   try to verify that there's some income in those accounts.  So

14   that is also a material matter.

15   Finally -- and this is where the parties will no

16   doubt -- most of the argument will be -- is that the government

17   has to prove that Dr. Ahuja acted willfully when he made and

18   signed the return.

19   And "willfulness" is defined as a voluntary and

20   intentional violation of a known legal duty.  And the known

21   legal duty here is that, when you sign your return under

22   penalties of perjury saying it is true, correct, and complete,

23   you know you have to report all your income.  You know that if

24   you have hundreds of thousands of dollars of taxable interest in

25   your undeclared foreign bank account, you know that's supposed

916

1    to go on line 8a.  And you know that that's going to flow

2    through to your total income on line 22.

3            So we have to prove that he, Dr. Ahuja, intentionally

4    violated that known legal duty.

01:10   5            There's no issue as to whether it was voluntary.

6    There's no evidence in this case that someone forced Dr. Ahuja

7    to sign these returns.

8            So, with that said, what is the evidence that

9    Dr. Ahuja acted willfully when he signed his tax returns?

01:11  10            First, the evidence shows that Dr. Ahuja handled his

11   own investments during these years.  You saw Government

12   Exhibit 58, which is the subscription agreement for the drilling

13   program.

14            And if you recall on the third page of that, there was

01:11  15   some handwriting, and it said, quote, "personally run my own

16   investments."  Dr. Ahuja signed that agreement.

17            You also heard testimony that Dr. Ahuja traded a lot.

18   Well, in addition to the testimony, you could look right to

19   Government Exhibit 14, and it speaks for itself.

01:11  20            Dr. Ahuja traded stocks, he traded foreign currencies,

21   he traded futures.  And based on this evidence, it is clear that

22   Dr. Ahuja was in charge of his investments during these years.

23            There was also an abundance of evidence showing that

24   Dr. Ahuja knew that he had undeclared bank accounts in Jersey

01:12  25   and India.  Just as recently as yesterday you saw all those

917

1    letters being flashed on the screen.  You're going to get those

2    letters when you deliberate.  Take a look at them.

3            They're all signed by Dr. Ahuja.  They're all very

4    short letters.  They all relate to his undeclared offshore

01:12   5    accounts where he's instructing bankers to -- for example, there

6    were three letters directing bankers in India to transfer

7    50 million rupees to something called the Oxus Fund Management,

8    which we know what that is from the testimony of Ramit Bhasin.

9            And when you look at the currency conversion chart,

01:12  10    which is Government Exhibit 91, that's about $1.2 million.

11            Indicates that he is controlling the accounts.

12            You've also seen that Dr. Ahuja directed bankers in

13    Jersey to deliver a PIN number for his offshore credit card to

14    Ramit Bhasin's address in London.  There were also e-mails where

01:13  15    he was trying to increase his credit limit.  That will all be

16    with you when you deliberate.

17            There was also another letter directing bankers in

18    India to transfer 5.1 million rupees to make an investment in

19    commercial real estate.  That's Government Exhibit 2.

01:13  20            The other three letters were Government Exhibits 3, 4,

21    and 80.  And the PIN -- the letter to deliver the PIN to

22    Mr. Bhasin's address was Government Exhibit 32.

23            The letters speak for themselves.  Dr. Ahuja exercised

24    control over these undeclared accounts, and those accounts were

01:14  25    located in accounts in India.

918

1    You've also seen other documents signed by Dr. Ahuja

2    that establish that he was aware that the funds were, in fact,

3    in bank accounts in India.  And this is going to be a challenge

4    for you because one of you, hopefully, has really good eyesight.

01:14    5    This is Government Exhibit 20.  When we put it on the screen, it

6    was hard to see.  But you can see what this is going.

7    These are both signed by Dr. Ahuja.  They're dated in

8    2005.  One is June and one is August.  And it says right here,

9    "Option transaction against FCNR deposit with HSBC-India."

01:15    10    $1.8205 million.  The second one is for $1 million.

11    The whole point of these is that this shows that the

12    money is over in India.  And how do we know that?  Right at the

13    bottom, account number 7002.  We are all familiar with that.

14    And it's right at the bottom here.

01:15    15    And if you want evidence that this was in the Eastern

16    District of Wisconsin at some point in time, there's a fax

17    number at the top of this, area code 414.

18    One year later after these documents were signed,

19    Dr. Ahuja sent an e-mail to one of his bankers asking, quote,

01:15    20    "Is there a CD due June 14th?  Thanks.  Let me know.  Thanks.

21    AA."  Government Exhibit 29.  This shows that Dr. Ahuja was in

22    charge of his investments, and he was keeping track of them, and

23    he knew what was going on.

24    You also saw that Dr. Ahuja signed the tax declaration

01:16    25    to reduce the amount of tax held -- withheld on his NRO deposits

919

1  in India.  And this, I believe, is Government Exhibit 47.

2  Actually, can we go back to -- yes.

3  I just mentioned NRO deposits.  And we know from

4  Ms. Vandana Katju that there were three types of deposits for

5  accounts that could be maintained over in India, and we're going

6  to get to Exhibit 42 a little later, but that was the

7  application when Dr. Ahuja applied for an NRO savings account,

8  which was taxable.  But, if you recall, she testified about

9  those three accounts.

10  But then she was asked about the tax declaration form,

11  and when she was asked to explain the purpose of this form, she

12  answered, quote:  "So if the client said that, you know, they

13  would like to pay the taxes in the United States and they'd like

14  the tax liability in India to be reduced, the only options for

15  them was to attest on that form."

16  And if we look on the top of that form, it is crystal

17  clear in black and white that it says, "The Hong Kong and

18  Shanghai Banking Corporation, Ltd., Mumbai office, India."

19  Again, this is another document that Dr. Ahuja signed

20  indicating that he knew that these were accounts located in

21  India.

22  And if you look at the first paragraph, which is in

23  two parts, when Dr. Ahuja signed this form, he specifically

24  acknowledged that he was, quote, "a tax resident of the United

25  States," unquote.

920

1    And then a little bit further down at the beginning of

2    the second part, he also acknowledged that, quote, "I am the

3    beneficial owner of the interest paid by the bank."

4         Clearly, Dr. Ahuja knew that he was earning interest

5    on his certificates of deposits in India.

6         And, by the way, you have to look at the bottom of

7    this form to figure out when it had to be submitted by the bank,

8    and I believe it was sometime in March of 2008.

9         You also -- you've also heard the testimony about the

10   millions and the millions of dollars that Dr. Ahuja

11   wire-transferred to India.  And what's on the screen right now

12   is a summary.  And because this was not admitted into evidence,

13   you're not going to have this back in the deliberation room.

14   But what it shows is that the bank statements, Government

15   Exhibit 72, the HSBC-United States bank statements, reflect in

16   here that Dr. Ahuja wire-transferred over $4 million from the

17   United States to India to be placed in either the 7002 account

18   or to be placed -- or to be invested in certificates of deposit.

19        You will have this.  And you can go back and you can

20   just flip through these pages.  There are very few transactions

21   in them.  And, if you recall, you saw these when Special Agent

22   Cook testified.  You can go through and you can see exactly

23   where the money was going and why it was going there because

24   it's all detailed in these statements.  But these are the only

25   transactions in these statements.

921

1    But do not overlook that these statements.  They were

2    mailed to Dr. Ahuja at his address in Greendale, Wisconsin.

3    They weren't mailed to anyone else.  They were mailed to him.

4    He had -- all he had to do is look at his bank statements, and

5    he could tell the money was going over to India.

6    You've also seen evidence establishing that Dr. Ahuja

7    knew he was required to report his income from India.  If you

8    recall Government Exhibit 42, which is the application, on

9    page 2 the boxes checked, for one of those NRO savings accounts,

10   if you look at the top of this, by the way -- if you blow up the

11   top -- there could be little question that he's opening accounts

12   in India.  "Please open an account at your New Delhi branch as

13   per details below."

14   But let's look at the signature page of this document,

15   which is slide A, I believe.  Above his signature under

16   "Customer Declaration," this is crystal clear:  "I/we understand

17   that the accounts applied hereunder, will be opened by the Hong

18   Kong and Shanghai Banking Corporation, Limited, India."

19   And then it goes on to say in the fourth bullet point

20   that I had Ms. Katju read, quote:  "Under current U.S. tax laws,

21   U.S. citizens and residents are subject to tax on their

22   worldwide income."

23   It doesn't end there.  It goes on to say, "Please

24   consult with your tax preparer."  And we know that Dr. Ahuja

25   never consulted with Mark Miller on this issue.

922

1       You've also seen the Citibank NRI application,

2   Government Exhibit 57.  And at the top of that form, it's an

3   application for, quote, "Citibank rupee and FCNR deposit

4   account."

5       And you heard the testimony of Ms. Katju.  She said

6   that she knew that NRI deposits that were taken out at Citibank

7   were located in India.

8       And you heard all the other evidence.  I'm not going

9   to belabor this point.  You've seen the applications.  I think

10  it's Defense Exhibit 2060?  And you've seen the other detail of

11  this.  You can look at it when you deliberate.  These accounts

12  are in India.

13      And if you look at this signature page, it's clear

14  that this is an offshore account.  Because the word "offshore"

15  appears in this at least three times.  And it's clear that this

16  is intended to put Dr. Ahuja on notice that he is the one

17  responsible for complying with any tax reporting or filing

18  requirements that may apply as a result of his country of

19  citizenship, the United States of America.

20      You also know from the returns themselves -- if you go

21  and look at the schedules -- he reports interest income from

22  banks.  Not only the Citibank here, but HSBC in the United

23  States, US Bank, which is a bank here in Milwaukee.

24      Ladies and gentlemen, all this evidence that I've just

25  reviewed indicates that Dr. Ahuja knew that he had millions and

923

1    millions of dollars in undeclared bank accounts in India, and he

2    knew that he had hundreds of thousands of dollars of interest

3    income that he didn't report every year.  And that at the time

4    he signed his returns, armed with this knowledge, he still

5    signed his returns knowing that he hadn't disclosed these to his

6    accountant; so, therefore, he acted willfully when he signed his

7    returns.

8         But there is more evidence of willfulness.  And this

9    relates to the events during the summer and fall of 2009.

10         And can we all remember the e-mail that Mr. Ramit

11   Bhasin testified about?

12         This was the only exhibit that we offered through the

13   testimony of Mr. Bhasin, Government Exhibit 8.  And we had

14   trouble putting this on the electronic system.  If you look now,

15   you can't even read it.  But guess what?  You can read it, Ramit

16   Bhasin could read it, and Dr. Ahuja could read it.  So when you

17   go back and read this, it's clear.  We now know definitively

18   what Dr. Ahuja's state of mind was on July 4th, 2009, which was

19   about a month before he met with Mark Miller to have a

20   face-to-face meeting to talk about foreign bank accounts.  This

21   talks about bank secrecy and how HSBC has got four different

22   countries that it's considering turning over information to the

23   taxing authority of other countries.  One of those countries is

24   India.  Please consider this because this establishes what

25   Dr. Ahuja's state of mind was when he went to meet with Mark

924

1    Miller in August of 2009.

2         And you heard Mark Miller testify that he prepared an

3    agenda for that meeting, as he did for many of the meetings, and

4    one of the items that he prepared -- or that he placed on the

5    agenda was to talk about the FBAR reporting requirements.  And

6    he also explained to you, if you recall, that there was a lot of

7    publicity about offshore bank accounts during 2009 and that he

8    consulted with a local tax firm to get advice.  And the whole

9    goal was to advise their clients at Kolb+Co that there were

10   reporting requirements.  And Mark Miller, you heard his

11   testimony, that he specifically advised Dr. Ahuja of the

12   reporting requirements during that meeting.

13        But what did Dr. Ahuja say in response after

14   Mr. Miller told him about the requirement to report foreign bank

15   accounts to the United States Government?  "I will check into

16   it, I will get back to you."

17        What did Dr. Ahuja do after the August meeting?  Let's

18   take a look at Government Exhibit 62, which is dated

19   September 21st, 2009, the next month.  Dr. Ahuja signs a letter

20   addressed to the manager, HSBC-Jersey, telling the manager

21   "Close my Jersey account and send me a check for the balance in

22   the account.  Send it to my address in Greendale, Wisconsin."

23        And we have corroboration of that check because that

24   check is Government Exhibit 64.

25        Less than three weeks later -- and this is Government

925

1    Exhibit 82 -- Dr. Ahuja starts moving funds out of his

2    HSBC-India account and transfers them in the name of his wife.

3          Special Agent Cook testified that when he traced these

4    specific certificates of deposits into the screen shots that are

01:28   5    at Government Exhibit 71, and there are a couple at 69 for the

6    high balances, those accounts, the ones that were moved into the

7    wife's name, had over $3 million in them.

8          Two days later -- and this is Government Exhibit 85 --

9    I stand corrected. Two days earlier. Two days earlier. This

01:29  10    is a letter Dr. Ahuja signed -- oh, addressed to the HSBC

11    manager in New Delhi, where he's authorizing the bankers over in

12    India to give Ramit Bhasin cash. Because apparently Dr. Ahuja

13    has purchased some jewelry in India and he wants Ramit Bhasin to

14    get the cash.

01:29  15          This is all part of his state of mind in the summer

16    and fall of 2009. Because after this, he then again meets with

17    Mark Miller. And Mark Miller testified that he prepared another

18    agenda. That agenda is in evidence, Government Exhibit 18. And

19    the last item on the agenda is Item K, quote: "Remember, we

01:30  20    will be" -- we will have a FBAR reporting for any foreign bank

21    accounts."

22          And how do we know that Dr. Ahuja never came clean

23    with Mr. Miller and never told him that, yeah, do you know what,

24    I do have foreign bank accounts? Well, there's no indication to

01:30  25    the right of that item. Mr. Miller said he would have made

926

1  notes had there been any follow-up to do.  And we know from the

2  tax returns he didn't report -- the foreign bank account box was

3  checked "no" again.  So we know -- and also Mr. Miller testified

4  that Dr. Ahuja never told him about his undeclared offshore bank

5  accounts during these years.

6        Ladies and gentlemen of the jury, when you conceal

7  information from your accountant, no matter how good your

8  accountant is, that information is not going to get on your tax

9  return.

10        And there is one more piece of evidence to consider is

11  that after this meeting, in a letter dated, I believe,

12  December 29th -- this is Government Exhibit 19 -- Government

13  Exhibit 19 -- Mr. Miller testified that they sent a letter to

14  Dr. Ahuja at his address in Greendale, and attached to the

15  letter was the tax organizer and then an insert that was on a

16  different colored piece of paper.  And I asked him why was it

17  different, why was it on a different colored piece of paper, and

18  he said so it would stand out.

19        And if we would look at that insert, which is page 2

20  of Government Exhibit 19, and we look at the fourth item, we

21  see, again, another notification to Dr. Ahuja that, quote, "the

22  Treasury Department and IRS impose strict rules on the reporting

23  of foreign bank accounts that you own, control, or have

24  signature authority over.  Please inform us if you have any such

25  accounts so that the appropriate separate filings can be made."

927

1    But Dr. Ahuja didn't tell Mr. Miller about the

2    accounts.  And based on all the evidence that I've reviewed thus

3    far, it is clear that Dr. Ahuja acted willfully when he signed

4    his 2009 return as well as when he signed his 2006 return, 2007

01:33    5    return, and 2008 return.

6    But there's even more evidence of willfulness.  You

7    should also consider the amount, the sheer size of the

8    unreported income, as well as the clear pattern of year after

9    year failing to report hundreds of thousands of dollars of

01:33    10    interest income.

11    If we look at Government Exhibit 70, over this

12    five-year period from 2005 to 2009, we are talking about

13    $2.7 million of unreported income.  And if we look at another

14    version of this chart, let's look at what percentage of

01:33    15    income -- of interest income did Dr. Ahuja actually report.  And

16    what this chart reflects is that in some years Dr. Ahuja

17    reported less than 10 percent of his interest income on his

18    return.  That's the year 2007 and year 2008.  And over this

19    five-year period Dr. Ahuja reported only 17 percent of his

01:34    20    interest income.

21    Ladies and gentlemen, based on the evidence presented

22    during this trial, the overwhelming evidence, we ask that you

23    find Dr. Ahuja guilty of willfully filing false tax returns for

24    the years 2006 through 2009.

01:34    25    Now what I want to do is move on to the FBAR counts --

928

1    there are three more counts, Counts 5, 6, and 7, for the years

2    2007, 2008, and 2009 -- and review with you the elements that we

3    have to prove beyond a reasonable doubt and summarize the

4    evidence establishing and proving those elements beyond a

5    reasonable doubt.

6         First element:  That Dr. Ahuja was a resident or a

7    citizen of the United States.

8         Again, this is one of those elements that is not in

9    dispute.  There is a photocopy of his passport in Government

10   Exhibit 57, and that's the Citibank application, and on page 1

11   of that application Dr. Ahuja actually indicates that he is a

12   resident of the United States.  It's clear that he's a resident

13   of the United States.

14        The second element is:  That Dr. Ahuja had a financial

15   interest in or authority over at least one account located at

16   HSBC-India.

17        All the evidence I summarized relating to Dr. Ahuja's

18   offshore bank accounts in India on Counts 1 through 4 is

19   relevant on this point.  Also the screen shots that are in

20   Government Exhibits 69 and 71, they clearly show -- they

21   identify Account 7002, and they show all the sub-accounts for

22   the various CDs.  They even break down, if you recall, that in

23   the beginning in 2006 Dr. Ahuja had much of his money invested

24   in the foreign currency non-resident CDs.  And later on, if you

25   want to peruse Government Exhibit 71 and 69, you'll see that

929

1    later on after he opens up the NRO savings account -- and that's

2    Government Exhibit 42 -- he starts moving his funds into that

3    account.

4            So there's no question that he had a financial

5    interest in foreign bank accounts in India.

6            The third element is:  That the account balance had a

7    balance exceeding $10,000.

8            Government Exhibit 69 speaks for itself.  These

9    amounts range between 5.3 million in 2006 up to a high balance

10   of 8.7 million in 2009.  There can be no dispute on this

11   element, ladies and gentlemen.

12           The fourth element is:  That Dr. Ahuja knew that he

13   had a legal duty to file an FBAR.

14           And fifth:  That Dr. Ahuja knowingly and willfully

15   failed to file an FBAR.

16           Thus we have the burden, the government, of showing

17   that Dr. Ahuja knew that there was a reporting requirement, a

18   separate requirement to file a form with the government in

19   addition to his federal income tax return.  Let's look at the

20   evidence that establishes that.

21           You heard Mark Miller testify that he mailed out tax

22   organizers every year to Dr. Ahuja, and that the organizers ask

23   questions about foreign bank accounts.  He didn't know whether

24   Dr. Ahuja ever looked at those organizers.  He did testify that

25   Dr. Ahuja never filled them out and sent them in.

930

1        But the tax returns themselves put Dr. Ahuja on

2   notice.  Because if you look at the Schedule B, right after the

3   foreign bank account question on 7a, line 7a, it says "see page

4   B2 for exceptions and filing requirements to Form -- for Form

01:39   5   TDF 90-22.1."

6        Now, who in the world knows what that form is?  Mark

7   Miller knew what the form was.  He said -- he told you that it

8   was the FBAR form.  The point is, though, is that it doesn't

9   matter what the form is.  The tax return says check out the

01:39   10  filing requirements for the form.  That put Dr. Ahuja on notice.

11  Because when he signed the return under penalties of perjury, he

12  declared that he had reviewed the contents of his return

13  including all accompanying schedules.  So we have that evidence.

14       We also have the evidence that Mr. Miller stated when

01:40   15  he testified that had Dr. Ahuja been truthful and told him about

16  his foreign bank accounts he would have inquired and determined

17  whether they exceeded $10,000, and then he would have asked

18  Dr. Ahuja, "Do you want me to file the return?"

19       In addition to that, we have all the evidence

01:40   20  indicating that Dr. Ahuja intentionally concealed the existence

21  of his foreign bank accounts, as well as the income earned from

22  those foreign bank accounts, from Mr. Miller.

23       All of this evidence applies to Counts 5, 6, and 7,

24  which are the 2007, 2008, and 2009 calendar years.

01:41   25       But there's one more piece of evidence that we submit

931

1    to you is both compelling evidence and it's also evidence that

2    is uncontroverted, and that is:  In August of 2009, Mr. Miller

3    specifically informed Dr. Ahuja of the FBAR reporting

4    requirements.  And that, ladies and gentlemen, definitely put

01:41    5    Dr. Ahuja on notice.

6            Therefore, we submit to you that the evidence relating

7    to Count 7, which relates to the 2009 FBAR which would have been

8    filed as of June 30th, 2010, is overwhelming.  And based on the

9    other evidence I reviewed with you, the FBAR counts for two

01:42    10    thousand -- 2007 and 2008, which are Counts 5 and 6, we submit

11    to you that there is ample evidence for you to find that

12    Dr. Ahuja acted willfully when he failed to file those FBARs.

13            Therefore, we are asking that you return guilty

14    verdicts on Counts 5, 6, and 7.

01:42    15            Ladies and gentlemen, when you go back and start your

16    deliberations, you're going to have all the evidence.  A lot of

17    the evidence speaks for itself, especially the letters that

18    Dr. Ahuja signed.  That evidence shows beyond a reasonable doubt

19    that Dr. Ahuja maintained undeclared foreign bank accounts in

01:42    20    Jersey and in India that had millions and millions of dollars in

21    them that generated millions and millions of dollars of

22    unreported interest income, and he concealed those facts from

23    both his accountant and the IRS.

24            In the final analysis, ladies and gentlemen, this case

01:43    25    is not complicated, and therefore we ask that you return the

932

1    only verdicts that are just in this case and those are verdicts

2    of guilty.  Thank you.

3                    DEFENSE CLOSING ARGUMENT

4              MR. WEBB:  Good afternoon, ladies and gentlemen of the

5    jury.  I just heard the government's closing argument.  And when

6    I first spoke to you, the first time I spoke to you, I

7    respectfully said to you that there are two sides to every

8    story.

9              Well, I am stunned that the government counsel has

10   left out so much evidence that you heard during the course of

11   this trial that relates to the critical issues in this case, and

12   I am going to take some time to carefully talk about it.

13             This is my opportunity to give a closing argument on

14   behalf of Dr. Ahuja.  This will be my last chance to talk with

15   you about the evidence.  The way the procedures work is the

16   government got to give his closing argument, I'm given a chance

17   now to speak, but then the government gets a second chance.

18   They speak again.  So this is my only chance to talk to you.

19             And there's a lot at stake in this case and so I'm

20   going to take some time.  I'm going to try to go slow, but my

21   goal is, I'm going to talk about what I believe to be the actual

22   evidence that you heard, and I'm going to try to put it into a

23   framework of the legal instructions that you're going to get

24   from the Court so that I can try to organize my evidence based

25   on issues that I believe you have to address back in the jury

01:43
01:44
01:44
01:45
01:45

933

1    room.

2              You will be instructed on legal principles that you
3    are to accept as the law and apply to the facts as you find them
4    to be.  Those legal principles will be given to you by the Court

01:45    5    after these closing arguments are completed.  But we as lawyers
6    know what those instructions are.  They've been -- we know what
7    they are.  And so as I go through my presentation to you this
8    afternoon -- and it's going to take awhile -- I'm going to try
9    to walk through all the critical evidence that I believe was

01:46    10   actually presented during the course of the trial and try to put
11   it into a framework that I believe are the legal requirements in
12   this case.

13             And the government might think -- are in agreement.
14   The government just told you that they believe they can prove

01:46    15   that Dr. Ahuja willfully and knowingly filed false income tax
16   returns from 2006 through 2009.  That's their position.

17             During counsel's closing argument, they totally
18   ignored what we have been presenting during the course of the
19   trial from witness after witness, which is the reason -- there

01:46    20   is certain HSBC interest income that is not on Dr. Ahuja's tax
21   returns.  I told you that in the first five minutes of my
22   opening statement when I first met you in this case.  That's not
23   an issue in the case.  There is interest income that is not on
24   his tax return from HSBC CDs.  I told you in my opening

01:47    25   statement that I thought what the evidence would establish is

934

1    that he never received any 1099 forms ever from HSBC, and I was

2    curious as to why that happened.

3         You now know from Agent Cook that I was right.  There

4    never were any HSBC 1099 forms ever sent to Dr. Ahuja in

01:47   5    connection with these CDs.  And the government has acknowledged

6    that they've done their entire investigation and they've now, as

7    Agent Cook said, confirmed that Dr. Ahuja did not receive any

8    HSBC 1099 forms.

9         The government just ignored that for 45 minutes in

01:47   10    talking with you.  That has been the whole case, is that we've

11    been explaining to you that Dr. Ahuja did not willingly and

12    knowingly file false tax returns.  There was a mistake made

13    because he didn't get 1099 forms.  It actually wasn't even his

14    mistake.

01:48   15         We proved to you during the trial, and I'm going to

16    summarize it for you, HSBC-USA here in the United States was

17    responsible for sending Dr. Ahuja 1099 forms just like Citibank

18    did, just exactly like Citibank did on similar accounts, and

19    HSBC did not do it.  And because they did not do it, this money

01:48   20    did not get on his tax return.  And that was not because he

21    willingly and knowingly did it.  It was because of a mistake,

22    but the mistake was HSBC's.

23         Now, I want to return -- the government not only has

24    to prove willfulness, they have to prove it beyond a reasonable

01:48   25    doubt.  And I just want to stop.  We talked about this in my

935

1    opening statement, but I just would like to respectfully ask you

2    to focus on those words.

3         This is a criminal case.  The stakes are extremely

4    high as a result of that.  Our system of justice for over 200

5    years has said that in criminal cases you need to be sure, so

6    that's why we put this burden called beyond a reasonable doubt.

7         This is not a civil case dealing with money or

8    property, real estate, or something like that.  This is a

9    criminal case, and that's why the words I put on the screen.

10   "Proof beyond a reasonable doubt" is the standard that you all

11   agreed to apply when you took your oath to serve as jurors in

12   this case.  And all I respectfully ask you, when you go back to

13   the jury room to begin your deliberations and talk about the

14   issues in this case, I respectfully hope and ask that you

15   remember that the government has the burden of proof.

16        In our system of justice, the defendant does not have

17   to prove anything, zero.  Zero.  The burden of proof always sits

18   at this table.  It never leaves this table ever once during this

19   case unless and until you all decide -- after you've talked

20   about the evidence and deliberated you decide that they've

21   sustained and met that burden of proof beyond a reasonable

22   doubt.  Only then does that burden disappear.

23        And so as I speak to you now, the burden of proof

24   rests here at this table.  So I'm going to be talking about it

25   because the defendant is presumed at all times to be innocent.

936

1    And if you find things in the case that nags at you, that you

2    ask yourself, hm, maybe that's true but maybe it's not, that's

3    not proof beyond a reasonable doubt.  And that is the standard

4    that is to be applied based on the law that you'll be given by

01:50   5    the Court, and it's a standard that is a very high standard and

6    it's one that I just respectfully ask that you think and talk

7    about when you go back to the jury room and ask yourself about

8    this issue of willfulness.

9         Because I put on the screen -- there are six facts I

01:51   10   just put on the screen that I believe are undisputed in this

11   case.  I believe these six facts are undisputed.  And if even

12   one or two of these facts were true, they would create

13   reasonable doubt.  But there are six facts on here that I'm

14   going to spend some time talking about, and let me just review

01:51   15   them with you because I don't think they're in dispute in the

16   case and they go directly to the issue of whether Dr. Ahuja

17   acted knowingly and willingly when he did not put the HSBC

18   interest income on his tax returns.

19        First point:  HSBC did not provide Dr. Ahuja with 1099

01:51   20   forms.

21        Agent Cook has admitted that.  It has been absolutely

22   established that the government did not call anyone from HSBC to

23   show the contrary.  HSBC did not provide 1099 forms to

24   Dr. Ahuja.

01:52   25        Number two:  There is no evidence -- I'm talking about

937

1    zero evidence -- that Dr. Ahuja ever knew that he was not

2    getting 1099 forms.  Never -- and I'm going to walk through that

3    evidence.  But I thought they might call someone from HSBC.  I

4    didn't know.  They had the burden of proof.  I thought they were

01:52    5    going to call someone from HSBC who would say, you know, when he

6    opened up this account we told him, "Doc, you know, you don't

7    have to worry about taxes; we're not going to send you a 1099

8    form."

9         That did not happen in this case.  There is not a

01:52    10    single piece of testimony that that happened.  So we know that

11    Dr. Ahuja did not know.  You can't guess about this.  You need

12    either documents or evidence.  You just can't guess and say,

13    well, I bet he knew.  We need evidence in a courtroom.  They

14    didn't bring anybody in from HSBC to say that he was ever told

01:53    15    or would have known that he did not get the 1099 form.

16         We also know from Mr. Miller's testimony that he

17    had -- he got 18 to 32 separate 1099 and similar forms during

18    these relevant years and that he had tax people that we're going

19    to talk about, Mr. Branch and Mr. Miller, who went through his

01:53    20    1099 forms.

21         And we know now from the evidence, Mr. Miller told you

22    that every time, every time a 1099 form was sent to Dr. Ahuja,

23    it ended up with Mr. Miller and it ends up on his tax return.

24         This is not a case where you've got evidence that

01:53    25    somehow Dr. Ahuja -- Citibank.  Citibank sends him a 1099 form

938

1    for $122,000 in 2009; it's on his tax return.  When the 1099s

2    came in, Dr. Ahuja had a system that Mr. Branch got it to

3    Mr. Miller.  And Mr. Miller told you, he said, "We didn't miss

4    one, not one in all these years.  Not one ever fell through the

01:54    5    cracks because the IRS gets a copy of the 1099 forms and they

6    would contact me if we missed one."

7            So we know that Dr. Ahuja, every 1099 form gets

8    reported on his tax return.  But we know he didn't get the HSBC

9    1099 but we don't know why.  Because the government never

01:54    10    explained to you once during this trial why that happened.  Not

11    once.  And they said they can prove their case beyond a

12    reasonable doubt.

13            We know that during the relevant years Dr. Ahuja paid

14    $44.4 million in federal income taxes.  We know that the amount

01:54    15    of unpaid taxes here is 1.8 percent.  And we know on

16    willfulness, on this issue of willfulness, if a taxpayer wants

17    to cheat, he's going to find a way to cheat more than

18    1.8 percent.  So that number is very important as evidence that

19    Dr. Ahuja was not acting willfully.

01:55    20            And the last point I put on my chart -- think about

21    this -- when people set up foreign accounts, they want to hide

22    income.  They use shell corporations, phony names, because they

23    want to hide their identity.  Dr. Ahuja had no way to know he

24    wasn't going to get a 1099 form.  He had no way to know that,

01:55    25    and he didn't try to hide these accounts.  He opened this

939

1    account at HSBC in his own name in New York, in his own address.

2         There's not a single speck of evidence that there were

3    any shell corporations or phony names ever used in connection

4    with him and his banking relationship with HSBC.

5         Those six points I've put on the chart I'm going to

6    talk about in a little more detail, but I started by -- I just

7    want to remind you, the government chose not to talk about any

8    one of those six points during their closing argument.  Any one

9    of those points, two of them, three of them, would establish a

10   reasonable doubt, and the government has chosen not to address

11   those in their closing argument.

12        There are two charges for filing false returns:  One

13   is not reporting that HSBC interest income.

14        Two is a little more technical.  It's not checking off

15   the right boxes or filing the right forms regarding disclosing

16   foreign accounts.

17        I'm going to talk about both of these.  I'm going to

18   talk about what the evidence is and what the government has to

19   prove to establish willfulness on both.  I'm going to take some

20   time to do it.  I want you to understand exactly what the

21   evidence is.

22        So -- but I put down at the bottom of this chart a

23   fundamental fact that has been testified to in this trial:  "If

24   HSBC had actually sent 1099 forms, if they had, both of these

25   problems would have been resolved."

940

1    We know from Mark Miller that, absolutely, the money

2  would have gotten on his tax return, and we also know that if

3  the 1099 disclosed foreign accounts that it would have been --

4  the boxes would have been checked off.  Both of these so-called

01:57  5  crimes which occurred because HSBC, for reasons that you don't

6  know and I don't know, chose not to send a 1099 out is why this

7  happened in this courtroom.  And yet Dr. Ahuja is being faced

8  with multiple felony counts because of that.

9    The government in their opening statement -- the

01:57  10  government's theory -- and you heard it again.  They have a

11  theory that Dr. Ahuja knew he wasn't getting 1099 forms.  They

12  had a theory, but they didn't give you any evidence of that.

13  This is the opening statement from the government.

14    Prosecutor said:  "Dr. Ahuja, a Greendale

01:58  15  neurosurgeon, was provided with the seemingly perfect

16  opportunity to get away with filing false tax returns and never

17  be discovered by the United States Government.  He utilized

18  foreign accounts to conceal part of his income."

19    That perfect opportunity -- they're trying to suggest

01:58  20  to you the perfect opportunity would be if somebody knows -- if

21  HSBC had told Dr. Ahuja, "You will not get a 1099 form.  Don't

22  worry about it."  And Dr. Ahuja says, "Wow.  I'm not gonna get a

23  1099 form?  I don't have to put this money on my tax return.

24  I'll get away with it."

01:58  25    That's what they told you.  But they have to prove

1    that.  And I put right here on the screen, I've waited and I'm

2    waited during this trial -- we can't guess, did any witness, did

3    any witness at all testify in any way that said that Dr. Ahuja

4    was told or knew he wasn't getting a 1099 form.  Did anybody?

01:59    5         No.  Not a single witness.  They called one HSBC

6    witness, Ms. Katju, and she said she didn't know Arvind Ahuja,

7    had never met him, didn't know anything about him.  That's what

8    she said.

9         And they called Ramit Bhasin, and he told you, "I

01:59    10    never discussed 1099 forms with Dr. Ahuja."

11         Those are the two witnesses.  The only two witnesses

12    they called in the case that know my client.  Neither one of

13    them had given you any evidence, zero testimony, that he knew he

14    wasn't getting 1099 forms.

01:59    15         Now, you can go back there in the jury room and say,

16    "Oh, I bet he did, or the government says he's a sophisticated

17    smart investor, he takes responsibility for" -- that's not

18    evidence.  That's -- all they're doing is guessing.  They've got

19    to prove that beyond -- beyond a reasonable doubt.

02:00    20         And there's not -- I thought they -- they didn't call

21    a single witness that testified that Dr. Ahuja had any knowledge

22    that he wasn't getting 1099 forms, not a single witness.

23         And documents.  The other form of evidence is

24    documents.  If they had documents from HSBC where they made some

02:00    25    kind of record that Dr. Ahuja was told he's not getting 1099

942

1    forms, they would have offered that into evidence.  They did

2    not.  So there's no testimony, there's no document.  So there's

3    no evidence at all on this critical issue, none, zero.

4            This is her testimony, Ms. Katju.

02:00    5        "You never met Arvind Ahuja, have you?

6        "Not to the best of my knowledge.

7        "And you never recall meeting him, right?

8        "No, I don't recall meeting him."

9            That's hardly somebody from HSBC that's going to be

02:00   10   able to provide you with testimony that Dr. Ahuja was told he's

11   not going to get 1099 forms.  This is Ramit Bhasin's testimony.

12   I asked him -- I grilled him on this.

13           "Did you ever tell Dr. Ahuja that HSBC would not be

14   providing him 1099 forms?

02:01   15           "No, I did not.

16           "As far as 1099 forms are concerned, at any time did

17   Dr. Ahuja ever tell you he was aware he was not receiving 1099

18   forms?

19           "No, he did not."

02:01   20           Next question:  "And sir, at any time, did you ever

21   tell Dr. Ahuja that HSBC was not providing you with 1099 forms?

22           "ANSWER:  No, I did not."

23           "So you didn't have any discussions with him about

24   1099 forms?"

02:01   25           I faced this issue head-on with someone who walked

943

1    into the courtroom who was coming on with a deal with the

2    government, and I put him right on the line because you had to

3    know one way or the other, I want to find out, and he didn't.

4    Zero.

5            All of these witnesses -- did you see all these people

6    on the screen here?  These are bankers that -- these are people

7    that maintained and worked on Dr. Ahuja's tax returns -- I mean

8    on his bank account.  These are the people that worked for

9    HSBC-USA.  They work right here in New York.  And they at

10   various times were involved in managing his account.

11           And the most -- the two most frequent are Mr. Tandon

12   and Ms. Dhanani, but the other names that you see there are on

13   these exhibits.  I thought they might call one of them.  They

14   didn't.

15           Not a single witness came in on behalf of HSBC by the

16   government to try to prove that Dr. Ahuja knew that he wasn't

17   getting 1099 forms.  Not a single witness.  That's not proof

18   beyond a reasonable doubt.

19           1099 forms, what are they?  I think you know.  I won't

20   spend a lot of time, but they are important in this case.  And

21   probably a lot of you know just because you file tax returns,

22   and you probably get some of them.  They are the government form

23   that's required -- the payors, banks, insurance companies have

24   to send you.  And they have to tell you how much interest you

25   earned because, otherwise, you don't know what to put down on

944

1    your tax return because they have to calculate that.  The law

2    requires that, and they do.

3            It tells you the exact amount of interest, and then

4    you take it and you record that amount of interest on what's

02:03  5    called Schedule B.  That's what they didn't send to Dr. Ahuja.

6            The customer, by the way, then it's his

7    responsibility -- once he gets a 1099, it's that taxpayer then

8    does have the responsibility to make sure that it gets on his

9    return.

02:03  10           Dr. Ahuja did that every single time, sometimes 30,

11   35 times a year he would get forms, and every one of them was

12   recorded on his tax returns.

13           And a copy of it goes to the IRS so that the IRS can

14   keep track and make sure that you haven't missed one and make

02:03  15   sure they're recorded.

16           So we know that Dr. Ahuja reported every single 1099

17   form that he received, and he didn't get one from HSBC.

18           I want to talk a little bit -- you've heard the

19   evidence now.  And so I told you when I started my

02:03  20   presentation -- first time I talked with you in the opening

21   statement, there's kind of four major players or people tied to

22   these events.  I want to talk to you about what do you now know

23   about these four people based on the evidence you've heard.

24           You know my client is 50 years old, married, two

02:04  25   children, came in from India, young age, went on to become a

945

1    prominent brain surgeon, performs cutting-edge-type of brain

2    surgery here in the United States.  He's one of the few that can

3    do these procedures.

4         Mark Miller talked to you in some detail about who he

02:04   5    was and how he's a world renowned neurosurgeon.  I don't have to

6    go on and on about it, but he set up a neurosurgery center at

7    St. Luke's Hospital, and he's someone who works frequently 12,

8    14, 16 hours a day six or seven days a week.

9         He basically created a neurological center at

02:04   10   St. Luke's Hospital and recruited younger doctors, and they

11   built it up to -- they employ 40 to 50 people now in this

12   neurosurgery practice.

13        And he's also part of the community and very

14   philanthropic.  And Mr. Miller explained his charitable

02:05   15   activities.  And they're community minded as a family.  And

16   that's my client, Dr. Ahuja.

17        They called two witnesses that had contact with

18   Dr. Ahuja to prove their case beyond a reasonable doubt.  Some

19   cases it might be 10 or 20, but there's two.

02:05   20        What's interesting is that one of them, Ramit Bhasin,

21   got caught on the witness stand lying about material issues in

22   this case.  There's virtually nothing he said that you could use

23   to convict somebody on.  I'm going to walk through that.

24        The other person, Mark Miller, was a very credible

02:05   25   witness, very professional, very --

946

1    MR. SULLIVAN:  Objection, Your Honor.  The reference

2  to "he was a very credible witness."

3    THE COURT:  Overruled.

4    MR. WEBB:  You judge -- you make that credibility

5  judgment.  Remember him and you know what he talked about and

6  how professional he was.

7    He talked -- he provided an enormous amount of

8  evidence that supports Dr. Ahuja, didn't help the government at

9  all.  I still don't know why they called him.

10    Those are the only two witnesses.  One was a liar, and

11  the other helped Dr. Ahuja.  That's their case beyond a

12  reasonable doubt.

13    Ramit Bhasin.  I'm not going to belabor this, but you

14  saw him testify.  They were very close family friends.  He

15  described Dr. Ahuja as being like his brother and a father to

16  his children.

17    He had a long career in banking.  He told you about

18  that.  He told you about this non-prosecution agreement that he

19  entered into so he could avoid having any charges filed against

20  him, and he agreed to testify against Dr. Ahuja.

21    Let's talk about his credibility just for a moment.

22  He told you -- first of all, did he have any motive?  Did he

23  have a motive or bias to fabricate to help the government?

24    He told you that he did.  He told you that he wanted

25  the government to agree not to prosecute him because he was

947

1    facing a long time in jail for tax fraud and he wanted a deal

2    from the government.  He told you that.  And he said that was a

3    huge benefit to him because the government gave him a

4    non-prosecution agreement.  And he said that was a huge benefit

02:07    5    to him, to help him testify in this case.

6    He then said, "Not only that, but by giving me a

7    non-prosecution agreement, they saved my career, my ability to

8    work in the banking industry at World Bank of Scotland, because

9    if I got indicted or charged, I would be out of the banking

02:07    10    industry."  He said that was a huge benefit to him.  He

11    basically said, in order for me to get my deal with the

12    government -- and I think most of you followed this -- he had to

13    kind of give what he called a prof.  He had to tell the

14    government in advance what could he say about Dr. Ahuja.

02:08    15    And then if the government thought it was valuable

16    enough, they'd give him the deal.  And he did that.  And he

17    testified.  He gave them a proffer of evidence and told them

18    things that he told you here in this courtroom, which we're

19    going to talk about, and then they gave him the deal that he

02:08    20    wanted.

21    But when they -- and when they interviewed him,

22    they're only focused on Dr. Ahuja.  He had referred five to ten

23    other people to HSBC, and he said they only were interested in

24    Dr. Ahuja.

02:08    25    And it was interesting.  I asked him, by the way, did

948

1   you ever tell -- does your bank now know that you've been

2   prosecuted?  He said, "No."

3        I said, "Don't you think that's a little bit

4   dishonest?"  And there was this hesitation like he never thought

5   about it.  He never thought about should he be telling his

6   employer that he's committed bank fraud and is a witness in a

7   case, but he said, "I didn't think about it."

8        He also told you that -- I asked him -- I said, "Do

9   you know, you said that that man was your brother, like a father

10  to your kids.  After you did this, did you at least tell him?

11  Look, I've had to testify against you in the grand jury."  He

12  said, "No."

13       I said, "Did you -- three or four weeks after you

14  testified in the grand jury, did you pack up your wife and kids

15  in India and fly them to Milwaukee and stay at Dr. Ahuja's house

16  and enjoy his hospitality and his graciousness for two weeks?

17  And did you actually -- were you with him the day the grand jury

18  indicted him?"  I saw the agony on his face.  And I said, "Did

19  you tell him then that you're the one that went to the grand

20  jury?  He said, "No."  He said, "I didn't tell Dr. Ahuja about

21  that."

22       I then asked him about the following, as far as his

23  credibility as a witness.  When he entered into this deal with

24  the government, he promised the government that he would file

25  true and accurate amended tax returns.  That's what he promises.

949

1    And for him to get his deal, he had to do that.  And his deal

2    said that if you don't live up to your conditions we will revoke

3    your deal and prosecute you.

4         He then admitted on the witness stand, while I was

5    asking him questions, that after he flew over here last week --

6    he got over here last week before he testified, he was here in

7    Milwaukee, and he met with the prosecutors.  And they started

8    asking him about his amended tax returns because he had filed

9    amended tax returns, which he promised would be accurate and

10   correct tax returns.  He said he filed them.

11        And then he was meeting with the government last week,

12   and they were asking him about his wages from HSBC in 2006 and

13   2007.  And then he went back, apparently, to another --

14   somewhere else and then said, "It just dawned on me.  I forgot

15   to put $450,000 of wage income on my amended returns."  Forgot.

16        He thought the government, these prosecutors, had

17   caught him, caught him in violating his agreement because he had

18   promised he would file amended tax returns and make them

19   accurate.  He got caught.  So then he calls them up and says,

20   "Oh, do you know what, I think I just remembered.  I forgot

21   $450,000."

22        These amended tax returns he's reporting 16, $18,000

23   in amended income?  He forgot 450,000 that he had to put on his

24   original return, and that he didn't put on his amended return.

25   He was in breach of his agreement.

950

1    And I asked him:  "You just breached your agreement

2    with the government.  The agreement says they shall prosecute

3    you.  Are you being prosecuted?"  And he said, "No, they didn't

4    prosecute."

02:12  5    They put him on the witness stand, didn't prosecute

6    him for breaching his agreement, did not prosecute him at all,

7    and then he's gone back to India, presumably.  That's the deal

8    he had with the government.  So he clearly breached his

9    non-prosecution agreement.

02:12  10   He also breached it in connection with another

11   paragraph where he had promised he would pay $1 million in FBAR

12   penalties, basically, saying, if you give me my non-prosecution

13   agreement so I don't have to go to jail, I will give you --

14   among other things, I'll pay these penalties.

02:12  15   I asked him, I said, "16 months later have you done

16   so?"  He said, "No."

17   He provided false testimony.  He tried to reach out

18   and help the government against Arvind Ahuja.  And I caught him

19   in two different lies right here in front of you.

02:12  20   Lie one is that he tried to say he's the one that

21   referred Arvind Ahuja to HSBC to set up bank accounts.  And I

22   pointed out to him that couldn't possibly be true because

23   Dr. Ahuja set up his HSBC account on August 17, '01.  August 17,

24   '01 is when Dr. Ahuja set up his HSBC account.  Ramit Bhasin

02:13  25   wasn't even working.  He didn't even work at HSBC until 2002.

951

1    So it would have been impossible for Bhasin to have referred

2    Arvind Ahuja to HSBC.  And nobody came in here from HSBC to say

3    that that did happen.

4            So I guess he wanted to somehow, like, to get a

5    non-prosecution agreement, be a big man with the government and

6    say, "Hey, I'm the one that brought Arvind Ahuja in, sent him

7    over to people, and they set up these nefarious accounts."

8            That's just not true.  It did not happen that way.  It

9    was two years earlier that Dr. Ahuja set up his account at HSBC,

10   having nothing to do with Ramit Bhasin.

11           And then we have the golf course testimony.  In order

12   to get his non-prosecution agreement, he had told a story to the

13   government about how he was playing golf with Dr. Ahuja in

14   California, and he remembered so clearly having a conversation

15   about Dr. Ahuja being concerned about a Citibank 1099 form.  And

16   he told you that on direct examination.  That was his big

17   testimony to incriminate Dr. Ahuja.

18           And I asked him on cross, I said, "Are you sure?

19   You're telling me -- where were you?"  He said, "I was in Pebble

20   Beach, California, on the Pebble Beach Golf Course in June of

21   2009.  I know I was there.  I flew in through San Francisco from

22   India.  And I went to Pebble Beach, and I golfed with Dr. Ahuja.

23   And I remember having this conversation with him on the golf

24   course."

25           I made him pull out his passport, pull it out right

952

1    here in front of the jury, right.  And he said, "Well, you can't

2    see it because it's covered up."  But it doesn't show landing in

3    San Francisco.  It shows CHI, which, by the way, would be

4    Chicago because he was probably going to Milwaukee.  He didn't

5    go in through San Francisco.

6         But then over the weekend, after he gave that

7    testimony, I subpoenaed the bank records from Pebble Beach

8    because I wanted to find out.  And I presented it to you in the

9    courtroom and showed you.  He lied.  He did not golf at all with

10   Dr. Ahuja in June of 2009.

11        Now, I then showed, through Pebble Beach, that he was

12   at Pebble Beach with Dr. Ahuja in July of 2008.  But that was

13   before Dr. Ahuja even had an account at Citibank, didn't even

14   have an account with Citibank.  So he couldn't possibly have had

15   the conversation in July --

16        And then yesterday the prosecutor jumps up and said,

17   "Oh, maybe he went to Milwaukee and played golf in Milwaukee."

18   So I brought in the lady from the golf course in Milwaukee near

19   Dr. Ahuja's house.  No, he didn't golf there either.  He lied to

20   you.

21        This is when the Citibank account gets opened up.

22   It's on August -- October 16th, '08, for $1 million.  The first

23   Citibank 1099 form that could have ever been issued would be in

24   January and February of '09.

25        So, just remember, I kept -- Bhasin kept telling me:

953

1    "No," that "I came to California.  I was golfing with

2    Dr. Ahuja."  He went on and on and on.

3                In fact, I'm going to find --

4                "Is there any doubt in your mind about that?"

5                "I was at the golf course.  I was actually on the tee

6    box when I started to swing."

7                He was telling you, "I remember the conversation so

8    well that I was swinging when he told me about the 1099 form."

9                And now we have the records from Pebble Beach, which

10   the government, by the way, even hadn't contested.  The records

11   make it -- it's impossible.  We know exactly.

12               I offered into evidence the actual records from Pebble

13   Beach -- and they're right here in this exhibit, Exhibit 2228 --

14   every tee time, everyone who golfed in Pebble Beach in June of

15   '09, and they aren't there.  They are not there.

16               I then asked Pebble Beach if you would go back and

17   find out, do a search from somewhere earlier in '08 all the way

18   up until today.  Let's find out were they ever there together.

19   And they were there on one occasion.  When they did the search,

20   they did one search, and they found both of them there on July

21   2nd to July 5th of '08.  So they were there in July of '08.

22               And it would have been impossible for Dr. Ahuja to

23   have mentioned a Citibank 1099 form as having received it when

24   it didn't -- it wouldn't have even been issued until eight or

25   nine months later.  He lied about this critical conversation

954

1    because he thought he was going to help the government.  That's

2    the kind of testimony you're supposed to use to convict

3    Dr. Ahuja.  I respectfully suggest that's not proof beyond a

4    reasonable doubt.

02:18   5           Interesting.  One other thing I just want to point out

6    to you about Ramit Bhasin.  He actually retained a prominent tax

7    preparation firm called McGladrey to prepare his amended

8    returns.  And he testified, "I told them all the facts about why

9    I didn't report HSBC income on my return."

02:19  10           The McGladrey firm, a very reputable firm, after

11   hearing all those facts, they put on the amended returns, they

12   concluded that what Bhasin had done was inadvertent.  That's

13   what they wrote down on his amended returns.  And I don't think

14   the government has challenged that.  Inadvertent.

02:19  15           And yet in this case when Dr. Ahuja, who doesn't even

16   get a 1099 form says he made a mistake, he's now under

17   indictment with multiple felonies.

18           Mark Miller, you know who he is.  He's the tax

19   preparer that testified in some detail during the course of our

02:19  20   trial.  You judge his demeanor.  He told you that his firm would

21   not represent someone who concealed information from them.  And

22   he told you -- actually told you six things that I'm going to

23   walk through quickly with you that are important to this case.

24           First of all, he told you he had no trouble getting

02:20  25   tax information from Dr. Ahuja and his people.  This is his

955

1    testimony.  He explained in detail he doesn't remember any

2    occasion he had any problem getting tax information from

3    Dr. Ahuja.

4         As far as tax compliance, he told you that he

02:20  5    considered Dr. Ahuja to be above normal as far as complying with

6    tax laws.

7         As far as 1099 forms, he told you they got all

8    reported every time.  Explained to you in some detail how he

9    knows, he's never heard from the IRS that every year they report

02:20  10   18 to 32 interest 1099s or similar forms, and every one of them

11   gets reported on Dr. Ahuja's tax return.  He's not a tax cheat.

12        He said that he would terminate a client if they

13   concealed information, and he's still representing Dr. Ahuja to

14   this day.

02:20  15        And, lastly, he told you this right here:

16        "QUESTION:  Please listen carefully to the question.

17   Do you know the reason for underpaid taxes in the years 2004 to

18   2005 as shown on Exhibit 2092?  Answer yes or no.

19        "ANSWER:  Yes.

02:21  20        "QUESTION:  And what was the reason for that?

21   "Because there was no 1099 that was received by our firm knowing

22   that the income existed."

23        That's what he told you.  He's the government's own

24   witness, and that's what he told you happened in this case.

02:21  25        Tom Branch.  They didn't call Tom Branch to the

956

1    witness stand.  They could have; they didn't.  Now, Tom Branch,

2    you know, was the person who gathered the 1099 forms and other

3    tax information and delivered it to Mark Miller.  And Mark

4    Miller testified that Tom Branch was a very professional person,

02:21    5    and that he thought that he did a good job.  But we didn't hear

6    from Tom Branch because the government chose not to call him as

7    a witness.

8            Let me walk through quickly the two different crimes

9    that they allege are false statements.  The first one is not

02:22    10    reporting HSBC CD interest income.  And here's what we know

11    about that.  We know that Dr. Ahuja did not get 1099 forms, and

12    he didn't know it.

13            The relationship starts in August of 2001.  That's

14    what we know.  There was a deposit of $1,075,000.  We know that

02:22    15    Dr. Ahuja used his own name, his own home address when he set

16    that account up.

17            There's the deposit right there on the screen.

18            We know what HSBC is.  It's a large international

19    bank, headquartered in London, and that they have affiliates in

02:22    20    the U.S. and in 80 other countries.

21            We know from the records in this case that Dr. Ahuja

22    deposited all of his deposits into HSBC-USA.  The prosecutor

23    said that he wire-transferred money to India and Jersey.

24            You look at the documents.  That did not happen.

02:23    25    Every single wire transfer in this case goes to Dr. Ahuja's bank

957

1    in Milwaukee to HSBC-USA in New York.  Every single one of his

2    wire transfers goes exactly that way.

3         I put kind of a diagram here up on the screen so you

4    can see it, that every single one, he deposits money into the

5    domestic account here in the United States.  Then HSBC takes

6    money and buys CDs.  They bought CDs in Jersey and India.

7         That's no secret.  I told you that in my opening

8    statement that that was no secret.  And Dr. Ahuja was very much

9    aware of that.  But Dr. Ahuja had a domestic account at HSBC in

10   the United States.

11        Now, we know that HSBC did not send 1099 forms to

12   Dr. Ahuja.  That's not in dispute.  They did send 1099 forms to

13   him, but didn't include the CD.

14        So here's what we don't know.  For eight years in a

15   row Dr. Ahuja's tax preparer got 1099 forms from HSBC.  They

16   didn't include the CDs in Jersey and India.  They included

17   interest on a Premier account, but not CDs.  And I thought they

18   were going to call someone to explain this, and they didn't.  We

19   don't know -- why this 1099 form is wrong, we don't know because

20   no one came to explain it.

21        Here's what we know from the documents that came into

22   evidence.  Just so you know, you -- just to be -- we don't know

23   when HSBC in New York started taking Dr. Ahuja's money and

24   investing it in CDs in India and Jersey.  We don't know.  I

25   don't know.  You don't know.  There's no documents to show it.

958

1      We know that he opened the account in 2001, and the

2  first time that I can see from the records is the summer of '05.

3  By the time you get to the summer of '05, HSBC in the U.S., in

4  New York, is taking some of its CD money and they're investing

5  it in India at HSBC, their sister bank, and they're investing it

6  in Jersey.

7      And we don't have the records from India. I don't

8  know why they did that. Maybe because they wanted to get more

9  interest -- maybe they could invest their money better in India.

10  We don't have their records. We don't know. But HSBC in USA --

11  and we don't know when and we don't know why. There's no one

12  who has come into the courtroom to explain when and why did HSBC

13  in New York decide to put Dr. Ahuja's money into CDs in two of

14  their sister banks in different countries, in India and Jersey.

15      We can guess, but you can't guess in a criminal case.

16  It's got to be proven beyond a reasonable doubt. And we don't

17  know when and why and how that happened. We don't know. And

18  the government has not explained it to you because they didn't

19  call any witnesses.

20      But just so -- it may have been confusing by the

21  government's explanation, but all of these deposits -- every

22  one; they're in evidence -- every one of them is a wire transfer

23  from his bank in Milwaukee to HSBC-USA in New York.

24      None of those -- he's not sending money. HSBC then

25  sends money to foreign countries, but he doesn't. Over the

959

1    years, we know he communicated only with HSBC-USA bankers.  He's

2    not communicating with people in India and Jersey.  Every

3    communication is him sending e-mails back and forth to these

4    people in New York.  There's no evidence that I'm aware of that

5    he's talking to anybody at HSBC-India or Jersey.

6         And by the way, all of his bank statements, every one

7    of these bank statements is from HSBC-USA.  That's -- these are

8    not bank statements from HSBC-Jersey or bank statements from

9    India.  These are bank statements from HSBC-New York.

10        Now, they put these letters up on the screen as if

11   somehow these are incriminating evidence of something.  We don't

12   deny Dr. Ahuja was aware that they had put CD money -- he knew

13   he had CDs in India and Jersey.  He knew that.  I told you that

14   in the opening statement.  He absolutely knew that he had money

15   in India and he had money in Jersey.  And that he knows that

16   because he's got records but the records are coming from

17   HSBC-USA.

18        These kind of letters that we have on the screen here,

19   those letters, according to the testimony, were drafted by

20   bankers in New York at HSBC-USA would draft this kind of letter,

21   send it to Dr. Ahuja, and then he would sign it and send it back

22   to HSBC-USA.

23        For example, here these are CDs.  And we don't have

24   any record from India.  I don't know if those are CDs.  They may

25   be in India.  They could very well be in India, but I don't know

960

1    that because I don't have the records from India.

2         Same thing with this letter here.  They talk about

3    these CDs.  Arvind Ahuja knew they had invested his money in

4    India and Jersey.  And we're going to come to what -- you're

5    going to find out under the law those are not foreign accounts,

6    and I'm going to explain to you in a little bit why.

7         Some of these people on this screen here would

8    probably be able to tell you why they did this, why they decided

9    to put the money into a sister bank.  And by the way, there's

10   nothing wrong with it.  As long as Dr. Ahuja gets the interest

11   rate he's entitled to, there's no problem.  We're not

12   complaining.  But they now -- but none of them came in to

13   testify so I don't know when and why this happened.

14        But I put up on the screen here what the government

15   tried to tell you is a wire transfer from Dr. Ahuja, Dr. Ahuja

16   would -- this is an example.  He wire-transfers on November 3rd,

17   '05, a million dollars.  Four days later they, being HSBC-USA,

18   wire-transferred to their sister bank in India and put it into

19   CDs, which is perfectly fine.  But Dr. Ahuja is not doing that.

20        So one big issue is why didn't HSBC send him 1099s.

21   Why didn't they?  I can't answer that.  Don't know.

22        This is what we do know.  Mark Miller explained to you

23   that HSBC-USA should have sent him 1099 forms and they didn't.

24   That's what we know.  We know that.

25        Citibank.  Thank the Lord for Citibank, because

961

1    Dr. Ahuja basically October 16, 2008, he made a similar type of

2    investment with Citibank, which Ms. Katju testified is right

3    next door in New York.  These two banks are right next door to

4    each other in New York City.

02:30

5            Dr. Ahuja put a million dollars in Citibank.  And when

6    he did that, they took his money and they invested it in a CD in

7    one of their sister banks in India.  That's what they did.  And

8    they put that money similar to what HSBC had done.  So the money

9    goes from Citibank USA to Citibank India.

02:31

10           The difference is Citibank USA sends 1099 forms to

11   Dr. Ahuja with the India money on it, and it goes on his tax

12   returns.  This is -- there's -- I think there's two in '08 and

13   one in '09.  This one is $122,000.  We know, we absolutely know

14   that Citibank sent 1099 forms because they are the U.S. bank and

02:31

15   that's where Dr. Ahuja set up the bank account.  And they are

16   the payor, and they may have decided that they want the money in

17   India.  And it's okay, but they got to send him a 1099 form.

18   And it says India on it.  It shows foreign tax paid.

19           And Mark Miller said, "I got this 1099.  I put this on

02:31

20   his tax return."  It's on his 2009 tax return.  It's there.

21   It's on the return.

22           So I can't explain -- what I put on the screen here

23   is, HSBC does not issue 1099 forms for CD investments in India,

24   and Citibank does.  And Mark Miller explained that Citibank did

02:32

25   it correctly and HSBC did it wrong.  And we don't know why.

962

1    In fact, Ms. Katju testified that even she knew that

2    Citibank right next door was sending 1099 forms on accounts in

3    India out to their U.S. customers so they would know how much

4    interest to put on their tax return.

02:32   5    Now, we know that Dr. Ahuja's 1099s, he hired

6    professionals.  The money ends up on his tax return.  And he had

7    a good preparation system and it worked.  We know that.  When he

8    got a 1099 -- they're in evidence; every single one of them is

9    on his tax return.  Here's a summary of them.  I don't have to

02:32   10   go through it, belabor it.  Every single one, every single year,

11   every single one is on his tax returns.

12   When HSBC sent him 1099 forms, he puts those on his

13   tax returns.  There's one.  When Citibank sends him a 1099, he

14   puts those on his tax returns.  Here's his tax returns.  They're

02:33   15   in evidence.  Every year he reports the money on his tax

16   returns.  Because he's not getting the 1099 forms, they're

17   coming to Branch, Branch is giving them to Miller, and they're

18   ending up on the tax return, every single year, every single

19   one.

02:33   20   Next.  Yes.  Dr. Ahuja realized in July of 2010, got a

21   letter from the government, he found out that he had not gotten

22   HSBC 1099 forms.

23   And he did the right thing.  He filed amended tax

24   returns in May of 2011, a month before he was indicted in this

02:33   25   case, and he went back all the way to 2002.  He went all the way

963

1    back to the first year that they didn't send him a 1099, and he

2    filed amended returns.  And he's paid the government every dime.

3    Tax, interest, and penalties have all been paid a month before

4    this indictment came down.

5            And I showed it to you earlier, but this chart breaks

6    it down as to how you can calculate to come out to show that

7    overall it's 1.8 percent.

8            Bloomberg.  Can I talk about Bloomberg for a minute?

9    The government has an e-mail that Arvind Ahuja sends to Ramit

10   Bhasin on July 3rd -- July 4, 2009, sends a Bloomberg article

11   that talks about HSBC and some foreign accounts.  I can't

12   read -- it doesn't matter.  It will be in evidence.

13           Here's my point.  I don't know what that means.  Ramit

14   Bhasin testified that Dr. Ahuja would send him news articles all

15   the time.  He just would find something on Bloomberg that he

16   thought Bhasin -- they were close friends -- would be interested

17   in, and he would e-mail it to him.  He e-mailed this one

18   Bloomberg article.

19           I think this represents the government's desperation

20   to try to prove something beyond a reasonable doubt when they

21   had no evidence at all.  I don't know what this article means.

22   All I know is -- and Bhasin said he doesn't know.  All he knows

23   is they never talked about it.  He didn't make any comment when

24   he sent the e-mail, they don't talk about it afterwards, they

25   have no conversation about that article ever, and yet is that

964

1    the government's proof beyond a reasonable doubt of what?

2         So the first crime they charge, which is not reporting

3    the CD interest income, that is such -- I think that's Counts 1

4    through 4.  And I put a red line through that because that

5    underreporting of interest income, they have not even come close

6    to proving beyond a reasonable doubt, willfulness.

7         So let me go to the next part of the case, which is

8    they say Dr. Ahuja did not comply with federal tax reporting

9    requirements because he doesn't file certain forms -- there's no

10   tax involved in this -- didn't check off certain forms or file

11   certain forms or check off the box.  That's what this is.  So

12   let's talk about this.

13        Put up on the screen --

14        Your Honor, I don't know whether at some point you

15   want to take a break or --

16        THE COURT:  If the jury wants a break, we will break.

17   I didn't want to interrupt you.

18        MR. WEBB:  It's okay to do that because --

19        THE COURT:  Does the jury want a break?  No, they're

20   ready to proceed.  We'll break after you're done.

21        MR. WEBB:  That's fine.  Thank you.

22        THE COURT:  Or sooner if the jury wants a break.

23        MR. WEBB:  There's a question on the federal tax

24   return down at the bottom on Schedule B which is -- it's very

25   hard to read.  I called it out for you.  They contend that

965

1    Dr. Ahuja filed a false income tax return because that box is

2    checked "no," which is at any time during that year did you have

3    an interest in a foreign account.

4            Mark Miller testified that he's the one that checked

5    that box "no," not Dr. Ahuja.

6            FBARs is another form that's a separate tax form that

7    U.S. taxpayers are required to file to disclose a financial

8    interest in foreign accounts.  There's no tax due, but they're

9    supposed to file this form called an FBAR.  They say Dr. Ahuja

10   did not do that.

11           Now, there's two things the government has to prove,

12   so I want to get focused on this because the government just

13   sloughs over this.  They first have to prove that Dr. Ahuja had

14   a financial interest.  He actually had a foreign account, but

15   foreign account is defined by law as to what a foreign account

16   is.  And I want to talk about it with you.

17           But even if they proved he had a foreign account, they

18   have to prove he acted willfully and that he actually knew that

19   he had to check that box off on Schedule B and he actually knew

20   about this separate thing called an FBAR.  Let's talk about

21   those two elements because the government fails to prove either

22   one of them.

23           First of all, as far as whether he had foreign

24   accounts, this is the definition.  It's going to be in the

25   instructions, this is what a foreign account is.  A foreign

966

1    account has to be an account located and maintained in a foreign

2    country.  You're going to be told by the Court that an account

3    is not located in a foreign country and is not a foreign account

4    if it's maintained with a financial institution in the United

5    States.  So I don't want to get too technical, but that's -- if

6    the HSBC account is an account that's maintained in the United

7    States, even though they've invested in CDs in a foreign

8    country, that is not a foreign account for purposes of these tax

9    returns.  That's why the last -- a foreign investment in a

10   domestic account is not a foreign account.

11         So what I'm going to walk through with you right now

12   is to show you why Dr. Ahuja doesn't even have foreign accounts

13   that are reportable.  I think the government is contending -- I

14   can't tell for sure, but they're talking about Citibank, HSBC,

15   Oxus.  I'm going to walk through these quickly, but the big ones

16   seem to be Citibank and HSBC.

17         Citibank in India is not a foreign account.  How do we

18   know that?  That's because Mark Miller, the government's own

19   witness Mark Miller, he explained to you in some detail that

20   that account at Citibank, Arvind Ahuja put money into that

21   account in New York.  That is a domestic account.  And just

22   because that account was investing in a CD in India does not

23   make it a foreign account that's reportable.  That was his

24   testimony.  That is their witness.  Their witness explained that

25   to you.  That's not my witness.  That's their witness explaining

967

1    to you that that Citibank account is not a foreign account, and

2    therefore Dr. Ahuja or Mark Miller would not be checking off the

3    form "yes" or would not be filing this FBAR because it's not a

4    foreign account, according to their witness.  Because it's a

5    domestic account making a foreign investment.

6            He did explain that's exactly the situation with HSBC.

7    HSBC is exactly the same.  HSBC is clearly a domestic account in

8    New York that Dr. Ahuja invested -- sent all his deposits to.

9    That account was maintained in New York, and therefore the same

10   logic from Mr. Miller clearly applies.  The HSBC account is a

11   domestic account in New York.  That account, though, has made

12   investments in CDs in India and Jersey, and that's called a

13   domestic account making a foreign investment.

14           That's -- the only witness in this case that has

15   explained that to you is Mark Miller, and that's his testimony.

16   He's the government's witness.  And I don't think they

17   challenged his testimony.  He's their witness.

18           So let's focus -- because the focus of this case has

19   been on HSBC, I want to remind you of the evidence that HSBC is

20   an account that is maintained in the United States.  I put on

21   one screen the major facts that I don't think can be disputed at

22   all.

23           On August 17, Dr. Ahuja opens an account not in India,

24   not in Jersey, in HSBC-USA in New York by wire-transferring that

25   amount of money I talked to you about.  Every deposit he made

968

1   over the next seven years, all of those deposits go to HSBC-USA.

2        There's no evidence that Dr. Ahuja ever got bank

3   statements from anybody other than HSBC-USA.  They were

4   maintaining his account in New York, but they were making

02:43  5   investments in India and Jersey.  There's no question they were

6   doing that.  And every single e-mail in this case, every contact

7   with Dr. Ahuja, are from bankers in New York employed by

8   HSBC-USA.  These are not bankers in India or Jersey.

9        And we also know that when Agent Cook testified all

02:43  10  the documents you have in this case, every single record that

11  the government has offered into evidence, every single one was

12  maintained at HSBC-USA.  They served a subpoena on HSBC-USA.

13  They got every document, all those documents are maintained in

14  the United States.

02:43  15        So the requirement that HSBC is an account maintained

16  in the United States is overwhelming.  And so the fact that

17  HSBC-USA is investing his money in India in investments, or in

18  Jersey, according to Mr. Miller that is not reportable as a

19  foreign account.  And nobody has contradicted his testimony,

02:44  20  nobody at all.

21        There's the deposits.  Tandon was the main person he

22  dealt with.  He's employed by HSBC-USA.

23        Ms. Dhanani, she's employed by HSBC-USA.  His

24  statements say if you have any questions, call HSBC-USA.  That's

02:44  25  what he's told.

969

1    This is on his bank statement.  His bank statement he

2  gets every month says, "If you deposit money with us in

3  New York, these funds are held by HSBC-USA."  That's what it

4  says.

5    Agent Cook said, "When I wanted to get records that

6  relate to his account, I went to HSBC-USA to get the records."

7    So there's no question that Dr. Ahuja and HSBC have

8  maintained a domestic account making a foreign investment, and

9  there's no -- for the government to contend that they've proven

10  beyond a reasonable doubt that that's a foreign account, just

11  look at the definition the Court gives you.  That's simply not

12  true and not correct.

13    Oxus.  I don't know what they're going to -- I don't

14  know if they contend that Oxus is some kind of foreign account.

15  I don't know.  They seem to say so in some of the -- anyway,

16  I'll listen to their argument.  Because here's what we know.

17  Dr. Ahuja clearly invested a million dollars in a fund called

18  Oxus Fund Management.  But there's no evidence he had any

19  account there.  He made an investment there.

20    Just so you know, the government has not brought in

21  any records from Oxus in India.  We don't have any account

22  documents; we don't have any account number; we don't have any

23  account statements.  I don't think there's any account in India

24  in Oxus so I don't know what the evidence is that's a foreign

25  account.

970

1    Mr. Bhasin said it was an investment in Oxus.

2    Then there's another company called MF Global.

3    MF Global, if you remember, this is what Mr. Bhasin explained,

4    after Dr. Ahuja had given his friend Mr. Bhasin a million

5    dollars to invest in this new company called Oxus, they lost

6    $500,000 in the first six months.  Then Bhasin goes to Dr. Ahuja

7    and says, "I don't trust my partner anymore in running this

8    fund.  Let's get the money out of that fund, and I'm going to

9    put it over into something called MF Global."

10    And so Dr. Ahuja says yes, and they do that.  And we

11    don't know exactly what happened because we don't have any

12    account records.  I have no records from MF Global.  We don't

13    have any bank, we don't have any account record, we have no

14    account statements, we have no opening statements.  I don't know

15    what that is.  But somehow if the government's contending that's

16    a foreign account that should have been reported on these forms,

17    they have not proven that even close.

18    Then there's another bank called HDFC.  According to

19    Bhasin, that's a bank in India.  And we know that there's a

20    draft -- there's a draft from Dr. Ahuja's CD for some reason

21    that goes to HDFC.  But there's no evidence there's any account

22    there.  They didn't come -- there's no -- we have no record of

23    any account at HDFC.  So nobody in this courtroom knows whether

24    there's an account in HDFC.  We don't know.  There's no account

25    records, there's no opening statement, there's no statements,

971

1    there's no doc -- there's nothing.  Zero.  Zero.  So I don't

2    know.

3        They get rebuttal after I get done talking so I don't

4    know what they're going to say, but I don't know how they've

5    proven that that's a foreign account.  They don't have any

6    records of it.  They didn't bring any records in here.  So these

7    accounts, by their own testimony, are not foreign accounts.

8        More importantly, they can't prove that he acted

9    willfully in not checking off this box on Schedule B or filing

10   this separate FBAR.

11        First of all, this is the instruction you're going to

12   get.  The government's going to have to prove to you that

13   Dr. Ahuja actually knew of his legal duty to check off

14   Schedule B, Part III, line 7a; that he had no interest in

15   foreign accounts; that he's got to actually know that question

16   is down at the bottom of that form and that it got checked by

17   Miller incorrectly.

18        The word "willfully" on the FBAR violation, the same

19   thing.  For the FBAR violation the word "willfully" means that

20   the defendant knew it was his legal duty to file an FBAR and

21   intentionally failed to do so.  They have to show that he knew,

22   there's something called an FBAR form, and he knew that it

23   wasn't filled out.  If they can't prove that, they can't prove

24   that he acted willfully.

25        So let's talk about what the evidence is on this

972

1    issue.  As far as 7a is concerned on Schedule B, let's talk

2    about -- we'll talk about them separately.  First question 7a on

3    Schedule B, and then I'll talk about the FBAR.

4         Schedule 7a, I asked Miller directly:  You never

02:49  5    personally ever discussed with Arvind Ahuja that on Schedule B

6    there's that one question at the bottom of the form called 7a

7    that the government called -- did you ever discuss that specific

8    question on the tax return with Dr. Ahuja?

9         No, I did not.  No, I did not.

02:50  10        Then I asked him:  Who is the one that checked the

11   box?

12        He said:  I did.  My firm did.

13        Did Dr. Ahuja check that box?

14        No, he did not.  That would be correct, he did not

02:50  15   check the box.

16        So we know that the government has no evidence that

17   anybody ever talked to Dr. Ahuja about that question which is at

18   the bottom of one of those pages.  And I introduced into

19   evidence just one year's -- I wanted you to see just as a

02:50  20   demonstrative, on April 15th, he gets -- and this is year is

21   2007 -- 16 tax returns to be signed.  They brought it to his

22   medical office, put it on his desk to be signed.

23        Now, therefore the government's theory is that he

24   went -- by the way, just the income tax -- the federal income

02:50  25   tax return in here when you look at it is about 100 pages long.

973

1    They're theory is that he -- he somehow found his way

2    to a schedule called B and then down at the bottom of the page

3    knew that that question was there.  That's their theory of this

4    case.  That's ridiculous.  And the evidence that he knew that

5    that box was checked "no" and filed a false return, there is no

6    evidence that will support that whatsoever in this record.

7    Zero.

8         Now, FBARs.  Let's talk about FBARs.  This is even

9    more interesting.  I listened to counsel, and here's what he

10   told you.  What is the evidence that Dr. Ahuja was aware of

11   FBARs?  By the way, I haven't seen one of these forms in this

12   courtroom.  I don't think there's any here.  There's some form

13   called an FBAR.  And this is the government's theory about why

14   he knowingly willingly filed a false return.

15        I asked Miller:  Did you ever actually use the term

16   "FBAR" with Dr. Ahuja?  And he explained that he never did,

17   never did talk to him specifically about what an FBAR is.  He

18   did talk to him about the fact, told him, he said he did talk to

19   him about the fact that there is a reporting requirement, but he

20   doesn't talk to him about the specific FBAR requirement.  He

21   said he did not.

22        So I said:  So, by the way, you've explained what you

23   said to Dr. Ahuja about the enhanced focus on foreign bank

24   accounts.  Did you say anything different in the grand jury

25   about that?

974

1       No, not to my knowledge.

2       He never specifically -- let me come back.

3       Several times before you he explained that he never

4  actually ever used the term "FBAR" with Dr. Ahuja, ever.

02:53   5       Bhasin, their other witness, here's what he told you

6  about FBARs.  He said he spent his whole life in the banking

7  world.  He's an expert banker.  He said he never heard of FBARs.

8  Never heard of it.  And then he went on to say not only did he

9  not ever hear about it, he doesn't think accountants know about

02:53  10  FBARs.  That's the testimony from another government witness in

11  this case.

12       Now, I want to focus on this instruction right here.

13  The word "willfully," the defendant acts willfully if he knew it

14  was his legal duty to file an FBAR and intentionally failed to

02:53  15  do so.

16       The prosecutors in opening statement didn't show this

17  to you, but he said -- he pointed over here and he said:

18  There's this form down here.  And if you look at this form,

19  here's what it says.  So this is their theory.  Please read this

02:54  20  with me carefully.

21       Their theory is the following:  That in that

22  Question 7a, after it talks about if you have any foreign

23  account, it says "See page B-2 for exceptions and filing

24  requirements for Form TDF 90-22.1."

02:54  25       He just told you because that language is there

1    Dr. Ahuja must have known about FBARs.

2           There's not a single word there about an FBAR that is

3    about a form.  So I've got the returns here.  I don't know -- I

4    don't know where that is.  There's nowhere -- if Dr. Ahuja -- I

5    don't know where Dr. Ahuja would go to to find that -- where --

6    where is page B-2 that's going to describe something called a

7    TDF 90-22.1, because it's not in these returns.

8           It's not here.  It's not in the courtroom.  I looked

9    last night.  I don't think there's anything in evidence that

10   would show you what they say he should have gone to look at and

11   therefore when he looked at it he would know:  Oh, there's a

12   form called FBAR.  I should have filed it.

13          That is -- to say that that's proof beyond a

14   reasonable doubt, that he didn't file an FBAR and knew about an

15   FBAR, that's so -- so weak evidence, not even close to proof

16   beyond a reasonable doubt.

17          The fact that a -- this is an instruction the court's

18   going to give you.  Just because Dr. Ahuja signs a tax return

19   does not by itself proof beyond a reasonable doubt the

20   taxpayer's knowledge of the contents of the return.

21          The instruction goes on to say that you need to look

22   at the surrounding facts and circumstances to decide what that

23   means, but the government has to prove it beyond a reasonable

24   doubt.

25          And you've got in evidence the number of returns he

976

1    got every year to sign on April 15th.  And the government's

2    theory is that somehow he somehow managed to get through and

3    understand that that form wasn't filled out.  There's no

4    evidence to support that.

5           And the last point on willfulness, is my most

6    important, I think.  There's no evidence that Dr. Ahuja, as a

7    medical doctor, was ever aware of the difference between a

8    domestic account having a foreign investment and a foreign bank

9    account.

10          Miller explained it to you.  You're jurors in a

11   courtroom.  So Miller comes in here and he tells you there's a

12   difference under the law if you have an account -- same thing

13   the court's gonna tell you -- if you have an account that is

14   maintained in a financial institution in the United States, even

15   though it invests in or holds an asset in a foreign country,

16   that's not a foreign account for purposes of FBAR reporting

17   purposes.  That's exactly what -- that's -- Miller told you the

18   same thing that the court's gonna tell you in the instructions

19   today; that that's not a foreign bank account.

20          So Miller went on to explain to you -- the government

21   wants to make this, like, "Oh, this is just such a little simple

22   case."  Miller explained to you that whether -- whether or not

23   something is a foreign account that's got to be reportable or

24   whether it's a domestic account that's making a foreign

25   investment, he said, their witness said, that's a complicated

977

1    issue.  That complicates even tax preparers.

2            I asked him, I said:  "Now, as far as this issue of

3    whether something is a domestic account making a foreign

4    investment or is a foreign account, is that something -- is that

02:58    5    something that actually is an issue that has been discussed

6    among professional groups that has caused some confusion?

7            "ANSWER:  Absolutely."

8            So if this issue of whether something is a domestic

9    account making a foreign investment or whether it's a foreign

02:58   10    account, is something that is confusing to professional tax

11    preparers -- which, by the way, is their evidence.  He's their

12    witness.  -- then how can they say that, because Dr. Ahuja, a

13    doctor, doesn't -- and, by the way, Miller then explained -- I

14    asked him this question:

02:58   15            "And the testimony that you gave the jury earlier

16    about the difference between a domestic account making a foreign

17    investment and an actual foreign account that has to be reported

18    for federal tax purposes, did you ever try to explain that to

19    him, to Dr. Ahuja?

02:59   20            "I did not."

21            He explained he didn't -- professional people that

22    prepared these returns are confused on this issue, and he

23    certainly didn't talk to Dr. Ahuja about it.  And yet the

24    government, the government wants you to believe that Dr. Ahuja

02:59   25    somehow understood this and somehow should have known that what

978

1    he had was foreign accounts and not a domestic account making a

2    foreign investment.

3         So -- and, by the way, one other point that came out

4    yesterday.  If the investments in India, there may be a foreign

02:59   5    tax paid, but that doesn't make it a foreign account.

6    Dr. Miller told you that.  That does not make it a foreign

7    account.

8         What it does create is a foreign tax credit, which

9    Agent Cook explained yesterday because Citibank sent a 1099 form

02:59  10    to Dr. Ahuja, Dr. Ahuja had to pay taxes in India, which he did.

11    And then Miller took a foreign tax credit.

12         But Miller -- but Mr. Cook explained, that's not true

13    for HSBC because he didn't get a 1099 form.  So there's no

14    foreign tax credit in connection with any of the HSBC CDs

03:00  15    because there was no -- there was no 1099 received.

16         So willfulness.  The government has -- on this second

17    charge, they've not proven -- let me come back.  I want to talk

18    about one issue.

19         There was a conversation between Miller and Dr. Ahuja

03:01  20    and Tom Branch in August of 2009, and Miller testified he

21    recalled generally telling Dr. Ahuja about new penalties

22    regarding reporting foreign accounts.  And Dr. Ahuja said that

23    he would follow up with a couple of bank or brokerage accounts.

24         Now, Miller had described these meetings as completely

03:01  25    chaotic where Dr. Ahuja comes in in scrubs out of surgery and

979

1    sits in these tax planning meetings, and Miller testified that

2    Tom Branch is the professional manager that was in this meeting.

3    And that if somebody was going to follow up, according to

4    Miller's testimony, he would have expected Tom Branch to follow

5    up.

6              We don't know if that happened because Branch was not

7    called as a witness by the government, and we don't know.  What

8    we do know is, Miller never discussed with Dr. Ahuja the

9    specific reporting requirements of question 7a for FBARs in that

10   meeting.  And that's what these instructions say would have had

11   to have happened.  That Dr. Ahuja has to actually know about the

12   legal duty to report on Schedule B, Part III, line 7a, which

13   Mr. Miller said he never discussed with Dr. Ahuja.

14             And for the FBAR, the legal instruction is the

15   defendant would act willfully if he actually knew about the FBAR

16   and knew about his duty to fill it out.  And there's no

17   evidence, other than the government saying, "Well, he should

18   have figured that out from looking at the return because you

19   should go to TD something or other and read it."  That's the

20   only evidence of willfulness on the FBAR.

21             And this is Miller's testimony.

22             "Tom Branch was in that meeting; is that correct?

23             "ANSWER:  That's correct.

24             "And Tom Branch -- if someone was going to get back to

25   you as a follow-up, who would you expect that person to be?

980

1          "ANSWER:  Tom Branch."

2          That was the testimony that was given by Mr. Miller.

3    And Tom Branch, we know, the government has chosen not to call

4    him as a witness.

03:03  5          MR. SULLIVAN:  Your Honor, may we approach briefly?

6          THE COURT:  Approach.

7          (At side bar on the record.)

8          MR. SULLIVAN:  Your Honor, I just want to make sure,

9    because Mr. Webb has repeatedly said that the government didn't

03:03  10   call Mr. Branch, are we allowed to say that they could have

11   called Mr. Branch?  Because --

12         THE COURT:  No.

13         MR. SULLIVAN:  What is the law?

14         THE COURT:  You cannot.  The defendant has no

03:04  15   obligation to produce any witnesses.  So --

16         MR. SULLIVAN:  We're stuck with it?

17         THE COURT:  You're stuck with it.

18         MR. SULLIVAN:  Thanks for the good news.

19         Mr. Webb, it's been about an hour 30 minutes since

03:04  20   you've begun; how much additional time?

21         MR. WEBB:  10 minutes.

22         THE COURT:  We'll take a break.

23         MR. WEBB:  Thank you.

24         THE COURT:  I think they're restless.

03:04  25         (End of discussion at side bar.)

981

1            THE COURT:  This is a good time to break.  Please do

2    not discuss the case in the jury room.  You may leave your

3    notebooks here.

4            THE BAILIFF:  All rise.

03:04    5            (Jury out at 3:04 p.m.)

6            THE COURT:  It should be about 10 to 15 minutes before

7    the jury is ready to continue.  So we will get done as quickly

8    as we can.

9            (Recess taken at 3:05 p.m., until 3:28 p.m.)

03:28   10            (Jury in at 3:28 p.m.)

11            THE COURT:  Please be seated.

12            Mr. Webb?

13            MR. WEBB:  Thank you very much, Your Honor.

14            THE COURT:  You may move that lectern over so that --

03:29   15            MR. WEBB:  Like this?

16            THE COURT:  That way you will be closer to the mic.

17            MR. WEBB:  When we took our afternoon break, I was

18    talking to you about what is it the government must prove

19    regarding the allegations that Dr. Ahuja filed false income tax

03:29   20    returns because he didn't report foreign accounts either on

21    Schedule B or in connection with what is called the FBAR.  And

22    we were talking about these two elements or requirements that

23    the government must prove, and we were talking about

24    willfulness.

03:29   25            The government argued to you during their closing

982

1    argument that after Dr. Ahuja had met with Mark Miller in August

2    of 2009 and Mark Miller had discussed with him foreign accounts,

3    that then, according to the government, Dr. Ahuja started to

4    conceal his foreign accounts.

5          And he used two examples.  He said, first of all, he

6    closed out an account in Jersey in the fall of '09.  That is

7    true.  But the account in Jersey was a very small amount.  HSBC

8    had put most of Dr. Ahuja's money in India.  There was some in

9    Jersey, but not a lot.  You'll see it in the records.  When

10   Arvind Ahuja closed out the Jersey account, he didn't close out

11   the accounts in India.  He didn't notify HSBC in New York now I

12   want to close all -- you've got all these CDs that you invested

13   for me in these foreign accounts; I want them all closed.  That

14   didn't happen.  Nothing like that happened.  Those accounts

15   stayed open because Dr. Ahuja did not believe that he had

16   anything to hide.

17         HSBC had put his money into India and Jersey.  They

18   had made the decision to do that for whatever their reasons are

19   for HSBC, and they paid him the amount of interest that he had

20   coming to him.  And Mr. Miller told you that is a domestic

21   account, HSBC-New York investing in CDs in foreign countries,

22   and that's not reportable.  That's the testimony that you have.

23         Now, when Dr. Ahuja closed out the Jersey account,

24   that's not an act of concealment.  He left all the accounts open

25   in India.  He didn't do anything with those accounts in India.

983

1    He left them wide open.

2            Then the other act that the government talked about

3    was supposedly, according to them, Dr. Ahuja transferred some of

4    his India CDs into whose name?  His wife's.  Well, how is that

03:31  5    an act of concealment?  They filed joint tax returns.  He didn't

6    transfer it into some secret shell name or some shell company or

7    some phony name.  It's transferred -- and by the way, he still

8    kept most of it in his name.  So the idea that those are acts of

9    concealment simply is not supported by the evidence.

03:32  10           So to close out this issue, on the issue about whether

11   or not the government has proven that Dr. Ahuja, A, had foreign

12   accounts that should be disclosed on his tax returns, I walked

13   through with you in some detail based on the legal definition of

14   what a foreign account is.  The government clearly has not

03:32  15   proven beyond a reasonable doubt that Dr. Ahuja even had a

16   financial interest in an account in a foreign country, as it is

17   defined by the judge's instructions.

18           So all I can respectfully ask of you as jurors when

19   you go back to the jury room and you begin your deliberations,

03:33  20   look at the instructions.  It clearly states in the instruction

21   that an account maintained in the United States that is simply

22   making investments in foreign investments is not a foreign

23   account for purposes of disclosure on your income tax return.

24           That was the testimony by Mark Miller, it's going to

03:33  25   be the instruction the judge is going to give you, and I've

984

1    walked through the evidence is overwhelming that Dr. Ahuja

2    maintained an account at HSBC-USA that made foreign investments

3    and that's not, as it turned out under the law, a foreign

4    investment.

03:33    5            On the issue of Dr. Ahuja's willfulness, Dr. Ahuja

6    actually has to know that he is supposed to fill out and check

7    off the Question 7a on Schedule B and has to know that there's

8    this separate form called an FBAR. And the government has

9    clearly failed to prove beyond a reasonable doubt either one of

03:34   10   those.

11           I'm almost done. There's one last issue.

12           I talked about both of the areas of false returns that

13   the government has alleged in this case. One other topic I just

14   want to talk to you about is something that happened that was

03:34   15   unusual yesterday. We have known throughout this trial that

16   there were -- that the government did not obtain any evidence

17   from HSBC-India or HSBC-Jersey. And so we asked Agent Cook

18   questions yesterday because the government has the burden of

19   proof, and documents in India or Jersey could very well shine

03:35   20   light on this case. I don't know what they would show but we

21   wanted to find out, so yesterday I got it on the screen. We

22   asked Agent Cook whether he served a subpoena on HSBC-India.

23           He said: "No."

24           And the question: "You didn't think it would be

03:35   25   important to retrieve documents from HSBC-India as part of your

985

1    investigation?"

2            His answer would be:  "I would have loved to.  That

3    would have been great."

4            So I guess he thought it would be nice to do that, to

5    complete and bring evidence before you.

6            But he said:  "But you didn't do it."

7            His answer was:  "My subpoena authority or the

8    subpoena authority from the court doesn't extend beyond the

9    United States."

10            And we started to ask him questions about that.  "So

11    you just subpoenaed HSBC; is that right?"

12            And he says:  "I'm not sure what the exact language

13    was, but HSBC in the United States."

14            So they only subpoenaed HSBC in the United States.

15            Next question:  "And those are the documents that have

16    been admitted into evidence are the ones that you received from

17    the United States?

18            "ANSWER:  Yes.

19            "And you never pursued any other form of investigation

20    in India, correct?

21            "Answer:  Correct."

22            We asked him about a process called letters rogatory,

23    to obtain evidence in foreign countries.  And he told you as an

24    IRS agent:

25            "QUESTION:  Have you ever seen any reference to

986

1    letters rogatory on the Department of Justice website?

2         "ANSWER:  I don't even know how to spell that," was

3    his answer.

4         He's the case agent working the case on Arvind Ahuja

5    involving CDs in India and Jersey.

6         "QUESTION:  You didn't think it was important in the

7    course of this investigation to familiarize yourself with these

8    treaties between India and the United States that deal with

9    obtaining evidence, including testimony in foreign countries,

10   did you?

11        "ANSWER:  Correct.

12        "QUESTION:  Now, during our trial, Agent Cook" --

13        So that's Agent Cook's testimony.  He decided that he

14   had no ability to get any evidence in India or Jersey to shine

15   the light on what we might be able to find out that might be of

16   assistance, for example, to Dr. Ahuja in this case, or to you as

17   jurors in this case.  He said he couldn't do it.

18        So I then called former Special Agent -- supervisory

19   Special Agent Ron Braver, who told you that he had had 25 years

20   of experience before he retired as a special agent with the IRS,

21   and then he was a supervisory special agent supervising other

22   special agents.  25 years of experience.  Because I thought you

23   were entitled to know that what Agent Cook told you was

24   factually wrong.  You were entitled to know that as jurors in

25   this case.

987

1      And so I asked Agent Braver -- former Agent Braver --
2  he's retired now in the private sector.

3      I asked him:  "Now, during our trial, Agent Cook has
4  told the jury that he was not aware of any way that an IRS Agent
5  could obtain evidence in India in connection with an
6  investigation he was conducting.  Based on -- factually do you
7  agree or disagree with that testimony?

8      "ANSWER:  I would disagree."

9      I then said:  "Can you just summarize for the jury the
10  different methods and ways IRS special agents have to obtain
11  evidence in foreign countries if they feel it's necessary on a
12  case?

13      "ANSWER:  Sure.  You have your manual, which kind
14  of -- the IRS manual."

15      So Mr. Braver is describing the IRS manual that
16  special agents operate under.

17      "The manual lays out different methods you can use to
18  obtain evidence.  And you have the IRS international section of
19  the criminal investigation that also assists you in helping you
20  obtain records overseas.  There's various methods using
21  Interpol, your foreign attachés that are stationed around the
22  country, around the world, and again the international section.
23  And you use letters of interrogatory.  There's various treaties
24  with various countries, and you can do it both informally and
25  formally."

988

1    He explained to you that if you want to obtain

2 evidence in foreign countries as an IRS agent it's in the

3 manual, the manual that IRS agents have, and there's ways to do

4 it both formal and informal to obtain evidence from foreign

5 countries.

6    "QUESTION:  So there are two different ways to use

7 letters rogatory to get evidence in foreign countries?

8    "ANSWER:  Correct.

9    "QUESTION:  For example, you said that you can use the

10 letters rogatory to get both documents in foreign countries and

11 testimony; is that correct?

12    "Correct.

13    "QUESTION:  And if you obtain -- if you want to obtain

14 testimony in a foreign country to be presented here in the

15 United States, are you able to take depositions in the foreign

16 country that then can be sworn testimony that can be presented

17 in a court of law in the United States?

18    "ANSWER:  Yes.

19    "And what process do you follow to obtain documents,

20 for example, by letters rogatory?  How do you do that?"

21    And he said:  "Same method.  It's a formal request.

22 You request it from the country, and the country responds

23 formally in writing."

24    Former Agent Braver explained to you that there are

25 ways to get evidence in foreign countries, both formal and

989

1    informal.

2            "QUESTION:  Now, over the years when you were a

3    special agent or a supervisory special agent during those

4    20-some years, did you frequently obtain evidence from foreign

03:41  5    countries through both the formal and the informal process?

6            "ANSWER:  Frequently would be -- on numerous

7    occasions.

8            "QUESTION:  That's fine.  On numerous occasions.

9            "Yes.

03:41  10            "And did you do it both formally with letters rogatory

11    and informally with the process you just described?

12            "ANSWER:  Yes."

13            And then I said:  "And for example, during your career

14    as a special agent, did you obtain evidence through letters

03:41  15    rogatory from the nation of India?"

16            And he said:  "Yes."

17            So the testimony yesterday from Agent Cook that there

18    was no way to go to India to help get records that might help us

19    in this case was factually wrong.

03:42  20            And so I tell you that because we are entitled in this

21    case to find out whether or not there's other evidence that

22    might show, for example, that Dr. Ahuja was never told that he

23    wouldn't get 1099s, or there might be records that would show

24    why did HSBC start setting up the CDs in India, and why did they

03:42  25    start setting up the CDs in Jersey.

1    I don't know what would be in those records because
2    the government never went to get those records to complete their
3    investigation.  And it's the government that has the burden of
4    proof to prove this case beyond a reasonable doubt.

03:42    5    I respectfully suggest to you that I've now discussed
6    with you the two different courses of conduct that the
7    government contends are the false statements in this case.  I
8    walked through the evidence in a great deal of detail because I
9    believe you as jurors are entitled to know exactly what the
03:43    10    evidence is, exactly what the legal requirements are, because I
11    want you to understand how that fits into the government's
12    burden of proving this case beyond a reasonable doubt.

13    I'm going to stop talking now.  Our work is almost
14    done as lawyers.  Your most important work is about to begin,
03:43    15    which is to go back in that jury room, review the evidence
16    carefully, understand the Court's instructions that will be
17    given to you later, and then you apply that law to these facts.

18    At the outset, let me as I wind down thank you for
19    agreeing to serve as jurors in this case.  I know that it's not
03:44    20    an easy task.  I know you're taken away from your family, your
21    jobs, and other responsibilities.  I think I can speak on behalf
22    of all of us, I greatly appreciate and Dr. Ahuja greatly
23    appreciates your service as jurors.

24    All I ask you to do is go back in that jury room, be
03:44    25    fair and impartial, review the evidence carefully, look at the

991

1   legal requirements that we talked about and that the judge will

2   describe to you, and I respectfully suggest to you that based on

3   that the proper verdict in this case would be a verdict of not

4   guilty as to Dr. Ahuja on each and every count of the

5   indictment.

6         Thank you for listening to me.

7               REBUTTAL CLOSING ARGUMENT

8         MS. SISKIND:  Your Honor, can we switch back to the

9   government's computer?

10        Ladies and gentlemen, in the hour and a half that

11   Mr. Webb was just talking to you, he mentioned shell

12   corporations and letters rogatory and stamps on passports and

13   golf course records.  He talked a lot about what kind of

14   evidence the government did not show to you in this case, but he

15   spent very little time going over what the government did put

16   into evidence, the records that do prove the charges in this

17   case.  So now before you go back and you finally have an

18   opportunity to talk about this case among each other and

19   deliberate on the charges, I really want to refocus you on what

20   this case really is about.

21        Arvind Ahuja knew he had foreign bank accounts.  He

22   knew that the funds in those accounts were invested in

23   certificates of deposit, that they were earning interest income,

24   sometimes as high as 10.8 percent.  He knew all of those things.

25        But he concealed those facts from his accountant, Mark

992

1    Miller.  And because a tax return is only as accurate as the

2    information a client gives to his accountant, the tax returns

3    that Dr. Ahuja filed with the IRS for the years 2006 through

4    2009 were false, and no FBARs were filed for the years 2007

03:46    5    through 2009.

6         That's what this case is about, and that's what the

7    evidence has proven beyond a reasonable doubt.

8         I want to talk about what Mr. Webb was talking about,

9    the difference between foreign bank accounts and domestic

03:46    10   accounts that have foreign investments in them.  Because the

11   evidence in this case proves that Arvind Ahuja had foreign bank

12   accounts.  He did have a bank account in this country with HSBC.

13   You saw the records in Exhibit 72.  Mr. Webb pointed out some

14   language at the bottom of the one of those pages about how the

03:47    15   account was located in the United States.

16        But those statements, take a look at them, there's not

17   many of them in Exhibit 72, the CDs that you heard so much about

18   in this case, you won't see a word about CDs on there being

19   invested in that account.  What you will see are wire transfers

03:47    20   of millions of dollars from his account in the United States to

21   India to be invested in CDs in India.  That's what the records

22   show.

23        Now, Mr. Webb flashed for a couple moments on the

24   screen some wire transfer record from 2001, and I'm not sure if

03:47    25   you got a chance to see it because it was up there just for a

993

1    second.  But take a look at that because that wire transfer has

2    nothing to do with India.  That was a domestic wire transfer.

3    That's not one of the wire transfer records that Agent Cook went

4    through when he was on the stand.

5    When Mr. Sullivan was talking in closing argument, he

6    showed you that summary that gives all of the wire transfers,

7    and you can look at them.  Those are wire transfers from the

8    defendant's account in the United States to his account in

9    India, that account ending 7702.

10   Now, Mr. Webb wants you to believe that it was the

11   bank that was sending the defendant's money to India, but that's

12   not what the records show.  It's the defendant's bank account,

13   and he was making wire transfers.

14   Ladies and gentlemen, do you really think that bankers

15   at HSBC, without the defendant's knowledge, without the

16   defendant's consent, reached into his bank account and

17   transferred millions of dollars to other countries?  Doesn't

18   make any sense.  That's laughable, ladies and gentlemen.  These

19   are the defendant's bank accounts, his money.  He was the one

20   moving it around; no one else was doing it for him.

21   MR. WEBB:  Your Honor, I object.  Lack of evidence.  I

22   object.  No evidence to support that statement by Counsel.

23   THE COURT:  Approach.

24   (At side bar on the record.)

25   MR. WEBB:  I strenuously object to that last statement

994

1    by the counsel.  The government lawyers had a right to ask the

2    jury to draw reasonable inferences from the evidence, and I

3    recognize that.  However, Counsel just asked the jury to infer

4    that there must have been conversations between Arvind Ahuja and

5    HSBC bankers giving them directions and instructions or else

6    they would never have transferred that money.

7              There is -- there's no testimony from which you can

8    draw that inference, zero.  And you're not allowed to draw an

9    inference from zero evidence.  And so I object to the argument

10   because it's not supported by any evidence in the record at all.

11             THE COURT:  What do you cite?

12             MS. SISKIND:  All I'm directing the jury to look at is

13   the words on the page in Exhibit 72.  The reasonable inference

14   to be drawn from Exhibit 72, the defendant's own bank account

15   records, is that he was the one directing the deposits.  There's

16   nothing indicating anyone else made those transfers.

17             THE COURT:  Let me look at 72.

18             (Brief pause.)

19             THE COURT:  72 -- no, that's 71.

20             MS. SISKIND:  That is 72, Your Honor.

21             THE COURT:  So you were talking about the statements

22   themselves.

23             MS. SISKIND:  Yes.  And I believe -- I believe the

24   first wire transfer comes in November of 2005.

25             THE COURT:  All right.  Go back and clarify that --

995

1    what you're basing your statement on.  We'll proceed.

2              The objection is overruled.

3              (End of discussion at side bar.)

4              THE COURT:  Proceed.

03:51  5              MS. SISKIND:  Ladies and gentlemen, look at those

6    statements in Exhibit 72.  Look at the words in the wire

7    transfer instructions.  You won't see anything in there to

8    suggest that anyone other than the defendant was sending that

9    money from New York to India.  These are his bank records, his

03:51 10    money, he knew the money was going to India.

11              So it's true, yes, he had a domestic account here.

12    There's really no question about that.  But he also had bank

13    accounts in foreign countries.  His accounts in India, that's

14    where the CDs were, that's where he was earning interest income,

03:52 15    not on the account in New York.  Both Ramit Bhasin and Vandana

16    Katju told you that NRI accounts are located in India.  They

17    provided uncontroverted testimony on this point.

18              Ms. Katju told you that HSBC-India maintains offices

19    or maintained offices here in this country to service NRI

03:52 20    clients like the defendant.  But just because Vandana Katju or

21    other account representatives sat in an office in New York or

22    had USA in their e-mail address, that doesn't change that the

23    accounts were overseas, they were in India.

24              And that's what NRI means, non-resident Indian.

03:53 25    Individuals of Indian descent, living outside of India, who want

996

1    bank accounts in that country.  Vandana Katju told you that.

2            So it's clear that the NRI accounts that the defendant

3    had with HSBC, those accounts were in India.  So don't let the

4    defense confuse you on this point.  There's HSBC-USA, there's

03:53   5    HSBC-India; they're two separate things.

6            The defense's own witness Ron Braver when he testified

7    yesterday, he told you that HSBC-USA and HSBC-India are separate

8    legal entities.  They're separate legal entities.  And the

9    defendant had bank accounts with both.

03:53  10            The letters written by the defendant to the bank

11    confirm that he knew he had foreign accounts.  And I went

12    through some of them very quickly with Agent Cook during his

13    redirect examination yesterday.  There were letters the

14    defendant signed addressed to HSBC-India, letters he signed

03:53  15    directed to HSBC-Jersey.  He knew he was not talking about

16    domestic bank accounts in those letters.

17            Take a look at some of these letters when you get back

18    to the jury room.  You can see most of them are one page,

19    they're short, to the point, nothing confusing about them, and

03:54  20    they're addressed in the top left-hand corner to banks in other

21    countries.

22            The defendant signed all of the letters that the

23    government put into evidence.  It doesn't matter who drafted

24    them, it doesn't matter where they were kept.  The defendant

03:54  25    signed them, and they talk about accounts located in foreign

997

1    countries.  They tell the bank what to do with his money in

2    India and what to do with his money in Jersey.

3          The letters also refer to account numbers in India and

4    Jersey.  Take a look at the account numbers on some of those

03:54   5    letters, and we talked about them with Agent Cook yesterday.

6    Those are not the same as the account number you'll see on the

7    statements in 72 which is his HSBC-USA account.  Those are

8    different account numbers and the defendant knew they were

9    different.

03:55   10    When you get back to the jury room, look at these

11    letters.  The defendant refers to them as accounts.  He doesn't

12    refer to them as investments.  He knew that he had bank accounts

13    in foreign countries.

14          And if you need further convincing that the defendant

03:55   15    knew that this money over in India was not just some foreign

16    investment, I would suggest you take a look at Exhibit 50.  This

17    single sheet of paper, Exhibit 50, a letter from the defendant,

18    blows the defense's entire theory of this case out of the water.

19          So what is Exhibit 50?  It's a letter signed by the

03:55   20    defendant to HSBC-New York in July of 2008 in which he says:

21    "With reference to the above subject, you are requested to

22    please close my above checking account with you."

23          And that account number that you see in the subject

24    line here, that's his New York account.  July 2008, he writes

03:56   25    this letter to the bank, this simple, to-the-point, concise

998

1    letter, closing his New York account.

2         And yet, he kept earning interest income.  Agent Cook

3    told you there were records and screen shots from 2009.  And the

4    defendant kept writing letters to HSBC-India and HSBC-Jersey

5    after he wrote this letter closing his New York account.

6         So if he thought that all of this money was based in

7    New York and that someone else was sending it over to India and

8    Jersey, then why is he still managing accounts in India and

9    Jersey after he closes the New York account?  It doesn't make

10   any sense.

11        Look at Exhibit 54.  That's a letter he wrote to HSBC

12   in India after he wrote this letter in Exhibit 50.  Exhibit 54

13   is him trying to change the correspondence address on his

14   account.  Why would he be writing this letter to change an

15   address on an account if he didn't think it existed anymore?

16        Look at Exhibit 59 and Exhibit 61, letters from July

17   2009, a full year after he closed his account in New York.

18   Those letters direct the bank to transfer money from his

19   accounts in Jersey and in India to a travel agency.

20        If the account was closed, which is what Mr. Webb --

21   Mr. Webb wants you to believe, that this is related to that

22   New York account, but if the New York account was closed, how

23   could he be telling the bank what to do with the money?

24        Because the defendant closed his New York account in

25   July of 2008, the defendant's argument that these accounts were

1    really based in New York but with investments in India and

2    Jersey doesn't make any sense.  It's impossible to access funds

3    in an account that doesn't exist anymore.

4         Now, there's no dispute in this case that the

5    defendant did not receive Forms 1099 reflecting the interest

6    income he earned from the CDs in India.  He did receive 1099s

7    from HSBC, and the defense has shown you some of those.  He

8    reported that interest income on his tax return.

9         But look at how much he reported:  $396 in 2006.  $167

10   in 2007.  And in 2008, the year that he closed the New York

11   account, he reported $51 in interest income.

12        Ladies and gentlemen, the minute the defendant saw

13   those Forms 1099, he would have known they didn't include his

14   interest income from the India CDs.  The numbers were just too

15   low.  He knew that he had put millions of dollars over in India,

16   that he was earning interest at rates up to 10.8 percent.  The

17   dollar figures on those HSBC 1099s are so incredibly low that

18   the defendant knew they were not reporting his interest income

19   from his CDs.

20        The defendant is trying to confuse you on this point.

21   He's trying to suggest that HSBC-USA, they were the one required

22   to send him a Form 1099 to report the interest income.  They

23   want you to believe that the bank somehow made a mistake, but

24   there was no mistake.  HSBC in the United States was never going

25   to report this interest income on a Form 1099 because the money

1000

1    wasn't in that bank.  The money was in India.

2         And as you've now heard from both Mark Miller and

3    Ronald Braver, one prosecution, one defense witness, foreign

4    banks don't issue Forms 1099.  HSBC-India was never going to

03:59  5    send the defendant a Form 1099 for that account.  Mark Miller

6    knew it; Ronald Braver knew it; and the defendant knew it.

7         MR. WEBB:  I'm going to object.  Lack of evidence.

8    I'm going to object.  There's no evidence to support that last

9    statement.  Objection.

04:00  10        THE COURT:  The government and the defense have their

11   own theories.  Ultimately you the jurors are the ones who are

12   the trier -- finders of fact.  If your recollection differs from

13   that of the attorney's, it is your recollection that controls.

14        You may continue.

04:00  15        MS. SISKIND:  The defendant was taking advantage of

16   the fact that he was never going to get a Form 1099 from a

17   foreign bank, because if the bank wasn't going to tell the IRS

18   about his interest income, then he wasn't going to do it either.

19        I want to say something else about Forms 1099.

04:00  20   Mr. Webb made it seem like it would have been impossible for the

21   defendant to report his interest income to his accountant unless

22   he got a 1099.

23        That's simply not true.  Because Vandana Katju came in

24   here and told you about the process that was available for NRI

04:01  25   accountholders to get information about their accounts.  She

1001

1    told you that the representative office in New York would field

2    questions from NRI customers in this country, about balances or

3    deposits; she told you that for complicated inquiries, they

4    would contact the bank in India, who would send over these

5    screen shots that you saw in Exhibits 69 and 71.

6            We also saw at least one e-mail in which the defendant

7    was asking Ankush Tandon, one of the bankers in New York, for

8    information about a CD that was going to mature.  So it's clear

9    that the defendant knew how to get information about his account

10   when he wanted to.

11           Look at Exhibit 38.  This is an e-mail from Priti

12   Dhanani, one of the bankers in New York, to the defendant.

13   She's talking about statements regarding his account in India --

14   sorry -- in Jersey.  She says, "I refer to your request for a

15   composite statement of your Jersey investments.  I have placed a

16   request with our Jersey Premier Division for your statements,

17   and you shall receive the same shortly at your U.S. mailing

18   address.  I have also requested them to send you soft copy of

19   the same on your e-mail address in their records."

20           He asked for statements; the bank delivered.  Whenever

21   he wanted information about his account, those bankers in

22   New York, as Vandana Katju told you, would have been available

23   to help him.

24           So the defendant knew how to get information about his

25   accounts, about his deposits, about his CDs if he wanted to get

1002

1    information.  The defendant stayed on top of his accounts.  He

2    personally managed his investments, just like you saw him state

3    in that Texas Energy account application.

4         So this whole 1099 argument, this whole theory that

5    it's impossible to report his interest income unless he got some

6    magic form, that's a distraction, ladies and gentlemen.  The

7    defendant did not need to get a 1099 to know that he was earning

8    interest income.

9         The defendant also knew that he had foreign accounts

10   at places besides HSBC-India and Jersey.  Look at Exhibits 57

11   and 2060.  These are the account applications for the Citibank

12   NRI account.

13        Now, Mr. Webb said something to you in his closing

14   argument about how the Citibank CDs in India are not a foreign

15   account.  Is that what you remember the evidence showing, ladies

16   and gentlemen?

17        Take a look back at those two Citibank account

18   applications.  They both talk about offshore accounts, about

19   accounts in India.  And Ms. Katju told you that Citibank NRI

20   accounts, just like their counterparts at HSBC are located in

21   India.

22        Ms. Katju told you this, but Mark Miller couldn't.  He

23   was asked about whether he knew what NRI stood for, and he

24   didn't know.  And Mr. Sullivan asked him during

25   cross-examination about why he reported the Citibank interest as

1003

1    he would for any other domestic account.  Mr. Sullivan asked him

2    if it was just because he assumed that it was a U.S.-based

3    account.

4            And Mr. Sullivan read back to him some of his grand

5    jury testimony, testimony under oath, without the defendant in

6    the room, about the Citibank Form 1099.  Mr. Sullivan asked if

7    he recalled in the grand jury responding to a question if it was

8    fair to say that he just assumed that this was a U.S.-based

9    account, and his answer was "Yes."

10           Mr. Miller just assumed that the Citibank accounts

11   were not foreign.  He didn't know that.

12           But Vandana Katju told you they were foreign accounts,

13   and the evidence shows that the account application show the

14   defendant knew they were foreign accounts too.

15           Look at that handwritten application in Exhibit 2060.

16   We talked about it with Agent Cook on the stand yesterday.  Go

17   to Part C on that form, on page 3.  There is that list of

18   countries, none of which were in the United States.

19           And Dr. Ahuja was directed to check a box next to

20   which city in India he wanted to have his accounts opened with

21   the bank, and he checked New Delhi.  He knew that was a foreign

22   account.

23           And don't forget about all of the letters the

24   defendant signed directing that HSBC transfer his money to Oxus

25   and HDFC and Mann Financial.  He was telling the bank to send

1004

1    more than $1.5 million to these bank and brokerage accounts,

2    which Ramit Bhasin told you were located in India.

3           These accounts have nothing to do with a bank account

4    in New York.  They're foreign accounts, foreign bank accounts,

5    and foreign brokerage accounts, and the defendant knew that.

6           So the evidence in this case establishes beyond a

7    reasonable doubt that the defendant knew he had foreign bank

8    accounts, knew that he had millions of dollars in interest

9    income from those accounts, but didn't report it on his tax

10   returns.

11          I want to talk to you for a minute about Ramit Bhasin.

12   We heard a lot about that in Mr. Webb's closing argument.

13   Mr. Webb says he testified to get a deal, that he's not

14   credible, that he should be prosecuted.

15          Well, ladies and gentlemen, this case is not about

16   whether anyone else should be prosecuted.  This case is about

17   whether the government can prove beyond a reasonable doubt that

18   the defendant is guilty of the charges in the indictment.

19          It's your job to evaluate Mr. Bhasin's testimony, to

20   evaluate his credibility, and to decide for yourself whether and

21   how much of his testimony you want to believe.  But when you're

22   thinking about whether he was a credible witness, think about

23   all the ways in which his testimony, in which things he said

24   when he sat in that box, how they're corroborated by other

25   evidence, other documents that you have seen.

1005

1    He told you about the defendant opening a brokerage

2    account at Oxus with a $1 million investment.  That's exactly

3    what Exhibits 3, 4, and 80 show.  Letters signed by the

4    defendant transferring money to Oxus.

04:07  5    Mr. Bhasin told you that he invested jointly with the

6    defendant in some commercial real estate at DLF India.  That's

7    exactly what Exhibit 2 shows.  A letter signed by the defendant

8    transferring money to DLF.

9    Mr. Bhasin told you he helped the defendant withdraw

04:08  10   cash in India.  Well, you saw a letter in which the defendant

11   told the bank to give cash to Mr. Bhasin.

12   So Mr. Webb said that Ramit Bhasin is a liar.  Well,

13   how can that be, ladies and gentlemen?  Much of what he said is

14   supported by documents in black and white signed by the

04:08  15   defendant.

16   And, ladies and gentlemen, don't be distracted by the

17   evidence that you heard yesterday and then this morning about

18   Pebble Beach and the golf course here in Milwaukee.  A binder

19   full of golf course records has absolutely nothing to do with

04:08  20   whether the defendant filed false tax returns and willfully

21   failed to file FBARs.  Nothing to do with it.  It's a

22   distraction.  And they don't say anything about whether you

23   should believe Mr. Bhasin.

24   I want to read to you from part of Mr. Bhasin's trial

04:09  25   testimony, a part that Mr. Webb did not put on the screen for

1006

1    you during his closing.

2            Because after the issue was raised on

3    cross-examination about where he was when the conversation about

4    the Citibank 1099 occurred, on cross-examination Mr. Webb asked

5    him:

6            "If it turns out the records show you were in

7    Milwaukee and not in California, you couldn't have played golf

8    in California; is that correct?"

9            And he said:  "That's correct."

10           So it's not as if he took the stand and maintained

11   with 100 percent certainty he knew exactly where he was standing

12   the moment the defendant said, "I got a 1099."  These golf

13   course records say nothing about anything in this case.

14           What Mr. Bhasin was clear on is that the conversation

15   did occur.  On redirect examination I asked Mr. Bhasin whether

16   there was any doubt in his mind that the defendant said, "I

17   received a 1099 from Citibank," and Mr. Bhasin responded:  "No,

18   there is no doubt in my mind."

19           I asked him whether there was any doubt that the

20   conversation occurred in June of 2009, and again he said:

21   "There is no doubt in my mind."

22           Something else there is no doubt about, ladies and

23   gentlemen, is that e-mail with the article from Bloomberg about

24   bank secrecy.

25           Well, it's true, as Mr. Webb pointed out, Mr. Bhasin

1007

1    pointed out there were a lot of e-mails about financial topics

2    or sports or news between the defendant and Mr. Bhasin.  But

3    that e-mail about foreign bank secrecy, that's something

4    entirely different.

04:10    5         This is an e-mail sent between two men, both of whom

6    had undeclared foreign bank accounts.  There's no text in that

7    e-mail.  They never had any follow-up conversations because they

8    didn't have to.  They both knew what it meant.  HSBC-India was

9    thinking about turning over the names of accountholders.  They

04:11    10   knew that that meant that they would not be able to fly under

11   the radar very much longer, and that their accounts would soon

12   be discovered.

13        You heard during the testimony of Agent Cook about the

14   ways in which evidence was gathered in this case.  And Mr. Webb

04:11    15   has now suggested to you, both through his argument and through

16   the testimony of Ronald Braver, that there were other things the

17   government could have done to investigate this case.  What this

18   basically boils down to is a difference in strategy, how former

19   Special Agent Braver might have investigated this case has no

04:12    20   bearing on the issues that you have to decide here.

21        The defense is, essentially, speculating about what

22   might be found in foreign bank records.  And even though

23   Mr. Braver suggested that there were ways to get evidence from

24   abroad, he didn't say anything about the evidence you actually

04:12    25   have in front of you in this case.

1008

1       You don't need to see bank statements from India to

2   know that the defendant earned interest income.  He admitted

3   that when he filed amended tax returns.  And you saw other

4   records in this case maintained in this country, letters signed

5   by the defendant, e-mails from the defendant, account

6   applications signed by the defendant, all establishing that he

7   knew he had foreign bank accounts, and that he knew he was

8   earning interest income.

9       So don't be distracted by all the talk about tax

10  treaties or letters rogatory or foreign attachés.  That has

11  nothing to do with whether the defendant is guilty and whether

12  the government has proven his guilt beyond a reasonable doubt.

13      There is no dispute that the defendant's 2006 through

14  2009 tax returns were false.  He amended those returns in 2011,

15  after he learned, as Agent Cook told you, that he was under

16  criminal investigation.  He amended those returns and reported

17  more than $2 million in additional income.

18      But the defendant also knew those returns were false

19  when he filed them.  Because although the defendant's tax

20  returns undoubtedly are thick, they have a lot of pages, report

21  a lot of information, he wouldn't even need to make it past the

22  very first page of those returns to know that his interest

23  income was not being reported.

24      When you go back to the jury room, take a look at

25  line 8a on the first page of each return.  That's the line where

1009

1    all the interest income from the Schedule B gets totaled up and

2    reported all in one place.

3            For each of the years 2006 through 2009, the defendant

4    would have seen that number and known that it was too low to be

5    including all of his interest income that he was earning on that

6    millions of dollars he invested at those high interest rates.

7            He knew that the tax returns were not reporting his

8    interest income, but he didn't want to report his income to the

9    IRS.  Like Mr. Bhasin, he thought he could get away with it; he

10   thought if he kept his mouth shut, the IRS wouldn't know, and he

11   could fly under the radar.

12           The evidence has also established that the defendant

13   knew he was required to file the FBARs.  First, the defendant

14   signed his tax returns.  And the judge will instruct you -- and

15   you saw the instruction on the screen with Mr. Webb -- that you

16   can consider that signature when deciding whether the defendant

17   had knowledge of the contents of the return.

18           Part of the instruction reads that, "knowledge of the

19   contents of the return may be inferred from the surrounding

20   facts and circumstances in addition to the signature which on

21   its face is evidence that the signer knew of the contents of the

22   return."

23           He signed those returns; he acknowledged that they

24   were true and complete and accurate, and he acknowledged that he

25   knew what they contained.  What they contained in the 2007

1010

1    through 2009 returns is a statement about the FBAR.  Doesn't

2    call it an FBAR.  It refers to it by the more technical name,

3    the form number.

4         And the defendant didn't have to go find that form by

5    himself, like Mr. Webb suggested.  That's what he paid a CPA

6    for.  And Mr. Miller told you that if the defendant had come to

7    him and said, "I have foreign accounts," Mr. Miller would have

8    investigated the matter further and, if appropriate, filed an

9    FBAR.  But he couldn't possibly do that unless his client told

10   him about the foreign accounts.  And because the defendant chose

11   to conceal those accounts from Mr. Miller, no FBARs were filed.

12        Mr. Webb told you there is no evidence that Dr. Ahuja

13   was aware of the FBARs.  Well, then, what do you call that

14   agenda from the meeting in December of 2009 that has as a line

15   item the FBAR reporting requirement?  What do you call the tax

16   organizer from December 2009 with that extra color sheet of

17   paper that talks about the FBAR?  What do you call the

18   conversation between Mr. Miller and the defendant in August of

19   2009?

20        He testified that he had a conversation about FBARs.

21   And on his direct examination Mr. Sullivan asked him some

22   questions about that, and he read to him from his grand jury

23   transcript -- again, which was under oath -- and Mr. Miller

24   agreed that he had testified in the grand jury under oath that

25   he had told the defendant about the FBAR requirement in August

1011

1    of 2009.

2           And Mr. Miller told you that during that conversation

3    the defendant said he would have to follow up about a few

4    accounts and get back to him.  But we all know by now, ladies

04:17  5    and gentlemen, the evidence showed that never happened.

6    Mr. Miller told you that Dr. Ahuja never came back to him and

7    said anything about foreign accounts, and no foreign accounts

8    got reported on the 2009 return and no FBARs were filed.

9           Three times in the summer and winter of 2009

04:17  10   Mr. Miller raised the subject of FBARs.  He was practically

11   begging the defendant to tell him about the foreign accounts.

12   And still, the defendant concealed those accounts from

13   Mr. Miller.  Ladies and gentlemen, that is willfulness.

14          Because the defendant kept his CPA in the dark, no

04:18  15   foreign interest income was reported, the "no" box was checked

16   next to the foreign bank account question on Schedule B, and no

17   FBARs were filed.

18          The government has proven beyond a reasonable doubt

19   that with respect to the charges of filing false tax returns and

04:18  20   failing to file FBARs the defendant acted willfully.  He knew

21   what the law required him to do, and he intentionally violated

22   that duty.

23          He knew he had foreign accounts that generated

24   millions of dollars in interest income, but he chose to

04:18  25   deliberately conceal that fact from his accountant.  He

1012

1    concealed that fact from his accountant and ultimately from the

2    IRS and hoped he would never get caught.

3            That is why the government is asking you to return the

4    only verdicts in this case that are consistent with the

04:19  5    evidence, which are verdicts of guilty on all charges.

6                        FINAL JURY INSTRUCTIONS

7            THE COURT:  Members of the jury, you have seen and

8    heard all the evidence and the arguments of the attorneys.  Now

9    I will instruct you on the law.

04:19  10           You have two duties as a jury.  Your first duty is to

11   decide the facts from the evidence in the case.  This is your

12   job, and yours alone.

13           Your second duty is to apply the law that I give you

14   to the facts.  You must follow these instructions, even if you

04:20  15   disagree with them.

16           Perform the duties fairly and impartially.  Do not

17   allow sympathy, prejudice, fear, or public opinion to influence

18   you.  You should not be influenced by any person's race, color,

19   religion, national ancestry, or sex.

04:20  20           Nothing I say now, and nothing I said or did during

21   the trial, is meant to indicate any opinion on my part about

22   what the facts are or about what your verdict should be.

23           The evidence consists of the testimony of the

24   witnesses, the exhibits admitted in evidence, and stipulations.

04:21  25           A stipulation is an agreement between both sides that

1013

1    a person would have given certain testimony.

2           You are to decide whether the testimony of each of the

3    witnesses is truthful and accurate, in part, in whole, or not at

4    all, as well as what weight, if any, you give to the testimony

5    of each witness.

6           In evaluating the testimony of any witness, you may

7    consider, among other things:

8           The witness's intelligence;

9           The ability and opportunity the witness had to see,

10   hear, or know the things that the witness testified about;

11          The witness's memory;

12          Any interest, bias, or prejudice the witness may have;

13          The manner of the witness while testifying; and

14          The reasonableness of the witness's testimony in light

15   of all the evidence in the case.

16          You should use common sense in weighing the evidence

17   and consider the evidence in light of your own observations in

18   life.

19          In our lives, we often look at one fact and conclude

20   from it that another fact exists.  In law we call this

21   "inference."  A jury is allowed to make a reasonable inference.

22   I should say, to make reasonable inferences.  Any inferences you

23   make must be reasonable and must be based on all of the evidence

24   in the case.

25          Some of you have heard the phrases "circumstantial

1014

1  evidence" and "direct evidence."  Direct evidence is the

2  testimony of someone who claims to have personal knowledge of

3  the commission of a crime which has been charged, such as an

4  eyewitness.  Circumstantial evidence is the proof of a series of

04:23  5  facts which tend to show whether the defendant is guilty or not

6  guilty.  The law makes no distinction between the weight to be

7  given either direct or circumstantial evidence.  You should

8  decide how much weight to give to any evidence.  All of the

9  evidence in the case, including the circumstantial evidence,

04:23  10  should be considered by you in reaching your verdict.

11  Certain things are not evidence.  I will list them for

12  you:

13  First, testimony and exhibits that I struck from the

14  record, or that I told you to disregard, are not evidence and

04:24  15  must not be considered.

16  Second, anything you may have seen or heard outside

17  the courtroom is not evidence and must be entirely disregarded.

18  Do not consider anything you may have seen or heard outside of

19  court, including anything from the newspaper, television, radio,

04:24  20  the Internet, or any other source.  Such reports are not

21  evidence and your verdict must not be influenced in any way by

22  such publicity.

23  Third, questions and objections by the lawyers are not

24  evidence.  Attorneys have a duty to object when they believe a

04:24  25  question is improper.  You should not be influenced by any

1015

1    objection or by my ruling on it.

2         Fourth, the lawyers' statements to you are not

3    evidence.  The purpose of these statements is to discuss the

4    issues and the evidence.  If the evidence as you remember it

5    differs from what the lawyers said, your memory is what counts.

6         Fifth, any notes you have taken during this trial are

7    not evidence.  They are only aids to your memory.  If you have

8    not taken notes, you should rely on your independent

9    recollection of the evidence and not be unduly influenced by the

10   notes of other jurors.  Notes are not entitled to any greater

11   weight than the recollection or impression of each juror about

12   the evidence.

13        It is proper for any attorney to interview any witness

14   in preparation for trial.

15        You may find the testimony of one witness or a few

16   witnesses more persuasive than the testimony of a larger number.

17   You need not accept the testimony of the larger number of

18   witnesses.

19        The defendant is presumed to be innocent of each of

20   the charges.  This presumption continues during every stage of

21   the trial and your deliberations on the verdict.  It is not

22   overcome unless from all of the evidence in the case you are

23   convinced beyond a reasonable doubt that the defendant is guilty

24   as charged.

25        The government has the burden of proving the guilt of

1016

1  the defendant beyond a reasonable doubt.  This burden stays with

2  the government throughout the case.

3  A defendant is never required to prove his innocence

4  or to produce any evidence at all.  The defendant has an

5  absolute right not to testify.  The fact that the defendant did

6  not testify should not be considered by you in any way in

7  arriving at your verdict.

8  You heard evidence of the acts of the defendant other

9  than those charged in the indictment.  You may consider this

10 evidence only on the questions of intent, lack of mistake, and

11 lack of accident.  You should consider the evidence only for

12 these limited purposes.

13 You've heard opinion evidence from Mark Miller about

14 the defendant's character.  You should consider character

15 evidence together with and in the same way as all of the other

16 evidence in the case.

17 You've heard evidence that before the trial witnesses

18 made statements that may be inconsistent with the witnesses'

19 testimony here in court.  If you find that it is inconsistent,

20 you may consider the earlier statement in deciding the

21 truthfulness and accuracy of that witness's testimony in this

22 trial.  If that statement was made under oath, you may also

23 consider it as evidence of the truth of the matters contained in

24 the prior statement.

25 The indictment in this case is the formal method of

1017

1    accusing the defendant of a crime and placing him on trial.  It

2    is not evidence against the defendant and does not create an

3    inference of guilt.  You have been provided -- you will be

4    provided copies of the indictment, and I will note that you will

5    have written instructions that will read -- you have been

6    provided with copies of the indictment.

7            Counts 1 through 4 charge the defendant with willfully

8    making and subscribing false tax returns, Forms 1040, for the

9    calendar years 2006, Count 1; 2007, Count 2; 2008, Count 3; and

10    2009, Count 4, by filing tax returns under penalty of perjury

11    with the IRS that did not report income received from, and his

12    financial interest in and signature authority over, financial

13    accounts allegedly located in India and the Bailiwick of Jersey,

14    in violation of Title 26 United States Code Section 7206(1).

15            Counts 5 through 7 charge the defendant with willfully

16    failing to file with the Commissioner of the IRS Reports of

17    Foreign Bank and Financial Accounts, Forms TD 90-22.1, FBARs,

18    for the calendar years 2007, Count 5; 2008, Count 6; and 2009,

19    Count 7, disclosing that he had a financial interest in, and

20    signature authority over, at least one financial account

21    allegedly located in India, at HSBC-India that had an aggregate

22    value of more than $10,000 during calendar years 2007, Count 5;

23    2008, Count 6; and 2009, Count 7, in violation of Title 31

24    United States Code, Sections 5314 and 5322.

25            The defendant has pleaded not guilty to the charges.

1018

1    It is the defendant, Arvind Ahuja's, position that he

2    did not wilfully file false income tax returns by willfully

3    failing to report interest income earned from his HSBC

4    certificate of deposit investments because: HSBC did not send

5    him 1099 forms stating the interest earned on his certificate of

6    deposit investments and therefore the interest income was not

7    reported on his -- reported to his accountant, Mark Miller, for

8    inclusion on his income tax returns; and there is no evidence

9    that he was aware that HSBC did not send him 1099 forms or that

10   the interest income earned from his HSBC certificate of deposit

11   investments was not reported on his income tax returns.

12   Additionally, it is Arvind Ahuja's position that he

13   did not willfully fail to disclose on Schedule B, Part III,

14   line 7a of his income tax returns a financial interest in and

15   signature authority over financial accounts located in India and

16   Jersey because:

17   There is no evidence that he knew it was his legal

18   duty to report his investments at HSBC, Citibank, HDFC, Oxus

19   Fund Management, and MF Global on Schedule B, Part III, line 7a

20   of his income tax returns;

21   His HSBC certificates of deposit were foreign

22   investments held in a domestic account, which was maintained in

23   the United States, and therefore did not require reporting on

24   Schedule B, Part III, line 7a;

25   The Citibank certificates of deposit were foreign

1019

1    investments held in a domestic account, which was maintained in

2    the United States, and therefore did not require reporting on

3    Schedule B, Part III, line 7a;

4        He did not have an account at HDFC;

5        He made foreign investments in but did not have a

6    foreign account at Oxus Fund Management, and therefore he did

7    not have an account to report on Schedule B, Part III, line 7a;

8        And he made foreign investments in, but did not have a

9    foreign account at, MF Global, and therefore he did not have an

10   account to report on Schedule B, Part III, line 7a.

11       It is Arvind Ahuja's further position that he did not

12   willfully fail to file FBARs disclosing that he had a financial

13   interest in and signature authority over a financial account

14   located in India at HSBC-India because:

15       There is no evidence that he knew it was his legal

16   duty to file FBARs; and the HSBC certificates of deposits were

17   foreign investments held in a domestic account, which was

18   maintained in the United States, and therefore did not require

19   FBAR reporting.

20       Counts 1 through 4 of the indictment allege that the

21   defendant filed false individual federal income tax returns for

22   calendar years 2006, Count 1; 2007, Count 2; 2008, Count 3; and

23   2009, Count 4.

24       To sustain each charge that the defendant willfully

25   made and subscribed a false individual income tax return, the

1020

government must prove the following propositions:

First, the defendant made or caused to be made the income tax return;

Second, the defendant signed the income tax return, which contained a written declaration that it was made under penalties of perjury;

Third, the defendant filed the income tax return or caused the income tax return to be filed with the Internal Revenue Service;

Fourth, the income tax return was false as to a material matter, as charged in the count;

And fifth, when the defendant made and signed the tax return, the defendant did so willfully and did not believe that the tax return was true, correct, and complete as to every material matter.

If you find from your consideration of all of the evidence that each of these propositions has been proved beyond a reasonable doubt as to a particular count, then you should find the defendant guilty of that particular count.

If, on the other hand, you find from your consideration of all of the evidence that any of these propositions has not been proved beyond a reasonable doubt as to a particular count, then you should find the defendant not guilty of that particular count.

You may infer and find that a tax return was, in fact,

1  signed by the person whose name appears to be signed on it.  You

2  are not required, however, to accept any such inference or to

3  make any such finding.

4         In the case of an electronically filed return, an

5  electronic signature made in accordance with guidelines

6  published by the Internal Revenue Service is for all purposes

7  the same as the written signature on a paper tax return.

8         A taxpayer's signature on a return does not by itself

9  prove beyond a reasonable doubt the taxpayer's knowledge of the

10  contents of the return.

11         Knowledge of the contents of the return may be

12  inferred from the surrounding facts and circumstances in

13  addition to the signature, which on its face, is evidence that

14  the signer knows the contents of the return.  However, the

15  government must prove beyond a reasonable doubt that when the

16  taxpayer signed his tax returns he knew they were false as to a

17  material matter.

18         A line on a tax return is a material matter if the

19  information required to be reported on that line is capable of

20  influencing the correct computation of the amount of tax

21  liability of the defendant or the verification of the accuracy

22  of the return.

23         If you find that the defendant willfully understated

24  the amount of interest income on his individual tax return, and

25  if you find that the amount of interest income on that return is

1022

1    essential to a correct computation of the amount of taxable

2    income or tax or to the verification of that return, then you

3    may find that the false and fraudulent statements were false as

4    to a material matter.

5         Counts 1 through 4 of the indictment allege that the

6    defendant committed certain specific acts.  The government need

7    not prove that each of the specific acts alleged -- each and

8    every specific act alleged was committed by the defendant.

9         However, the government must prove that the defendant

10   committed at least one of the specific acts alleged in each

11   count.  In order to find that the defendant has proved -- in

12   order to find that the government has proved the defendant

13   committed a specific act, you must unanimously agree on which

14   specific act the defendant committed.

15        For example, if some of you find that the government

16   has proved beyond a reasonable doubt that the defendant

17   willfully made a material false statement on line 8a of his 2006

18   individual income tax return and the rest of you find that the

19   government has proved beyond a reasonable doubt that the

20   defendant willfully made a material false statement on line 22

21   of his 2006 individual tax return, then there is no unanimous

22   agreement on which act has been proved and you must find the

23   defendant not guilty of Count 1.  On the other hand, if all

24   jurors find that the defendant willfully made a material false

25   statement on line 8a of his 2006 individual income tax return,

1023

1    then there is unanimous agreement.

2         The word "willfully" means the voluntary and

3    intentional violation of a known legal duty or the purposeful

4    omission to do what the law requires.

5         In order to prove that the defendant willfully failed

6    to report on lines 8a, 9a, and 22 income received from him in a

7    bank, securities, or other financial account located in India

8    and Jersey -- it should be income received by him in a bank,

9    securities, or financial account located in India and Jersey --

10   the government must prove that the defendant knew of the legal

11   duty to report on lines 8a, 9a, and 22 income received by him in

12   a bank, securities, or financial account located in India and

13   Jersey and intentionally did not report income on lines 8a, 9a,

14   and 22 received by him from a bank, securities, or other

15   financial account located in India and Jersey.

16        In order to prove that the defendant willfully failed

17   to report on Schedule B, Part III, line 7a that he had an

18   interest in or a signature or other authority over bank,

19   securities, and other financial accounts located in India and

20   Jersey, the government must prove that the defendant knew of the

21   legal duty to report on Schedule B, Part III, line 7a that he

22   had an interest in or signature or other authority over

23   securities and other financial accounts located in India and

24   Jersey and intentionally did not report on Schedule B, Part III,

25   line 7a that he had an interest in or signature or other

1024

1    authority over bank, securities, and other financial accounts

2    located in India and Jersey.

3            Although the government is required to prove beyond a

4    reasonable doubt that the defendant willfully filed a false

5    document as charged in Counts 1 through 4 of the indictment, the

6    government is not required to prove that any additional tax was

7    due to the government or that the government was deprived of any

8    tax revenues by reason of any filing of any false return.

9            Counts 5 through 7 of the indictment allege that the

10   defendant knowingly and willfully failed to file with the United

11   States Department of Treasury a report of foreign bank and

12   financial accounts for calendar years 2007, Count 5; 2008,

13   Count 6; and 2009, Count 7.

14           In order for you to find the defendant guilty of each

15   of these charges, the government must prove, with respect to

16   each count, each of the following four proposition beyond a

17   reasonable doubt:

18           First, that the defendant was a resident or citizen of

19   the United States during the year specified in the count;

20           Second, that the defendant had a financial interest in

21   or signature or other authority over at least one bank account,

22   securities, or other financial account located in India at

23   HSBC-India during the time period specified in the count, and

24   that account had a balance exceeding $10,000 in aggregate value

25   at any time during that time period;

1025

1    Third, the defendant knew he had a legal duty to file

2  a report of foreign bank and financial accounts with the

3  Department of the Treasury;

4    And fourth, the defendant knowingly and willfully

5  failed to file the report on or before June 30th of the year

6  after the year identified in the count.

7    The word "willfully" means the voluntary and

8  intentional violation of a known legal duty or the purposeful

9  omission to do what the law requires.  The defendant acted

10  willfully if he knew it was his legal duty to file an FBAR and

11  intentionally failed to do so.

12    If you find from your consideration of all the

13  evidence that the government has proved each of these

14  propositions beyond a reasonable doubt as to a particular count,

15  then you should find the defendant guilty of that count.

16    If, on the other hand, you find from your

17  consideration of all of the evidence that the government has

18  failed to prove any one of these propositions beyond a

19  reasonable doubt as to a particular count, then you should find

20  the defendant not guilty of that count.

21    U.S. persons have a financial interest in or signature

22  or other authority over one or more bank, securities, or other

23  financial accounts in a foreign country with an aggregate value

24  in excess of $10,000 are required to file a form called a

25  "Report of Foreign Bank of Financial Accounts," FBAR, to report

1026

1    the account or accounts to the commissioner of the Internal

2    Revenue Service.

3            U.S. persons with such accounts are required to file

4    an FBAR for each year in which the account exists.

04:48    5            FBARs must be filed with the commissioner of the

6    Internal Revenue Service on or before June 30 of each year with

7    respect to foreign financial accounts exceeding $10,000

8    maintained during the previous calendar year.

9            For purposes of the charges alleging that the

04:49    10   defendant willfully failed to report on Schedule B, Part III,

11   line 7a that he had a financial interest in or signature

12   authority over bank, securities, and other financial accounts

13   located in a foreign country, India or Jersey, and for the

14   charges that the defendant willfully failed to file an FBAR

04:49    15   disclosing that he had a financial interest in and signature

16   authority over at least one financial account located in a

17   foreign country, India, at HSBC-India, that had an aggregate

18   value of more than $10,000:

19            "United States persons" means a citizen or resident of

04:49    20   the United States.

21            "Bank account" means a savings account, demand

22   deposit, checking, or other account maintained with a person

23   engaged in the business of banking.  The term "other financial

24   account" means an account with a person that is in the business

04:50    25   of accepting deposits as a financial agency.  A financial asset

1027

1   can include an investment that is not held in an account.

2        A "financial interest" in a bank or other financial

3   account means an owner of record or holder of legal title,

4   whether the account is maintained for his own benefit or for the

04:50  5   benefit of others.  If an account is maintained in the name of

6   more than one person, each United States person in whose name

7   the account is maintained has a financial interest in that

8   account.

9        "Signature or other authority" means the authority of

04:51  10  an individual, alone or in conjunction with another, to control

11  the disposition of money, fund, or other assets held in a

12  financial account by direct communication, whether in writing or

13  otherwise, to the person with whom the financial account is

14  maintained.

04:51  15       A financial account is "located in a foreign country"

16  if the account is physically located and maintained outside the

17  United States.  A "foreign country" includes all geographical

18  areas located outside of the United States.  A financial account

19  is not "located in a foreign country" if it is maintained with a

04:52  20  financial institution located in the United States.  The mere

21  fact that an account may contain holdings or assets of foreign

22  entities does not render the account "foreign."

23       A defendant does not act willfully if he believes in

24  good faith that he is acting within the law or that his actions

04:52  25  comply with the law.  Therefore, if the defendant actually

1028

1  believed that what he was doing was in accord with the laws, he

2  cannot be said to have had the criminal intent to willfully

3  subscribe a false tax return or willfully failed to file an

4  FBAR.  This is so even if the defendant's belief was not

5  objectively reasonable, as long as he held the belief in good

6  faith.  However, you may consider the reasonableness of the

7  defendant's belief together with all the other evidence in the

8  case in determining whether the defendant held the belief in

9  good faith.

10        When the word "knowingly" or the phrase "the defendant

11  knew" is used in these instructions, it means the defendant

12  realized what he was doing and was aware of the nature of his

13  conduct and did not act through ignorance, mistake, or accident.

14  Knowledge may be proved by the defendant's conduct and by all

15  the facts and circumstances surrounding the case.

16        The punishment provided by law for the offenses

17  charged in the indictment is a matter exclusively within the

18  province of the Court.  In reaching the impartial verdict, you

19  should never consider what punishment the defendant might

20  receive if he is convicted of the offenses charged in the

21  indictment.

22        You may consider the punishment that Ramit Bhasin may

23  have received if he had been charged with tax crimes in

24  determining his credibility as a witness.  The indictment

25  charges that the offense was committed "on or about" a certain

1029

1    date.  The government must prove that the offense happened

2    reasonably close to that date, but it is not required to prove

3    that the alleged offenses happened on that exact date.

4              Each count of the indictment charges the defendant

5    with having committed a separate offense.  The number of charges

6    is not evidence of guilt and should not influence your decision.

7    Each count and the evidence relating to it should be considered

8    separately, and a separate verdict should be returned as to each

9    count.  Your verdict of guilty or not guilty of an offense

10   charged in one count should not control your decision as to any

11   other count.

12             MR. KIRSCH:  Your Honor, may we approach?

13             THE COURT:  Yes.

14             (At side bar on the record.)

15             MR. KIRSCH:  Your Honor, I realized as you were

16   reading an instruction, a standard pattern instruction was left

17   out of the instructions.  It's Pattern 3.13, and it's the

18   standard "great caution and care" instruction that, I think, is

19   required to be given when a witness testifies with a benefit

20   from the government.

21             And I didn't want to interrupt the court during the

22   instructions, but I did want to interrupt the court.  I felt

23   like you just read the punishment instruction.  So I wanted to

24   interrupt because this is the place that it would go, and it's

25   entirely proper, and I don't think the government deliberately

1030

1    left it out of the instructions.  I think it was just an

2    inadvertent --

3                THE COURT:  Both sides left it out.

4                MR. KIRSCH:  I'm not saying it's anybody's fault.  I'm

5    saying it's a pattern.  It's given in every case in the Seventh

6    Circuit.

7                THE COURT:  There is something else we need to address

8    as well, and I think it might be appropriate for me to send the

9    jury out so we can get all of this straightened out.  Okay?

10                MR. KIRSCH:  That's fine.  Yes.

11                THE COURT:  Okay?

12                (End of discussion at side bar.)

13                THE COURT:  We need to take a short break.  So, please

14    leave your notebooks here, return to the jury room, do not

15    discuss the case, and we will get back to you ASAP.

16                THE BAILIFF:  All rise.

17                (Jury out at 4:57 p.m.)

18                THE COURT:  Be seated, please.

19                First, we will address the issue raised by Mr. Kirsch.

20                MR. SULLIVAN:  Your Honor, Mr. Kirsch stated that it

21    would be reversible error not to give it.  If that's the case --

22                THE COURT:  Go ahead.

23                MR. SULLIVAN:  -- then the government would not want

24    reversible error.  So I'm not sure if it's required to be given

25    or not.

1031

1    MS. SISKIND:  Your Honor, does Your Honor have a

2    better copy of the comments?  I'm trying to read the comments to

3    the pattern instruction on Mr. Kirsch's Blackberry, which is not

4    being productive.

5    THE COURT:  The defense is requesting Pattern

6    Instruction 3.13, which was not included in the series of

7    instructions we discussed and the parties agreed the court

8    should give.

9    The instruction -- the committee comments to the

10   instructions are extensive.  And so what I will do is give you a

11   couple of moments to look at them, but -- when a witness is

12   given consideration, this instruction is one that this court

13   does give.  And, quite frankly, I did not think about this

14   instruction as we were going through the materials, but I do

15   note, as discussed earlier in these instructions -- in fact, at

16   Instruction Number 3, the cautions that are given to the jury,

17   which is "urge to consider any bias, prejudice, or interest a

18   witness may have," and that would include considerations that

19   may have been given to a particular witness who might otherwise

20   have been charged with a crime or given immunity.

21   I will give you a chance to look at this.

22   MR. SULLIVAN:  Your Honor, we don't object to the

23   court giving the instruction in an abundance of caution to

24   prevent any reversible error.

25   THE COURT:  Hold on for one moment.

1032

1      (Brief pause.)

2      (Discussion off the record.)

3      THE COURT:  The next instruction that I noticed and

4  marked, as I was reading them, appears to have a typo.

05:03   5  Instruction Number 21, line 5, line 4.  It says, "income

6  received from him in a bank."

7      MR. KIRSCH:  Your Honor, I think I can explain this

8  typo.  This typo comes from the Instruction 14, but I agree it's

9  a typo.  The way Instruction 14 reads, it -- I agree there's a

05:04  10  typo there.  It was -- the language -- well -- I agree that's a

11  typo, Your Honor.

12      THE COURT:  It should be "income received by him."

13      MR. KIRSCH:  I think you read it correctly.  You fixed

14  it.

05:04  15      THE COURT:  I fixed it in what I gave to the jury, but

16  I want to see whether or not we can give -- prepare another set

17  of instructions for the jury consistent with the proper

18  language.

19      Does the government see what I'm referring to?

05:04  20      MS. SISKIND:  Yes, Your Honor.  I see the typo.

21      MR. KIRSCH:  It looks like it appears two places.

22      THE COURT:  Yes.  It has a second line, where it

23  appears as well, and I believe -- it's further down the same

24  paragraph, "received by him from a bank, securities, or other

05:05  25  financial account located in India."

1033

1          Would you agree?

2          MS. SISKIND:  Your Honor, there are three instances.

3    Did Your Honor see that?

4          THE COURT:  I believe it was further down.

5          MS. SISKIND:  After each time the line numbers appear

6    in the first paragraph.

7          THE COURT:  Okay.  We'll make the corrections.  And I

8    did note something very minor.  In Instruction 23, line 6 from

9    the bottom has a double period.  It's a minor thing.

10          And Instruction Number 25, line 4, it should say "file

11    an FBAR" instead of "file an FBARs."

12          Would you agree?

13          MS. SISKIND:  Yes, Your Honor.

14          MR. KIRSCH:  Yes, Your Honor.

15          THE COURT:  All right.  What I will do is -- let me

16    see where we were.

17          MR. KIRSCH:  We had just finished Number 30,

18    Your Honor.

19          THE COURT:  We will -- I will repeat Number 30.  I

20    will go through the balance of the instruction.  I will give

21    them this cautionary instruction.  I will advise them that I

22    will not provide them -- I may -- I'm going to see if I can get

23    this copied.

24          MR. KIRSCH:  Your Honor, I guess, could I just suggest

25    we insert the new instruction as Number 31 and then just

1034

1    renumber 31 through -- did you just want to renumber 31 through

2    34 as 32 through --

3              THE COURT:  I'm looking at things logistically.

4              MR. KIRSCH:  Oh, yes.

05:08   5              THE COURT:  And my assistant, who ordinarily does

6    this, is gone.  And I'm trying to figure out how much time --

7    how much time it will take to redo these.  And considering the

8    fact that the jury is not going to stay beyond 6:00 o'clock, we

9    will complete the oral instructions and dismiss the jury and

05:09  10    have them deliberate tomorrow morning.

11              MR. WEBB:  That's fine, Your Honor.

12              THE COURT:  All right.  We will then be able to

13    make -- finalize the copies for the jury before they begin

14    deliberations tomorrow morning.  And you'll have a chance to

05:09  15    flyspeck the final, final copy before we give it to the jury.

16              MR. WEBB:  We'll stay up all night and make sure we do

17    that, Judge.

18              THE COURT:  Don't stay up all night.

19              MR. SULLIVAN:  The government will not be staying up

05:09  20    all night.

21              THE COURT:  All right.  Please bring in the jury.

22              (Jury in at 5:09 p.m.)

23              THE BAILIFF:  Please be seated.

24              THE COURT:  Members of the jury, each count of the

05:10  25    indictment charges the defendant with having committed a

1035

1    separate offense.  The number of charges is not evidence of

2    guilt and should not influence your decision.  Each count and

3    the evidence relating to it should be considered separately, and

4    a separate verdict should be returned as to each count.  Your

05:10    5    verdict of guilty or not guilty of an offense charged in one

6    count should not control your decision as to any other count.

7         The indictment which you will have will not be read at

8    this time, but you will have it in your hands in the jury room.

9         Please note that upon retiring to the jury room,

05:11    10    select one of your number as your foreperson.  The foreperson

11    will preside over your deliberations and will be your

12    representative here in court.

13         Forms of verdict have been prepared for you.

14         And I will read these forms to you, but before I do,

05:11    15    please note that you've heard testimony from Ramit Bhasin who

16    received benefits from the government in connection with this

17    case.  You may consider his testimony -- you may give his

18    testimony such weight as you feel it deserves, keeping in mind

19    that it must be considered with caution and great care.

05:12    20         Considering the time of day, I am going to terminate

21    my instructions at this time and release you for the evening.

22         Before I begin tomorrow morning -- no.  I'm going to

23    go forward, and this is what I'm going to do.

24         I will release the alternate jurors, and the

05:13    25    alternates need not return tomorrow morning.  However, the

1036

1    alternate jurors should remain available, and the bailiff will

2    get your contact information, and you should stand by and be

3    available to deliberate in this case if it becomes necessary for

4    one or both of you to serve as jurors in this matter.

05:13    5        Further note that if it becomes necessary for an

6    alternate to commence deliberations, deliberations must begin

7    anew.  In other words, the alternate has to participate in full

8    deliberations with respect to any verdict in this case.

9        Therefore, when you retire to the jury room after the

05:14    10    alternates have been released and you have returned here

11    tomorrow morning, you should take the forms.  And, when you have

12    reached unanimous agreement on the verdict, your foreperson will

13    fill in, date, and sign the appropriate form.

14        The verdict form reads:  "United States of America vs.

05:15    15    Arvind Ahuja, Case No. 12-CR-35 (sic)."

16        Verdict form:

17        "We, the jury, having been duly impaneled and sworn

18    return the following verdicts."

19        Count 1, has paren, "willfully making and subscribing

05:15    20    a false tax return for calendar year 2006."

21        There's a line for not guilty, followed by a line for

22    not guilty (sic).  Your unanimous decision with regard to Count

23    1 should be inserted there.

24        Subsequently, there is a place for your determination

05:15    25    with regard to Count 2, "willfully making and subscribing a

1037

1    false tax return for calendar year 2007."

2            Next is Count 3, "willfully making and subscribing a

3    false tax return for calendar year 2008."

4            Followed by Count 4, "willfully making and subscribing

5    a false tax return for calendar year 2009."

6            Count 5, "willfully -- willful failure to file an FBAR

7    for calendar year 2007."

8            Count 6, "willful failure to file an FBAR for calendar

9    year 2008."

10            Count 7, "willful failure to file an FBAR for calendar

11    year 2009."

12            Your verdict, as I said, should be inserted on the

13    appropriate line, and the foreperson should sign and date the

14    verdict.

15            Now, I do not anticipate that you will need to

16    communicate with me, but if you do, however, the only proper way

17    is in writing signed by the foreperson, or, if he or she is

18    unwilling to do so, by some other person and given to the

19    marshal.

20            During your deliberations, you must not communicate

21    with or provide any information to anyone by any means about

22    this case.  You may not use any electronic device or media, such

23    as telephone, cell phone, smartphone, iPhone, Blackberry, or

24    computer, the Internet, any Internet service, or any text or

25    instant messaging service, or any Internet chat room, blog, or

1038

1  website such as Facebook, Myspace, LinkedIn, You Tube, or

2  Twitter, to communicate with anyone any information about this

3  case or to conduct any research about this case until I accept

4  your verdict.

05:18  5      The verdict must represent the considered judgment of

6  each juror.  Your verdict as to each count, whether it be guilty

7  or not guilty, must be unanimous.

8      You should make every reasonable effort to reach a

9  verdict on each count.  In doing so, you should consult with one

05:19  10  another, express your own views, and listen to the opinions of

11  your fellow jurors.  Discuss your differences with an open mind.

12  Do not hesitate to re-examine your own views and change your

13  opinion if you come to believe it is wrong.  But you should not

14  surrender your honest beliefs about the weight or effect of

05:19  15  evidence solely because of the opinions of your fellow jurors or

16  for the purpose of returning a unanimous verdict.

17      The 12 of you should give fair and equal consideration

18  to all of the evidence and deliberate with a goal of reaching an

19  agreement which is consistent with the individual judgment of

05:19  20  each juror.

21      You are impartial judges of the facts.  Your sole

22  interest is to determine whether the government has proved its

23  case beyond a reasonable doubt.

24      Please approach.

05:19  25      (At side bar on the record.)

1039

1          THE COURT:  Is there anything further that the

2    government believes we need to address before releasing the

3    jury?

4          MS. SISKIND:  No, Your Honor.

5          THE COURT:  Are there any corrective instructions that

6    you believe the court needs to deliver before the jury commences

7    deliberation tomorrow?

8          MS. SISKIND:  No, Your Honor.

9          THE COURT:  Same question of the defense?

10         MR. WEBB:  Same answers.

11         THE COURT:  Very well.  I will wait until tomorrow

12    morning to swear the bailiff, and we will give you the

13    instructions before the jury is given the materials.  You'll

14    have to review the materials that go into the jury room just to

15    ensure that they are in proper order.

16         I did note that when the defense was showing some of

17    the exhibits, among the exhibits was a check from the US Bank,

18    which had the routing number of US Bank on it as well as the

19    account number at the bottom.

20         MR. KIRSCH:  That's not going back, Your Honor.

21         THE COURT:  Okay.

22         MR. KIRSCH:  I think that was the front and back of

23    the check.

24         THE COURT:  No.  It was just the front --

25         MR. KIRSCH:  Okay.

1040

1    THE COURT:  -- of Dr. Ahuja's US Bank check and with

2    the routing number at the bottom and the account number.

3    MR. KIRSCH:  I think that was a government's exhibit,

4    and I think you guys had yours redacted, and we just hadn't

05:21  5    redacted ours on that slide.

6    THE COURT:  I also noted several other exhibits that

7    had Social Security numbers -- full Social Security numbers.

8    And I believe the defense showed those during closings as well.

9    MR. WEBB:  And I think we had earlier indicated we

05:22  10   were waiving that issue because we wanted to show that he was

11   not trying to conceal his identity.

12   THE COURT:  And also -- but are you -- off the record.

13   (Discussion off the record.)

14   (End of discussion at side bar.)

05:25  15   THE COURT:  At this time the Court is releasing Jurors

16   36 and 37.  Do you recall your numbers?

17   As I said earlier, you are not required to return

18   tomorrow morning with the rest of the jury pool.  Nonetheless,

19   you are part of this case, and we will treat you as such if it

05:26  20   becomes necessary for you to return to render service in this

21   matter.  The parties thank you for your attention, as they

22   indicated during their closing arguments, and I add my thanks to

23   what they have said.

24   With that, you are released at this time and you

05:26  25   should turn your notebooks in to the bailiff.  Your notebooks

1041

1    will remain intact and they will be placed under lock and key

2    until a verdict is reached in this case or you are called back

3    into service as a juror in this matter.

4              Would the courtroom please stand as these jurors

05:27    5    depart.

6              (Alternates discharged.)

7              THE COURT:  Please be seated.

8              For the remainder of you, I do want to alert you to

9    several different things.

05:27    10             The first is:  In the jury room there is a green

11    button next to the cooler.  You can use that to alert us if you

12    have a verdict or a question that needs to be responded to.  The

13    parties will not be sitting in the courtroom as you deliberate;

14    therefore, do not expect instantaneous responses to any question

05:28    15    that may be raised.  It will be necessary for us to contact the

16    parties and have them come to the courtroom and they may not be

17    next door.  So there may be some considerable delay between any

18    question or questions that you have -- I assume there will be

19    very few, but if there are inquiries by you we will try to

05:28    20    address them in due course, and the fact that we don't respond

21    immediately does not mean that we are ignoring your concerns.

22             Additionally, I mentioned early on that you cannot

23    deliberate if someone is away from the table.  Therefore, if

24    someone is out for a smoke break or is otherwise not able to be

05:29    25    at the table, your deliberations should come to a halt until all

1042

1    12 jurors are at the table discussing the matters.

2            I do also ask that you read through the instructions

3    before you begin your deliberations tomorrow.  I will not give

4    you the instructions at this time; I have to do some tweaking to

05:29   5    a couple of typos that were discovered during the course of my

6    reading and as a result of things that the parties have brought

7    to my attention.  Hence, I do want you to know that once you

8    arrive here tomorrow morning we will let you know when you can

9    commence your deliberations.

05:29   10            With that, as soon as our bailiff returns you can go

11   to the jury room and leave your notebooks with him and he will

12   make sure that you can get out of the building.  It's now 5:30,

13   so it is likely that the front doors are locked and you will

14   have to exit the building on the east side.

05:30   15            Is there anything the parties wish me to address at

16   side bar before the jury leaves?

17            MR. WEBB:  No, Your Honor.

18            MS. SISKIND:  No, Your Honor.

19            THE COURT:  All right.  Let me check to see whether or

05:30   20   not the bailiff is in the jury room.  If not, I will take care

21   of those responsibilities.

22            (Brief pause.)

23            THE COURT:  Here he is.

24            MS. JOHNSON:  Your Honor, could you instruct them on a

05:31   25   report time for tomorrow?

1043

1    THE COURT:  I just told them 8:30, and he will

2    reiterate it in the back.  Mr. Hill?

3    THE BAILIFF:  Okay.

4    (Jury out at 5:31 p.m.)

05:31    5    THE COURT:  Please be seated.  I would ask that the

6    attorneys remain for a little while and review the exhibits

7    tonight so that we don't have a delay tomorrow morning.  I do

8    have a law clerk here who can assist you if necessary, but I

9    would like for all the exhibits to be ready to go tomorrow

05:32    10    morning so that we don't have any unnecessary delay.

11    Is there anything else?

12    MR. KIRSCH:  Can we leave them here tonight once we

13    verify them, just leave them?

14    THE COURT:  Yes.  The courtroom will be locked.

05:32    15    MR. KIRSCH:  Perfect.

16    THE COURT:  No one will be coming in except our

17    cleaning crew.  All right?

18    MS. SISKIND:  Your Honor, should we report here in the

19    morning at 8:30 as well?

05:32    20    THE COURT:  I do want you to come in at 8:30 just for

21    a short while to look over a final set of instructions and to

22    verify whether or not there are any materials that need any

23    special attention.  I ask that you flyspeck the exhibits and

24    verify what goes in so that we don't have an issue down the

05:33    25    line, particularly with respect to something that was not

1044

1    admitted or something that should have been redacted being

2    viewed by the jury.  I don't want this case to be upset in any

3    way by some materials that have not been appropriately viewed or

4    were, in fact, sent into the jury because of failure on the part

5    of someone to look closely at the materials.  We've had too many

6    instances of stuff like that as a lawyer and as a person on the

7    bench.  All right?

8              Thank you greatly.  I'll see you in the morning.

9              (Trial adjourned for the day at 5:33 p.m.)

10                            *    *    *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1045

```
 1   UNITED STATES DISTRICT COURT

 2   EASTERN DISTRICT OF WISCONSIN

 3

 4           I, JOHN T. SCHINDHELM, RMR, CRR, Official Court

 5   Reporter for the United States District Court, Eastern District

 6   of Wisconsin, do hereby certify that I reported the foregoing

 7   proceedings, and that the same is true and correct in accordance

 8   with my original machine shorthand notes taken at said time and

 9   place.

10   Dated this 21st day of August, 2012

11   Milwaukee, Wisconsin.

12

13   _____
           Official Court Reporter
14         United States District Court

15

16

17

18

19

20

21

22

23

24

25
```

```
1                      I N D E X

2    JURY INSTRUCTION CONFERENCE

3         CONT'D IN OPEN COURT.............................   901

4    GOVERNMENT CLOSING ARGUMENT

5         BY MR. SULLIVAN.................................   913

6    CLOSING ARGUMENT

7         BY MR. WEBB....................................   933

8    REBUTTAL CLOSING ARGUMENT

9         BY MS. SISKIND.................................   992

10   FINAL JURY INSTRUCTIONS

11        READ BY THE COURT..............................  1013

12


13   WITNESS   EXAMINATION                            PAGE

14   JENNIFER ANN BECK, DEFENSE WITNESS

15        DIRECT EXAMINATION BY MR. KIRSCH..............   888

16


17                      * * * * *

18                   E X H I B I T S

19   NUMBER            DESCRIPTION          OFFERED ADMITTED

20     2204   Tuckaway statement....................890     890

21     2214   HSBC 1099s (2001-2008)................895     895

22     2233   1099/K-1 Forms........................895     895

23     2234   1099/K-1 Forms........................895     895

24     2235   1099/K-1 Forms........................895     895

25     2236   1099/K-1 Forms........................895     895
```

1047