UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

───────────────────────────────────────────────────

UNITED STATES OF AMERICA,

        Plaintiff,

     v.                              Case No.  11-CR-135

ARVIND AHUJA,

        Defendant.

───────────────────────────────────────────────────

**GOVERNMENT'S SENTENCING MEMORANDUM**

───────────────────────────────────────────────────

The United States of America, by its attorneys, the United States Attorney for the Eastern District of Wisconsin and the Department of Justice, Tax Division, hereby submits this memorandum in aid of the sentencing of the defendant, Arvind Ahuja, which is scheduled for February 1, 2013.  As set forth more fully below, the government respectfully requests that the Court sentence the defendant to a term of imprisonment, and submits that a sentence within the Guideline range of 41-51 months is sufficient, but not greater than necessary, to address the sentencing concerns set forth in 18 U.S.C. § 3553(a).

## I.      <u>BACKGROUND</u>

On August 23, 2012, following a week-long trial, a jury found the defendant guilty of willfully filing a false tax return, in violation of 26 U.S.C. § 7206(1), and willfully failing to file a Report of Foreign Bank and Financial Accounts ("FBAR"), in violation of 31 U.S.C. §§ 5314 and 5322.  Both charges related to the defendant's failure to disclose the existence of, and interest income derived from his foreign bank accounts at the Hong Kong and Shanghai Banking Corporation Limited ("HSBC").

The evidence at trial established that during the years 2005 through 2009, the defendant maintained multiple bank accounts at HSBC in India ("HSBC India") and the Bailiwick of Jersey, a British crown dependency located off the coast of Normandy, France ("HSBC Jersey"). The defendant funded his HSBC India account by wire transferring more than $4 million from his U.S. Bank account in Milwaukee to an account that he maintained with HSBC in New York ("HSBC New York"). From there, the defendant directed that the funds be wired to HSBC India. Bank records from the defendant's HSBC New York account (Gov. Exh. 72) show that the defendant directed the following wire transfers from his HSBC New York account to his HSBC India account between 2005 and 2008 in the following amounts:

| DATE | AMOUNT |
|---|---|
| 11/7/05 | $1,000,000 |
| 1/31/07 | $500,000 |
| 3/16/07 | $500,000 |
| 7/30/07 | $400,000 |
| 11/7/07 | $500,000 |
| 4/17/08 | $500,000 |
| 6/17/08 | $750,000 |
| **TOTAL** | **$4,150,000** |

The defendant utilized funds from his HSBC India accounts to open additional bank and brokerage accounts in India and to invest in commercial real estate. Gov. Exhs. 2-4, 46, 80. He also directed that funds be transferred from his HSBC India and Jersey accounts to pay for personal expenses that he incurred while traveling abroad. Gov. Exhs. 59, 61 (letters signed by defendant in July 2009 directing transfers of funds from his HSBC India and HSBC Jersey accounts to a travel agency in London); Gov. Exh. 85 (letter signed by defendant in October

2

2009 directing HSBC India to provide cash to Ramit Bhasin to pay for jewelry).  Finally, to facilitate his ability to access funds in his offshore accounts, the defendant obtained multiple debit and credit cards linked to these accounts and directed that the bank use funds from his accounts to pay his credit card balances.  Gov. Exhs. 22, 32, 35.

The funds in the defendant's HSBC India account were invested in certificates of deposit ("CDs") that earned interest, sometimes at rates as high as 10.8%.  By the defendant's own admission on his amended tax returns (Forms 1040X), which he filed after learning that he was the subject of a federal criminal investigation, the funds in the defendant's HSBC India and HSBC Jersey accounts generated interest income in the following amounts:

| YEAR | INTEREST INCOME |
|---|---|
| 2005 | $719,079 |
| 2006 | $315,858 |
| 2007 | $463,480 |
| 2008 | $699,946 |
| 2009 | $566,660 |
| **TOTAL** | **$2,765,023** |

Gov. Exh. 70.  On his original 2005-2008 U.S. Individual Income Tax Returns (Forms 1040), which were prepared by CPA Mark Miller, the defendant reported interest income from several sources, including his HSBC New York account.  Gov. Exhs. 12-15; Def. Exh. 2227.  However,

3

the defendant failed to tell Mr. Miller about his interest income from his HSBC India and HSBC

Jersey accounts and, as a result, no such income was reported on his tax returns.[1]

At trial, there was no dispute that the defendant's tax returns were false because they

failed to report the existence of, and interest income derived from, his foreign bank accounts.

Instead, the defendant argued that the government failed to establish that he acted willfully when

he filed these false returns. Specifically, he claimed that the falsities on the returns were the

result of an oversight that was, in turn, the result of HSBC not sending the defendant a Form

1099 that reflected interest income generated by his accounts. To the contrary, the evidence

established that the defendant knew his foreign accounts generated interest income even without

receiving a Form 1099 and that the defendant knew that he was required to report that interest

income on his tax returns.

First, the defendant was a savvy investor who was intimately involved in his financial

affairs. Mr. Miller testified that the defendant was an "active trader" in the stock market and

"had over $245 million worth of trades" in 2008. Tr. at 544. Mr. Miller further testified that this

level of trading activity qualified the defendant as a day trader. Id. The government also

introduced an application that the defendant completed in February 2009 to invest in an oil

drilling program. In response to question four on the application, which asked the defendant to

describe his "experience in financial and business matters," the defendant wrote: "Personally run

most of my own investments." Gov. Exh. 58. This statement is supported by other evidence in

the record regarding the defendant's management of his accounts, including records reflecting

---

[1]        On his 2008 and 2009 returns, the defendant reported interest income from a bank
account at Citibank India after Citibank sent Forms 1099 reflecting that income to the IRS.
However, the defendant never told Mr. Miller that the Citibank account was a foreign account.

4

funds that the defendant wired from his HSBC New York account to his HSBC India accounts and letters from the defendant to the bank directing how funds in the account were to be spent. These documents demonstrated that, just as the defendant was intimately involved with other aspects of his financial affairs, the defendant was also directly involved in depositing money into, and withdrawing money from, his HSBC India bank accounts.

Second, the defendant knew he held CDs in India and that those CDs generated interest income. On August 9, 2005, the defendant signed two letters regarding FCNR deposits in his HSBC India accounts. Gov. Exh. 20. One letter references a $1 million FCNR deposit with a maturity date of August 3, 2006, and the other letter references a $1.8205 million FCNR deposit with a maturity date of June 19, 2006. Id. Vandana Katju, an HSBC employee, testified that "FCNR" refers to "[f]oreign currency nonresident accounts," which were CDs held in certain currencies other than Indian rupees. Tr. at 399. As the Term Deposit Advice form in Exhibit 20 shows, the $1.8205 million FCNR deposit referenced in one of the August 9, 2005 letters earned interest at a rate of 3.51%. Gov. Exh. 20. The defendant continued to write letters to the bank about CDs during the prosecution years. Specifically, on October 8, 2009, the defendant signed two letters directing HSBC India to cash out 35 CDs in his account and transfer the funds – approximately $3 million – to an account in his wife's name. Gov. Exh. 82; Tr. at 686. A tax declaration that the defendant signed in 2008 also establishes that he knew that his HSBC India account would generate interest income. In that declaration, the defendant confirmed that he was "the beneficial owner of the interest paid by the Bank during the aforesaid year [the period from April 1, 2008 to March 31, 2009]." Gov. Exh. 20. Accordingly, it is clear that beginning in at

Case 2:11-cr-00135-CNC   Filed 01/22/13   Page 5 of 34   Document 194

least 2005 the defendant knew that funds in his HSBC India account were invested in interest-generating CDs.

Third, the defendant knew that he was required to report interest income from his foreign bank accounts on his tax returns. In January 2008, a few months before his 2007 return was due, the defendant filled out an application to open an account at HSBC's New Delhi Branch. Gov. Exh. 42. The defendant's signature appears on the sixth page of this application, below a "Customer Declaration" that contained the following language: "Under current U.S. Tax laws, U.S. citizens and residents are subject to tax on their worldwide income (please consult your tax advisor regarding the tax treatment of these deposits in U.S.A. or any other country where you are subject to tax, including your country of residence/nationality)." Id. The tax declaration in Government Exhibit 47 also establishes that the defendant knew that there were tax consequences associated with his HSBC India CDs. Vandana Katju testified that HSBC India accountholders could sign this form to claim the benefits of a tax treaty between the United States and India and reduce the amount of tax they were required to pay to the Indian government on their NRO accounts. Tr. at 400-01. Ms. Katju further stated: "So if the clients said that, you know, they would like to pay the taxes in the U.S. and they'd like the tax liability in India to be reduced, the only option was for them to attest on that form." Tr. at 401. The fact that the defendant reported interest income from his Citibank India account on his 2008 and 2009 tax returns after Citibank sent him a Form 1099 further established the defendant knew that interest income earned from foreign bank accounts needed to be reported to the IRS. In light of the customer declaration in Exhibit 42, the tax declaration in Exhibit 47, and the fact that the defendant reported interest income from another foreign bank account on his returns, it is clear

6

that the defendant knew that he was required to report interest income from all of his foreign bank accounts to the IRS on his tax returns.

Finally, the evidence established that the defendant knew that his foreign interest income was not included on his 2005-2009 tax returns. The defendant signed his returns before they were filed with the IRS[2]. Gov. Exhs. 12-15; Def. Exh. 2227. The defendant's "signature, on its face, is evidence that [the defendant] knows the contents of the return," including the fact that interest income from HSBC was not reported on Schedule B. Jury Instr. No. 19. Additionally, as the government pointed out to the jury in rebuttal argument:

> [A]lthough the defendant's tax returns undoubtedly are thick, they have a lot of pages, report a lot of information, he wouldn't even need to make it past the very first page of those returns to know that his interest income was not being reported.
>
> When you go back to the jury room, take a look at line 8a on the first page of each return. That's the line where all the interest income from Schedule B gets totaled up and reported all in one place.
>
> For each of the years 2006 through 2009, the defendant would have seen that number and known that it was too low to be including all of his interest income that he was earning on that millions of dollars he invested at those high interest rates.

Tr. at 1009-10. The tax returns, combined with the surrounding circumstances, including the active role that the defendant played in the management of his offshore accounts, established that the defendant knew that his 2005-2009 returns did not include interest income from HSBC India.

At trial, and in his counsel's submission to the Probation Officer, the defendant argued that if HSBC India had sent him a Form 1099 reflecting interest income generated by his foreign CDs, then he would have provided that Form 1099 to his accountant and the interest income

---

[2]    For 2005, 2006, 2008, and 2009, the defendant's signature appears on his tax return. Because his 2007 return was electronically filed, his signature appears on the IRS e-file Signature Authorization (Form 8879).

Case 2:11-cr-00135-CNC   Filed 01/22/13   Page 7 of 34   Document 194

would have been reported on his tax return.  See e.g. Tr. at 940; PSR ¶¶ 52-54.  However, as the government argued to the jury during rebuttal argument, the defendant's position erroneously assumes that he was unable to report his HSBC India interest income to the IRS unless the bank sent him a Form 1099.  Tr. at 1003.  Vandana Katju testified that HSBC India established representative offices in the United States to assist accountholders with their banking needs, including obtaining information about their account balances.  Tr. at 363.  Ms. Katju further testified that "if a client would have a more complicated inquiry or he'd have a significant number of accounts" the employees in the representative office could request screen shots from the HSBC India computer system.  Tr. at 366.  The bank employees would then review those screen shots and provide information to the accountholder in response to their inquiry.  Id.  The government introduced screen shots for the defendant's HSBC India accounts at Government Exhibits 69 and 71, and Ms. Katju testified that they show, among other things, the amount of interest accrued on each of the defendant's CDs as of the date of the screen shot.  Tr. at 458.  Emails between HSBC bankers demonstrate that bankers in the representative office obtained these types of screen shots to provide to the defendant.  Gov. Exhs. 30, 86 (not introduced at trial).  The fact that the bank provided the defendant with these screen shots upon request demonstrates that he had access to information about his account, including the amount of income he had earned on his investments.

    There is other evidence that the defendant had access to information about income earned from his foreign bank accounts even if he did not receive a Form 1099.  For example, in January 2006, the defendant asked a banker in the HSBC India representative office in New York to fax him a copy of a bank statement for his HSBC Jersey account.  Gov. Exh. 26 (not introduced at

8

trial).  A few months later, the defendant emailed the same banker to ask about a CD that was maturing.  Gov. Exh. 29.  The banker responded to this email by providing the defendant with the information he sought.  Id.  Government Exhibit 38 is another inquiry from the defendant about one of his foreign bank accounts.  In this email, HSBC banker Priti Dhanani wrote to the defendant:

> I refer to your request for a composite statement of your Jersey investments to Ankush.  I have placed a request with our Jersey Premier division for your statements and you shall receive the same shortly at your US mailing address.  I have also requested them to send you soft copy of the same on your email address in their records. . . .  Please feel free to call me on my direct line . . . in case of any further queries.

Gov. Exh. 38.  Additionally, Vandana Katju testified that, as a Premier HSBC customer, the defendant would have received monthly statements detailing his accounts, including balances and accrued interest.  Tr. at 395.  Accordingly, even though the defendant did not receive a Form 1099 from HSBC reflecting interest income earned from his India and Jersey accounts, he had other means of obtaining the information that would have been reported on that form (i.e., by contacting his bankers or reviewing bank statements) and providing that information to his accountant so the interest income could be reported on his tax return.  That he did not receive a Form 1099 from the bank in no way absolved him of his legal duty to report that income to his CPA.

The defendant's 2005-2009 tax returns were also false because the defendant answered "no" in response to the "foreign bank account question" on Schedule B, which asks taxpayers whether they had a financial interest in or signature authority over a foreign bank account during the year covered by the return.  Again, because the defendant failed to tell CPA Mark Miller that he had foreign bank accounts, Mr. Miller did not report the accounts on the defendant's tax

9

returns.  However, the evidence at trial established that the defendant was aware of his legal duty to report this information on his tax returns, particularly with respect to the 2009 tax year.

First, as stated above, the defendant signed his 2005-2009 tax returns under penalties of perjury.  Gov. Exhs. 12-15; Def. Exh. 2227.  Schedule B, line 7a, asked whether the defendant, at any time during the year, had "an interest in or signature or other authority over a financial account in a foreign country, such as a bank account."  Id.  In response to that question, the "No" box was checked on each of the 2005-2009 tax returns, thereby reporting to the IRS that the defendant did not have any foreign bank accounts in those years.  Id.  The defendant's signature on these returns is prima facie evidence that he knew of the contents of the returns, including the existence of the foreign bank account question.

Additionally, the series of events that preceded the preparation and filing of the defendant's 2009 tax return, support a finding that the defendant acted willfully with respect to the filing of all five false returns.  First, in July 2008, the defendant signed a letter directing HSBC New York to close his bank account in New York.  Gov. Exh. 50.  The following month, on August 21, 2008, the defendant signed a letter instructing the bank to change the correspondence address associated with his HSBC India account to a residence in New Delhi, India.  Gov. Exh. 54; Tr. at 248-49.  At trial, the defendant argued that he was not aware that he had a bank account in India, and that, instead, he believed he had a US-based bank account that held foreign CDs.  However, the fact that the defendant closed his domestic HSBC account in July 2008, but continued to manage foreign HSBC accounts after that date, demonstrates that, at least as early as July 2008, he knew that he had foreign bank accounts.

10

Second, in early 2009, the defendant received the first of two Forms 1099 from Citibank India. Gov. Exhs. 10 & 11. The defendant knew that his Citibank India account was a foreign bank account because, on October 16, 2008, the defendant personally appeared in a Citibank branch in New York and signed account opening documents on which he directed Citibank to open an account for him in New Delhi. Def. Exh. 2060. Although the defendant argued at trial that he received a large volume of tax forms, including Forms 1099, each year, the evidence established, through the testimony of Ramit Bhasin, that the defendant saw his 2008 Form 1099 from Citibank India. Specifically, Mr. Bhasin testified that, in July 2009, the defendant "said that he had received a 1099 from Citibank." Tr. at 252. The Citibank India Forms 1099 were provided to CPA Mark Miller, and the interest income from these accounts was reported on Schedule B of the defendant's 2008 and 2009 tax returns. Tr. at 584; Gov. Exhs. 14, 15. Even though the defendant knew that he had a foreign bank account at Citibank, the defendant never told his accountant that the Forms 1099 were associated with a foreign account, and nothing on the face of the forms permitted Mr. Miller to draw that conclusion on his own. Tr. at 543, 648. The concealment of this fact from his accountant supports a finding that the defendant intended to conceal the existence of foreign bank accounts from the IRS.

The facts and circumstances that establish willfulness also include the Bloomberg news article that the defendant emailed to Ramit Bhasin in July 2009. Gov. Exh. 8. This article stated, in relevant part:

> HSBC Holdings Plc's Swiss private bank last September asked clients and independent money managers to surrender their right to banking secrecy protection in order to keep securities invested in 28 countries.
>
> In countries where rules demand investor disclosure, HSBC asked for permission to hand over the names of clients that want to keep their investments, the Geneva-

11

based bank said in a letter that it e-mailed to Bloomberg News today. Those
countries include Brazil, China, India and Greece.

Gov. Exh. 8. As the government argued to the jury:

> This is an e-mail sent between two men, both of whom had undeclared foreign
> bank accounts. There's no text in that e-mail. They never had any follow-up
> conversations because they didn't have to. They both knew what it meant.
> HSBC-India was thinking about turning over the names of accountholders. They
> knew that that meant they would not be able to fly under the radar very much
> longer, and that their accounts would soon be discovered.

Tr. at 1008. The defendant's blank email to Ramit Bhasin with the attached Bloomberg news
article speaks volumes about his mental state in the summer of 2009 and shows that the
defendant intentionally failed to disclose the existence of his foreign bank accounts when he
signed his tax returns.

The evidence at trial also established that the defendant continued to manage his offshore
bank accounts in July 2009. On July 21, 2009, the defendant signed a letter directing HSBC to
wire funds from his HSBC Jersey account to Lanza & Baucina Limited, a boutique travel agency
in London, England. Gov. Exh. 59. Ten days later, the defendant signed a letter directing the
bank to transfer additional funds from his HSBC India account to the same company. Gov. Exh.
60. Both letters bear the defendant's signature and direct the bank to contact him on his cell
phone if necessary. Gov. Exhs. 59, 61.

With his foreign bank accounts on his mind, and being fully aware of the threat that
HSBC might disclose his name to the U.S. government, the defendant met with his accountant in
August 2009. CPA Mark Miller testified about that meeting: "And my recollection is, is that I
would have told him that there are new penalties -- enhanced penalties regarding reporting of
foreign bank or foreign financial accounts and that if he has any that we would need to address

those." Tr. at 548; see also Tr. at 646 (confirming that Miller advised the defendant of the FBAR reporting requirements in August 2009). After being advised of the enhanced penalties, the defendant told Mr. Miller "that there were a couple of banker brokerage accounts that he wanted to check into, that he would get back to [Mr. Miller] if he had determined that he had a foreign account, and that there was nothing [Kolb+Co.] needed to do at that time." Id. Asked if the defendant ever provided Mr. Miller with information about foreign bank accounts after that meeting, Mr. Miller testified: "I do not have any recollection of that discussion and there's no notes in our files indicating that I had such a discussion with him." Tr. at 549. Even though this meeting occurred mere weeks after the defendant sent the Bloomberg article to Mr. Bhasin and directed the transfer of funds from his HSBC Jersey account, the defendant made no mention of foreign bank accounts to his accountant even when specifically informed of the reporting requirements. By August 2009, the defendant was on direct notice from his accountant that foreign bank accounts needed to be reported to the IRS. That he continued to conceal his foreign accounts from Mr. Miller after this meeting is compelling evidence of willfulness, not just for the 2009 tax year but for all preceding years.

In the month following the face-to-face meeting with Mr. Miller during which foreign bank account reporting was discussed, the defendant continued to manage his offshore accounts. On September 21, 2009, the defendant sent a letter to HSBC Jersey directing the bank to close his HSBC Jersey account. Gov. Exh. 62. The bank obliged, and sent the defendant a check for 4,696.71 pounds on October 19, 2009. Gov. Exh. 64. Also in October 2009, the defendant signed a letter instructing the bank to provide Ramit Bhasin with cash from the defendant's HSBC India account to pay for jewelry that the defendant purchased in India. Gov. Exh. 85.

13

Two days later, the defendant sent two letters to HSBC India to break CDs in his account and transfer more than $3 million to a new offshore account in his wife's name. Gov. Exh. 82. After the August 2009 meeting, during the time in which he promised his accountant he would follow up if there were any foreign bank accounts that needed to be reported, the defendant was actively managing his offshore accounts. At no time, however, did the defendant return to his accountant and tell him that he had bank accounts in India and Jersey.

Nor did the defendant disclose this information to his accountant at the next face-to-face meeting, which occurred in December 2009. The agenda from this meeting includes the following entry: "Remember we will have a FBAR reporting for any foreign bank accounts." Gov. Exh. 18. Mr. Miller testified that it was his "general protocol" to provide a copy of the agenda to the defendant during tax planning meetings. Tr. at 552. He further testified that this item was included on the agenda "because of the meeting that we had earlier in the year in August where there was some question as to whether or not there were any foreign bank accounts." Id. Although, Mr. Miller could not recall whether the FBAR reporting issue was addressed at the meeting, he confirmed several times that if there was a written agenda, as there was at the December 2009 meeting, a copy would have been given to the defendant. Tr. at 552-53. Despite the presence of this item on the agenda, the defendant never told Mr. Miller about his foreign bank accounts during the December 2009 tax planning meeting or at any other time prior to the filing of his 2009 tax return. Tr. at 554.

Mr. Miller also testified that on December 29, 2009, Kolb+Co. mailed a tax organizer to the firm's clients, including the defendant. Tr. at 555. Included with the 2009 tax organizer was a page titled "2009 Tax Return Reminders," which Mr. Miller testified was printed on a different

14

color paper than the rest of the organizer "[s]o that it stands out." Tr. at 556. The reminder sheet included the following paragraph:

> **<u>FOREIGN BANK ACCOUNT REPORTING ("FBAR"):</u>** The Treasury Department and IRS impose strict rules on the reporting of foreign bank accounts that you own, control, or have signature authority over. Please inform us if you have any such accounts so that the appropriate separate filings can be made. Severe penalties may be imposed on noncompliance with these FBAR filings.

Gov. Exh. 19. (emphasis in original). This insert in the 2009 tax organizer reiterated what the defendant already knew from his two face-to-face meetings with Mr. Miller – that he was required to file an FBAR to report his foreign bank accounts to the government.

On at least three occasions leading up to the preparation of the defendant's 2009 tax return, CPA Mark Miller directly asked the defendant for information about foreign bank accounts. Even though the defendant was managing his foreign accounts during this time period, he never mentioned the existence of those accounts to Mr. Miller. Mr. Miller testified that, had the defendant told him that he had foreign bank accounts, Mr. Miller would have "verified that the account was, in fact, a foreign bank account" and then informed the defendant "that that box needs to be checked yes, that he needs to indicate the name of the country." Tr. at 546. Mark Miller never specifically discussed the foreign bank account question with the defendant because the defendant kept Mr. Miller in the dark about the existence of his foreign bank accounts, even after Mr. Miller raised the issue of foreign bank account reporting at two meetings with the defendant.

Throughout the year that preceded the signing of the defendant's 2009 return, the defendant actively managed his foreign bank accounts at the same time that he was monitoring the news for stories about foreign bank secrecy and meeting with his accountant to discuss

foreign bank account reporting requirements. That he did not disclose those accounts to Mr. Miller demonstrates that he intended to conceal those accounts from his CPA and cover up the fact that he had not reported more than $2.7 million of interest income on his 2005-2009 tax returns. The events that preceded the filing of the 2009 return are compelling evidence of wilfulness – not just as to the 2009 return, but as to the earlier returns as well. The fact that the defendant concealed his accounts from Mr. Miller after being specifically informed of the reporting requirements gives rise to an inference that his failure to provide that information to Mr. Miller in earlier years was also willful.

Finally, the evidence at trial established that the defendant failed to file FBARs for the years 2006-2009 and that his failure to file a 2009 FBAR was willful. If a taxpayer has more than $10,000 in foreign bank accounts during a given year, he is required to file an FBAR in addition to reporting the existence of those accounts to the IRS on Schedule B of his tax return. As demonstrated by the chart below, the high balances in the defendant's HSBC India accounts for the years 2006-2009 were substantially in excess of the $10,000 threshold.

| YEAR | HIGH BALANCE |
|------|--------------|
| 2006 | $5,343,246.86 |
| 2007 | $8,695,095.12 |
| 2008 | $8,416,363.43 |
| 2009 | $8,760,948.35 |

Gov. Exh. 69.

There is no dispute that the defendant failed to file FBARs for the years 2006-2009. Although he argued at trial that he was not aware of his legal duty to do so, the government's evidence was to the contrary. Schedule B, Line 7a, of the defendant's 2007-2009 tax returns

16

contained the foreign bank account question, which asked the defendant whether he had "an interest in or signature or other authority over a financial account in a foreign country, such as a bank account." After that question, the following statement appeared: "See instructions for exceptions and filing requirements for Form TD F 90-22.1" which is also know as the FBAR. As stated above, the defendant's signature on this return is prima facie evidence that he was aware of its contents, and specifically of its reference to the FBAR. In at least two FBAR cases, courts have found that the reference to the FBAR on a defendant's tax returns puts him on notice of the filing requirement.

However, the defendant's signature on his 2007-2009 tax returns is not the only evidence that established that the defendant was aware of his legal duty to file an FBAR. Instead, the jury heard about CPA Mark Miller's repeated efforts to inform the defendant that he was required to report the existence of foreign bank accounts to the government. As discussed above, the subject of foreign bank account reporting came up in two face-to-face meetings between the defendant and his account; in August 2009, Mr. Miller advised the defendant about "enhanced penalties regarding reporting of foreign bank or foreign financial accounts," Tr. at 548, 646, and in December 2009, Mr. Miller provided the defendant with a meeting agenda that reminded him of the need to file an FBAR to report foreign bank accounts, Gov. Ex. 18. The FBAR reporting requirement was also mentioned in a reminder letter that was included with the defendant's 2009 tax organizer. Gov. Ex. 19. Accordingly, the evidence at trial established that the defendant knew that he was required to file an FBAR to report his foreign bank accounts to the government but failed to do so.

Case 2:11-cr-00135-CNC   Filed 01/22/13   Page 17 of 34   Document 194

## II.    SENTENCING CONSIDERATIONS

A.    Statutory Maximum Sentence

The statutory maximum sentences for the offenses of conviction are as follows:

| Charge | Maximum Term of Imprisonment | Maximum Term of Supervised Release | Maximum Fine |
|---|---|---|---|
| 26 U.S.C. § 72061(1) | 3 years | 1 year | $250,000 |
| 31 U.S.C. §§ 5314 and 5322 | 5 years | 3 years | $250,000 |

B.    United States Sentencing Guidelines

Although the United States Sentencing Guidelines ("U.S.S.G.") are advisory, the Supreme Court has declared that "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for sentencing.  Gall v. United States, 128 S. Ct. 586, 596 (2007).  The government concurs with the guidelines calculation in the Presentence Investigation Report.  See PSR ¶¶ 100-117.

1.    *Applicable Guideline Provisions*

Violations of 26 U.S.C. § 7206(1) are governed by U.S.S.G. § 2T1.1, whereas violations of 31 U.S.C. §§ 5314 and 5322 are governed by U.S.S.G § 2S1.3.  Appendix A to U.S.S.G. These offenses group together pursuant to U.S.S.G. § 3D1.2(d).  Additionally, § 2S1.3(c)(1) provides that if the offense (i.e., willfully failing to file an FBAR) was committed for the purposes of violating the internal revenue laws, the Court should apply the appropriate guideline from Part T, which, in this case, is § 2T1.1, if the resulting offense level under Part T is greater than the resulting offense level under § 2S1.3 (which it is in this case).  Accordingly, the guideline calculation in this case is governed by § 2T1.1

Case 2:11-cr-00135-CNC   Filed 01/22/13   Page 18 of 34   Document 194

2.    *Tax Loss*

The base offense level under § 2T1.1 is based on the tax loss from the table in § 2T4.1. In cases involving false tax returns, "the tax loss is the total amount of loss that was the object of the offense (<u>i.e.</u>, the loss that would have resulted had the offense been successfully completed). U.S.S.G. § 2T1.1(c)(1).  Accordingly, the tax loss in this case is equal to the additional tax that the defendant would have been required to pay if he had accurately reported interest income from his offshore bank accounts on his tax returns.

When calculating tax loss, the Court should include the offense of conviction as well as any relevant conduct, defined as all acts committed by the defendant "that were part of the same course of conduct or common scheme or plan as the offense of conviction."  U.S.S.G. § 1B1.3(a)(2).  All violations of "the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated."  U.S.S.G. § 2T1.1, Application Note 2.  The Application Note further provides:

> The following examples are illustrative of conduct that is part of the same course of conduct or common scheme or plan: (a) there is a continuing pattern of violations of the tax laws by the defendant; (b) the defendant uses a consistent method to evade or camouflage income, <u>e.g.</u>, backdating documents or using off-shore accounts; (c) the violations involve the same or a related series of transactions; (d) the violation in each instance involves a false or inflated claim of a similar deduction or credit; and (e) the violation in each instance involves a failure to report or an understatement of a specific source of income, <u>e.g.</u>, interest from savings accounts or income from a particular business activity.

<u>Id</u>.  As described in the offense conduct above, all of the false returns in this case were part of the same course of conduct and involved a common scheme or plan.  In particular, they are all false in the same way; on each of the defendant's 2005-2009 tax returns, he failed to report the

19

existence of, and interest income derived from, his foreign bank accounts. Such a pattern of falsities clearly satisfies the relevant conduct standard.

The fact that the defendant was not charged with filing a false 2005 tax return does not preclude the Court from considering it as relevant conduct. United States v. Bove, 155 F.3d 44, 47-48 (2d Cir. 1998) (relevant conduct "clearly encompasses both charged and non-charged conduct"); United States v. Hatchett, 31 F.3d 1411, 1419 (7th Cir. 1994) (uncharged narcotics included as relevant conduct in computing offense level); United States v. Johnson, 971 F.2d 562, 576 n.10 (10th Cir. 1992) (funds associated with uncharged instances of money laundering can be included to determine the offense level under §2S1.1 if those acts are within the scope of relevant conduct under §1B1.3(a)(2)).

Nor is the fact that the jury acquitted the defendant of filing false 2006-2008 tax returns a bar to including the loss associated with those returns as relevant conduct. United States v. Watts, 519 U.S. 148, 157 (1997) (at sentencing, even the "jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge"); United States v. Waltower, 643 F.3d 572, 577 (7th Cir. 2011) ("Every circuit to have considered the question post-Booker, including ours, has held that acquitted conduct may be used in calculating a guidelines sentence, so long as proved by a preponderance standard.").

The government has the burden of proving relevant conduct, including uncharged and acquitted conduct, by preponderance of the evidence. U.S.S.G. § 6A.13, commentary. In other words, the government must prove, by a preponderance of the evidence, that the defendant willfully filed materially false tax returns for the years 2005-2008 in order for these years to be

Case 2:11-cr-00135-CNC   Filed 01/22/13   Page 20 of 34   Document 194

considered – along with the 2009 tax return – for purposes of calculating tax loss. The government submits that the facts set forth above are sufficient to meet this standard.

The Court should reject the defendant's assertion that the tax loss in this case is $0. PSR ¶¶ 42, 70. Even if the jury based its guilty verdict on the false tax return charge on the defendant's failure to disclose the existence of his offshore accounts, as the defendant suggests, there was still sufficient evidence presented at trial to permit this Court to conclude, by a preponderance of the evidence, that the defendant willfully failed to report the interest income as well. If the calculation of tax loss at sentencing turned solely on a jury's verdict, then courts would never be able to consider acquitted or uncharged conduct when calculating the guideline range. But the case law is clear on this matter – so long as the Court finds, by a preponderance of the evidence, that the defendant willfully failed to report interest income from his foreign bank accounts on his 2005-2009 tax return, then the Court may include the loss associated with those false returns when calculating the Guideline range. Accordingly, the Court should reject the defendant's arguments and the loss associated with all five years (2005-2009) should be included in the guideline calculation.

The calculation should also take into account the loss associated with the defendant's 2005-2009 Wisconsin income tax returns, which understated the defendant's adjusted gross income. See, e.g., United States v. Yip, 592 F.3d 1035, 1039 (9th Cir. 2010); United States v. McElroy, 587 F.3d 73, 88 (1st Cir. 2009); United States v. Fitzgerald, 232 F.3d 315, 318 (2d Cir. 2000); United States v. Schilling, 142 F.3d 388, 390 (7th Cir. 1998). The calculation of tax due on the Wisconsin income tax return is based, in part, on the adjusted gross income that the taxpayer reported on his federal tax return. Because the defendant's 2005-2009 federal returns

underreported his adjusted gross income, so too did his Wisconsin tax returns. Accordingly, there is an additional tax due to the state of Wisconsin that should be included in the tax loss.

In light of these precedents, the government submits that the tax loss computation is as follows:

| Year | Additional Federal Tax Due | Additional State Tax Due | Tax Loss |
|---|---|---|---|
| 2005 | $259,228.00 | $48,537.83 | $307,765.83 |
| 2006 | $110,551.00 | $21,320.42 | $131,871.42 |
| 2007 | $129,091.00 | $31,284.90 | $160,375.90 |
| 2008 | $189,824.00 | $47,246.36 | $237,070.36 |
| 2009 | $86,945.00 | $43,916.15 | $130,861.15 |
| TOTAL | $775,639.00 | $192,305.66 | $967,944.66 |

3. *Sophisticated Means Sentencing Enhancement*

Section 2T1.1(b)(2) of the Guidelines provides for a two-level adjustment if the tax offense involves "sophisticated means," defined as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of the offense." U.S.S.G. § 2T1.1, Application Note 4. The examples provided by the comment to § 2T1.1(b)(2) include the use of offshore financial accounts. Id. The Seventh Circuit has described this enhancement as follows:

> In light of its purpose and context, we think "sophistication" must refer not to the elegance, the "class," the "style" of the defrauder – the degree to which he approximates Cary Grant – but to the presence of efforts at concealment that go beyond (not necessarily far beyond, for it is only a two-level enhancement that is at issue, which in this case added roughly six months to the defendants' sentences) the concealment inherent in tax fraud. It is true that the guideline commentary illustrates with examples suggesting a higher level of financial sophistication . . . .

Case 2:11-cr-00135-CNC   Filed 01/22/13   Page 22 of 34   Document 194

But these are offered as examples . . . the essence of the definition is merely "deliberate steps taken to make the offense ... difficult to detect."

United States v. Kontny, 238 F.3d 815, 821 (7th Cir. 2001) (citations omitted).

This is not a case about a mere failure to report interest income. Instead, the defendant used offshore bank accounts to make his crimes more difficult for the IRS to detect. Notably, foreign financial institutions do not file Forms 1099 with the IRS to report interest or other income earned by a taxpayer from that account. The fact that the defendant's accounts were located in another country also enabled the defendant to ensure that account-related documents, such as bank statements, would remain outside the jurisdiction of the United States. To this end, the defendant directed HSBC to hold his mail at the bank in India. Gov. Exh. 39 (not introduced at trial). After a statement was accidentally sent to the defendant's house in Wisconsin despite the mail hold instructions, see Gov. Exh. 48 (not introduced at trial), the defendant contacted the bank a second time and changed the correspondence address associated with his account to an address in India occupied by Ramit Basin's father-in-law. Gov. Exh. 54.

The mail hold and the subsequent use of an Indian mailing address were of paramount importance to the defendant's concealment of his accounts. At trial, Mr. Miller testified that Thomas Branch, the corporate controller at the defendant's surgical practice, was responsible for gathering information from the defendant that Mr. Miller would need to prepare the tax returns. Tr. at 533, 568. To that end, the defendant and his wife provided Mr. Branch with bank statements and tax documents that were mailed to their home and Branch would, in turn, provide those materials to Mr. Miller's office. Branch MOI at ¶¶ 5, 7; Branch Grand Jury Tr. at 10.

23

That the defendant used email to communicate with HSBC bankers or had documents sent to his home in Wisconsin, as the defendant points out, does not undermine the government's evidence with respect to concealment because the defendant knew that, unlike bank statements, there was little risk of these emails making their way to Mr. Miller.

The sophistication of the defendant's offenses also demonstrated by the disposition of a check for 4,696.71 pounds that the defendant received after he closed his HSBC Jersey account in September 2009. The following diagram demonstrates the circuitous path that this check took from the time that it was issued by HSBC Jersey until the time that the defendant accessed the funds while traveling to London[3]:



# Flow of Funds – Check # 14221397

---

[3]        Exhibits 65, 87 and 88 were not introduced as evidence at trial.

24

Case 2:11-cr-00135-CNC   Filed 01/22/13   Page 24 of 34   Document 194

When the defendant received the check in Wisconsin in October 2009, he could have deposited it in one of his domestic bank accounts. Instead, he provided it to the HSBC New York representative office (likely during a face-to-face meeting with a banker at the Four Seasons hotel), who, in turn, arranged to have the check sent to England for processing so that it could ultimately be deposited in the defendant's HSBC India account and accessed by the defendant while traveling abroad. This series of events ensured that the defendant could access the funds from his HSBC Jersey account without creating any records at financial institutions in the United States.

In light of this transaction, and the defendant's overall use of foreign bank accounts to conceal income from the government, it is clear that the defendant's crime involved "efforts at concealment that go beyond . . . the concealment inherent in tax fraud." <u>Kontny</u>, 238 F.3d at 821. Accordingly, the sophisticated means sentencing enhancement should apply in this case.

    4.    *Guideline Range*

Based on the foregoing, the guideline range is calculated as follows:

| | | |
|---|---|---|
| Base offense level | 20 | Loss more than $400,000, less than $1 million – U.S.S.G. § 2T.4.1(H) |
| Specific offense characteristics | + 2 | Sophisticated means – U.S.S.G. § 2T1.1(b)(2) |
| Total offense level | 22 | |
| Criminal History Category | I | |
| **Guideline Range** | **41-51 months** | |

C.    Statutory Sentencing Factors

In addition to considering the advisory sentencing range set forth in the United States Sentencing Guidelines, the Court must also consider the sentencing factors set forth in 18 U.S.C. § 3553(a).

1.    *Nature and Circumstances of the Offense*

The first factor that the Court must consider is "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1).  As described above, the offense in this case spanned at least five years and resulted in the filing of at least five false tax returns with the IRS.  But the offense is not limited to the filing of false documents.  Instead, the defendant attempted to conceal his foreign bank accounts from the government by first, directing that the bank in India hold all account-related mail, and later, changing his correspondence address to India to ensure that no statements would inadvertently make their way to his house in Wisconsin and into the hands of his accountant.  The defendant also persisted in his concealment even after receiving three direct warnings from Mr. Miller about the need to report foreign bank accounts.  The sentence imposed in this case must reflect the fact that the defendant engaged in a five-year pattern of fraudulent conduct designed to deprive the IRS of nearly $1 million in taxes.

2.    *History and Characteristics of the Defendant*

A related factor that the Court must consider in imposing a sentence is "the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  The defendant is highly educated and financially savvy.  During the years at issue in this case, he played a direct role in his financial affairs and managed his own investments despite his busy work schedule.  By operating a

successful neurosurgery practice and making sophisticated investments in this country and abroad, the defendant accumulated a net worth of more than $63.5 million.  PSR ¶ 142.

The character letters submitted by the defendant in support of his request for a lenient sentence paint the picture of a loving family man, successful physician, and contributor to his community.  But these descriptions should be viewed in the context of what is typical and expected of individuals who have reached the defendant's station in life.  The fact that the defendant is well-regarded by his family, patients, and peers does not change the fact that he lied to his accountant and defrauded the government out of nearly $1 million.

The defendant asserts that a prison sentence will have adverse financial consequences for his medical practice, which he claims will close if he is incarcerated.  The Fourth Circuit addressed this issue in the companion cases of <u>United States v. Baucom</u> and <u>United States v. Davis</u>, 360 Fed. Appx. 457 (4th Cir. 2010).  In those cases, the trial court varied downward from the advisory guideline range of 33-41 months and sentenced Davis to four years of probation. <u>Id</u>. at 460-61.  As a basis for that sentence the trial court highlighted Davis's lack of a criminal record, "the support he provides to his family, his gainful employment, [and] the effect on large numbers of employees who would be out of work" if the defendant were sentenced to a term of imprisonment.  <u>Id</u>. at 461.  On appeal, the Fourth Circuit vacated the sentenced, explaining that:

> Sentencing a defendant to prison will always have an effect, often a very serious negative effect, on the lives of others – families lose caretakers and providers, and employees sometimes lose their employers.  In the usual case, however, the effect of the sentence on others is an insufficient basis for rejecting a term of imprisonment.  Moreover, because defendants who have employees are more likely to be wealthy, the approach taken by the district court in this case would, as the government argues, have the effect of reward[ing] the wealthy with probationary sentences while punishing the impoverished with incarceration.  While the socio-economic status of a defendant may sometimes be relevant to certain aspects of the sentencing process, it should not play the kind of role that it

27

played in the district court's decision in this case to entirely disregard the sentence recommended by the Guidelines.

United States v. Baucom, 360 Fed. Appx. 457, 465 (4th Cir. 2010) (citations omitted). Judge Sweet of the Southern District of New York also discussed the extent to which the affect of a sentence of the defendant's business should be considered by a court at sentencing in United States v. Barbera, No. 02-CR-1268, 2005 WL 2709112 (S.D.N.Y. Oct. 21, 2005). In that case the Court declined to grant a downward departure based on the defendant's operation of a medical practice that employed four individuals and the potential adverse consequences for that practice that would flow from the defendant's incarceration. Id. at *14. Judge Sweet also distinguished the facts of Barbera's case from those present in United States v. Milikowsky, 65 F.3d 4 (2d Cir. 1995), in which the defendant's company had between 150-200 employees and the defendant was the only individual capable of running the company. Id. The defendant in this case acknowledges that he is one of five neurosurgeons in the practice who perform surgeries at St. Luke's Hospital. PSR ¶ 139. Accordingly, there are other doctors who can fill the void left by the defendant if he is incarcerated.

Similarly, the Court should not be swayed by the defendant's bombastic claim that patients will die if he is sentenced a term of imprisonment. PSR ¶ 139. In Barbera, Judge Sweet noted:

> [T]he Court appreciates the hardship in finding a new doctor imposed on Barbera's patients, many of whom are elderly and ill and all of whom are innocent third parties. Although many of these patients have sought treatment from Barbera exclusively, Barbera's medical expertise is not irreplaceable. Despite the inevitable inconvenience of continuing an on-going treatment for a chronic illness with a new doctor should Barbera be incarcerated, such adverse effects thrust upon Barbera's patients provide no basis for a downward departure under the facts presented.

28

Barbera, 2005 WL at *14. By the defendant's own admission, there are at least four other neurosurgeons at St. Luke's Hospital who can ensure that the defendant's patients are cared for in his absence. Overall, although the collateral consequences of an incarcerative sentence in this case may be regrettable, they do not permit this Court to vary so far from the sentence recommended by the Guidelines and impose a term of probation in lieu of incarceration.

3. *Need for Sentence to Reflect Seriousness of the Offenses, Promote Respect for the Law, and Provide Just Punishment for the Offenses*

Section 3553(a)(2)(A) provides that sentences must reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. The government submits that a sentence that does not include a term of incarceration does not constitute just punishment because it is tantamount to no sentence at all. During the year that he was under court supervision pending trial in this case, the defendant was with his family, able to work, and free to travel, nearly unrestricted throughout the United States. Even after being convicted by a jury on two felony violations of federal law, he continues to live with limited constrains on his liberty. The government submits that a probationary sentence is inappropriate because it will do nothing to alter the defendant's reality. He will go on living as he has since he was indicted in June 2011. This is not what Congress intended when it directed the Court to impose sentences that reflect the seriousness of the offense, promote respect for the law, and provide just punishment.

4. *General Deterrence*

Section 3553(a)(2)(B) provides that the sentence imposed should "afford adequate deterrence to criminal conduct." This factor codifies the penal goal of general deterrence.

United States v. Russell, 600 F.3d 631, 637 (D.C. Cir. 2010). General deterrence is one of the prescribed goals of every sentencing, United States v. Pugh, 515 F.3d 1179, 1194 (11th Cir. 2008), but it occupies an especially important role in sentencing for criminal tax offenses, because criminal tax prosecutions are relatively rare. As the Sentencing Commission has stated:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

Introductory Cmt. to U.S.S.G. § 2T1.1; see also United States v. Burgos, 276 F.3d 1284, 1290 (11th Cir. 2001) (observing "[f]or a judge sentencing a defendant convicted of tax evasion, the chief concern may be general deterrence"). Accordingly, the sentence imposed in this case should send the message that U.S. citizens who attempt to conceal income from the IRS through the use of offshore bank accounts face significant criminal penalties.

        5.    *Sentencing Guidelines*

Although the United States Sentencing Guidelines are now advisory, § 3553(a)(4) directs the Court to consider "the kinds of sentence and the sentencing range established for (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines."

The Sentencing Guidelines reflect the consensus that those convicted of economic crimes should not be able to avoid incarceration. The legislative history of the Sentencing Reform Act of 1984, which created the United States Sentencing Commission, made clear that one of the

Act'' goals was to rectify a serious problem in the criminal justice system: "some major offenders, particularly white-collar offenders . . . frequently do not receive sentences that reflect the seriousness of their offenses." See U.S.C.C.A.N., 98th Cong., 2nd Sess. (1984) at 3260. As Justice Breyer, previously an original member of the Sentencing Commission, explained:

> The Commission found in its data significant discrepancies between pre-Guideline punishment of certain white-collar crimes, such as fraud, and other similar common law crimes, such as theft. The Commission's statistics indicated that where white-collar fraud was involved, courts grant probation to offenders more frequently than in situations involving analogous common law crimes; furthermore, prison terms were less severe for white-collar criminals who did not receive probation. To mitigate these discrepancies, the Commission decided to require short but certain terms of confinement for many white collar offenders, including tax, insider trading, and antitrust offenders, who previously would have likely received only probation.

See Breyer, "The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest," 17 Hofstra L. Rev. 1, 20 (1988). This approach provides just punishment for the considerable harm that white collar crimes cause society.

The wisdom of the Sentencing Commission is reflected in prior sentences imposed by this Court in white collar cases. Examples of cases in which this Court has sentenced defendants in tax and other fraud cases to prison include:

- James A. Stuart, 2:10-cr-288 – This Court sentenced Stuart to 33 months imprisonment after a jury convicted him of three counts of tax evasion. According to the government's trial brief, Stuart failed to report income from his chemical company over a three-year period and persisted in his misconduct even after receiving warnings from the IRS.

- Sam Burnette, 2:07-cr-74 – After pleading guilty to two counts of filing false claims for tax refunds, this Court sentenced the defendant to 22 months of

31

imprisonment. According to the plea agreement, the tax loss associated with his conduct was between $120,000 and $200,000.

- <u>James Wierzbicki, 2:09-cr-278</u> – Wierzbicki pleaded guilty to conspiracy to defraud the United States. This Court sentenced the defendant to 32 months imprisonment for his role in the scheme, which resulted in loss of between $400,000 and $1 million.

- <u>Jack Kuhn, 2:05-cr-133</u> – This Court sentenced Kuhn to 21 months in prison after he pleaded guilty to wire fraud and tax evasion. The loss associated with the defendant's conduct was between $350,000 and $500,000.

- <u>Shurone Nash, 2:12-cr-119</u> – Nash entered a pre-indictment plea to wire fraud and filing a false tax return. Her actions resulted in a tax loss of $92,800. This Court sentenced Nash to 20 months in prison.

As it was in the cases cited above, a sentence of imprisonment is also appropriate in the present case. The Guideline range of 41-51 months falls within Zone D of the Sentencing Table. When the Guidelines were mandatory, a range in Zone D required a sentence of incarceration. U.S.S.G. § 5C1.1(f). This demonstrates that the Sentencing Commission intended for white collar defendants like Dr. Ahuja to receive sentences of incarceration for their crimes.

6.    *Avoiding Unwarranted Sentencing Disparities*

Section 3553(a)(6) provides that the Court must consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." To that end, the Court should consider sentences received by defendants, in

cases involving the non-disclosure of offshore bank accounts, who pleaded guilty prior to indictment to either filing a false tax return or failing to file an FBAR.

| Case | Charge | Guideline Range | Sentence Received |
|------|--------|-----------------|-------------------|
| Lucille Jackson (2:10-cr-797) (D. New Jersey) | 26 U.S.C. § 7206(1) | 6-12 months | 1 year probation |
| Arthur Joel Eisenberg (2:10-cr-369) (W.D. Washington) | 26 U.S.C. § 7206(1) | 12-18 months | 3 years probation |
| Harry Abrahamsen (2:10-cr-254) (D. New Jersey) | 31 U.S.C. §§ 5314, 5322 | 21-27 months | 3 years probation |
| Sean and Nadia Roberts (1:11-cr-199) (E.D. California) | 26 U.S.C. § 7206(1) | 24-30 months | 12 months and 1 day imprisonment |

In each of these cases, the defendant received either a sentence of probation, or a sentence of incarceration below the advisory guideline range. However, unlike Dr. Ahuja, each of these defendants accepted responsibility for their criminal conduct prior to indictment, thereby sparing the government the time and expense of a trial. A sentence of probation in this case, or a sentence of incarceration substantially below the guideline range, would give rise to an unwarranted sentencing disparity because it would treat Dr. Ahuja – who went to trial and denied culpability – the same as defendants who readily accepted responsibility for their crimes.

33

## III.   CONCLUSION

For the reasons set forth above, the government respectfully requests that the Court sentence the defendant to a term of incarceration within the advisory guideline range of 41-51 months.  This sentence is sufficient, but not greater than necessary, to address the sentencing factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

JAMES L. SANTELLE
United States Attorney

By:   s/ Melissa S. Siskind
MELISSA S. SISKIND
D.C. Bar # 984681
Attorney for the United States
Department of Justice, Tax Division
P.O. Box 972
Washington, D.C. 20004
Telephone: (202) 305-4144
Fax: (202) 616-1786
melissa.s.siskind@usdoj.gov

JOHN E. SULLIVAN
Senior Litigation Counsel
Department of Justice, Tax Division

TRACY M. JOHNSON
Assistant United States Attorney
United State's Attorney's Office for the
Eastern District of Wisconsin